## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No.: 1:14-cv-22441-CMA |
| | ) | |
| SALLY JIM | ) | |
| Defendant. | ) | |

## UNITED STATES' RENEWED MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

The United States hereby refiles its motion for summary judgment against Sally Jim, asking the Court to enter an order reducing federal income tax assessments to judgment and finding that Sally Jim owes $278,758.83 as of April 9, 2015, for the year 2001.[1]  The United States previously filed this motion on April 17, 2015.  Docket No. 111.  The Court subsequently *sua sponte* stayed this case pending resolution of the appeal in *Colley Billie v. United States*, No. 14-13843 (11th Cir.).  Docket No. 120.  On June 1, 2015, the Eleventh Circuit affirmed this Court's Order in *Colley Billie*.  *Colley Billie v. United States*, No. 14-13843, 2015 WL 3450537 (11th Cir. June 1, 2015).  While the Eleventh Circuit did not finally resolve Sally Jim's claim that the income she received was exempt from tax by the Tribal General Welfare Exclusion Act, the Court held that "there is a high likelihood the present payments would not qualify as 'general welfare payments.'"  *Billie*, 2015 WL 3450537, at *4.  Following entry of the Eleventh Circuit's

---

[1] The Court previously granted the parties leave to file briefs of 30 pages regarding the United States' motion for summary judgment.  Docket No. 110.

order, the Court reopened this case, granting the United States leave to refile its summary judgment motion.

Based on the undisputed facts, defendant Sally Jim received taxable income in the year 2001.  Sally Jim's income includes distributions of over $270,000 from the Miccosukee Tribe of Indians, in addition to wages and other income.  Despite receiving such income, Sally Jim failed to file a federal income tax return or fully pay her taxes.  Sally Jim cannot identify any applicable exemption from federal taxation for the distributions she received, and she cannot substantiate her claims that such distributions represent tribal general welfare or income from untaxed tribal lands.  Additionally, Sally Jim has no defense to penalties for her failure to file tax returns and her failure to pay her taxes.  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court should grant the United States summary judgment and enter judgment in favor of the United States for $278,758.83 as of April 9, 2015, the amount Sally Jim owes in unpaid taxes, interest, and penalties for the year 2001, plus interest and statutory additions accruing after April 9, 2015, until the amount is full paid.

## BACKGROUND

### A.    Sally Jim Received Taxable Income in 2001

In 2001, Sally Jim was a member of the Miccosukee Tribe of Indians.  United States' Statement of Undisputed Facts (SOF), ¶ 3.  As a member of the Tribe, she received quarterly distributions in *per capita* amounts based on the number of members in her household.  SOF ¶¶ 3, 4; Dep. of Gabriel Osceola, Farrior Decl. Ex. 13 (GO Dep.), 87:16-23.  Sally Jim received a total of $272,000 in distributions from the Miccosukee Tribe of Indians.  SOF, ¶ 4.  She also was employed in the Tribe's healthcare facility and received wages of $25,990 in 2001.  SOF , ¶ 5; Dep. of Sally Jim, Farrior Decl. Ex. 11 (SJ Dep.), 91:23-92:2.  Sally Jim admits to having

2

gambled in 2001 but claims that 2001 was a bad year.  SOF, ¶ 6.  She has no documentary evidence or specific recollection substantiating any losses that may offset gambling winnings.  SOF, ¶ 6.  Sally Jim did not timely file a tax return for the 2001 tax year.  SOF, ¶ 7.  Apart from a small amount of tax withheld from her wages, she failed to make estimated payments of tax or pay her tax liability when due.  SOF, ¶ 7.

A delegate of the Secretary of the Treasury made federal income tax assessments against Sally Jim in the amounts and at the times stated in the attached statement of undisputed facts.  SOF, ¶ 1.  A delegate of the Secretary of the Treasury additionally assessed against Sally Jim failure to file penalties pursuant to 26 U.S.C. § 6651(a)(1), failure to pay penalties pursuant to 26 U.S.C. § 6651(a)(2), and failure to pay estimated tax penalties pursuant to 26 U.S.C. § 6654.  SOF, ¶ 1; Nez Decl. Ex. A.  The Certificate of Assessments and Payments (Forms 4340) establishes the date and amount of each assessment and establishes that a delegate of the Secretary of the Treasury gave notice to Sally Jim of the assessments and made demand for payment as provided for by law.  SOF ¶ 2; Nez Decl. Ex. A.  Despite notices of assessments and demands for payment, Sally Jim has failed to fully pay her 2001 tax liability.  As of April 9, 2015, Sally Jim owed a total of $278,758.83 in tax, interest, and penalties for 2001.  SOF ¶ 2; Nez Decl. Ex. B.

**B.    The Tribe's Distribution Scheme to Evade Tax Responsibilities of Itself and Its Members**

Sally Jim received distributions from the Tribe under a tribal scheme to evade withholding tax and reporting requirements.  For decades prior to 1990, the Tribe made per capita distributions to its members, in generally *de minimis* amounts.  SOF, ¶ 8; Dep. of Colley Billie, Farrior Decl. Ex. 12 (CB Dep.), 61:10-18.  Around 1990, the Tribe started operating its gaming facility referred to as the Bingo Hall or MIBG.  SOF, ¶ 9.  The Tribe's gaming facility

3

offers so-called class II gaming, including high-stakes bingo, poker, and video pull-tab machines. *See* 25 U.S.C.S. § 2703(7); SOF, ¶ 9.  When its gaming facilities began generating large amounts of income, the Tribe's ability to distribute large sums of money to its members increased.  SOF, ¶ 10.  On December 8, 1994, Congress added a provision to the Internal Revenue Code, requiring American Indian tribes to withhold federal income tax from any payment of net revenue from class II or class III gaming.  Uruguay Round Agreements Act, PL 103–465, December 8, 1994, 108 Stat 4809, Sec. 701 (codified at 26 U.S.C. § 3402(r)).

In response to the passage of this provision, the Tribe devised a scheme to argue that its distributions did not constitute "net revenue" from gaming.  *See* SOF, ¶ 11; Gen. Council Minutes, Feb. 2, 1995, Farrior Decl. Ex. 1, at L000338-39 (noting passage of "the new law placing taxation on payments made to tribal members from Indian Gaming profits" and approving Tribe's "Gross Receipts Tax Ordinance").  The Tribe enacted a so-called "gross receipts tax" or "gross receipts license fee" which it applied to its gaming facility.  SOF, ¶ 11; Tribal Tax Ordinance, Farrior Decl. Ex. 2.   The Tribe's license fee is a percentage of the gross revenue of the Bingo Hall.  SOF, ¶ 11.  The Tribe places the license fee into what it terms a NTDR ("non-taxable distributable revenue") account.  *See* SOF, ¶ 11; Memo. from B. Cypress to Mike Hernandez, Re: N.T.D.R. Account, Feb. 27, 1995, Farrior Decl. Ex. 3 ("In this new account I want you to deposit the 'Tribal Tax' collected at the Miccosukee Bingo.  The funds in this account will be evenly distributed to our members periodically.").  Sally Jim received distributions from the Tribe pursuant to this scheme.

