IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No.: 1:14-cv-22441-CMA |
| SALLY JIM | ) ) | |
| Defendant. | ) | |

**UNITED STATES' STATEMENT OF UNDISPUTED FACTS**

Pursuant to Local Rule 56.1, the United States submits the following list of undisputed facts in support of its motion for summary judgment:

1. On the dates and in the amounts set forth below, a delegate of the Secretary of Treasury made assessments against Sally Jim for federal income tax liabilities, penalties, and interest for tax year 2001.

| Tax Year | Date Assessed | Tax Assessed | Penalties Assessed | Interest Assessed |
|---|---|---|---|---|
| **2001** | 09/13/2004 | $15,498.00 | $2,551.95*<br>$1,644.59**<br>$430.55*** | $1,783.72 |
| | 06/26/2006 | | $1,190.91** | |
| | 12/31/2012 | $95,823.00 | $21,560.18*<br>$3,833.70*** | |

*late filing penalty – 26 U.S.C. § 6651(a)(1)
**failure to pay penalty – 26 U.S.C. § 6651(a)(2)
***estimated tax penalty – 26 U.S.C. § 6654

Nez Decl. ¶ 3, Ex. A (Form 4340, Certified Transcript).

2. Despite notices and demands for payment, Ms. Jim failed to pay her federal income tax liabilities in full. Nez Decl. ¶ 5. Ms. Jim continues to accrue interest, penalties, and statutory additions. *Id*. As of April 9, 2015, Ms. Jim is indebted to the United States for her

federal income tax liabilities for tax year 2001, in the amount of $278,758.83. Nez. Decl. ¶ 6, Ex. B.

3. In 2001, Sally Jim was a member of the Miccosukee Tribe of Indians. Dep. of Sally Jim, Farrior Decl. Ex. 11 (SJ Dep.), 13:20-22. As a member of the Tribe, Sally Jim received quarterly distributions in per capita amounts based on the number of members in her household. Dep. of Gabriel Osceola, Farrior Decl. Ex. 13 (GO Dep.), 87:16-23.

4. In 2001, Sally Jim received quarterly distributions from the Tribe totaling $272,000. Tribe's Listing of Distributions to Tribal Members, Farrior Decl. Ex. 16. In January of 2015, Sally Jim attempted to submit a belated 2001 tax return to the IRS; in that return, she stated that she received $272,000 in benefits from the Miccosukee Tribe of Indians which she listed as "other income" but "excluded from gross income" as Indian general welfare benefits." *See* Return, Farrior Decl. Ex. 5; SJ Dep., 91:2-93:10.

5. Sally Jim also received wages of $25,990 in 2001. SJ Dep., 91:23-92:2, Farrior Decl. Ex. 5. She was employed in the Tribe's healthcare facility. SJ Dep., 10:14-18.

6. Sally Jim admits to having gambled in 2001 but claims that 2001 like all other years was a bad year. SJ Dep., 16:25-17:8. She has no documentary evidence or specific recollection substantiating any losses that may offset gambling winnings. SJ Dep., 17:9-20.

7. Sally Jim did not file a tax return when due for the 2001 tax year. *See* SJ Dep., 55:11-12. Apart from a small amount of tax withheld from her wages, Sally Jim failed to make estimated payments of tax or pay her tax liability when due. Nez. Decl. Ex. A.

8. For decades prior to 1990, the Tribe made per capita distributions to its members, in generally *de minimis* amounts. Dep. of Colley Billie, Farrior Decl. Ex. 12 (CB Dep.), 61:10-18. Distributions were funded by a tribal tax levied on gross sales. *Id.* at 90:18-24.

9. Around 1990, the Tribe started operating its gaming facility referred to as the Bingo Hall or MIBG. GO Dep., 24:4-5. The Tribe's gaming facility offers so-called class II gaming, including high-stakes bingo, poker, and video pull-tab machines. GO Dep., 24:12-24.

10. When its gaming facilities began generating large amounts of income, the Tribe's ability to distribute large sums of money to its members increased. Farrior Decl. Ex. 7, at 6; SJ Dep., 102:11-103:7.

11. In response to the passage of 26 U.S.C. § 3402(r), the Tribe devised a scheme to argue that its distributions did not constitute "net revenue" from gaming. *See* Gen. Council Minutes, Feb. 2, 1995, Farrior Decl. Ex. 1, at L000338-39 (noting passage of "the new law placing taxation on payments made to tribal members from Indian Gaming profits" and approving Tribe's "Gross Receipts Tax Ordinance"). The Tribe enacted a so-called "gross receipts tax" or "gross receipts license fee" which it applied to its gaming facility. Tribal Tax Ordinance, Farrior Decl. Ex. 2. The Tribe's license fee is a percentage of the gross revenue of the Bingo Hall. *Id*. The Tribe places the license fee into what it terms a NTDR ("non-taxable distributable revenue") account. *See* Memo. from B. Cypress to Mike Hernandez, Re: N.T.D.R. Account, Feb. 27, 1995, Farrior Decl. Ex. 3 ("In this new account I want you to deposit the 'Tribal Tax' collected at the Miccosukee Bingo. The funds in this account will be evenly distributed to our members periodically.").

