# Exhibit 7

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA
SPECIAL GENERAL COUNCIL MEETING
THURSDAY, NOVEMBER 02, 1995
10:00 A.M.

### Item #1. Roll Call

A Special meeting of the Miccosukee General Council was held at the Chickeechobee Council Grounds on Thursday, November 02, 1995. Chairman Cypress announced quorum had been achieved at 10:25 a..m., with 26 voting members present and five clans represented.  The clans represented were; Bird, Panther, Otter, Tahkoshathee and Wind.

Treasurer Billie advised General Council that in consideration of the infirmed and elderly, the meeting should proceed quickly.  He also asked General Council to keep their remarks to the topic at hand.

Chairman Cypress announced the following Officers of the Tribe present:

| | |
|---|---|
| Billy Cypress | - Tribal Chairman |
| Jasper Nelson | - Assistant Chairman |
| Max Billie | - Treasurer |
| Jerry Cypress | - Lawmaker |
| Andrew Bert, Sr. | - Secretary |

Recording Secretaries for the meeting were Evelyn S. Osceola, Tribal Administrative Coordinator, Marla Sanders, Assistant Administrative Coordinator, Theresa C. Osceola, Data Entry Specialist and Suzanna Tiger, File Clerk.

### Item #2. Approval Of Agenda

Chairman Cypress reviewed the Agenda for the General Council and called for approval if there were no changes.

Betty H. Billie moved to accept the Agenda as read; seconded by Nancy Jim.  Motion carried with a vote of 14 for, 00 against and 00 abstention.

### Item #3. Approval of Minutes

Chairman Cypress stated a community meeting was held to review the August 10, 1995 General Council minutes and called for motion to accept.  He explained there were few members present during the reading of the minutes and encouraged more attendance.

1



EXHIBIT
24

**MICC 65010**

SGCMTG.11/02/95

Betty H. Billie stated she had read the minutes and had noted there were mistakes but she would motion to accept with corrections to be made.

**Betty H. Billie motioned to accept the August 10, 1995 General Council Minutes with corrections to be made as noted; seconded by Jimmie Poole. Motion carried with a vote of 11 for, 00 against and 00 abstention.**

**Item #4. MIBG Report**

Chairman Cypress stated Dexter Lehtinen, Tribal Attorney, usually reports on this item but is run..ing late.

Chairman Cypress reported each month this year MIBG has generated an increase in revenues. He added MIBG management had presented a proposal for an expansion on the south side of the building. He informed Business Council had tentatively approved this proposed expansion during the Business Council meeting but was presenting to General Council for final approval. He added this expansion would be a three story addition. The first floor would house the gaming components, second floor would house the offices and the third would house three different restaurants. (He stated the possibility of utilizing half the space on the second floor for a child care facility has been considered.) If this child care facility were opened, it would bring in more customers as it would enable patrons with children to come and play the gaming components and still have the children nearby and cared for. He added if the proposed expansion is approved the expanded gaming area would generate more revenue.

Chairman Cypress stated the cost of the expansion was approximately $4 million. He reiterated Business Council is requesting motion for approval for the proposed expansion. He added the architects would be drawing up the blue prints for the proposed expansion.

Tommy Tiger, Sr. questioned if this included the parking lot expansion.

Chairman Cypress stated the expanded parking lot had already been approved and was awaiting the permit from the COE. He added this was just for the building expansion.

Chairman Cypress stated the cost of the expansion would not affect the NTDR payments but the tribal programs which are assisted by gaming revenue will experience cutbacks for at least four months.

Chairman Cypress reiterated if the expansion is approved this would mean more revenue for the tribe. He again requested motion for approval if acceptable to General Council.

**MICC 65011**

L000355
L000355

SGCMTG.11/02/95

Betty H. Billie motioned to approve the proposed expansion to MIBG building; seconded by Jimmie Poole.  Motion carried with a vote of 17 for, 00 against and 01 abstention.

Chairman Cypress informed after the expansion is completed Business Council has considered building a 400 to 500 room hotel with meeting rooms on complex.  When a site is located then it will be presented for General Council's review.  He added the motion just approved was only for the expansion to the building and the proposed hotel was not included.

Chairman Cypress informed ther. have been two investment groups that Business Council has discussed this proposal with.  One group had pulled out but then have returned requesting to resume talks. Business Council has informed them they must resubmit their proposal as this would have to be treated as a new proposal.  They are to submit their proposal but as of today have not.  The other investment group has said they have all the finances for this project.  They have stated they would not have to seek additional outside financing.  He added Business Council has not met with this group.  He stated all communication has been by telephone or writing.  He added Business Council has informed them they must meet in person.  At this time the characters of the investors are being investigated before a meeting is scheduled.  He reiterated this investment group has said they are ready to start the project anytime.  He added all the investment groups say this but when background investigations are done they do not pass this.  If it is discovered the people are not of good character they are informed the Tribe can not do business with them.  The investors leave with bad feelings toward the tribe but the tribe has always maintained they will not deal with persons of bad character.

Chairman Cypress updated General Council on the taxation on gaming revenue issue.  He reported Congress and Senators have said states are not taxed therefore the Indian tribes should be given the same consideration.  They have stated federal government was to have given federal aid but assistance funds are being cut.  They have advised that anyone presenting this bill will face opposition.  He added gaming revenue taxation issue seems to be losing momentum. In the event it does come into effect then the tribal attorney has two financial plans which can be implemented which would aid the tribe in avoiding the paying of taxes.  The tribal attorney has said that the tribal members will not be affected by whichever plan is adopted.

Chairman Cypress reported Mr. Lehtinen has stated he did not think this issue would come this far but since it has they are keeping a more watchful eye on the proceedings.

3

MICC 65012

L000356
L000356

SGCMTG.11/02/95

Question was raised of who the persons were that was to keep an eye on this issue.

Chairman Cypress stated the two persons who are most involved are Mr. Lehtinen, Tribal Attorney and Mike Hernandez, Finance Director. He added Business Council has directed these two gentlemen to be more observant of any and all rulings on this issue. He stated last year when this issue was first brought up it caught the tribe and the tribal attorney unprepared but in the short time Business Council and Mr. Lehtinen had they still managed to come up with a plan that was beneficial to the tribe and its members.

Chairman Cypress reiterated MIBC is generating more revenue since the change in management. He stated tribal members are receiving more benefits and funds due to this increase. There has been an increase in the amount spent on MIBG in order to attract more customers which has been working. He added court litigation against TPL (past management) will be reviewed by Mr. Lehtinen.

Chairman Cypress stated funds generated by MIBG are used to build tribal housing but some tribal members are putting this in jeopardy by listing NTDR payments on loan applications.

He added when homes are released a copy of the homeowners agreement is given. A tribal member has apparently given this copy to a car salesman when applying for car financing. It would seem they are using this home as collateral to secure the loan. He added the tribal attorney will be writing to the car dealership to inform them if the applicant should default on the loan they (car dealership) could not possess the house since it is located on tribal land. He stressed to General Council that they (tribal members) are charged just a fraction of the cost to build this house and ownership should not be jeopardized.

Chairman Cypress stated the tribal member who gave this document to the car salesperson did not have the other tribal members best interest in mind when they did this. If this person should default on the loan and is taken to court all tribal members would be affected. He added when other tribal members apply for loans with out using this type of collateral they could be denied just because of problems caused by the other person. He advised the person who has given this document to the salesperson to get it back as it could adversely affect other tribal members. He reiterated the tribal attorney will be writing to the salesperson regarding this.

Chairman Cypress stated Administration Office is still receiving calls regarding tribal members listing NTDR payments on their credit applications. He stated Business Council has repeatedly asked tribal members not to do this as it could cause consequences. He added Business Council is trying very hard to protect tribal

4

**MICC 65013**

L000357
L000357

SGCMTG.11/02/95

members from facing problems with IRS but if they (tribal members) continue to list this as income then all Business Council effort will be for naught. If the gaming revenue taxation should be imposed then IRS can fine tribal members for the amounts they have listed on these applications.

He again requested of General Council not to list NTDR payments when applying for credit. He added some of the other Indian tribes have followed suit and are not paying taxes on gaming revenues. He stated Business Council is working very hard to keep other Indian tribes problems from affecting the Miccosukee Tribe but if tribal members continue to list NTDR payments they will hurt themselves in the long term.

Chairman Cypress stated when the tribe was going to start construction of MIBG they went to other Indian owned gaming halls and observed their operations and learned. In due course the tribe opened MIBG and implemented some of the observations made and have now started to realize a profit. It was not so in the beginning but with management change there have been changes for the better.

Chairman Cypress reported James Billie, Seminole Tribe Chairman, and some of the Councilmen have been to MIB to observe the operations. They wanted to observe operations in order to determine how the Miccosukee Tribe is operating its gaming hall and producing such a huge revenue. They have also sent Larry Frank, Seminole Tribe Administrative Coordinator, to observe the operations. He spent the day at MIBG observing operations, the Seminole Tribe will be sending other representatives at a later date to do the same. Mr. Billie has stated the Seminole Tribe has spent a lot of money in improving the operations at their gaming halls but have failed to produce any significant increase in the revenue.

He added Business Council has informed the Seminole tribal representatives when the Miccosukee Tribe was first thinking of building a gaming hall their gaming halls were visited and their operations were observed in order to learn. Also training sessions were held in Tampa as they were familiar with how to run the business. He stated some of the observations made were implemented and have helped the Miccosukee Tribe in making a profit in the business. They have been informed they are welcome any time to observe the operations at MIBG.

Chairman Cypress stated it seems the Seminole tribal members are starting to question their representatives as to why their gaming halls are not producing an equal or more revenue as Miccosukee MIBG. The Seminole tribe has four gaming halls but their tribal members receive only $1000 per month and Miccosukee Tribe has only one but tribal members receive substantially more.

5

MICC 65014

L000358
L000358

SGCMTG.11/02/95

Chairman Cypress stated Business Council had informed the tribal members that NTDR payments would be in accordance with the revenue generated at MIBG. Business has been good and NTDR payments have been increasing and not decreasing. He added the Seminole representatives have not come out and said their tribal members are questioning the payments but Chairman Billie has hinted at it during talks with him.

He added Chairman Billie stated he has informed the representatives that some people are not good at running a business and realizing a profit but they will observe MIBG operations to see if any changes can or should be made a their gaming halls.

Chairman Cypress informed General Council that if they observed any of the Seminole representatives at MIBG then they are there for this reason.

Chairman Cypress stated Chairman Billie has said they are now balking at paying the gaming taxes. They have questioned how the Miccosukee Tribe with little or no formal education has managed to avoid paying these taxes and the Seminole Tribe with a highly educated staff are being made to pay the taxes.

He informed General Council that the Miccosukee Tribe is not facing all the problems plaguing the Seminole Tribe due to our holding on and instilling our traditional beliefs and culture in our youth. He added it is traditionally believed that our conduct and participation in and during the Green Corn Dance has an effect in our lives. This could either be financially or emotionally. The Seminole tribe has seem to have forsaken a lot of their traditional beliefs and this could be one of the reasons for their circumstances.

**At this time Chairman Cypress requested Mr. Dexter Lehtinen to present his report.**

Mr. Lehtinen presented a written report which he reviewed for General Council. Report, comments and questions are as follows.

Mr. Lehtinen reported September 1995 set a net income record and October 1995 set an even higher record. He stated the figures for these months are on the first page.

Mr. Lehtinen reported the second page covered the last year's numbers. The figures were as follows:

| | | |
|---|---|---|
| two years ago | - $ | 750,000 |
| last year | - $1,200,000 | |
| this year | - $2,400,000 | |

MICC 65015

L000359
L000359

SGCMTG.11/02/95

Mr. Lehtinen reported if the government were to levy the 34% on Indian Gaming profits, the tribe would be paying more in tax this month than revenue made two years ago.  These figures show how much MIBG has grown in generating revenue but it also shows the magnitude of how the gaming profit taxation would affect the tribe.

He added the net income receipt to the tribe has gone up by three times over the last 24 months.  Mr. Lehtinen reviewed the chart showing the increases over the months and years.  He added the charts showed the gross and net income in quarters.  The reason it is shown in quarters is it is every three months.

Mr. Lehtinen reported there has been an increase in the marketing and additional machines have been purchased and installed at MIBG.

Mr. Lehtinen reported the ruling on the U.S. Games machines would affect not only the Miccosukee Tribe but all Indian tribes across the country.  This ruling would clarify the classifications of the Video Pull Tab machines.  The Miccosukee tribe and all other tribes across the country are trying to get the machines classified as Class II, the government maintains they are Class III.  The classification controversy does not apply to the Lucky Tab machines.

He added the Governor and Attorney General of California are very hostile to the Indian tribes in California who have Indian gaming halls.  These Indian tribes have over 500 of the Lucky Tab machines in their gaming halls.  These machines generate a very large amount of money for the tribes.  These Lucky Tab machines are very good in case the ruling should ever be against the Video Pull Tab machines.  He reiterated the Lucky Tab machines are already classified as Class II and would be allowed in the gaming halls.  He added patrons like the Lucky Tab machines better than the U.S. Games machines, the only complaint they have is you have to take the tab to the cashier in order to collect the winnings.  The patrons are leaving the losing tabs on the floor which creates a mess.  The staff do try to sweep the area as soon as possible but there are times when these tabs pile up.  These machines are classified as Class II because they dispense tabs for the wins.

Explanation of how these tabs are played and read for the winnings was given.

Mr. Lehtinen explained the one important point is if the Video Pull Tab machines were ever removed from the Indian Gaming halls then it could be replaced with the Lucky Tab machines or similar machines.  He added they did not have to be these particular name brand machines or from this company.

7

MICC 65016

L000360
L000360

SGCMTG.11/02/95

Mr. Lehtinen added these machines are just as good but the one drawback is they are a little slower in terms of collecting the prize. He added California has shown that if these machines are the only ones available for play then it will be played by patrons. He stated if the best machines to be played in Florida were the Lucky Tab machines then it will be played. He added they have proof these machines will be played. MIBG has these machines and the Lucky Tab II bank made more than five of the U.S. games machines. He explained which games on the machines made less than the Lucky Tab II machines.

He stated when the approved expansion is finished and the machines are placed the tribe will not have to worry about machines being removed because they are illegal. With these machines the tribe will always have good functioning machines in the gaming hall.

He reiterated the tribes in California who have these machines do make a large amount of money. He added Indian tribes have been in legal litigation for a long time over the classification of the Video Pull Tab machines. The technical break through of having machines which are within Class II classification is a major point.

**Gaming Litigation.**

Mr. Lehtinen reported the Indian Gaming Regulatory Act case: Seminole, Poarch Creek and Miccosukee was heard in the Supreme Court. The Supreme Court showed a great deal of confusion in the roles of IGRA, Indian Tribes, Congress and the State of Florida.

Chairman Cypress explained to General Council Items #4 and 5 would be combined as they were interlocked. He advised General Council to pay attention to the report as the Everglades issue would be included.

Chairman Cypress explained to Mr. Lehtinen that he (Chairman Cypress) had reviewed the MIBG report earlier and the proposed expansion to the building was approved. The cost for the expansion and architect's plans were to be reported to General Council before any work is done.

Mr. Lehtinen stated no work will be done until all aspects of the work are finalized. He added the bids will stipulate when the project is to start and end and will be enforced. He reiterated there will be no ground breaking until General Council has reviewed the information.

Cassandra Osceola asked if the machines were to be purchased with the net income reported on the financial statements. If so wouldn't the amount coming to the tribe be less.

8

MICC 65017

L000361
L000361

SGCMTG.11/02/95

Mr. Lehtinen stated the purchase of the machines was capital outlay which is a durable item over $5000 under accounting principles.

Mrs. Osceola questioned the purchase price for each machine.

Mr. Lehtinen stated the price was $9000 each and the total cost was $252,000.

Mr. Lehtinen explained the purchases are spread over a three month period in the financial statements.

Ms. Osceola questioned since Mr. Lehtinen reported in quarters would it be included in this quarter.

Mr. Lehtinen explained the report they were reviewing did not report payments to the tribe quarterly a they were paid every 15 days.   He added capital outlay is classified by accounting principles as spreading the cost over the life of the item.

Chairman Cypress explained to Mr. Lehtinen that Ms. Osceola's question was where the monies going to come from to purchase the machines whether it was from this month's or next month's monies. She did not question the procedures for purchasing.

Ms. Osceola explained she just wanted to figure the payment to the tribe in December.

Chairman Cypress explained this had been addressed earlier in the meeting.   The purchase costs were addressed earlier in the meeting and had been explained it would not affect the tribe's share.   He added funds for these type of purchases are set aside in different account.

Chairman Cypress explained the purchase would be an expense to MIBG and would not affect the 6.5% set aside for tribal members.   He added some of the profit can be put back into MIBG, also it helps with the General Account, Reserve Account and provide assistance to the Government Programs which need additional funds.

Ms. Osceola stated the way she understood her information was that at one time these expenditures/purchases were being deducted before it went to the tribe.

Chairman Cypress explained these purchases were capital outlay.  If they (MIBG management) are anticipating any large expenditures then they would have to submit this one month prior for approval.   At the end of the month it will show what the total expenses will be.

Mr. Lehtinen stated the question presented by Ms. Osceola was clear to him now.  He stated the distributions (NTDR payments) are paid

9

MICC 65018

L000362
L000362

SGCMTG.11/02/95

for legal purposes, as the legal ordinance was constructed which is from the gross receipts. That portion of the money the tribe receives which is called the gross receipts license fee is a 6.5 % levy on the gross. These monies go directly without any deductions from capital outlay in to a fund. This account is kept separate from the other accounts which is over seen by Mike Hernandez, Finance Director, on behalf of the tribe. He added the gross receipts license fee is paid, which pays the NTDR distributions, before capital outlay deduction occurs. The remaining income is calculated for financial purposes what ever amount was previously approved for capital outlay.

Mr. Lehtinen stressed this is only deducted after payment of the 6.5%.

Chairman Cypress explained to General Council the question raised would be better answered by Mr. Hernandez. He added Mr. Lehtinen was reporting solely on MIBG and Mr. Hernandez reports on the tribe's finances and the breakdown of these finances. He added Mr. Hernandez would be able to explain better which programs would not get as much assistance as before. He stated the approved expansion would cost approximately $3 million. He added monies will be coming into MIBG but the tribe's assistance share will be decreasing.

Chairman Cypress reiterated Mr. Lehtinen's comment regarding the 6.5%. He informed this is kept in a separate account and would not be affected.

Mr. Lehtinen reported Congress and the IRS are aware of the system devised and implemented by the tribe. He added they have reviewed it and have accepted that it is legally correct but they may try to do something about it. He stated of the 34% tax on gaming revenue should be levied then they (IRS) may try to come up with something to try and make the tribe pay. They may change some regulations in order to deal with this. He added this ordinance was created as an expense account that is due to the tribe no matter what. The gross receipts license fee will still be paid to the tribe even if IRS tries to tax the tribe's profit.

Mr. Lehtinen reported he would be very surprised if they passed the tax on gaming revenue.

Cassandra Osceola asked which funds will be used to pay for the expansion on the building.

Mr. Lehtinen stated the expansion is classified as capital outlay and would be paid for after the 6.5% is paid to the tribe. He stressed the NTDR payments would not be affected.

10

**MICC 65019**

L000363
L000363

SGCMTG.11/02/95

He added the expansion can not be paid for out of the revenue before the license fee payment. This can only be done with a change in rules by the Business Council and nobody has or is planning to propose any changes.

He added the Ordinance drawn up is legal but with all this talk of levying the tax on gaming revenue, IRS will be looking at it more closely. He added with the expansion being done, the restrooms will also be renovated. The permit for the parking lot expansion is with the COE.

With no further questions on MIBG the meeting proceeded.

Chairman Cypress reiterated Mr. Lehtinen's report. He reiterated how the Lucky Tab machines work. He added in the future if the ruling should be against the Video Pull Tab machines we (the Miccosukee tribe) would still have some machines in operation.

He added Mr. Lehtinen explained how if these machines were in place MIBG could still be open for business. He stated Mr. Lehtinen had requested to purchase 10 machines and Business Council had approved the purchase. At this time he has ordered more of the Lucky Tab machines and the Video Pull machines. He reiterated it was explained these purchases would not affect the NTDR payments. He advised General Council to keep the financial statement handouts in a safe place and not to share with others.

Chairman Cypress stated Mr. Lehtinen will be presenting the Legal Counsel Report. Mr. Lethinen's report, questions and comments are as follows.

Betty H. Billie stated before Mr. Lehtinen begins his report she had one question.

Mrs. Billie questioned the status of the upgrading of the air condition system at MIBG which had been discussed in earlier reports.

Mr. Lehtinen reported the system will be upgraded with the expansion. The a/c system was a construction default in the first construction of the building, the air is not circulating and this is the reason for the heavy smoke in the building. They just have the big a/c units for the building which is inadequate. It will be requested a water cooling tower be built to house the right system in the new building and expand to the old building at less cost. At this time the maintenance department has set up a temporary system. This has helped a great deal in alleviating the cigarette smoke problem. This has been noticeable as business has gone up and the smoke in the hall has not risen. The new system will be

11

MICC 65020

L000364
L000364

SGCMTG.11/02/95

built so it is capable of handling the new building as well as the old.

**Legal Counsel Report.**

**#2. Tribe versus FDOT**

Mr. Lehtinen reported this case is coming off a stay on December 21, 1995. This is in a Federal Court in West Palm Beach. Unless the time consuming negotiations succeed then it will go to hearing. The difficulties have been in the reverter clause in the agreement. There has been talk the Governor and cabinet may delay the ruling. The negotiations are still under way. The tribe gets better title descriptions. There are complications with which pipe flows from I-75 on to tribal lands and surveys are ongoing to determine. The biggest concern he has is he does not think the State of Florida is negotiating in good faith. There will not be any more continuances with the I-75 fill case. Judge Payne will go forward with the motion to dismiss on December 21, 1995.

**#1. Tribe versus Dept. of Interior**

Mr. Lehtinen stated he calls this case the Permit Area Rights Case. He stated the COE reversed its first decision and issued the dredge and fill permit to the tribe. The tribe is now waiting for NPS approval which they are delaying. They are asking for comprehensive land usage data which had been furnished when the permit was first applied for. This is for the tribal housing on Loop Road.

**C. #1. TPL versus Tribe**

Mr. Lehtinen reported this case was won by the tribe in Court of Appeals. The second complaint they filed which is the first amended complaint. The first complaint had not been amended. He added the first complaint was won in 1993 and the seconded amended complaint was won in late August of 1995. He stated now they will try a third complaint on their seconded amended complaint. The tribe is please with the decision since we won and not TPL. With this ruling, they will have to pay the filing, appealing and administrative fees for the tribe. They will bring into the third complaint charges of contract breeches. They have tried this before and the tribe won which was #707. This is not listed in the report but it was in arbitration. He added TPL is filing these amended complaints because they keep losing and are running out of suits to file. The tribe has been the clear winner in these cases thus far.

He added the tribe has won twice but the due legal process is due to TPL and they are taking advantage of it. He stated the tribe is

12

**MICC 65021**

L000365
L000365

SGCMTG.11/02/95

ready for the third complaint which will be heard in Federal Court on November 8, 1995 before Judge Highsmith.

#### #2. Tribe versus Schmiddt/Kosnitzky

Mr. Lehtinen reported the tribe has sued the arbitrators and the final hearing was to have been last Monday but was rescheduled due to the Judge being ill.

He added Judge Witherington, who heard the case the first time and who had ruled for the tribe is leaving\the position in January. They (tribal legal staff) had been hopeful he would hear the rescheduled case but have been informed he will not be the one.  He added due to the judge's illness the hearing has been rescheduled to November 21, 1995 in State Court.

Mr. Lehtinen reported in this suit, the tribe is claiming the arbitrators acted improperly.  The arbitrators did not render an award which is of any serious problem.  The tribe still maintains the arbitrators acted improperly and are not letting the ruling stand.

#### #3. TPL versus Cypress/Lehtinen

Mr. Lehtinen reported TPL sued him and Chairman Cypress for libel. They are suing stating they (he and Chairman Cypress) had stated TPL was buying bingo supplies from organized crime.  He added TPL has maintained these people are not tied into organized crime but the Pennsylvania Crime Commission report has stated they have ties to organized crime.  He added if this lawsuit had ever reached the court for a hearing the tribe would have won easily.  He stated this was won with out going to court because the Third District Court of Appeals issued a ruling that he and Chairman Cypress can not be sued and can not be made to do depositions.  TPL has this on rehearing trying to convince the State of Florida that normally the tribe can not be sued but he and Chairman Cypress can be sued if they exceeded the scope of area defined by General Council.  This was a good decision in the tribe's favor.

Mr. Lehtinen reported the tribe has won all the cases that TPL has filed but the ones filed against the individual Business Council members are going forward.  He added this is not unusual, the appellant court told the trial judge that it was their opinion this case should be dismissed.  This appellant court recommendation was a major victory for the individuals named in the suits.

He added the lawsuit the tribe filed against the individuals (TPL) in Federal Court is only and injunctive relief and not for money. He added a person would not really consider themselves being sued, as stated before this suit was not for monetary damages.  He added

13

MICC 65022

L000366
L000366

SGCMTG.11/02/95

this was totally different from item #3 where TPL was suing for a couple of million dollars each.

Mr. Lehtinen reported TPL will not let him interview the individual partners. They have complained to the Bar Association. It is an effort to try and intimidate the tribal attorneys and individual officials which will not work.

## B. Environmental Legal Actions

Mr. Lehtinen reported the first item was due for a forced hearing due to the tribe's efforts. It is set for November 6, 1995, it was previously scheduled for last Monday but changed due to a criminal jury trial being held. The Judge did not want to delay proceedings in that case while this case was given precedence.

Mr. Lehtinen stated he feels the Everglades Forever Act is being used improperly to change the Federal Settlement. The latest he has heard is the Federal Government is trying to intimidate the tribe's key witness, in cases such as this the Federal Government is not nice.

He added Dr. Ron Jones, Tribe's expert witness, had been doing the tribe's water quality work for five years and this was before he (Mr. Lehtinen) started working for the tribe. He was working for the tribe when the U.S. Attorney used him in the Federal Everglades case. He reiterated Mr. Jones has done the water quality testing for Gene Duncan, Water Resources Director. He added he brought up Dr. Jones' name because he was a key witness in the housing case. He stated he feels Dr. Jones and his studies were a key factor in the COE reversing themselves and issuing the dredge and fill permit. There were other persons instrumental such as Dr Goss, Ph D., from Arizona. But as stated before, Dr. Jones was very significate in COE reversing themselves. He added Chairman Cypress also testified in the hearings.

Mr. Lehtinen reported the Federal Government has threatened to cut off all of Dr. Jones' funding. They claim Dr. Jones receives federal funding and should not testify against them. The tribe appreciates Dr. Jones' position as he receives several million dollars in federal funding. He is a respected professor at FIU and this is a dirty tactic the government is using. He added he will be making an effort to file a contempt motion this afternoon and they will try to get this before a judge on Monday. They will claim the federal government is scared of the tribe's witnesses and the truth and are intimidating the witness. They will also claim the federal government is trying to suppress a key witness and interfering with the tribe's relationship with this witness. He added he is not sure if it will work but it will be tried anyway.