The Tribe initially set the license fee at 6.5% of gross revenue in 1995.  SOF, ¶ 12.  The Tribe later increased the fee to more than 8% of gross revenue.  SOF, ¶ 12.  Since its establishment, the Tribe has made per capita distributions to tribal members from its NTDR

4

account.  SOF, ¶ 12.  In spite of the Tribe's scheme, virtually all, if not all, of the Tribe's distributions constitute, in substance, distributions of net gaming revenue.[2] SOF, ¶ 13; GO Dep., 27:5-16 ("[A]ll other operations [other than Miccosukee Indian Bingo and Gaming] are not substantial . . . . The enterprises, they don't make any money.").

The Tribe makes decisions through its Business Council and its General Council.  The General Council of the Tribe consists of every member of the Tribe over 18.  SOF, ¶ 14.  The General Council meets quarterly.  SOF, ¶ 14.  Sally Jim attended numerous General Council meetings.  SOF, ¶ 15.  For those she did not attend, she sometimes learned of the substance of the meetings from her sisters.  SOF, ¶ 15.  At each meeting, the finance director or treasurer reports to the General Council that funds are available in the NTDR account for distribution. SOF, ¶ 16.  The General Council then approves making a distribution and sets a distribution date, usually about 30 days from the date of the meeting.  SOF, ¶ 16.  On the date of distributions, the head of household generally picks up a check equal to the per capita amount of the distribution multiplied by the number of members in that person's household.  SOF, ¶ 16.  The amount of the distribution is equal to all members but the specific amount of the check may vary depending on whether a tribal member took a loan in advance of the distribution, whether a tribal member

_____

[2] The United States has undertaken considerable efforts to determine the exact amount, if any, of tribal distributions constituting something other than net revenue from the Tribe's gaming operations.  After a lengthy discovery dispute, the Court ordered the Tribe to provide a representative pursuant to Rule 30(b)(6) to answer questions regarding the Tribe's finances. Docket No. 95.  The Tribal representative arrived unprepared to answer such questions.  *E.g.*, GO Dep., 36:3-38:2.  *But see* GO Dep., 123:8-127:3 (noting that tribal enterprises overall did not make a profit without assistance from gaming revenue).  The United States continues to seek Court-ordered discovery regarding the exact nature of the Tribe's distributions, but, for purposes of this motion, the United States will rely on the indisputable fact that all or virtually all of the Tribe's per capita distributions in substance constituted distributions of net revenue from gaming.

directed the Tribe to deposit a certain amount in a brokerage account for the member's benefit, and whether the tribal member directed the Tribe to make a large purchase for the member's benefit.  SOF, ¶ 16.  The Tribe's distributions are not based on the needs of the recipient, and the only guideline to be eligible for distribution is that the recipient must be a member of the Tribe. SOF,¶ 17; Meeting Notes, August 1, 2006, 0027, Farrior Decl Ex. 4  ("Per Marrero and Lehtinen – none of the payments were need based - they were equal to each tribal member").  The Tribe "cashes" most tribal members' checks immediately, essentially handing out prepared envelopes full of cash.  SOF, ¶ 17.

During 2001, Sally Jim had four eligible members of her household for whom she received per capita distributions.  SOF, ¶ 18.  The per capita distributions were solely within her control.  SOF, ¶18.  She directed a portion of her distribution to be placed in an account ostensibly for the benefit of one of her daughters, though she retained access to the money and eventually spent it on household expenses.  SOF, ¶ 18.

**C.    All Tribal Members Including Sally Jim Knew or Should Have Known Distributions Were Taxable**

At all relevant times, tribal members, including Sally Jim, were aware or should have been aware that distributions were taxable.  The leaders of the Tribe repeatedly discussed at General Council meetings the importance of hiding these distributions from the IRS.  SOF, ¶ 19. From before 1995 to 2009, Billy Cypress was chairman of the Tribe.  SOF, ¶ 19.  Although Chairman Cypress told tribal members that distributions from the Tribe were not subject to federal income tax and instructed members not to report distributions on their federal income tax returns, Cypress often instructed members at General Council meetings not to disclose that they were receiving distributions to persons outside the Tribe.  SOF, ¶ 19.  His primary message was that "distribution monies are non-taxable," but "if the IRS were to find out about these monies,

12627317.1

then we could end up being taxed." SOF, ¶ 19; Gen. Council Minutes, Aug. 3, 2000, Farrior

Decl. Ex. 6, at L000443. Sally Jim recalls Billy Cypress making this statement. SOF, ¶ 19. As

part of Cypress's scheme to hide the distributions from the IRS, Cypress repeatedly instructed

members not to report distributions on credit applications. These instructions are reflected in

General Council minutes:

> Chairman Cypress stated Administration Office is still receiving calls regarding
> tribal members listing NTDR payments on their credit applications. He stated
> Business Council has repeatedly asked tribal members not to do this as it could
> cause consequences. He added Business Council is trying very hard to protect
> tribal members from facing problems with IRS but if they (tribal members)
> continue to list this as income then all Business Council effort will be for naught.
> If gaming revenue taxation should be imposed then IRS can fine tribal members
> for the amounts they have listed on these applications.

*E.g.*, Gen. Council Minutes, Nov. 2, 1995, Farrior Decl. Ex. 7, at L000357-58. Thus, minutes

reflect Cypress warning members not to report distributions on credit applications specifically to

avoid being taxed on such distributions. SOF, ¶ 19. Sally Jim was aware of these instructions

and pursuant to these instructions did not report distributions as income when applying for

financing to purchase a truck. SOF, ¶ 20. Cypress additionally instructed members not to cash

their distribution checks in places where they would be reported to the IRS. SOF, ¶ 21; Gen.

Council Minutes, May 4, 2000, Farrior Decl. Ex. 8, at 6 ("[I]f a tribal member should cash their

NTDR check at the gaming facility, this will be reported to the IRS as required by the banking

laws. He stated that the only way the tribal member's money will not be reported to the IRS is if

they cash their checks at the Administration office . . . . He stated if a tribal member also has a

banking account (with a substantial amount of money) then this too will be reported and IRS will

investigate into how the money was obtained."). Sally Jim was aware of these instructions.

SOF, ¶ 19. And Tribal members were told to allow the Tribe to make large purchases for them

so that the IRS could not trace purchases to individual tribal members. SOF, ¶ 22.

12627317.1

Cypress also notified members that the Tribe would keep a reserve should the members ultimately have to pay taxes on their distributions.  SOF, ¶ 23.  Cypress's statement that distributions were not taxable but that the Tribe would nonetheless establish a reserve raised concerns among tribal members.  SOF, ¶ 23; CB Dep., 142:23-143:5 ("I remember we were asking -- we meaning the General Council were asking among ourselves, why is this money not subject to taxation?  If we are being told it is not taxable, then why are we setting aside monies?  We are being told we don't have to pay taxes but we are going to put this aside and hope that you don't have to use it.").

Finally, Cypress discussed on several occasions that other tribes' members were paying tax on distributions.  SOF, ¶ 24; Farrior Decl. Ex. 1, at L000346; Farrior Decl. Ex. 7, at L000359 ("[The Seminole Tribe] have questioned how the Miccosukee Tribe with little or no formal education has managed to avoid paying these taxes and the Seminole Tribe with a highly educated staff are being made to pay the taxes.").  Sally Jim, as a tribal member who was aware of Cypress's proclamations at General Council meetings, should have been aware that she owed tax on distributions of gaming revenue and that the Tribe was counseling tax evasion rather than non-taxability.