12. The Tribe initially set the license fee at 6.5% of gross revenue in 1995. Farrior Decl. Ex. 2. The Tribe later increased the fee to more than 8% of gross revenue. GO Dep., 26:9-27:13. Since its establishment, the Tribe has made per capita distributions to tribal members from its NTDR account. Farrior Decl. Ex. 3; SJ Dep., 87:4-88:3; GO Dep. 88:20-89:3.

13. Virtually all, if not all, of the Tribe's distributions constitute in substance distributions of net gaming revenue. GO Dep., 27:5-16 ("[A]ll other operations [other than Miccosukee Indian Bingo and Gaming] are not substantial . . . . The enterprises, they don't make any money."), 123:8-127:3 (noting that tribal enterprises overall did not make a profit without assistance from gaming revenue); Farrior Decl. Ex. 7, at 6 ("NTDR payments would be in accordance with revenue generated at MIBG. Business has been good and NTDR payments have been increasing."); SJ Dep., 102:11-103:7; Tribal Financial Statement September, 2001, and September 2002, at 14, Farrior Decl. Ex. 17, at 3, 14 (showing gross receipts license fee from Miccosukee Indian Bingo of $32,103,681 and "tribal trust distributions" of $32,268,000; for the year ending September 30, 2001); Tribal Financial Statement September, 2002, at 3, 13 (showing gross receipts license fee from Miccosukee Indian Bingo of $37,462,023 and "tribal trust distributions" of $36,335,300 for the year ending September 30, 2002); Miccosukee Indian Bingo Financial Statement, June, 2002 and 2001, at 3, 11, Farrior Decl. Ex. 19 (showing that Miccosukee Indian Bingo earned net revenue in excess of the gross receipts license fee paid to the Tribe).

14. The Tribe makes decisions through its Business Council and its General Council. The General Council of the Tribe consists of every member of the Tribe over 18. CB Dep., 26:22-25. The General Council meets quarterly. GO Dep., 34:18-36:2.

15. Sally Jim attended numerous General Council meetings. SJ Dep., 29:20-24. For those she did not attend, she sometimes learned of the substance of the meetings from her sisters. SJ Dep., 78:17-20.

16. At each meeting, the finance director or treasurer reports to the General Council that funds are available in the NTDR account for distribution. GO Dep., 85:8-86:16. The

4

12604396.1

General Council then approves making a distribution and sets a distribution date, usually about 30 days from the date of the meeting.  GO Dep., 34:18-36:2.  Whether the Tribe made a distribution depended only on whether funds were available for distribution and whether the General Council of the Tribe approved distribution, which the General Council appears to have done whenever funds were available.  GO Dep., 34:16-35:21.  The amount of distributions depended only on how much funds were available, which in turn depended on the performance of the Tribe's gaming facility.  GO Dep., 136:4-137:15.  On the date of distributions, the head of household generally picks up a check equal to the per capita amount of the distribution multiplied by the number of members in that person's household.  CB Dep., 115:9-12; *see* SJ Dep., 41:9-15.  The amount of the distribution is equal to all members but the specific amount of the check may vary depending on whether a tribal member took a loan in advance of the distribution, whether a tribal member directed the Tribe to deposit a certain amount in a brokerage account for the member's benefit, and whether the tribal member directed the Tribe to make a large purchase for the member's benefit.  Dep. of Jose Marrero, Farrior Decl. Ex. 15, 165-167; Meeting Notes, August 1, 2006, 0027, Farrior Decl. Ex. 3; GO Dep., 87:23.

      17.     The Tribe's distributions are not based on the needs of the recipient, and the only guideline to be eligible for distribution is that the recipient must be a member of the Tribe.  Meeting Notes, August 1, 2006, 0027, Farrior Decl Ex. 4  ("Per Marrero and Lehtinen – none of the payments were need based - they were equal to each tribal member"); GO Dep., 87:22-23 ("Everybody gets the same."), 88:15-89:7.  The Tribe "cashes" most tribal members' checks immediately, essentially handing out prepared envelopes full of cash.  CB Dep., 117:14-118:6; GO Dep., 54:6-55:5.

18. During 2001, Sally Jim had four eligible members of her household for whom she received per capita distributions. Farrior Decl. Ex. 16, SJ Dep., 88:14-24. The per capita distributions were solely within her control. SJ Dep., 41:9-21, 134:8-10  She directed a portion of her distribution to be placed in an account ostensibly for the benefit of one of her daughters, though she retained access to the money and eventually spent it on household expenses. SJ Dep., 38:19-40:1, 48:19-49:1.