14

MICC 65023

L000367
L000367

SGCMTG.11/02/95

Mr. Lehtinen stated Mike Reed has informed him a Justice department lawyer will argue the case against the sugar growers. Since the other party is a federal indian tribe they do not want to be against them and will let Water Management district handle the portion of argument against the tribe.

Mr. Lehtinen reiterated the Federal Government's intimidation with a key tribal witness will not go unnoticed.

Mr. Lehtinen reported the flooding case is still pending. The judge has ruled the Water Management District has the authority to raise and lower the water level. This is based on the flowage easement that exist in this conservation area. A flowage easement is the right of someone to come on your property and to do something. A typical easement is for a power line such as for FP & L. The 1952 flowage easement accepted in the 1982 settlement foes give the Water Management the right to flood the conservation area or to flow water across them. He added the tribe maintains there are certain qualifiers to this.

He added this litigation is only in the preliminary stages. The judge cannot say that as a matter of law the Water Management absolutely has no right to flow the water level up or down. They do have a flowage easement that states they can. The tribe thinks they can beat this ruling by showing discriminatory flooding. The flooding is killing the wildlife and root system. This will be more complicated than just saying to the judge they are violating the flowage easement.

He added the tribe maintains they are violating this by the way they are doing it, it is doing unnecessary damage and discriminatory damage to the tribe.

Mr. Lehtinen reported the MIBG security officers are very well trained, they are state certified, and they were assigned to assist the tribal wildlife officer in patrolling the AAR area levee where the illegal poaching has been going on. There are only 17 MPD officers and there are 52 trained security guards. There are enough security guards that they are able to assist when needed.

Chairman Cypress reiterated Mr. Lehtinen's report. He stated FDOT issue was reviewed, this was filed due to tribal lands being taken without approval or compensation.

He added a tribal employee who was terminated from his position has filed suit in Tribal Court and is up for hearing soon.

He added an Officer of MPD was terminated and filed suit in court, this case had reached the Federal Court where it was dismissed twice.

15

**MICC 65024**

L000368
L000368

SGCMTG.11/02/95

Chairman Cypress added a sexual discrimination suit was filed by female ex employees. They have claimed their release from their job positions was sexual discrimination. They have said if a male employee asks to leave position he is allowed to with no problems but if it is a female employee they are informed they are fired.

Chairman Cypress reported a tribal employee who had been terminated from their position is trying to file a suit claiming sexual discrimination in the tribal housing system. This is following the three homeowners being informed they risked the possibility of losing their houses for having non Indian males residing there. He added if she is meddling in tribal business which is of no concern to her then it will be reviewed by Business Council. If so then a law suit could be filed against this person. He added when certain questions are clarified, then Business Council will meet with the homeowners she is alleging to be working on behalf of. If it is discovered she is doing this without their knowledge she will be dealt with accordingly.

Chairman Cypress reported MPD has seized vehicles in drug busts and they are going to court now to clear the titles so they can be sold. He added when these vehicles are sold, by bid, Miccosukee Police department keeps the proceeds. He reiterated after the legal procedure has been completed then the vehicles will be sold.

Chairman Cypress reported there were three homeowners who were recently informed they faced the possibility of losing their house if the reports of non Indians residing there were found to be true. The reports to Business Council will be investigated further and if it is found to be true then it will be addressed accordingly.

Chairman Cypress reviewed the ongoing court litigation report.

He stated TPL keeps suing the tribe, they continuously lose the cases but they are persistent. The arbitrators did not follow guidelines and the tribe is suing to get the monies spent in arbitration proceedings. He added the libel suit filed against he and Mr. Lehtinen has been dismissed but they (TPL) are trying to appeal the ruling. He added the litigation process is slow but the Tribe does not stop and they do eventually accomplish what they wanted to.

He reviewed the Federal Government's intimidation of a tribal witness. He added Dr. Jones had been a federal government witness before but they let him go and he was hired by the tribe to do the water quality testing and to be their witness in the hearings. He did the study and the results were in the tribe's favor and the government does not like this. He added Dr. Jones is a very unbiased person and he reports his findings as they are and not how he is asked to report. There are clear water standards which must

16

**MICC 65025**

L000369
L000369

SGCMTG.11/02/95

be adhered to but is not being done.  The tribe is working to see these standards are enforced.

Chairman Cypress reported the Dredge and Fill Permit was received for the planned housing on Loop Road.  The tribe is now waiting for NPS permission before starting work.  the tribe is within its rights and are abiding by NPS regulations and compliances.  He added COE put fill at the bridges and NPS has been stopping to look at this periodically.  They may want to say something but as of now have not done so.  They (NPS) know of they say anything to the tribe about these fill placements, which was placed by COE, they will be building a stronger case against themselves.  He added Ft Myers, Bonita Springs and Palm Beach areas are being flooded and the government is not doing what they are suppose to.  If they had been doing what they were suppose to then the water level would not be as high.  He added the farmers are running television ads where they claim the sugar growers are polluting the everglades water and making money.  They are getting paid by the government for polluting waters and killing wildlife.  The tribe is a big obstacle in their way.  The water quality standard was changed and this will be heard in court.

### Item #6 Tribal Court

Chairman Cypress reported the Business Council is making every effort to insure the smooth operation of Tribal Court.  However, due to the death of one Judge and recurring illness with the other Judge this has been a difficult three month period.  He stated alternate judges will have to be installed and urged eligible tribal members to come forward to help.  He added some of the tribal members who have been asked say they do not want the position as it would mean sitting in on cases which involve family members and other tribal members.  He stated this issue goes back to us as Miccosukee Indians, keeping our differences and problems in house and not to take it to the non Indian court system.  This means keeping our youth under control and adhering to our cultural beliefs and customs.

Chairman Cypress stated if the cases are sent to the non Indian court system, our youth and tribal members will be bound by their rulings and this would just lead to worse conditions for us as a tribe.  The General Council needs to discuss this and work something out, we can not keep sending the cases to Miami.  He added the tribal members take the tribal court Judges ruling as personal.  He added the rulings are not personal and should not be taken as such.

Chairman Cypress added when General Council say they do not want to take part in the Tribal Court system, they are sending their family members, friends and other tribal members to the non Indian

17

**MICC 65026**

L000370
L000370

SGCMTG.11/02/95

judicial system and possible harsher terms. He added the possibility of Indian judges from other Indian tribes to fill the vacant positions has been considered. This would still be better than sending the cases out of the community.

Chairman Cypress stated the youth's behavior would get better if family members would request Indian medicine for them to use. After usage, if the conditions of the medicine were followed they would see a change in the youth. He added the first time they go to tribal court should scare them enough to behave better and not do the things that gets them in trouble. He reiterated if there were any tribal members who would like to be considered for any of the positions, Tribal Judge or Prosecutor, then to let Business Council know.

Chairman Cypress stated parents are purchasing illegal drugs and alcoholic beverages with their NTDR payments and also the children. He added the drugs are then sold on the reservation, if the persons selling drugs are arrested then their family members come to Business Council and tell them they are interfering in their lives. But these persons are harming their own families and the tribe as a whole. He added General Council is aware of who is selling the drugs but are not informing the proper authorities thinking it is none of their business. He added if Business Council takes the proper action against these people these same people will say Business Council is interfering in family matters. He stated it will be these same persons fault for not taking action earlier by not helping to solve the drug problem. He added MPD will be following up on this and any results will be reported to General Council.

Chairman Cypress reported drugs are being sold in the school, if this type of behavior continues, the person responsible will be disciplined at the Administration Office. He added guns and knives are being brought into the schools also. He stated the parents will be held accountable and they would have to go to Tribal Court over this matter. He added the number of underage minors driving on the reservation is getting out of control. He stated these young drivers are inexperienced and could very easily hurt a lot of people if they caused an accident. There is also the problem of teenagers out in the middle of the road, in front of Administration Building and surrounding complexes on their skateboards. He stated these teenagers come out into the roads with out checking for traffic. This is very dangerous and should be addressed by the parents as soon as possible.

Chairman Cypress stated General Council grounds are open to them and culture talks can be held. He added General Council should not wait for Business Council to schedule the culture talks.

18

**MICC 65027**

L000371
L000371

SGCMTG.11/02/95

He added curfew for the children will be enforced.  He stated he has been informed by MPD children are picked up and taken home but the parents are not there.  He advised parents to be aware of where their children are and for the children to know where the parents are.  The parents should insure they are home at a reasonable hour so the children will be taken care of and not left to take care of themselves.

Chairman Cypress reiterated Tribal Court is in need of Judges and Prosecutors.

Chairman Cypress added minors show up for their court appearances without parents or guardians.  Business Council has directed tribal; court staff to notify MPD next time it happens.  MPD is to locate the parent or guardian and bring them to tribal court to be with their child.  He added if this continues then the possibility of withholding the child's NTDR payments has been discussed.  The parents need to take responsibility for their children.

Andy Buster reiterated the comments made by Chairman Cypress.  He stated summons for court appearances do have the date and time so there should be no reason for the parents not to attend.  If the minor or the parent does not attend then other charges could be levied.  He stated he agreed with Chairman Cypress, the parents need to take responsibility for their children and their behavior and not let them go astray.  He added if this type of behavior is allowed to continue there could be serious consequences and this would affect the entire family if not the clan.

Mr. Buster added tribal court staffing has not been full in a long time.  He added the judges have always been from the Panther and Bird Clans with the majority being from the Bird Clan.

Howard Osceola stated his nephew has recently moved in with his aunt on the reservation.  He has told him he has seen people purchasing drugs from tribal members on the reservation and where they are purchasing to sell.  He added he knows the drugs are being dealt locally.  He has advised his nephew to stay away from these persons, if anything should happen then he will also be blamed.

Mr. Osceola stated he is very worried about the underage drivers on the reservation.  He added the major concern facing the tribe which has to be dealt with is the selling of drugs and the drugs being possessed in the schools.  He stated the younger school children could be given these drugs under false pretenses with grave consequences.  The children are very trusting and will do practically anything an older child tells them to do.  He again reiterated the tribal members have to face up to the drug problem we have in the community and do some thing to rid it off our

MICC 65028

L000372
L000372

SGCMTG.11/02/95

community.  The parents can not keep ignoring the fact that our
children are abusing and selling drugs.

Jackson Tiger stated he has heard his name has been put on the list
for a possible judge alternate position.  He added in the past he
and Bobby Billie had been appointed to patrol the area at nights.
If they observed any minors loitering around the Administration
complexes or any place they were not to be, they were taken home.
He stated he has experience in dealing with the youth.  He added
with all his other obligations he could forget the court dates and
this could present problems.  He stated he was unhappy with the
present Miccosukee Police Officers.  He does not like the way they
treat the tribal members and the community.

Mr. Tiger stated if he was appointed he would serve but he himself
could not come forward and say he will be a judge.  He added the
parents are no more than children themselves, they are raised with
no discipline and are raising their children in the same way.  He
stated this is the main reason the tribe is facing all these
problems.  With no parental guidance and discipline these problems
will continue.

### Item #7.  AAR Plaza Report

Chairman Cypress reported the firm of Freeman and Associates are
doing the audit for AAR Service Plaza.  They will be reviewing the
records from conception of the business to present.  If during this
audit it is determined there are monies due to the tribe it will be
addressed.  He added if the problems with Mr. Streicher are not
resolved then it could come to where Mr. Hernandez, Finance
Director, maintains the bookkeeping.

He added Jimmie Bert has been advised to continue forward with his
work on his business.  He has recommended he check his material and
supplies periodically and maintain in working condition so as not
to delay when all paperwork is completed.

Chairman Cypress stated the financial report for AAR Service Plaza
will be submitted during the Finance report.

Chairman Cypress stated Mr. Streicher will be meeting with Business
Council next week regarding the Christmas present list of MIS, Head
Start and Day Care children.  He added the senior citizens
participating at the Elderly Center are included as well as all
tribal members.  He reiterated Mr. Streicher is managing the
business on a monthly business and if it is discovered he has been
misappropriating funds then he will be terminated.

Chairman Cypress reported the telephone tower lease is also being
reviewed.  One company had approached Business Council regarding

MICC 65029

L000373
L000373

SGCMTG.11/02/95

the possibility of the tribe not benefiting from the present lease.

He added this company had said the lease does not seem to be beneficial for the tribe but more for the leasing company. Business Council gave their approval for them to proceed in the investigation and any findings, Business Council will report at the February General Council meeting.  He added they have stated the tribe is being taken advantage of in the lease and they will straighten it out.

Cassandra Osceola questioned who handles the purchasing of goods to be sold in the store or the type of agreements they made with people.

Chairman Cypress stated at this time the management does the buying for the enterprise.  He added the tribe could dictate someone else to do the purchasing but Mr. Streicher has stated they buy the only items that sell good.

Ms. Osceola stated she had been at the Service Plaza and the day manager had told her the tribe does not allow consignment items. She informed him she had never heard this stated in the meetings she has attended.

Chairman Cypress stated this is an example of the problems being encountered.   The manager is trying to keep things or do things with out Business Council being aware.

Ms. Osceola stated he had said it was to hard to keep track off. She added she did not like the way he was talking to her.

Chairman Cypress stated Business Council has first hand experience with this type of behavior.  When they start acting evasive things are usually being kept from Business Council.

William Jim, Sr. questioned how many years were left in the contract with Mr. Streicher.

Chairman Cypress stated Mr. Streicher's contract had 15 years left but his option to renew the contract had expired without any action from him.    Due to other problems with his handling of the enterprise he is only managing on a monthly basis.  He added due to these problems all the record are being reviewed.  The auditors are determining if there have been any infractions or violations of the agreement.   If the contract is voided then the tribe will be responsible for only the outstanding bills.  He added this is the risk Mr. Streicher is running.  He stated Mr. Streicher may be playing Santa Claus but the tribe does this all year and he only does this once a year.

**MICC 65030**

L000374
L000374

SGCMTG.11/02/95

**With no further questions, lunch break was taken at this time.
(12:05 p.m.)**

**Meeting resumed at 12:30 p.m.**

Before item #8 started, Chairman Cypress requested the meeting
proceed quickly as the some of the Business Council had to attend
cultural teaching sessions at 4:00 p.m.

**Item #8. Finance Report**

Mr. Mike Hernandez, Finance Director, distributed written financial
statements and reviewed it for General Council. Report, comments
and questions are as follows.

Mr. Hernandez reported the following Profit and Loss for the
Enterprises are as follows. He stated the end of the fiscal year
for the enterprises was June 30, 1995. (Copy of Financial report
attached).

**Miccosukee Restaurant.**

Page 1. This page shows the expenditures were more than the
revenue for every month of the year. He added the chart shows the
figures for these.

Page 2. This page shows how the first quarter revenue for FY' 96
compared to FY' 95. The September revenue was greater for FY' 96
than FY' 95. For the months of July and August, FY' 95 was
greater.

Page 3. The actual financial statement for the first quarter
FY'96, three months which ended on September 30, 1995 showed a loss
of $15,545.78.

Page 4. In FY' 96 (October) the financial statement again showed
a loss of $11,901.64 with a total four month loss of $27,447.62.
He added the restaurant had been closed for one month and hopefully
with the renovations completed the business will turn around.

**Miccosukee Service Station.**

Page 5. This page shows six of the twelve months the expenditures
were greater than the revenue. The chart shows which months these
were.

Page 6. The first quarter chart shows FY' 96 revenue was greater
than FY' 95 for the same months.

MICC 65031

L000375
L000375

SGCMTG.11/02/95

Pages 7 and 8. The actual financial statement for first quarter of FY' 96 , three month period, which ended September 30, 1995 shows a profit of $750.00 which is better than a loss. The four months which ended October 31, 1995 shows a total profit of $695.88.

**Miccosukee Airboats.**

Pages 9 through 12. The expenditures for FY' 95 were almost equal to the revenue except for the month of September where it shows a substantial loss. In FY' 95 there was not a major loss in the revenue. He added the FY' 95 and FY' 96 July and August comparison showed there was less revenue in FY' 96. September FY' 96 showed a turn around in the revenue from $22,927 (FY'95) to $28,339.00 (FY'96) with a $6000 gain.

Total net operating income for the first quarter of FY'96, three months ended September 30, 1995, was $24,306.23. October 31, 1995 shows a loss of $2,206.88 with a four month period profit of $22,099.35. He added the Airboats are doing good.

**Miccosukee Gift Shop.**

Pages 13 through 18. Review of the chart shows the expenditures were less than the revenue for the year which enabled the Gift Shop to make some profit. FY' 95 and FY'96 comparison showed July and August of FY' 96 showed less of revenue and September FY' 96 showed a nearly equal amount to FY' 95.

For the first quarter of FY' 96, three months ended September 30, 1995, the net operating income showed a profit of $5367.07. For October 31, 1995 it showed a loss of $676.46 with a total four month period profit of $4,690.61.

**Miccosukee Village and Culture Center.**

Page 19 through 22. Page 19 shows the expenditures were greater than the revenue for six months of the year.

The comparison chart shows July and September FY'95 were greater than FY'96 same months. August FY'96 was greater than FY'95. He added September FY'95 showed twice as much revenue than FY'96.

For the first quarter of FY'96, three months ended September 30, 1995, the net operating income showed a profit of $6570.59. For October 1995 it showed a profit of $829.39 with a four month period profit of $7399.98.

Treasurer Billie reiterated Mr. Hernandez's report and asked if there were any questions for Mr. Hernandez. With no questions presented the report continued.

23

**MICC 65032**

L000376
L000376

SGCMTG.11/02/95

MIBG.

Page 23.  The three month first quarter report, ended September 30, 1995, shows $37,728,154.40 in revenue, cost of revenue, prizes paid out to customer, was $27,383,040.23 which left a gross profit of $10,343,114.17.

Of the $10,343,114.17 was used to pay the employee's salary, purchase equipment and items for the restaurant.  He added the expenditures are covered on page 24 of the report.

The gross receipts license fee received was $2,460,004.07.  This is the NTDR payments, part of this money has already been used for the September distribution.  The total operating expenses from the gross profits was $6,495,845.62 leaving left an income from operations of $3,849,268.55.  With other income received, which is listed, this left a net income of $3,970,049.27.  He added part of this money is received by the tribe but not all.

Page 25.  The chart shows $3,718,762.27 was received on this page but previous page shows $3,970,049.27 in net income.  There is a $200,000 difference in the figures which the following page shows.  MIBG held these additional funds to purchase equipment and other items, Business Council would be able to explain it in detail.

Mr. Hernandez reviewed page 25 to better explain which accounts the monies went in to.  He added Business Council tries to maintain the same quality and quantity of services it has given in the past.  He added with governmental budget cuts the assistance to the other programs are needed in order to operate.

Page 27 and 28.  Mr. Hernandez reviewed the different accounts, amounts in these accounts, amounts invested and the amounts invested overnight.

Page 29 and 30.  Mr. Hernandez reported of the $560,532.16 in the reserve account for the Tobacco Shop, $397,000 is invested in different financial institutions which are listed.

Page 32.  This page list that the NTDR revenues were $2,067,414.32 and the amount invested was $1,000,000.  Mr. Hernandez stated after page 31 was printed another $1,000,000 was invested so this is not the true figure.

Treasurer Billie reviewed Mr. Hernandez's report.

Pages 33 and 34.  The Reserve Account shows funds of $6,015,895.82 of which $3,824,566.98 is invested.  Page 33 shows which banks the funds are invested in and the percentage rates received.  He added these funds are invested in three month terms and the remaining

MICC 65033

L000377
L000377

SGCMTG.11/02/95

funds are placed in overnight investments. These (overnight) investments are at a lower rate but is still invested.

Pages 35 through 38. These pages covered the Tribal, Enterprises and Legal & Financial Assistance. Part of the enterprise assistance funds were use to pay for the renovation of the Miccosukee Restaurant in October which is not listed. He added $944,994.42 was invested and listed which institutions these funds were invested with. He stated the Lehman Brothers brokerage house where the funds are invested have very good rates and returns.

Mr. Hernandez reported the tribal Health department is receiving less funds from the government and do need the extra funds which is provided. He added these supplemental funds are used to pay for the tribal members (with out insurance) medical bills. He added $150,000 is invested in overnight accounts. He stated for the Legal Financial assistance, $100,000 is invested over night.

Pages 39 through 41. These pages cover the proposed new buildings to house the Gymnasium, Tribal Court House, School and the remodeling of the Administration Building. Of the $2.3 million in reserve for these projects, $1.4 million is invested overnight. He reviewed where these monies are invested and which institutions they are invested with and the amounts of each investment.

Pages 42 and 43. These pages covered the Tribal Member Appreciation Fund. It lists which institutions the funds are invested with and the amounts. Of the $560,000, $175,000 is invested in overnight accounts and the rest for usual term of 90 days.

Pages 44 and 45. These covered the Housing Reserve account. Of the $1.1 million, $490,000 is invested for future housing and $652,000 is invested in overnight accounts.

Pages 46 and 47. These pages covered the Government Programs assistance and Tribal Member with Physical and Mental Limitations Assistance. He stated of the assistance provided to Government Programs, $340,000 is invested in over night accounts.

**Miccosukee Service Plaza (AAR)**

Pages 48 and 49. These pages reviewed the financial statement covering the first quarter, three months ended September 30, 1995. Total income was $1,790,113.86, costs of sales was $1,348,404.21 leaving a gross profit of $441,709.65 after operating expenses this let a net income of $55,821.79.

**MIBG.** Chart reviewed.

25

**MICC 65034**

L000378
L000378

SGCMTG.11/02/95

Mr. Hernandez reported the figures for this report would not have fit on the pages and had to present a chart. The chart showed revenue was received from MIB management (TPL) from September 14, 1990 through February 1993. After the tribe took back management from February 1993 to October 1993 MIB revenue was received for a half million dollars. From October 1993 through September 1995 the chart shows a dramatic increase in the revenue.

He explained the net income and the NTDR payments use to be combined but due to threat of the Gaming Revenue Taxation, Business Council decided to separate the funds and this reflected a drop in the figures. He added the net income is rising again.

Pages 51 through 54. These pages covered the Miccosukee General Account funds and expenditures. The report covered the twelve months which ended September 30, 1995. A total income of $19,000,000 has been received which $17,000,000 has been from MIBG. He added $5.5 million was from the license fee.

Mr. Hernandez stated all the funds coming into the tribe are listed and the amounts for each item are listed. He added the 1994 audit has been completed and can be reviewed Monday through Friday , 8:30 to 4:30. He advised General Council to check with Business Council first.

Chairman Cypress stated there is a sign in sheet which has to be done before reviewing the audit.

With no further questions for Mr. Hernandez the meeting proceeded to the next item.

Chairman Cypress stated Chief Zecca had some concerns with tribal members abusing the NTDR monies and other items which he requested to present to General Council.

Chief Zecca reported 2 years ago Miccosukee Police Officers arrested 2 of Tom Shirley's son for interfering with police activities near their permit camp. The officers had been investigating an airboat accident on AAR area. The Shirleys were removed from the permit camp by Business Council due to the circumstances. He added the case went to trial and the Judge dismissed the charges stating MPD did not show proof of criminal intent.

Chief Zecca stated the two boys were removing airboats from the accident scene while an investigation was on going. Even with this evidence presented the Judge still said they did not do it on purpose.

MICC 65035

L000379
L000379

SGCMTG.11/02/95

Chief Zecca reported a tribal member and non indians had been arrested on the AAR area for illegal poaching of pigs. MPD worked together with BSO to arrest these individuals, it took awhile to get the State Attorney to prosecute them.  The first charge had been a felony but the State Attorney had said they were willing to charge the men with misdemeanors.  He stated he had no objection with this but had presented the idea of the Tribe receiving monetary compensation for the hogs.  He added this will be up to the Judge to decide.

Chief Zecca reported the Internal Affairs people at Metro Dade Police requested assistance in a case they were working on.  The DEA believed large amounts of drugs were being delivered on AAR by a permit camp member.

Sergeant Brooks took the case and was working undercover for 18 months.  With the combined work of all departments a successful case was made.  He stated FDLE, U.S. Customs, Metro Dade and Homestead Police were all involved in handling the case.  He stated seven kilos of cocaine was sold but not on AAR.  The actual sale was in Homestead where the arrest was made but not by MPD.  The drugs were being sold by one of the permit camp members and the possibility of the farm they had in Homestead coming into the Tribe's possession is possible.  He informed General Council if this were to happen, it would be quite awhile in the future.

Chief Zecca stated one of his main concerns is the amount of illegal drugs being brought on to the reservation and being sold. The other is the youth who are out in the street late at night.  He added these concerns have also been expressed by Social Services and MIS.

He added he is aware the persons selling drugs on the reservation are tribal members.  He has been told by the children they keep telling their parents to stop using drugs but they keep buying.  He added MPD is not trying to harm the children they are trying to help the whole community so if they are aware of who is selling to please inform them.

Treasurer Billie reiterated Chief Zecca's report and concerns.

Chairman Cypress stated Chief Zecca's concern is with parents using their children NTDR payments to purchase drugs and not properly caring for the children.  He urges the parents to put the money to good use.  He stated he has heard of instances where the parents are purchasing weapons, knives and guns, and giving these to the children.  He stated they should not do this as it was harmful to the children and the whole tribe.

MICC 65036

L000380
L000380

SGCMTG.11/02/95

He added community members are parking on the big bridge and at the Culture Center parking lot and consuming alcoholic beverages. He added they have been warned before to stop doing this but it is still continuing. The Business Council has instructed MPD to issue tickets to persons doing this from now on. He added this had to be done because the Airboats department is losing batteries among other things when there are people in the area.

## Item #9.  Benefit Concert at Watson Island

Chairman Cypress reported State of Florida is having a centennial celebration. The cities of Dade and Broward would like to do the same but are lacking funds. They presented a proposal to the Miccosukee and Seminole Tribes to put up the funds, they would then split the profits after expenses. He had informed them Business Council could agree to this but when presented to General Council, if they do not accept then it could not be done. He added the arts and craft and food vendors would be needed for this event.

Chairman Cypress stated the funds needed would be substantial as it would have to cover the security cost and promotional advertisements. He stated in the public announcements it would be stated the event is being co-sponsored by the Miccosukee and Seminole Tribes.

Tommy Tiger, Sr. questioned if the counties had no funds available at all.

Chairman Cypress stated no, they did not.

Chairman Cypress stated approximately $500,000 will be needed to sponsor this event. He added this was an estimated figure and it could change to a higher figure. He reiterated the profit would be split between the Miccosukee and Seminole Tribes and the cities.

Chairman Cypress stated at least 20,000 people would have to attend the event in order to get a return in profit.

Buffalo Tiger questioned if the monies raised do not cover the expenses could the Tribe lose money.

Chairman Cypress stated yes we would lose money and even if the monies cover the expenses, the return could not be substantial.

Discussion followed.

Buffalo Tiger advised General Council to keep in mind that Dade County has never assisted the tribe in any way. He added he is only speaking of his experiences with the city and the decision is up to General Council.

28

**MICC 65037**

L000381
L000381

SGCMTG.11/02/95

Treasurer Billie reported this proposal was presented to Business Council and he personally felt this would be good for the tribe. He added non indians could be of assistance to us in the future if they see the Miccosukee Tribe was helpful to the city. He added with the gaming revenue taxation being discussed, we would need all the support we could get.