## ARGUMENT

The undisputed facts establish that Sally Jim owes taxes not only on her wages and other income, but also on the distributions from the Tribe.  Sally Jim does not dispute that she owes taxes on her wage income, although she admits failing to file a timely tax return reporting her wages.  She disputes the amount of gambling income she earned, but she has not provided any evidence to substantiate her claims.  She does not dispute that she received quarterly distributions from the Miccosukee Tribe totaling $272,000 in 2001.  Based on commonly

8

applicable tax laws and specific statutes addressing distributions of tribal gaming revenue, the distributions to Sally Jim constitute taxable income.  Nor can Sally Jim identify an applicable exemption from taxation.  The distributions are not general welfare payments, because they do not represent payments or services provided to Sally Jim under an Indian Tribal Government program designed to promote the general welfare, and because the benefits are lavish and extravagant. The distributions do not constitute income from the land.  Thus, the Court should find that Sally Jim owes tax, interest, and penalties for the amounts she received in 2001.

**I.      Standard of Review**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"  Fed. R. Civ. P. 56(c).  Summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Because the United States has submitted proof of assessments against Sally Jim, she has the burden in this case to prove the distributions are not subject to income tax:

> In reducing an assessment to judgment, the Government must first prove that the assessment was properly made.  The Government's submission of a Form 4340 establishes such a presumption.  Once the Form is provided, the taxpayer must then prove that the assessment is erroneous in order to prevail.

*United States v. White*, 466 F.3d 1241, 1248-49 (11th Cir. 2006) (citations omitted).  A Form 4340 is presumed correct and provides *prima facie* evidence of the adequacy and propriety of the tax assessments.  *See United States v. Chila*, 871 F.2d 1015, 1018 (11th Cir. 1989), *cert. denied*, 493 U.S. 975 (1989); *Roberts v. Comm'r*, 329 F.3d 1224, 1228 (11th Cir. 2003).  Here, the United States has submitted a Form 4340 showing the assessments against Sally Jim; Nez Decl. Ex. A, thus, the burden shifts to her to prove that the United States' assessments are erroneous.

9

II.     **Sally Jim Owes Federal Income Tax on Distributions from the Tribe**

A.     **Generally Applicable Tax Laws Require Tribal Members to Pay Tax on Distributions**

Sally Jim owes federal tax on all her income, including distributions from the Tribe,

unless she can identify an explicit statutory or treaty-based exemption.  Federally-recognized

American Indian tribes are not subject to federal income tax, though they may be subject to other

types of tax including, but not limited to, employment tax and federal income tax withholding.

*E.g.*, *Uniband, Inc. v. Comm'r*, 140 T.C. 230, 241 (2013).  Individual tribal members enjoy no

such exemption from income tax.  Federal tax laws require all taxpayers to include in gross

income for federal income tax purposes "all income from whatever source derived."  26 U.S.C. §

61.  Income has long been defined to include any "accession[] to wealth, clearly realized, and

over which the taxpayers have complete dominion."  *Comm'r v. Glenshaw Glass Co.*, 348 U.S.

426, 431 (1955).  American Indians are subject to the same requirement to pay income taxes as

non-Indians, unless exempted by a treaty or agreement with the tribe or an act of Congress.

*Squire v. Capoeman*, 351 U.S. 1, 6 (1956); *Doxtator v. Comm'r*, T.C. Memo. 2005-113 (2005)

(collecting cases); *see* Rev. Rul. 67-284, 1967-2 C.B. 55.  In Sally Jim's case, she admits

receiving distributions in the form of checks from the Tribe which she immediately cashed. SOF,

¶ 18; SJ Dep., 36:18-37:6, 43:12-44:20.   Ms. Jim was free to spend her distributions however

she wanted and, in fact, claims to have spent her entire distributions on household expenses,

among other things.  SOF, ¶ 18; SJ Dep., 41:16-42:18, 134:8-10.  Thus, Sally Jim received

income in the form of distributions from the Tribe, and she has the burden of identifying an

exemption to justify her claim that the distributions are not taxable.

**B.**     **Specific Statutory Provisions Also Establish Congressional Intent to Tax Per Capita Distributions of Gaming Revenue**

In addition to generally applicable tax laws making Sally Jim's distributions taxable, specific provisions of the Indian Gaming Regulatory Act (IGRA) and the Internal Revenue Code make clear that the Tribe's distributions of its gaming revenue to its members, including Sally Jim, are subject to taxation.  IGRA provides that tribes may not make per capita distributions of net gaming revenue (from class II or class III gaming) unless they meet certain requirements, including the requirement to obtain approval from the Secretary of Interior for a revenue allocation plan, the requirement that such payments are subject to federal taxation, and the requirement to notify tribal members of such tax liability when the payments are made.  25 U.S.C. § 2710(b)(3) and (d)(1)(ii).  Sally Jim may argue that the payments are not subject to IGRA because the Tribe has failed to put in place an approved revenue allocation plan pursuant to that Act.  However, mere failure to abide by IGRA does not mean that the Tribe's payments should escape taxation once distributed to the members or that the Tribe's per capita distributions are not subject to other provisions in the Act.  *Campbell v. Comm'r*, 28 F. App'x 613, 615 (8th Cir. 2002) ("[The Indian Gaming Regulatory Act] means the tribe must have an approved plan in effect before making the per capita distributions, not that tribes without such a plan can make tax-free per capita distributions.").  During the tax year at issue, the Tribe distributed per capita payments to its members, including Sally Jim.  SOF, ¶ 17.  The Tribe funded its distributions with net revenue from gaming.  SOF, ¶ 13.  The specific provision in IGRA requiring tribes to withhold from and report such distributions establish Congressional intent to tax Sally Jim's receipt of distributions from the Tribe.

As noted above, the Internal Revenue Code additionally contains a provision requiring tribes to withhold income tax from any distribution of net gaming revenue.  Section 3402(r) of

11

Title 26 states that "[e]very person, including an Indian tribe, making a payment to a member of an Indian tribe from the net revenues of any class II or class III gaming activity conducted or licensed by such tribe shall deduct and withhold from such payment a tax in an amount equal to such payment's proportionate share of the annualized tax."  Here, the Tribe makes distributions of net revenue from its class II gaming facility.  SOF, ¶ 13.  Thus, a specific provision of the Internal Revenue Code required the Tribe to withhold income tax from its payment to Sally Jim, further establishing Congressional intent to tax the distributions at issue.

Distributions to Sally Jim remain subject to federal income tax even if the Court finds a disputed issue of material fact whether the distributions are per capita distributions of gaming revenue.  *Doxtator*, T.C. Memo. 2005-113, at *9 ("In any event, these payments would be subject to Federal income tax regardless of their status as per capita payments.").  Nonetheless, provisions in IGRA and 26 U.S.C. § 3402(r) establish that Sally Jim's distributions are taxable as per capita distributions of gaming revenue and discredit Sally Jim's claimed exemptions discussed below.