19. From before 1995 to 2009, Billy Cypress was chairman of the Tribe. CB Dep., 82:8-11. Although Chairman Cypress told tribal members that distributions from the Tribe were not subject to federal income tax and instructed members not to report distributions on their federal income tax returns, Cypress often instructed members at General Council meetings not to disclose that they were receiving distributions to persons outside the Tribe. *E.g.*, Farrior Decl. Ex. 1, at L000338-39. His primary message was that "distribution monies are non-taxable," but "if the IRS were to find out about these monies, then we could end up being taxed." Gen. Council Minutes, Aug. 3, 2000, Farrior Decl. Ex. 6, at L000443. Sally Jim recalls Billy Cypress making this statement. SJ Dep., 109:9-110:13. As part of Cypress's scheme to hide the distributions from the IRS, Cypress repeatedly instructed members not to report distributions on credit applications. *E.g.*, Gen. Council Minutes, Nov. 2, 1995, Farrior Decl. Ex. 7, at L000357-58.

20. Sally Jim was aware of these instructions and pursuant to these instructions did not report distributions as income when applying for financing to purchase a truck. SJ Dep., 65:12-66:8, 100:24-102:5.

21. Cypress additionally instructed members not to cash their distribution checks in places where they would be reported to the IRS. Gen. Council Minutes, May 4, 2000, Farrior

12604396.1

Decl. Ex. 8, at 6 ("[I]f a tribal member should cash their NTDR check at the gaming facility, this will be reported to the IRS as required by the banking laws. He stated that the only way the tribal member's money will not be reported to the IRS is if they cash their checks at the Administration office . . . . He stated if a tribal member also has a banking account (with a substantial amount of money) then this too will be reported and IRS will investigate into how the money was obtained."). Sally Jim was aware of these instructions. SJ Dep., 108:4-9.

22. And tribal members were told to allow the Tribe to make large purchases for them so that the IRS could not trace purchases to individual tribal members. Gen. Council Minutes, May 2, 2002, at 20, Farrior Decl. Ex. 9.

23. Cypress also notified members that the Tribe would keep a reserve should the members ultimately have to pay taxes on their distributions. *Id*. at L000339. Cypress's statement that distributions were not taxable but that the Tribe would nonetheless establish a reserve raised concerns among tribal members. CB Dep., 142:23-143:5 ("I remember we were asking -- we meaning the General Council were asking among ourselves, why is this money not subject to taxation? If we are being told it is not taxable, then why are we setting aside monies? We are being told we don't have to pay taxes but we are going to put this aside and hope that you don't have to use it.").

24. Cypress discussed on several occasions that other tribes' members were paying tax on distributions. Farrior Decl. Ex. 1, at L000346; Farrior Decl. Ex. 7, at L000359 ("[The Seminole Tribe] have questioned how the Miccosukee Tribe with little or no formal education has managed to avoid paying these taxes and the Seminole Tribe with a highly educated staff are being made to pay the taxes.").

25. Sally Jim lives in a house provided by the Tribe. SJ Dep., 20:7-21:20. She additionally has several programs available to her and the members of her household, including programs providing education, medical care, and elder care. GO Dep., 57:10-65:13, 94:6-95:21. If tribal members are unable to pay bills such as their electric bill or pay for necessary repairs to their homes, the Tribe will step in and cover those costs. CB Dep., 55:22-56:19, 170:11-21; GO Dep., 90:18-91:5.

26. Lands generating tribal income are held in trust for the Tribe not for Sally Jim personally. Lehtinen Memo, Farrior Decl. Ex. 20, at 3-4 (citing 25 U.S.C. § 1750(5), (7)).

27. At her deposition, Sally Jim first refused to state why she failed to file tax returns when due, citing her Fifth Amendment privilege. SJ Dep., 56:5-16. She later conceded that she had the paperwork ready to file her tax return for 2001, but "just completely forgot to file that year." SJ Dep., 58:1-4.

28. Sally Jim relied on Billy Cypress, not legal advice from the Tribe's attorney Dexter Lehtinen, in choosing not to report or pay tax on distributions. SJ Dep., 60:19-62:20 (describing Billy Cypress telling her not to include taxes on her tax return), 119:23-120:20 (denying that Lehtinen provided tribal members legal advice). Billy Cypress is not a tax expert. GO Dep,. 77:18-78:2.

June 17, 2016

Respectfully submitted,

CAROLINE D. CIRAOLO
Acting Assistant Attorney General
Tax Division

By: s/ William E. Farrior
ROBERT L. WELSH
S.D. Fla. Bar No. A5500117
WILLIAM E. FARRIOR
S.D. Fla. Bar No. A5501479
U.S. Department of Justice
Trial Attorneys, Tax Division
Post Office Box 14198
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-6068
Facsimile: (202) 514-9868
Robert.L.Welsh@usdoj.gov
William.E.Farrior@usdoj.gov

Of Counsel:

WIFREDO A. FERRER
United States Attorney

12604396.1