Tommy Tiger, Sr. reiterated Treasurer Billie's comments and stated he felt the same way.

Discussion continued.

Jackson Tiger explained non indians have been helpful to the Miccosukee Tribe in the past. He reviewed the tribe's past history with non indians. He stated if assistance can be given it should be given. He added like Treasurer Billie and Tommy Tiger, he felt they could be of help in the future.

Chairman Cypress stated when MIBG was in the first phase of the planning stages, Mayor Clark was of great assistance in getting the permits and everything approved. He added the Governor and Secretary of Interior were against the idea of the Miccosukee Tribe having a gaming hall but with the support of Mayor Clark this was accomplished. He added the Tribe should look to the future and not reflect on past events. He added this would be a good promotional event but the final decision was up to the General Council.

Buffalo Tiger stated the Tribe should try to insure the counties will be of assistance in the future. He added when assistance is not received then it will be a lesson the tribe has learned.

Chairman Cypress stated this sponsorship could be approved by General Council and then the benefit concert could not come together and be canceled.

Betty H. Billie motioned to approve the co-sponsorship of the Benefit Concert at Watson Island with the Seminole Tribe; seconded by Alice J. Daye.

Before action was taken on the motion comments were presented.

Tommie Tiger, Sr. reiterated Mayor Clark along with other non-Indians had been of great support when MIB was going to be constructed and approval for the assistance request should be given.

Buffalo Tiger questioned who the performers were going to be.

29

MICC 65038

L000382
L000382

SGCMTG.11/02/95

Chairman Cypress stated entertainers were Gloria Estefan, Madonna and other local performers. He added the whole schedule of entertainers was not yet finalized.

Discussion continued.

Wayne Billie stated the performers are very well known in the entertainment industry and are very capable of drawing the amount of people needed to get a return in the investment. He added there are always alot of Hispanic people at MIB, this could be good for that business also.

Chairman Cypress requested action on motion made.

**Motion carried with a vote of <u>39</u> for, <u>01</u> against and <u>10</u> abstentions.**

Chairman Cypress stated approval had been given but as stated earlier, this event could not even go through. He added this would be a one day event and it will be requested the Miccosukee tribal members set up their booths at no charge as we would be co-sponsoring the event.

**Item #10. Planning Department Report**

Chairman Cypress reported there were three items to report on. He added as Mr. Logan was not present he will review this for General Council.

Chairman Cypress reported the contract for the Gymnasium construction has to be signed. He added Mr. Logan is meeting with the architect to discuss the price as it had been to high and additional bids had been sent out.

He added the construction of the Loop Road housing is held up in litigation as earlier reported.

Chairman Cypress stated all governmental programs within the tribe are all operating fine. He added some were not in compliance but have since corrected these.

Chairman Cypress reported governmental funding cuts are anticipated, if this should happen then as stated before tribal funds will be used to assist these programs. He added the tribe should not feel the affects of the budget cuts until next October.

Chairman Cypress stated the Federal Government always assumes the Indian Tribes will always be returning asking for assistance. They are worried now that the Tribes are self sufficient. This was

MICC 65039

L000383
L000383

SGCMTG.11/02/95

possible due to che revenue received from the gaming halls owned and operated by the Tribes.

He added Congress is against the taxation of funds generated by gaming on Indian lands. He added the politicians are now fighting amongst themselves over this issue.

He added Mr. Logan will be present at the next General Council meeting to give an update on these issues.

**Item #11.  Set Dates for Holiday Events**

Chairman Cypress stated dates for the tribal Thanksgiving and Christmas dinners has to be set. He added the Community Review Board will be planning the events but General Council has to set the dates.

Chairman Cypress questioned the dates the individual families had set for their parties.

The dates for the Thanksgiving parties for the camps were as follows:

| | | |
|---|---|---|
| November 22, 1995 | 12:00 p.m. | MIS |
| November 18, 1995 | 4:00 p.m. | Tiger's Camp |
| November 22, 1995 | 5:00 p.m. | Osceola's Camp (Monroe Station) |
| November 22, 1995 | 5:00 p.m. | Palm Hammock |
| November 25, 1995 | 5:00 p.m. | Virginia Poole's |

Chairman Cypress requested General Council set a date as the others were known.

**Betty H. Billie motioned to hold the tribal Thanksgiving Dinner on November 21, 1995; seconded by Rusty Billie.  Motion carried with a vote of 37 for, 03 against and 05 abstentions.**

Chairman Cypress requested a time be set also.

After discussion, the majority vote was for 4:00 p.m.

After further discussion it was decided the same menu as last year's will be used.

**Betty H. Billie motioned to hold the tribal Christmas Dinner on Wednesday, December 20, 1995 at 4:00 p.m.; seconded by Eric Cypress.  Motion carried with a vote of 26 for, 00 against and 05 abstentions.**

General Council questioned if the employees will be allowed to leave work early to attend the party.

31

**MICC 65040**

L000384
L000384

SGCMTG.11/02/95

Chairman Cypress stated the directors for each department will have to decide.  He added volunteers will be needed so they could go over there early to help.

Chairman Cypress stated the NTDR payments will be December 1, 1995 and the Christmas bonuses will be two weeks later.

Chairman Cypress stated the Arts Festival date has been set and Festival Committee members need to set schedule so they are available to direct the booth set up for the vendors who arrive early.  He added some of these vendors arrive at least two days early.

## Item #12.  Tribal Memberships/Relinquishments

Chairman Cypress urged General Council to keep their personal feeling and emotions under control.  He stated there should be no need for outbursts as the tribal ordinances are followed.  He advised Secretary Bert will be handling this portion of the meeting.

Secretary Bert asked if there were any applications for tribal enrollment.   He was informed there were 10 applications; as follows.

Before applications were read, Secretary Bert questioned if the applications were going to be reviewed all together or separately.

After discussion, General Council stated it would be reviewed separately.

01.  Brandi Lynn Wilson, Bird clan; parents are Randy Wilson (Tahkoshathee clan, tribal member) and Heather Lynn Cypress (Bird clan, tribal member).  Represented by Evelyn S. Cypress, maternal grandmother.

Betty H. Billie motioned to accept the tribal enrollment application; seconded by Alice J. Daye.  Motion carried with a vote of 44 for, 00 against and 01 abstention.

02.  Shay Novack Clay, Wind clan; parents are James Clay (Tahkoshathee clan, non-tribal member) and Audrey Osceola (Wind clan, tribal member).  Represented by Nina Billie, maternal great grandmother.

Betty H. Billie motioned to accept the tribal enrollment application; seconded by Jackson Tiger.  Motion carried with a vote of 43 for, 00 against and 01 abstention.

MICC 65041

L000385
L000385

SGCMTG.11/02/95

Evelyn S. Cypress stated the following three enrollment applications were for siblings, had the same parents and were represented by the mother. After the applications were read, General Council could decide if they would motion for all three together or separately.

03.  Montana Cypress, Otter clan; parents are Dwight Cypress (Bird clan, non-tribal member) and Shirley Frank (Otter clan, tribal member). Represented by Shirley Frank, mother.

04.  Talbert Henry Futch Cypress, Otter clan; parents are Dwight Cypress (Bird clan, non-tribal member) and Shirley Frank (Otter clan, tribal member). Represented by Shirley Frank, mother.

05.  Ashley Cypress, Otter clan; parents are Dwight Cypress (Bird clan, non-tribal member) and Shirley Frank (Otter clan, tribal member). Represented by Shirley Frank, mother.

Secretary Bert questioned if General Council was going to motion all three tribal enrollment applications or review separately.

General Council consensus was all three tribal enrollment applications be motioned together.

Betty H. Billie motioned to accept the tribal enrollment applications numbers 3, 4, and 5; seconded by Alice J. Daye. Motion carried with a vote of 48 for, 00 against and 01 abstention.

06.  Mariah Lauren Cypress, Panther clan; parents are Jerry L. Cypress (Tahkoshathee clan, tribal member) and Diane T. Cypress (Panther clan, tribal member). Represented by Diane T. Cypress, mother.

Alice J. Daye motioned to accept the tribal enrollment application; seconded by Betty H. Billie. Motion carried with a vote of 48 for, 00 against and 01 abstention.

Evelyn S. Cypress stated the following two enrollment applications were for siblings, had the same parents and were represented by Betty H. Billie, maternal Great Aunt. After the applications were read, General Council could decide if they would motion for both together or separately.

07.  Marshall Blake Sanders, Otter clan; parents are Phillip Sanders (Bird clan, tribal member) and Margaux Doctor (Otter clan, tribal member). Represented by Betty H. Billie, maternal Great Aunt.

33

MICC 65042

L000386
L000386

SGCMTG.11/02/95

08.   Evertt Mitchell Sanders, Otter clan; parents are Phillip
      Sanders (Bird clan, tribal member) and Margaux Doctor
      (Otter clan, tribal member).  Represented by Betty H.
      Billie, maternal Great Aunt.

Secretary Bert questioned if General Council was going to motion
both tribal enrollment applications together or separately.

General Council consensus was both tribal enrollment applications
be motioned together.

**Alice J. Daye motioned to accept the tribal enrollment applications
numbers 7 and 8; seconded by Betty L. Osceola.  Motion carried with
a vote of <u>47</u> for, <u>00</u> against and <u>01</u> abstention.**

09.   Deiondra Marteka Bert, Otter clan; parents are Dion Bert
      (Bird clan, tribal member) and Amanda Bert (Otter clan,
      tribal member).  Represented by Betty H. Billie, maternal
      Great Aunt.

**Alice J. Daye motioned to accept the tribal enrollment application;
seconded by Laura B. Abdo.  Motion carried with a vote <u>44</u> for, <u>00</u>
against and <u>01</u> abstention.**

10.   Rebel Cassidy Gage Billie, Panther clan; parents are
      Steven J. Billie (Bird clan, tribal member) and Jodi J.
      Billie (Panther clan, tribal member).  Represented by
      Nancy Jim, maternal Grandmother.

**Patricia Bert motioned to accept the tribal enrollment application;
seconded by Betty L. Osceola.  Motioned carried with a vote of <u>40</u>
for, <u>00</u> against and <u>01</u> abstention.**

Evelyn S. Cypress stated the family of Clayton Billie, Michelle
Billie, mother, stated they would like to enroll him in the
Miccosukee Tribe.  They stated  he is currently enrolled in the
Seminole Tribe but will be seeking relinquishment.  The Seminole
Tribe will be holding their Council meeting later in November and
if relinquishment application is approved then they will submit
tribal enrollment application to the Miccosukee Tribe in February.
They requested she present this to General Council at this meeting
and if there are any papers they should present or any other
requirements General Council has then they will know in advance and
be prepared in February.

After discussion, it was General Council consensus that they should
go through the same procedure as the Huggins family.  They
submitted papers stating they would not be receiving the Land
Settlement monies and verification their enrollment relinquishment

**MICC 65043**

L000387
L000387

SGCMTG.11/02/95

had been approved.  As stated the same would be required of Clayton Billie.

**Relinquishments.**

Secretary Bert asked if there were any applications for enrollment relinquishments.  Evelyn S. Cypress, Administrative Coordinator, informed him there were none.

## Item #13.  Marriage Recognition/Dissolution

Secretary Bert asked if there were any applications for marriage recognition or dissolution.  Evelyn S. Cypress, Administrative Coordinator, informed him there were none.

## Item #14.  Councilmen Reports

Chairman Cypress requested Councilmen to present his report and he would present his after.  He added he was pleased the General Council meeting went fine and finished quickly.  He added the tribal members have to remember General Council meeting is held to conduct tribal business in a respectful manner.  He stated personal matters should be handled as they are, personal and private.

Assistant Chairman Nelson reported the dates for the Arts Festival are December 26, 1995 through January 1, 1996.  He added the Festival Committee are working to finalize some matters and to tie up loose ends.  He added expenses are high and not all is available in the Festival Account.  He will be requesting for supplemental funds when the dollar amount is finalized.  He will inform Business Council when this amount is known.

Treasurer Billie reported his position as Facilities Manager and salary were paid under BIA but has moved into Business Council position and is being paid through General Account.  He added MIS is having disciplinary problems with one student who had brought a knife to school.  As he was a family member he administered traditional discipline (scratching).  He added the problem of students bringing guns and knives to school has never been noticed until now.  He urged the parents to better raise the children with cultural teachings and discipline.  He added these are very serious matters and should not be taken lightly.

Secretary Bert reported Business Council has traveled to observe gaming operations in different Indian owned and operated gaming halls.  He added they have visited gaming halls in Las Vegas and Milwaukee.  He stated some of these observations could at some time be implemented at MIB with revisions.

MICC 65044

L000388
L000388

SGCMTG.11/02/95

Lawmaker Cypress stated he did not have anything to report at this time.

Chairman Cypress reported he will be attending a workshop on 638 contracts.  He added the 638 contracts have been helpful to the Indian Tribes.

He added Business Council will be meeting with tribal consultants next week to discuss tribal issues such as water flooding and taxes.

Chairman Cypress reported as stated before the tribal member who supplied the car salesperson with the tribal homeowners agreement did this with no thought for other tribal members.  He added there were some items the Business Council had wanted to propose but with this being done by a tribal member he is hesitant to proceed with the plans.  Business Council will be reviewing further before proceeding.

Tommy Tiger, Sr. questioned Chairman Cypress if he was referring to gaming taxes.

Chairman Cypress stated no, state taxes levied on purchases.

Chairman Cypress advised chickee builders to be careful of who they hire as workers as they could not be of good character.  He stated there have been instances of chickee builders being harassed by a county employee.  He has stated to them permits are required for construction of chickees and they will be reported.  Upon further investigation it was learned that a former son in-law of Bobby Henry was involved in this.  He stated if this harassment does not end then a lawsuit will be considered.

**Item #15.   General Discussion**

Chairman Cypress stated General Council will now be allowed to present their comments or any questions they have.  He again requested personal feelings be kept out of this meeting and to refrain from argumentive sessions.

Connie Jim stated the one item she wished to address was future enrollment procedures.  She stated children with no clans (mother is non-Indian) will not be allowed to enroll in the tribe.

Chairman Cypress explained Connie Jim's statement and informed Mrs. Jim her comments were duly noted but as with all tribal enrollment applications the General Council will be the deciding factor and not just her comments.

MICC 65045

L000389
L000389

SGCMTG.11/02/95

Connie Jim added if the enrollment of children with no clans still continue then children of non-Indian males will also be denied enrollment in the tribe.

Andy Buster stated these comments leads back to us, the parents, in the way we raise our children. We should teach our children in the traditional ways and with discipline. If we did this effectively then we would not be sitting here arguing over the enrollment of children with no clans and children of non-Indian males. If we arguing amongst ourselves over these children we have branded as not fit to be a member of the tribe, whether it is here or in our homes then we are teaching our children to display negative behavior towards others. We should not be doing this, we have to look within our own families and clans and not sit here blaming everyone else for children of other races being born into our families.

Jackson Tiger reiterated the parents now days are young and not raising there children with discipline or respect for their elders. This was evident during Halloween night when there were alot of young children out in the street throwing eggs at passing cars or people. He added it is up to us, the parents, to instill values in our children. He added if this non discipline continues we will be hurting ourselves as a tribe.

He added the actions of our children could lead them to being put in jail for a very long time and we would wish we had done things differently. He reiterated the parents have to take responsibility and raise our children better disciplined.

Buffalo Tiger stated the older generation understand what is being said but the younger ones , ages 23 and down, are not able to comprehend and take into consideration what is being said. He agreed the teenagers are having children at a young age and raising their children with no discipline nor guidance. He added families have to get back to where the children are raised with discipline and disciplining the children. He added the traditional ways of the Miccosukee Indians should not be lost as this would lead only to destruction.

Pauline Tiger stated the children should be taken to their grandparents or uncles for traditional discipline. This is the way it has always been and tradition should continue. She added if the children misbehaved then the parents were also given the same form of punishment as the children received.

Lois T. Billie stated she had anticipated this problem when in MIS the students were out of control and undisciplined the parents were against any type of disciplinary action. She added the MIS staff should be allowed to administer discipline or take them to someone

37

**MICC 65046**

L000390
L000390

SGCMTG.11/02/95

who can.  She added she herself does not have anything against traditional discipline as she was raised with this type disciplinary action.

Tommy Tiger, Sr. stated when the children were disciplined the non-Indian employees raised an issue about it.  He added they would threaten to take the children from their parents custody.  He added this problem with the non-Indians has been resolved and the traditional discipline is being allowed.

Lois T. Billie stated she had an issue to present to General Council.  She stated she had thought the issue of non Indians residing with their wives/girlfriends had been resolved but she has heard there is one tribal member who is still allowing her non Indian male friend to reside with her in her house and he is allowed to go on MIS sponsored field trips.  She has heard he has been residing in this house for a long time and the homeowner is not listening to the Business Council.

Chairman Cypress stated this issue has been addressed for the past several meetings and Business Council had assumed the problem had been resolved.  He added this will be looked into and if warranted a meeting will be scheduled with the homeowner.

A lengthy discussion followed regarding the alleged situation of a non Indian residing in the home of a tribal member.

Buffalo Tiger addressed members of his clan (Bird), he stated General Council meetings are held to conduct tribal business and items such as this should be discussed at our own homes amongst ourselves as it is a family (Clan) issue.  This should not be brought before General Council and fought over, we should refrain from making spectacles of ourselves and conduct ourselves as adults with out resorting to name calling or trying to be better than someone else.

Judy J. Osceola stated the same should apply to tribal member males who have non Indian females residing in their homes.  They should not be allowed to have them residing there.

Chairman Cypress reiterated earlier comments made by Connie Jim, the children who have no clan and children who have non Indian males for fathers could be denied enrollment in the Miccosukee Tribe.

Evelyn S. Cypress stated a memorandum had been submitted by Harry Billie, Recreation Director, requesting to change the gymnasium hours.  Ms. Osceola read the memo for the record.

MICC 65047

L000391
L000391

SGCMTG.11/02/95

Cassandra Osceola stated he is never there to supervise the activities and there is no planned schedule of activities for the youth. She added Business Council needs to address this, they need to make accountable for the hours he is to be there and start working for the recreational needs of the youth which he was hired to do.

Chairman Cypress stated Business Council has addressed this issue with Mr. Billie before and he has said he is not running a baby sitting service. He needs to run a recreation program but is not possible when he has to watch a lot of children.

Betty L. Osceola stated MIS uses the gymnasium on those days he is proposing, where will the students go and was this considered and discussed with MIS before submitting the memo.

Jackson Tiger questioned if he was aware that he is taking on additional duties. He stated when there is a death in the community, cultural teachings and restrictions have to be adhered to. He added this does not seem to be done at times.

Discussion of Mr. Billie and his erratic work schedule and lack of job dedication continued.

It was General Council's consensus that Mr. Billie's work habits will never change and the recreation program will suffer because of it.

Theresa Willie stated it seems Business Council has been talking to him for a long time with no changes or results. It would seem he does not listen to Business Council and this should be addressed also.

Wayne Billie stated it may be just a rumor but he has heard that Mr. Billie has stated he does not want to be in the gymnasium due to the asbestos in the building. This is known to cause cancer and with the passing of the previous two people who took care of the building, Stanley Frank, Sr. and Henry Osceola, he is scared it will happen to him.

Chairman Cypress stated if this is his problem then he should inform Business Council so they can find another Recreation Director for the program.

Lois T. Billie stated to her knowledge non of the tribal employees follow guidelines and are always away from their work stations in the times she has been to the offices. She stated she did not understand what the problem was since his describe behavior seemed to be the normal conduct of all employees. She added if she should be returning from Miami, employees are usually headed into town.

MICC 65048

L000392
L000392

SGCMTG.11/02/95

Suzanna Tiger questioned if Mr. Billie had gone through the proper channels before submitting this change of hours proposal.  She added if this were not followed then it should not be considered.

**Suzanna Tiger motioned for Harry Billie, Recreation Director to resubmit the proposed gymnasium hours at February's General Council meeting; seconded by Andy Buster.**

Chairman Cypress questioned if it was to be resubmitted along with Mr. Billie's explanation of his work attendance and the issue of the asbestos scare.

It was General Council consensus this be done.

Chairman Cypress stated there were at least four items of concern General Council needed clarified and Mr. Billie was to be present at the next General Council meeting.

General Council concurred.

Lengthy discussion followed on Mr. Billie's usage of the recreation van for his personal use.

Chairman Cypress requested action on the previously made motion.

**Motion carried with a vote of 20 for, 00 against and 04 abstentions.**

With no further items for discussion, Chairman Cypress requested motion to adjourn the meeting.

**Suzanna Tiger motioned to adjourn the November 2, 1995 General Council meeting; seconded by Andy Buster.  Motion carried with a vote of 25 for, 00 against and 00 abstention.**

The General Council meeting officially adjourned at 3:28 p.m.

MICC 65049

L000393
L000393

# Exhibit 8

## MICCOSUKEE TRIBE OF INDIANS OF FLORIDA
## SPECIAL GENERAL COUNCIL MEETING
### THURSDAY, MAY 04, 2000
### 10:00 A.M.

1.  Roll Call

2.  Approval of Agenda

3.  Approval of General Council Minutes from February 03, 2000

4.  Alligator Alley/MIBG/MRCC Reports

5.  Legal Reports/Everglades

6.  Finance

7.  Health Insurance for Tribal members

8.  Housing Update/Request from Tribal member

9.  Recognition of Marriage

10. Dissolution of Marriage

11. Guardianship applications

12. Tribal enrollment relinquishment applications

13. Tribal enrollment applications

14. Councilmen applications

15. General Discussion

SJ001406

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA
SPECIAL GENERAL COUNCIL MEETING
THURSDAY, MAY 04, 2000
10:00 A.M.

### Item #01.  Roll Call

A special meeting of the Miccosukee General Council convened at the Chickeechobee Council grounds on Thursday, May 04, 2000.

Chairman Cypress announced quorum had been achieved at 10:05 a.m. with 27 voting members present. He stated there were 15 agenda items with the majority being repeat items. He requested Treasurer Billie present the opening remarks.

Treasurer Billie stated it has been three (3) months since the last General Council meeting. He stated there were 27 voting tribal members present with five (5) clans represented. The clans represented were as follows: Bird, Panther, Wind, Otter and Tahkoshathee. He requested General Council to keep their remarks to the topic at hand.

Lawmaker Cypress stated it has been three (3) months since the last meeting and General Council will be updated on issues that were discussed at the last meeting and will be advised of any new issues that have risen since the last meeting. He advised General Council to behave accordingly and if someone is presenting their comments they should wait for that person to finish speaking and not interrupt them. He urged General Council to utilize the microphones, when the microphones are not used, it is difficult for the recording secretaries to hear the comments being made therefore they are unable to duly note these comments. He stated all the comments made by General Council are important therefore they should allow each other to present these comments without interruption.


Chairman Cypress announced the following Officers of the tribe present:

| | | |
|---|---|---|
| Jasper Nelson | - | Assistant Chairman |
| Max Billie | - | Treasurer |
| Jerry Cypress | - | Lawmaker |
| Andrew Bert, Sr. | - | Secretary |
| Billy Cypress | - | Chairman |

Recording Secretaries for the meeting were Evelyn S. Cypress, Tribal Administrative Coordinator and Diane T. Cypress, Assistant Chairman's Secretary.

### Item #02.  Approval of Agenda

Chairman Cypress reviewed the Agenda for General Council. He stated there was a typo on item

*1*

**SJ001407**

SGCMTG.05/04/2000

#14, this should read Councilmen Report.  He requested motion to accept if there were no other changes noted.

**Richard Buster motioned to accept the Agenda with the correction; seconded by Andy Buster. Motion carried with a vote of 22 for, 00 against and 00 abstention.**

## Item #03.  Approval of Minutes

Chairman Cypress stated a Community meeting had been held on Tuesday night to review the February 3rd General Council Meeting minutes.  He stated tribal member attendance at this meeting was low as usual.  He stated he had noticed where there was one correction to be made which was in reference to the request submitted by Jimmie Willie, this was to have been noted as an enclosed structure and not a chickee.  He stated he had not made it clear during his report/review of this item and may have been the cause for the confusion.

Chairman Cypress stated some tribal members had already taken their copies of the Minutes and he would like to know if they or any of the tribal members who were present during the reading of the Minutes have any corrections they have noted.

Laura Abdo requested clarification on Chairman Cypress' report on page 21 of the Minutes (which she read).  She stated the report was in reference to the pending housing sites for her father (Sonny Billie) and her brother (Colley Billie).  She had understood this site would be located between late Lois Billie's and Colley Billie's home sites, it would be fill on fill and not a new site.  She stated there are some tribal members who did not understand this as they have been asking her about it and she would like for this to be clarified for them.

Chairman Cypress stated the home site would be located on an area which already had existing fill (the permit had already been obtained for this a...d initial fill was put in) and there was one small area which required a permit (this was located right in front of the new sites) and when the permit is received then fill would be placed in this small area.  He reiterated to General Council that the fill being placed for the new home sites was in an area where fill had initially been placed therefore it was fill on fill.

Chairman Cypress reiterated the earlier request, that General Council use the microphone when presenting their comments.  He stated when this is not done, it is hard to hear the comments and note the comments in the Minutes.

Chairman Cypress requested motion to accept the Minutes if there were no other corrections to be noted.

**Richard Buster motioned to accept the February 03, 2000 General Council Minutes (with**

2

SJ001408

SGCMTG.05/04/2000

noted corrections); seconded by Jackson Tiger.  Motion carried with a vote of <u>21</u> for, <u>00</u> against and <u>01</u> abstention.

Chairman Cypress informed General Council the Minutes had been accepted.

### Item #04.  Alligator Alley/MIBG/MRCC Reports

Chairman Cypress reported a new manager has been hired for the AAR Service Plaza, business has been steadily increasing.  The Plaza had a contract with Shell gas company for the fuel but their prices were to high and other companies had been contacted to see which would give us a better price.  After this search, it was decided that Mobil gas company was offering the better price, after the tribal attorneys review the contract and forward to BIA for their review and approval, it will be then forwarded to Business Council for final approval and signature.  He stated after the process is completed (if approved by all parties) then Mobil will be the fuel provider for AAR Service Plaza.

Chairman Cypress reported on the status of the tax problem that the previous manager (Stan Streicher) is embroiled in.  He stated Mr. Streicher is contending the tribal attorney did not explain the tax exemption (which was only for the Service Plaza) thoroughly which ultimately led to his current tax problems.  He is contending that the tribe should accept some of the financially responsibility for the tax fine, which was levied against him but this is not the case, he wrongfully used the tax exemption right for his personal businesses which is not allowed (under law).  He stated all this was explained thoroughly to him but he seems to be the type of person who forgets and or remembers certain parts of a conversation/meeting, whichever or whatever is convenient for him and the situation at hand.  He stated each time this case has gone to the court/trial, the ruling was against him but he appealed the ruling but he lost this also.  Mr. Streicher seemed to believe the tribe would help him (defend him in court), we would have if this was a problem that involved the tribe but his actions are what created the problem for him and it was nothing that the tribe did to him (as he seems to believe).