### C.    Distributions Are Not Excludable from Income as General Welfare

Neither the longstanding administrative practice of excluding general welfare payments from taxable income nor the recently passed Tribal General Welfare Exclusion Act exempt the Tribe's distributions to Sally Jim from taxation.  Historically, where Indian tribal governments act to provide general welfare-type benefits of a kind traditionally provided by federal, state or local governmental bodies, the benefits are treated the same as benefits from any governmental entity and not included in taxable income of the recipient.  This is true, however, only if the governmental benefit is paid out of a welfare fund, administered based upon need (usually tested by income level), and not paid as compensation for services.  The recently passed Tribal General

12

Welfare Exclusion Act of 2014 codified, but did not supplant, the decades old administrative general welfare exclusion for certain benefits provided under governmental programs, including American Indian Tribal government programs.  Indeed, as detailed above, more specific statements from Congress demonstrate its desire to tax per capita distributions of gaming revenue; thus, if Sally Jim wanted to take advantage of the general welfare exclusion she would first have to disprove that the distributions she received were per capita distributions of gaming revenue.   The Tribe's distribution scheme fails to meet other requirements in the Tribal General Welfare Exclusion Act as well.  For these reasons, Sally Jim may not rely on the Tribal General Welfare Exclusion Act to avoid liability in this case.

       1.     **The Meaning of "General Welfare"**

Although the Internal Revenue Code contained no statutory exclusion for "welfare benefits" prior to the enactment of 26 U.S.C. § 139E (The Tribal General Welfare Exclusion Act), the IRS has long taken the position that government disbursements based on needs of the recipient are not taxable income to the recipient.[3]  Courts refer to this exclusion of governmental

---

[3] *See e.g.,* Rev. Rul. 57-102, 1957-1 C.B. 26 (government benefits paid to blind persons under a state public assistance law are not income); Rev. Rul. 74-153, 1974-1 C.B. 20 (government payments to assist certain adoptive parents with support and maintenance of adoptive children are not income); Rev. Rul. 76-395, 1976-2 C.B. 16, 17 (government grants to assist low-income city inhabitants to refurbish homes are not income); Rev. Rul. 76-144, 1976-1 C.B. 17 (government grants to persons eligible for relief under the Disaster Relief Act of 1974 are not income); Rev. Rul. 78-170, 1978-1 C.B. 24 (government payments to assist elderly or permanently disabled low-income persons with utility costs are not income); Rev. Rul. 98-19, 1998-1 C.B. 840 (relocation payments received by residents of a disaster area to help defray the expenses of moving from a flood-damaged residence); Notice 99-3, 1999-1 C.B. 271 (payments received as Temporary Assistance to Needy Families (TANF) by individuals performing work under state welfare-to-work programs); Notice 2011-14, 2011-11 I.R.B. 544 (payments made under the Emergency Homeowners' Loan Program with funds authorized by the Dodd-Frank Act, to help homeowners who were at risk of losing their homes).

12627317.1

benefits based on need as the "general welfare exclusion."  *Maines v. Comm'r*, No. 14699-12,

2015 WL 1062997, at *9 (T.C. Mar. 11, 2015); *Bailey v Comm'r*, 88 T.C. 1293, 1299-1301

(1987); *Graff v. Comm'r*, 74 T.C. 743, 753-754 (1980), *aff'd per curiam*, 673 F.2d 784 (5th Cir.

1982); *Bannon v. Comm'r*, 99 T.C. 59, 63 (1992).[4]  To qualify under the exclusion, the payments

must: (1) be made to an individual under a governmental program; (2) be for the promotion of

the general welfare (that is, based on need); and (3) not represent compensation for services.

*Maines*, 2015 WL 1062997, at *9; Rev. Rul 2003-12, 2003-1 C.B. 283.  Grants received under

social welfare programs that do not require recipients to establish individual need are not

excluded.  *Maines*, 2015 WL 1062997, at *9; *Bailey v. Comm'r*, 88 T.C. at 1300; *see Foley v.

Comm'r*, 87 T.C. 605, 609 (1986) ("We are aware that payments made by the United States

pursuant to certain social benefit programs as relief from poverty, unemployment, sickness,

aging or lack of education, may be excluded, at least in part, from income. The payments

received by petitioner were not predicated on need nor were they made in furtherance of a social

program[; thus the payments were includible in taxable income].").  This case law establishes

that "general welfare" in the federal tax context means "based on need."

## 2.    IRS Guidance on Tribal General Welfare Benefits

Prior to the passage of the Tribal General Welfare Exclusion Act, the IRS issued

guidance on how the general welfare exclusion applies to tribes.  Specifically, in 2011, the IRS

invited comments concerning the application of the exclusion to Indian tribal government

programs that provide benefits to tribal members.  Notice 2011-94, 2011-49 I.R.B. 834, 2011

---

[4] In a different context, the Supreme Court, referring to a New York State low-income housing subsidy, distinguished income from welfare benefits, stating: "In a real sense, it no more embodies the attributes of income or profits than do welfare benefits, food stamps, or other government subsidies." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 855(1975).

12627317.1

WL 5555589.  After receiving comments, the IRS proposed issuance of a revenue procedure, Notice 2012-75, 2012-51 I.R.B. 715, and ultimately issued Rev. Proc. 2014-35, 2014-26 I.R.B. 1110, on June 3, 2014. The IRS guidance reaffirmed that "[p]ayments by Indian tribal governments qualify for the general welfare exclusion if the payments are (1) made pursuant to a governmental program of the tribe; (2) for the promotion of general welfare (that is, based on individual or family need); and (3) not compensation for services."  Rev. Proc. 2014-35, at 1111. The IRS guidance further established that for certain programs the IRS "will conclusively presume that individual need is met" for tribal members receiving such benefits.   *Id*. at 1114. This conclusive presumption did not do away with the requirement that a program be based on need, but did alleviate the requirement for tribes or recipients to provide individualized proof that such programs are based on need.  The IRS applied the presumption to an illustrative list of 23 types of programs such as housing programs, educational programs, elder and disabled programs, and cultural and religious programs.  Rev. Proc. 2014-35, § 5.02.  While the IRS guidance stated that for some programs the IRS will presume that the need requirement will be met and that tribes may fund general welfare programs with gambling revenue, the IRS guidance reiterated that "per capita payments to tribal members of tribal gaming revenues that are subject to the Indian Gaming Regulatory Act are gross income under [26 U.S.C.] § 61 . . . and are not excludable from gross income under the general welfare exclusion or this revenue procedure." *Id*. at 7.

The Tribe's distributions to Sally Jim do not qualify for the general welfare exclusion in Rev. Proc. 2014-35 because they fail the general criteria for such programs and are categorically different from those programs that the IRS "conclusively presume[s]" to be for general welfare. *See e.g.*, Rev. Proc. 2014-35, at 16 (requiring benefits to be provided pursuant to written

12627317.1

guidelines); § 5.02 (listing programs designed to meet some need of the recipient rather than programs providing cash benefits for unfettered use by the recipient).  Additionally, the Tribe's program is in substance a program to make per capita distributions of gaming revenue, SOF, ¶¶ 13, 17, which are explicitly identified as taxable in the Revenue Procedure.