Chairman Cypress reported as Service Plaza Manager (Mr. Streicher) over saw several bank accounts (which held tribal profits/monies) which totaled approximately $100,000.  When he was terminated as manager he assumed the money in these accounts were rightfully his but the tribe challenged this as it was profits made from the Service Plaza.  At first the courts ruled in Mr. Streicher's favor but the tribe appealed this ruling.  He stated the bank's stand was that the tribe was the owner of the business therefore the money in the account/s was rightfully their's and not Mr. Streicher.  During the court proceedings, the tribe acted as the bank's lawyer and defended the bank.  After the appeal process, the appellant court ruled for the tribe stating Mr. Streicher did handle the accounts but this was only when he was in the managerial position, after his termination, then all access to the accounts would also be terminated.  He stated the courts ruled the money should be released to the tribe but again, Mr. Streicher is appealing this decision.

SJ001409

SGCMTG.05/04/2000

Chairman Cypress stated the tribe is currently reviewing all business decisions and or actions taken by Mr. Streicher during his term as manager of the Service Plaza to insure the tribe does not face any consequences as a result of any actions taken. He stated the tribe hires people who they believe are trustworthy and are capable of the job but there are some who try to take advantage of us. He stated these are the people who create problems for the tribe, after they are terminated, then the tribe has to work to clear up these problems.

Chairman Cypress reviewed the tribe's history of such problems/situations.

Review of enterprise (AAR Service Plaza)continued as follows.

Chairman Cypress reported the septic tank at the plaza has been replaced, the contractor is requesting payment (of $90,000) for the work. The work was done without final approval from Business Council, the approval was given to the contractor by Indian Health Service (IHS). When the work was done, the required testing was never done, the tribe was never informed of the approval given (by IHS) therefore we have informed the contractor we will not pay the bill. He reiterated the required testing should have been performed by the contractor as well as IHS, the tribe has informed IHS they are the ones who gave approval for the work therefore they are responsible for the bill. He stated Business Council is still working towards expanding the enterprise but first some of the minor repairs have to be addressed. He reiterated Mobil gas company now has the contract for the delivery of the fuel to the plaza.

Chairman Cypress stated this concluded the report for the AAR Service Plaza and asked if there were any questions or comments from General Council regarding this report. With no questions nor comments presented, the meeting continued with the MIBG report. Report, questions and comments were as follows.

Chairman Cypress reported the MIBG will have been in operation for 10 years on September 15th, the Business Council has considered the possibility of having a celebration to note this anniversary or to let it pass as just another day of operation. He stated the gaming hall is beginning to show the effects of the ten years (wear and tear, inside and outside of the building).

SJ001410

SGCMTG.05/04/2000

He stated the annual Freedom Fest will be held on Wednesday, July 5th, the public will be celebrating the fourth of July on Tuesday but to hold the Freedom Fest on this day has proven to be difficult due to the high volume of traffic, the road leading into the gaming facility is not sufficient to handle this many cars and it leads to traffic jam. He stated July 5th is more practical for the public as well as the tribe, families will have more time to enjoy the activities and will not be as inclined to consume alcoholic beverages, some of the public do have to go to work later or might even be there for only a couple of hours. He stated in the past, the police have arrested a lot of the public due to alcohol intoxication and we do not like to see this happen, it is good for business that they are buying the alcoholic beverages but there is also the bad side to it.

Chairman Cypress reminded General Council that the Freedom Fest had started as a means for the tribe to express their appreciation to the public for the help/assistance they gave to us following Hurricane Andrew. He stated Business Council is considering the possibility of offering a special Hotel package rate for the long Holiday weekend.

He stated the entertainers that have been contacted (made offers) to appear are Ronnie Milsap, Trisha Yearwood and another male entertainer whose name he has forgotten, at this time, no deal has been finalized with any of these entertainers. He informed General Council that they are encourage to attend the festivities, sell their arts and craft or operate a food booth. He stated this event is also a means of promoting the Music Festival which is held approximately two (2) weeks later. He stated he has not been informed of who the entertainer will be for this event (the Music Festival).

MIBG report continued.

Chairman Cypress stated during construction of the Hotel, MIBG had been the only enterprise there and was making a profit, even though the ongoing construction had slowed business some it did not really affect the profits. Upon completion and operation of the Hotel, they have noticed that more patrons are playing the machines located there (at the Hotel) and as a result the Hotel is generating more of a profit. There are not as many people playing the machines located in the main gaming facility, profit is still being made there but not as much.

Chairman Cypress stated the majority of the profits made by MIBG is made during the weekends, this is also when there are more guests at the Hotel, during this period, profits made by MIBG are utilized to pay for the cocktail waitresses (working for the Hotel and MIBG) and also the treasury staff. He stated the Hotel receives approximately $500,000 a month from MIBG. He stated approximately 20 of the Hotel's rooms are blocked by MIBG to be used for winners of the jackpots and the patrons/players who are recognized as being loyal customers, these are the ones who are always playing the machines at MIBG. He stated when this is done, if the winners/guests should stay at the Hotel, then they will most likely go back and play the machines enabling us to recoup the money. He stated whether the rooms are utilized or not, MIBG always has these 20 rooms blocked. He stated the Hotel is starting to make a profit but it is a slow process, within a year's time the profit

SJ001411

SGCMTG.05/04/2000

will be more noticeable, but compared to profits made from a year ago, there has been a noticeable gain as monthly gain. He stated it seems every time there is a profit made, more expenses seem to come up but that is the course of business.

Chairman Cypress reported the gaming laws are becoming more stringent and they are always working to insure the gaming employees are aware of these and are following these. He informed General Council that NIGC also insures all gaming laws are being followed and as result if a tribal member should cash their NTDR check at the gaming facility, this will be reported to the IRS as required by the banking laws. He stated the only way the tribal member's money will not be reported to the IRS is if they cash their checks at the Administration office, this is the only way they can be assured they will not be reported. He stated if a tribal member also has a banking account (with a substantial amount of money) then this too will be reported and IRS will investigate into how the money was obtained. He cautioned General Council to be more careful of how they handle their checks and money.

Chairman Cypress urged tribal members to not report their NTDR monies on their credit applications, this is an ongoing problem. He stated tribal members are informing creditors they receive NTDR monies every three (3) months and list the tribal office as the place where they receive these monies. He stated the creditors then call the Administration office for confirmation, these people are told (by the staff) that they are not aware of any such monies nor of any such distributions. He advised tribal members to urge family members to not list these monies on their credit application.

He stated if tribal members continue doing this, then invariably, the IRS will find a way to tax us on these monies, the IRS regulations/laws are becoming more stringent and it may come to where they will be able to tax us on these monies. He stated there have been times where a tribal member will say, in a fit of anger or when they are upset with the tribal administrators, that they are going to report these monies. He stated to do this would bring consequences upon the entire Tribe (which means the tribal members). He stated as he has said before the money is used by the elderly, families and tribal members who are not capable of working to support themselves and or their families. He stated all tribal members would be affected by the actions of a few if they continue with this (listing the money on credit applications). He again asked that all tribal members speak to family members about this ongoing problem.

Chairman Cypress stated there is no problem when tribal members utilize the money to renovate their homes but the problems occur when a tribal member applies to purchase a home off the reservation or when they apply to purchase a vehicle, this is when they question where this person is getting this large amount of money from. He stated tribal members assume since no one else sees them when they apply for credit they will not know even if they list the NTDR money, but the creditors have to verify income information and this is when they call the tribal office for verification which makes Business Council aware of tribal members actions. He stated as he has said before,

SJ001412

SGCMTG.05/04/2000

if a tribal member wants to purchase a high priced item, they should save their money and when they have enough, they could purchase it without applying for credit.

Chairman Cypress stated at the last General Council meeting he had reported a gaming Bill had reached the Tallahassee courts, this Bill was in reference to the claim made by "the Secretary" that he would be the one to impose the gaming regulations. He stated the last they (Business Council) heard about this is that a ruling would be made in three (3) weeks but as it invariably happens, Business Council has not heard anything yet. He stated when a ruling is made and it is not favorable for the Indian tribes, then we have the opportunity to file a lawsuit opposing the ruling or if the ruling should be favorable for the Indians, then it is more than likely the State of Florida will be the ones filing the suit opposing it. He stated whatever the ruling should be, this issue will take a long time to resolve, there is the strong possibility it may take several years. He urged General Council to keep this mind and if they should read in the newspapers that the ruling was for the Indian tribes or the State, this is not the final ruling/decision. He stated anything that is filed in the courts is a time consuming process and is not readily resolved. Review of this issue (proposed regulations) continued.

Chairman Cypress stated the Attorney General and the Governor of Florida allowed the casino boats to operate but then they are saying there is to be no gaming allowed in the State of Florida, the tribal attorneys as well as the tribe (Business Council) have opposed these statements, we have informed them that gaming was introduced into Florida when they first allowed the casino boats to operate. At the present time there is a Bill in the courts which would ban these casino boats but this Bill does not have any support, if the Bill does not receive any support, then it will die on the floor (will not proceed any further) at midnight tomorrow night.

SJ001413

SGCMTG.05/04/2000

Chairman Cypress stated our gaming operations are still being reviewed, as reported in earlier meetings, all machines, throughout the gaming hall are being checked to insure they are operated legally. He stated due to actions of other gaming facility owners, this review of operations was required and any findings are to be submitted to a grand jury, the grand jury will then decide if there are to be any indictments handed down to these illegally operated gaming facilities/owners. He stated he has requested they wrap up their investigation (of our gaming hall) as quickly as possible in order for him to present his report to the General Council. He stated they have told him it would be concluded in thirty (30) days but this is what they have said for the past 90 days.

Chairman Cypress reported the tribe has requested additional gaming features from the State for our gaming facility, these additional gaming would be slot machines, crap games (dice), roulette, table games and simulcasting. He stated there is no guarantee that our requests will be approved/allowed, but it does show the State that we are interested in expanding our gaming.

Chairman Cypress reported they have terminated some MIBG employees for repeated violations. the gaming facility's policy is different, it only allows for two violations. He stated there are some who question why a very good video attendant was terminated but it must be understood if these employees are repeatedly violating the policy and action is not taken, then they will assume they can continue in this pattern and not face any consequences. He stated these employees must not be given the chance to take advantage of the tribe and any violations have to be dealt with swiftly. He stated when a player cashes in their video ticket, this pay out must be duly noted, by having the winner sign the ticket but some of these attendants are not doing this and there have been times where these attendants will allow their relatives, boyfriends and or spouses to cash in this same ticket. He stated if this is discovered to have happened, then the attendant is required/made to make restitution for the second pay out.

Chairman Cypress reported there have been instances where patrons have placed counterfeit or stolen money in the video pull tab machines, then they will cash out quickly in order to get rid of this money, the investigations into these type of activities are always ongoing. Review of these activities

8

SJ001414

SGCMTG.05/04/2000

Chairman Cypress stated our gaming operations are still being reviewed, as reported in earlier meetings, all machines, throughout the gaming hall are being checked to insure they are operated legally. He stated due to actions of other gaming facility owners, this review of operations was required and any findings are to be submitted to a grand jury, the grand jury will then decide if there are to be any indictments handed down to these illegally operated gaming facilities/owners. He stated he has requested they wrap up their investigation (of our gaming hall) as quickly as possible in order for him to present his report to the General Council. He stated they have told him it would be concluded in thirty (30) days but this is what they have said for the past 90 days.

Chairman Cypress reported the tribe has requested additional gaming features from the State for our gaming facility, these additional gaming would be slot machines, crap games (dice), roulette, table games and simulcasting. He stated there is no guarantee that our requests will be approved/allowed, but it does show the State that we are interested in expanding our gaming.

Chairman Cypress reported they have terminated some MIBG employees for repeated violations. He stated tribal policy allows for four violations before an employee is terminated but the gaming facility's policy is different, it only allows for two violations. He stated there are some who question why a very good video attendant was terminated but it must be understood if these employees are repeatedly violating the policy and action is not taken, then they will assume they can continue in this pattern and not face any consequences. He stated these employees must not be given the chance to take advantage of the tribe and any violations have to be dealt with swiftly. He stated when a player cashes in their video ticket, this pay out must be duly noted, by having the winner sign the ticket but some of these attendants are not doing this and there have been times where these attendants will allow their relatives, boyfriends and or spouses to cash in this same ticket. He stated if this is discovered to have happened, then the attendant is required/made to make restitution for the second pay out.

Chairman Cypress reported there have been instances where patrons have placed counterfeit or stolen money in the video pull tab machines, then they will cash out quickly in order to get rid of this money, the investigations into these type of activities are always ongoing. Review of these activities

SJ001415

SGCMTG.05/04/2000

continued.

Chairman Cypress reported the tribe's gaming facility is one of the better Indian owned and operated facility, the investigators have informed us they would only be reviewing the operations on a once a year basis.  He reiterated this is due to the fact we are always working to insure we, as well as gaming employees, are in compliance with the gaming regulations.  He stated the one problem that keeps reoccurring is that gaming employees work there for a long time and it would seem they would be the ones to insure that we are in compliance with the gaming regulations but they tend to try and take advantage of the tribe and when this is discovered, the employee is terminated.  He stated invariably, this employee will say that they have been a dedicated tribal employee and yet the tribe is treating them unfairly.  He stated it seems the employees are testing the tribe, to see how far and what they can get away with.  He stated if these actions are not caught and it is discovered during the investigations, then we could be fined as much as $1,000,000.  There are times where tribal members will defend the terminated employee, they say that this person has been a dedicated employee and the punishment is to severe, but we have to be tough or we will bathe ones to pay for these mistakes later.  Review continued.

Chairman Cypress' response to Mr. Osceola's comments were as follows.  The twenty rooms reserved (as reported in earlier report) are reserved for winners, some of these winners say they do not live far and they would rather sleep at their own homes.

He stated surveillance cameras are situated throughout the gaming and or Hotel room, so it is very easy to detect criminal activity.

SJ001416

SGCMTG.05/04/2000

continued.

Chairman Cypress reported the tribe's gaming facility is one of the better Indian owned and operated facility, the investigators have informed us they would only be reviewing the operations on a once a year basis. He reiterated this is due to the fact we are always working to insure we, as well as gaming employees, are in compliance with the gaming regulations. He stated the one problem that keeps reoccurring is that gaming employees work there for a long time and it would seem they would be the ones to insure that we are in compliance with the gaming regulations but they tend to try and take advantage of the tribe and when this is discovered, the employee is terminated. He stated invariably, this employee will say that they have been a dedicated tribal employee and yet the tribe is treating them unfairly. He stated it seems the employees are testing the tribe, to see how far and what they can get away with. He stated if these actions are not caught and it is discovered during the investigations, then we could be fined as much as $1,000,000. There are times where tribal members will defend the terminated employee, they say that this person has been a dedicated employee and the punishment is to severe, but we have to be tough or we will bathe ones to pay for these mistakes later. Review continued.

Chairman Cypress' response to Mr. Osceola's comments were as follows. The twenty rooms reserved (as reported in earlier report) are reserved for winners, some of these winners say they do not live far and they would rather sleep at their own homes.

He stated surveillance cameras are situated throughout the gaming and or Hotel room, so it is very easy to detect criminal activity.

SJ001417

SGCMTG.05/04/2000

Chairman Cypress asked if there were any other questions or comments.

Richard Buster stated in regards to the aforementioned Freedom Fest, it had been their recommendation to hold this on a different day rather than the Wednesday (July 5th) he reported. He stated it was felt that this being the day after the fourth of July, it would not be profitable and he (Chairman Cypress) did have concerns in regards to some of the public being arrested for intoxication.

Chairman Cypress reiterated that this event is to show our appreciation to the public for the help they gave the tribe in the days following the Hurricane. He stated when it was scheduled on a weekend or on the holiday, there were not to many guests and this seemed the better alternative. He stated it is true that some of the public do get arrested for intoxication but they tend to not be as bad as they bring their families to this event. He reiterated that the Hotel will be offering discounted hotel packages for the holiday, check in would be July 3rd and check out would be on the 5th.

Chairman Cypress reviewed the past years when there would be other activities scheduled for the same day as the tribe's Freedom Fest, these activities are normally held at C.B. Smith park where they feature activities geared towards the family as well.

Mr. Buster stated his other concern was the annual Music Festival. He stated this event does not make any money, it is an event which loses revenue as it does not attract a crowd. He stated they had thought it would be in the tribe's best interest to by pass this event for this year. He reiterated Business Council/tribe spend to much money on this event and as it does not produce profits.

Mr. Buster stated he is presenting his concerns as a member of the community. He stated the food and crafts vendors have said the vendor fee is to high, there are no customers and they do not make a profit.

Chairman Cypress stated there has not been an increase in the vendor fee for a long time. He asked if there had been an increase which he was not aware of.

SJ001418

SGCMTG.05/04/2000

Assistant Chairman Nelson stated there has not been an increase in the vendor fee, the only increase has been in the admission price, this was raised to $10.

Chairman Cypress stated the admissions cost was raised in order to cover the insurance cost.  He reiterated Mr. Buster's comments/concerns for General Council. He stated Mr. Buster is proposing the tribe not hold it's annual Music Festival as it is a money losing event.  He stated the vendors make enough to cover their expenses and he assumed this is what was important.  He stated this event was started as a means of promoting the Arts Festival, which is held six months later.  This event has never really generated a profit but as just stated, it is a means of informing the public of the tribe's upcoming Arts Festival.

Mr. Buster stated the same goes for the Arts Festival, this event also loses money, there has been a steady decline of customers for this event also.  He stated everybody is tired of seeing the same thing year after year, changes should be made in the program but it is always the same thing and no one is interested in coming out.

Chairman Cypress stated the same vendors come every year and they can not be discouraged in coming, they come to sell their crafts.

Mr. Buster stated if there is going to be entertainment, then this should also be changed, not the same ones every year.

Mr. Buster asked if he is saying there are no new entertainers available and the same ones are returning every year.

Chairman Cypress stated this seems to be true.  He stated the same group returns although there are times where some of the dancers may have been changed.  He stated the same goes for the Music Festival, the committee contracts entertainers whose fees will fall within the approved budget but if they keep hiring the same group on a regular basis, they are told to contract a different group.

Chairman Cypress stated Business Council is still waiting for the architect to submit the drawings,

*11*

SJ001419

SGCMTG.05/04/2000

after he does, then they will show these to General Council for their approval.

Mr. Buster stated after they have constructed the new amphitheater, then they should hire new entertainment for the events, if they do not do this, nothing will have changed, people will still stay away because they do not want to see the same old program.

Chairman Cypress reiterated Mr. Buster's comments/concerns regarding the two tribal events, the Music Festival and the Arts Festival. He stated Mr. Buster is saying these events do not generate a profit therefore they should be canceled.

Mr. Buster stated he is saying the General Council should consider taking this action.

Chairman Cypress informed him he is binding the two events together, if he is referring to canceling only one of the events, he should state this clearly or it could be taken as he is referring to both events.

Mr. Buster stated he does believe that the Music Festival should be canceled due to lack of customers and it losing money every year but Business Council should look into how the Arts Festival can be improved so it can generate a profit.

Discussion continued between Chairman Cypress and Mr. Buster regarding which event should be canceled.

Andy Buster asked how does Business Council see the two events as far as generating income for the tribe and if they are saying it loses money, is the debt high or is at a level which could be worked out with no difficulty.

Chairman Cypress stated the debt resulting from these events is not really high, the tribal members are only looking at profits made from admissions and not the complete picture. He stated Business Council takes into consideration the income for the vendors, air boats and the Village. The Village receives $1 per person from the gate admissions for the two events, the Hotel also profits from these events as some of the customers spend the night there after attending these festivities. He reiterated Business Council does not focus solely on the gate revenue, these other things are taken into consideration.

SJ001420

SGCMTG.05/04/2000

Andy Buster asked if we, the tribal members, looked at these two events as promoting the tribe and its enterprises and not as profit generating events, it would be better.

Chairman Cypress stated the vendor fees has not been raised in the past five (5) years, the only increase has been in the admission price.  He asked the vendors present if the fee had been increased.

The vendors present were not sure if there had been an increase as they do not take care of this, other family members pay the vendor fees for them.

*13*

SJ001421

SGCMTG.05/04/2000

Minnie Bert asked if there is a group who works on promoting these events, she hears about the Festival Committee all the time, does it really exists.

Chairman Cypress stated the committee does exists and it is good that we have tribal members on the committee but the one problem we have is that the Arts Festival starts on December 26th but the vendors start setting up on December 25th

SJ001422

SGCMTG.05/04/2000

Discussion of the vendor fee, change in entertainment and complaints regarding lack of customers continued but the microphone was not used therefore these comments could not be noted.

Chairman Cypress stated the Festival Committee will look into this and act upon in accordance with the policy that is in place.  He stated there have been times where the booths are sold out with request still coming in, they are informed booths are not available but if a vendor does not show up the first day due to unforeseen circumstances, the booth is held for them until they arrive.  When a vendor sees this empty booth, they ask to set up but are told it is not available, they get upset about this.
probl

Richard Buster asked who is in charge of the Music Festival, who addresses the complaints.

Chairman Cypress stated if there are complaints the Festival committee takes these down and submits to the Business Council who are on the Festival grounds all day, they review these in the afternoon (after the gates have closed), but there times where one or more of the Councilmen will say they have places to go and will tell the remaining Councilmen to review these complaints.  He stated if the complaints are warranted, they will inform the Festival Committee of this for them to take care of but they also have to take into consideration that the decision they reach (Business Council) will not go against the policy the Festival Committee has and works with.

SJ001423

SGCMTG.05/04/2000

Richard Buster asked if he feels the Music Festival should be canceled this year, can he make a motion and see what the outcome is.

Chairman Cypress stated yes he can, the tribal members have a right to voice their opinion as long as he is making it clear which event he is referring to.

After discussion (without the use of the microphones) motion was made.

**Richard Buster motioned the Music Festival not be held for the year 2000; seconded by Betty H. Billie.  Motion was as follows: 10 for, 26 against and 11 abstentions.**

Chairman Cypress informed General Council the motion was denied and the Music Festival will be held this year.

Meeting continued with the MRCC report.  Report, questions and comments were as follows.

Chairman Cypress stated the financial side would be reviewed more in-depth during the finance report, he would review other aspects of the Hotel report.

He stated there have been some losses since the beginning of June, profit should have been realized in December but this did not happen, there was a slight profit showing in February and March, April was also slow, business is expected to pick up in May.  He stated other Hotels (operated by non-Indians) busy season ends in April, and their season picking up in December, they normally lay off staff during the slow season.  He stated Hotel management has not been doing this but he has informed them that next time they hire staff, this should be done during the seasonal period in order to not have as much profit loss.  He stated they have been advertising the Hotel off season, it was recommended we do more advertising during the peak season, which would be in June, we will follow this recommendation.  He stated they have been questioned as to why there is not many convention/meeting bookings, these are booked a year in advance therefore some of the companies have already booked elsewhere but we are starting to get some business as the Hotel is becoming more familiar to the public.

Chairman Cypress stated with the winter season starting in the northern part of the country, air travel is affected, flights are canceled and three airlines (American, Delta and Virgin) are now lodging their passengers at the Hotel.  He stated American Airlines is a steady customer, if they have problems with their flights, they automatically bring their passengers to the Hotel.  He stated when Carnival

*16*

**SJ001424**

SGCMTG.05/04/2000

Cruise lines recently had ship problems, they sent 179 passengers to the Hotel for lodging, these cruise line has said they will now be using the Hotel when they need passenger lodging. He stated Norwegian cruise lines has also expressed an interest in dealing with the Hotel, when we work out the terms and get the contract, we will not be making a huge profit but will be making enough for the Hotel to cover its expenses. He stated when Hotel staff was first hired, it was done on the assumption approximately 300 rooms in the Hotel would always be booked, this did not happen and staff has slowly been cut until there is now approximately 300 staff which is adequate. He stated the Hotel also has an increase in guests during the weekends, which helps cover some of the expenses (as stated earlier).

Chairman Cypress stated other Hotels pay their promotion/sales department staff on a commission basis for each Hotel and or catering booking/sale they make, this way the employee would have an incentive to be more aggressive in making sale, it was recommended to Business Council they do this rather than pay them a salary as we are currently doing. It was noted to us that if we pay them the salary they will not have as much incentive to make sales knowing that they are still going to receive their salary, if it were on a commission basis, they would work harder to bring in business. We have said we will continue paying the staff a regular salary and after a year (which will be July 01st) it will be reviewed, until then it will stay the same. He stated in August, Business Council will evaluate the sales department staff's yearly performance and will give a salary increase/bonus to the employee/s with outstanding sales/job performance. He stated this is done for MIBG employees also, Business Council has discussed this possibility for tribal employees also but is still in the discussion phase. Review of these bonuses continued and what this can mean to an employee who has been a faithful tribal employee for a long period of time.

Richard Buster asked what the current rating is for the Hotel.

Chairman Cypress informed him it was still rated a five star hotel, this was to have been reviewed after one year, we feel it should still be rated the same but the final decision would be based on the report given, they review our operations through out the year.

**Item #05. Legal Reports/Everglades.**

SJ001425

SGCMTG.05/04/2000

Chairman Cypress stated tribal legal counsel will be presenting the report, he included some of the items in his earlier report but Mr. Lehtinen will be including the Everglades report which he (Chairman Cypress) did not cover.

Chairman Cypress requested tribal attorney, Dexter Lehtinen, present his report.  The report, questions and comments were as follows.

Mr. Lehtinen stated he is aware some of the items have already been discussed.  He stated there are the revenue numbers from last year which are always compared (for General Council's benefit) to last year's figures, the chart shows the figures are rising.  He stated this includes, because of the legal requirements that gaming be reported consolidated to the National Indian Gaming Commission, this includes a substantial amount of increases which are attributable to the Hotel and the gaming facilities in the Hotel.  But as a legal matter, these are shaved off even though they are a product of the Hotel and the increased activity, the legal requirement is that gaming is different from other businesses.  He stated in reality this does not make sense, but this is how they report it.

Mr. Lehtinen stated the federal government is suppose to give a ruling to the Secretary of Interior on the scope of Class III gaming in Florida.  He stated the Miccosukee and Seminole tribes have requested that they be allowed to conduct Class III gaming, this includes Poker, Slots, Craps Roulette, and casino type gaming.  The federal government claims the tribe's current Video Pull Tab machines are Class III which we all know about.  He stated they told a federal judge in a ruling two weeks ago that they would have a preliminary ruling out within three weeks (this would be sometime in May).  He stated it is important for tribal members and the employees at MIBG to know is that

SJ001426

SGCMTG.05/04/2000

if this ruling appears in the newspapers (sometimes these get leaked to the newspapers first), no matter what it says, nothing is going to happen for several years. If the ruling should allow the tribe to have slots and crap games, this will not happen for several years (an example was) if the ruling was against the tribe's Video Pull Tab machines and it said the tribe can not keep these, this would not happen for several years. He stated the newspapers would ignore this fact and report it as something catastrophic, either good or bad, this is a way for them to sell more newspapers. In an arrangement with Congress and with the federal judge in Tallahassee, the Secretary of Interior agreed that he would issue a preliminary ruling that would then be litigated in court, it is most likely that everyone will challenge it. He believes the Secretary of Interior will support the tribe's Video Pull Tabs, he will have to give them Poker and he will have to give them simulcasting. But the bottom line is since the cruise ships have slots, we believe the tribe should also have this, unless the tribe receives all they are requesting, they tribal attorneys will appeal the ruling. He stated unless the Secretary of Interior gives the tribe nothing, the state will be appealing it, so all of the lawyers in connection with the Secretary of Interior and the federal judge believe that everybody will be filing motions against everybody else. The agreement was that none of it is final until the federal court rules and this is at least one to two years later, the worst thing would be was for the tribal members to read that there was a ruling against the tribe's Video Pull Tab machines, the tribal members and MIBG employees would think that these machines would be removed the next day, this would not be true. He stated there have been several rulings already against the Video Pull Tabs but the tribal attorneys have beaten these every time, therefore whatever they read in the newspaper might be true but it would not be immediate, and it would only be one ruling in a series of long processes.