### 3.     Passage of the Tribal General Welfare Exclusion Act

On September 26, 2014, President Obama signed into law the Tribal General Welfare Exclusion Act of 2014, Pub. L. No. 113-168, 128 Stat. 1883.  The Act amends the Internal Revenue Code by adding § 139E, the effect of which was generally to codify Rev. Proc. 2014-35.  Section 139E(a) provides that "gross income does not include the value of any Indian general welfare benefit."  An "Indian general welfare benefit" includes:

> any payment made or services provided to or on behalf of a member of an Indian tribe (or any spouse or dependent of such member) pursuant to an Indian tribal government program, but only if –
>
> > (1) the program is administered under specified guidelines and does not discriminate in favor of members of the governing body of the tribe, and
> >
> > (2) the benefits provided under such program—
> >
> > > (A) are available to any tribal member who meets such guidelines,
> > >
> > > (B) are for the promotion of general welfare,
> > >
> > > (C) are not lavish or extravagant, and
> > >
> > > (D) are not compensation for services.

26 U.S.C. § 139E(b).

The House of Representatives passed the Tribal General Welfare Exclusion Act by suspension of the rules and the Senate by unanimous consent.  The bill did not go through any committee markups, and there are no committee reports or hearings for the bill.  The only legislative history for the bill includes floor statements by members of the House and Senate. Statements from members of Congress may not be interpreted to change the plain language of a

16

12627317.1

statute, *United States v. Navajo Nation*, 537 U.S. 488, 511 n.16 (2003) (finding that "lofty statements in legislative history" did not apply an "extratextual" requirement to the Executive Branch), and floor statements by their nature are a less reliable form of legislative history. *United States v. Rentz*, 777 F.3d 1105, 1122-23 (10th Cir. 2015) (Hartz, J., concurring); *Kenna v. U.S. Dist. Court for C.D. Cal.*, 435 F.3d 1011, 1015 (9th Cir. 2006) ("Floor statements are not given the same weight as some other types of legislative history, such as committee reports, because they generally represent only the view of the speaker and not necessarily that of the entire body."); *Szehinskyj v. Att'y Gen. of U.S.*, 432 F.3d 253, 256 (3d Cir. 2005) ("The law is what Congress enacts, not what its members say on the floor.").

The plain language of the statute in this case indicates that Congress did not intend for per capita distributions, primarily of gaming revenue, to escape taxation. A benefit for the promotion of "general welfare" as described above and as used in the statute means that a benefit as an initial matter is provided based on the needs of the recipient. *See supra*, part II(C)(1); 26 U.S.C. § 139E. The plain language of the statute does not alter this definition nor suggest any intent to abrogate provisions of IGRA, 25 U.S.C. § 2710(b)(3), or the Internal Revenue Code, § 3402(r) establishing Congressional intent to tax per capita distributions of gaming revenue. Based on the plain language of the Tribal General Welfare Exclusion Act, per capita distributions by tribes, primarily of gaming revenue, remain taxable income in the hands of the recipient.

The floor statements in this case support the plain language of the statute and reflect Congress's intention in passing the Tribal General Welfare Exclusion Act to "generally codif[y]"

12627317.1

existing IRS guidance (specifically Rev. Proc. 2014-35) and IRS practice.[5]  Additionally, a

colloquy between Senators Moran and Wyden discussed incorporating the IRS's guidance

regarding the demonstration of individualized need in Rev. Proc. 2014-35:

> Mr. MORAN: I ask the chairman, is it your understanding that in interpreting the meaning of the requirement under the bill that Indian Tribal government programs be ''for the promotion of the general welfare,'' it is intended that the IRS will apply this requirement in a manner no less favorable than the safe harbor approach provided for in Revenue Procedure 2014–35, and in no event will the IRS require an individualized determination of financial need where a Tribal program meets all other requirements of new section 139E as added by the bill?

> Mr. WYDEN: The Senator is correct. I want to express my full support for the administrative guidance issued by the IRS in Rev. Proc. 2014–35.

*See* Colloquy on H.R. 3043 and S. 1507 between Senator Moran and Senator Wyden,

Congressional Record S5686 (Sept.17, 2014).  Thus, the senators demonstrated their intent to

incorporate the IRS's illustrative list of categories of programs "conclusively presume[d]" to

meet the individualized need requirement.  This discussion did not change the common

definition of "general welfare" as a program based on need nor did it write the general welfare

requirement out of the statute altogether.  As established above, the Tribe's distribution scheme

varies markedly from the illustrative list of programs in Rev. Proc. 2014-35, and Rev. Proc.

---

[5] 160 Cong. Rec. E1469-02 (Sept. 16, 2014) (statement of Rep. Reed) (citing Rev. Proc. 2014-35); *see also* 160 Cong. Rec. H7599-02 (Sept. 16, 2014) (statement of Rep. Kind) ("[T]his legislation would codify existing IRS practice . . . ."); 160 Cong. Rec. H7601 (Sept. 16, 2014) (statement of Rep. Nunes) ("The provisions in H.R. 3043 would codify this IRS guidance, specifically applying the general welfare exclusion to Indian tribe and payments received by tribal members, their spouses and children.").

2014-35 explicitly states that per capita distributions of gaming revenue remain taxable.  Floor statements incorporating IRS guidance regarding general welfare do not assist Sally Jim.[6]

Moreover, the Court should reject any argument by Sally Jim or the Tribe, based on floor statements, that the use of the term "general welfare" is ambiguous and that therefore the Court should ignore the "general welfare" requirement in applying § 139E.  "[O]ne of the most basic interpretive canons" requires courts to "construe[ ] [the statute] so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotations omitted); *see also Nunnally v. Equifax Info. Serv., LLC*, 451 F.3d 768, 773 (11th Cir.2006) (quoting *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).  Here, the "general welfare" requirement in the Tribal General Welfare Exclusion Act must mean something, *i.e.*, its commonly accepted definition, and the Court should decline any request to write that requirement out of the statute.

### 4.    The Tribe's Distributions to Sally Jim Were Not for the Promotion of General Welfare

Sally Jim may not rely on the exclusion in the Tribal General Welfare Exclusion Act because the Tribe's distributions were not for the promotion of general welfare as that term is used in the statute.  26 U.S.C. § 139E.  A program for the promotion of general welfare is a program based on the needs of the recipient.  *E.g.*, *Maines*, 2015 WL 1062997, at *9.  While

---

[6] Additionally, there is a difference between not requiring an individualized showing of need and completely ignoring that a program must be designed to meet a need of the recipient.  For example, under Rev. Proc. 2014-35, the IRS may exclude from taxable income a housing benefit provided by a tribe to all its members regardless of whether an individualized member demonstrates a need for the housing benefit.  Such a safe harbor provision does not mean that all benefits in whatever form are for the purposes of general welfare or that the program need not be designed in the first instance to meet some need of the tribal members, as Sally Jim is expected to argue.