Mr. Lehtinen reported they have had hearings with the federal judge in Tallahassee in regards to how he is going to handle this when the Secretary of Interior rules. In addition, the Secretary is going to have to give the tribe unlimited high stakes poker, once he announces this preliminary decision there will be several months in arranging the details which are needed for a compact on poker rules, there would have to be different rules and adopt these rules. This will take some time and then it will go to the federal judge sometime in August or September.

Mr. Lehtinen reported the negotiations with the Governor have not gone anywhere other than beyond where they currently are, the Governor has informed the tribal attorneys their position has not changed. Fortunately the Justice Department and National Indian Gaming Commission take the view now that whatever happens should happen in court, there will be no midnight raids, so the tribe has several years involved in this.

Mr. Lehtinen reported in regards to the TPL case, several of the counts were dismissed except the count that allowed arbitration because the tribe had waived its immunity on this, this is the same thing the Tribal Court said as well, the Appellant Court said the same thing. The tribal attorneys believe the tribe won this arbitration, they also believe that these machines are clearly not within the scope of what the contract with TPL was. He does not believe the tribal members will read anything

SJ001427

SGCMTG.05/04/2000

in the newspapers, if they did read anything, it would be that the tribe won 90% and they may win the additional 10%, this is the normal progress on this issue.

Mr. Lehtinen reported the State Attorney General made an effort to get the cruise ship legislation in Florida repealed, the tribal attorneys argued affectively that the cruise ships are allowed to have craps, slots and roulette, as approved by the State legislature. He stated the Attorney General knows this is a weak point so they went to the State legislature with a Bill and announced that they would like to repeal the legislative approval of the cruise ships because the Indian tribes in Florida are using this to argue for Class III gaming. He stated the tribe's lobbyists and others have affectively stopped this so far, the legislative session ends at midnight tomorrow night and this is when all Bills die.

Mr. Lehtinen reviewed the Streicher issue. He stated Streicher put the tribe's money (which he had control of) into the bank in his name, the judge said the account was in his name and as far as the bank is concerned, he gets the money then the tribe sues Streicher if they have to. He stated with immunity, the tribal attorneys are very careful about how they protect the tribe's immunity, they like ...........................

The tape was changed at this time, some of Mr. Lehtinen's report was not recorded. Tape/recording resumed.

Mr. Lehtinen reported the bank would not give the money to Streicher, Streicher had to sue and the tribe/tribal attorneys defended the bank. The trial judge had originally said the account was in his name so he gets the money and the tribe sues him if they want the money back but the Appellant Court reversed this ruling and said if it is clearly known the money is not his and it appears (in light of the Appellant courts ruling) the money was not his and should not be given to him. He stated this goes back to the trial court on the basis of the Fourth District Court of Appeals ruling in the tribe's favor.

Mr. Lehtinen reported there was a lawsuit against the tribe about mineral rights and stuff by George May, this lawsuit was also against the Seminole tribe, this lawsuit was dismissed. He stated all litigation regarding the air boat accident was affectively dismissed and future efforts to refile this will be unsuccessful.

SJ001428

SGCMTG.05/04/2000

Mr. Lehtinen stated this concluded his report.

SJ001429

SGCMTG.05/04/2000

Upon conclusion of the report, lunch break was taken at 12:25 p.m.
Meeting resumed at 12:50 p.m.

**Item #06.  Finance**

Treasurer Billie stated the finance staff will review the tribal enterprises financial report, upon conclusion of the report, General Council may present any questions they may have.  He stated the proposed General Account budget (for FY' 2001) will also be given to them, they can review this and present any changes at the next meeting.

Julio Martinez presented the tribal enterprises financial report for the ten month period.  Report, questions and comments were as follows.

**Miccosukee Restaurant.**

Total revenue                                          -          $407,183.86

**SJ001430**

SGCMTG.05/04/2000

| | | |
|---|---|---|
| Expenses | - | $428,572.98 |
| Taxes | - | $  2674.96 |
| Net loss | - | $<24,064.08> |

**Miccosukee Service Station.**

| | | |
|---|---|---|
| Total revenue | - | $277,673.12 |
| Expense | - | $308,461.15 |
| Taxes | - | $  4495.15 |
| Net loss | - | $<35,283.18> |

**Miccosukee Airboats.**

| | | |
|---|---|---|
| Total revenues | - | $456,186.33 |
| Expenses | - | $458,380.52 |
| Tribal taxes | - | $ 13,332.52 |
| Net loss | - | $<15,526.71> |

**Miccosukee Gift Shop.**

| | | |
|---|---|---|
| Total revenue | - | $296,435.61 |
| Expenses | - | $252,029.90 |
| Tribal taxes | - | $  2,743.13 |
| Net profit | - | $ 41,778.69 |

**Miccosukee Village and Culture Center.**

| | | |
|---|---|---|
| Total revenue | - | $204,143.64 |
| Expenses | - | $323,725.01 |
| Tribal Taxes | - | $  5,307.77 |
| Net loss | - | $<117,889.14> |

**Miccosukee General Store.**

| | | |
|---|---|---|
| Total lease revenue | - | $  6,945.75 |
| Expenses | - | $   663.90 |
| Net profit | - | $  6,281.85 |

**Miccosukee Indigenous Images.**

| | | |
|---|---|---|
| Total sales | - | $ 16,002.00 |

SJ001431

SGCMTG.05/04/2000

| | | |
|---|---|---|
| Expenses | - | $ 83,587.13 |
| Tribal assistance | - | $ 24,381.95 |
| Net loss | - | $<43,203.18> |

**Miccosukee Tobacco Shop.**

| | | |
|---|---|---|
| Total revenues | - | $2,001,346.82 |

**NTDR.**

Mr. Martinez explained that on the far right side is the amount which is distributable, all the revenues are listed on the left, the 7.75 gross receipts license tax which is distributed to the tribal members is listed on the right hand side. He stated as of May 1st there was $4,755,793 received since the last distribution, this is the amount available for the next distribution.

**Miccosukee Service Plaza.**

| | | |
|---|---|---|
| Total revenue | - | $7,428,429.00 |
| Cost of sales | - | $5,733,795.00 |
| Gross profit | - | $1,694,635.00 |
| Operating expenses | - | $1,114,862.00 |
| Other expenses | - | $1,543.139.00 |
| Net income from operations | - | $   151,495.00 |
| Other income | - | $   355,136.00 |
| Net income | - | $   506,632.00 |
| Distribution to the Tribe | - | $   150,000.00 |
| Net income | - | $   356,632.00 |

**MIBG.**

| | | |
|---|---|---|
| Total revenue | - | $241,010,104.46 |
| cost of revenue (which is the prizes) | - | $170,910,902.66 |
| Gross profit | - | $ 70,099,201.80 |
| Operating expenses (which includes the gross receipts license tax) | - | $ 50,056,960.94 |
| net income from operations | - | $ 20,402,240.00 |
| Net income | - | $ 21,078,707.71 |

**Distributions of net revenue from MIBG.**

| | | |
|---|---|---|
| Reserved Account (25% of amount received) | - | $ 4,087,979.60 |

24

SJ001432

SGCMTG.05/04/2000

| | | |
|---|---|---|
| Projects (Hotel and Administration complex) | - | $12,368,075.61 |
| General Account | - | $ 5,213,043.26 |

**Amounts allocated to the different categories.**

| | | |
|---|---|---|
| Reserved Account | - | $37,866,106.62 |
| Tribal Health Assistance | - | $ <646,725.64> |
| Enterprise assistance | - | $ 979,994.36 |
| Legal and Financial Assistance | - | $ 463,635.36 |
| Baptist Church | - | $ 37,081.45 |
| Landscaping and Improvement | - | $ <15,072.62> |
| Housing expenses | - | $ 30,431.82 |
| Projects | - | $ <9,263,901> |
| Appreciation fund | - | $ <270,959.43> |
| Housing reserve | - | $ <207,008.48> |
| Government programs assistance | - | $ <1,048,509.35> |
| Tribal members with physical and mental limitations | | $ 471,820.26 |
| Water Utility | - | $ 56,254.44 |

**Miccosukee General Account.**

| | | |
|---|---|---|
| All revenues from all sources | - | $26,261,421.51 |
| Salaries and benefits | - | $ 1,218,668.26 |
| General operating expenses | - | $ 1,930,957.22 |
| Tribal and community activities | - | $13,680,609.07 |
| (which includes the NTDR distribution) | | |
| Other expenses (largest category is housing) | - | $ 1,140,770.57 |
| Program assistance | - | $ 607,889.15 |
| Construction expenses for MIS | - | $ 1,377,791.71 |
| total expenditures | - | $19,956,685.98 |
| Excess of revenue | - | $ 6,304,734.00 |

Mr. Martinez asked if there were any questions.

Treasurer Billie stated this concluded the finance report and asked if General Council had any questions.

Treasurer Billie stated at the last meeting Business Council had reported the General Store monthly rent would be increased as soon as it was determined what the going rate for similar stores was.

SJ001433

SGCMTG.05/04/2000

He stated the Gift Shop was being stocked with crafts/items which were not native American items, this has been changed, more locally made crafts are being stocked. He stated if tribal members are interested in selling their crafts, then they should bring these in. He stated they should keep in mind that if they want to sell their craft at a high price, it may not be purchased, when the items are purchased a certain percentage has to be added to make a profit, keep this in mind when bringing the crafts in.

Treasurer Billie stated the proposed budget for fiscal year 2001 was presented to General Council for their review, during the next General Council meeting they will be asked for their decision, they can either accept the budget as presented or make recommendations for changes where they feel is needed.

SJ001434

SGCMTG.05/04/2000

**Tribal member presented comments but did not use the microphone, therefore these were not noted.**

Treasurer Billie informed General Council they can approve the proposed General Account budget (for fiscal year 2001) now or if they need to review it further, they can discuss this at the next scheduled General Council meeting.

SJ001435

SGCMTG.05/04/2000

Betty H. Billie stated they normally discuss this at the August General Council meeting so we should keep it the same. (Microphone was not used, therefore all comments may not have been noted).

Chairman Cypress informed General Council Ms. Billie is saying they just received the proposed budgets therefore they would like to take time to review it and make their decision in August. He asked if this were General Council's consensus.

General Council's consensus was to discuss this at the August General Council meeting.

With no further discussion on this item, the meeting proceeded.

Chairman Cypress stated General Council needs to set a date for the next NTDR distribution, the next one is scheduled for June 1st which is a Thursday, the next feasible day would be Saturday, June 3rd as this is the next closes day to June 1st.

Betty Billie suggested a date but could not be noted as the microphone was not used.

Chairman Cypress stated the date suggested is to far off from June 1st.

More comments from Ms. Billie without the use of a microphone.

Chairman Cypress informed General Council motion had been made for May 28th. He requested Ms. Billie use the microphone.

**Betty H. Billie motioned for Sunday, May 28, 2000 for the NTDR distribution; seconded by Marilyn Huggins. Action was as follows 23 for, 05 against and 12 abstentions.**

Chairman Cypress stated the motion had passed, NTDR distribution (for June 1st) would be on Sunday, May 28, 2000 and would be from 8:30 a.m. to 2:30 p.m.

Chairman Cypress reiterated earlier request, General Council was told to use the microphone when presenting their comments so these can be duly noted and attributed to the right person. He stated they do not use the microphone, it is difficult to transcribe these into the Minutes.

Evelyn Cypress informed General Council the cut off date for the NTDR loans will be Tuesday, May 9th at 12:00. If they turn in their requests before this time it will be processed and they can receive it at 3:00 p.m. the same day, after 12:00 p.m. loan requests will not be taken.

Comments were made by tribal member but the microphone was not used.

Chairman Cypress requested this person use the microphone when presenting their comments.

28

SJ001436

SGCMTG.05/04/2000

SJ001437

SGCMTG.05/04/2000

SJ001438

SGCMTG.05/04/2000

With no further discussion on this item the meeting proceeded.

**<u>Item #07.  Health Insurance for Tribal Members</u>**

**SJ001439**

SGCMTG.05/04/2000

Chairman Cypress informed General Council the Health Insurance for unemployed tribal members will soon be available.  He stated the tribal member can go to the tribal office and fill out the application, their picture will be taken for identification, they will be issued an identification number then issued the insurance card.

Don Osceola asked if a referral from the Miccosukee clinic will still be required even with this insurance.

Chairman Cypress stated he would only need the insurance card issued to him.

Lawmaker Cypress requested Mr. Osceola use the microphone.

Mr. Osceola repeated his comments/question.

Chairman Cypress reiterated it would not be required but he could be mistaken, they work with the Health Department when issuing the insurance cards so all problems/questions will be addressed.

SJ001440

SGCMTG.05/04/2000

SJ001441

Item # 10 - Dissolution of marriage

None submitted

Item # 11 - Guardianship applications

None submitted

Item # 12

SJ001442

Moving on to Item # 11 - Guardianship

Chairman - this is when grandparents or other family members take custody of a child with mutual agreement.  Had stated earlier there were no applications.

Item # 12 - Tribal enrollment relinquishment applications

These applications are for those who are enrolled in the Miccosukee Tribe but wish to have their name removed from the rolls.  Chairman asked if there were any applications.

None were submitted.

Item # 13 - Tribal enrollment applications

SJ001443

SJ001444

SJ001445

Item # 14 - Councilmen reports

**(REFER TO TAPES)**

Item # 15 - General discussion

**(REFER TO TAPES)**.

SJ001446

# Exhibit 9

**MICCOSUKEE TRIBE OF INDIANS OF FLORIDA**
**SPECIAL GENERAL COUNCIL MEETING**
**THURSDAY, MAY 02, 2002**
**10:00 A.M.**

### Item #01.  Roll Call

A special meeting of the Miccosukee General Council convened at the Chickeechobee Council grounds on Thursday, May 02, 2002.

Chairman Cypress announced quorum had been achieved at 10:05 a.m. with 27 voting tribal members present.  He requested Treasurer Billie present the opening remarks.

Treasurer Billie stated there were 27 voting tribal members present with five (5) clans represented.  The clans represented were as follows: Panther, Otter, Tahkoshathee, Wind and Bird.  He requested in consideration of the elderly and infirmed, that General Council keep their remarks to the topic at hand.

Lawmaker Cypress advised General Council to behave accordingly and if someone is presenting their comments they should allow that person to finish speaking.  If they need clarification on an item being discussed, they should present these.  He informed General Council if they have any personal grievances, these are not to be brought to the meeting, these issues are to be resolved away from the Council grounds.  He stated when these are brought to the meeting there is too much arguing and it is a distraction to other tribal members as well as time consuming.

Lawmaker Cypress reminded General Council if any of them are constantly interrupting while others are speaking, after being asked to be quiet, they could be removed from the meeting.  He again requested General Council to behave accordingly and to keep their comments to the topic at hand.

SJ001964

Chairman Cypress announced the following Officers of the tribe present:

| | | |
|---|---|---|
| Billy Cypress | - | Chairman |
| Jasper Nelson | - | Assistant Chairman |
| Max Billie | - | Treasurer |
| Andrew Bert, Sr. | - | Secretary |
| Jerry Cypress | - | Lawmaker |

Recording Secretaries for the meeting were Evelyn Cypress, Administrative Coordinator, Dee Dee Kelly, Treasurer's Secretary and Beverly Billie, Tribal Secretary.

## Item #02.  Approval of Agenda

Chairman Cypress reviewed the Agenda and asked if there were any changes to be made. He requested a motion if there were no changes.

**Connie Jim motioned to accept the Agenda as read; seconded by Richard Buster. Action was as follows: 24 for, 00 opposed and 00 abstentions.**

## Item #03.  Approval of Minutes

Secretary Bert stated the General Council Minutes (for February 2002) was read to Business Council, there had been some typos that have since been corrected.  He stated it took the better part of the day to finish reading as a lot of comments were made by General Council (not pertaining to the items).

He stated some comments were not noted as the microphones were not used and could not be heard clearly.  He requested General Council to utilize the microphones when presenting their comments.

SJ001965

Secretary Bert motioned to accept the February General Council Minutes; seconded by Richard Buster. Action was as follows: <u>11</u> for, <u>00</u> opposed and <u>00</u> abstentions.

## Item #04. AAR Plaza Report

Chairman Cypress presented the following report. Report, questions and comments are as follows.

He reported we are no longer dealing with the Shell Gas/fuel Company, we have contracted with Mobil and business has already started with them. He stated business has relatively been the same, no decline, the one problem we still have is with the restrooms. The restrooms are in bad shape and need to be repaired and or replaced. The plaza was recently inspected and one of the items referred to was the restrooms, they had tried to meet with the manager but were not able to, although they were told that he was on the premises. He was given a written report on the findings at the Plaza, while on other business in the area, he stopped in at the Plaza and inquired about the manager. He too was told that he (the manager) was always on the premises but yet he did not see him.

He told the person there that the restroom conditions were bad, there was an offensive odor to the area and the trailer (which houses the restrooms) needed to be replaced. He stated he stressed the point that the trailer needed to be replaced as soon as possible, hopefully this will be done soon. Other areas of the Plaza are operating fine, he did notice that when they contract with one company, that is the only brand you see throughout the store. He told them they have to switch companies every few months, by doing this the companies will see that they have to offer a better price in order to keep our business. They will understand that there is competition out there and will eventually offer a better price to us.

Chairman Cypress stated they met with the manager yesterday and he has informed them (Business Council) that he has started working on this request and should have results soon.

SJ001966

He asked that if tribal members should notice anything that concerns them at the Plaza, to report this to them (Business Council). He stated they might feel that the store could be stocked with better items but the goods currently stocked are things, which are seller items. They may feel these items are gaudy, i.e. T-shirts, rocks/pebbles and blankets (Indian), but these are things the tourists are interested in. With items like these throughout the store, it does make the place look bad/messy but as he just stated, these are items that sell and this is what they look for.

Chairman Cypress reported that the Police department has assigned officers to the Plaza and they now patrol the area and the surrounding Miccosukee area.

He stated there are no major problems and or concerns regarding the AAR Plaza, business is operating as usual.

Chairman Cypress reported the tribe has not received back from BIA the grazing lease (with the Seminole tribe). We are waiting for the signed document but has not been returned yet.

Chairman Cypress stated this concluded the AAR Plaza report and asked if there were any questions.

With no questions or comments presented, the meeting proceeded to the next Agenda item.

**Item #05. MIBG Report**

Chairman Cypress presented the following report. Report, questions and comments are as follows.

4

Chairman Cypress reported the tribe has been working to combine/join the Hotel/Resort with the gaming hall but due to litigation we have been in since 1992 or 1993, it has not been done yet.  This litigation resulted from the tribe's business partnership with TPL management firm.  Due to problems we were having with their business practices, we took them to court to terminate our partnership.  As litigation proceeded, Miccosukee Tribal Court ordered we enter to arbitration with them.  We did as Tribal Court ordered but when TPL started losing (the rulings were not in their favor) they turned around and filed in Federal Court.  As years went by the Courts ruled that the tribe could pay TPL $9,500,000 to settle this and move on, we were not ordered to pay but had been a recommendation from the Courts.  TPL heirs assumed that this was a court ruling and that they would be receiving this money and when it was not forth coming, they filed in Court again.

He stated we would also be filing in Court today (May 02, 2002), as we do not feel that they are entitled to this money.  We will be following all the legal venues open to us in order to not pay what we feel should not be paid.  This case could very well wind back in the Supreme Court if not resolved within the lower Courts.  He stated before, the tribe offered them $3,000,000 to settle this but TPL felt they would be able to gain more if they continued with the litigation.  He added non-Indians see that the gaming hall and Resort are financially prosperous for the tribe and assume we will pay whatever they ask for in order to settle lawsuits brought against us.  He stated this is not true, the tribe will all exhaust all legal venues open before we settle, we do not automatically hand over any money.

Review of litigation with TPL continued (this item has been reviewed in previous meetings).

Chairman Cypress reported that the litigation with TPL has been ongoing for approximately 10 years.  The two gentleman of TPL are deceased but it is their heirs who are continuing with the litigation.

SJ001968

He reported the gaming hall has been doing well, revenue for the same time as last year has risen, from $36,000,000 to approximately $40,000,000.  He stated after prize payouts and payment of other bills, the profit for this month is approximately $4,000,000.  We have seen profit/revenue steadily rise throughout the years, this is in part to the extensive advertising campaign we engage in.  As a result of this advertisement we are getting more people to come in and we are also seeing buses bring gaming patrons in.

Chairman Cypress stated before the Seminole tribe hardly advertised, they always said we were not a threat to their gaming hall revenue as we were located far enough away but, now they see us attracting a lot of patrons and are feeling differently.  They have started to advertise their gaming facilities and are becoming aggressive in attracting players, they started this after they noticed a decline in their revenue.  He stated the Seminole tribe currently has 6 gaming facilities in operation at this time and we have just the one.  They have asked when we (the Miccosukee tribe) will be opening other gaming facilities elsewhere.  He has told them there are no plans to open any others, the tribe is satisfied with the one we have and see no need to open another one.

Chairman Cypress stated the tribe is still in litigation regarding classification of the machines and is working everyday to be compliance with the abundant gaming regulations in place.  He stated that there are approximately four (4) boxes filled with legal papers regarding our fight for classification of these machines.

Chairman Cypress reported the gaming hall is operating with no problems, everything is fine in that area and we currently have 1220 to 1240 Video Pull-Tab machines in place.  There are still the usual problems with the employees, if they do not perform their duties as required, they are given a warning and after the second warning, they are terminated.  He stated this was also true of the patrons, if for whatever reason they are given a warning and if they do it again, they are barred from the premises.  He stated tribal members are normally barred from the gaming hall for six (6) months but the non-Indians are barred for one (1) year.  After this one year is up, their case will be reviewed and a decision will be made as to whether they will be allowed to return or not.  The non-Indian

SJ001969

patrons have this notion that they spend their money there, so their behavior there should not be an issue, this is not true.

He stated the Freedom Festival will be held on July 5th, the entertainment has not been confirmed yet, the tribe has submitted an offer to a couple but have not received a definite answer. He stated he would refrain from naming any group and or entertainer as in the past he would say it will be this person and it would change.

Chairman Cypress reported that they have started clearing the land we purchased, by the Pit Bar-B-Q, once this is completed the storage containers located behind the Gaming Hall will be relocated there. He stated it would also be used for employee parking when special events are held at the Gaming, Hotel/Resort complex. In the future when permits are obtained we may use it for other purposes, there are no plans though at this time.

Chairman Cypress asked if there were any questions.

With no questions presented the meeting proceeded to the next item.

**Item #06. MRCC Report**

Chairman Cypress reported the Hotel/Resort would be starting their third year of operations. Business is on the rise but it is slow which is normal for a new business. He

SJ001970

stated it might be wrong to say it, but as the public has been saying, this is in part to the tragedy of September 11th. The public has been hesitant to use air transportation to travel and this has affected all tourists businesses, which includes us. As time has gone on, the tourists have started to travel again and we are seeing a slow increase in business.

He reported that within the next year or two, they would be changing the carpets at the Resort. He stated that during a meeting they (Business Council) attended, they were congratulated for their management of the tribal enterprises. He informed the group that this success was largely in part to the decisions made by the General Council. He had explained that any expenditure of tribal funds for business purposes have to be approved by General Council before anything can be done. The group presented stated they were impressed by how well the tribe is doing financially (for a small group) and that they make wise business decisions. He reminded General Council that it is important that they attend the General Council meetings so they will be informed of any potential business ventures that have been presented to Business Council. He stated it is also during these meetings that decisions are made regarding tribal fund expenditures and it is important that General Council is aware of these.

Chairman Cypress reported the Golf Course needed repairs and renovations and this is currently being done. He stated the previous owners did not seem to want to spend any money to maintain this property and had been neglected therefore this work is needed. When we host tournaments or when the public plays golf there, they will see that the grounds are well maintained and will return. When we have repeat business this is good and it will enable the facility to carry their own expenses, at this time the Golf Course is making a small profit but this is in turn used to pay for the work being done.

He reminded General Council that they are encouraged to go to the Finance office and look at the finances of the tribal enterprises, this will allow them to see for themselves what is reported here. They may feel they are not being told the truth, that something is being held back, they can see for themselves that they are being given the complete report.

SJ001971

Chairman Cypress reported that once all legal aspects are settled our tribal police officers will be allowed to patrol the area, at this time they are not stationed there. He stated Dade County police has said they could patrol there but since we are an Indian tribe, it would be in our better interest to provide our own police presence.

He stated General Council asked about this at a previous meeting and they had said it was being worked on, things still have not been finalized at this time. There are no problems with the Golf Course, everything is moving along.

Chairman Cypress asked if there were any questions.

Buffalo Tiger asked if the Golf Course was getting business.

Chairman Cypress stated yes.

Mr. Tiger stated he drove by there and did see some golfers out on the course. He does not play golf nor does he know how but one day if he should buy the necessary equipment, they may see him out there.

Chairman Cypress reported a charity golf tournament has been scheduled (to raise funds for diabetes prevention) this month. They have invited Business Council to attend this event and they have accepted. The public has been renting the banquet area for weddings, parties, etc., which also brings in revenue. The previous owners applied for and received permits to do several projects throughout the property but never followed through and the tribe has been working on closing these permits out. They have opened a cafeteria/grill next to the Pro Shop and lunch is available there, if tribal members are in the area, they should check this out.

Chairman Cypress stated the prices at the Country Club are not as high as others, people question why this is, we just tell them that we price it where we will make a profit and

9

SJ001972

will allow us to attract people. The more people we get to come to our facility, the better it is for us.

He asked if there were any other questions.

Tribal member presented comments but could not be heard, as the microphone was not used.

Secretary Bert asked this person to use the microphone so their comments could be recorded.

Mr. Tiger stated we (the Miccosukee tribe) have never been in this business (golf) and do not have the experience but he is sure other Indian tribes must. There may be people present who would understand this business, he only has experience in operating an airboat business and how to improve a business. He stated due to our lack of experience in this area, he is hopeful that Business Council will appoint/hire someone who is qualified. He asked Business Council if they have considered this or have they already hired someone.

Chairman Cypress stated at the present time the General Manager under the previous owner has been hired. He is used to working for a larger company and is slow in addressing items, which requires immediate attention, Business Council met with him yesterday regarding this problem.

He stated the General Manager was informed that Business Council expects their employees to perform their duties without having to be reminded. They should know what their duties are and make it a routine, this way they do not have to be prodded to do their work, they cannot sit there until told what to do, they should be capable of performing their tasks.