12627317.1

Congress recognized in floor statements that the IRS will not require specific showing of individualized need to exclude certain payments from taxable income, per capita distributions of money, primarily gaming revenue, bearing no relation to the need of the recipient, remain taxable income in the hands of the recipient.   Here, it is undisputed that the Tribe's distributions were not based on the needs of the recipient.   SOF, ¶ 17.   The Tribe made distributions – often in cash - in equal amounts based on the number of tribal members in a recipient's household.   SOF, ¶ 17; GO Dep., 52:21-55:5.   Whether the Tribe made a distribution depended only on whether funds were available for distribution and whether the General Council of the Tribe approved distribution, which the General Council appears to have done whenever funds were available.   SOF, ¶ 16.   The amount of distributions depended only on how much funds were available, which in turn depended on the performance of the Tribe's gaming facility.   SOF, ¶ 16.   Because the Tribe's distributions depended only on whether money was available for distribution and were not designed to meet any need of the recipient, the Tribe's distributions were not for the promotion of general welfare as that term is used in the Tribal General Welfare Exclusion Act.

Another reason that the distributions do not constitute general welfare is because the Tribe already had in place several other programs based on need, fully providing for Sally Jim's general welfare.   The Tribe has represented to the IRS that "Miccosukee tribal members . . . are wholly dependent members, having their housing, medical care, education, police and fire protection and general welfare provided by the Tribe."   Docket No. 46-1, at 25, *United States v. Billie*, No. 14-20938 (S.D. Fla. Dec. 10, 2014).   Sally Jim lives in a house provided by the Tribe. SOF, ¶ 25.   She additionally has several programs available to her and the members of her household, including programs providing education, medical care, and elder care.   SOF, ¶ 25. Additionally, if tribal members are unable to pay bills such as their electric bill or pay for

necessary repairs to their homes, the Tribe will step in and cover those costs.  SOF, ¶ 25.  In

communications with the IRS, the Tribe itself recognized the distinction between per capita

distributions from its NTDR account and its general welfare programs, addressing each in

separate sections of its July 12, 2010 appeal memo to the IRS:

> In this section, we will demonstrate that payments, *other than distributions from
> the NTDR Account*, are excludable from income because they are either particular
> welfare payments, loans to Tribal members or reimbursements of outlays by
> Tribal members on behalf of the Tribe.

Docket No. 46-1, at 50, *United States v. Billie*, No. 14-20938 (S.D. Fla. Dec. 10, 2014)

(emphasis added).  Thus, the Tribe has distinguished between its general welfare programs and

its per capita distributions.  This discussion is not meant to criticize the Tribe for providing for

the general welfare of its members; rather, it highlights the distinction between programs

designed to meet tribal members' needs, of which the Tribe has many, and the Tribe's scheme to

distribute gambling revenue to tribal members in extravagant, *per capita* amounts.

### 5.    The Tribe's Distribution Scheme Fails Other Provisions of § 139E

The Tribe's distributions were not based on any specific guidelines and are lavish and

extravagant; therefore, they do not qualify as general welfare under the Tribal General Welfare

Exclusion Act.

The Tribal General Welfare Exclusion Act states, in addition to being for the promotion

of general welfare, a program must be "administered under specified guidelines" to be excluded

from taxable income.  26 U.S.C. § 139E(b)(1).  Implicit in the statutory scheme and the use of

the plural term "guidelines" is that the guidelines must include more than that a benefit is

available to all tribal members.  Here, the Tribe has no written or specified guidelines for its

distribution scheme, and in fact, the Tribe's only asserted guideline to receive a distribution is

21

that a recipient must be a member of the Tribe.  SOF, ¶ 17; GO Dep., 88:15-89:7.  Based on a plain reading of the statute, this guideline is too general to satisfy the statutory requirement that a payment be made pursuant to a program administered under specified guidelines and be for the promotion of general welfare.  The Tribe appears to have resisted formalizing its distribution scheme, which would require a distribution plan to be filed with the Secretary of the Interior and would have required federal income tax withholding and notifying the tribal members that the distributions are subject to federal income taxation.  The Tribe's conscious decision not to have specific guidelines has consequences – *i.e.*, the distributions do not qualify as excluded from tax under the Tribal General Welfare Exclusion Act.

The distributions fail a further requirement:  the Act additionally requires that distributions must not be lavish or extravagant to be excluded from taxable income.  The Act empowers the Secretary of the Treasury, in consultation with a Tribal Advisory Committee established by the Act, to "establish guidelines for what constitutes lavish or extravagant benefits with respect to Indian tribal government programs."  26 U.S.C. § 139E(c)(3).  The Tribal Advisory Committee has not been assembled, and the Secretary has yet to release guidelines pursuant to this provision.  Nonetheless, the Court should not ignore this provision solely because the Secretary is still in the process of establishing guidelines.  *See Pittway Corp. v. United States*, 102 F.3d 932, 936 (7th Cir. 1996) (holding taxpayer did not escape taxation solely because Secretary of the Treasury had not issued regulations as directed by the statute); *Sundance Helicopters, Inc. v. United States*, 104 Fed. Cl. 1, 11 (2012) (noting that Congress did not intend for Treasury to defeat legislation by not making certain implementing regulations).  In 2001, the median household income in Florida was between $36,000 and $39,000.  Money Income in the United States: 2001, United States Census Bureau, *available at*

http://www.census.gov/hhes/www/income/data/incpovhlth/2001/statemhi.html.  In addition to her wages of $25,990, Sally Jim received $272,000 in distributions from the Tribe in 2001.  SOF, ¶¶ 4-5.  Payments of this magnitude, approximately seven times the median household income, would qualify under any definition of lavish or extravagant, especially considering that the Tribe already provides housing and other benefits to Sally Jim.

Given that the per capita distributions of gaming revenue were not for the promotion of general welfare, were not pursuant to specific guidelines, and were lavish and extravagant, it is not surprising that the Eleventh Circuit concluded that "there is a high likelihood the present payments would not qualify as 'general welfare payments.'"  *United States v. Billie*, No. 14-13843, 2015 WL 3450537, at *4 (11th Cir. June 1, 2015).

### D.     Distributions Are Not Excludable from Taxable Income as Income from the Land

Although in certain circumstances, tribal members may earn income from untaxed lands held in trust for their benefit and exclude such amounts from their taxable income, this exclusion does not apply here.  The exemption for income from certain tribal lands can be traced to the Supreme Court's decision in *Squire v. Capoeman*.  351 U.S. 1 (1956).  In *Squire*, the Supreme Court addressed provisions of the General Allotment Act of 1887, which restricted taxation of certain allotted lands.[7]  25 U.S.C. § 349.  The Supreme Court construed sections of the act "to create an express tax exemption for an Indian deriving income directly from his own trust allotment."  *United States v. Anderson*, 625 F.2d 910, 914 (9th Cir. 1980) (citing *Squire*, 351

---

[7] *See e.g.*, Taiawagi Helton, *Nation Building in Indian Country: The Blackfoot Constitutional Review*, 13-Fall Kan. J. L. & Pub. Pol'y 1, 6 (2003) (describing the General Allotment Act and the government's repudiated policy to allot community-held lands to individual tribal members).