10

SJ001973

Mr. Tiger stated this is understandable but his concern is that the Business Council may become too busy with their tribal duties and not give this business their full attention and this is when operations may suffer. When employees are not properly supervised, including the managers, they tend to slack off and not do their job properly, it has happened before and we should not allow it to happen here. We have to be strict with what we expect from the employees and insure that they do what they were hired for.

Chairman Cypress stated this is what we expect from our employees, this expectation was stressed to the General Manager. He was told that Business Council expects employees to greet people coming in and ask how they can help them, the public should not be the ones to seek out the employees.

He stated we have people who come to play who say they have been coming for approximately 20 years and had noticed the property was being neglected. They have said they know the Miccosukee tribe maintains their businesses and are glad to see us acquiring the property. They have said they are supportive of us and will be returning to play golf as their way of supporting our business and us. He stated Business Council told the General Manager if he does not straighten up and start taking his duties more seriously, he would be terminated. He was told that if he continues to neglect his duties, as he has been, this is what his future holds for him.

### Item #07. Legal Counsel Report

Chairman Cypress stated General Council might feel they always hear a report regarding litigation regarding the Everglades and our fight to maintain our water rights. He informed General Council that the Everglades and our water is an important and vital part of our existence and should not be neglected, we have to keep fighting to insure nothing is done to harm these two things. The Miccosukee tribe has always fought to maintain the Everglades and we will keep up this fight. He reiterated General Council may not want to hear the report, they may think it is always the same report, but it is very important to us.

SJ001974

Chairman Cypress requested Mr. Dexter Lehtinen present the legal counsel report.

Mr. Lehtinen's report, questions and comments were as follows.

Mr. Lehtinen stated tribal attorneys filed a matter in Court regarding the construction work on the canal, before you reach the gaming hall.  This is a new emergency pump (temporary) and they did not finish the analysis as to what this would do to the tribal lands in 3-A if they pumped water in the wrong direction.

He stated there is a hearing coming up in June…actually he will be appearing in court 4 times…scheduled in June.  One will be in the Court of Appeals regarding flooding matters, another in the Dade County Flooding Task Force to explain what happens to tribal land under certain water conditions.  He will also testify in a workers compensation hearing as an expert witness for the tribe on tribal law.  The tribal attorneys have succeeded in several other cases in having workers compensation for all of the tribal employees declared to be exclusively under tribal control.  He stated they expect this Judge to do the same, but he is requesting expert testimony, which he qualifies for, as a teacher of Federal Indian Law at the law school.

Mr. Lehtinen stated Chairman Cypress' efforts in the State Legislature, which is supported by others, did not pass the PL280 repeal but went much further than anybody in that system predicted.  Both the Florida House and Florida Senate passed Bills that would repeal PL280 that's the assertion of State jurisdiction on Miccosukee Indian lands. He reminded General Council that over in the tribal reserved area Congress already repealed this in 1999.

Mr. Lehtinen stated for the tribal administration building and housing area, they succeeded in having this repealed in 1999.  They are making an effort to have the State Legislature repeal it.  Both the House and Senate did pass this, and in both chambers it passed on second reading, which was also a surprise, it ran out of time for what is called

12

SJ001975

"Third Reading" or passage.  This was substantially opposed, as was expected, by State Prosecutors and State Sheriffs but well supported by the tribe's legislatures and others. He stated it is not unusual for it to take many years to try to pass a Bill so other than this not actually passing, it was considered by legislative people to be the successful beginning of what has to be a repeated campaign through the upcoming years.  It is the logical thing after Congress did it in the Federal Area now to try and get the State to do it in the State area.

He reported the Appellant Court did maintain the TPL ruling, that ruling was that the tribe was allowed to eject TPL from tribal grounds.  TPL could not sue for more than $150,000,000.  The tribe did win this ruling, however that arbitration award, which was, less than $10,000,000 is enforceable.  The tribal attorneys expect to appeal this, this item was reported (at General Council) in detail, more than one year ago.  He stated this money has already been set aside and dealt with the Court as to how to handle this if the ruling was continued to be maintained on another appeal.

Mr. Lehtinen reported the MIG quarterly income status report is attached to the report he distributed to General Council.  This report shows an increase again over the last quarterly incomes.  At some point it would seem logical that income would stabilize, in MIG's history, it has always gone up, the tribe should expect that sometime in the future that these revenues will stabilize.

He reported that they did finish with the A-League hearing, this is the construction company who were building bathhouses (at some of the Indian camps) in the Big Cypress National Preserve Area, for the tribe.  These bathhouses were not always being properly built and it went to arbitration trial last week, the tribal attorneys are expected to file the briefs next week.

Mr. Lehtinen concluded his report.

SJ001976

Chairman Cypress reviewed the report presented.  He stated the TPL case is the same one we have been involved with throughout the years.  He stated IHS (Indian Health Service) were the ones having the bathhouses built, the tribe felt these were not being built to specifications.  The inspector for IHS was also designated to be the engineer for this project, he was to inspect the drain fields, IHS wanted him to also do the architect's work and he was not qualified for this.  His argument was that IHS funds were being used in the construction work and was approving the work being done even against our objections.  The tribe finally asked our architect to inspect the construction work, take photographs and give his opinion.  Based on our architect's opinion, we asked that IHS remove their engineer from the project, a representative from their office came down to inspect the work.  They said the engineer was there to help us and he had been helpful to the Seminole tribe.  We told them if the Seminole tribe was comfortable with him, then they could keep him in their area, the Miccosukee tribe did not want him in our area.  This engineer has repeatedly asked for payment (for his services) but we have told him we do not know how much it will cost the tribe to build the bathhouses the way they were originally designed.  No payment would be made until this is determined.  He has said he would settle for $15,000 but as stated, no payment will be made until the cost to us is determined.  The funds to build the bathhouses (in the original design) will not actually be from the tribe's funds, we will go through litigation to get this money from either IHS, the contractor or the bonding company, it may even be all three that has to pay the costs.  He stated IHS has offered to pay the tribe 50% of the costs but we did not agree to this.  They are willing to pay this but would ask that this issue not be brought back up, if a company is willing to pay (monetary) for their mistakes, then they are not a reputable company.  If they do this with us, then it is certain they have done it before and will do again.  The Miccosukee tribe does not want to do business with companies like this, we have struggled hard to become self-sufficient and will not be taken advantage of.  He stated the tribe, has in place, rules and regulations which we ask outside companies to follow when doing business with us, these companies think we are asking to much but we do this in order to protect the tribe and its assets.  If we do not protect ourselves, then it would be easy for these companies to try and take advantage of us, we would only create problems for ourselves if we do not look to the future and protect ourselves.

SJ001977

Chairman Cypress reviewed the litigation we are involved in (these are the same ones which was reviewed by Mr. Lehtinen).

Chairman Cypress reviewed Public Law 280 and how this affects the different Indian tribes, the ones who accepted and the ones who did not.

He stated when PL280 was first introduced, it was explained that this law would be beneficial to the Indian tribes but it was the opposite. It was a law that only hurt the Indian tribes who had accepted it. This law was being used to keep and or beat the Indians down, it did not help them but only hurt them more. When the Seminole tribe was being organized (in 1957), they accepted this law for their tribe and its tribal members. The Seminole tribal leaders had felt that this would be beneficial to them but came to realize that it was harmful to their tribal members. At this time the Miccosukee tribe was not organized therefore we had no use for this law, even when we eventually organized into a tribe, we told them we did not want to be under PL280, and to not bother us with it. We told them if there were other Indian tribes who wanted to be under this law, they could do it but as for the Miccosukee tribe, we were never interested and we never would be.

Review of Mr. Lehtinen's earlier report continued.

Chairman Cypress explained that during a meeting of the Florida Governor's Council (in 1982 or 83) they discussed the need to abolish PL280, it was stated that it was doing more harm to the Native American than good. At that time the Seminole tribal representatives did not say too much on this matter, they may have not known the full effect of this law at that time.

He stated the Business Council is always working at maintaining the tribe's rights, their sovereignty, we do not want anything to jeopardize this and this is one of the main reasons we have never wanted PL280 to be attached to us.

SJ001978

**Tape change at this time, may have missed some comments.**

Chairman Cypress stated the most important issue we are facing at this time is the issue of Public Law 280. He urged tribal members to remember this and to remind the younger generation so this law never harms us.

Chairman Cypress asked if there were any questions or comments regarding the report.

Buffalo Tiger stated he sees the younger generation at the meetings and in the community but he has never heard them say whether they are for Public Law280 or not. They have never said they want to continue with their traditional ways with no interference from anybody. It seems like they are not even interested in finding out what this law is, they have no idea of what it is or understand how harmful it would be to the tribe and tribal members.

Mr. Tiger reviewed the history of Public Law280 and how this law came to be in place. He stated it is important that we (the Miccosukee tribe) practice our native ways, adhere to our traditional ways, and wear our traditional clothing. He added the State is always looking for ways to control us and if they see us not practicing our traditional ways, not being what we are, Native American, their goal will be to apply Public Law280 to us. He reiterated we must not lose our traditional ways or our heritage.

He stated recently a Hispanic male, with his son, stopped by to visit with him and during the course of their conversation, this gentleman said he was interested in getting a job with the tribe. He told him he does not know anything about the jobs that are available or if there are even jobs available. He told him that he would have to come to the Tribal Administration office and look at any job positions that may be available. He stated the gentleman told him he was a nurse and was interested in applying for a nursing position with the tribe. He told him he would have to go to the tribal clinic and inquire there, he reiterated to him that he did not know anything about the jobs available with the tribe.

16

SJ001979

The gentlemen asked if the tribe controlled and operated on their own with no interference from the government. He told him that for the most part the tribe does operate by itself but the United States is always in the background in the event something major happens and they are needed. He explained to him that although the tribe operates on it's own, in the event the tribe gets into a situation where someone or a company tries to take advantage of us then the United States is there to assist the tribe. And they will not allow us to be taken advantage of. He had told him that it was the State who is always looking for ways to take away our rights.

Mr. Tiger stated during one of the meetings with the Business Council, his nephew, Treasurer Billie asked questions regarding PL280 as he did not have a clear understanding of what this law was. Mr. Billie had said that the Seminole tribe is under this law and they have benefits that we (the Miccosukee tribe) do not receive, he was told by Seminole tribal members that this law was beneficial to them and they do not see anything wrong with it.

He had told Mr. Billie that it may seem like the Seminole tribe and its tribal members have it better than the Miccosukee tribe but it is not really, as it seems. He stated if they get into trouble, it would be the county police to handle the case and not they're own police officers. He stated it is because of Indian tribes such as us, who are not under PL280, who are able to help the other tribe's survive. Left to fend for themselves through this law, they would most likely not be able to survive.

He stated it is worrisome/disturbing to him when he sees tribal members not knowing or not taking the time to find out what this law is really about. He wanted tribal members to understand that if they do not learn about this law, sometime in the future, the younger generation may unknowingly put us under this law. He would like to teach his clan/family members about this law but they will not take the time to sit down and listen. If tribal members attend these meetings, they could learn about it, when it is explained, everything is clear, it is always mentioned but there are only a few (and the same ones) who attend the meetings. Without this knowledge, the tribal members will end up like

SJ001980

the non-Indians, their laws will bind us, we would lose our children, their laws would also apply if a tribal member should get married and or divorced in the non-Indian way.

Mr. Tiger stressed to General Council to learn about this law, pay attention when it is brought up during the meetings, knowledge will make us stronger, without this knowledge, we are only hurting ourselves.  We must understand that the non-Indian is always looking for an opportunity to control us and we must not give them this opening.

Chairman Cypress asked if there were any other questions or comments.  With no comments presented the meeting proceeded.

### Item #08.  Finance

Chairman Cypress stated the tribal enterprises financial statements will be reviewed.  He stated the next NTDR distribution is scheduled for June, General Council will have to

**SJ001981**

decide what day.  He reminded General Council to be careful of their expenditures when they get their money, they overspend and run up bills which they can not cover. This leads them to come before General Council asking for assistance, in the past this was done but at a previous meeting, General Council voted to not approve any more assistance requests.  We have to remember the money we receive is substantial and if spent wisely, we would not have to ask for assistance.

He stated Business Council has repeatedly asked tribal members to set aside their children's money in trust accounts, the parents should be supporting their children but this is not happening, they are using their children's money.  The money should be set aside for them (the children) so they will have it when needed in the future.  The parents can set aside half of the distribution or the whole amount, the point is some of the money should be set aside.

Chairman Cypress stated the problem with tribal members declaring the NTDR money as income continues even though Business Council has repeatedly asked that this not be done.  It has been stated that Tribal Administration will not confirm this when calls are received from creditors, tribal members still assume Business Council will not hear of it but the creditors do call the office.  There are some creditors who have been giving credit without confirmation of the income listed but General Council has to understand that creditors have reports they have to submit to the IRS.  When they (IRS) review these reports, they are going to question how the creditor extended the credit without confirmation/backup of the income listed, then the creditor will have to show proof, this is when it will ultimately lead back to the tribal member and the tribe.  As they (Business Council) have stated before, it is not only themselves they are hurting when they do this, it is the tribe and all tribal members who will be hurt.  Tribal members need to understand that the money we receive from the gaming hall may not always be there, if this should happen, there would be grave consequences.  If a tribal member has too much credit and is not able to pay his bills, then he could face jail time.  They have to remember all this and not overextend themselves when applying for credit.

SJ001982

He stated there might come a day when tribal members elect to pay taxes on their NTDR money in order to be able to report it as income.  If this happens then the same thing could happen, money from gaming may stop and we would not be able to pay our bills and face legal problems.  He stated the best thing that tribal members can do in order to stay out of trouble with the IRS is to not think of this as real money and or income.  They should think of this as money they can spend without accounting for it, the best thing for them to do is to save this money and not spend frivolously.

He stated if tribal member's put their money into the trust account then if they need to make a purchase, then a tribal check can be issued.  If the IRS should have any questions, the check will be from the tribe and it will be the Business Council's responsibility to answer their questions.  If a tribal member should give them a check (of their own) and there are questions, then the tribe would not be able to help them, they would have to settle with IRS on their own.  This is not an issue to be taken lightly, it is important that all tribal members understand the extent of problems we would face if this continues.

Chairman Cypress reiterated tribal members need to start saving their children's money, they will need it in the future.  When the children reach of age, they will ask for their money and if it is not there, one of them may accuse you of stealing their money.  This would create conflict within the family and we do not want to see this happen.  Some parents say that their children are 18 years old and are old enough to accept responsibility for their actions and just turn them out into the world with no parental guidance. After literally being abandoned by their parents they get into trouble with the law, the parents do not accept some of the responsibility and try to help their children.  Instead they come to the Business Council asking them to help their child.  He stated no matter what age the child is, it is our responsibility to rear our children, we are not told that when they reach a certain age, and they are to fend for themselves.  We are taught they will always be our responsibility, no matter what their age is.

SJ001983

Chairman Cypress asked General Council to be careful with their money, to save and or spend wisely, as he said before, the money may not always be coming in. This is something we all have to think about seriously, it is not to be taken lightly.

He informed General Council that he is not saying every tribal member is like this, only that this is the direction we are headed in. There are couples, Indian and non-Indian, who help each other to support their family but there are more that are not doing this and this is what has him worried. He stated the other thing which worries him is the frequency of vehicles that the tribal members are trading in. He sees tribal members trading their cars in and they are less than a year old, this puts them deeper in debt. If the vehicle is not paid off when traded, the balance owed will be transferred to the new vehicle and you will literally be paying for two vehicles.

Chairman Cypress asked General Council to seriously think about what he said and to be careful with their money. He only has their best interest at heart when he says these things and is not meant to be offensive.

Chairman Cypress requested the finance report be presented.

Treasurer Billie stated the following report would cover all the tribal enterprises including the AAR Service Station. After the report is completed the FY'2003 Proposed

SJ001984

General Account Budget will be handed out. He requested General Council review this later and at the next meeting (in August), they can accept it as is or with changes. Treasurer Billie requested Mr. Julio Martinez to present the enterprises financial report.

Mr. Martinez stated he would be reviewing the financial report for the nine- (9) months, which ended March 31, 2002. Report was as follows.

**Miccosukee Restaurant.**

| | | |
|---|---|---|
| Total revenues | - | $350,981.78 |
| Total cost of purchases | - | $124,102.33 |
| Gross profit | - | $226,879.45 |
| Total operating expenses | - | $270,858.30 |
| Net income (loss) | - | $(43,978.85) |
| Tribal assistance | - | $100,000.00 |

**Miccosukee Service Station.**

| | | |
|---|---|---|
| Total revenue | - | $311,458.65 |
| Total purchases | - | $264,380.01 |
| Gross profit | - | $47,078.64 |
| Net income | - | $65,706.74 |
| Net income (loss) | - | $(18,628.10) |

**Miccosukee Airboat Rides.**

| | | |
|---|---|---|
| Total revenues | - | $343,101.75 |
| Total operating expenses | - | $378,591.42 |
| Net income (loss) | - | $(35,489.67) |
| Tribal assistance | - | $50,000.00 |

SJ001985

**Miccosukee Gift Shop.**

| | | |
|---|---|---|
| Total revenues | - | $168,279.22 |
| Total purchases | - | $67,173.72 |
| Gross profit | - | $101,105.50 |
| Total operating expenses | - | $83,755.29 |
| Net income | - | $17,350.21 |

**Miccosukee Village/Culture Center.**

| | | |
|---|---|---|
| Total revenues | - | $134,937.87 |
| Total operating expenses | - | $281,645.05 |
| Net income (loss) | - | $(146,707.18) |
| Tribal assistance | - | $140,000.00 |

**Miccosukee General Store.**

| | | |
|---|---|---|
| Total revenues | - | $44,608.16 |
| Total operating expenses | - | $38,926.30 |
| Net income | - | $5,681.86 |

**Miccosukee Indigenous Images.**

| | | |
|---|---|---|
| Total revenues | - | $14,723.00 |
| Total cost of purchases | - | $1,554.80 |
| Gross profit | - | $13,168.20 |
| Total operating expenses | - | $55,917.49 |
| Net income (loss) | - | $(42,749.29) |
| Tribal assistance | - | $45,000.00 |

**Miccosukee Service Plaza.**

SJ001986

| | | |
|---|---|---|
| Total income | - | $6,257,834.18 |
| Total cost of goods sold | - | $4,971,730.92 |
| Gross profit | - | $1,296,103.26 |
| Total expenses | - | $1,549,123.48 |
| Net ordinary income (loss) | - | $(253,020.22) |
| Total other income | - | $274,049.43 |
| Total other expenses | - | $92,000.00 |
| Net income (loss) | - | $(70,970.79) |

**Miccosukee Indian Gaming.**

| | | |
|---|---|---|
| Total revenues | - | $341,901,732.46 |
| Total cost of revenues | - | $247,302,777.20 |
| Gross profit | - | $94,598,955.26 |
| Total operating expenses | - | $59,070,268.11 |
| Income from operations | - | $35,528,687.15 |
| Net income | - | $37,188,097.56 |

Mr. Martinez stated the following report would cover the monthly amounts received from MIG and into which category it is allocated.

| | | |
|---|---|---|
| **Reserve Account** | - | $5,494,229.36 |
| **FDOT** | - | $143,881.91 |
| **Tribal health assistance** | - | $245,687.84 |
| **Enterprise assistance** | - | $97,739.51 |
| **Legal and finance** | - | $144,957.85 |
| **Arts Festival** | - | $153,639.50 |
| **Landscaping Improvement** | - | $141,507.19 |
| **Housing Expense** | - | $25,407.75 |
| **Appreciation fund** | - | $247,529.35 |

**SJ001987**

| | | |
|---|---|---|
| **Housing reserve** | - | $122,637.06 |
| **Government programs assistance** | - | $111,786.71 |
| **Physical/mental limitations assistance** | - | $278,334.25 |
| **Music festival** | - | $117,821.72 |
| **MIT 10% Contingency** | - | $47,008.94 |
| **Water utility** | - | $59,576.75 |
| **Baptist Church** | - | $35,481.75 |
| **Managed Account** | - | $1,176,212.62 |
| **Insurance** | - | $135,085.55 |
| **Check Cashing** | - | $406,891.62 |
| **Gift Shop** | - | $50,511.33 |
| **Administration Construction** | - | $175,000.00 |
| **Tobacco Shop** | - | $426,614.94 |

**Miccosukee General Account.**

| | | |
|---|---|---|
| Total revenues | - | $42,660,579.93 |
| Total salaries and benefits | - | $480,115.57 |
| Total operating general expenses | - | $2,625,954.37 |
| Total tribal/community activities | - | $20,766,422.65 |
| Total other expenses | - | $724,431.72 |
| Total program assistance | - | $2,739,843.20 |
| Total construction expenses | - | $1,443,607.99 |
| Total expenses | - | $28,780,375.50 |
| Increase in net assets | - | $13,880,204.43 |

Mr. Martinez reported there is $7,375,730.09 available for distribution in the NTDR account as of today.

He stated they would be handing out the proposed FY'2003 General Account budget.

SJ001988

Treasurer Billie stated this concluded the enterprises financial report and asked if there were any questions.

Minnie Bert asked if the report said the AAR Service Plaza was losing revenue.

Treasurer Billie stated yes.

Ms. Bert asked if it had been losing money while under the previous management.

Chairman Cypress stated there had been a loss then but also the previous manager had been taking the rebate that was due the enterprise. He stated even though Mobil is paying for some thing's (repairs) there are some expenses which we have to cover and this is where we are incurring expense costs. We do have insurance coverage but there are gas leaks, which need to be repaired but they are saying they will not pay for this. The insurance company is saying the gas leaks were an already existing problem when we purchased the insurance therefore they cannot pay for it. He stated Mobil is saying the same thing, they will not pay for repairs to an already existing problem.

Ms. Bert stated she had believed that the enterprise was making a profit every since the tribe took over operations but it does not seem this way based on the report.

Chairman Cypress stated profit was being made but it was going back into General Account and as he said before, we have incurred more expenses for this quarter and this is the reason for the loss.

Ms. Bert asked if the expenses were the main reason for the loss.

Chairman Cypress stated yes, and when the tribe settles with the insurance company, they will reimburse us, but for now, the tribe has to carry the cost of the repairs. He stated the best solution would be for us to become self-insured but we have not accomplished this yet. If we were, then our insurance would cover all the tribal enterprises. The money

SJ001989

that these enterprises pay into the account would be saved and when they need it for repairs, it would be available. He stated at this point we are paying for the policy and when needed, for the deductible also and the cost are too much.

Buffalo Tiger stated listening to the report, we are being told that the tribal enterprises are not making a profit. Aside from this we seem to be involved in a lot of legal litigation and he is sure these are not cheap, we would have to pay for witnesses, experts, etc and any monetary judgement that is made against us. He stated he has heard reports of managers and or employees seeking monetary compensation from us and we may have had to pay for some of these, this is another area which is an expense and cuts into our profit. Every since other enterprises have been opened, we have always been mired in litigation, we have never seemed to operate without some type of problem hanging over us. He stated he himself does not see a way out of this, he assumes Business Council has given this some thought and they may see a solution that he has not seen, he personally believes this is something we will always have to deal with. He stated Business Council has to find a solution in order for these enterprises to be profitable. As he reiterated they are always reporting that the tribe is involved in litigation (old and new). He stated he may be the only one who feels this way but it is of concern to him, it is up to the Business Council to find a solution so we are not always involved in litigation.

Chairman Cypress stated the tribe is paying for the insurance coverage but the company is saying they will not pay when they should and this is why the attorneys are involved. We have to make them pay as it is their responsibility. The reason for the other litigation is that there are people out there who try to take advantage of us and we can not allow them to do this. We have to use all avenues available to us in order to do this, they believe that if they seek monetary compensation from us, we will readily pay it, this is not true. If we allow this to happen, this will open the door for everyone to try it, they will think we are weak and will pay what is asked in order to avoid embarrassment to the tribe and its tribal members.

SJ001990

Chairman Cypress stated in regards to the previous manager of the Service Plaza, he was passing himself off as the owner of the enterprise and worked to get the rebate due paid to him.  He stated Shell Oil company was paying him the rebate and not the tribe, when Business Council questioned him about profit not being made, the following month, the report would show there was a profit.  He assumed that if he showed a profit for that month, we would not question him, based on the report submitted to Business Council, there were fewer sales but more of a profit.  Based on this, Business Council instructed that an investigation be done, this would determine what was happening and whether Shell was aware of what the manager was doing and covering up for him.

He stated his actions could not go hidden for too long.  When the IRS told him he had made a certain amount of money and owed them (IRS) $2,500,000, he told them he was not the owner, only the manager, therefore he was not responsible for the bill.  He stated the manager told IRS that the Miccosukee tribe was the owner so they are the ones responsible for the bill, this is when the truth about his actions became clear.  Even though he violated his contract with us, he said we should be responsible for half of the IRS bill, we told him this was not true, he was the only one responsible for it as he is the one who took the money.  In order to protect our share of the money, which he had in some of his accounts, all his accounts were frozen.  When this went to trial he was found guilty and released some of the money to us, he has since said that the tribe took his business away.  He was told that he never had a business, the tribe had hired him to be a manager and this is what he was, not the owner of the Service Plaza.  He stated the tribe's part is over but the State and IRS are after him, this does not affect us though.

Mr. Tiger stated he is aware of all this, he is talking about future tribal enterprises they want to operate.  We have too much on-going legal litigation and these should be cleared up/settled before we get involved with other enterprises.  He is not criticizing anything, he is only saying we need to settle present issues before going forward.  If in the future we want to open another tribal enterprise, we have to hire the most qualified person to manage it, it is due to incompetence that we find ourselves in litigation.

SJ001991

Chairman Cypress stated managers hired will work good until they have been there awhile and then they assume we are not watching them and start trying to take advantage of us.

Colley Billie informed Mr. Tiger that his comments were true, he sees this too. He stated at the last General Council meeting, Business Council informed us that the tribe had purchased the Golf Course/Country Club, he felt this was done wrong. He had assumed we (General Council) were to have reviewed it first and if the asking price were acceptable, then General Council was to approve the purchase, it was not done this way. Business Council reported that the asking price was acceptable and they had made the purchase, this was done without a business plan. They (Business Council) should have presented the business plan showing us the asking price, costs for repairs/renovations, long term profit plan, etc and only then could we (General Council) decide but it was not done this way.

He stated Ms. Bert was right in bringing up the Service Plaza profit, he noticed it too, but as with all other tribal enterprises, he assumed this was the norm. This is why he did not say anything until it was brought up.

Chairman Cypress stated General Council approved the purchase of the Golf Course/Country Club, all the information was given to them. He stated the Business Council did not make this decision/purchase on their own. A business plan was in effect and this was reviewed for General Council, it was stated then that the owners had not made that many repairs as they were only interested in selling the property and did not want to spend money on it. He stated this enterprise will turn a profit but at this point they are making repairs and any profit currently being made is going back into this. They have to be aware that all businesses have a good and bad year and profit rises or falls

29

SJ001992

each year.  He stated Business Council is not trying to hide anything from General Council, all financial reports reflect all expenditures.