12627317.1

U.S. at 1).  The exemption for income from the land generally does not apply to lands held in trust communally for the benefit of groups of tribal members.  *United States v. Anderson*, 625 F.2d 910, 913-14 (9th Cir. 1980) (collecting cases).[8]

Additionally, *Squire* and other cases have established that to qualify as income from the land for purposes of tax exemption the income must be "directly derived" from the land.  *See Critzer v. United States*, 597 F.2d 708, 713 (Ct. Cl. 1979).  This exemption, where it applies, exempts income from things like farming and ranching operations, oil and gas leases, and mineral deposits.  *Id*. (citing *Stevens v. Comm'r*, 452 F.2d 741 (9th Cir. 1971); *United States v. Daney*, 370 F.2d 791 (10th Cir. 1966); *Big Eagle v. United States*, 300 F.2d 765, 156 Ct.Cl. 665 (1962)).  This exemption does not apply to income generated more from commercial activity, including income from gaming.  *In re Cabazon Indian Casino*, 57 B.R. 398, 402 (9th Cir. 1985) ("The income derived from operating a casino stems in a far more important fashion from card playing, liquor sales and food preparation, than it does from the land alone."); *Doxtator v. Comm'r*, T.C. Memo. 2005-113 at * 9; *Campbell v. Commissioner*, T.C. Memo.1997–502. ("Income earned through the investment of capital or labor, such as restaurants, motels, tobacco shops, and similar improvements to the land, fails to qualify for the exemption . . . . Under the

---

[8] The rationale for this rule is based on the rationale in *Squire*.  There, the Supreme Court reasoned that when Congress set aside lands for use by an individual tribal member, taxing the tribal member on the income from the land might jeopardize the tribal member's interest in the land and contravene the will of Congress.  *See Anderson*, 625 F.2d at 914.  By contrast, taxing a tribal member who has no personal interest in the trust land does not jeopardize a tribe's ability to continue to benefit from a piece of trust land.  *Id*.  In at least one instance, Congress has explicitly exempted distributions of income from lands held by a tribe to tribal members from the members' taxable income, but this exemption does not apply to the lands at issue here.  *Cf.* 25 U.S.C. § 459e.

rationale of these cases, the income derived from the operation of a casino would not be derived directly from the land.").

Here, Sally Jim may not claim that her distributions are exempted as income from the land because the land is not held in trust for her personal benefit; rather, it is held for the benefit of the Tribe.  When asked to explain the claim in her amended complaint that the distributions are income from the land, Sally Jim responded by referring to documents, including a memorandum from Dexter Lehtinen and others to the IRS, dated June 28, 2006.  Resp. to Interrogatories, No. 5, at 6, Farrior Decl. Ex. 20.[9]  The memorandum by Dexter Lehtinen

---

[9] Sally Jim refers to this memorandum from Dexter Lehtinen despite the fact that the Tribe and one member on behalf of the class of tribal members, represented by Sally Jim's former counsel, sued Dexter Lehtinen for malpractice for issuing the opinions discussed in the memorandum. The complaint in that case asserted that Lehtinen's opinions that the Tribe's distributions were not taxable were false.  Complaint, at 22-28, *Miccosukee Tribe of Indians of Florida v. Lehtinen*, No. 11-39362-CA-21 (11th Jud. Cir. Fla. filed Nov. 28, 2011).  A copy of the complaint is filed with this Court at Docket No. 11-1 in *Cypress v. United States*, No. 14-cv-22066-KMW (S.D. Fla. Aug. 19, 2014).  Former counsel for Sally Jim additionally represented to the state court in that case that the distributions were subject to federal income tax and that the issue had been resolved:

> The Court [(referring to individual tribal member's liability for the years 2000 to 2005)]: And that's already been determined exactly what they owe?
>
> Mr. Roman: Yes
>
> The Court: Individually?
>
> Mr. Roman: Closed.  Yes.
>
> The Court: It's done?
>
> Mr. Roman: Done.  It cannot be taken back.  It includes taxes, penalties, and interest.  That money is owed.  It's in collection.  It's just a matter of how the government, how the U.S. Government determines it's going to go about collecting.

(continued...)

12627317.1

confirms that the lands allegedly generating the income at issue are in trust for the benefit of the

Miccosukee Tribe of Indians, and not Sally Jim personally.  SOF, ¶ 26; Lehtinen Memo, Farrior

Decl. Ex. 20, at 3-4 (citing 25 U.S.C. § 1750(5), (7)).  Thus, the exemption for income from the

land, even if applicable, does not extend to distributions to tribal members, such as Sally Jim.

 Sally Jim additionally may not claim the distributions represent income from the land

because the distributions were not directly derived from the land.  Here, the distributions were

derived primarily, if not entirely, from gambling revenue, not from the land.  SOF, ¶ 13.  Thus,

the exemption for income from the land cannot apply.  Judicial anti-abuse doctrines exist to

ensure that taxpayers are taxed in accordance with "the thing which the statute intended."

*Kirchman v. Comm'r*, 862 F.2d 1486, 1491 (11th Cir. 1989) (quoting *Gregory v. Helvering*, 293

U.S. 465, 469 (1935)).  The most fundamental such rule in applying the tax statutes is substance

over form, that is, the "basic maxim of tax law . . . that 'the substance of a transaction rather than

the form which it is cast, ordinarily determines tax consequences.'"  *Ocmulgee Fields, Inc. v.*

*Comm'r*, 613 F.3d 1360, 1368 (11th Cir. 2010) (quoting *Swaim v. United States*, 651 F.2d 1066,

1070 (5th Cir. 1981)).  "This principle 'is no schoolboy's rule; it is the cornerstone of sound

taxation.'"  *Southgate Master Fund, L.L.C. v. United States*, 659 F.3d 466, 479 (5th Cir. 2011)

(quoting, *inter alia*, *Comm'r v. Sw. Exploration Co.*, 350 U.S. 308, 315 (1956)).  Applying the

substance over form rule, Sally Jim may not argue that the Tribe somehow transformed the

distributions into something other than gaming revenue by using its "gross receipts license fee"

_____

(… continued)

 Tr. of Hrg., at 34, *Miccosukee Tribe of Indians v. Lehtinen*, 11-39362 (11th Jud. Cir. Fla. Dec.
23, 2013) Farr. Decl. Ex.10.  Lehtinen's memo was additionally accompanied by a memo to the
Tribe warning that the position in the memo is contrary to the position of the IRS and that the
Tribe would be prudent to reserve funds to pay the taxes discussed in the memo.  Lehtinen
Memo, June 26, 2006, Farrior Decl. Ex. 21.