Mr. Osceola stated he recently traveled to New Mexico and noticed that they had Gaming halls, and they would had their own golf course located across the street and it was evident that business was good by the amount of vehicles in the parking lots.

He stated if tribal members read the newspapers, they will see that giant company's who employ thousands of people, who all have excellent college education's have the same problems we do but on a higher scale.  These company's (such as Enron) employ over 600 accountants but still lost substantial amounts of money for a lot of people, we do not know how this happened, it could have been the poor lack of judgment on one persons part or a lot of people.  The threat of losing money when in business is not something to be taken lightly but the possibility is always there and it is something we have to live with.  He stated he wanted General Council to think about this before passing judgement on anyone.

Mr. Tiger stated he did not want this issue to drag on when he presented his comments, he only asked that Business Council considers his comments.  He is saying they should not get involved in anymore business ventures until the present ones are turned around and start making a profit.  They (Business Council) cannot continue to move from one to another with all these legal cases following them.  He stated it is obvious some people do not understand what he is saying, this is evident in the comments made.

SJ001993

Chairman Cypress acknowledged Mr. Tiger's comments.

With no further comments the meeting proceeded.

Chairman Cypress informed General Council that June 1st was a Saturday and asked if they want to schedule this for NTDR distributions.

Richard Buster stated General Council had said the first of every three months was to be the distribution date, there should be no reason to ask. He informed Chairman Cypress that when asks them to set a date, this is when General Council will start discussing and it takes too much time.

Chairman Cypress stated there are times when the first does not fall on a Saturday and this is when he asks.

Mr. Buster stated since that date fell on a Saturday, it should be June 1st.

General Council concurred.

Chairman Cypress stated the hours for distribution would be from 8:30 a.m. until 3:00 p.m. The cut-off date for loans will be May 08th.

Chairman Cypress informed General Council the problem with tribal members spending all their money then borrowing from community members is still on going. He stated these people do not tell them they have already borrowed the maximum amount and borrowed even more. When it is time to pay back, they do not have the money and the person who loaned the money comes to Business Council or the Administration staff asking us to collect the money for them.

**Tape change at this time, some comments may not be recorded.**

**SJ001994**

He stated tribal members are borrowing from the elderly and not paying them back. They tell them they will pay on a certain day, but never go back, this is when they (the elderly) call the Administration office seeking help. The other problem is tribal members are not paying for vehicles they get, the car dealers call and say it has been three months and the person has not paid them. There have been times where the dealer will say they thought the tribal member was getting their money every three months. It goes back to what he said earlier, tribal members are telling about the NTDR monies when applying for credit and it is the non-Indians who seem to be certain of the dates that this will be distributed.

Chairman Cypress requested tribal members watch their expenditures, they should save their money and not borrow from the elderly.

With no further comments the meeting proceeded.

Chairman Cypress reported the Florida Governor's Council has added a new item, which he wanted General Council to be aware of. He stated the State wants to fund the program, in this way they will have control over what is passed during these meetings, they can control what is being discussed. He stated when James Billie was on Board, he had said it would be better if the tribe's funding this program, in this way, the State would have no say in anything. It was discussed several times but action was never taken.

Chairman Cypress stated this concluded the Finance report. After lunch break the meeting would resume with item #09.

SJ001995

Connie Jim stated she had a question.  Mrs. Jim asked if the Corn Dance loans would be available this year.  She stated this money was for groceries, supplies, etc.

Chairman Cypress stated this decision has always been up to General Council.

Treasurer Billie stated this does not have to be discussed, if a tribal member wishes to get a loan for this purpose, then they can go to the Administration office and request it.  If they open this particular loan program, then tribal members who are not even going will seek this loan.

Elvis T. Cypress stated if the tribal member has to pay this loan back, then they have the right to open it for discussion.

Connie Jim stated then this particular loan program should be stopped.  There are a lot of tribal members who get the loan and do not go, the majority of us present are employed, and we should use our pay to buy our supplies.  She stated we have men here, they should hunt and the ladies can cook the meat gathered.

Chairman Cypress stated this is true, this is the way it was in the past.

Mrs. Jim stated the majority of us have taken out loans for the full amount, therefore we may not have the money to pay this particular loan back.

33

SJ001996

Richard Buster stated it is wrong to talk about money and our sacred ceremonies in the same breath, unless tribal members have placed money above this. When he hears them talking like this, it seems they have made money into a god and wish to offer homage to it rather than our cultural ceremony.

Treasurer Billie stated he only said it would be up to the individual when the time comes.

With no further comments, lunch break was taken.

Meeting resumed with the following item.

**Item #09.   Home Depot/Strategic Vision**

Assistant Chairman Nelson stated General Council had requested Business Council meet with this group and obtain more information. He stated they have met with them twice, at the first meeting Business Council informed them of rules and stipulations we have in regards to companies leasing tribal lands. We also informed them there were permits that they would have to obtain before any work could be done, in the event this business venture proceeded. The company requested to lease 50 acres of property and for this to be located right off the road/highway, Business Council informed them it had to be located two (2) miles off from the main road. They had said they would look at the site and get back to Business Council as to whether this would be feasible for them.

He stated during the second meeting, they had said that the property was acceptable for their purpose. At this meeting Real Estate Services and Water Resources staff were present and reiterated to them the need to obtain necessary permits before construction and questioned them about their plans in dealing with the waste from the plant, etc. They requested blueprints of the building they were proposing to build on this site, they submitted small prints, he (Mr. Nelson) had requested larger drawings be submitted.

SJ001997

He stated the group was informed of all the procedures that had to be followed before anything can be done. It was explained to them that there would have to be a public hearing after that they would have to contact the BIA in Washington first. They assumed if all parties agreed then work could start soon, they realized it could take time. They asked approximately how long before anything could be done, they were told at least six (6) months, barring no problems. He stated the tribal attorneys were not present at this meeting, they did not discuss the business side of it, and they were there only to obtain the information requested by General Council.

Assistant Chairman Nelson stated from what he sees, the company is asking to tie up too much of our property and he is not comfortable with this. It is true that this company has a lot of warehouses but as he said, they would use up too much of tribal lands. He stated the final decision is for General Council to make. He had asked this group if they would be able to attend this meeting to answer any questions General Council may have and to present their plans for the property. They had informed him via letter that they were busy and would not have time to attend the meeting.

He stated Steve Terry, who was at the meeting, was going to present his report.

Mr. Terry stated they met with Home Depot and their consultants about four times on this project. He stated they are proposing to build a distribution warehouse on the Alligator Alley reservation, they would take up approximately 50 acres, this is at least 750,000 square feet in size. They would have 150 loading docks, they would be running 75 to 100 trucks per day and operate seven (7) days a week, 24 hours a day. They would use this to store their lumber and other products they sell in their stores, that they can bring in from Port of Miami or Port Everglades, they would then distribute to their stores throughout South Florida.

Don Osceola stated if they get the contract with us, they should get their fuel from us at the Service Plaza.

SJ001998

Mr. Terry stated this is one of the things they had discussed, for them to have their trucks buy their diesel fuel at the Plaza.

Assistant Chairman Nelson asked if General Council had any questions.

Betty L. Osceola asked if Mr. Terry could give an example as to how big this area is by naming a building, then they would have a visual idea.  She asked if it would be the Gaming Hall, Hotel, Dome.

Mr. Terry stated and the parking lot.

Tribal member asked if this were just the building size.

Mr. Terry stated yes, just the building size.  The property would be slightly larger than that because right now what we have in parking lot… at the Resort/Convention Center is approximately 45 acres.  He stated a 750,000 square foot building is about 17 acres, so this would be about the size of the parking lot around the Hotel.

Don Osceola asked if they would need the Miccosukee police to patrol the area.

Mr. Terry stated he did not know but that is something they (Business Council) would have to bring up with them.  He stated they might provide their own security.

Assistant Chairman Nelson asked if there were any more questions.

Colley Billie stated he does not have questions regarding the report they are giving but his question is in regards to the Home Depot item.  He stated at the November General Council meeting he had thought we voted to not pursue this proposal, in reading the Minutes from that meeting, this particular item was addressed but that part was not noted due to the tape change.  He stated his question is "what is going on".

SJ001999

Assistant Chairman Nelson stated as far as he knew General Council had directed them (Business Council) to obtain more information before a final decision is made. He stated this is why they proceeded with it. He stated they have secretaries who take care of the tapes and this is what he assumed they do.

Mr. Billie asked Mr. Nelson if he knew or understood that there may be other tribal members who assume this business venture had been stopped just as he did. He stated he believed this was stopped and his question his "where is the authorization".

Evelyn Cypress stated General Council voted to have Business Council gather more information before making a final decision.

Mr. Billie asked when this was done.

Assistant Chairman Nelson stated during the November meeting.

Mr. Billie stated it was during this meeting that they (General Council) had voted to stop further talks.

Ms. Cypress stated it was not stopped, Business Council was told to obtain more information and bring back for General Council's review.

Secretary Bert asked if they had received the Minutes from that particular meeting, it was noted in there.

Mr. Billie stated he read the last set of Minutes and noticed they (Business Council) were told to obtain more information, he went further back to the previous set of Minutes and that set had a notation that the tape was cut off (at this particular part).

Lawmaker Cypress stated he is aware that the purchase of the airplane had been stopped by General Council but for the Home Depot proposal, Business Council was directed to

**SJ002000**

obtain more information. He stated this is why Assistant Chairman Nelson has been meeting with this group.

Buffalo Tiger stated he is not aware of all comments made so far but if they are referring to the Home Depot proposal, he was at the meeting when Business Council was directed (by General Council) to obtain more information for their review. He stated this is all they were told to do, no final decision was made regarding this proposal.

Assistant Chairman Nelson stated all they have done is gather information. He reiterated they told the group of how we operate, what we expect from our business partners, etc. He stated that there was no paperwork involved at any of the meetings.
Treasurer Billie stated when Home Depot first presented their proposal they were looking at a site located just south of the Service Plaza area. General Council had said this could not be done and to offer them another area they could look at, and this is where they proceeded from. He stated General Council never said to stop this proposal, they requested more information before they made a final decision. He stated it would have been better if the Home Depot group were here to answer questions we may have for them but as reported earlier, they had other business to attend to.

Chairman Cypress stated we have dealt with business venture groups who would try to by pass the tribe's water and land use regulations, when they do not want to follow these regulations, Business Council will not accept their proposals. He stated some of these people also assume, wrongly, that if they go into a business venture with the tribe, they do not have to pay taxes. This is not true, they have to pay taxes just as the tribe does, they assume they will be making a lot of money but learn differently. The other thing is that any person proposing a business venture will have to undergo a background check, if they pass then Business Council will meet with them.

Chairman Cypress stated as reported before, Business Council has only gathered information for General Council thus far. He stated we do not know if they did not come

SJ002001

because they did not like the tribe's rules or if they really had other business to attend to as they said.

Andy Buster stated we (General Council) have heard a lot of comments made regarding the business ventures the tribe gets involved in. It is true, we have been in some that have been costly to us, this has involved tribal lands and it makes you feel bad when this happens. Our problem seems to be that when the business groups say they will pay a certain amount of money, we fall right on it, we do not proceed with caution, and we are too hasty. He stated tribal members have seen the Seminole tribe go through a lot of problems with their land lease, they are now trying to get out of the lease they made and it is proving to be difficult for them. His concern is how long will this building be there, if they give up their lease, what will we do with the building, if there is no use for it, how will we clean it up. We are the ones here who make the final decision and if we decide to proceed with it, our younger and future generation may not like the terms that were set, they will question why we ever agreed to this business venture. He stated we need to keep our tribal lands, as our history has proven, the non-Indian will not settle for just the area they say they will try to take more. It is not known where the access road will be located, will it go over I-75 or will it be from Snake Road. All this has to be taken into consideration since they will have trucks running continuously and this will create a lot of dust in the area. If we want the area to be like Dade Corners, traffic noise and dust, then there would be no problem but if we want to keep the area in its natural state, this is something they have to think about. He reminded General Council that we may have a need for this property in the future and if we lease it out, it will not be available to us.

Mr. Buster stated the bottom line is that he is not interested in this business proposal, this is only his opinion and General Council may feel differently.

Chairman Cypress stated it was reported approximately 700 trucks will be traveling from this area, this will be their main point of loading for the South Florida area, they will be running 24 hours a day. He stated they will be employing approximately 500 people, but the main concern is the amount of land they will be taking, 50 acres. He added it would

SJ002002

have been better if the group were here today to answer questions but they are not, they may come at a future meeting. Business Council is only presenting the information they have obtained.

Don Osceola stated they have not said if they will be making the rent payment on a monthly or yearly basis, this information is important. In the old days our people use to travel in canoes but times have changed and we travel by automobile and money is needed to run these. He stated the tribe has to look for ways to bring revenue in for our future.

He stated he read in the newspapers, as he imagine other tribal members may have, that 10 companies received permits to do excavation work stretching from Kendall Drive to U.S. 27. The environmentalists challenged this but were unable to stop them and the permits were given. The State/County looks for ways to make money and this is one way for them, we have to do the same, we have to look into opportunities where money will be made for the tribe and it's tribal members. He added that Chairman Cypress had said this company would be required to follow our water and land regulations, so there should be no problem with this project. This is only his opinion and General Council may vote differently, we should find out how much they will be paying the tribe and how many years they want to lease the land for.

Chairman Cypress stated we are along way from this, we have only gathered information at this time. When this group was informed of our regulations and the site that would be available to them, they seemed hesitant to proceed with the meetings. He stated they may even withdraw their proposal but as we have always said, the final decision is up to General Council.

Buffalo Tiger stated if possible, maybe General Council could give their decision at the next scheduled meeting. He asked if this were possible or is there not enough time to make a sound decision.

SJ002003

Chairman Cypress stated a report would be given at every quarterly meeting unless or until General Council directs otherwise. As he said earlier, the final decision is their's to make. He stated General Council has to keep in mind that this company is asking to lease a large acreage of tribal lands.

Mr. Tiger stated this was true. But we have to keep in mind that going into another business venture, with all the other problems we are currently facing, may not be a good idea. He stated if tribal members are paying attention to what is being said, they can base their decision on this but he is saying they may need time to review all this before making their decision.

Elvis T. Cypress stated if the group was to receive the lease and build the building, they may leave after the lease is up. If they do there are a lot of uses for the building, it could be used as a school for future generations that may be living in this area, it could be used as a recreation area for basketball players. He stated tribal houses could be built around this building. He stated there are different uses for it and they should think of this before making a final decision.

Don Osceola stated Chairman Cypress said that this company seemed to want to pay a low lease rate, if we ask them to pay us $5,000,000 a year, they will lose interest in this proposal. He stated we must remember that they will be leasing a large amount of tribal land and payment should be equal to that. If they are serious, they will let us know.

Chairman Cypress asked General Council if they wanted to review this item again in three months (at the next meeting).

Richard Buster informed General Council this is the time for them to speak up, there are a lot of people here, and a decision can be made. He stated his personal opinion was that we should use the property, we are always leasing out our property instead of using it ourselves. It is time we start using our lands for what we need, build on it, etc, instead of leasing it out.

41

SJ002004

Chairman Cypress informed General Council that the final decision is their's to make, Business Council will do what General Council says.

Sonny Billie stated he has experience in construction work and when he wants to start on a project, he does not want to waste time, he wants to start immediately and some people do not like this. From what he has seen, BIA will start saying we are not using the land and try to take it away from us, if we do not use this property, we could end up losing it. He stated that if you have experience in construction work you would know that 50 acres is not much of an area to work with. If General Council is thinking of approving this proposal, they have to review all information, ask all pertinent questions, and consider what the future would hold for the tribe and the use of this property. He stated he works in the area they are talking about and has seen how Snake Road was constructed, this road was never meant for heavy traffic use, its original design had been for local traffic/light traffic use only. But today, all types of heavy trucks travel it everyday, delivery trucks, produce trucks, gas trucks, etc. This company is saying they want to build a warehouse, General Council has to understand this is not a place where you will be able to go in and shop like regular Home Depot stores. This will only house items that you find in their stores, it will be a shipping area and there would be very heavy traffic in and out of this area. When BIA sees this, they may take away the access road, if this happens, there would be a lot of problems. He stated he builds roads also in his line of work so if need be, they can hire him to build one. He added that if this business proposal is reviewed carefully and is a viable business venture, he would support them.

Chairman Cypress stated Business Council is only submitting a report on what has been discussed this far. He personally has not spoken with this group, it was Mr. Nelson who met with them.

Assistant Chairman Nelson asked General Council if they had any more questions. He asked Steve Terry if there were anything else he had to report.

42

SJ002005

Mr. Terry stated the tribe has received another proposal from Strategic Vision, they are asking to buy property somewhere between Okeechobee and Orlando near a natural gas line. He stated they want to construct an electrical producing plant, what they want to do is purchase this property, give it to the tribe so it can be placed in trust, then build this plant. He stated they just sent this recently and it is called a 'bare bones proposal". He stated this was submitted to Business Council and they directed that it be brought here for General Council to review and decide if they want to pursue it.

Chairman Cypress stated what they were told approximately 1 to 2 years ago, when they had companies come, including Enron, requesting to build a power plant, we were not allowed to have anything to do with this type of business. He stated we were told we could not have anything to do with a business that produces electricity therefore he is certain we can not deal with it. He requested Mr. Terry inform this company that we can not do business with them.

He informed Mr. Terry that General Council is in the middle of discussing the pros and cons of the Home Depot proposal. If there is no final decision made at this meeting, more information will be obtained for the next meeting.

Chairman Cypress asked General Council what they wanted to do, if they do not make a decision, then Business Council will gather more information and submit this at the next General Council meeting.

Buffalo Tiger stated we seem to be discussing this item for a long time, we need to consider what all has been said and go from there. It is true we do need the money for our future use, but we also need to understand we may need the land for the tribe's personal use in the future. He stated his personal opinion is that the tribe should not lease this property out, we will need it in the future and this is the way he will vote when the time comes.

SJ002006

**Elvis T. Cypress presented comments, with the use of a microphone but Chairman Cypress was on his cellular phone and this was distracting when listening to comments.**

Mr. Cypress stated we have heard a lot of comments regarding this proposal and everyone has their personal opinion. When General Council is ready to take action, they have to think about how this lease could possibly help us. If we are not going to build on this property anytime soon, then if leased out, it would be bringing in needed income, this is something they have to consider.

Assistant Chairman Nelson stated if there were no more questions or comments, the meeting would proceed to the next Agenda item.

Margie Sanders requested time to speak, she stated she would not take up much of their time.

Mrs. Sanders stated she heard that the Corn Dance loans were not going to be made available, some of the tribal members may have enough money that they have no need for it but there are some, like her that need this loan. She stated if they are phasing out this loan, then she would like to know if she and her son, Stewart (Sanders) could get a loan of $1000 each so they will be able to purchase groceries (to take out there).

Treasurer Billie stated he had said this would not be acted on here, but if a tribal member feels they need money, they can go to the Administration office, when it gets closer to the date set (for Corn Dance ceremonies) and request a loan. He stated tribal members have to understand this loan has to be paid back.

Mrs. Sanders stated there are a lot of older female tribal members who are not able to support themselves sufficiently enough and this money has always helped them during this time. She stated she was elsewhere when she was told of this and wanted to come here and clear it up.

44

SJ002007

Treasurer Billie stated that when things are told to another person and retold elsewhere, it gets taken out of context, this could be what happened here.

Chairman Cypress reviewed what had been said earlier in the meeting regarding this issue.

Mrs. Sanders stated she has gone to the Administration office before requesting a loan and she was told Business Council would let her know and she would wait for a couple of days.  She stated they are slow in making their decisions and there are times where a tribal member needs an answer immediately, she does not want this to be the same way.

Chairman Cypress stated as it stands, a tribal member may go to the Administration office and request this loan.

45

SJ002008

He stated until told otherwise by General Council, Business Council will gather more information regarding Home Depot's proposal and will present this at the next General Council meeting.

**Tape change at this time, some comments may have been missed.**

### Item #10.  Baptist Hospital; Jackson Memorial; Miami Children's Hospital

This item was not recorded, therefore could not be noted.

### Item #11.  Seminole Loans to Miccosukee members

This item was not recorded therefore could not be noted.

### Item #12.  Don Strock – Sponsorship

Tape resumed with following comments.

Evelyn Cypress asked if they are saying we should ask for $7,000,000 a year.

Chairman Cypress stated no, it is only a figure to present to the group, they are asking us to pay them $10,000,000 a year and we would offer them another figure.  If they feel this amount is too low then, they can withdraw their proposal.

SJ002009

Don Osceola stated the Miccosukee tribe seems to be interested in football, we have a suite for the Miami Dolphins games.  They are asking for $10,000 a year for a 5-year term, they will give us advertising, which we would have to pay anyway.

Chairman Cypress corrected Mr. Osceola, he informed him they are asking for $10,000,000 a year.

Mr. Osceola stated we have bookkeepers/accountants who could work on this and see what we would actually be paying out over this 5-year period.  He stated today, the amount asked does not reflect the actual value and we could be making money, the accountants should look at this.

Chairman Cypress stated whether it is $10,000,000 or $5,000,000, the amount is high and Business Council informed them they would get back to them.  He stated they (Business Council) did not know if they should give them a figure and if they were not interested, there was no harm done.  This group sees the parking lots full at the gaming hall and Resort complex and assume the tribe has a lot of money and that we would be able to pay this amount.  He stated they do not understand that we do not have that much money, they seem to think that they can get a big share of the profits and be rolling in money. They have said the Miccosukee tribe's name would be seen everywhere and that no one would forget it.

Chairman Cypress stated General Council has the final say in this, it is up to them to make a decision.

SJ002010

Richard Buster informed Chairman Cypress if he is saying there is enough money to consider this proposal, then this money should be used for the betterment of the enterprises. He stated the Miccosukee Restaurant and Village are getting old and need to either be replaced or repaired, these should be considered first, we need to look after what we have now and not spend the money elsewhere. If the money is there, then General Council can think about these repairs instead of this proposal.

Chairman Cypress stated he personally does not have this money, he is only presenting a business proposal, which was submitted to Business Council. He stated he is only following the procedure set by General Council regarding expenditure of tribal money, tribal members sometime forget this and this seems to be what is happening now.

Mr. Buster stated he knows this but is only saying this is something that General Council should think about, if the money is there, then it should be used here and not elsewhere.

Chairman Cypress stated when either he or the Business Council bring forth a business proposal, tribal members assume (wrongly) that either he or the others want to spend the money on their personal project, this is not true. He stated they bring it here because any tribal fund expenditures have to be approved by General Council, Business Council can not make this decision on their own.

Connie Jim stated we should not even consider this proposal, they are asking for too much money. Business Council does get tickets to events but she has heard that when a tribal member asks for tickets, they are told it is gone but then it is non-Indians who fill up the suites.

Chairman Cypress stated the tribe does pay for the suite and there are tickets but there have been times where the suites have been empty, tribal members do not go to all the events. He stated all General Council has to do is make a motion and vote.

48

SJ002011

**Connie Jim motioned to not accept the sponsorship proposal; seconded by Richard Buster.  Action was as follows: 26 opposed, 04 for and 06 abstentions.**

Chairman Cypress stated they would inform the group this proposal was denied.

With no further comments the meeting proceeded.

### Item #13.  Tribal Housing

Chairman Cypress stated they were to build additional tribal housing on the AAR but the tribal members who requested changed their minds about living there.  He stated one tribal member informed them, they still wanted the housing they had applied for and work will start on the home site soon.  The contractor has told them that the house should be completed in 120 days, which would be in August.  He stated 10 tribal members had initially requested housing there but this tribal member was the only one left who wanted to live in this area.  He stated there is currently one tribal house empty on the AAR.

He stated the other two Councilmen who oversee the local housing work would give an update on the work/progress.

Assistant Chairman Nelson reported the contractor has completed 2 houses, one family has already moved in and the other can move in as soon as they pay their electricity bill, their power is currently off.  One house is due to be completed this week and final inspection will be on Monday, if there are no problems the family can move in.  For the other house, the roof has been completed and interior work will start.

He stated work will start on an additional 5 houses soon, two families have not moved out yet,

}                                                                              He stated work would start on the other three while they wait for these two.  He stated work was to start on an

49

SJ002012

addition to one of the tribal homes but the family has not moved out yet, he will be
checking on this to see when they plan on moving out.

Assistant Chairman Nelson asked if there were any questions.  With no questions
presented, the meeting proceeded.

Lawmaker Cypress reported three new tribal houses are being constructed on Loop Road,
the cabinets are being installed at this time, when this is completed, carpet and air
conditioning units will be installed.  He stated he is having problems with the Air
Conditioning Company that the tribe contracts with.  He is working on straightening this
problem out (problem with their submission of bills), after this is done, they (Business
Council) will determine if we stay with this company or contract with another.  He stated
this might cause a delay in housing construction progress.

He stated work has started on the tribal house for Sonny Billie.  He made a mistake in the
assigning of the housing pad, he assigned Mr. Billie's site to the one his son (Colley
Billie) had picked.  He stated he is certain these two gentlemen will let him know what
they want to do, they may decide there is no problem with this since the two houses will
be located in the same camp.  At this point they are waiting for trusses to be delivered
(for Mr. Billie's house).  He has changed the pattern of when he orders these trusses,
before he would order, and they would already be here when work reached that point but
there were problems with the lack of space to put these.  He started ordering the trusses
after the wall was put up so the trusses could be leaned against the wall and it takes
approximately six to seven weeks to finish these (trusses) and sometimes there is a wait.
He stated the roof work for Thomas Cypress' replacement home will be completed
tomorrow, inspection will be done before they do the "dry in".  He stated they are waiting
for the trusses, for Tony Bert's replacement home, work will resume when these are
delivered.

Lawmaker Cypress reported that the Housing Committee has assigned him to oversee the
construction of five replacement homes.

SJ002013

The problem they are facing is the need for temporary housing for tribal members (who are getting replacement homes), these people look but when they do not find any, they come back to Business Council asking for help.  He stated there are some temporary houses available but when these are occupied, none are available.  Some of the people have had to move in with other family members and this enabled them to be able to demolish their old houses.  He stated two families have not moved out yet, the one family

has said she is moved out but that some of her personal items are still there and will let them know when all are removed.  He stated demolition would start after she lets them know.

Lawmaker Cypress asked if there were any questions.

Connie Jim stated they demolished one of the houses located by hers but they have not said when this would be replaced or anything and she wanted to know what the status was.

Lawmaker Cypress stated he forgot to mention this in his report, there are actually two that are located by her house.  He stated the one fo                   they are waiting for the outside paint to be done.  The one demolished will be replaced but they are waiting for additional fill to be placed, the current site is not adequate enough for the new type of houses.  He stated as soon as the fill is placed, then work will begin, a new driveway also had to be built as there is none at this time.

Sonny Billie informed Mr. Cypress that even though there was a mistake made in assigning the new houses (for his), as he said it is the same camp therefore they can continue with the project and complete it.

Lawmaker Cypress stated this is all he wanted to know, work will continue.

SJ002014

He stated sometimes there are delays when tribal members do come in to make their color selections or the types of houses they want, when asked to. He stated before work begins, this has to be done, the contractor has to know what type and how many bedrooms the house is suppose to be and when the selection is not made on time, this causes the delay.