26

to route the money into its NTDR account.  Sally Jim and the Tribe have yet to substantiate any claim that the distributions constitute anything other than distributions of gaming revenue. Accordingly, the distributions are not distributions of income from the land and are not exempt from taxation.[10]

### III.    Sally Jim Is Liable for Penalties

Sally Jim owes penalties for her failure to file a tax return and pay her taxes when due. Section 6651(a)(1) imposes a penalty against a taxpayer for failure to file a return on the prescribed date of 5 percent of the tax required to be shown on the return for each month or fractional month for which there is a failure to file, not to exceed 25 percent. 26 U.S.C. § 6651(a)(1). The penalty is added to the tax owed for the year "unless it is shown that such failure is due to reasonable cause and not due to willful neglect ..." 26 U.S.C. § 6651(a)(1). Similarly, § 6651(a)(2) imposes a penalty for failure to pay the tax liability shown on the taxpayer's return on or before the prescribed date. This penalty is also added to the tax owed "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." 26 U.S.C. § 6651(a)(2). The Supreme Court has explained that "Congress' purpose in the prescribed penalty was to ensure timely filing of tax returns to the end that tax liability will be ascertained and paid promptly." *United States v. Boyle*, 469 U.S. 241, 244 (1985).  "To escape the penalty, the taxpayer bears the heavy burden of proving both (1) that the failure did not result from 'willful

---

[10] In addition to the exclusions discussed above, the IRS recently released interim guidance clarifying that certain per capita distributions made to members of Indian tribes out of funds held in trust by the Secretary of Interior for the benefit of the tribe are excluded from the members' gross income.  Notice 2014-17, 2014-13 I.R.B 881. The distributions in this case, however, would not qualify for the exclusion discussed in the IRS' interim guidance because the funds paid to Sally Jim were not funds held in trust by the Secretary of Treasury.  Further, even if the funds were held in trust, they would likely be mischaracterized gaming revenue under Notice 2014-17.  *Id.* at 883.

27

neglect,' and (2) that the failure was 'due to reasonable cause.'" *Id*.; *In re Johnson Sys., Inc.*, 432

B.R. 306, 312 (Bankr. N.D. Ala. 2010) (citing *Staff It, Inc. v. United States*, 482 F.3d 792, 800–

801 (5th Cir. 2007); *United States v. Sanford*, 979 F.2d 1511, 1514 (11th Cir. 1992)).  While

"reasonable cause" is not defined in the Internal Revenue Code, *In re Carlson*, 126 F.3d 915, 941

(7th Cir. 1997), it is addressed in the Treasury Regulations:

> If the taxpayer exercised ordinary business care and prudence and was
> nevertheless unable to file the return within the prescribed time, then the delay is
> due to a reasonable cause.  A failure to pay will be considered to be due to
> reasonable cause to the extent that the taxpayer has made a satisfactory showing
> that he exercised ordinary business care and prudence in providing for payment of
> his tax liability and was nevertheless either unable to pay the tax or would suffer
> an undue hardship . . . if he paid on the due date.

26 C.F.R. § 301.6651-1(c)(1); *see also In re Sanford*, 979 F.2d 1511, 1514 & n.8 (11th Cir.

1992).  Thus, debtor must show that it exercised ordinary business care and prudence and was

nevertheless unable to file and pay its taxes.  26 C.F.R. § 301.6651-1(c)(1).  Reliance on a tax

expert can constitute reasonable cause for failing to meet a deadline "where taxpayer made full

disclosure to expert, relied on his advice, and did not otherwise know that the return was due."

*James v. United States*, No. 8:11-CV-271, 2012 WL 3522610, at *3 (M.D. Fla. Aug. 14, 2012)

(citing *Estate of La Meres v. Comm'r*, 98 T.C. 294, 316–17, 1992 WL 54258 (1992))

    Sally Jim cannot meet her burden of establishing that her failure to file a tax return and

pay tax was due to reasonable cause.  At her deposition, Sally Jim first refused to state why she

failed to file tax returns when due, citing her Fifth Amendment privilege.  SOF, ¶ 27; SJ Dep.,

56:5-16.  She later conceded that she had the paperwork ready to file her tax return for 2001, but

"just completely forgot to file that year."  SOF, ¶ 27; SJ Dep., 58:1-4.  Forgetting to file one's

return does not constitute reasonable cause.  *Halbin v. Comm'r*, T.C. Memo. 2009-18, at *4

(2009).  As for her failure to pay tax on distributions from the Tribe, the facts establish that Sally

Jim relied on Billy Cypress, not legal advice from the Tribe's attorney Dexter Lehtinen, in choosing not to report or pay tax on distributions.  SOF, ¶ 28, SJ Dep., 60:19-62:20 (describing Billy Cypress telling her not to include taxes on her tax return), 119:23-120:20 (denying that Lehtinen provided tribal members legal advice).  Billy Cypress is not a tax expert, SOF, ¶ 28, and given the basis for his advice, expressed in General Council meetings - essentially that the distributions are nontaxable only as long as the IRS does not know about them - Sally Jim cannot claim to have reasonably relied on his instructions to avoid penalties.  Sally Jim cannot show reasonable cause in failing to file her tax return or pay her taxes when due.

Sally Jim additionally cannot show that her failure to file and pay was not due to willful neglect. To invoke the reasonable cause defense to penalties, Sally Jim has the burden to establish a lack of willful neglect.  26 U.S.C. §§ 6651(a)(1); 26 C.F.R. § 301.6651-1(c)(1). "[T]he term 'willful neglect' may be read as meaning a conscious, intentional failure or reckless indifference" to debtor's responsibility to file.  *Boyle*, 469 U.S. at 245.  Here, as set forth above, the Tribe's strategy to avoid taxation was to hide its distributions from the IRS.  SOF, ¶¶ 19-24. Sally Jim chose to participate in this gambit, omitting her distributions when applying for credit and failing to report them on a timely tax return.  SOF, ¶ 20.  Such behavior constitutes a "conscious, intentional failure or reckless indifference" to her responsibility to file tax returns and pay tax on the extravagant cash distributions from the Tribe.   The Court should find that Sally Jim is liable for penalties due to her willful neglect.

## CONCLUSION

Sally Jim received taxable income, primarily in the form of per capita distributions of gaming revenue from the Miccosukee Tribe of Indians, in the tax year 2001.  She failed to report such income on a tax return and failed to fully pay her liabilities.  The Court should enter

12627317.1

judgment in favor of the United States and against Sally Jim for $278,758.83 as of April 9, 2015,

the full amount of the tax assessments set forth above, plus interest and statutory additions

accruing after April 9, 2015, until the amount is full paid.

June 17, 2015                              Respectfully submitted

                                          CAROLINE D. CIRAOLO
                                          Acting Assistant Attorney General
                                          Tax Division

                                          By: s/ William E. Farrior
                                          ROBERT L. WELSH
                                          S.D. Fla. Bar No. A5500117
                                          WILLIAM E. FARRIOR
                                          S.D. Fla. Bar No. A5501479
                                          U.S. Department of Justice
                                          Trial Attorneys, Tax Division
                                          Post Office Box 14198
                                          Ben Franklin Station
                                          Washington, D.C. 20044
                                          Telephone: (202) 514-6068
                                          Facsimile: (202) 514-9868
                                          Robert.L.Welsh@usdoj.gov
                                          William.E.Farrior@usdoj.gov

                                          Of Counsel:

                                          WIFREDO A. FERRER
                                          United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2015, I electronically filed the foregoing document along with a statement of undisputed facts and attached exhibits with the Clerk of Court using CM/ECF and that it will be served accordingly on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.  Additionally, I served a copy on the Miccosukee Tribe of Indians of Florida by sending a copy via US Mail to:

Miccosukee Tribe of Indians of Florida
P.O. Box 440021, Tamiami Station
Miami, FL 33144


s/ William E. Farrior
WILLIAM E. FARRIOR
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 14198
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-1908
Facsimile: (202) 514-9868
William.E.Farrior@usdoj.gov

12627317.1