Cassandra Osceola stated she had a couple of questions regarding the new houses. She stated she had asked if they could have tiles put in instead of carpeting, she had been told no. That the tribe has to put carpet in and then she can have it removed and have the tile put in. She stated to her this was a waste of money, if possible, she would like to have tile put in, carpet carries a lot of dust even if cleaned on a regular basis and some people have allergies and it is better to not have carpet. She stated she would like to know why they are doing it this way. She has heard they are saying it slows down the construction work but she does not see how, there is no difference in the structure of the house, it is only a change from carpet to tiles.

Lawmaker Cypress stated when tribal houses were built it, carpet was standard but after tribal members starting have more money, they asked if tiles could be installed instead of carpeting and they would be responsible for the costs. Business Council agreed to this, assuming the tribal member had the money, and when work was completed they would say they did not have the money and request the tribe pay for it and they would pay it back. It was done at first but it became a routine until finally Business Council decided to revert back to having carpet installed and the homeowner could change it if they wanted to.

He stated Ms. Osceola is asking to have tiles installed instead of carpet. He stated under the housing program, carpet is standard but she is bringing it before General Council.

Howard Jim stated it is not clear if they are talking about ceramic tiles or if they mean the linoleum flooring, some people mistake these two. He stated they had linoleum installed in their house and this worked fine, the ceramic tiles are expensive and the cost could be

SJ002015

high unless the homeowner is sure they have enough money to pay for it. He knows that in the past, when this was requested the homeowner was asked to bring in a sample and when they did, no one was in the office and they kept coming back and forth and this caused a delay in the work. He stated he knows about the problems that they had with tribal members not paying for the upgrades/changes.

Chairman Cypress stated when changes were requested, when Jerry Hart was the contractor, Business Council use to approve the changes, only because the homeowner said they would pay for the cost. When the work was completed the homeowner would say the tribe had a lot of money, they should pay for it. The homeowners were not honoring their word and it was creating problems with the housing program, therefore this was stopped and they reverted back to having carpet installed. He stated after the homeowner moved in, they could make any changes they wanted.

Ms. Osceola stated she paid for the upgrades, in advance, for the house she is currently living in now but for the new one she was told there would be no upgrades until it was completed. She stated she did not understand why since she would be paying for it…

Chairman Cypress reiterated his earlier comments, it was the actions of other tribal members that forced Business Council to revert back to the standard carpet. If they had kept their word and paid for the upgrades, there would be no problems but they reneged on their part of the agreement.

Ms. Osceola asked why other tribal members have to be penalized because there are some people who are like this. She stated she does not think this is right, how many people are they talking about when they say some of the tribal members did not pay for the upgrades.

Chairman Cypress stated quite a few.

SJ002016

Ms. Osceola asked if Business Council could not get the payment from their NTDR distribution.

Chairman Cypress stated this is what they had to do.  He reiterated this is why they had to revert back to the standards for the other houses.

Betty Osceola asked if Business Council could not draw up an agreement stating what she had to pay.  She added she has heard that Business Council is letting a select few make their changes and not allowing others to make changes they want.

Chairman Cypress stated as far as he knew, upgrades were not being allowed.

Mrs. Osceola stated her husband attended one of the housing meetings and when a homeowner requested to make changes, they were told upgrades were not allowed. But then when another person asked for it and at first was told the same thing, but they insisted they were paying for it and should be allowed to.  From what she was told, after the homeowner voiced their complaint, she was allowed to make changes, this meeting was approximately four or five months ago.

Chairman Cypress requested clarification on this.

Richard Buster (Housing Committee member) stated the housing committee will agree to something and then the other two (Lawmaker Cypress and Assistant Chairman Nelson) change this.

Lawmaker Cypress stated the contractor and sub-contractors were asked to use medium priced carpeting and tiles and this is what is displayed for the homeowners in his office. He stated these are there for their review when making their selections and they are the standard ones that are placed in the new and replacement houses.

SJ002017

Chairman Cypress reviewed his earlier comments and reiterated why they had reverted back to standard carpet installation.  He stated he has not been involved with tribal housing in quite awhile, they have several people on the Housing Committee and along with the other Councilmen, he felt this was enough people.  He had told them that if they ever needed his help, he would be available but they have said there are no problems and if any, they are minor and they have been able to resolve it.

Buffalo Tiger asked if it would be possible for the house to be built and allow tiles to be installed.  He stated the homeowner would be responsible for the cost, but they (Business Council) should subtract the cost of it.

Chairman Cypress reiterated this is what they did before, but as he said earlier, the homeowner did not have the money to pay and would ask the tribe to pay for it and they would pay it back.  He stated this was happening to frequently so they stopped approving the changes.

Mr. Tiger stated all Business Council has to do is deduct the amount from the individual's NTDR distribution.  He stated it makes him wonder what is wrong with Business Council that they would allow this to happen, there should be no trouble or problems if they were strong and decisive.  He stated if they keep changing the housing rules back and forth, it will never run smoothly, they have to have one set of rules in place and stick with it.

Chairman Cypress stated that is what they did, they have rules which say there are to be no changes made and this is what they (General Council) are trying to change.

Assistant Chairman Nelson stated tribal members will borrow the full amount of the loan and then some from other people and it was difficult for Business Council to get the payment.

Lawmaker Cypress requested Housing Committee members respond to this issue.

SJ002018

Chairman Cypress stated they do not say anything and this leads to mis-understanding and or confusion.  They need to speak up and tell General Council what they see and how these requests are handled.

Betty H. Billie stated each meeting she has attended she has noticed that they change things, they will say one thing and at another meeting, they will say another thing.  It is never the same decision.

Chairman Cypress reiterated his earlier comments, it was his understanding that changes/upgrades were not allowed.  He stated one tribal member came to him saying they wanted their front door to open in as it had been before the replacement home was done.  He asked the contractor to look into this but he was told that the house was built standard, like all the others, and there was no reason for them to consider looking for a solution.  When he was told this, he assumed that changes were not being allowed as he had been told before.

Kenny Cypress asked if General Council could make a motion.

Chairman Cypress requested Councilmen to present any comments they may have on this subject, later they cannot say they do not know what is being discussed.

Treasurer Billie stated when Jerry Hart built the type of houses they currently live in, if changes from carpet to tile were requested, Mr. Hart would deduct the price of the carpet and you would be responsible for the balance.  You would give the balance to Mr. Hart who would then pass it along to the tile installer, it was done the way tribal members are asking to do now.  He stated if tribal members had paid when they said they would, there wouldn't have been any problems but they didn't and the contractor would wait for the money.  The reason changes were made was because the tribal members were not paying their bills for the upgrades.  He stated there is no problem with tribal members making

SJ002019

changes after they have moved in, it is better that it is done this way, there are no headaches for anybody.

Buffalo Tiger asked what the cost is for the installation of the carpets in the houses. He stated the tribe is paying for the carpet installation and then if a tribal member makes changes, then money is being wasted. They should allow the homeowners to make changes but with an agreement, stating when this will be paid, etc. He stated the only problem with this is that Business Council has a difficult time in honoring agreements. He added if they want him to, he will help them with the Housing Program.

Chairman Cypress stated they (General Council) are saying an agreement can be drawn up, this has been done before, it did not work out, and the tribal members would not honor this either. He added one other problem with change requests was that tribal members wanted to paint the exterior of the house black and this is culturally wrong, we stay away from dark colors. He reiterated there were too many problems with allowing the tribal member to make changes. He stated changes can be made after the homeowner moves in, there are no problems with that, and they will be the ones responsible for the cost.

Lawmaker Cypress stated if the house has three bedrooms, the cost for installation of the carpet is approximately $3000 but for the tiles, it is $5000, the difference is $2000. He stated it is good that General Council is discussing this, the final decision as to what they want to do lies with them. They are only relaying what Business Council has had experience with when a tribal member requests changes to their house and then not paying for the cost. He stated from what he hears, Ms. Osceola is asking for assistance from General Council, she is asking to make changes to her house.

SJ002020

Secretary Bert stated tribal members have to know that if they have tiles installed, within three months, they will see cracks going through the middle of the floor.  He stated they will lose money this way too, he has noticed this in mostly all of the houses.

Chairman Cypress stated this happens when the house settles in the foundation.

SJ002021

SJ002022

Chairman Cypress reviewed Mr. Buster's comments, he urged homeowners to attend the meetings scheduled for them.

SJ002023

**Item #14.  Marriage Recognition/Dissolution of Marriage**

**Item #15.  Guardianship Applications**

**SJ002024**

He asked if there were any guardianship applications submitted.  He was informed there were none.

## Item #16.  Tribal Enrollment Relinquishment

Chairman Cypress asked if any tribal enrollment relinquishment applications were submitted.  He was informed there were none.

SJ002025

SJ002026

SJ002027

**Tape change at this time, some comments may have been missed.**

SJ002028

SJ002029

67

SJ002030

68

SJ002031

SJ002032

SJ002033

SJ002034

SJ002035

SJ002036

SJ002037

75

SJ002038

SJ002039

SJ002040

SJ002041

SJ002042

SJ002043

SJ002044

SJ002045

83

SJ002046

**Item #19.  General Discussion**

SJ002047

SJ002048

SJ002049

Assistant Chairman Nelson asked if there were other concerns.

Joann Osceola stated approximately three months ago a fire started in her chickee, there was damage to the inside and she wanted to get this repaired.  She stated she went to Lawmaker Cypress asking for assistance from Business Council, he had told her he would have to present it to the other Councilmen.  After their meeting they told her she had an outstanding balance, for previous assistance given, and could not be done at this time.  She stated the tribe paid for her present chickee, as assistance.  She added she has been traveling back and forth to the hospital helping her family out.

Ms. Osceola stated she would like to know if the tribe will pay for another chickee to be built for her, this would be bigger.  It can either be an enclosed chickee or wooden

SJ002050

structure, it would be up to the tribe to decide which one, they may want to go with the one that is least expensive. She added she still has an outstanding balance with General Account but does not know the exact amount. If her request were approved, she would like for the cost to be taken from her NTDR distribution. She stated the final decision is up to General Council.

Assistant Chairman Nelson explained Ms. Osceola's request. He stated we all know that culturally you are not to reside in a fire damaged home. He stated Ms. Osceola does have an outstanding bill for previous assistance given. He added the final decision is up to General Council.

Kenny Cypress reminded Ms. Osceola that if this amount is added to her existing balance, it will be higher and will take longer to pay off.

Connie Jim stated if her balance is low, then it could be added on to her present balance.

Secretary Bert asked what her balance was.

Evelyn Cypress stated after the June deduction, her balance will be $9700, the amount being deducted is $10,000 per distribution.

Assistant Chairman Nelson reiterated this information for General Council.

Ms. Osceola informed General Council that she is asking for assistance, from them, for a bigger chickee, this chickee would be located further back from her existing one. She stated it could either be an enclosed chickee or a wooden structure.

Assistant Chairman Nelson requested action from General Council.

SJ002051

**Kenny Cypress motioned to approve Joann Osceola's request for a new and bigger chickee (cost to be added to her present General Account loan); seconded by Tracey Cypress.  Action was as follows; <u>09</u> for, <u>00</u> opposed and <u>00</u> abstention.**

Assistant Chairman Nelson asked what type of structure is she asking for.

Ms. Osceola stated it could either be an enclosed chickee or wooden structure, which ever cost less.

Lawmaker Cypress stated Ms. Osceola had said whichever cost less so we will go with this.

Ms. Osceola asked if she could get back to Business Council with the size of the chickee she wants or will Business Council be deciding this.

Assistant Chairman Nelson states she can decide on the size but Business Council will decide on the cost/price.

Ms. Osceola asked about the payback, would it be her or Business Council who decides how much she has to pay back monthly or per deduction.

Assistant Chairman Nelson stated this would also be determined during their meeting, they (Business Council) will get back to her about it.

Ms. Osceola stated her nephew pays $300 every three months and she understands that other tribal members pay this same amount, she wanted to know (today) if it will be the same for her or will it be different.

Assistant Chairman Nelson reiterated they would get back with her about it.

Secretary Bert asked General Council how they wanted to handle this.

SJ002052

Kenny Cypress stated she should pay the same amount as the other housing payments.

Elvis T. Cypress stated it would be better if she told General and Business Council the size of the chickee she wanted.

Ms. Osceola stated she did not know yet.

Kenny Cypress stated if the chickee were too big, her brothers may not approve.

Joann Osceola stated they have nothing to say about this, she is the one responsible for paying back the cost of the chickee.  She stated they do not live there.

Discussion continued.

Assistant Chairman Nelson informed Ms. Osceola that they would get back to her about the payment.

Ms. Osceola stated she would let them know of the size of the chickee and the location. She asked who she would be speaking to, Business Council or the staff.

Assistant Chairman Nelson stated she would be called to a housing meeting and this would be discussed.

Ms. Osceola concurred.

Assistant Chairman Nelson asked if there were any other concerns.

Connie Jim stated she would like to request that a cooking chickee be built for her and the cost to be paid by the tribe.  She stated she voted for the Councilmen so this should be their way of thanking her.

SJ002053

Assistant Chairman Nelson informed Mrs. Jim that her comments were uncalled for.  If she wants assistance then she can present this to General Council.

Mrs. Jim acknowledged these comments.  She informed General Council that she would like a cooking chickee but does not have the money, she would like for the tribe to pay for one to be built for her.

Assistant Chairman Nelson reiterated Mrs. Jim's request.

General Council member asked if the elderly care program workers could build this.

Evelyn Cypress stated there are not enough workers.

Treasurer Billie stated the Wilderness Program workers could build this, the tribe would buy the supplies.  He stated she would have to let them know what size chickee she wants.

Mrs. Jim stated she would place markers for the size and the location.

Assistant Chairman Nelson asked if there were anything else.  With no further comments or questions, he requested motion to adjourn meeting.

**Evelyn Cypress motioned to adjourn the May 02, 2002 General Council meeting; seconded by Joseph Osceola.  Action was as follows; <u>25</u> for, <u>00</u> opposed and <u>00</u> abstention.**

The meeting officially adjourned at 5:15 p.m.

SJ002054

_____          _____
DATE                             Billy Cypress, Chairman
                                 Miccosukee Tribe of Indians of Florida


_____          _____
DATE                             Andrew Bert, Sr., Secretary
                                 Miccosukee Tribe of Indians of Florida

SJ002055

# Exhibit 10

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 11-39362


MICCOSUKEE TRIBE OF INDIANS OF
FLORIDA, a federally recognized Indian
Tribe and THERESA WILLIE, Individually
and on behalf of all others similarly situated,

       Plaintiff,

vs.

DEXTER WAYNE LEHTINEN,

       Defendant.

COPY

_____/

*Hearing
23 Dec 2013
Judge Thornton*


The above-entitled cause came on for hearing before the

Honorable John Thornton, Judge of the above-styled court,

at the Dade County Courthouse, Miami, Florida, on the 23rd

day of December, 2013, commencing at 10:00 a.m..

APPEARANCES


    On behalf of the Plaintiff:

        BERNIE ROMAN, ESQUIRE
        P.O. Box 440021, Tamiami Station
        Miami, Florida 33144
        BY:   BERNARDO ROMAN, ESQUIRE
        BY: YINET PINO, ESQUIRE
        BY: YESENIA LARA, ESQUIRE


    On behalf of the Defendant:

        RASCO KLOCK PEREZ NIETO
        283 Catalonia Avenue
        Coral Gables, Florida 33134
        BY:   JOSEPH KLOCK, ESQUIRE
        BY: SUSAN ELIZABETH KLOCK, ESQUIRE

    Also present:
        Dexter Lehtinen
        Roy Cypress Junior
        Theresa Willie

3

1          (Thereupon, the following proceedings

2     were had:)

3          THE COURT: We're here in the matter of

4     Miccosukee versus Lehtinen, Case No.

5     11-3936211.   And this just got transferred

6     into the division?   Thank you all.

7          All right.   Let me have appearances,

8     please.

9          MR. KLOCK: Joe Klock and Susan Klock on

10    behalf of Dexter Lehtinen.

11         THE COURT: All right.   Good morning.

12         MS. PINO:   Yinet Pino on behalf of the

13    Miccosukee Tribe.

14         MS. LARA:   Good morning, Your Honor.

15    Yesenia Lara on behalf of the Miccosukee

16    Tribe.

17         MR. ROMAN:   Bernie Roman on behalf of

18    the Miccosukee Tribe.   And also with us is

19    Assistant Chairman Roy Cypress Junior and the

20    other Plaintiff in this case, Ms. Theresa

21    Willie.

22         THE COURT: Good morning.

23         Please be seated.

24         Let me just start by saying, you know,

25    I've read the materials, I think I get it, so

4

1    just, you know, as far as your remarks are

2    concerned, please, let's try and limit them

3    to half an hour a side.  I may, you know, ask

4    some questions, and stuff like that, forgive

5    me, I want to make sure that I completely

6    understand everything in terms of where we're

7    going.

8         So let me start with you Mr. Klock since

9    they're your motions, please.

10        MR. KLOCK:  Thank you, Judge.  We did,

11   Judge, have some visual aids.  Mr. Lehtinen

12   was in charge of the technology and had very

13   carefully figured out how the programs work

14   but didn't bring a screen with him so... as a

15   backup --

16        THE COURT: I wish, I wish the State of

17   Florida were as flush.  Representative Ross

18   Lehtinen, if you have the power, would you

19   tell the legislature for the State of Florida

20   to just take the Pacer system that we have in

21   the federal because in my practice it was the

22   single best system, and bring it over, you

23   know, and by it by the state system and, you

24   know, please, we'll just adapt it to --

25        MR. KLOCK:  Odyssey is not bad.  Did you

33

```
1    advice of counsel, which, as Your Honor
2    knows, is one of the -- one of the defenses
3    that is commonly used in tax cases.
4         THE COURT:  Right.
5         MR. ROMAN:  Which is:  I did not pay
6    because I relied on the advice on the tax
7    shelter --
8         THE COURT:  And that's exactly what
9    you're doing now with the IRS, correct, on
10   behalf of the Tribe?
11        MR. ROMAN:  Which the IRS did not
12   accept, and that's why we have a judgment
13   which in their lingo is a final assessment.
14   The fact that has not been paid, that doesn't
15   mean they do not owe the money.
16        THE COURT: Well, where is it in that --
17   when does it come to the point that they, you
18   know, finally owe the money, finally?
19        MR. ROMAN:  When they issue the notice
20   of deficiency which it was issued probably a
21   couple of months before the lawsuit was
22   filed.
23        THE COURT: And what happened since then,
24   have you all paid it?
25        MR. ROMAN:  No.  It's in collection.
```

1    But it doesn't matter, they owe it.  That's

2    the damage.

3            THE COURT: And the individual members --

4            MR. ROMAN:  The same thing.

5            THE COURT: And what do the individual

6    tribal members, what do they owe,

7    individually?

8            MR. ROMAN:  Give or take --

9            THE COURT: Is that already --

10           MR. ROMAN:  Give or take right now the

11    amount is 155 million for the period of 2000

12    through 2005.

13           THE COURT: And that's already been

14    determined exactly what they owe?

15           MR. ROMAN:  Yes.

16           THE COURT: Individually?

17           MR. ROMAN:  Closed.  Yes.

18           THE COURT: It's done?

19           MR. ROMAN:  Done.  It cannot be taken

20    back.  It includes taxes, penalties and

21    interest.  That money is owed.  It's in

22    collection.  It's just a matter of how the

23    government, how the U.S. Government

24    determines it's going to go about collecting.

25           THE COURT: And they haven't gotten to

35

1    that stage yet?

2         MR. ROMAN:  They have not gotten to the

3    levy stage, which, as Your Honor knows, is

4    the part where they decide if they're going

5    to take their cars, their furniture, whatever

6    they're going to get.

7         THE COURT: And as far as going to the

8    levy stage, you're using advice of counsel as

9    the defense in order to work out some type of

10   an agreement with them, correct?

11        MR. ROMAN:  It only applies -- yes, but

12   it only applies as to the penalties, it does

13   not apply to the interest because basically

14   they would say interest is on the money owed,

15   it only goes as to penalties because it has

16   to be -- the penalties, as Your Honor knows,

17   is based on intentional disregard of the tax

18   laws.

19        Now, even if Your Honor was to say well,

20   you know, there was no relationship, as to

21   the members, which we dispute, and it's an

22   issue of disputed fact.  The letter clearly

23   states the Tribe is not required to withhold

24   before distributing to the tribal members,

25   and that is also wrong because according to

36

 1     the IRS it has been litigated, has been

 2     decided, the Tribe had an obligation to

 3     withhold.

 4          Now, another issue of material fact:

 5     Who told the Tribe you don't have to

 6     withhold?  The Tribe has clearly stated that

 7     was the advice given by Mr. Lehtinen.  We

 8     have attached affidavits, we have attached

 9     memorandums, we have attached the opinion --

10     not the opinion, the statements made by

11     future -- I mean by the former in-house

12     counsel Diana Carol said yes, this tax system

13     was created under the advice of Mr. Lehtinen,

14     another issue of material fact.

15          Now, all we have is a very, very

16     preliminary, incomplete record because it's a

17     case that barely just started, even though it

18     goes back a year and a half or two years, and

19     the reason why was because there was a motion

20     filed by the Tribe to recuse Mr. Klock.  In

21     the meantime, until the 3rd D.C.A. ruled,

22     both sides decided to stay so there will be

23     no discovery.  Nothing has moved.  There has

24     been no discovery, no substantial -- no

25     relevant discovery of any type, okay, and

1    then the case was transferred to Your Honor.

2          Now, there are two issues that Your

3    Honor seems to be hitting on, which was the

4    subject matter jurisdiction.  We have

5    contested, we have challenged on the Tribe's

6    response, that there is subject matter

7    jurisdiction because these events happened in

8    an area where there is jurisdiction by this

9    court, the location where the advice was

10   given, the location where the advice was

11   created was done, was sent.

12         Now, as to the damages.  We have

13   damages.  They haven't been paid, that's

14   true, because the government has not decided

15   as a matter of policy of politics how they're

16   going to get their money, how they're going

17   to execute their judgement, but there is a

18   judgment.  And mind you, Your Honor, this is

19   only for the years 2000 through 2005 because

20   it seems that the Defendant's argument wants

21   to make it seem that he just got there in

22   2003 when White and Case came in to give an

23   analysis.  This Defendant had been working as

24   the only attorney, as the main attorney

25   basically for the Miccosukee Tribe

1    continuously since 1992.

2        We have included evidence to our

3    pleadings that show that the arguments that

4    the Tribe relied on to basically say that

5    these taxes did not apply to them was because

6    they were going to impose a tax on their

7    money from the gaming; it was designed by Mr.

8    Lehtinen.   The former in-house counsel Diana

9    Carol said that in 2005, that was the main

10   reason, one of the main reasons for which

11   this system, this tax shelter, was created by

12   Mr. Lehtinen in which the Miccosukee Tribe

13   did not have to pay taxes on the

14   distributions neither at the tribal

15   government level nor at the individual

16   members.   Not only this is going on from the

17   1990's until 2003, when the IRS comes

18   knocking three years later, in 2006, the

19   advice is reaffirmed in writing, to the IRS,

20   to the Internal Revenue Service, to Ms.

21   Christie Jacobs, the Director of Inter-Tribal

22   Government.   Let's suppose for a minute,

23   another issue of material fact, look, I

24   really don't know, I'm not sure, this is not

25   my area of expertise, three years ago White

1    and Case just came in and gave you a memo

2    that is like we don't know what way to go.

3    You know what?  In 2006 this is the time to

4    bail out.  Does this look to you like bailing

5    out?  "For these reasons, the Miccosukee

6    tribal members are not required to pay income

7    tax, nor does the Tribe have any related

8    withholding obligations."  This was the

9    response to the audit that was taking place

10   from 2000 through 2005, not from 2006

11   forward.  This was for the audit of the

12   previous year, which is another disputed

13   fact.

14       Damages.  We have the Tribe for that

15   period that owes 170 million dollars and

16   counting.  It's in collection.  Game is over.

17   The fact that it hasn't been paid, according

18   to state law, and that we have cited on our

19   response, it doesn't matter, that's a

20   judgement.  Tribal members, the same thing.

21       Now, if Mr. Lehtinen did not represent

22   tribal members, had nothing to do with tribal

23   members, and we have briefed on our response

24   exactly how the attorney/client relationship

25   is formed, and we have cases, controlling

40

1    authority, that it basically says it's a

2    subjective -- if you believe you're being

3    represented, and what you're saying is going

4    to be relied on, like Ms. Willie and other

5    tribal members did, it is considered legal

6    advice.

7        Now, let's suppose -- another disputed

8    issue.  Let's suppose it is true, Your Honor,

9    he wasn't representing tribal members, he had

10   nothing to do with tribal members when he

11   stood there every three months, every quarter

12   at the General Council meeting, at

13   Chickeechobee, not at the red zone, he was --

14   he was only talking on behalf of the Tribe,

15   nothing with tribal members.  How you can

16   separate tribal members and not Tribe, I

17   don't know, but let's take that at face

18   value, okay, another disputed issue of fact.

19       THE COURT: I mean, you're telling me

20   that there are individual letters of

21   engagement between Mr. Lehtinen and the

22   individual Tribe members?

23       MR. ROMAN:  No, it doesn't have to be,

24   under the standard, to create the

25   relationship --

1            THE COURT: So when I was in private

2        practice and I represented the University of

3        Miami as an entity, I represented each

4        individual student and each individual

5        faculty member when I was giving them advice?

6            MR. ROMAN:  No.

7            THE COURT:  When I represented the

8        Archdiocese of Miami, would I represent every

9        priest and every single -- the archbishop

10       individually and the, you know, I represented

11       all of them individually?

12           MR. ROMAN:  Absolutely not.

13           THE COURT: When I gave them advice?

14           MR. ROMAN:  Absolutely not.  Except if

15       when Your Honor represented the University of

16       Miami you stood there every three months with

17       a bunch of students or faculty, and they

18       asked you, "Do I need to pay taxes on this,"

19       and you said, "No."

20           THE COURT:  Well --

21           MR. ROMAN:  Then yes, you did represent

22       those because they were relying on you to

23       give them that answer.

24           Kaplan v.  Leibowitz says when an

25       attorney is acting, not just for the

42

```
 1        corporation's benefit, but on those who rely

 2        on the representations in their documents,

 3        then the public policy concerns preventing

 4        the assignability of legal malpractice claims

 5        is attenuated and the assignee was able to

 6        bring the suit.

 7             If you're asking a question from a

 8        lawyer that you believe that the answer

 9        you're going to be relying on?  That is an

10        attorney/client relationship.

11             What Your Honor probably would have done

12        while representing the University of Miami,

13        is said, wait a minute, I cannot answer that

14        question because I don't represent you, and I

15        don't want to mislead you into thinking that

16        I'm giving you advice.  The same way Your

17        Honor would have done when representing the

18        archdiocese.  Look, I represent the

19        archdiocese as an entity, but if I have a

20        room full of priests, and they're asking me

21        for advice, and I'm answering, and I know

22        that they're going to be relying on that, and

23        three years later I write above my signature,

24        "For these reasons, the tribal members are

25        not required to pay income tax."  Hey, if I
```