# Exhibit 11

12626113.1

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
               SOUTHERN DISTRICT OF FLORIDA
 2                MIAMI-DADE COUNTY
 3   UNITED STATES OF AMERICA,
              Plaintiff,
 4     vs.          Civil No. 1:14-cv-22441-CMA
     SALLY JIM,
 5            Defendant.
 6   _____/
 7              DEPOSITION
 8                 OF
 9               SALLY JIM
10   APPEARANCES:
11   WILLIAM E. FARRIOR, Trial Attorney, DOJ
     ROBERT L. WELSH, Trial Attorney, DOJ
12   U.S. Department of Justice
     Tax Division
13   P.O. Box 14198
     Ben Franklin Station
14   Washington, D.C. 20044
     Appearing on behalf of the Plaintiff.
15
     BERNARDO ROMAN, III, ESQUIRE
16   DANIEL DAVIS, ESQUIRE
     ANDRES DENIS, LEGAL ASSISTANT
17   Law Office of Bernardo Roman, III, P.A.
     1250 SW 27th Avenue, Suite 506
18   Miami, Florida 33135
     Appearing on behalf of the Defendant.
19
     ALSO PRESENT: VIRGINIA POOLE, MICCOSUKEE INTERPRETER(if needed)
20            ALEXANDER OSCEOLA
21         Kresse & Associates, LLC
           44 West Flagler, Suite 600
22            Miami, Florida 33130
23         Tuesday, March 24, 2015
     10:15 a.m. to 12:50 p.m. & 1:30 p.m. to 4:47 p.m.
24
     Susan Suddarth, Court Reporter, Kresse & Associates, LLC.
25
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 2

```
 1              I N D E X
 2                         PAGE
 3   Direct by Mr. Farrior          3
 4   Cross by Mr. Roman           115
 5   Redirect by Mr. Farrior      133
 6
 7        EXHIBITS MARKED FOR IDENTIFICATION
 8   Government's Exhibit No. 1        8
 9   Government's Exhibit No. 2       71
10   Government's Exhibit No. 3       83
11   Government's Exhibit No. 4       90
12   Government's Exhibit No. 5       93
13   Government's Exhibit No. 6       99
14   Government's Exhibit No. 7      105
15   Government's Exhibit No. 8      106
16   Government's Exhibit No. 9      109
17   Government's Exhibit No. 10     111
18   Government's Exhibit No. 11     111
19   Government's Exhibit No. 12     112
20        (All exhibits retained by attorneys.)
21
22
23
24
25
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 3

```
 1       Deposition of SALLY JIM, a witness of lawful age, taken by
 2   the PLAINTIFF for the purpose of discovery and for use as
 3   evidence in the above-entitled cause, wherein UNITED STATES OF
 4   AMERICA is the Plaintiff, and SALLY JIM is the Defendant,
 5   pending in the UNITED STATES DISTRICT COURT FOR THE SOUTHERN
 6   DISTRICT OF FLORIDA, Miami-Dade County, Florida, pursuant to
 7   notice heretofore filed, before SUSAN SUDDARTH, a Court
 8   Reporter and Notary Public in and for the State of Florida at
 9   Large, on the 24th day of March 2015 at Kresse & Associates,
10   LLC, 44 West Flagler, Suite 600, Miami, Florida 33130
11   commencing at 10:00 a.m.
12          --------------------------------------
13   THEREUPON,
14            VIRGINIA POOLE,
15   the Interpreter here, having been first duly sworn to translate
16   the questions from English into Miccosukee and the answers from
17   Miccosukee into English, thereupon translated upon her oath as
18   follows:
19          ------------------------
20   THEREUPON,
21            SALLY JIM,
22   a witness being of lawful age and being first duly sworn in the
23   above cause through the Interpreter, testified on her oath as
24   follows:
25       MR. FARRIOR:  We are on the record.  Let's go around
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 4

```
 1   the room and make sure everyone identifies themself on the
 2   record if you don't mind.
 3       MS. JIM:  Sally Jim.
 4       MS. POOLE:  Virginia Poole, P-O-O-L-E.
 5       MR. RAMON:  Bernie Ramon on behalf of Sally Jim and
 6   here to my left is Alexander Osceola who is Ms. Jim's
 7   husband.
 8       MR. DAVIS:  Daniel Davis on behalf of Sally Jim.
 9       MR. DENIS:  Andres Denis, Legal Assistant for the
10   Miccosukee Legal Department, M-I-C-C-O-S-U-K-E-E.
11       MR. FARRIOR:  Robert Welsh for the United States.
12   BY MR. FARRIOR:
13       Q   Thank you.  My name is Will Farrior.  I'm an attorney
14   with the Department of Justice, Tax Division, and I represent
15   the United States along with my co-counsel, Bob Welsh, in the
16   case United States versus Sally Jim, pending in the United
17   States District Court for the Southern District of Florida.
18       Thank you for appearing here today.  I'll begin with
19   Ms. Poole, you have agreed to act as an Interpreter for us
20   today.
21       MS. POOLE:  Yes.
22       MR. FARRIOR:  That is correct?
23       MS. POOLE:  Yes.
24       MR. FARRIOR:  Do you understand that acting as an
25   Interpreter, you have to just repeat what I say in
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 5

1  Miccosukee to Ms. Jim?
2       MS. POOLE:  Yes.
3       MR. FARRIOR:  And you understand not to comment or
4  make a leading suggestion about what the answer should be.
5       MS. POOLE:  This isn't my first time in a deposition.
6  My understanding with Ms. Jim is that, she understands
7  English pretty well.  But if there is something that she
8  doesn't understand, then she will say I don't understand,
9  or I don't know, and then I will interpret to the best of
10  my ability.
11       MR. FARRIOR:  Then I just want to make it's on the
12  record and you agree to interpret accurately what Ms. Jim
13  says, if she says something in Miccosukee; is that
14  correct?
15       MS. POOLE:  Yes.
16       MR. FARRIOR:  Thank you.
17            DIRECT EXAMINATION
18  BY MR. FARRIOR:
19   Q  Now, Ms. Jim, you understand that you have just been
20  sworn in today?
21   A  Yes.
22   Q  And do you understand that means you have a duty to
23  testify truthfully here today; is that correct?
24   A  Yes.
25   Q  So you understand a little bit of English?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 6

1   A  Yes, uh-huh.
2   Q  You understand English fairly well; is that correct?
3   A  I just need it as backup just to know better what I
4  need to understand.
5   Q  That's no problem at all.  If at any point in time
6  you need a translation or help understanding a question, please
7  stop us and let us know, okay?
8   A  Okay.
9   Q  Could you state your full name for the record please?
10   A  Sally Jim, J-I-M.
11   Q  Do you have a middle name?
12   A  No middle name.
13   Q  What is your current address?
14   A  HC61 Box E, 4300 Ochopee, Florida 34141.
15   Q  Have you ever had your deposition taken before?
16   A  No.
17   Q  Have you ever testified in court before?
18   A  No.
19   Q  I'll go through some of the standard instructions
20  just so we are all on the same page here.  If you do not hear a
21  question, please say so, and I will repeat it.
22   A  Okay.
23   Q  If you do not understand a question, please say so,
24  and I will do my best to rephrase it to where you can
25  understand it.  And we also have the assistance of Ms. Poole as

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 7

1  an Interpreter, if you don't understand a question?
2   A  Okay.
3   Q  If you do not know or do not remember the information
4  necessary to answer a question, please just say so.
5   A  Okay.
6   Q  If you answer a question, I will assume that you have
7  heard my question, you have understood, and you have given me
8  your best recollection.  Is that fair?
9   A  Yes.
10   Q  If at any point in time you realize that an earlier
11  answer you gave was inaccurate or incomplete, you can just
12  state that you would like an opportunity to supplement an
13  earlier answer and you will be given a chance to do so?
14   A  Okay.
15   Q  If at any point in time you find that you need to
16  take a short break, please just let us know and you'll be
17  allowed to take breaks whenever you need to.  However, if I
18  have a question pending, you might be required to answer that
19  question before we are allowed to go on break?
20   A  Okay.
21   Q  Please provide verbal answers so that the court
22  reporter here can record your response.  Please speak slowly
23  and clearly.  One important one is please wait for me to
24  complete my question before you begin to answer?
25   A  Okay.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 8

1   Q  A lot of times the end of my question may be obvious,
2  or I have a tendency to pause in the middle of what I'm saying,
3  so please do your best.  And I'll do my best to allow you to
4  finish your answers before I begin my next question?
5   A  Okay.
6   Q  Do you understand these instructions?
7   A  Yes, I do.
8   Q  Are you currently under the influence of any
9  medication or alcohol?
10   A  No.
11   Q  Can you think of any reason why you might not be able
12  to be completely truthful with your answers here today?
13   A  No.
14       MR. FARRIOR:  I'm going to mark this as Exhibit
15  No. 1.
16       (Government's Exhibit No. 1 marked for identification.)
17  BY MR. FARRIOR:
18   Q  This is just the Notice of Deposition.  I think this
19  might be the only copy we have.  So, we have marked this for
20  identification as Exhibit No. 1.  Have you seen this document
21  before?
22   A  Just need my glasses.  I'm not sure if I seen this
23  one or not, I seen a whole bunch of them.  Not exactly this
24  one, which I haven't seen.
25   Q  Are you here today to testify pursuant to our request

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 9

1 that you come testify in this case?
2    A   Yes.
3    Q   Could you tell us very briefly what your educational
4 background is.
5    A   I went to, I didn't graduate, I went to ninth grade
6 at the Miccosukee High School.  From there I never went back to
7 school.  I worked and I've been working ever since then at
8 different jobs at the Miccosukee Tribe, the National Park
9 Service I was a Ranger there for nine years.
10    Q   So what year did you finish in school at the
11 Miccosukee?
12    A   I dropped out in ninth grade.  I think it was in 1989
13 is when my father got sick, so I had to take care of him.
14    Q   Then you went to work, is that what you said?
15    A   Uh-huh.
16       MR. RAMON:  I'm sorry, you need to answer yes or no,
17 she cannot pick up uh-huh.
18       THE DEPONENT:  Oh.  What was that?
19 BY MR. FARRIOR:
20    Q   Where did you go to work?
21    A   At Miccosukee Tribe at different jobs.
22    Q   Could you just list what jobs you had with the
23 Miccosukee Tribe?
24    A   It was Community Action Agency helping out senior
25 citizens, delivering meals.  After that I worked at a

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 10

1 restaurant a Miccosukee restaurant.  Then from there I worked
2 at National Park Service for nine years.  Then I stopped for a
3 while and then went back to work at Miccosukee Health
4 Department for six years.
5    Q   Go ahead, I'm sorry.
6    A   Now I'm unemployed.
7    Q   Where are you currently employed?
8    A   I don't work now.
9    Q   Okay, unemployed, gotcha.  What years did you work
10 for the National Park Service?
11    A   I'm not sure the dates, but I stopped working there
12 in 1990. I think, but I'm not sure what the dates are, the
13 years.
14    Q   Where were you employed during the year 2001?
15    A   Miccosukee Health Department .
16    Q   What were your duties at the Miccosukee Health
17 Department?
18    A   Coordinator.
19    Q   What did that include doing?
20    A   Helping out, making like doctors appointments and do
21 translations for the elders when they come to see the doctor,
22 helping out.
23    Q   Are you married?
24    A   Yes.
25    Q   Who are you married to?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 11

1    A   Alexander Osceola.
2    Q   How long have you been married to him?
3    A   Thirty-two years.
4    Q   Were you married before that?
5    A   No, this is my first one and the only one.
6    Q   Do you have any children?
7    A   I have one child and I adopted one and she is
8 eighteen.
9    Q   What is the name of your child?
10    A   Alexis Nicole Osceola and Tamara Jim.
11    Q   When was Alexis Nicole Osceola born?
12    A   1983.
13    Q   When did you adopted Tamara Jim?
14    A   1996.
15    Q   You said Tamara Jim is currently eighteen years old?
16    A   Yes.
17    Q   And you didn't have any other children?
18    A   No.
19    Q   Did you have any other members of your household
20 during the 2001 year?
21    A   No.
22    Q   When did you become a member of the Miccosukee Tribe?
23    A   I don't remember the date, the year for that one,
24 because my mom put in the Tribe.
25    Q   What's your mother's name?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 12

1    A   Connie Jim.
2    Q   Is Connie Jim a member of a clan in the Tribe?
3    A   Yes.
4    Q   Which clan?
5    A   Bird clan.
6    Q   Can you sort of describe for me how the clan system
7 works in the Tribe?
8    A   What do you mean?
9    Q   I guess could you tell me what the significance is of
10 being in the Bird clan as opposed to some other clan?
11    A   There is no difference.
12       MR. OSCEOLA:  (Talking in Miccosukee.)
13       THE DEPONENT:  Excuse me, she's going to.
14       THE INTERPRETER:  There is no difference, it's just
15 the different clans that we have.  Bird clan, otter clan,
16 deer clan, those kind of things.  We don't marry within
17 the same clan, that's a major difference.
18 BY MR. FARRIOR:
19    Q   Okay, let me make sure that we are clear on the
20 ground rules here.  Right now, I appreciate that answer, thank
21 you.  But we are just asking Sally Jim right now for answers.
22       So, Mr. Osceola, we will get to you this afternoon.
23 But please don't feel like you need to volunteer any
24 information right now.  Do you understand what I'm saying?
25       MR. OSCEOLA:  Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 13

BY MR. FARRIOR:

1  Q   No, I understand and that's why we went through the
2  rules earlier today, if you don't understand a question, or
3  it's difficult for you to answer, you can just let me know.  We
4  may or may not move on, or I'll make sure I rephrase the
5  question.  But right now the goal is just to make sure we
6  understand what your testimony is, Ms. Jim, do you understand.
7  A   Okay.
8  Q   Thank you.  So, is your husband a member of the
9  Miccosukee Tribe?
10 A   Yes.
11 Q   And how long has he been a member of the Miccosukee
12 Tribe?
13 A   Since he became a member, I'm not sure the year, but
14 I think it's 1985.
15 Q   Were you a member before or after he became a member?
16 A   Yes, I was a member.
17 Q   Before?
18 A   Before.
19 Q   So sometime before 1985 you became a member of the
20 Tribe?
21 A   Uh-huh, yes.
22 Q   Do you recall about how old you were at the time you
23 became a member of the Tribe?
24 A   Me, when he became a member?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 14

1  Q   No, when you became a member?
2  A   I don't really know.
3  Q   Were you a child?
4  A   Yeah, I was a child.
5  Q   Is Alexis Nicole Osceola a member of the Miccosukee
6  Tribe?
7  A   Yes.
8  Q   Was she living with you in your household during the
9  year 2001?
10 A   Yes.
11 Q   Is Tamara Jim a member of the Miccosukee Tribe?
12 A   Yes.
13 Q   Was she living with you --
14 A   -- yes.  Sorry.
15 Q   Was she living with you during the year 2001?
16 A   Yes.
17 Q   Were you employed at the Miccosukee Health Department
18 for the entire year 2001?
19 A   Yes.
20 Q   Do you recall about how much you made?
21 A   I don't remember.
22 Q   Were you paid on an hourly basis?
23 A   Yes.
24 Q   Were you paid more than twenty dollars an hour?
25 A   No.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 15

1  Q   Were you paid more than ten dollars an hour?
2  A   Yes.
3  Q   Did you work forty hours a week?
4  A   Yes.
5  Q   Did you work more than forty hours a week?
6  A   Yes.
7  Q   About how many hours a week did you work?
8  A   About maybe ten hours.
9  Q   Let me make sure I understand.
10 A   The job was like you just can't go at 4:30, you have
11 to stay until what you were doing was done, helping the
12 community.
13 Q   So when you say ten, you meant ten hours a day?
14 A   Yeah, ten hours a day.
15 Q   And how many days a week did you work?
16 A   Five.
17 Q   Did you get overtime when you worked more than forty
18 hours a week?
19 A   Yes.
20 Q   And they kept track of your time?
21 A   Yes.
22 Q   And by "they" I mean your employers the Miccosukee
23 Tribe?
24 A   Yes.
25 Q   Did you get any other benefits in addition to being

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 16

1  paid hourly?
2  A   No.
3  Q   You didn't have a 401K contribution or anything like
4  that?
5  A   Oh, yeah, I did.
6  Q   Was that related to your employment at the health
7  department?
8  A   Yes, it was like offered to see if you wanted to, how
9  do I say it, to save money, put it away.
10 Q   Do you recall having to take any significant amount
11 of time off during the year 2001?
12 A   No.
13 Q   About how many weeks out of the year did you work if
14 you recall?
15 A   The only time I probably took off was maybe like two
16 weeks for -- excuse me, I've got to ask.  Religious retreat for
17 like two weeks, that was about it for the whole year.
18 Q   Do you recall how your 401K worked as far as how much
19 you put in versus how much your employer put in?
20 A   I think I put in, I don't really remember what but
21 what I put in, the Tribe put in matching that amount.
22 Q   Do you recall having gambling income during the year
23 2001?
24 A   I don't remember.
25 Q   Did you gamble during the year 2001?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 17

```
1    A    Yes.
2    Q    Where did you gamble?
3    A    Miccosukee Resort.
4    Q    What sort of games did you play?
5    A    The machines and sometimes the bingo games.
6    Q    Do you recall any year in particular where you had a
7  good year or a bad year as far as gambling?
8    A    Every year was bad, I had no luck.
9    Q    During 2001 did you keep track at all of your
10 winnings and losses?
11   A    No, I didn't.
12   Q    Is there any way that you can think of to find any
13 evidence of what you won or lost as far as gambling in 2001?
14   A    I don't think so.
15   Q    Is there anyone that you gambled with in 2001 that
16 would maybe be able to refresh your recollection?
17   A    No.
18   Q    Is there anybody generally that you went and gambled
19 with?
20   A    No.
21   Q    Is your father a member of the Tribe?
22   A    He is deceased, he was.
23   Q    What was his name?
24   A    Rocky Jim.
25   Q    When did the Tribe open up its gambling resort?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 18

```
1    A    I don't remember the year.
2    Q    Do you recall a time before the Tribe had a bingo
3  hall?
4    A    Do I remember if they had a bingo hall?
5    Q    Did the Tribe have a bingo hall?
6    A    They didn't, yeah, but now they do.
7    Q    And were you a member of the Tribe at a point in time
8  before the Tribe had a bingo hall?
9    A    Uh-huh, yes, I was.
10   Q    Do you recall about when the Tribe started the bingo
11 hall?
12   A    I don't know the year for that when it opened and all
13 that stuff.  I wasn't really paying attention.
14   Q    When you were working at the Miccosukee Health
15 Department, did you get health care benefits?
16   A    Yes, I did.
17   Q    Can you describe how that worked?
18   A    They made us buy health insurance from the Tribe.  It
19 was either, there were changing all the time, so I'm not really
20 sure which insurance companies they were.
21   Q    Do you recall how much that insurance cost that you
22 purchased from the Tribe?
23   A    Something over a hundred dollars.
24   Q    When you say over a hundred dollars, do you mean a
25 month?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 19

```
1    A    Every two weeks I think.
2    Q    When you were working at the Miccosukee Health
3  Department, were all the patients Tribal members?
4    A    Yes.
5    Q    How did the patients pay for the health services that
6  they got?
7    A    That one it's owned by the Miccosukee Tribe, so they
8  don't pay to see the doctor or to get medicine at the clinic.
9    Q    The Miccosukee Tribe pays to operate that clinic; is
10 that correct?
11   A    I think Indian Health Service.
12   Q    When you say Indian Health Service are you referring
13 to some sort of federal program?
14   A    Yes.
15   Q    Does the Miccosukee Tribe contribute to that?
16   A    Maybe, I'm not sure on that one.
17   Q    You mentioned that you went to the Tribe school; is
18 that correct?
19   A    Yes.
20   Q    How was that school set up?
21   A    Just a regular school, they had regular classrooms
22 and all that on the reservation.
23   Q    Is the school operated by the Tribe?
24   A    I don't think it was.  I think they had help from
25 Indian Health Service, I'm not really sure.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 20

```
1    Q    Did you have to pay to go to school there?
2    A    No.
3    Q    Does the Tribe have any program where they will pay
4  to send Tribal members to junior college or to college that
5  you're aware of?
6    A    Not that I'm aware of, no.
7    Q    Do you own your house that you live in right now?
8    A    The Tribe owns it, I guess it's like a house.  I
9  would consider it as my house, yes.
10   Q    And the house is on Tribal land; is that correct?
11   A    Yes.
12   Q    How big is your house?
13   A    Three bedrooms, living room and a kitchen, not that
14 big.
15   Q    When was it built?
16   A    I'm not sure the date, the year.
17   Q    Was it built within the last twenty years?
18   A    Before.
19   Q    Did someone live in it before you did?
20   A    No.
21   Q    Was the house built for you?
22   A    Yes.
23   Q    Did you provide specifications for how you wanted the
24 house to be?
25   A    No.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 21

1   Q   Could you describe the process of being able to move
2   into the house?
3       A   I was living, we were living in my mom's house and it
4   was crowded, so I had to apply for the house.  When it was my
5   turn, that's when they agreed to build a house for me.  So we
6   moved in.
7       Q   When you say they, you mean the Miccosukee Tribe?
8       A   Yes.
9       Q   So there is an application process for building
10  houses that they have; is that correct?
11      A   Yes.
12      Q   What sorts of things do they ask in the application?
13      A   If you have a family, and mostly that, if you have a
14  family and why you need a house and all that.
15      Q   Are some people's houses nicer than others?
16      A   Yeah.
17      Q   How is that determined?
18      A   I guess as the years go by, I think the houses that
19  they build are like a different agency or different company
20  builds it, so that's why it's different.
21      Q   What sorts of bills do you have right now?
22      Q   Bills?
23      Q   Right?
24      A   Car payment, light bill, phone bill, direct TV,
25  insurance, car insurance.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 22

1       Q   Does the Tribe pay for any of those bills?
2       A   No.
3       Q   Do you have a water bill?
4       A   No.
5       Q   Do you know if the Tribe provides water to your
6   house?
7       A   Yes.
8       Q   It does?
9       A   Yes.
10      Q   And when you say light bill, is that electricity?
11      A   Yes.
12      Q   And you pay for your own electricity?
13      A   Yes.
14      Q   Do you have a natural gas bill?
15      A   No.
16      Q   Do you use natural gas?
17      A   No.
18      Q   Were you living in the house that you are currently
19  living in in 2001?
20      A   Yes.
21      Q   You mentioned that you had a car payment; is that
22  correct?
23      A   Yes.
24      Q   What kind of car do you drive?
25      A   Dodge Dually truck.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 23

1       Q   What year is that truck?
2       A   2010.
3       Q   Did you buy it new?
4       A   Yes, financed it.
5       Q   Where did you buy it from?
6       A   I financed it at University Dodge.
7       Q   Is that in Miami?
8       A   Broward, Davie.
9       Q   I'm sorry?
10      A   Davie.
11      Q   That's where it's located?
12      A   Yes.
13      Q   What kind of car did you drive before the Dodge
14  Dually?
15      A   I think a Mercury Cougar.
16      Q   How long did you have that car?
17      A   Maybe about four years.
18      Q   Did you finance that car as well?
19      A   No.
20      Q   Did you pay cash?
21      A   I bought it from somebody from the reservation.
22      Q   Are there any other items that you had an installment
23  plan to pay off?
24      A   No.
25      Q   Do you have any other open lines of credit, credit

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 24

1   cards, that sort of thing?
2       A   Yeah, I think I have an American Express still paying
3   for it.
4       Q   Did the Tribe ever provide child care for your
5   children?
6       A   No.
7       Q   Did the Tribe ever provide any educational benefits
8   to your children?
9       A   No.
10      Q   Did your children go to the school on Tribal land?
11      A   Yes.
12      Q   Did either of your children attend college?
13      A   No.
14      Q   Or junior college?
15      A   No.
16      Q   What do they currently do?
17      A   My youngest daughter Tamara still goes to school,
18  she's in 11th grade.  My other daughter she just had a baby, so
19  she's home.
20      Q   Did you ever receive food benefits from the
21  Miccosukee Tribe?
22      A   Long time ago, food stamps.
23      Q   And those were provided from the Tribe?
24      A   No, from town, Miami.
25      Q   Does the Tribe operate a community center or anything

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 25

1  like that?
2      A   Yes.
3      Q   Could you describe that.
4      A   There is the community, the one I was saying, the
5  Community Elderly Center that provides food for the seniors.
6      Q   Is that a place where seniors can go live there or
7  they just?
8      A   No, not to live there, to eat hot meals.
9      Q   Do they have to pay for those?
10     A   No.
11     Q   How do you currently pay your bills and provide for
12 yourself?
13     A   My husband does lawn service and he makes tables,
14 picnic tables or shelves and all that stuff and he sells those
15 and that's how we live pay for our stuff.
16     Q   You currently receive -- well, is there any other
17 benefits that you receive from the Miccosukee Tribe that we
18 haven't already discussed?
19     A   No.
20     MR. RAMON:  I'm sorry, can you explain what you mean
21 by benefits.
22 BY MR. FARRIOR:
23     Q   Do you currently receive distributions from the
24 Miccosukee Tribe?
25     A   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 26

1      Q   And those distributions, do you receive them
2  quarterly, every three months?
3      A   Yes.
4      Q   Do you also receive an end of year distribution?
5      A   No.
6      Q   Do you receive a Christmas distribution?
7      A   Yes.
8      Q   When did you begin receiving quarterly distributions
9  from the Miccosukee Tribe?
10     A   I don't remember the date for that.
11     Q   Was it before 1990?
12     A   I'm not sure if it was after or before.
13     Q   You mentioned that you lived in your mother's house
14 is that correct?
15     A   Yes.
16     Q   When you lived in your mother's house, did she get a
17 distribution for you?
18     A   I don't think so, she was working at that time.
19     Q   Tell me what you mean by that.
20     A   Like what, like working?
21     Q   No?
22     A   What?
23     Q   Was it if you were working you did not get
24 distributions?  I'm just trying to make sure I understood you
25 if you were trying to imply something?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 27

1      A   Oh, no.  I was saying, you were asking me, when I was
2  living there if my mom was receiving distributions and I told
3  you, no, she was working at that time.
4      Q   Thank you.  When you were living with your mother,
5  did you receive a distribution from the Tribe?
6      A   I'm not sure if I did or not.  My mother was the one
7  that was in charge of and I was younger so.
8      Q   Remind me again.  So, you have been with your husband
9  thirty-two years; is that correct?
10     A   Yes.
11     Q   And you lived with him in your mother's house for a
12 while; is that correct?
13     A   For a while, yeah.
14     Q   About how long after you got married do you think you
15 moved out and into your house?
16     A   I think when my daughter was two years old, must have
17 been like 1989, no, 1985 or '86.
18     Q   Okay.  Did the Tribe, do you recall if it had a
19 distribution program going when you moved into your house?
20     A   Yes.
21     Q   It did?
22     A   Yes.
23     Q   Do you recall about the amount of distributions at
24 that time when you moved into your house?
25     A   Fifty dollars.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 28

1      Q   And that was every quarter?
2      A   Yeah.
3      Q   And the amount of distributions increased since then;
4  is that correct?
5      A   Yes, that's why we're here.
6      Q   So the Tribe began its bingo hall around 1990, does
7  that sort of agree with your recollection?
8      A   I think so.
9      Q   Did the Tribe's starting a bingo hall have an effect
10 on the amount of distributions you received from the Tribe?
11     A   I guess some of it did.  It wasn't just from that, we
12 also had Indian Village, gift shop, restaurant, gas station.
13     Q   Could you tell me how the leadership of the Tribe is
14 set up.
15     A   There is a Chairman, Assistant Chairman, a Treasurer
16 and a Lawmaker.
17     Q   What are the Lawmaker's duties?
18     A   Watch over the community with the police station for
19 safety.
20     Q   And the Tribe has a business council; is that
21 correct?
22     A   I think yeah business council.
23     Q   Those are them?
24     A   Yeah.
25     Q   What are the duties of the business council?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 29

1    A   To help the community, to watch over the community,
2  and help us when we need help sometimes.
3    Q   And the Tribe also has a general council; is that
4  correct?
5        MR. RAMON:  By the way just for the record, council
6  would be COUNCIL, not counsel lawyer.
7        THE DEPONENT:  I'm not sure on that one so, I don't
8  know.  I think they are the same ones.
9  BY MR. FARRIOR:
10   Q   Right.  But when the Tribe had council meetings,
11  council refers to every member; is that correct?
12   A   Yes.
13   Q   And do you know if the general council when that term
14  is used refers to every member of the Tribe?
15   A   Yes.
16   Q   Did the business council have regular meetings?
17   A   The business council, yes, I think they did.
18   Q   Have you ever attended any business council meetings?
19   A   No.
20   Q   Have you ever attended any General Council Meetings?
21   A   Yes.
22   Q   About how many General Council Meetings have you
23  attended?
24   A   Maybe over fifty or more.
25   Q   And the Tribe General Council Meetings every quarter;

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 30

1  is that correct?
2    A   I'm not sure on that.
3    Q   That's okay.
4    A   Yes.
5    Q   Do they also have special meetings in addition to
6  ones they have every quarter?
7    A   I don't think so.  I don't really participate or look
8  into all that stuff, so I really don't have an answer for that
9  one.
10       MR. RAMON:  Sorry, when you mean special meeting, you
11  mean special general council meeting?
12       MR. FARRIOR:  That is what, it's all right.
13  BY MR. FARRIOR:
14   Q   So approximately what percentage of the General
15  Council Meetings do you attend?
16   A   Just for the General Council Meetings whenever the
17  weather going to be nice or sometimes we go just to hear what's
18  going on and all that.
19   Q   So would you say the majority of them you attend?
20   A   Yes.
21   Q   And they serve a meal at the General Council
22  Meetings; is that correct?
23   A   Yes.
24   Q   So at some point in time the distributions you were
25  getting from the Tribe became much more than fifty dollars a

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 31

1  quarter; is that correct?
2    A   Uh-huh, yes.
3    Q   Do you recall when the Tribe raised the amount of its
4  distributions?
5    A   I don't really recall what year.
6    Q   Did the Tribe raise its distributions around the year
7  1995?
8    A   I really don't know.
9    Q   How was the amount of distributions determined, if
10  you know?
11   A   I don't know.
12   Q   So did you receive a distribution, well, when was the
13  last distribution that you received from the Tribe?
14   A   A couple weeks ago.
15   Q   What was the amount of that distribution?
16   A   I think I got like sixteen thousand.
17   Q   And when you say, I got sixteen thousand, did you get
18  a distribution that included distributions for other people?
19   A   No.
20   Q   Do you know if the amount of the distribution that
21  you received is the same as the amount that other Tribal
22  members received?
23   A   I don't know.
24   Q   You don't know how much distribution other members
25  receive?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 32

1    A   No.
2    Q   How did you know you were going to get a
3  distribution?
4    A   I think we talked about that before when you asked me
5  if we were getting distributions every quarterly so that's how
6    Q   How did the Tribe distribute the money?
7    A   I don't really understand that one.
8    Q   Can you just describe the process of getting your
9  distribution, the one you got a couple weeks ago.
10   A   We go they give it to us at the administration
11  office.
12   Q   Is there a set time you're suppose to show up to get
13  it?
14   A   Yes.
15   Q   What time is that?
16   A   8:30 a.m. to 1:00 p.m.
17   Q   How do you know what day they're going to be giving
18  out the distributions?
19   A   They set that up at the community council meeting.
20   Q   The business council?
21   A   Yeah.
22   Q   They tell the Tribal members at the General Council
23  Meetings when the distributions are going to occur?
24   A   Tribal member sets the date.
25   Q   Is that a reason to attend the general council

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 33

1  meeting to find out when the distributions are?
2  A   No.
3  Q   You find out from other Tribal members; is that
4  correct?
5  A   Yes.
6  Q   Do they tell Tribal members at the general council
7  meeting what the amount of the distributions will be?
8  A   No.
9  Q   Do people find out, do Tribal members find out ahead
10 of time before they get their distribution what the amount will
11 be?
12 A   No.
13 Q   You just show up and figure out what it is?
14 A   I do.  I don't know about other people.
15 Q   And the distribution comes to you in an envelope; is
16 that correct?
17 A   Yes.
18 Q   And it's cash in an envelope?
19 A   Yes.
20 Q   What sort of denomination is it of bills?
21 A   Sometimes hundreds and fifties.
22 Q   Do you also get a check from the Tribe?
23 A   No.
24 Q   Do you have to sign any sort of paper when you pick
25 up your distribution?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 34

1  A   Yes.
2  Q   What does the paper say?
3  A   It says how much I'm getting.
4  Q   Do you know what a check looks like?
5  A   Not really, but I sign on it before I get the cash.
6  Q   I'm not asking related to the distribution, I'm
7  saying generally, do you have a checkbook?  Do you know what a
8  checkbook looks like?
9  A   Do I have a checkbook?
10 Q   Yes?
11 A   No.
12 Q   Have you ever had a checking account?
13 A   Yes.
14 Q   Did you ever use a debit card with that account?
15 A   Yes.
16 Q   So you never had an actual checkbook?
17 A   No.
18 Q   Have you ever endorsed a check?
19 A   Oh, no.
20 Q   Is your own sheet of paper that you sign when you
21 sign for the cash?
22 A   Yes.
23 Q   Then is there a line of people when you go to pick up
24 the cash?
25 A   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 35

1  Q   Are people counting it immediately, or what is
2  everybody doing?
3  A   No, they just get it and go.
4  Q   And you said the most recent distribution received
5  was sixteen thousand?
6  A   Yes.
7  Q   Has that distribution amount been pretty steady for
8  the last say five distributions?
9  A   What do you mean steady?
10 Q   Has it --
11 A   -- you mean the amount?
12 Q   Yes?
13 A   No.
14 Q   How has it changed?
15 A   I'm not sure how to answer that.
16     THE INTERPRETER:  (Talking in Miccosukee.)
17     THE DEPONENT:  Now they take out the taxes so the
18 amount is decreased.
19 BY MR. FARRIOR:
20 Q   Do you recall what the amount was before -- first of
21 all when you say "they" you mean the Tribe; is that correct?
22 A   Yes.
23 Q   Do you recall what the amount was before the Tribe
24 started taking out taxes?
25     THE INTERPRETER:  (Talking in Miccosukee.)

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 36

1      THE DEPONENT:  Before the taxes, I think I was
2  getting nineteen thousand.
3  BY MR. FARRIOR:
4  Q   Let me just make sure the record is clear.  You just
5  had a discussion with Ms. Poole, which I couldn't understand;
6  is that correct?
7  A   Yeah, I didn't try to, I was just asking her about if
8  I should say that amount or whatever.
9  Q   I don't mind if there is a question where you can't
10 remember the answer to and it would be easiest if you just
11 asked Ms. Poole to help you recall.  If you just want to tell
12 me when you're going to do that and say, it might refresh my
13 recollection if I ask Ms. Poole and then we will probably allow
14 you to do that.  I just want to make sure we are clear that we
15 are getting your testimony and your best recollection to the
16 answers, the questions I'm asking.
17 A   Okay.
18 Q   Do you recall the process for receiving your
19 distribution around the year 2001?
20 A   What do you mean by process?
21 Q   Sort of what we have just been talking about.  About
22 how physically you find out when the distribution is going to
23 be made and then how you pick up your distribution?
24 A   It's been the same.
25 Q   It's always been the same?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 37

1     A   Yeah, it's always been the same.
2     Q   Was there ever a point in time where you received a
3   check for your distribution?
4     A   No.
5     Q   It's always been cash?
6     A   Yes.
7     Q   Do you know if you ever received a larger
8   distribution based on the amount of members in your household?
9     A   No.
10     Q   You never discussed -- first of all, did you ever
11   discuss with any other Tribal member what the amount of their
12   distribution was?
13     A   No.
14     Q   Why not?
15     A   I wasn't interested.
16     Q   Did you ever think that other Tribal members were
17   getting larger distributions than you were getting?
18     A   I don't know, I just mind my own business, I never
19   asked.
20     Q   You mentioned that your daughter Tamara Jim was a
21   member of the Tribe; is that correct?
22     A   Uh-huh, yes.
23     Q   So I believe you said you adopted her in 1996; is
24   that correct?
25     A   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 38

1     Q   Did she get a distribution when you adopted her in
2   and around 1996?
3     A   No.
4     Q   Did she ever start to get distributions from the
5   Tribe?
6     A   Not until later on when I enrolled her into the
7   Miccosukee Tribe.
8     Q   When did you enroll Tamara Jim into the Miccosukee
9   Tribe?
10     A   Probably after maybe like two years or three years
11   after I adopted her.
12     Q   So that would have been approximately 1998?
13     A   Yeah.
14     Q   And about that time Tamara Jim started to receive
15   distributions from the Miccosukee Tribe?
16     A   Yes.
17     Q   She would have been a child at that point?
18     A   Yes.
19     Q   What was the process for her getting her
20   distribution?
21     A   Back then, I didn't get it for her, I put it away in
22   the bank.
23     Q   Could you describe how that worked.
24     A   I just didn't get the check or the money for her.  I
25   just put it away for her just to help her out later on.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 39

1     Q   So would you tell, instruct the Tribe to put money in
2   the bank for Tamara Jim?
3     A   Yes.
4     Q   How did you convey that instruction to the Tribe?
5     A   In writing.
6     Q   And the Tribe has offices; is that correct?
7     A   Yes.
8     Q   So you would go down to the Tribal offices and write
9   out something that instructs them to put Tamara Jim's
10   distributions in a bank account for her; is that correct?
11     A   Yes.
12     Q   Did you instruct the Tribe what bank to put it into
13   to?
14     A   No.
15     Q   Do you know if the Tribe did that?
16     A   No, I don't think, I think they had an account at the
17   administration where they put the funds there.  So that's
18   where, so if we needed like a little cash, we could access to
19   that for food or whatever. It wasn't really in a bank.
20     Q   So the Tribe kept track of what distributions you
21   were not receiving in cash for Tamara Jim and accounted for
22   that; is that correct?
23     A   Yes.
24     Q   Then you as a family could access the money in that
25   account if you needed it; is that right?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 40

1     A   Uh-huh, yes.
2     Q   Do you know if the Tribe ever opened up an account
3   for you or any member of your family at Smith Barney?
4     A   No.
5     Q   Any other bank?
6     A   No.
7     Q   Did you have to enroll Alexis Nicole Osceola into the
8   Tribe?
9     A   Yes.
10     Q   When did you do that?
11     A   The same year we enrolled my husband, what year
12   forgot.  I forgot what year.  I told you 1990 or something like
13   that.
14     Q   Did Alexis Nicole Osceola receive distributions from
15   the Tribe?
16     A   Yes.
17     Q   How did that work?
18     A   I get it for her.
19     Q   When you say you get it for her, you would get the
20   cash in a package?
21     A   Yes.
22     Q   Did the Tribe make distributions to just one member
23   of each household?
24     A   I don't understand that one.
25     Q   Okay, let me go back.  Your husband is Alexander

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 41

```
 1    Osceola; is that right?
 2        A  Yes.
 3        Q  Did he receive distributions from the Miccosukee
 4    Tribe?
 5        A  Yes.
 6        Q  How did he receive his distributions?
 7        A  Oh, okay, it was under my name and his name for the
 8    family.
 9        Q  And who would be the one to go pick up the
10    distribution from the administration office?
11        A  Me.
12        Q  Was it always you?
13        A  Yes.
14        Q  Why is that?
15        A  Because I go.
16        Q  What generally do you do with the cash when you get
17    it?
18        A  Pay bills with it.
19        Q  What bills?
20        A  Car payment, light bills, and all that. We always had
21    bills to pay at the time we get the money.
22        Q  You mentioned the bills earlier which would include
23    the car payment, the light bill, the phone bill, Direct TV and
24    insurance; is that correct?
25        A  Yes.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 42

```
 1        Q  Are there any other bills that you have?
 2        A  J.C.Penney and Macy's.
 3        Q  Do you have credit cards at those stores?
 4        A  Yes.
 5        Q  Do you recall when you applied for credit cards at
 6    those stores?
 7        A  In think about four or three years ago.
 8        Q  Can you think of any other bills that you have?
 9        A  I think that's about it.
10        Q  Do you have credit card bills?
11        A  Yeah.
12        Q  What do you use your credit cards for?
13        A  For groceries, for to pay the Direct TV and gas.
14        Q  What would you say your total monthly household
15    expenses are.
16        A  Maybe four thousand a month or more. We do a lot of
17    stuff around the house like gardening and all that, we keep the
18    area clean so it looks nice.
19        Q  Did you ever spend your distribution from the Tribe
20    on gambling?
21        A  No.
22        Q  Never?
23        A  I did before, but I stopped gambling.
24        Q  When did you?
25        A  Four years ago.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 43

```
 1        Q  Prior to that, did you ever spend the money you got
 2    from the distributions from the Tribe on gambling?
 3        A  Probably some of it and some of it was from work.
 4           THE WITNESS:  Can we have a short break?
 5           MR. FARRIOR:  Sure, absolutely, we'll go on a short
 6    break.  We are off the record.
 7           (A brief recess.)
 8    BY MR. FARRIOR:
 9        Q  We are back on the record.  Do you understand you are
10    still under oath?
11        A  Yes.
12        Q  When we went off the record we were discussing how
13    the distributions are made.  Just to be clear, during the year
14    2001, you never received a check for distributions from the
15    Tribe; is that correct?
16        A  2001?
17        Q  Yes?
18        A  Distribution you mean the stuff we were talking
19    about?
20        Q  Yes, the quarterly distributions from the Tribe?
21        A  Yeah, I did.
22        Q  You did receive a check?
23        A  Yes.
24        Q  So earlier you were telling me that you would go to
25    the administration office and you would receive an envelope
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 44

```
 1    full of cash; is that correct?
 2        A  Yes.
 3        Q  And you told me that's the current method of
 4    receiving the money; is that correct?
 5        A  Yes.
 6        Q  And you told me that the distributions have always
 7    been made that way; is that correct?
 8        A  Yes.
 9        Q  But now you're telling me additionally they provide
10    you with a check at some point, the Tribe provides you with a
11    check at some point?
12        A  They provide the check and then if we wanted to cash
13    it, we cash it there.
14        Q  When did the Tribe provide you with a check?
15        A  That day at that time.
16        Q  And is that how they do it now the Tribe does it now?
17        A  Yes. I guess I didn't really understand the first
18    time when you were asking about that, so, yeah, it's a check.
19    Then if you wanted to cash it, you just sign it and they cash
20    it there.
21        Q  When you were talking about the piece of paper you
22    signed for receiving your distribution, were you talking about
23    a check or is there an additional piece of paper that you sign?
24        A  Additional paper that I received the check.
25        Q  Has the Tribe always given you a check that you
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 45

```
 1   cashed?
 2      A   Yeah.
 3      Q   And do you know anyone who doesn't cash their
 4   distribution check at the administration office?
 5      A   I don't know.
 6      Q   One way or the other?
 7      A   I don't know.
 8      Q   Have you always cashed your distribution check at the
 9   administration office?
10      A   Yes.
11      Q   Why do you cash your check at the administration
12   office?
13      A   Because I need it and in order to pay the bills with
14   it as soon as possible.
15      Q   I asked you just a second ago, you have a checking
16   account; is that right?
17      A   I used to, but I don't have it anymore.
18      Q   Why don't you have a checking account anymore?
19      A   I just closed the account.
20      Q   Why, go ahead, I'm sorry?
21      A   Because I always, how do you say it, over balance,
22   overdrawn, yeah.  I was never good at keeping the checks so.
23      Q   So, do you have a savings account now anywhere?
24      A   No.
25      Q   Could you describe how you physically go about paying
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 46

```
 1   your bills with the cash you have?
 2      A   I go to Western Union and do Western Union Quick
 3   Click and send the payments through there.
 4      Q   And it was Western Union, what was the word you said
 5   after that?
 6      A   Western Union Quick Click.
 7      Q   Do you pay a fee to use that service?
 8      A   Yes.
 9      Q   Has anyone at the Tribe ever told you not to cash
10   your check somewhere other than the administration office?
11      A   No.
12      Q   Has anyone at the Tribe ever told you not to keep
13   large balances in checking or savings accounts?
14      A   No.
15      Q   So you told me earlier that you got sixteen thousand
16   for yourself in the latest distribution; is that correct?
17      A   Yes.
18      Q   What was the amount of the check that you received in
19   the latest distribution?
20      A   Sixteen thousand.
21      Q   So the sixteen thousand includes a distribution for
22   your husband Alexander Osceola?
23      A   No, that was just for me, after the tax they take
24   out.
25      Q   Did your husband get a separate distribution in the
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 47

```
 1   latest one?
 2      A   Yes.
 3      Q   Did he go and pick that up?
 4      A   No, I get it for him.
 5      Q   Did you pick up a check to Alexander Osceola?
 6      A   No.  I cashed it.
 7      Q   How much was the check to Alexander Osceola?
 8      A   I think it was thirteen thousand.
 9      Q   Thirteen thousand; is that what you said?
10      A   Yes.
11      Q   Do you know why you received sixteen thousand and he
12   received thirteen thousand?
13      A   Not sure.
14      Q   And are you telling me, that you got one check for
15   you in the latest distribution; is that correct?
16      A   Yes.
17      Q   And you picked up thirteen thousand in cash for
18   Alexander Osceola in the latest distribution; is that correct?
19      A   Yes.
20      Q   And there was no check for Alexander Osceola in the
21   latest distribution?
22      A   It was a check and I signed for it and got the cash.
23      Q   Was there one check made out to both you and
24   Alexander Osceola, or were there two checks?
25      A   Two checks.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 48

```
 1      Q   Okay, tell me who the checks were made out to.
 2      A   One for me Sally Jim and one for Alexander Osceola.
 3      Q   Did your kids receive a distribution in the latest
 4   distribution cycle?
 5      A   Yes, Tamara.
 6      Q   And did you receive that distribution for her?
 7      A   Yes.
 8      Q   Was there a separate check to Tamara Jim or was she
 9   included in a separate check to you?
10      A   Separate check.
11      Q   It was a separate check?
12      A   Yes.
13      Q   But you receive the cash; is that correct?
14      A   Yes.
15      Q   What did you do with the cash?
16      A   Put it away for her.
17      Q   Where did you put it?
18      A   In a safe.
19      Q   Earlier you were telling me that the Tribe kept an
20   account for Tamara Jim that you had access to; is that correct?
21      A   Yes.
22      Q   Did you ever use up all the money in that account?
23      A   Yes, we did.
24      Q   What did you use that money for?
25      A   Like I said to pay bills, all the bills, everything
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 49

1  went up.
2     Q   And those would include the household expenses you
3  were talking about earlier; is that correct?
4     A   Yes, buy like refrigerators and all that when they
5  break down also.
6     Q   How much was the amount of Tamara Jim's most recent
7  distribution?
8     A   I think it was sixteen thousand.
9     Q   So are the envelopes prepared ahead of time?
10    A   Yes.
11    Q   And the envelope has your name on it?
12    A   Yes.
13    Q   Does it say what multiple of distributions you are to
14 receive?
15    A   On the envelope?
16    Q   Yes?
17    A   Yes.
18    Q   So for you, you would be receiving distributions for
19 three Tribal members this latest time that you received a
20 distribution; is that correct?
21    A   I don't understand for that one.
22    Q   Let me as a different question.  So the Tribe has a
23 program where you can get loans in advance of receiving your
24 distributions, loans from the Tribe; is that correct?
25    A   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 50

1     Q   Did you ever take out a loan from the Tribe?
2     A   Yes.
3     Q   And you pay that loan back with money from the
4  distributions; is that correct?
5     A   Yes.
6     Q   Let me make sure I finish my question before you
7  answer?
8     A   Okay, I thought you were finished.
9     Q   I'm a slow talker.  So the Tribe automatically
10 deducted the amount of your loan from your distribution when
11 you paid that loan back; is that correct?
12    A   That's correct.
13    Q   How often do you take out loans in advance of
14 distributions?
15    A   Once, for the quarterly distribution.
16    Q   So once per distribution you take out a loan?
17    A   Yes.
18    Q   How much is the amount of the loan?
19    A   Ten thousand.
20    Q   Have you always been allowed to borrow ten thousand
21 in advance of receiving your distribution?
22    A   I think so.
23    Q   So when do you receive your loan in the distribution
24 cycle, when in the distribution cycle do you receive your loan?
25    A   Before the quarterly comes again before that.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 51

1     Q   Is about in the middle between distributions or some
2  other time?
3     A   No, some other time.
4     Q   How do you know when you are allowed to go pick up
5  your ten thousand dollar loan?
6     A   I call and ask if I'm eligible to get it, to get a
7  loan.
8     Q   How does the Tribe determine if you're eligible to
9  get a loan?
10    A   I guess they check.
11    Q   What do you think they check?
12    A   The finance department.
13    Q   So your most recent distribution you received a loan
14 for ten thousand dollars prior to receiving your distribution;
15 is that correct?
16    A   No, not for this one, no.  Ahm, yeah go ahead.
17    Q   Go ahead, I'm sorry.
18    A   I forgot what I was going to say.
19    Q   In 2001 did you take out loans in advance of
20 distributions?
21    A   In 2001, yes.
22    Q   Is there any reason why you remember doing that
23 during that period of time your practice was to take out loans?
24    A   To like I said to pay bills with it and some other
25 stuff, help the family and all that, we always pay bills with

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 52

1  our distribution.
2     Q   How did you find out about the Tribe's loan program?
3     A   I called and asked.  Sometimes they say it at council
4  meetings.
5     Q   They talk about the loan program at the council
6  meeting; is that correct?
7     A   Not really.
8     Q   Do you know other Tribal members that take advantage
9  of the loan program?
10    A   I don't know.
11    Q   Did you hear about the loan program from other Tribal
12 members?
13    A   No.
14    Q   Did you get to borrow ten thousand dollars per member
15 of the household, or it was per household?
16    A   Per household.
17    Q   So you didn't get to borrow an extra ten thousand for
18 each?
19    A   No.
20    Q   Tamara or Alexis?
21    A   No.
22    Q   Is that correct?  That's correct?
23    A   It's correct.
24    Q   So when you receive a check, does the check amount,
25 does it include or exclude the amount that the Tribe is using

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 53

1   to pay back the loan, the advance that you got?
2     A  Yes.
3     Q  It includes it, the check includes the amount?
4     A  Yes.
5     Q  How do you know that?
6     A  I check it first sometimes, sometimes I know.
7     Q  So the check, so for example let's just say that you
8   had borrowed ten thousand dollars this last quarter and you
9   were due a distribution of sixteen thousand dollars; is that
10   correct?
11     A  Yes.
12     Q  Would the check show sixteen thousand dollars or
13   would it should six thousand dollars?
14     A  Sixteen thousand.
15     Q  And then when you cashed the check with the Tribe,
16   you would receive six thousand dollars; is that correct?
17     A  Sixteen thousand.
18     Q  You would get sixteen thousand?
19     A  Yeah.
20     Q  So how would you repay the loans then, the ten
21   thousand dollar loan?
22     A  Like I said, they take it out from my dividends, from
23   my distribution.
24     Q  So you wouldn't even see it, then your distribution
25   for this period would be sixteen thousand and you would assume

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 54

1   that they would have taken out the ten thousand for the loan
2   that you paid back; is that correct?
3     A  Yes.
4     Q  Did they ever provide you with an accounting of that
5   or any piece of paper showing what their calculations were?
6     A  They do have a piece of paper when I sign for it, but
7   I don't really check sometimes.
8     Q  Then does that piece of paper that you sign shows
9   they have subtracted ten thousand dollars --
10     A  -- yes --
11     Q  -- let me make sure, that they subtracted ten
12   thousand dollars for your repayment of the loan generally; is
13   that right?
14     A  That's right.
15     Q  You mentioned that you did take out loans in 2001; is
16   that correct?
17     A  Yes.
18     Q  You mentioned in the last distribution cycle, you
19   received and signed for three checks.  One to yourself, one to
20   Alexander Osceola, and one to Tamara Jim; is that correct?
21     Q  Did I understand you correctly?
22     A  Yes.
23     Q  Was there a point in time where the Tribe didn't
24   distribute three checks, but there was only one check?
25

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 55

1     A  Yes.
2     Q  Was that in the 2001 tax year?
3     A  Yes.
4     Q  Do you remember when the Tribe started giving you
5   three checks as opposed to one check?
6     A  I think in December.
7     Q  Of this year?
8     A  Yes, or last year.
9     Q  2014?
10     A  Yes.
11     Q  Did you file a tax return in 2001?
12     A  No, I didn't.
13     Q  You had a job during 2001; is that correct?
14     A  Yes.
15     Q  And received wage income during 2001; is that
16   correct?
17     A  Yes.
18     Q  Did you receive gambling income during 2001?
19     A  Yes.
20     Q  Do you know the amount of gambling winnings that you
21   had in 2001?
22     A  No, I don't.
23     MR. DAVIS:  Asked and answered.
24   BY MR. FARRIOR:
25     Q  The amount of money that you won in 2001, could it

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 56

1   have been more than $20,000?
2     A  I don't really remember to be correct.
3     Q  Could it have been more than $40,000?
4     A  I don't remember, not sure.
5     Q  Why did you not file a tax return in 2001?
6     MR. DAVIS:  Don't answer that question, Ms. Jim.
7   We're going to invoke Ms. Jim's Fifth Amendment Right not
8   to answer that question.
9     MR. RAMON:  You're being instructed based on a legal
10   Fifth Amendment privilege, you need to tell the attorney
11   that you are invoking your Fifth Amendment.
12     THE DEPONENT:  So I cannot answer that?
13     MR. RAMON:  Yes.  You have to tell that you're being
14   told you have a Fifth Amendment privilege not to answer.
15     THE DEPONENT:  I have the Fifth Amendment not to
16   answer that question.
17   BY MR. FARRIOR:
18     Q  So just to be clear, my question was, why did you not
19   file a tax return in 2001.  And you are following your
20   counsel's instruction not to answer that question invoking a
21   Fifth Amendment privilege; is that correct?
22     A  That's correct.
23     Q  Did you file a tax return in 2000?
24     A  I'm not sure.
25     Q  Do you recall when if any of the years between 1990

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 57

1     and the present that you did file a tax return for?
2         A    That's the only one I remember the 2001.
3         Q    And you remember not filing a tax return in 2001?
4         A    No.
5         Q    Did you ever go to someone in the Tribe and ask them
6     to assist you in filing a tax return?
7         A    No.
8         Q    Did you ever go to somebody like H&R Block or
9     somebody like that and ask them to assist you in filing a tax
10    return?
11        A    Yeah, before.
12        Q    When you say before, what do you mean by that?
13        A    The year before.
14        Q    The years before 2001?
15        A    Yeah.
16        Q    Do you think you filed a tax return for any of the
17    years after 2001?
18        A    I might have, I'm not sure.
19        Q    Could you describe what you did -- first of all, did
20    you make a determination that you did not need to file a tax
21    return for 2001?
22        A    What do you mean determination?
23        Q    Did you make a decision not to file a tax return for
24    2001?
25        A    No.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 58

1         Q    Could you describe what efforts you took if any to
2     determine whether you needed to file a tax return for 2001?
3         A    I think I had everything ready, but I just completely
4     forgot to file that year.
5         Q    How did you get everything ready?
6         A    The paperwork.
7         Q    Did anyone assist you in putting the paperwork
8     together?
9         A    No.
10        Q    You did it yourself?
11        A    Uh-huh, oh, no.
12        Q    You did not do it yourself?
13        A    What was the question?
14        Q    The question was, no one assisted you in putting
15    together the tax return that you prepared for the 2001 tax
16    year?
17        A    Nobody.
18        Q    Where did you get the form you needed to fill out?
19        A    I never filled out the form, I just got my W, what is
20    that --
21        Q    -- the W-2?
22        A    Yeah, form that was it that I remember.
23        Q    Did you also get a form called a W-2G that reflected
24    gambling income?
25        A    I don't think I seen that one.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 59

1         Q    So you had the form ready, but you forgot to go --
2     what would you have done if you wanted to fill out a tax
3     return?
4         A    Probably do it in town, or they usually provided with
5     the Miccosukee administration that's where I would take it.
6         Q    When you filled out a tax return, you would take it
7     to the administration building of the Tribe?
8         A    Yeah.
9         Q    Do you know who would assist you in filling out your
10    tax return?
11        A    There is a group, I don't know what that's the tax
12    return people, I don't know the name is.  H&R Block.
13        Q    H&R Block, the Tribe would bring in H&R Block?
14        A    Yeah.
15        Q    Did you ever work with Miguel Hernandez on issues
16    related to your taxes?
17        A    Not that I remember.
18        Q    Do you know who that is?
19        A    No.
20        Q    In the General Council Meetings that you attended,
21    did you ever hear any members of the Tribe discuss the
22    distributions to the Tribe?
23        A    No.
24        Q    I'm just asking about whether they discussed the
25    distributions.  I think earlier you said they would discuss the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 60

1     time of day?
2         A    Oh, yes.
3         Q    So, yes, they did discuss the distributions at the
4     General Council Meetings' is that correct?
5         A    Yes.
6         Q    And did you ever hear anyone at the General Council
7     Meetings discuss taxes?
8         A    I think so, yeah.
9         Q    What if anything do you recall being discussed about
10    taxes at the General Council Meetings?
11        A    Can I ask her what I need to be translated?
12        Q    Do you understand my question?
13        A    What do you mean?
14        Q    My question is, what if anything do you remember
15    being discussed, taxes just generally, what do you recall being
16    discussed regarding taxes at General Council Meetings?
17        A    I'm not sure if they talked about taxes or whatever,
18    but I don't really recall.
19        Q    Do you recall anyone at the Tribe ever telling you
20    whether or not you should include distributions from the Tribe
21    on your tax returns?
22        A    No.
23        Q    No one ever told you one way or the other?
24        A    No.
25        Q    For tax returns that you did file, did you ever

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 61

```
1    include distributions that you got from the Tribe?
2         A   No.
3         Q   Why not?
4         A   Because I was told that it was, I forgot what the
5    word was.  Our income, so it wasn't included, not have to
6    include it.
7         Q   Who told you that?
8         A   I heard it from Billy Cypress.
9         Q   Did you hear that from Billy Cypress at General
10   Council Meetings?
11        A   Yes.
12        Q   Let me make sure I understand, because earlier I was
13   attempting to ask you, what if anything you recall anyone
14   saying at the General Council Meetings about taxes.
15        A   Uh-huh, yes.
16        Q   And I think that would have included if Billy Cypress
17   had told you at the General Council Meetings not to include
18   distributions on your tax returns.  Do you understand what I'm
19   saying?
20        A   Yeah.
21        Q   So was my question earlier was not clear?
22        A   I guess so, yeah, yeah.
23        Q   Do you recall if Billy Cypress told you that at
24   General Council Meetings before 2001?
25        A   Yes.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 62

```
1         Q   What else did Billy Cypress say about not including
2    the distributions on your tax returns?
3         A   Just that, just that.
4         Q   What clan is Billy Cypress in?
5         A   There is no English for that name.  It's Takoshathee
6    (phonetic).
7         Q   Say it one more time slowly.
8         A   Takoshathee.
9    BY MR. FARRIOR:
10        Q   Did anyone else besides Billy Cypress ever talk about
11   taxes at General Council Meetings that you attended?
12        A   They talked about taxes.  I think it was the lawyer
13   that was working for the Tribe at that time, but I'm not sure
14   really sure what kind of taxes he was talking about.
15        Q   Was that lawyer Dexter Lehtinen?
16        A   Yeah.
17        Q   Did you ever do anything independently to verify what
18   Billy Cypress was telling you about not including the
19   distributions on your personal tax return?
20        A   No.
21        Q   Do you know any Tribal members that include
22   distributions from the Tribe on their personal tax returns?
23        A   No, I don't know.
24        Q   Did you ever discuss whether to include distributions
25   on tax returns with any of your fellow Tribal members?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 63

```
1         A   No.
2         Q   Did you ever discuss whether to include distributions
3    with your children?
4         A   No.
5         Q   With your husband?
6         A   Yes.
7         Q   Does your husband file a separate tax return from
8    you?
9         A   Yes.
10        Q   Do you know if he filed a tax return in the 2001 tax
11   year?
12        A   I think he did, yes.
13            MR. OSCEOLA:  (Said something in Miccosukee not
14   translated.)
15   BY MR. FARRIOR:
16        Q   So in 2001 you understood that your tax return was
17   due approximately April 15th, 2002; is that correct?
18        A   Yes.
19        Q   And you had a W-2 ready and you could have gone and
20   the Tribe would assist you in preparing your tax return; is
21   that correct?
22            MR. RAMON:  I'm going to instruct the witness not to
23   answer based on her Fifth Amendment privilege.
24            THE DEPONENT:  I cannot answer based on the Fifth
25   Amendment that question.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 64

```
1    BY MR. FARRIOR:
2         Q   Do you plan to file a tax return -- actually let me
3    ask it this way.  So have you filed a tax return for the 2014
4    tax year?
5         A   Not yet.
6         Q   Do you plan to file a tax return?
7         A   Yes.
8         Q   Do you plan to include distributions from the Tribe
9    on your 2014 tax return?
10        A   I don't know, I'm not sure.
11        Q   Have you ever discussed distributions that you
12   received from the Tribe with people outside of the Tribe?
13        A   No.
14        Q   Why is that?
15        A   Nobody's business.
16        Q   Has anybody of the Tribe ever instructed you not to
17   discuss distributions with people outside of the Tribe?
18        A   No.
19        Q   Earlier you mentioned that you had a car payment; is
20   that correct?
21        A   Yes.
22        Q   Did you have to fill out an application to get a loan
23   to purchase that car?
24        A   No.
25        Q   You didn't have to fill out a loan application?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 65

1    A    No, I financed it, we financed it.
2    Q    Right, and when you get financing to purchase the
3    car, you had to fill out paperwork with the people?
4    A    The dealership.
5    Q    At the dealership; is that correct?
6    A    Yes.
7    Q    So at the dealership they ask you about your credit
8    history; is that right?
9    A    Yes.
10   Q    And they ask you about your income?
11   A    Yes.
12   Q    When you filled out that application, did you include
13   the distributions that you were getting from the Tribe?
14   A    No.
15   Q    Why not?
16   A    Let me ask Virginia a question.
17   Q    Can you just answer my question?
18        MS. POOLE:  Do you understand his question?
19        THE DEPONENT:  Yes.  Because it was, we cannot
20   include it in saying that we getting distribution at that
21   time.
22   BY MR. FARRIOR:
23   Q    And you say "we" you mean you and your fellow Tribal
24   member?
25   A    Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 66

1    Q    Why is that?
2    A    Because it wasn't, how do you use that word, it
3    wasn't income, so that's why we didn't include it.
4    Q    Who old you it wasn't your income?
5    A    Billy Cypress at meetings.
6    Q    Did Billy Cypress tell you not to report
7    distributions on credit applications?
8    A    Yes.
9    Q    Did you understand why you were being told not to
10   report distributions on credit applications?
11   A    Not really.
12   Q    When you say not really, what do you mean?
13   A    I didn't understand it at that time, but I do now
14   what they were talking about and that's why I'm here.
15   Q    So tell me what you mean when you say you understand
16   now what they were talking about?
17   A    Not to, not to use it as income, because it was not
18   income, so not to report it as additional income.
19   Q    Do you know anyone who did report the distributions
20   on their credit applications?
21   A    No, I do not know.
22   Q    Earlier you said that it had something to do with why
23   we are here today.  Was the reason you didn't report
24   distributions on credit applications at all related to taxes?
25   A    Not really.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 67

1    Q    When you say not really, what do you mean?
2    A    I didn't really understand what they were talking
3    about and about not reporting it and all that.
4    Q    You mentioned other lines of credit that you had
5    including your J.C.Penney and Macy's charge cards?
6    A    Uh-huh, yes.
7    Q    Did you have to fill out applications when for other
8    lines of credit that you have?
9    A    Yes.
10   Q    On any of those applications, did you include
11   distributions that you received from the Tribe as part of your
12   income?
13   A    No.
14   Q    And that was at the direction of the Tribe; is that
15   correct?
16   A    That one I just did not include it.
17   Q    About how much were the distributions you received in
18   2001?
19   A    In 2001, I'm not really sure the amount, but maybe,
20   I'm not sure.
21   Q    Was it more or less than the amount you receive
22   currently?
23   A    More.
24        MR. OSCEOLA:  (Said something in Miccosukee not
25   translated.)

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 68

1        MR. FARRIOR:  Did Mr. Osceola just say something to
2    you?
3        THE DEPONENT:  No.
4    BY MR. FARRIOR:
5    Q    Do you know if it was double, or about how much more
6    was it in 2001 than it is now?
7        MR. DAVIS:  Object to form.
8    BY MR. FARRIOR:
9    Q    You can answer.
10   A    About maybe double.
11   Q    Did anyone at the Tribe ever tell you that the reason
12   your -- let me back up.  Did you ever have a sense of where the
13   money was coming from that the Tribe was distributing to its
14   members?
15   A    Yes.
16   Q    What was you sense?
17   A    It was coming from the resort, was the income.
18   Q    By resort you mean the Miccosukee Indian bingo gaming
19   facility; is that correct?
20   A    Yes.
21   Q    Do you have acquaintances in any other Tribes that
22   have gaming?
23   A    What do you mean with that?
24   Q    Do you have any friends, people you know in any other
25   Tribes that have gaming?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 69

```
 1      A  No.
 2      Q  For example, do you know any Seminoles?
 3      A  I just know them, but not as friends, just social,
 4   just see them.
 5      Q  And you said so so?
 6      A  Social.
 7      Q  I'm sorry.  Are you aware that the Seminole Tribe
 8   also has gaming?
 9      A  Yes.
10      Q  Are you aware that the Seminole Tribe also makes
11   distributions to their members?
12      A  Yes.
13      Q  Were you aware of that in 2001?
14      MR. OSCEOLA:  (Said something in Miccosukee not
15   translated.)
16      THE DEPONENT:  I don't know.
17      MS. POOLE:  Can we take a five minute break.
18      MR. FARRIOR:  Let's also instruct your clients that
19   they are not to communicate on the subject of this
20   deposition.  His deposition is set later.  You can take
21   him out of the room and he can stay out.
22      MR. RAMON:  I meant to have a break with Mr. Osceola.
23   She can stay in this room.
24      MR. FARRIOR:  We will go off the record and take a
25   short break.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 70

```
 1      (A brief recess.)
 2      (Mr. Osceola does not return to the deposition room.)
 3   BY MR. FARRIOR:
 4      Q  Back on the record.  When we went off the record, we
 5   were discussing the Seminole Tribe.
 6      A  Yes.
 7      Q  And you're aware that they make distributions, the
 8   Seminole Tribe makes distributions to their members; is that
 9   correct?
10      A  Yes.
11      Q  Are you aware how the Seminole distributions compare
12   to the distributions that the Miccosukees get, is it more or
13   less?
14      A  I don't know.
15      Q  Do you know if members of the Seminole Tribe pay tax
16   on the distributions that they get?
17      A  I don't know.
18      Q  And you never heard anyone at the Miccosukee Tribe
19   discussing whether the members of the Seminole Tribe pay tax on
20   the distributions that they get?
21      A  No.
22      Q  Did you ever hear anyone at the Miccosukee Tribe
23   discuss whether the Seminole Tribe pays taxes on their gaming
24   revenue?
25      A  No, I don't know.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 71

```
 1      MR. FARRIOR:  Let's go off the record.
 2      (A lunch recess.)
 3   BY MR. FARRIOR:
 4      Q  We're back on the record.  Do you understand you are
 5   still under oath?
 6      A  Yes.
 7      MR. FARRIOR:  I'm going to hand you what we are going
 8   to mark as Exhibit No. 2 and I have a copy for your
 9   counsel.
10      (Government's Exhibit No. 2 marked for identification.)
11   BY MR. FARRIOR:
12      Q  Take your time.  I'm going to hand you a few
13   documents today.  When I hand you a document, if you need more
14   time to look through the document to answer my question, please
15   just let me know and you can have more time.
16      A  Okay.
17      Q  Do you understand?
18      A  Yes.
19      Q  Take you time and look through this document.  My
20   first question will be, I'll ask you to turn to the next to the
21   last page.  For the record this document is Sally Jim's response
22   to the United States first set of interrogatories.  You don't
23   need to read every word of every document I hand you, just read
24   as much as you are going to need to answer my question.  Do you
25   understand?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 72

```
 1      A  Yes.
 2      MR. WELSH:  Hang on just one second, if I could,
 3   Mr. Roman, for purposes of the record because the Notice
 4   of Deposition said that Alex Osceola's deposition was to
 5   begin at 2:00 o'clock according to the Exhibit No. 1 which
 6   is the Notice of Deposition.  I wondered if you could
 7   state on the record, so that we can have a complete record
 8   for Notice of Deposition purposes with Exhibit No. 1, what
 9   the situation is with Mr. Osceola now and why he is not
10   here.
11      MR. RAMON:  When we broke for lunch, Mr. Osceola, we
12   found out for the first time that Mr. Osceola had called a
13   cab, a taxi, and returned to the Reservation.  Ms. Jim has
14   attempted to contact him for either for him to return and
15   he is not returning.  He has stated that he would not
16   return today.  He was here.  We do not know the reason.
17   We have not been told a reason, but that is what the
18   situation is.
19      MR. WELSH:  But Mr. Osceola was here this morning,
20   correct, during Ms. Jim's testimony, correct?
21      MR. RAMON:  That is correct.
22      MR. WELSH:  And he exhibited no indication he was in
23   any way ill; is that correct?
24      MR. RAMON:  As far as I know, I have not been
25   informed of any of that.  I'm sorry Ms. Jim wants to say
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 73

```
 1    something.
 2         THE DEPONENT:  He didn't bring his two medications
 3    that he usually takes because he thought it was going to
 4    be like a quick question.  So he needed to take his
 5    medicine.
 6         MR. WELSH:  But Mr. Osceola knew that his deposition
 7    was to begin at 2:00 o'clock, correct, according to the
 8    Notice of Deposition?
 9         MR. RAMON:  I know that he was aware that his
10    deposition was going to be taken today.
11         MR. WELSH:  And he saw the Notice of Deposition?
12         MS. POOLE:  That I do not know because I don't have
13    any context of the deposition as to be here with Ms. Jim
14    in order to have his deposition taken also today.
15         MR. WELSH:  As his lawyer, you notified him as to the
16    time, etcetera, correct?
17         MS. POOLE:  That is correct, I told him to be here
18    for the deposition today.
19         MR. WELSH:  Okay, thank you.
20    BY MR. FARRIOR:
21         Q   Looking back at what we've marked as Exhibit No. 2,
22    could you turn to the second to the last page in this exhibit.
23    Is this your signature?
24         A   Yes.
25         Q   Did you sign this document on January 20th, 2015?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 74

```
 1         A   Yes.
 2         Q   Do you recognize this document?
 3         A   I think so.
 4         Q   Did you read through it before you signed it?
 5         A   No, I did not.  I just saw my name and they told me
 6    to sign it.
 7         Q   Did you discuss the contents of this document with
 8    your counsel?  Don't tell me the contents of that discussion,
 9    but did you discuss the contents of this document with your
10    counsel before you signed it?
11         A   No.
12         MR. FARRIOR:  Okay, we will go off the record for a
13    second.
14         (A discussion off the record.)
15    BY MR. FARRIOR:
16         Q   Back on the record.  To clarify, did you discuss this
17    document with your lawyer or attorney?
18         A   Yes.
19         Q   Did you understand the contents of this document?
20         A   Yes.
21         Q   And you understood before you signed it; is that
22    correct?
23         A   Yes.
24         Q   And you understood that by signing it, you were
25    swearing that the contents of the document were accurate; did
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 75

```
 1    you understand that?
 2         A   Yes.
 3         Q   Let me ask you about the first interrogatory here
 4    number one on the first page.  This lists checks that you
 5    received from the Miccosukee Tribe.  Do you see where it says
 6    that?
 7         A   Checks, the general.
 8         Q   The second and third item in the table there?
 9         A   This one, yeah.
10         Q   Do you see where it says that?
11         A   Yes.
12         Q   Did you receive the checks reflected in that table?
13         A   I don't know.  It's like a year or so, I don't really
14    know what the amount was.
15         Q   Let me ask you on page four, can you review your
16    answer to this question here.
17         A   Okay.
18         Q   So you reviewed the answer to interrogatory number
19    three on page four; is that correct?
20         A   Yes.
21         Q   Is there anything you need to supplement or change
22    from that answer after just reviewing it right now?
23         A   No.
24         Q   So this answer states that Ms. Jim has heard legal
25    advice that distributions are not taxable.  Do you see where it
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 76

```
 1    says that in this answer?
 2         A   Yes.
 3         Q   And is that true?
 4         A   Yes.
 5         Q   Had you heard legal advice that distributions were
 6    not taxable at General Council Meetings; is that correct?
 7         A   Yes.
 8         Q   And you believe you heard this advice from Dexter
 9    Lehtinen; is that correct?
10         A   Yes.
11         Q   Who is Dexter Lehtinen a lawyer for?
12         A   For the Tribe, Miccosukee Tribe.
13         Q   Did you consider Dexter Lehtinen to be your lawyer?
14         A   No.
15         Q   And you saw Dexter Lehtinen at General Council
16    Meetings; is that correct?
17         A   Yes.
18         Q   Do you remember him addressing the Tribe?
19         A   Yes.
20         Q   What sorts of things would he talk about at General
21    Council Meetings?
22         A   About the bingo hall and finances or some other legal
23    stuff about the land or whatever, mostly those.
24         Q   This answer refers to Julio Martinez, do you see
25    where it says that?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 77

1    A   Yes.
2    Q   Do you know who that is?
3    A   Yes.
4    Q   Who is that?
5    A   He's a finance worker.
6    Q   Did he ever discuss the taxability of distributions
7    with you?
8    A   Not with me, but at the business council.
9    Q   At the business council meetings is that what you
10   said?
11   A   Yes, the business council.
12   Q   He was part of the business council?
13   A   Just for finance purposes, just for that area.
14   Q   And you attended business council meetings where
15   Julio Martinez discussed the taxability of distributions?
16   A   Yes.
17   Q   Do you see the next name Mike Hernandez?
18   A   Yes.
19   Q   Who is that?
20   A   He's also a finance worker, was at the Miccosukee
21   Tribe.
22   Q   Did either Julio Martinez or Mike Hernandez ever
23   assist you in preparing one of your personal tax returns?
24   A   No.
25   Q   It says, Ms. Jim had also heard this legal advice

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 78

1    repeated outside of General Council Meetings from fellow Tribal
2    members.  Did you see where it says that?
3    A   Yes.
4    Q   So you did discuss legal advice with fellow Tribal
5    members; is that correct?
6    A   I didn't discuss them, I just heard it.  I never
7    discussed anything was legal stuff with other people.
8    Q   So you heard other Tribal members?
9    A   Not Tribal members but my sisters.  They are Tribal
10   members, yeah, I guess.
11   Q   So, how did your sisters know whether distributions
12   were taxable or not, if you know?
13   A   They heard it through the business council because
14   they attend meetings also.
15   Q   The General Council Meetings?
16   A   The General Council Meetings, yes.
17   Q   So your sisters would tell you what happened at a
18   general council meeting if you were unable to attend it for
19   some reasons in some instances; is that correct?
20   A   Yes.
21   Q   Did your sisters agree that distributions were not
22   taxable?
23   A   Yes.  But, they didn't agree, they just heard it,
24   that it was.
25   Q   Did you discuss the taxability of the distributions

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 79

1    with anybody else, with any other Tribal members besides your
2    sisters?
3    A   No.
4    Q   Or hear about the taxability from anybody else
5    besides your sisters?
6    A   No.
7    Q   Can you turn to page seven please.  Take your time
8    reviewing this.  My question is, where it says Ms. Jim does not
9    have personal knowledge as to whether or not the distributions
10   are substance distributions of gaming proceeds from the gaming
11   facility owned by the Tribe, because this information was based
12   on legal and accounting advice that she was not privy to.  Do
13   you see where it says that?
14   A   Yes.
15   Q   Do you understand what that means?
16   A   No, not really.
17   Q   And the next sentence says, the documents that
18   supports the information about the taxes, the resolution that
19   imposes the tax; do you see where it says that?
20   A   Yes.
21   Q   Do you know what is being talked about there?
22   A   Yes.
23   Q   What is that, what is the resolution being discussed
24   there?
25   A   About using the gambling money for tax returns I

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 80

1    think.
2    Q   So looking about in the middle of the page where it
3    says, day meaning the distribution payments were provided to
4    her according to the following specific guidelines.  Do you see
5    where it says that?
6    A   Yes, I see that.
7    Q   Under letter A it says, she needed to meet the blood
8    quantum requirement of -- there is a typo -- fifty percent
9    Miccosukee blood, she had to be an involved member which
10   requires applying for enrollment, being sponsored by an
11   enrolled Tribal member, and approved by the Miccosukee general
12   council.  Do you see where it says that?
13   A   Yes.
14   Q   Are those the guidelines to be a member of the Tribe?
15   A   Yes.
16   Q   Do you know if those guidelines -- well, are there
17   any additional guidelines that you are aware of that you had to
18   satisfy to be allowed to receive distributions?
19   A   You have to be what it says right here Miccosukee
20   blood and then your mother or father has to be a Miccosukee
21   member already or enrolled and they can enroll you under
22   eighteen.
23   Q   And once you're enrolled, are there any other -- do
24   you understand what I mean when I say guidelines?
25   A   Yeah.  Like if you're able to be a Miccosukee member,

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 81

1  how to be a Miccosukee member, yes.
2      Q   And are there any other guidelines or requirements in
3  addition to being a member, that you are aware of, in order to
4  get the distributions?
5      A   No, I don't.
6      Q   Looking at number three it says, Ms. Jim as part of a
7  small egalitarian society does not consider the amount of
8  payments to be lavish and extravagant, because these payments
9  help provide for her basic needs and what her culture considers
10  appropriate and necessary.  Do you see where it says that?
11     A   Yes.
12     Q   Do you know what that means?
13     A   Not that egalitarian, whatever that is.  I don't know
14  what that means.
15     Q   Just looking at page 20 of this document, looking at
16  the answer to request for admissions number forty, there is a
17  list of several individuals here.  Do you see the list of
18  individuals?  Do you see it's just a list of people in a
19  paragraph form?
20     A   This one that says individuals who have knowledge?
21     Q   That's correct.
22     A   Yes.
23     Q   So the request being referred to here is asking for a
24  list of people who have knowledge about some of our discovery
25  requests in this case.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 82

1      A   Uh-huh.
2      Q   I'm just going to go through some of these people
3  with you.  You or your attorney is listed, the Miami-Dade
4  County Clerk of Court.  Do you see where it says that?
5      A   Yes.
6      Q   Do you know what information they would have about
7  your case?
8      A   Do I know it?
9      Q   Right?
10     A   Probably.
11     Q   What information is that?
12     A   They probably know more than me.
13         MR. DAVIS:  Sorry to interrupt.  If you could provide
14  the question as written to Ms. Jim so it's clear what the
15  interrogatory specifically says, because it's not written
16  down over here.
17  BY MR. FARRIOR:
18     Q   I just want to go through them.  So do you see number
19  three or the third person on the list is Theresa Willie?
20     A   Yes.
21     Q   Do you know who that is?
22     A   Yes.
23     Q   Does she have some position in the Tribe?
24     A   I don't know what her position is.
25     Q   Are you familiar with her?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 83

1      A   Yes.
2      Q   What clan is she?
3      A   Otter.
4      Q   Do you know who Jasper Nelson is?
5      A   Yes.
6      Q   Who is that?
7      A   He is ex-chairman, I mean ex-assistant chairman.
8      Q   Let me ask you to set that aside for a second.
9      (Government's Exhibit No. 3 marked for identification.)
10  BY MR. FARRIOR:
11     Q   I'm going to hand you what's marked Exhibit No. 3
12  and a copy for your counsel?
13     A   Lawyer.
14     Q   Sorry, lawyer.  So I first would ask you to turn to
15  what's marked at the bottom as 00084.  This document for the
16  record is an excerpt of a ledger and copies of checks.
17     A   Uh-huh.
18     Q   Do you recognize this document?
19     A   I don't remember.
20     Q   Have you ever sign a check that looks like this?
21     A   I probably have, I don't remember.
22     Q   When you got a distribution about two weeks ago, did
23  you receive a check that looked similar to this?
24     A   Yes.
25     Q   Do you see at the top it says Miccosukee Tribe,

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 84

1  Miccosukee NTDR account?  Do you see where it says that?
2      A   Yes.
3      Q   Do you know what NTDR account means?
4      A   No.
5      Q   Have you ever heard anyone at the Tribe discussing
6  what NTDR account means?
7      A   No.
8      Q   This check is dated June 15, 2001, correct?
9      A   Yes.
10     Q   This check appears to be signed by Billy Cypress and
11  Max Billy?
12     A   Yes.
13     Q   Do you know those people?
14     A   Yes.
15     Q   Who is Billy Cypress?
16     A   Ex-chairman.
17     Q   When was he last chairman?
18     A   I want to say 2008, I think, I'm not sure.
19     Q   Who is Max Billie?
20     A   Treasurer, he is no longer with us, he passed away.
21     Q   And can you see who has endorsed this check?
22     A   Endorsed, you mean signed?  You mean signed?
23     Q   Yes, has someone signed this check, the back of it.
24  Do you understand this is the front of the check and the back
25  of the check?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 85

1     A    That's the front and that's the back, yes, my name
2    Sally Jim.
3     Q    Did you sign this check, the back of this check?
4     A    I guess I have.
5     Q    You guess you have or you don't know?
6     A    I don't remember.
7     Q    In generally around 2001, did you sign checks, the
8    back of checks?
9     A    Yes.
10    Q    Was it your practice when you received a check from
11   the Tribe to sign the back of it?
12    A    Yes.
13    Q    Do you have any reason to believe that somebody else
14   signed your name to the back of this check?
15    A    No.
16    Q    This says at the bottom, paid to the order of First
17   Union National Bank.  Do you see where it says that?
18    A    Yes.
19    Q    And then there is an account number, do you see that?
20    A    Yes.
21    Q    Do you recognize that account number?
22    A    No.
23    Q    It says, For Deposit Only General Account?
24    A    No.
25    Q    Was that your account?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 86

1     A    I don't think so.  I don't know if I had an account
2    that year or not.  I don't really remember back that long?
3     Q    Will you look please -- well, first of all do you see
4    the amount here is $4,450?
5     A    Yes.
6     Q    Did you receive that amount from the Tribe at that
7    time?
8     A    Like I said, I don't really remember getting it.
9     Q    Do you know why at the time the Tribe would be giving
10   you a check for $4,450?
11    A    I think it's for payment for bills.
12    Q    Payment for bills?
13    A    Yes.
14    Q    Do you think that this check was your quarterly
15   distribution, or do you think this was in addition to your
16   quarterly distribution?
17    A    Addition.
18    Q    How often did you get checks in addition to your
19   quarterly distribution?
20    A    Like I said before earlier, like limit ten thousand
21   so be like sometimes once, or not the limit maybe twice.
22    Q    So this might be a loan that would later be paid back
23   out of your distributions; is that correct?
24    A    Yes.
25    Q    Let's look at what is marked at the bottom 00087.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 87

1    This is check ending in 3222 dated June 2nd, 2001.  Do you see
2    where it says that?
3     A    Uh-huh, yes.
4     Q    This is a check for $44,600; is that correct?
5     A    Yes.
6     Q    Has someone signed the back of this check?
7     A    I have, Sally Jim.
8     Q    It looks like it also says, Alex M. Osceola under
9    Sally Jim; do you see that?
10    Q    Did you sign that for Alex Osceola?
11    A    Yes.
12    Q    Do both of these look like your handwriting, both of
13   these signatures?
14    A    Yes.
15    Q    Was this check provided for your quarterly
16   distribution from the Tribe?
17    A    Yes.
18    Q    And this check appears to have been deposited back
19   into the Miccosukee NTDR account; do you see where it says
20   that?
21    A    Yes.
22    Q    And that's not your account, is it?
23    A    No.
24    Q    Looking up at the top, this check is written on a

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 88

1    check from the Miccosukee Tribe of Indians of Florida NTDR
2    account.  Do you see where it says that?
3     A    Yes.
4     Q    Let me ask you looking back at the first page of this
5    exhibit, this is a list of Tribal members and the dividends
6    received, the other Tribal members and been redacted from this
7    exhibit.  Do you see where it has your name there?
8     A    Yes.
9     Q    And then there is a column that says, number of
10   MemCVRD.  Do you see where it says that?
11    A    Yes.
12    Q    Do you know what that refers to that column?
13    A    No, I don't.
14    Q    And you're listed as having four.  Do you see where
15   it says that?
16    A    Yeah, I guess that's a four.
17    Q    It's difficult to see?
18    A    Yes.
19    Q    During the year 2001, did you have four members
20   receiving dividends in your household?
21    A    I might have with my two daughters.
22    Q    So it would have been your two daughters and Alex
23   Osceola and you; is that correct?
24    A    Yes.
25    Q    At this point in time, were you directing the portion

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 89

```
1    of the dividend for Tamara Jim be directed to a savings
2    account?
3        A   At that time I don't really know if it was that time
4    or if I stopped before or after.
5        Q   The fourth column says, gross dividends.  Do you see
6    where it says that?
7        A   Yes.
8        Q   Do you know what that means?
9        A   The whole year what we got, yeah.
10       Q   Column number five is $15,400.  Do you see where it
11   says that?
12       A   Yes.
13       Q   Do you know what the significance of that is?
14       A   No, I don't.
15       Q   So assuming that this reflects the distribution for
16   one quarter, would you have gotten loans of ten thousand
17   dollars for one of the quarters in 2001?
18       MR. DAVIS:  Object to form.
19       MR. RAMON:  You can answer.
20       THE DEPONENT:  Yes.
21   BY MR. FARRIOR:
22       Q   And is it possible that you directed that $15,400 be
23   set aside in a savings account?
24       A   Yes.
25       Q   Is it possible that the total amount of your
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 90

```
1    distribution for that quarter was $70,000 minus the ten
2    thousand dollar loan that you had to pay back and setting aside
3    the $15,400?
4        MR. DAVIS:  Object to form.
5        THE DEPONENT:  Yes.
6    BY MR. FARRIOR:
7        Q   The answer is yes, that's possible?
8        A   Yes.
9        Q   I'm going to ask you to look at the second page of
10   this exhibit which is marked at the bottom 81.  Is it possible
11   in this quarter you would have gotten a loan of $1,376.83?
12       A   Yes, it's possible.
13       Q   Do you know why you would have gotten a loan in the
14   amount of that specific amount?
15       A   Maybe mine was one and my husband got a loan, but I
16   don't know why.
17       Q   You can set that document aside for a minute.
18       MR. FARRIOR:  I'm going to have this marked as
19   Exhibit No. 4, a copy for you and a copy for your counsel
20   (Government's Exhibit No. 4 marked for identification.)
21   BY MR. FARRIOR:
22       Q   This is an individual income tax return for 2001 for
23   Sally Jim.  Take your time looking through this.  My first
24   question is going to be, have you ever seen this document
25   before?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 91

```
1        A   Yes.
2        Q   This is an unsigned copy provided to us by your
3    counsel, if you look at the second page.
4        MS. POOLE:  Attorney.
5    BY MR. FARRIOR:
6        Q   Attorney, thank you.  Did you ever sign a copy of
7    this tax return?
8        A   Yes.
9        Q   Was it around January 20th, 2015?
10       A   Yes.
11       Q   Did you submit this tax return to the IRS?
12       A   Yes.
13       Q   Why did you do that?
14       A   Because they were asking for me to file the tax
15   return for that year.
16       Q   When you say "they" who are you referring to?
17       A   The IRS.
18       Q   On the first page, you have Tamara Jim listed as a
19   dependent.  Do you see that?
20       A   Yes.
21       Q   In 2001 was Alexis Nicole also a dependent of yours?
22       A   I don't think so.
23       Q   So you have listed here on line seven, wages, salary
24   and tips of $25,990.  Do you see where it says that?
25       A   Yes.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 92

```
1        Q   Is that accurate how much wages you got in 2001?
2        A   Maybe, I don't remember.
3        Q   Looking at that filing status, do you see where it
4    says that?
5        A   Yes.
6        Q   You have checked head of household.  Do you see where
7    it says that?
8        A   Yes.
9        Q   Why did you check that instead of married, filing
10   separately, or any of the other choices there?
11       A   I just been filing ad head of household for myself?
12       Q   Did anyone help you prepare this tax return?
13       A   Yes.
14       Q   Who helped you?
15       A   Bernie, my attorney, my lawyer.
16       Q   So on the second page it lists Rodriguez Trueaba,
17   T-R-U-E-A-B-A.  Do you recognize that name there?
18       A   No.
19       Q   Looking at the fourth page of this document which is
20   Statement One, Form 1040, line 21?
21       A   Yes.
22       Q   This says, this lists Miccosukee Tribe of Indians,
23   Indian Welfare Benefits as $272,000.  Do you see where it says
24   that?
25       A   Yes.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 93

```
1      Q   Was that the amount of money that the Miccosukee
2    Indian Tribe provided you in 2001 in distributions?
3      A   I don't know, I don't know that at all.
4      Q   Did you provide any documents to the people who
5    helped you prepare this tax return?
6      A   No.
7      Q   Do you have any reason to doubt that is the correct
8    amount of the total amount of distributions that you received
9    in 2001?
10     A   No, I don't.
11     (Government's Exhibit No. 5 marked for identification.)
12   BY MR. FARRIOR:
13     Q   I'm handing you what has been marked as Exhibit No. 5
14   for purposes of this deposition and a copy for your counsel.
15   This document is marked L333 thru L341.  This is minutes of the
16   Special General Council Meeting for February 2nd, 1995.  First
17   of all, have you ever reviewed or looked at minutes of General
18   Council Meetings?
19     A   Sometimes.
20     Q   Does the Tribe make the minutes available for Tribal
21   members to read?
22     A   Yes.
23     Q   How do they do that?
24     A   When they have the Tribal Council Meeting is when
25   they distribute the agenda.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 94

```
1      Q   At meetings do Tribal members vote on approving
2    minutes from prior meetings?
3      A   Yes.
4      Q   Have you ever done that?
5      A   No.
6      Q   You've never voted on approving minutes from a prior
7    meeting?
8      A   No.
9      Q   Did you ever vote on anything at the General Council
10   Meetings?
11     A   Just certain stuff, like for people to join the
12   membership.
13     Q   Do you recall whether you were at this meeting on
14   February 2nd, 1995?
15     A   I don't think I was there.
16     Q   During this time period did you regularly attending
17   General Council Meetings?
18     A   Yes.
19     Q   Then once you didn't attend, were you generally
20   discussing what occurred with your sisters; is that correct?
21     A   Some of them, not all of them.
22     Q   Is it possible that your sisters conveyed to you
23   generally what occurred at this meeting?
24     A   No.
25     Q   It's not?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 95

```
1      A   No.
2      Q   Why is that?  Go ahead, I didn't mean to cut you off?
3      A   Yeah, I don't remember talking about this with my
4    sisters.
5      Q   What about this makes you say that you don't remember
6    talking about it?
7      A   As I was reading, because I usually read the front
8    pages so I don't remember seeing this, reading about it.
9      Q   Is there anything in particular that you see in the
10   first few pages?
11     A   No.
12     Q   That makes you say that?
13     A   No.
14     Q   I'm going to have you turn to page five which is also
15   marked at the bottom L338 and looking at the second paragraph,
16   it's says, Mr. Lehtinen reported Tribal members will be
17   receiving two separate checks at this trust fund distribution.
18   Do you see where it says that?
19     A   Yes.
20     Q   Do you know what trust fund distribution refers to?
21     A   The NTDR.
22     Q   What do you refer to the NTDR distributions as?
23     A   Just that NTDR.
24     Q   And you don't know what NTDR stands for?
25     A   No.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 96

```
1      Q   It says, referring to one check will be the gross
2    receipts and one will be the tax amount due, which he urged
3    Tribal members to deposit so they may use to pay taxes when
4    due.  Do you see where it says that?
5      A   Yes.
6      Q   Was there ever a point in time where you received two
7    separate checks, one of which was to pay taxes when due?
8      A   No.
9      Q   Looking at the fourth paragraph from the bottom, do
10   you see where it says ALice J. Osceola?
11     A   Yes.
12     Q   It says Alice asked if these trust fund payments are
13   not reported, the individual does not have to report it on
14   their tax returns.  Do you see where it says that?
15     A   Yes.
16     Q   Do you know Alice Osceola?
17         MR. RAMON:  It's Alice J.
18   BY MR. FARRIOR:
19     Q   Alice J.
20     A   I'm not sure who that is, but --
21     Q   -- it's all right if you don't.
22     A   I don't know.  There are a couple of Alice Osceolas,
23   so I don't really know.
24     Q   The next paragraph says, Chairman Cypress stated that
25   was correct, it does not have to be included on the tax
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 97

1    returns.  Do you see where it says that?
2        A    Yes.
3        Q    And that agrees with your recollection that Billy
4    Cypress said not to include to distributions on tax returns
5    around that time; is that correct?
6        A    Right.
7        Q    The last paragraph on this page says, that Mr.
8    Lehtinen read and summarized the gross receipts tax ordinance.
9    Do you see where it says that?
10       A    Yes.
11       Q    Do you ever recall any discussion in a General
12   Council Meetings about a gross receipts tax ordinance?
13       A    I'm not sure if I heard it or not, because he would
14   read it and then go from there so, kind of hard to hear from
15   where they were standing.
16       Q    Looking at page thirteen, I'll looking at the middle
17   of the paragraph above meetings, above the heading meetings?
18       A    Uh-huh.
19       Q    It says, it stated that this Tribe, referring to the
20   Mashantucket Pequot Tribe, he stated this Tribe is saying, they
21   are willing to pay the taxes being imposed on gaming revenue.
22   Do you see where it says that?
23       A    Oh, okay, this one, yes, I see it.
24       Q    Do your recall discussions at General Council
25   Meetings about certain Tribes being willing to pay taxes and

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 98

1    other Tribes not being willing to pay taxes?
2        A    No.
3        Q    You don't recall any mention of this Tribe at a
4    General Council Meeting?
5        A    No.
6        Q    Do you recall any mention of the Seminole Tribe and
7    their willingness to pay taxes at a General Council Meeting?
8        A    No.
9        Q    Looking at page nineteen, the fourth paragraph up
10   from the bottom that begins Wayne Billie.  Do you see where it
11   says that?
12       A    Uh-huh.
13       Q    Do you know who Wayne Billie is?
14       A    Yes.
15       Q    It says, Wayne Billie stated he has talked with some
16   Tribal members and been informed of illegal drug selling on the
17   Reservation.  Then skipping a sentence he says, he added that
18   the trust fund payments being distributed is contributions to
19   the problem.  Do you see where it says that?
20       A    Yes.
21       Q    Are you aware of Wayne Billie having the opinion that
22   NTDR payments contributed to the problem of illegal drug
23   selling on Miccosukee Tribal lands?
24       A    I wasn't aware of that.  Like I said, I wasn't at
25   that meeting.  That was the first time I seen it.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 99

1        Q    Are you aware of any Tribal members having that
2    concern?
3        A    No.
4        Q    You don't have that concern?
5        A    No.
6            MR. FARRIOR:  I'm going to ask you to set aside that
7        document for the time being.  I'm going to ask this be
8        marked Exhibit No. 6 and I have a copy for you and a copy
9        for your counsel.
10   (Government's Exhibit No. 6 marked for identification.)
11   BY MR. FARRIOR:
12       Q    This is marked at the bottom just for the record
13   MICC65010 thru 65049.  It's also marked L354 thru L393.  These
14   are minutes of the General Council Meeting for November 2nd
15   1995.  Take your time looking through this.  My first question
16   is going to be whether you attended this General Council
17   Meeting.
18       A    I don't remember this one either.
19       Q    Is there anything that sticks out to you, that you
20   are sure you didn't?
21       A    Just reading it.
22       Q    But around this time you generally did attend General
23   Council Meetings; is that correct?
24       A    Yes.
25       Q    Looking at the second page, there is a discussion of

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 100

1    a proposed expansion of the Miccosukee Indian Bingo Gaming
2    Facility.  Do you recall ever being present for discussions of
3    expansions of the facility at General Council Meetings?
4        A    I have but, I'm not sure if it was this year or so.
5        Q    The second paragraph from the bottom of the page
6    says, Chairman Cypress stated the cost of the expansion will
7    not affect the NTDR payments, but the Tribal programs which are
8    assisted by gaming revenue will experience cutbacks for at
9    least four months.  Do you see where it says that?
10       A    Yes.
11       Q    Was it your experience that NTDR payments were not
12   affected by expansion at the gaming facility?
13       A    What do you mean like experience?
14       Q    Do you know whether or not the amount of your
15   distribution would be lower depending on if the Tribe was
16   expanding or improving the gaming facility?
17       A    No, I don't know.
18       Q    You never noticed that happening?
19       A    No.
20       Q    Did you ever notice cutbacks in other programs that
21   the Tribe put on, because the Tribe was using money to improve
22   the gaming facility?
23       A    No.
24       Q    Looking at page four last paragraph it says, Chairman
25   Cypress stated administration office is still receiving calls

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 101

1  regarding Tribal members listing NTDR payments on their credit
2  applications. Do you see where it says that?
3      A   Yes.
4      Q   Were you ever at a General Council Meeting where you
5  were told not to list NTDR payments on credit applications?
6      A   Yes.
7      Q   The next thing it says, it says, he stated business
8  council has repeatedly asked Tribal members not to do this, as
9  it could cause consequences.  He added, business council is
10 trying very hard to protect Tribal members from facing problems
11 with IRS, but if they, Tribal members, continue to list this as
12 income, then all business council effort will be for naught.
13 Do you see where it says that?
14     A   The last paragraph?
15     Q   The last paragraph and the first paragraph of the
16 next page?
17     A   Yes.
18     Q   You do see that?
19     A   Yes.
20     Q   Have you ever been at a General Council Meeting where
21 Chairman Cypress or anyone said the business council was trying
22 to protect Tribal members from facing problems with the IRS?
23     A   Yes.
24     Q   Were you at a General Council Meeting where the
25 Chairman or anyone else said that if Tribal members continued

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 102

1  to list NTDR payments on credit applications, Tribal members
2  could face problems with the IRS?
3      A   Yes.
4      Q   Was that explained to you why that was the case ever?
5      A   Yes.
6      Q   What was the explanation?
7      A   They said that, it was non-taxable funds that we get
8  so, not add to your tax returns.
9      Q   Or add it to credit applications; is that correct?
10     A   Yes.
11     Q   Looking at page six at the top it says, Chairman
12 Cypress stated business council had informed the Tribal members
13 that NTDR payments would be in accordance with the revenue
14 generated at MIBG.  Do you see where it says that?
15     A   Yes.
16     Q   What does MIBG refer to?
17     A   Miccosukee Indian Bingo Gaming.
18     Q   Were you ever informed that the NTDR payments be in
19 accordance with the revenue generated at the gaming facility?
20     A   What do you mean by that?
21     Q   Okay, so the next sentence says, business has been
22 good and the NTDR payments have been increasing and not
23 decreasing.  Do you see where it says that?
24     A   Oh, okay, yes.
25     Q   So that's your experience, when business was good at

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 103

1  the gaming facility --
2      A   -- yes --
3      Q   -- let me finish?
4      A   Sorry.
5      Q   When business is good at the gaming facility, the
6  NTDR payments would increase.  Is that your experience?
7      A   Yes.
8      MR. DAVIS:  Do you want to take a break for a minute.
9      MR. FARRIOR:  We will go off the record.
10         (A brief recess.)
11 BY MR. FARRIOR:
12     Q   Back on the record.  One more question on what we
13 marked as Exhibit No. 6.  Do you understand you are still under
14 oath?
15     A   Yes.
16     Q   On page twenty-five, I have a couple questions.  This
17 says discussing a report by Mike Hernandez.  Do you see where
18 it says that?
19     A   Yes.
20     Q   In the middle of the page it refers to a Tribal
21 member appreciation fund.  Do you see where it says that?
22 Where it says pages 42 and 43?
23     A   Yes.
24     Q   Do you know what a Tribal member appreciation fund
25 is, you ever heard of that?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 104

1      A   No.
2      Q   Turning to page twenty-seven, looking at the last
3  paragraph this refers to Chief Zecca, Z-E-C-C-A?
4      A   Yes.
5      Q   Do you know who Chief Zecca is?
6      A   Yes.
7      Q   Who is that?
8      A   It was Miccosukee Police Department --
9      Q   -- Chief?
10     A   Chief, yeah.
11     Q   It says, Chairman Cypress stated Chief Zecca's
12 concern is with parents using their children's NTDR payments to
13 purchase drugs and not properly caring for the children.  Do
14 you see where it says that?
15     A   Yes.
16     Q   Do you recall being at General Council Meetings where
17 there was discussions of concerns about people using the
18 children's NTDR payments to purchase drugs?
19     A   I haven't really heard of it, but like I said, I
20 heard it from my sister than was brought up.
21     Q   So you're aware of that being a concern that was
22 discussed?
23     A   Yeah.
24     MR. FARRIOR:  I'm just going to mark this as Exhibit
25 No. 7, a copy for you and a copy for your counsel.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 105

```
1        MR. RAMON:  Lawyer.
2        MR. FARRIOR:  I'll write that on my hand.
3     (Government's Exhibit No. 7 marked for identification.)
4  BY MR. FARRIOR:
5     Q    This is marked at the bottom L241 thru L251 and it's
6  also marked MICC64656 thru 64666.  This is minuted of a General
7  Council Meeting from February 8th, 1996.  Take you time
8  reviewing this.  My question is going to be, did you attend
9  this General Council Meeting?
10    A    Yeah.
11    Q    You think you were there?
12    A    Yes.
13    Q    What jumps out at you that makes you think you were
14 there?
15    A    The one they are talking about MIB page three.
16    Q    So injuries at the MIB?
17    A    Yeah.
18    Q    And what does MIB refer to there?
19    A    Miccosukee Indian Bingo.
20    Q    Looking at the second paragraph from the bottom, the
21 last few sentences -- never mind, I'm sorry.  Looking at page
22 four, fourth paragraph down it says, he, meaning Billy Cypress,
23 reported one Indian Tribe had requested the Tribe's help in
24 implementing the kind of plan which had enabled us, meaning the
25 Miccosukee, to legally avoid paying taxes.  Do you see where it
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 106

```
1  says that?
2     A    Yes.
3     Q    Do you recall that discussion at this General Council
4  Meeting?
5     A    Not really.
6     Q    Do you recall generally discussions about the Tribe's
7  plan to avoid paying taxes?
8     A    Yeah, I think years before.
9     Q    Did you understand the parameters, did you understand
10 how the Tribe's plan worked?
11    A    About what?
12    Q    We're talking about the Tribe's plan to avoid paying
13 taxes?
14    A    Oh, okay.
15    Q    I thought that you just said that you did recall that
16 being discussed generally at General Council Meetings?
17    A    Yeah.  And what was your question?
18    Q    My question is, did you understand how the Tribe's
19 plan worked?
20    A    No.
21    Q    Did you understand that other Tribes were not being
22 able to implement the same plan that the Miccosukee had?
23    A    No.
24    Q    I will ask you to set that aside for the time being.
25    (Government's Exhibit No. 8 marked for identification.)
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 107

```
1  BY MR. FARRIOR:
2     Q    I'm going to hand you what had been marked as Exhibit
3  No. 8.  This is marked at the bottom L396 to L397.  It's an
4  excerpt, as was the last exhibit an excerpt, of the May 4, 2000
5  General Council Meeting.  Do you recall attending a General
6  Council Meeting around May 4th, 2000?
7     A    Not this one, I was not there.
8     Q    Around May 4th, 2007 (sic) were you regularly
9  attending General Council Meetings, though?
10    A    In 2007?
11    Q    I'm sorry, in 2000?
12    A    In 2000, not 2000.
13    Q    You weren't attending meetings around 2000?
14    A    No.
15    Q    Were you discussing with any other Tribal members
16 what was going on at meetings around 2000?
17    A    No.
18    Q    What about 2001?
19    A    I don't remember discussing anything, I might have, I
20 don't remember.
21    Q    Looking at the next page, the second page in this
22 exhibit, the second paragraph, about half way through the
23 paragraph it says, "he", meaning Billy Cypress, stated the only
24 way the Tribal members' money will not be reported to the IRS
25 is if they cash their checks at the administration office.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 108

```
1  This is the only way they can be assured they will not be
2  reported.  Do you see where it says that?
3     A    Yes.
4     Q    Were you ever present at any General Council Meeting
5  where Billy Cypress said the only way to avoid distribution
6  being reported to the IRS was if you cashed your check at the
7  administration office?
8     A    Yes, one of the meetings, I don't know which year it
9  was.
10    Q    Would that have been before 2001?
11    A    I think it was after 2001.
12    Q    The next sentence says, he stated, if a Tribal member
13 also had a banking account with a substantial amount of money,
14 th en this too will be reported and the IRS will investigate
15 into how the money was obtained.  Do you see where it says
16 that?
17    A    Yes.
18    Q    It's in the same paragraph?
19    A    Yeah.
20    Q    The second paragraph of the document?
21    A    Okay.  I've heard that before.
22    Q    You have?
23    A    Yes.
24    Q    Was that at General Council Meetings?
25    A    Yes.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 109

1   Q   You heard it from Billy Cypress outside of General
2   Council Meetings?
3      A   No, not outside.
4      MR. FARRIOR:  You can set that aside for the time
5   being.  I'm going to hand you what I'm going to mark as
6   Exhibit No. 9.
7      (Government's Exhibit No. 9 marked for identification.)
8   BY MR. FARRIOR:
9      Q   Exhibit No. 9 is marked at the bottom L442 thru L443.
10  This is an excerpt of minutes of a General Council Meeting
11  August 3rd, 2000.
12     A   Yes.
13     Q   Do you recall if you attended that meeting?
14     A   Yeah.
15     Q   You did attend this meeting?
16     A   Yeah.
17     Q   Is there something that jumps out at you?
18     A   The first paragraph.
19     Q   That says, Chairman Cypress stated that the Chickee
20  Builders are an example they need liability insurance?
21     A   Yes.
22     Q   So you recall that being discussed at a General
23  Council Meeting?
24     A   Yes.
25     Q   Around this time?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 110

1      A   Yes.
2      Q   Looking at the third paragraph, it says, Chairman
3   Cypress stated, at every General Council Meeting the Tribal
4   members are asked to not claim the NTDR monies as income when
5   applying for credit.  Distribution monies are non-taxable NTDR
6   He stated, if the IRS were to find out about these monies, then
7   we could end up being taxed.  This would mean the Tribal
8   members would have 33 percent of the NTDR monies deducted to
9   cover this tax.  Do you see where it says that?
10     A   Yes.
11     Q   Do you recall that Billy Cypress saying that at this
12  General Council Meeting?
13     A   Yes.
14     Q   Looking towards the bottom where it says Dan Osceola?
15     A   Yes.
16     Q   Presented questions regarding the check cashing?
17     A   Yes.
18     Q   Do you recall what the questions regarding the check
19  cashing were?
20     A   I'm not sure on that one.
21     MR. RAMON:  Mr. Farrior, the name is Don, D-O-N,
22  Osceola.
23     MR. FARRIOR:  I'm sorry, thank you.
24        (Discussion off the record.)
25     MR. FARRIOR:  Back on the record.  I'm going to mark

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 111

1   this exhibit as No. 10.
2      (Government's Exhibit No. 10 marked for identification.)
3   BY MR. FARRIOR:
4      Q   This is marked at the bottom L444 thru L445.  This is
5   an excerpt of a General Council Meeting minutes of August 2,
6   2001.  My question is, did you attend this meeting?
7      A   I don't think I was there, no.
8      MR. FARRIOR:  I'm going to mark this as Exhibit
9   No. 11, a copy for you and a copy for your lawyer.
10     (Government's Exhibit No. 11 marked for identification.)
11  BY MR. FARRIOR:
12     Q   This is marked at the bottom L463 thru L471.  This is
13  minutes, excerpted minutes from General Council Meeting of
14  February 3rd, 2011.  Do you recall if you were in attendance at
15  this meeting?
16     A   I'm not sure, I'm not sure if I heard some of that,
17  so let me read the rest.  No.
18     Q   Going ask you a couple questions?
19     A   Okay.
20     Q   Looking at page eight at the bottom it refers to the
21  IRS sending out a letter, do you see where it says that?
22     A   Yes.
23     Q   First of all have you ever received notices from the
24  IRS?
25     A   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 112

1      Q   Do you recall receiving notices from the IRS for the
2   2001 tax year?
3      A   Yes.
4      Q   And you signed for those notices; is that right?
5      A   Yes.
6      Q   Do you recall receiving a notice around 2004
7   regarding the 2001 tax year?
8      A   Yeah.
9      Q   You believe you did?
10     A   Yeah.
11     Q   This says that Mr. Ramon recommended Tribal members
12  do not open any paperwork from the IRS, just bring it to the
13  fourth floor.  Do you see where it says that?
14     A   Yes.
15     Q   Were you ever told not to open paperwork that you
16  received from the IRS?
17     A   No.
18     Q   You opened the paperwork; is that correct?
19     A   Yes.
20     MR. FARRIOR:  I'm going to mark this for
21  identification as Exhibit No. 12.
22     (Government's Exhibit No. 12 marked for identification.)
23  BY MR. FARRIOR:
24     Q   This is a document that was produced to us.  It's
25  pages 1 thru 29 of Docket Number 46-1 in Case 14-20938 from the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 113

```
1    Southern District of Florida.  My question to you, and take
2    your time reviewing through this, have you ever seen any of the
3    documents in this package before?
4        A   No.
5        Q   Looking at third page, this a letter signed by Dexter
6    Lehtinen, do you see where it says that?
7        A   Yes.
8        Q   You never had any personally had any interaction with
9    Dexter Lehtinen; is that correct?
10       A   Correct.
11       Q   Did Dexter Lehtinen ever explain to you the contents
12   of this letter?
13       A   No.
14       Q   Did you ever pay Dexter Lehtinen for legal services?
15       A   No.
16       Q   Looking at the fourth page of the document, this is a
17   memo, from Dexter Lehtinen, do you see where it says that?
18       A   Yes.
19       Q   It also says, Guy Lewis (phonetic), do you see where
20   it says that?
21       A   Yes.
22       Q   Do you know who Guy Lewis is?
23       A   No.
24       Q   Have you ever met him?
25       A   No.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 114

```
1        Q   It also says Anthony J. O'Donnell, do you see where
2    it says that?
3        A   Yes.
4        Q   Do you know who that is?
5        A   No.
6        Q   Did you receive any legal advice from Guy Lewis?
7        A   No.
8        Q   Did you ever receive any legal advice from Anthony
9    O'Donnell?
10       A   No.
11       Q   Did anyone at the Tribe ever tell you that Dexter
12   Lehtinen was your lawyer?
13       A   From the business council meetings they would
14   announce him as the lawyer for the Miccosukee Tribe.
15       Q   For the Tribe?
16       A   Yes.
17       Q   But not for you personally?
18       A   No.
19       Q   And you don't recall Dexter Lehtinen ever explaining
20   the legal theory expressed in this memo at General Council
21   Meetings; is that correct?
22       A   Yeah, that's correct.
23           MR. FARRIOR:  Let's go off the record and take a five
24   minute break.
25           (A brief recess.)
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 115

```
1
2            MR. FARRIOR:  Back on the record.  Ms. Jim, thank you
3    for your attendance here today.  Subject to some follow-up
4    we may have after your attorney Mr. Roman asks some
5    questions, we completed this portion.  I appreciate your
6    patience.  We pass the witness.
7                    CROSS EXAMINATION
8    BY MR. RAMON:
9        Q   Good afternoon, Ms. Jim.  I have some questions in
10   some areas that Mr. Farrior has asked you about.  The same rule
11   applies.  If there is a question you do not understand, please
12   let me know and I will rephrase it.  If there is a question
13   that you need translation, let us know and we will ask for the
14   translation of the question only.  You can ask Ms. Poole who is
15   here to assist you with that?
16       A   Okay.
17       Q   Is the English language spoken during General Council
18   Meetings?
19       A   No, it's Miccosukee translated into English for most
20   of the elderly that are affected don't speak English or
21   understand English.
22       Q   Do all Miccosukee Tribal members, do all Miccosukee
23   that attend General Council speak Miccosukee?
24       A   Yes.
25       Q   Are there some members who, because of their young
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 116

```
1    age, do not understand the Miccosukee language?
2        A   Could you ask that again?
3        Q   Are there members that do not understand the
4    Miccousukee language and only understand English?
5        A   Yes.
6        Q   There were several questions asked about Former
7    Chairman Billy Cypress speaking at General Council Meetings.
8    When Mr. Cypress, Billy Cypress spoke, at General Council
9    Meetings based on the ones that you attended, did he speak in
10   Miccosukee or in English?
11       A   He spoke Miccosukee.
12       Q   And were there times when what he was saying in
13   Miccosukee would be translated into English for members that
14   did not speak Miccosukee?
15       A   Yes, after he speaks, explain Miccosukee they were
16   said in English.
17       Q   When Dexter Lehtinen was giving his legal report, was
18   Mr. Lehtinen giving his legal report in Miccosukee or in
19   English?
20       A   English.
21       Q   Was what he was saying translated into Miccosukee?
22       A   Billy Cypress translated most of them.
23       Q   And when you said most of them, were those things
24   that Lehtinen that were not translated into Miccosukee?
25       A   The ones that doesn't understand English will ask
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 117

```
 1    what he was saying so Billy Cypress will translate it in
 2    Miccosukee, but get into more detail about taxes, what Dexter
 3    Lehtinen was saying.
 4         Q   When you say that Billy Cypress will get into more
 5    details, what do you mean by that?
 6         A   About tax refunds, the tax returns, that they can't
 7    be recorded into the tax returns.
 8         Q   Was that part about the tax returns not to be
 9    reported, was that particular part also said in English for
10    members that did not speak Miccosukee?
11         MR. FARRIOR:  Objection to the form.
12    BY MR. RAMON:
13         Q   Go ahead.
14         A   Yes.
15         Q   When that was said in English, was Lehtinen present?
16         A   No.
17         Q   Was he present when Billy Cypress was talking about
18    taxes and whether they were to be reported on income taxes or
19    not?
20         A   No, he would just do his report and then leave it up
21    to Billy Cypress to translate and he would leave.
22         Q   Would he leave after Billy Cypress had translated or
23    before?
24         A   I think, I'm not really sure about that, but
25    sometimes it's before or after.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 118

```
 1         Q   Was there any time that you remember you attending
 2    General Council where the issue of taxes that Mr. Farrior had
 3    asked you about here, where Lehtinen was not present at that
 4    meeting?
 5         A   Which?
 6         Q   Let me give you moment, this has been marked as
 7    Exhibit No. 5 and this is the meeting of February 2nd, 1995.
 8    Mr. Farrior asked you about this meeting.  Do you recognize
 9    this document?
10         A   Yes.
11         Q   Now this is Thursday, February 2nd, 1995?
12         A   Yes.
13         Q   Mr. Farrior asked you on page five about Mr. Lehtinen
14    reported Tribal members would be receiving two separate checks
15    at this trust fund distribution.  Can you see that?
16         A   Yes.
17         Q   Right above that, the first paragraph, it says,
18    Mr. Lehtinen reviewed the new law placing taxation on payments
19    made to Tribal members from Indian gaming properties.  Do you
20    see that?
21         A   Yes.
22         Q   Now, the last sentence of that paragraph it says, he
23    reiterated profits disbursed to Tribal members from profits
24    made from Tribal lands should not be taxed.  Can you read that
25    there?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 119

```
 1         A   Yes.
 2         Q   Now.  According to this document, it was Mr. Lehtinen
 3    the one that said that, correct?
 4         A   Yes.
 5         Q   Now, Billy Cypress is not an attorney, correct?
 6         A   Correct.
 7         Q   Did Billy Cypress ever tell you that he was giving
 8    you legal advice?
 9         A   No.
10         Q   Did Billy Cypress ever tell you, or any members in
11    the General Council Meetings that you attended, where he was
12    getting his legal advice from?
13         A   No.
14         Q   Did Billy Cypress ever present at this meeting, this
15    meeting the General Council Meeting of Thursday, February 2nd,
16    1995, do you remember any other attorney present other than
17    Dexter Lehtinen?
18         A   No.
19         Q   Did you see any other attorney during this meeting
20    talking about taxes and distributions as reflected in these
21    minutes?
22         A   No.
23         Q   Did you believe in 1995 when Mr. Lehtinen was talking
24    about distributions and taxes and this statement here that
25    Mr. Farrior asked you about, two different checks, did you
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 120

```
 1    believe that Mr. Lehtinen was representing you as an attorney
 2    on the tax issue?
 3         MR. FARRIOR:  Object to the form.
 4         THE DEPONENT:  No.
 5    BY MR. ROMAN:
 6         Q   Did you believe that Mr. Lehtinen was giving you and
 7    Tribal members legal advice regarding the distributions and
 8    taxes?
 9         A   No.
10         Q   Now, did Billy Cypress ever say to you that Dexter
11    Lehtinen was representing you on tax issues regarding
12    distributions?
13         A   No.
14         Q   Did he say to you that he was working on tax matters
15    regarding distributions?
16         A   No.
17         Q   Did you hear from any Tribal member that Dexter
18    Lehtinen was representing the Tribe and Tribal members on issue
19    of whether the distributions were taxable or not?
20         A   No.
21         Q   Now, the meeting here, the other meeting that
22    Mr. Farrior asked you about, this would be the meeting of
23    November 2nd, 1995 Exhibit No. 6.  According to these records
24    on page two, Dexter Lehtinen was present during that meeting,
25    correct?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 121

1    A   Yes.
2    Q   And in here Item Number 4, it says, MIBG report.
3    According to these minutes, it was Lehtinen who was giving that
4    report, correct?
5    A   Yes.
6    Q   Now, on page three there is also a discussion by
7    Billy Cypress regarding taxation, correct?
8    A   Yes.
9    Q   And according to these minutes, the NTDR payments
10   were also discussed, correct?
11   A   Yes.
12   Q   Now, Dexter Lehtinen was also present during that
13   meeting, correct?
14   A   Yes.
15   Q   Now you can look at these minutes on page four, Mike
16   Hernandez, Finance Director, was also present during those
17   meetings, correct?
18   A   Yes.
19   Q   Now Mike Hernandez, does Mike Hernandez speak
20   Miccosukee?
21   A   No.
22   Q   Would it be fair to say that whenever Mike Hernandez
23   spoke to Tribal members at General Council it was in English?
24   A   It was in English.
25   Q   And did Mike Hernandez, how long was Mike Hernandez

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 122

1    employed with the Tribe?
2    A   For a long time.  I'm not sure how many years, but
3    over ten years.
4    Q   Have you known -- I'm sorry, I didn't mean to cut you
5    off.  Had you known Mike Hernandez by any other name?
6    A   No.
7    Q   Have you ever known him by Miguel Hernandez?
8    A   No.
9    Q   When Mr. Farrior asked you about if you knew Miguel
10   Hernandez, did you know whether Miguel Hernandez and Mike
11   Hernandez was the same person?
12   A   No, I didn't until I saw a document.
13   Q   Did Mike Hernandez deal with matters involving the
14   distributions?
15   A   Yes.
16   Q   What was his role in dealing with distributions, what
17   did he do?
18   A   He looking, I guess looking finances to see how much
19   the gift shop or the enterprises are receiving, getting or if
20   they made enough money or anything like that or the restaurant
21   on financial stuff.
22   Q   This meeting that Mr. Farrior asked you about on
23   February 2nd, 1995, if you go to page five, there is a fourth
24   paragraph, it says, Chairman Cypress reported Mike Hernandez,
25   Finance Director, does the income tax return for some of the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 123

1    Tribal members, wasn't sure if he was to add the trust fund
2    taxes or not.  He had informed him to do the income taxes as he
3    always has until he was informed otherwise.  Do you remember if
4    Mike Hernandez continued to do taxes for Tribal members without
5    reporting the distributions?
6    A   I don't remember that, no.
7    Q   The next paragraph that Mr. Farrior asked you
8    about --
9        MR. FARRIOR:  -- I'm sorry, can I just make sure I'm
10   on the same page.
11       MR. RAMON:  Page five, that would be Exhibit No. 5,
12   page five.
13       MR. FARRIOR:  I'm sorry, go ahead.
14   BY MR. RAMON:
15   Q   Mr. Farrior asked you about the next paragraph that
16   reads, Alice J. Osceola asked if these trust fund payments are
17   not reported, the individual does not have to report it on
18   their tax return.  Do you see that?
19   A   Yes.
20   Q   Then also he asked you about the next line that says,
21   Chairman Cypress stated that was correct, it does not have to
22   be included on the tax return.  Do you remember that?
23   A   Yes.
24   Q   Was Mr. Lehtinen present when Chairman Cypress say
25   that?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 124

1    A   No.
2    Q   Let me ask you about February 8, 1996 this is Exhibit
3    No. 7.  On page nine it says, legal counsel report.  Do you see
4    that Item Number Five?
5    A   Yes.
6    Q   Now there was a report regarding, I'm reading from
7    the third paragraph, there was a report by Mr. Lehtinen and a
8    chart about how much money MIB was making.  Do you see that?
9    A   Yes.
10   Q   Then it says, he reported January was the highest
11   record month for the gross and net revenues, correct?
12   A   Yes.
13   Q   Were you aware at the time that Mr. Lehtinen was also
14   managing Miccosukee Indian Bingo?
15   A   No.
16   Q   Did you learn that subsequent to this date, later
17   after this date sometime?
18   A   No.
19   Q   Did you believe at the time Mr. Lehtinen was giving
20   his report, he was giving his report as attorney for the Tribe?
21   A   Yes.
22   Q   Would it be fair to say you did not know at the time
23   whether he was giving that report in his capacity as Manager of
24   MIB?
25   A   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 125

1    Q   Now on May 4th, 2000 this is the Special General
2    Council Meeting of Thursday, May 4th, 2000 and this is Exhibit
3    No. 8.  There is a one page, page six regarding a discussion by
4    then Chairman Billy Cypress about the NTDR.  Do you see that?
5        A   Yes.
6        Q   Now, was Dexter Lehtinen present at that meeting on
7    May 4th, 2000?
8            MR. FARRIOR:  Objection, leading, form.
9    BY MR. RAMON:
10       Q   Do you remember if Mr. Lehtinen was present at this
11   meeting?
12       A   I don't remember.
13       Q   Did Mr. Lehtinen attend all the General Council
14   Meetings that you remember attending?
15       A   No, not all of them.  The ones I attend some of the
16   time he wasn't there.
17       Q   Now, on Thursday, August 3rd, 2000 and this is
18   Exhibit No 9, Mr. Farrior asked you about a statement by then
19   Chairman Billy Cypress on this second page, which is page
20   three, starts with Chickee Builders.  That was something that
21   you said it reminded you attending this meeting because talking
22   about the Chickee Builders?
23       A   Yes.
24       Q   Then there was also a question regarding Donald
25   Osceola and check cashing, correct?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 126

1        A   Yes.
2        Q   There is Item Number Six that it says legal counsel
3    report here, correct?
4        A   Yes.
5        Q   Now on this report would it be fair to say that
6    Mr. Lehtinen was present at that meeting?
7        A   No.
8        Q   Exhibit No. 10, Thursday, August 2nd, 2001 Special
9    General Council Meeting of August 2nd, 2001 two pages, the
10   second page is page number five.  Mr. Farrior asked you about a
11   statements made by Billy Cypress the Chairman.  My question is,
12   do you remember whether Mr. Lehtinen was present during this
13   meeting?
14       A   I don't remember.
15       Q   Now would it be fair to say the complete agenda of
16   this meeting will tell us whether Mr. Lehtinen was present or
17   not?
18       A   Yes.
19           MR. FARRIOR:  Objection to form.
20   BY MR. FARRIOR:
21       Q   Now the first page of the agenda has seventeen items
22   listed, correct?
23       A   Yes.
24       Q   And Item Number Six, nineteen pages I'm sorry, Number
25   Six says legal counsel report, correct?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 127

1        A   Yes.
2        Q   Do you understand today what the word counsel, S-E-L,
3    means?
4        A   The lawyers.
5        Q   Who do you remember being the Tribe's lawyer on
6    August 2nd, 2001?
7        A   Dexter Lehtinen.
8        Q   How do you know that?
9        A   Chairman Billy Cypress would say he's legal counsel.
10       Q   When you heard the Chairman Billy Cypress saying he
11   was the Tribe's lawyer, what did that mean to you?
12       A   I really don't know.  I thought he was a lawyer to
13   the Tribe, and I thought what it was, not legal council from my
14   understand.
15       Q   When Mr. Lehtinen would speak about legal matters at
16   General Council meetings, did you believe that he was also
17   speaking about issues that affected you as a Tribal member?
18       A   No.
19       Q   On Thursday, February 3rd, 2011 this meeting and this
20   is Exhibit No. 11, there was a legal counsel reported listed as
21   Item Number Six that Mr. Farrior asked you about.  Were you
22   present when Mr. Jim Jordan, J-O-R-D-A-N, made his
23   presentations when he spoke about these matters that you were
24   asked about here?  Do you remember if you were present?
25       A   I don't remember.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 128

1        Q   How long did you know Julio Martinez?
2        A   I didn't really know him, just saw him at the
3    administration as a worker for maybe ten years or more.
4        Q   Did you believe that the distributions that you were
5    getting, that you were receiving from the Miccosukee Tribe, you
6    did not have to pay taxes on them?
7        A   Yes.
8        Q   Where did you get that belief from?
9        A   From Billy Cypress and Lehtinen.
10       Q   And how did you get that belief from Lehtinen?
11       A   From the General Council Meetings.
12       Q   What would he say at General Council Meetings that
13   led you to believe that distributions were not taxable?
14       A   When a person asked about it, he would say, it's not
15   taxable, that's not income, so there is no way you can use
16   it as a tax return.
17       Q   Who would say specifically that?
18       A   Dexter Lehtinen, after Billy Cypress interpreted in
19   Miccosukee and then the non-Miccosukee, no, speaking asked
20   Miccosukee members.
21       Q   How many times more or less do you remember through
22   all the years Tribal members asking Dexter Lehtinen whether the
23   distributions were taxable or not?
24       A   I don't know how many times, because I'm not sure how
25   many times I was there at the meetings, but every time I was

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 129

1    there, maybe most of the meetings like five times I heard it
2    before.
3        Q   Is there a reason why you did not, when you heard
4    that, you did not ask another lawyer for his opinion about
5    whether the distributions were taxable or not?
6        A   No.
7        Q   Is there a reason why you didn't do that?
8        A   Because I thought he was helping us and looking over
9    the Miccosukee finances.
10       Q   Can you tell us a little bit more, why did you
11   believe that?
12       A   Because he was the lawyer for the Miccosukee Tribe.
13   So I would think that he knew what he was talking about, he was
14   telling the truth.
15       Q   Did you ever see, during the times you attended
16   General Council Meetings, any other lawyer other than Lehtinen?
17       A   No.
18       Q   Did you ever see or heard during the years you
19   attended General Council Meetings any other lawyer being
20   presented as the lawyer for the Tribe other than Lehtinen?
21       A   No, just him.
22       Q   Did you have any reason to believe that what Lehtinen
23   was saying about t he distribution not being taxable was not
24   true?
25       A   No.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 130

1        Q   Did you have reason to believe that what he was
2    saying about the distributions, what Lehtinen was saying about
3    the distributions not being taxable was not the correct legal
4    advice?  Did you have a reason to believe that he was wrong
5    legally?
6        A   No.
7        Q   Did you ever see Billy Cypress the former Chairman at
8    a General Council Meeting with any attorney other than Dexter
9    Lehtinen?
10       A   No.
11       Q   Did you believe that Dexter Lehtinen was an expert in
12   tax matters?
13           MR. FARRIOR:  Objection to form, foundation.
14           THE DEPONENT:  No.
15   BY MR. RAMON:
16       Q   Did you believe that Dexter Lehtinen had knowledge
17   about taxes?
18       A   I would have thought so.
19       Q   From the General Council Meetings that you attended,
20   when you saw Mr. Lehtinen talking about taxes, did you have a
21   reason to believe that he was not a tax attorney?
22       A   No, I didn't.
23       Q   Can you tell us in your own words, what do you
24   remember Lehtinen saying at any General Council Meetings
25   regarding the distributions and whether they were to be

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 131

1    included in your individual member's tax returns or not?
2        A   I don't remember what year it was, but I remember one
3    time he was saying it wasn't taxable, not taxable your
4    distribution.
5        Q   Was Ex-Chairman Billy Cypress present when Lehtinen
6    said that?
7        A   Yes.
8        Q   Did Lehtinen ever say at General Council Meetings,
9    that you're aware of, that the distributions are taxable and
10   you need, and Tribal members need to report them on their tax
11   returns?
12       A   No.
13       Q   Do you remember the issue of distributions, do you
14   remember the subject of distributions being discussed at
15   General Council Meetings when Lehtinen was present, when he was
16   there?
17       A   Do I remember?
18       Q   Yes?
19       A   Yes, some of the time.
20       Q   How many years, are you aware of how many years
21   Lehtinen, for how many years he was the Tribal lawyer, the
22   Tribe's lawyer?
23       A   I don't know, I just remember seeing him there in
24   1999. I may have seen him before, I don't recall.
25       Q   When was the last time you saw Lehtinen at a General

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 132

1    Council Meeting?
2        A   About six years ago.
3        Q   Is the Miccosukee language a written language?
4        A   No, it's not.
5        Q   If I want to learn Miccosukee, can I go to a library
6    at the Tribe or somewhere and pick up a book about Miccosukee?
7        A   No.
8        Q   Would it be fair to say that it's a verbal, oral
9    language, meaning that it is spoken not written?
10       A   Yes.
11       Q   What is easier for you to remember, something that
12   you heard or something that you read?
13       A   Heard.
14       Q   What is that?
15       A   Something that I head?
16       Q   Yes, why would you remember something better that you
17   heard opposed to something that you read, why is that?
18       A   Because if I read like this, if I was reading I would
19   forget about it, but when someone telling me I would remember.
20       Q   When you said like this, what are referring to?
21       A   The minutes.
22       Q   Can you explain a little bit more what you mean by
23   that?
24       A   Like the minutes a meeting about what people had said
25   and all that, I would read it and understand what they are

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 133

1  saying, but I would forget it.
2  Q   What about instead of being in writing, if something
3  said while you were present, would you remember that better?
4  A   Sometimes I remember, but sometimes I forget.
5  MR. RAMON:  I have no further questions, thank you.
6  REDIRECT EXAMINATION
7  BY MR. FARRIOR:
8  Q   When Mr. Ramon was asking you what you recall
9  specifically Dexter Lehtinen said about the taxability of
10  distributions, you said something about using the distribution
11  for something else.  Could you describe what you meant by that,
12  or if I misheard you?
13  A   Using?
14  Q   First of all can you repeat what you said when you
15  said that when Mr. Ramon asked you to describe what you
16  remember Mr. Lehtinen saying about the taxability of
17  distributions.
18  A   That it's from the gaming facility, so it wasn't
19  taxable.
20  Q   Did you ever ask Mr. Lehtinen or Chairman Cypress any
21  questions about what they were telling you on the taxability of
22  distributions?
23  A   No, no.
24  Q   Did you ever ask anyone for more information on that?
25  A   Not ask information about it, but just talked about

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 134

1  what they were talking about and all that.
2  Q   You mentioned that you were told that the
3  distributions were not income.  What do you understand income
4  to mean when you use it in that sense?
5  A   If you were working, you would file a tax return, so
6  that's income that I think of.  The distribution is to me not
7  like an income.  It's helping us out.
8  Q   Were there ever any limits on what you could spend
9  the distributions on?
10  A   No.
11  MR. FARRIOR:  Okay, pass the witness.
12  MR. RAMON:  No further questions.
13  MR. FARRIOR:  Thank you for your time today.
14  MR. RAMON:  Just for the record before we go off the
15  record the time is 4:47 in the afternoon.  I think because
16  of the time that this witness has been testifying, I think
17  that even if Mr. Osceola would have remained here, I don't
18  think he would have been able to testify today for how
19  long she has been going on.  So we will go ahead and speak
20  to him and try to have him come back this week or as soon
21  as possible and make those arrangements accordingly.
22  THE DEPONENT:  He doesn't sit this long.  He doesn't
23  sit still this long.
24  MR. FARRIOR:  Without stating whether we agree with
25  that characterization, we will go off the record and

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 135

1  discuss this further.
2  (Discussion off the record.)
3  MR. FARRIOR:  Have her say that she is going to read
4  and sign on the record.
5  MR. RAMON:  She is going to read and sign.
6  MR. FARRIOR:  Also, we thank Ms. Poole for her
7  attendance here today.
8  (Thereupon the deposition was concluded.)

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 136

2  CERTIFICATE
3  UNITED STATES DISTRICT COURT
4  SOUTHERN DISTRICT OF FLORIDA
5  COUNTY OF MIAMI-DADE
7  I, SUSAN SUDDARTH, the undersigned authority, certify
8  that SALLY JIM personally appeared before me and was duly
9  sworn.
10  I, SUSAN SUDDARTH, a Court Reporter and Notary Public
11  in and for the State of Florida at Large, certify that I was
12  authorized to and did stenographically report the foregoing
13  deposition; and that the transcript is a true record of the
14  testimony given by the witness.
15  I further certify that I am not a relative, employee,
16  attorney or counsel of any of the parties, nor am I a relative
17  or employee of any of the parties' attorney or counsel
18  connected with the action, nor am I financially interested in
19  the action.
20  Dated this 29th day of March 2015.

23  Susan Suddarth, Notary Public
State of Florida at Large
Commission #EE827308
24  Expires October 2, 2016

KRESSE & ASSOCIATES, LLC
(305) 371-7692

```
                                        Page 137
 1               CORRECTION SHEET
 2    RE: USA vs Sally Jim
      CASE NO.  1:14-cv-22441-CMA
 3    DEPOSITION OF:  Sally Jim
      DATE TAKEN: 3-24-15
 4
 5        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 6    Page No.  Line No.      Change & Reason
 7    _____  _____  _____
 8    _____  _____  _____
 9    _____  _____  _____
10    _____  _____  _____
11    _____  _____  _____
12    _____  _____  _____
13    _____  _____  _____
14    _____  _____  _____
15    _____  _____  _____
16    _____  _____  _____
17    _____  _____  _____
18    _____  _____  _____
19    _____  _____  _____
20    _____  _____  _____
21    Under penalties of perjury, I declare that I have read my
      deposition and that it is true and correct subject to
22    any changes in form or substance entered here.
23    Date _____ Signature _____
24    Please forward the original signed errata sheet to this office
      so that copies may be distributed to all parties.
25
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

# Exhibit 12

Page 1

```
 1   .
 2      IN THE UNITED STATES DISTRICT COURT FOR THE
            SOUTHERN DISTRICT OF FLORIDA
 3
 4         CIVIL NO. 1:14-cv-22441-CMA
 5
 6   UNITED STATES OF AMERICA,
 7         Plaintiff,
 8   vs.
 9   SALLY JIM,
10         Defendant.
11   _____/
12
13
          DEPOSITION
14
            OF
15
         COLLEY BILLIE
16
17
18      44 West Flagler Street
            Suite 600
19          Miami, Florida
20
21
22      Thursday, March 26, 2015
          11:27 a.m. - 6:02 p.m.
23
24
25
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 2

```
 1          APPEARANCES
 2
 3   For the Plaintiff:
 4      ROBERT L. WELSH, ESQ.
         WILLIAM E. FARRIOR, ESQ.
 5      U.S. Department of Justice
         Tax Division
 6      P.O. Box 14198
         Ben Frnaklin Station
 7      Washington, D.C.  20044
 8
 9   For the Defendant:
10      BERNARDO ROMAN, III, ESQ.
         DANIEL DAVIS, ESQ.
         Of the Law Offices of
11      Bernardo Roman, III, P.A.
         1250 S.W. 27th Avenue
12      Miami, Florida  33135
13
     Also Present:
14
         Pete Osceola
15      Roy Cypress, Jr.
         Theresa Willie
16      Gabriel Osceola
17
18      - - - - - -
19
20
          I N D E X
21
     Witness        Direct    Cross
22
     COLLEY BILLIE      4      201
23
24
25
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 3

```
 1
 2
         E X H I B I T   I N D E X
 3
 4   Plaintiff's     Description        Page
 5      13      Notice of Deposition     5
 6      14      Ordinance No. 3         89
 7      15      Gross Receipts Tax      96
                 Ordinance
 8
         16      Memo              120
 9
         17      Memo 6-26-2006     191
10
         18      Memo 8-26-2003     192
11
         19      Memo 2-14-2003     193
12
13
14      (All Exhibits Retained By Mr. Welsh)
15
16
17
18
19
20
21
22
23
24
25
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 4

```
 1   THEREUPON:
 2          COLLEY BILLIE,
 3   a witness named in the notice heretofore filed,
 4   having been first duly sworn, deposes and says as
 5   follows:
 6          DIRECT EXAMINATION
 7   BY MR. WELSH:
 8      Q.   Good morning, Mr. Billie.  My name is
 9   Bob Welsh and with me is Will Farrior and we
10   represent the United States in this case, and we
11   would like to ask you a number of questions.
12          As you know, you have been represented
13   to us to be an expert in the history of the
14   Miccosukee Tribe and its traditions and customs;
15   is that correct?
16      A.   Yes.
17      Q.   Okay.  Just preliminarily, Mr. Billie,
18   I would like to just ask you a couple of
19   questions just proforma; and, this is, are you
20   under any disabilities which would prevent you
21   from testifying truthfully and honestly today and
22   completely?  That is, any disability in terms of
23   medications, drugs or anything else which might
24   impair your ability to testify today?
25      A.   Not that I'm aware of.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 5

```
 1      Q.   Okay.  Thank you.
 2          MR. WELSH:  And I wonder if we can go
 3   around the room and having everybody
 4   introduce themselves just for the record and
 5   explain who they represent in this
 6   deposition?
 7          MR. ROMAN:  Yes.  Bernie Roman,
 8   R-O-M-A-N, on behalf of Sally Jim.
 9          MR. DAVIS:  Daniel Davis on behalf of
10   Sally Jim.
11          MR. OSCEOLA:  Pete Osceola,
12   O-S-C-E-O-L-A, a member of the Miccosukee
13   Tribe.
14          MR. CYPRESS, JR.:  Roy Cypress, Jr.,
15   Assistant Chairman.
16          MR. WELSH:  As I previously mentioned,
17   Bob Welsh and Will Farrior.
18      Q.   {By Mr. Welsh}  First of all, I would
19   like to start off just identifying the first
20   exhibit.  I think this pile of documents here is
21   the exhibits.
22          MR. FARRIOR:  Set that aside.  That was
23   the wrong one.
24          (Thereupon, the Notice of Deposition was
25      marked as Plaintiff's Exhibit 13 for
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 6

```
 1      Identification.)
 2      Q.   This is one for you to use and then she
 3   has the exhibit.
 4      A.   These are the same, right?
 5      Q.   Yes.
 6          MR. FARRIOR:  Yes.
 7      Q.   Okay.  Could I have that one?  Sorry.
 8   It looks like --
 9      A.   That is the exhibit?
10      Q.   Okay.  Mr. Billie, do you recognize
11   what has been marked as Exhibit 13?
12      A.   I recognize it as the subpoena.
13      Q.   All right.  Have you seen this before?
14      A.   No.
15      Q.   Okay.  If you could glance through it
16   and see if there is anything in the first part of
17   it, which is the notice of deposition and notice
18   of subpoena and the subpoena itself, and tell us
19   if there is anything that you don't understand or
20   question?
21      A.   No.  I believe everything is clear.
22      Q.   Well, on that first part, sir, it asks
23   you under the third page, it is the subpoena to
24   testify; do you see that?  It says production.
25   Do you see the box production with a checkmark?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 7

```
 1      A.   Mm-hmm.
 2      Q.   And it asks you to bring with you all
 3   documents relied on in arriving at the opinions
 4   described in the attached expert witness summary
 5   for Colley Billie on behalf the Sally Jim.
 6          Do you have any documents that you
 7   produced related to that?
 8      A.   No.  No, I don't.
 9      Q.   Okay.  Did you look for any documents
10   that you might have relied upon in reaching your
11   opinions set forth in the attached expert witness
12   summary for Colley Billie on behalf of Sally Jim?
13      A.   No.
14      Q.   Is that because there are no documents,
15   or perhaps you can explain?
16      A.   Sure.  In terms of welfare the Tribe is
17   providing to its members, and this goes along
18   with the new legislation that was enacted, which
19   is called Tribal General Welfare Exclusion Act,
20   one of the main things that was pointed out is
21   that our guidelines that the IRS is looking for
22   are not written.  Our procedures are not written.
23   And we had asked, when the legislation was being
24   discussed, that that be taken into consideration;
25   and as a result, the legislation contains the
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 8

```
 1   language where it doesn't say or where it doesn't
 2   allow a Tribe to have a set of written guidelines
 3   or procedures to identify their welfare programs.
 4   So we are one of those Tribes that do not have a
 5   written program set for our welfare programs.
 6      Q.   Okay.  So I want to move on to
 7   something else beyond that; but, first of all, I
 8   just want to understand that there are no written
 9   guidelines --
10      A.   No.
11      Q.   -- concerning any type of welfare
12   provided to any member of the Miccosukee Tribe?
13      A.   Right.
14      Q.   And that includes all welfare programs,
15   whether it be housing?
16      A.   Yes.
17      Q.   I don't know what other programs you
18   have, but there are no written guidelines for any
19   programs whatsoever?
20      A.   Never.  No.
21      Q.   And there are no written guidelines
22   concerning any other distributions made to tribal
23   members?
24      A.   No.
25      Q.   Including monetary distributions,
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 9

1    loans, payments of any type on behalf of any
2    tribal members?  There are no documents in that
3    regard that -- wait for me to finish.
4         A.  Okay.
5         Q.  There are no written guidelines
6    concerning anything like that for any type of
7    benefit provided to any Miccosukee member that is
8    written?
9         A.  Okay.  Now can I respond?
10        Q.  Sure.
11        A.  In the beginning when I -- when this
12   issue was brought to my attention when I first
13   got in office, one of the biggest concerns that I
14   had was that the Tribe was being forced to fit
15   into some sort of peg where the Tribe itself is a
16   round peg.  Meaning that our programs that we
17   have in place, it seems like the Service was
18   trying to fit us into a structured program that
19   they're familiar with.  In other words, they're
20   bringing a template and trying to apply it to the
21   Tribe, and the Tribe is not going to fit into
22   that template.
23        (Thereupon, Mr. Gabriel Osceola entered the
24        deposition.)
25        A.  For example, you're looking for a set

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 10

1    of written guidelines that will say that this
2    person has to, say, earn a certain amount or live
3    within a certain area or come from a certain
4    background in order to be entitled to a program.
5    No.  The Tribe itself has always taken the
6    position, and this goes back before the
7    establishment of this country, that it helps all
8    its people, and the Tribe has always maintained
9    that it will help its own people.
10        The Tribe has always said to the
11   government, not just the federal government but
12   even to the state government, that it wants to be
13   left alone so that it could determine its own
14   future, and it is also willing to provide for its
15   own people, and that's what it has done.
16        MR. ROMAN:  Just for the record,
17        Mr. Welsh, we have Gabriel Osceola,
18        O-S-C-E-O-L-A, just join us.  He's the
19        secretary and a member of the Miccosukee
20        Business Council.
21        MR. WELSH:  Okay.  Thank you.
22        Q.  {By Mr. Welsh}  Mr. Billie, perhaps I
23   wasn't being clear.  I'm not here today to try to
24   fit the Tribe's position into any type of hole,
25   whether it be round or square or any geometrical

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 11

1    design.  What I'm here to try to do is just to
2    find out the facts, and that's why I was asking
3    you whether or not you have any records.  If
4    there are no records, and that's what I was
5    inquiring about, if you have no written records
6    as to any of these programs or any welfare
7    program of any type, be whatever it is, whether
8    it is housing or assistance to the elderly or
9    whatever kind of program, I don't know what all
10   your programs are, and we'll get into that later,
11   but I was trying to find out whether or not there
12   are any documents.
13        I'm not questioning whether they're
14   should or shouldn't be.  I want you to understand
15   that.  That's not my or Mr. Farrior's position
16   here today.  We are here only to find out the
17   facts so we can understand.  We're at a separate
18   level from the Internal Revenue Service.  We work
19   for the Department of Justice, and it's our
20   position to try to figure out whether or not what
21   they asked for in this case is correct, and we
22   have to represent the government in that regard.
23   That's our position.
24        So when I ask you something, it's only
25   to find out the facts.  This is not -- what we

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 12

1    are doing here today is a deposition.  It's
2    purely a fact finding instrument.  It's not a
3    determination or it's not something which
4    attempts to make a determination on the ultimate
5    issues here, okay?
6         A.  I understand.
7         Q.  That's why I didn't want you to feel
8    compelled to explain to me the theories.  As I
9    said, we are only here trying to get answers to a
10   few facts, and that's our only position.
11        A.  I understand, but you are looking for a
12   certain simple answer, and the answer to the
13   question that you're asking is not that simple.
14   That's why I had to explain.
15        Q.  No.  I understand.  I just want you to
16   understand me and our position today and in the
17   future.  It's not to try to get at why.  It's to
18   get at the facts of is this or isn't this the
19   case.
20        So, again, I will ask you, just because
21   we have gone on so long and the record might be
22   cloudy in that regard, am I hearing you to tell
23   me that there are no type of benefit provided to
24   any tribal member, be it welfare or otherwise,
25   but particularly welfare, there are no written

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 13

1    records regarding any benefit which you
2    consider -- the Tribe considers to be welfare
3    provided to any member?
4        A.   No.  As I mentioned, everything is done
5    orally.
6        Q.   So would that be true of loans, there
7    are no records concerning the loans made to
8    tribal members?
9        A.   When you say --
10       Q.   If it's welfare.
11       A.   Right.
12       Q.   Non-welfare loans, that's a different
13   matter.
14       A.   Right.
15       Q.   If you loan $3,000 and they have to pay
16   interest and pay it back and there are records
17   and it is all accounted for appropriately as an
18   economic loan, then that's different; but if you
19   loan under some program which the Tribe considers
20   to be welfare, then if there aren't records, you
21   can just tell me.  It has to be that kind of a
22   loan, that is, welfare as opposed to an economic
23   loan.
24       A.   Right.  If it is a welfare loan, no,
25   there won't be any records.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 14

1        Q.   Okay.  So any loan for which there are
2    no records you would consider welfare, whereas
3    any loan for which there is an economic
4    consideration of repayment, then there would be
5    records; is that correct?
6        A.   For the purposes of loans, if it is not
7    for welfare, there would be some kind of a track
8    record as far as loans being issued and loans
9    being repaid back.  But if the loan itself is an
10   economic welfare -- I mean, not economic --
11   welfare, then, no, there wouldn't be.
12       Q.   Okay.  For instance, if the Tribe made
13   a loan to somebody from some other cash or check
14   distribution and then was repaid, that would be
15   an economic loan rather than a welfare loan,
16   correct?
17       A.   If a loan is to be made, the Tribe
18   would have to approve it, either the Tribe
19   will -- General Council or the Business Council.
20   It would be identified whether that loan is
21   coming out as a long or if it is to be identified
22   as assistance.
23       Q.   So, then, on the books and records of
24   the Tribe there will be a distinction between an
25   economic loan and a welfare loan?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 15

1        A.   I would think so, yes.
2        Q.   Would both of those have to be repaid,
3    that is, an economic loan and a welfare loan?
4        A.   No, not a welfare loan.
5        Q.   And does the Tribe make welfare loans?
6        A.   I wouldn't call it a welfare loan.  I
7    think what you are talking about goes back to
8    what we talked about.  It would be considered a
9    form of assistance.
10       Q.   Okay.  So, then, it is not really a
11   loan in the traditional sense, that is --
12       A.   Exactly.
13       Q.   -- where someone loans money and then
14   it has to be repaid?  It's an advance, in fact?
15       A.   Yes.
16       Q.   And it's not repaid?
17       A.   It is what it is.  It is an assistance.
18       Q.   No.  I understand.  That person, that
19   tribal member doesn't give that money back?
20       A.   If it is assistance, no.
21       Q.   So, now, also as part of the document
22   which has been marked as Exhibit 13 is your
23   expert witness summary for Colley Billie on
24   behalf of Sally Jim.  I take it you recognize
25   that?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 16

1        A.   Mm-hmm.
2            MR. ROMAN:  For the record you have to
3    say yes or no.
4        A.   Yes.  I recognize it, yes.
5        Q.   Could you review it and make sure that,
6    as you sit here today, you agree with each and
7    every aspect of it?
8        A.   Mm-hmm.  Yes.
9        Q.   Is there anything you would correct or
10   add to it?
11       A.   I don't think so.  I think it looks
12   fine.
13       Q.   Thank you.
14           Now, sir, so that I can understand and
15   your position in the Tribe, in your expert
16   witness summary you stated that you are an expert
17   on basically all the aspects of the Miccosukee
18   Tribe, its customs, history; and to the extent
19   it's mentioned in here, I take it the economic
20   aspects of it, its governance?
21       A.   Yes.
22       Q.   The different levels of its governance,
23   the Business Council, the General Council and all
24   other entities mentioned in the expert witness
25   statement, correct?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 17

```
 1      A.   Yes.
 2      Q.   Okay.  So I can understand, sir, I
 3  would like to go through a little bit of your
 4  history then with the Tribe.  Could you give me
 5  in summary, and then I will ask, if I have any
 6  questions, your life history, including where you
 7  were born, raised, your education, your life
 8  history, your history with the Tribe, positions
 9  which you have held, if you are married, if your
10  marriage is to another tribal member, anything
11  else you can think to add which might bare on
12  your standard as an expert on behalf of the
13  Tribe?
14      A.   I was born in Dade County, Florida.  I
15  was born at Jackson Memorial on June 16, 1959.
16  My mother was Lois Billie.  My father was Sonny
17  Billie.  I have been living at what we call the
18  Tamiami Trail Miccosukee Reservation since the
19  '60's, probably around '62.  Before that I used
20  to live in an Indian village which was known as
21  Musa Isle.  Musa Isle closed and we located to
22  the Miccosukee Reservation.  That probably would
23  have been around '62.
24           From there I went to school out there
25  at the Miccosukee Indian School, and at the age
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 18

```
 1  of 10 I was transferred to public school, and I
 2  started attending public school from third grade,
 3  and I graduated high school at the age of 17.
 4           At the age of 15 I started working for
 5  the Tribe in what was termed as an After School
 6  Training Program is what they called it.  And
 7  from there I continued to work for the Tribe, and
 8  I served for a couple of years as their program
 9  director.  The program was known as CETA.  That
10  was a Comprehensive Employment and Training
11  program that the Tribe had, and I used to be in
12  charge of that program.  And then from there I
13  also worked in the Administration Department, I
14  believe like in '85 and '86.
15           And then in '87 I decided to go back to
16  school, and I went back to college, and in '93 I
17  obtained my bachelor's degree in Management from
18  Stetson University.
19           When I left in '87 that was the first
20  time I had ever left the Reservation, and then I
21  came back on to the Reservation in '94.  My
22  mother passed away in '96.
23           I became -- I was employed in '95 at
24  the Miccosukee Indian Gaming.  I became employed
25  as a supervisor trainee; and I believe it was '98
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 19

```
 1  or '99, I am not sure, I think it was '99 I
 2  became Poker Director at the Miccosukee Indian
 3  Gaming.  In two thousand -- I worked there until
 4  2009.
 5           In 2009 I was elected Chairman for the
 6  Miccosukee Tribe of Indians of Florida, and I
 7  took office December 28, 2009, and I have been
 8  Chairman since then, and that is where I have
 9  been working up until today.
10           As far as family, I have sisters and I
11  have two half brothers.  I'm the third son in the
12  family.  I have five sisters.  They're all
13  younger than myself.  I am a member of the Bird
14  Clan.  My current residence, I live off the
15  Reservation.  I am married.  I have a daughter,
16  and I currently live off the Reservation.  I have
17  done housing off the Reservation because the
18  Tribe has a shortage of housing available.
19      Q.   Thank you, sir.  I just have a few
20  questions in that regard.
21           You said you came back from Stetson in
22  '94 back to the Reservation?
23      A.   Mm-hmm.  Yes.
24      Q.   Since that time I understand that you
25  worked in the casino until you were elected
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 20

```
 1  Chairman.
 2           Have you held any other positions in
 3  the Tribe between the time of '94 when you
 4  returned and when you became Chairman in the end
 5  of '09?
 6      A.   I also worked as a board member for the
 7  Florida Governor's Council on Indian affairs.
 8           I also was serving as the tribal judge
 9  with the tribal court system.  I was appointed as
10  judge in 1993.
11      Q.   Okay.  Are you still on the tribal
12  court?
13      A.   No.  When I became Chairman, I stepped
14  down from the court.
15      Q.   What was your position on the court?
16  What did you do?
17      A.   I was a -- I was serving as the
18  contemporary tribal court, sitting on cases that
19  involved non-Indian that were sometimes required
20  to come into court.
21      Q.   Can you just give me a little better
22  understanding of what that entailed?  What kind
23  of cases were they, civil, criminal?  What did
24  they involve?
25      A.   No.  Mostly they were civil.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 21

1    Q.   What sorts of issues?
2    A.   We had one case, which is the Kraus
3  Anderson case, where they were alleged to have
4  done construction work that was less than what
5  the standards called for, and there were
6  questions of overinflated prices.  And I believe
7  those were the two main issues in that.
8    Q.   Just mainly --
9    A.   Tort.
10   Q.   -- disagreements, torts and contracts
11 and damage in terms of improper work and that
12 sort of thing?
13   A.   Yes.
14   Q.   Okay.  And is your wife a member of the
15 Tribe?
16   A.   No.
17   Q.   Are your children?  You have one child?
18   A.   I have one child with my current wife.
19 I have two total.
20   Q.   Are any of them members of the Tribe?
21   A.   One is, but she is a Seminole.
22   Q.   Does that mean that she is not a member
23 of the Miccosukee Tribe?
24   A.   No.  She is not a Miccosukee.
25   Q.   She is a member of the Seminole Tribe?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 22

1    A.   Yes.  Right.
2    Q.   Does that mean that she is not eligible
3  for benefits -- welfare benefits under the
4  Miccosukee rules?
5    A.   No.
6    Q.   No, she is not?
7    A.   No, she is not eligible for benefits
8  under Miccosukee.
9    Q.   What are the requirements for being
10 entitled to welfare benefits under the Miccosukee
11 Tribe?
12   A.   The requirements?
13   Q.   Yes.
14   A.   What do you mean requirements?
15   Q.   Well, are there blood requirements?
16 Any requirements, whatever you view as a
17 requirement.
18   A.   The only requirement would be to be a
19 member of the Miccosukee Tribe in order to get
20 benefits from the Tribe, from Miccosukee.
21   Q.   Does that mean that you are enrolled as
22 a tribal member?
23   A.   Yes.  You have to be at least
24 50 percent Miccosukee to be an enrolled member,
25 and you fill out an application, and the Tribe

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 23

1  will accept your application during its General
2  Council meeting.  Once you have been accepted,
3  you are entitled to the benefits that the Tribe
4  offers to its members.
5    Q.   Is that person then considered to be an
6  enrolled member?
7    A.   Yes.
8    Q.   So we can use that term for somebody
9  who is a member of the Tribe, an enrolled member?
10   A.   Yes.
11   Q.   Do you have to be a certain age before
12 you can become an enrolled member?
13   A.   You have to be at least of four moons.
14   Q.   So would that correspond to a calendar
15 year?
16   A.   No.
17   Q.   Okay.  What is four moons?
18   A.   Again, that is what I was telling you,
19 some of our --
20   Q.   No.  I understand.  I'm just trying to
21 get the facts so that I can understand how it
22 works.
23   A.   Those are lineal -- lunar cycles that
24 we go by.
25   Q.   Is that based on a full moon?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 24

1    A.   Yes.  That's what it is.
2    Q.   So four full moons?
3    A.   Yes.
4    Q.   So if you went through a four full moon
5  cycle?
6    A.   It would have to be at the full moon
7  cycle, four.
8    Q.   So after you experienced four full
9  moons?
10   A.   No.  That's not what I'm saying.
11   Q.   Okay.
12   A.   If you are in a fourth moon, you will
13 be eligible.
14   Q.   I see.
15   A.   Every cycle takes about 30 days.
16   Q.   Okay.
17   A.   So you can be in the first day of that
18 fourth cycle --
19   Q.   Okay.
20   A.   -- to be eligible.
21   Q.   So you could be an infant and be
22 enrolled?
23   A.   Mm-hmm.
24   Q.   Is that generally what occurs or not?
25   A.   Mm-hmm.  Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 25

1    Q.  So most people enroll their children
2  when they're very small?
3    A.  Yes.
4    Q.  Now, who votes in the new members?  How
5  do they become --
6    A.  The General Council.
7    Q.  The General Council.  Just a majority
8  vote or how does that work?
9    A.  Yes.  The majority vote of the General
10  Council.
11    Q.  Who submits the application?  Does the
12  parent or another tribal member or how does it
13  work?
14    A.  If it is for an infant, it is usually
15  submitted by the parents.
16    Q.  I understand the Tribe is a matriarchal
17  society?
18    A.  Yes, it is.
19    Q.  So is it the mother who submits the
20  application?
21    A.  Both parents usually will submit the
22  application.
23    Q.  Is it a written application or is it
24  a --
25    A.  Yes.  It is a form that the mother and

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 26

1  father will complete.
2    Q.  Okay.  Is it extensive?  Is it more
3  than a page or not?
4    A.  Yes.  I believe it is more than a page.
5    Q.  Okay.
6    A.  I think it is front and back.
7    Q.  What kinds of things does it go into?
8    A.  They ask who the mother is, who the
9  father is, the degree of blood, whether they're
10  members of Miccosukee or any other Tribe,
11  birthday, the Clan affiliation of both the father
12  and mother.  You also identify the Clan
13  affiliation for the applicant.  And then it has
14  to be signed by both the mother and the father.
15    Q.  Is there any distinction drawn within
16  the Tribe based on different Clans or does it
17  matter?
18    A.  No.  As long as the child has a Clan
19  and is of at least four moons old, usually the
20  Council -- the General Council will take it into
21  consideration.
22    Q.  Okay.  And then the whole Tribe -- the
23  General Council is the whole Tribe, correct?
24    A.  The General Council is those that are
25  18 and over.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 27

1    Q.  Okay.  And so anybody, then, who is 18
2  and over who is an enrolled member of the Tribe
3  can vote whether or not to admit this individual?
4    A.  Yes.
5    Q.  Based on the written application
6  submitted by the parents?
7    A.  Yes.
8    Q.  And what all is taken into account in
9  this vote?  How does it work procedurally?  What
10  is taken into account other than the -- is the
11  application read, the written application read?
12    A.  Yes.
13    Q.  And then people talk about it or how
14  does it work?
15    A.  Yes.  The application is read.  The
16  parents are identified.  The child is identified.
17  The child's Clanship is identified.  The child's
18  birthday.  The child's age.  And then it is
19  opened up for discussion but usually there no
20  discussion.  They just go into a vote.
21    Q.  Okay.  And does the child, since it's
22  matriarchal, take the Clan of the mother?
23    A.  Yes.
24    Q.  Is it almost always immediately
25  approved if the blood quantum is sufficient?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 28

1    A.  Yes.
2    Q.  Is the blood quantum 50 percent?
3    A.  Yes.
4    Q.  Now, is that 50 percent allowed if the
5  child has blood from another Indian Tribe or does
6  it have to be Miccosukee?
7    A.  No.  The blood quantum has to be at
8  least 50 percent Miccosukee.
9    Q.  So Seminole wouldn't be sufficient?  If
10  he was only 25 percent Miccosukee but 75 percent
11  Seminole, that wouldn't be sufficient?
12    A.  No.
13    Q.  All right, sir.  I would like to move
14  on, then, to understand, if you could, explain to
15  me the interrelation between the Business Council
16  and the General Council and their areas of
17  authority?
18    A.  The General Council will meet every
19  quarter.  They're my boss.  They're -- we are
20  responsible, we meaning the Miccosukee Business
21  Council, is responsible for reporting to the
22  General Council the responsibilities of managing
23  the Tribe during the three months that the
24  General Council is not in session.
25    So at the General Council meeting I

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 29

```
 1    will present a report, and the General Council
 2    will also make decisions that we bring forth to
 3    the General Council.  And when the General
 4    Council hears these matters, they'll ask
 5    questions, we'll discuss it, and whenever they
 6    decide the outcome, that will be the orders that
 7    the Business Council with carry forth.
 8        Q.   When you say that you are the Chairman
 9    of the Miccosukee Tribe of Indians, does that
10    mean that you're Chairman of the General Council?
11        A.   I am the Chairman for the Miccosukee
12    Business Council.
13        Q.   Okay.  Is there a Chairman of the
14    General Council?
15        A.   I also serve to chair the meetings of
16    the General Council.
17        Q.   But when you say chair them, is that
18    more a position where you are the emcee of the
19    operation or does that mean that you have some
20    higher authority than every other member of the
21    Tribe --
22        A.   No.
23        Q.   -- as to the General Council?
24        A.   No.  As to the General Council, they're
25    my boss.  I am there to chair the meeting and
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 30

```
 1    conduct the meeting on behalf of the General
 2    Council, but the General Council is my boss.
 3        Q.   Okay.  And votes of the General
 4    Council, does your vote count any more than any
 5    other member of the Tribe?
 6        A.   I vote only when there is a tie.
 7        Q.   Then moving to the Business Council,
 8    what is the Business Council and how does it
 9    operate?
10        A.   The Business Council is responsible for
11    the day-to-day operation of the Tribe.  In my
12    capacity I'm there to chair the Business Council
13    meetings, and there, again, I can only vote when
14    there is a tie.
15        Q.   And tell me what the Business Council
16    is composed of?
17        A.   The Business Council is composed of
18    five council members.  First council is my
19    position, Tribal Chairman.  The second one will
20    be the Assistant Chairman.  The third position
21    will be the Tribal Secretary.  The fourth
22    position will be the Tribal Treasurer.  And the
23    fifth position will be the Tribal Lawmaker.
24        Q.   Okay.
25        A.   That's the Business Council.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 31

```
 1        Q.   Okay.  So there are six members then?
 2        A.   No, five.
 3        Q.   Five plus you or a total of five?
 4        A.   A total of five.
 5        Q.   Okay.  I see.  So you vote to break
 6    ties?
 7        A.   Yes.
 8        Q.   But, otherwise, you don't vote?
 9        A.   Right.
10        Q.   Okay.  Has the General Council, that
11    is, the Tribe, delegated authority to the
12    Business Council in some regard?  Has it given
13    you the right to act on behalf of the Tribe
14    without consulting it on various matters?
15        A.   Only those areas that are identified in
16    the bylaws that are in our constitution is what
17    the Business Council is allowed to act on.  As
18    far as delegation of authority, they would have
19    to be specific; and usually if that's going to
20    happen, they do it in a form of a resolution.
21        Q.   Okay.  Correct me if I'm wrong, but let
22    me understand, when you say there would have to
23    be a specific delegation, that means they would
24    specifically vote, that is, the General Council,
25    the Tribe would specifically vote to give you
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 32

```
 1    authority to do a particular act?
 2        A.   To carry out a particular
 3    responsibility is what I'm referring to.
 4        Q.   It wouldn't have to be on a business
 5    act by business act basis?  They could give you
 6    through a resolution the right to carry out some
 7    particular kind of function to, say, oversee
 8    housing, is that correct, or am I
 9    misinterpreting?
10        A.   Mm-hmm.  Yes.  Or to issue a house to
11    an individual.  That would be an example.
12        Q.   Okay.  Maybe that's probably a good
13    example.  Explain to me what that means when you
14    say issue a house.
15        A.   Let's say a particular person is in
16    dire need of a house, if a person is in need of a
17    house, they'll vote and through that vote will be
18    my directive to make sure that that person gets
19    the house immediately.
20             (Thereupon, Theresa Willie entered the
21        deposition.)
22        Q.   Following through on that example, if a
23    member of the Tribe needs a house, then they
24    apply to the General Council for a house?
25        A.   No.  We have a Housing Department that
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 33

1  maintains a list of those people that are in need
2  of a house.
3      Q.  Okay.  So then the tribal member goes
4  to that office?
5      A.  Mm-hmm.
6      Q.  Of housing assistance?
7      A.  Mm-hmm.
8      Q.  And explains that they need a house and
9  makes application?
10     A.  Mm-hmm.
11     Q.  And --
12     A.  Yes.  I'm sorry.
13     Q.  Do they fill out an application form or
14 how does that work?
15     A.  Yes.  They'll fill out -- first they
16 will talk to the Housing Committee and they'll
17 fill out an application and then be placed on the
18 waiting list.
19     Q.  Who is on the Housing Committee?
20     A.  There are, I believe, five committee
21 members, but I'm not exactly sure of exactly who
22 is on the committee.
23     Q.  Is that an elected committee?
24     A.  No.  It's appointed.
25     Q.  And who appoints it?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 34

1      A.  The committee itself will make the
2  recommendation and forward it to the Business
3  Council.  We'll look at it, and then take it to
4  the General Council for affirmation of the
5  appointment.
6      Q.  I take it the Business Council votes on
7  it and then takes it to the General Council, to
8  the whole Tribe?
9      A.  Mm-hmm.
10     Q.  And then they vote on it too?
11     A.  Mm-hmm.
12     Q.  Okay.
13     A.  Yes.
14     Q.  And then as a result of that vote, then
15 they designate you or the Chairman of the Tribe
16 as the one who oversees, then, the actual
17 acquisition or construction of this house,
18 correct?
19     A.  It is the Business Council that is
20 designated as overseeing the Housing Department
21 and the committee.
22     Q.  Okay.
23     A.  It is the Housing Department that will
24 oversee the construction of the actual house
25 itself.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 35

1      Q.  Okay.  So I'm sorry.  I'm getting
2  confused.
3          What is the Business Council's job
4  then?  Just to carry the application and
5  recommendation from the Housing Council to the
6  Tribe?
7      A.  I would say ours is more of
8  administrative.  We just make sure that the
9  person being recommended to serve as a Housing
10 Committee member is somebody that is of the
11 proper person that can carry out the
12 responsibilities of being a Housing Committee
13 member.
14     Q.  Okay.
15     A.  And you review and get a consensus
16 among the Business Council.  Then we'll inform
17 the General Council.  If the General Council
18 feels that person is not adequate for that
19 position or the person for one reason or another
20 cannot serve, then they'll let us know.
21     Q.  Okay.
22     A.  If they feel that the person that is
23 being appointed is okay, they'll just affirm the
24 decision of the Business Council.
25     Q.  Okay.  I think I understand now.  So

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 36

1  the Business Council doesn't actually have any
2  obligation as to each individual application for
3  housing?  For each tribal member who comes in and
4  fills out the application and asks the Tribe to
5  provide him or her family for housing, the
6  Business Council doesn't have to be involved in
7  each individual request, correct, or am I wrong?
8      A.  You mean the actual making of the
9  request?
10     Q.  Well, the making of the request and the
11 way it flows through so that the request is acted
12 on and a house is provided or not provided?
13     A.  Well, the applications are received by
14 the Housing Committee.  The Housing Committee is
15 the one that takes a look at the application.
16 Once the house -- once they have funds to build a
17 house, they'll inform the Business Council of
18 their decision of how many houses they're going
19 to build and who is going to get those houses.
20 Then the Business Council will act on it and
21 either affirm the Housing Committee's
22 recommendation or they'll deny the recommendation
23 or they'll make adjustments to the
24 recommendation.
25     Q.  Okay.  And that's for each individual

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 37

1    tribal member who wants a house?
2       A.   That would be the -- for each request
3    that the Housing Committee submits to the
4    Business Council.
5       Q.   And then after that, that
6    recommendation by the Business Council one way or
7    the other goes to the General Council, correct?
8       A.   That is reported back to the General
9    Council.
10      Q.   Okay.  Can the General Council -- say
11   the Business Council recommends rejecting the
12   application, can --
13      A.   Yes, they can.
14      Q.   -- the General Council override that?
15      A.   Yes.
16      Q.   Okay.  I understand.
17          So I would like to get into a little
18   history and background since we are here today
19   talking about welfare and its relation to the
20   gaming operations of the Tribe.  I wonder
21   since -- you said you returned to the Tribe in
22   1994.  Were you at all knowledgeable of the facts
23   surrounding the Tribe's earlier entry into the
24   gaming business?
25      A.   Well, in `85 my father served as the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 38

1    Chairman.  When he served as Chairman, I was
2    involved when we were working on the legislation
3    that is known as the Indian Gaming Act.  In fact,
4    if you look at the original legislation, you are
5    going to see language in there that directs the
6    Department of Interior to place 25 acres of land
7    in the trust for the Miccosukee's for the purpose
8    of establishing gaming.  So I would say I was
9    very much aware that we were going into gaming.
10      Q.   Okay.  Just for purposes of the record
11   then, so we can keep this shorter, you're
12   referring to the Indian Gaming Regulatory Act?
13      A.   Yes.  The original.
14      Q.   Which was in 1988?
15      A.   That was -- that issue was worked on in
16   the year `85, and I believe it came into law in
17   like `88 or `89.
18      Q.   Okay.  And your father was involved in
19   that?
20      A.   Yes.
21      Q.   Very interesting.  So what were you
22   telling me about the 25 acres?  What was that?
23      A.   You will see in the original
24   legislation, the original IGRA Act, there is a
25   language in there that directs the Department of

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 39

1    Interior to place 25 acres of land in the trust
2    for the Miccosukee Tribe for the purposes of
3    gaming.
4       Q.   Okay.
5           MR. WELSH:  For your purpose it is
6    IGRA.
7       Q.   Is that okay if we just call it IGRA?
8       A.   Yes.
9       Q.   Maybe you can then enlighten me
10   concerning the history of the Miccosukee Tribe's
11   authority in relation to IGRA?  How does that
12   work?
13      A.   Say that again.
14      Q.   Well, you said you were involved --
15   your father actually was involved in the original
16   enactment of IGRA, setting aside the land and
17   that sort of thing.
18          What was the Tribe's, that is, the
19   Miccosukee Tribe's situation and what authority
20   did it rely upon under IGRA that established its
21   gaming?
22      A.   The Tribe before the establishment of
23   our gaming facility relied on federal funds to
24   sustain itself.  It relied on federal money to
25   provide employment to its people.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 40

1           It was decided that we would go into
2    gaming by the General Council, but we did not
3    have the appropriate land available.  Our current
4    Reservation was located on the north border of
5    the Everglades National Park.  For some reason if
6    you take a look at all the Reservations across
7    the country, you are going to find that it backs
8    up against a national park.  We were no
9    exception.
10          And the park was not supportive of us
11   putting a gaming facility on the north side of
12   the park.  So we started looking around, and the
13   closest property to the Miccosukee that was
14   available was a 25-acre tract, which was at the
15   northwest quadrant of Tamiami Trail and Krome
16   Avenue.
17          The problem was that there was movement
18   politically that there were no more lands being
19   placed in the trust for the purposes of gaming.
20   So we had language inserted into IGRA directing
21   that the Department of Interior place that land
22   in trust for us.
23          Initially we had approached the
24   Department of Interior to place that land in a
25   trust for us but the Tribe was denied the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 41

```
 1    request.  So we decided to take the legislative
 2    approach which was to insert that language into
 3    that legislation.
 4         Now, when we went around talking to
 5    other elected officials, we found support in one
 6    of the elected officials, and so our senator, a
 7    Republican senator at the time was very
 8    supportive.  The other senator from the State of
 9    Florida was a Democrat, he was supportive and he
10    said he wouldn't oppose it.  Together they worked
11    on it and had that language then inserted.
12       Q.   That is very interesting.  So that
13    piece of land at Tamiami Trail and Krome was
14    federal land?
15       A.   Yes.
16       Q.   Is that part of the Everglades Park?
17       A.   No.
18       Q.   It was federal land?
19       A.   No.  Originally it was private land.
20       Q.   Oh, so it was just acquired?
21       A.   Mm-hmm.
22       Q.   Oh.
23       A.   We purchased it and after we purchased
24    it, because of that language, the Department of
25    Interior was directed to take it in the trust for
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 42

```
 1    the purpose of gaming.
 2       Q.   And now it is actually part of the
 3    Reservation?
 4       A.   Mm-hmm.
 5       Q.   That was in 19 --
 6       A.   In `89.
 7       Q.   In `89?
 8       A.   Mm-hmm.
 9       Q.   Okay.
10       A.   By then I had already gone back to
11    school.
12       Q.   Okay.  So would it be fair to say that
13    the creation of the Miccosukee Gaming, Miccosukee
14    Bingo, et cetera, was really intricately tied to
15    IGRA and is part of IGRA; is that correct?  You
16    said you were part of the original act, and, in
17    fact, your trust land was set aside as part of
18    the original IGRA?
19       A.   Mm-hmm.
20       Q.   So your gaming operation is not only
21    under but intricately tied to the original IGRA?
22       A.   Mm-hmm.  Yes.  I'm sorry.
23       Q.   Who advised you in that regard?  You
24    said that there were some senators and
25    representatives.  Was there a law firm or who was
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 43

```
 1    involved in that at the time?
 2       A.   I believe that would have been -- I
 3    don't think he's around anymore.  I think his
 4    name was Arthur Lazerus.  I don't think he is
 5    around anymore.  And also the firm of Hobbs,
 6    Straus, Dean & Walker, I think in Washington,
 7    D.C., they also had some involvement as well.
 8       Q.   Okay.  Now, since we are discussing
 9    IGRA, I wonder if you can help me out to
10    understand just a few of the terms in IGRA.
11         In your understanding, what does gross
12    gaming revenue mean?
13            MR. ROMAN:  I'm going to object to the
14    question because he is an expert on the
15    subject of history, not a legal expert on
16    the law or what the terms mean.
17            MR. WELSH:  No.  I'm not asking him for
18    a legal opinion.  I'm just asking him
19    because he talked here about the
20    governmental purpose of tribal assistance,
21    where it comes from, how it relates to the
22    Business Council's position.
23         I just want to understand what -- so
24    when we start talking about some of the
25    benefits and where the money comes from for
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 44

```
 1    the benefits, I want to understand what some
 2    of the terms mean.
 3            MR. ROMAN:  You mean --
 4            MR. WELSH:  Whatever, he is here only
 5    as an expert for the Tribe in regard to
 6    welfare and culture.
 7            MR. ROMAN:  Yes.
 8            MR. WELSH:  So in terms of economically
 9    what it means to him.
10            MR. FARRIOR:  Did you want to take a
11    break?
12            MR. ROMAN:  No.  But I want to make
13    sure, he is not here as an expert on IGRA or
14    on gaming.
15            MR. WELSH:  No.  I'm not saying that --
16    I'm not saying he is an expert on IGRA or
17    gaming, but he is the Chairman and I found
18    it fascinating.  I didn't know exactly how
19    that piece of land became part of the Tribe
20    and everything.  It is really quite
21    interesting.
22            MR. ROMAN:  You can answer.
23       A.   Rephrase that question.
24       Q.   {By Mr. Welsh}  Under IGRA, as you
25    said, the Tribe was so involved, much more than I
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 45

1   knew.  That is pretty interesting.
2       What do you mean by or do you
3   understand the meaning of gross gaming revenue to
4   be?
5       A.   Gross gaming revenue is after your
6   revenue, minus your expenses.
7       Q.   That's gross or net?
8       A.   You're talking about --
9       Q.   No.  First I was just asking you gross
10  gaming revenue?
11      A.   Gross gaming revenue would be the
12  revenues that are coming in before you declare
13  your expenses.
14      Q.   What is net gaming revenue?
15      A.   Net gaming revenue?
16      Q.   Now we are talking about under IGRA?
17      A.   Right.  That would be the revenue minus
18  your expenses, things like your operations.
19      Q.   Okay.  I mean, when you say operations,
20  what goes into operating expenses?
21      A.   Things like employee's pay, promotions,
22  cost of maintaining the building, supplies.
23      Q.   Are there any tribal costs involved in
24  that or distributions under IGRA?
25      A.   Under IGRA?  Back when we worked on it

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 46

1   there wasn't at the time when this was
2   established, no.
3       Q.   Are there any tribal costs associated
4   with net gaming revenue under IGRA now?
5       A.   I'm sure there is because I understand
6   that there has been some changes.
7       Q.   Of distributions, monetary
8   distributions to tribal members, expenses in
9   reaching net gaming revenue under IGRA?
10      A.   Say that again.
11      Q.   Are distributions by the Tribe of
12  funds, of money or loans, cash type or check or
13  any monetary distribution from the Tribe to
14  tribal members, are those expenses under IGRA in
15  reaching net gaming and net income?
16      A.   I'm going to go back to the beginning.
17  The purpose of establishing our gaming facility,
18  there was another -- what do you call it?  A fact
19  to the equation.  At the time our elected
20  officials realized that the federal government
21  was not meeting its obligations to Tribes,
22  including Miccosukee.
23      The federal government has a
24  responsibility and a promise to Tribes across the
25  country that they would provide basic services

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 47

1   such as health, education, housing and other
2   governmental services.  But up until the `80's
3   funding for these areas had always been reducing.
4   We were getting less and less monies, but yet our
5   needs were continuing to grow.
6       So it was discussed and decided that
7   the additional revenues that would be generated
8   would be to help alleviate the burden that the
9   Tribe is carrying because of the lack of funding.
10  In there it was understood that the Tribe would
11  use the funds to see fit how it can help and
12  benefit its own tribal members.  There were, I
13  believe, certain areas that were identified
14  originally where some of those funds would go to.
15  I think health was one of the areas that was
16  identified in the original legislation.  But in
17  the act it was never -- there was never any kind
18  of language that would limit the kind of services
19  that the Tribe would be able to provide to its
20  own people.
21      And so when these funds became
22  available, the Miccosukee Tribe was able to
23  provide services and needed services that it was
24  never able to provide before.  In essence, it
25  helped expand our ability to provide for the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 48

1   needs of our tribal members in ways that we were
2   never able to provide to them before.
3       Q.   So you were able under IGRA to provide
4   welfare benefits to your tribal members?
5       A.   I don't know if I would say under IGRA.
6   I would say it allowed us to provide for -- or
7   enabled the Tribe to provide those additional
8   services that the Tribe had needed to provide to
9   its people.
10      Q.   No.  I was agreeing with you.
11      Under IGRA you could do that?
12      A.   Mm-hmm.
13      Q.   And in compliance with the requirements
14  of IGRA?  In compliance with the statute which
15  was set up in part to provide welfare benefits or
16  help provide through gaming revenue welfare
17  benefits to Tribes, you complied with IGRA so
18  that you could do that, correct?
19      A.   I wouldn't put it necessarily that way.
20  It allowed us to have or generate the needed
21  funds, and after that the Tribe was able to
22  decide what to do with those funds.
23      Q.   I understand.  I'm just saying that to
24  do that, to have this gaming revenue which you
25  could use for welfare purposes, the Tribe

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 49

1  complied with IGRA to do that?  That is, they
2  followed the rules set forth by IGRA so that they
3  could have net gaming revenue to provide for the
4  welfare benefits to the members of the Tribe?
5      A.  IGRA basically preserved what the Tribe
6  was already entitled to, because, as you
7  remember, there was a decision that was made not
8  long after IGRA was passed, I believe that was
9  the Cabazon case, where it was decided that
10  Tribes can operate gaming facilities on their
11  Reservation.  That's what IGRA preserved, the --
12  that was the intent, the original intent of IGRA,
13  to preserve our gaming for Indian Tribes across
14  the nation.
15      Q.  Precisely.  I'm just trying to
16  understand.
17          The Tribe has complied with IGRA for
18  that purpose, correct?
19      A.  For?
20      Q.  For the purposes of obtaining -- so
21  they could have gaming and net gaming revenue so
22  it could help out its members, correct?
23      A.  IGRA has preserved our ability to
24  operate a gaming facility on our Reservation.
25      Q.  Exactly.  And so the Tribe has followed

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 50

1  IGRA, has complied with IGRA, correct?
2          MR. DAVIS:  Asked and answered.
3          MR. WELSH:  No.  He has never answered
4  one way or the other.
5          MR. DAVIS:  He has answered.
6          MR. ROMAN:  Let's not argue over each
7  other.  Let him make the objection and then
8  you can respond.
9          MR. WELSH:  Okay.  Make the objection
10  and then answer.
11      Q.  {By Mr. Welsh}  The Tribe has complied
12  with IGRA, correct?
13      A.  Mm-hmm.
14      Q.  Yes or no?
15      A.  Yes.
16      Q.  Okay.  Now, in that regard -- so let's
17  move on to the benefits which the Tribe does
18  provide to its members.  I think we have already
19  gone through housing as one of the benefits.
20          What other benefits does the Tribe
21  provide to its members?  If you could, just
22  detail them for me.
23      A.  We provide tuition for our students to
24  go to college.  We also provide additional
25  funding for our police department.  We also

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 51

1  provide additional funding for our health
2  department.  We also provide monies for our
3  community services.  We also have provided
4  funding for our tribal court system.  I did
5  mention police, right?
6      Q.  Yes, sir.
7      A.  We have also provided monies for our
8  community water and fire department.  We have
9  also built and replaced some of our aging
10  governmental buildings.  We have also improved
11  the Reservation, and currently we are also
12  providing funding to provide a new waterline for
13  the community.
14      Q.  Okay.  Then in terms of individual
15  benefits, you mentioned education and you provide
16  education beyond --
17      A.  Secondary education.
18      Q.  -- secondary education?  Okay.
19          So how does that work?  Is there an
20  application process?  Who qualifies?  What are
21  the requirements, that sort of thing?
22      A.  Anybody that is interested in going to
23  school will let us know and then we'll provide
24  the assistance.
25      Q.  Okay.  Do they fill out a written

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 52

1  application?
2      A.  No.
3      Q.  And who do they contact in that regard?
4      A.  They'll usually contact either my
5  office, which is the Administration Department,
6  or we have a Voc Ed Department that is part of
7  the Adult Education Department.  They'll
8  sometimes talk to the program director and he
9  will let us know as well.
10      Q.  Okay.  And then can this individual
11  tribal member who wants to go to college go
12  anywhere?
13      A.  Mm-hmm.
14      Q.  And the Tribe pays for it?
15      A.  Yes.
16      Q.  And the Tribe pays all the costs,
17  transportation, housing, books, fees, tuition?
18      A.  We make sure -- as long as the cost is
19  related to their education and as long as that is
20  understood, yes, we'll pay for it.
21      Q.  And is that program set out anywhere in
22  particular or is it just understood among the
23  tribal members?
24      A.  No.  It is understood.
25      Q.  How long has that existed?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 53

1    A.   It has always been there.  It is just
2    in the past years we never had as much money
3    available as we do now.
4        Q.   How many students have taken advantage
5    of that, if you know?
6        A.   Today?
7        Q.   Yes.
8        A.   Today I am not really sure, but that is
9    where my tuition was paid from when I went to
10   school.
11       Q.   So how many a year on average?
12       A.   On average about 25.
13       Q.   And are the records kept in terms of
14   how much is paid for that or just checks to the
15   schools or how does it work?
16       A.   Yes.  As long as a check is issued,
17   there should be a record of it.
18       Q.   Okay.  And what about the incidental
19   costs, living expenses for the students?
20       A.   Yes.  That has to be documented too.
21   The student will have to submit that.  They
22   submit that information to us in order for us to
23   pay for that.
24       Q.   So then you just reimburse the student
25   for the outlay?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 54

1    A.   No.  We pay the school directly.
2        Q.   What about for food for the student at
3    school?
4        A.   Yes.  They are given some assistance,
5    but not all of them will get assistance because
6    basically they request for just tuition and books
7    and materials.
8        Q.   So a student funds his or her other
9    living expenses, that is, food, incidentals,
10   clothing?
11       A.   Yes.  When I went to school they
12   provided my room and board, but a lot -- most
13   of the students that are going to school today
14   are going locally, so I believe that's part of
15   the reason why they don't ask for room and board.
16   I was the only stupid one that went off the
17   Reservation.
18       Q.   Well, you got to go off the Reservation
19   and get away for a few years.
20            That's education.  Housing I think we
21   have gone through, how you make application and
22   how it is approved.
23       A.   Mm-hmm.
24       Q.   In terms of the cost of the upkeep of
25   the housing, what does the Tribe provide in terms

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 55

1    of utilities, maintenance, that sort of thing?
2        A.   For the most part the homeowners will
3    take care of it.  The Housing Committee will do a
4    home inspection for the elderly that are unable
5    to take care of themselves for one reason or
6    another.  The Tribe will address those areas that
7    need addressing like repairs or any breakages
8    that they incur.  Also, even if a person isn't
9    elderly, if the individual homeowner is 60, then
10   the Tribe will again provide assistance to those
11   individuals as well.
12       Q.   Okay.  What costs does the homeowner
13   have to bare him or herself in terms of
14   utilities, upkeep expense, that sort of thing?
15       A.   They will have to pay for that on their
16   own.  If they do have problems, from time to time
17   they'll request for assistance; and once that
18   assistance request is made, it will be
19   considered.  And if it is decided that a request
20   -- I mean, assistance is necessary, then the
21   Tribe will provide that requested assistance.
22       Q.   Let's go through the basic expenses.
23   So who pays for the electricity for the house?
24       A.   The homeowner.
25       Q.   But the Tribe will pay for that if the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 56

1    homeowner is needy?
2        A.   Mm-hmm.
3        Q.   And how does that come about?  How does
4    that homeowner express that to the Tribe?
5        A.   I wouldn't say needy, but I would --
6    from time to time we have had requests from the
7    homeowners for additional assistance, and the
8    Tribe has helped those homeowners in those
9    particular situations.
10       Q.   To pay their utility bills?
11       A.   Sometimes to pay for their utility
12   bills, that has been done.
13       Q.   Is there a program in that regard?  How
14   do they apply?
15       A.   No.  There is no written program.  It
16   is just that if they need any assistance, they
17   will let the Council know and then the Council
18   will take it up either at the Business Council
19   level or the General Council level.
20       Q.   So the Business Council can act on that
21   by itself without going to the General Council?
22       A.   Yes, they can, but usually they will
23   let the General Council know of that decision,
24   and the General Council will vote and has always
25   affirmed those decisions.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 57

1    Q.   So you'll submit a vote to the General
2    Council?
3    A.   If it is related to something that was
4    done during the interim period between the
5    meetings.
6    Q.   So then the General Council affirms the
7    action?
8    A.   Mm-hmm.
9    Q.   And then ratifies the action?
10   A.   Yes.
11   Q.   Then what beyond electricity does the
12   homeowner pay for?  Water?
13   A.   No.
14   Q.   That is provided by the Tribe?
15   A.   Yes.
16   Q.   You have your own water system?
17   A.   Right.
18   Q.   I wouldn't think there would be any
19   other significant costs then to homeownership,
20   correct, beyond that?  Those are the only
21   utilities available, right?
22   A.   Mm-hmm.  Basically the Tribe provides
23   the water and the house.  The homeowner just
24   basically maintains it.
25   Q.   And what about like yourself, a tribal

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 58

1    member who lives off the Reservation, how does
2    the Tribe or does the Tribe, first of all,
3    provide any sort of housing assistance to those
4    members?
5    A.   No, but that's where the assistance
6    comes in handy for me.  Without the assistance
7    that I get from the Tribe, that would make it
8    more difficult for me, but the assistance that
9    the Tribe makes to me, I am very appreciative of.
10   Q.   I see.  What percentage of the Tribe or
11   number or percentage lives off the Reservation
12   versus living on the Reservation?
13   A.   I'm not sure of the percentage, but if
14   we tried to give everybody a house, the
15   Reservation isn't big enough to give everybody a
16   house.  So there would still be people having to
17   live off the Reservation.
18        So when you look at it in that sense,
19   you will still have to provide assistance to
20   those people that live off of the Reservation, as
21   well as those living on the Reservation as well.
22   Q.   Does the Tribe make any allocation --
23   additional allocation to assist with housing to
24   those members who live off the Reservation?
25   A.   No.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 59

1    Q.   So I think that leads then into what
2    you are talking about, the assistance that you
3    are talking about, the quarterly distribution?
4    A.   Yes.  The quarterly assistance that we
5    get.
6    Q.   Okay.  I don't know what term we want
7    to use for that.  Do you want to use quarterly
8    assistance?
9    A.   We call it assistance.
10   Q.   But assistance can cover a lot more
11   than that.  You said it covers housing and other
12   things.  There are a lot of kinds of assistance
13   that the Tribe provides, correct?
14   A.   Mm-hmm.
15   Q.   Then these quarterly distributions; is
16   that true?  Is that a correct term for them?
17   A.   We always call that assistance.  I
18   wouldn't call it a distribution.
19   Q.   Well, it's assistance.  Okay.  Then
20   let's define it then.  What is the assistance?
21   What is the form of it?
22   A.   Can you rephrase that again?
23   Q.   You were calling it quarterly -- you
24   were calling it assistance?
25   A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 60

1    Q.   Monetary assistance, correct?
2    A.   Yes.
3    Q.   And it's in the form of money, dollars,
4    correct?
5    A.   Yes.
6    Q.   And it's paid quarterly?
7    A.   Mm-hmm.
8    Q.   And can you describe to me how the
9    quarterly assistance is actually provided to each
10   tribal member?
11   A.   Each tribal member is issued a check
12   for the distribution, and for the most part the
13   members, let's say, the -- will take the check
14   and provide -- myself, I put -- I always break it
15   down to make sure that my living expenses will be
16   covered by the assistance that is provided to me.
17   That's why I was saying it is very handy.  I'm
18   very appreciative for what I get because without
19   it it would make the hardship more difficult to
20   deal with.
21        If you are living on the outside,
22   everything is basically about money.  You have to
23   pay for everything.  You have to pay for not just
24   your utility bill, but also for your water.  And
25   if your kitchen runs on propane, you have to pay

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 61

1  propane. And then also you have to pay property
2  tax if you are living on the outside. So to me I
3  think there is a lot more expenses and it costs
4  more to live on the outside than it does to live
5  on the Reservation.
6      Q.  I would think so.
7          Can you give me the history of the
8  quarterly distribution of these payments?
9      A.  What do you mean history?
10     Q.  When did it start or how did it start?
11     A.  Okay. We'll start from the beginning.
12  As I said, I probably started out there on the
13  Reservation back in the early `60's and the Tribe
14  was -- started recognition, I believe, was
15  officially issued in `61.
16         I remember when I was little we would
17  get distributions. It wasn't very much.
18  Sometimes it will be like $20, $25.
19     Q.  A year?
20     A.  Sometimes it will be twice a year,
21  three times a year, and I think one time we only
22  had once a year. But the amount fluctuated.
23  Sometimes it was $20. Sometimes it was $25. I
24  remember the anticipation was much more greater
25  when we were issued $100.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 62

1      Q.  You mean for the year?
2      A.  No.
3      Q.  For the quarter?
4      A.  For the distribution, whatever it was.
5  The anticipation is still the same but the only
6  the difference is the dollar amount.
7          But when we get those monies, I
8  remember the first thing we would have to do is
9  we would have to buy clothes, we would have to
10  buy shoes; and then if there was anything left,
11  we were told to get a toy at the store.
12         So that's why I remember that time when
13  we got $100. We were like, oh, you got this
14  excitement that you could -- you knew you could
15  get some clothes and you could get at least one
16  toy out of it. Like I said, today the
17  anticipation is still the same but the dollar
18  amount is a little bit more than what we used to
19  get.
20         And back then there was never any
21  discussions about whether it was considered a
22  distribution or anything else. We always called
23  it assistance. The General Council, we vote on
24  it, and the Tribe will be providing assistance to
25  the -- to its members.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 63

1      Q.  Okay. Let's come forward in time then
2  to after the adoption of IGRA and the creation of
3  the Miccosukee Gaming.
4      A.  Mm-hmm.
5      Q.  How did the assistance, the quarterly
6  monetary payments change and develop after that
7  time?
8      A.  Mm-hmm. Well, like I said before, with
9  the establishment of our gaming facility, we had
10  more revenues becoming available to the Tribe, so
11  the Tribe was able to provide an increase in the
12  services that it provided before and also was
13  able to provide the line of services that it was
14  able to provide before.
15     Q.  Yes, sir. I want to direct your
16  attention, though, to the monetary distribution
17  that you have described that started out as a
18  small amount and at one time was $100.
19     A.  Mm-hmm.
20     Q.  These quarterly distributions which you
21  said come in the form of checks --
22     A.  Mm-hmm.
23     Q.  -- once a quarter, can you describe to
24  me how the amounts each quarter are set and if
25  that process changed over the years since the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 64

1  beginning of the gaming facility, how it changed
2  over time?
3      A.  Mm-hmm. The revenues came from the
4  monies that were gathered by the Tribe from
5  different sources, and today it still comes from
6  different sources, and it comes into an account
7  known as the NTDR, and the distribution is made
8  from that account, from the NTDR account.
9      Q.  What does NTDR stand for?
10     A.  I believe it was Nontaxable
11  Distribution Reserve.
12     Q.  Okay. When was this NTDR account set
13  up?
14     A.  I believe it started back around `95.
15     Q.  And how was it created? That is, how
16  was the process of creating an NTDR account
17  achieved?
18     A.  I couldn't really tell you firsthand
19  because I was not in office at that time, but I
20  do remember as a tribal member that's when we
21  started seeing an increase in our distribution.
22     Q.  What money goes into that NTDR account?
23  Where does the money come from?
24         MR. DAVIS:  At this point we just want
25  to make clear that the witness is appearing

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 65

1    on the history.
2        MR. WELSH:  I know.  I'm just trying to
3    get the parameters here.  I don't want to go
4    into -- I'm not going to ask about every
5    year and dime in terms of the NTDR.  I just
6    want to understand the parameters of what,
7    as I understand it, Mr. Billie is explaining
8    the assistance or welfare comes from.
9        MR. DAVIS:  As long as you focus on the
10   general welfare programs of the Tribe.
11       MR. WELSH:  No.  We will.  He said that
12   this welfare program money comes out of the
13   NTDR.
14   Q.  {By Mr. Welsh}  Correct, Mr. Billie?
15   A.  Yes.
16   Q.  So where does the money come from or
17   where does the money come from that goes into the
18   NTDR account?
19   A.  Into that account I know that we have
20   money we collect from -- from our rental of our
21   radio towers and our land lease that we have for
22   the purposes of cattle grazing, and other areas
23   that we collect monies from.  And then also there
24   is a tax assessment that is made by the Tribe,
25   and there are taxes that are collected that go

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 66

1    into that account.
2    Q.  Is that tax assessment on the gaming
3    revenue?
4    A.  Yes.
5    Q.  And what percentage is that?  Sir, what
6    percentage is the percentage of the tax on the
7    gaming revenue?
8    A.  The tax rate, I believe, is
9    8.7 percent.
10   Q.  Has that changed over time?
11   A.  I don't believe so.
12   Q.  Is it on the gross gaming revenue?
13   A.  I believe so, yes.
14   Q.  And that goes into the NTDR account?
15   A.  Yes.
16   Q.  Does any money from any other source go
17   into the NTDR?
18   A.  Yes.  That's what I was saying.
19   Q.  What are those other sources?
20   A.  Those are the sources that we collect
21   taxes on sales that we make.
22   Q.  And what percentage is that?
23   A.  Again, that would be at the same rate,
24   the 8.7 percent.
25   Q.  You tax the radio tower and the --

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 67

1    A.  Yes.
2    Q.  Do you lease land to concessioners and
3    that sort of thing?
4    A.  Yes.
5    Q.  And you tax them at 8.7?
6    A.  The land lease that I was referring to
7    is leased to the Seminoles for the purpose of
8    grazing.
9    Q.  Do you tax the receipt of money for
10   leasing for grazing at 8.7 percent also?
11   A.  It should be.
12   Q.  Do you know if it is or not?
13   A.  I'm not 100 percent sure.
14   Q.  Okay.  And if you know, what percentage
15   of the money that goes into the NTDR account is
16   actually from a tax on gaming revenue?
17   A.  That portion I'm not sure.
18   Q.  Is it over 95 percent?
19   A.  Again, I'm not sure.
20   Q.  Based on your knowledge being on the
21   Business Council and the Chairman of the Tribe,
22   could you hazard a guess if it is over
23   98 percent?
24       MR. DAVIS:  Asked and answered.
25   A.  No.  Like I said, I'm not sure.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 68

1    Q.  Okay.  All right.  Then out of this
2    money in the NTDR account, you said that the
3    quarterly distributions are made, correct?
4    A.  Out of that account, yes.
5    Q.  Okay.  And how is it decided how much
6    money is to be paid to each individual tribal
7    member each quarter?
8    A.  That is set by the General Council when
9    we have our General Council meeting.
10   Q.  And those are quarterly?
11   A.  Right.
12   Q.  Well, have you attended the General
13   Council meetings?
14   A.  Yes, sir.
15   Q.  Do you attend every General Council
16   meeting?
17   A.  Yes, sir.
18   Q.  Since how long ago have you attended
19   every General Council meeting?
20   A.  Well, since I have been in office I
21   have attended each one of them, but even before
22   that I might have missed a few, but for the most
23   part I have attended most of the General Council
24   meetings.
25   Q.  Since what year?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 69

```
1      A.   Probably about `82.
2      Q.   So since before the Tribe had gaming?
3      A.   Mm-hmm.  Yes, sir.  I'm sorry.
4      Q.   Certainly subsequent to that time,
5  since the Tribe established gaming -- when did
6  you open the --
7      A.   `90.
8      Q.   In `90?
9      A.   Yes.
10     Q.   So since 1990 you have attended
11  basically every one or just a few?
12     A.   I wouldn't say every one, no.
13     Q.   But almost every one?
14     A.   Yes.
15     Q.   So you can tell me the process of how
16  the amount of the quarterly distribution that
17  each tribal member is set at the Council meeting?
18     A.   The amounts that are set, as I said,
19  are set by the General Council.  Whatever is in
20  the account is usually what gets distributed to
21  the members.
22     Q.   So maybe you could illustrate with a
23  number then and tell me how the actual number
24  that is to be distributed to each member is
25  established?
```

Page 70

```
1      A.   The number fluctuates.  Sometimes it's
2  $17 million or sometimes it's $20 million.
3      Q.   In the account at that time?
4      A.   Mm-hmm.
5      Q.   As of each quarter?
6      A.   Yes.
7      Q.   And then how do you come up with the
8  number that each member is to get?
9      A.   You divide that by the number of
10  members.
11     Q.   How many members are there?
12     A.   There are approximately 600 members.
13     Q.   So you just take whatever the balance
14  is in the NTDR account and divide it by 600?
15     A.   Yes.
16     Q.   And then what is the role of the
17  General Council?
18     A.   The General Council is the one that
19  gets informed of the amount, and the General
20  Council is the one that determines what
21  assistance will be provided, and they're the ones
22  that make that decision when it will be provided.
23     Q.   Okay.  I'm sorry.  I'm a little slow on
24  this.  I don't understand.
25         If there is whatever you said,
```

Page 71

```
1  $20 million in the account --
2      A.   Mm-hmm.
3      Q.   -- and there are 600 members --
4      A.   Mm-hmm.
5      Q.   -- so you just divide the $20 million
6  by 600 and then write everybody a check for that
7  amount, correct?
8      A.   Yes.
9      Q.   So then what is the role of the General
10  Council?  Do they vote?  I don't understand.
11     A.   Yes.
12     Q.   They just vote on the actual making of
13  the payment?
14     A.   They'll decide whether there will be a
15  distribution.  They'll decide whether -- I mean,
16  when that distribution will be.
17     Q.   Okay.  So there are a series of votes
18  then; is that correct?
19     A.   Yes.  It's not automatic.
20     Q.   I see.  So then -- well, if you could,
21  so I can understand this aspect of the
22  distribution, do you or someone else gets up in
23  front of the tribal meeting, the General Council
24  meeting, and says we have $20 million in the NTDR
25  account and that comes to whatever, $200,000 per
```

Page 72

```
1  tribal member?
2      A.   That will be basically done by the
3  treasurer and his staff in finance.
4      Q.   So the treasurer stands up and says
5  when you do that, it comes out to $200,000 per
6  member this quarter, and we are asking that you
7  vote to authorize us to pay you?
8      A.   No.
9      Q.   How does it work?
10     A.   No.  The General Council is informed of
11  the amount, whatever is the amount.  It's not a
12  specific amount because you really don't know how
13  much you are going to have in that account
14  because that account is liquid and it is either
15  growing or it's not growing, depending upon
16  whether there is money coming into that account.
17         So it is difficult for the treasurer to
18  stand there and say we have $20 million in this
19  account.  If we divide it by this many people,
20  this is how much you will get, no, it's not like
21  that.
22     Q.   Then explain it.
23     A.   He'll explain that there is this amount
24  of money in that account today, and at the end of
25  the fiscal -- I mean, financial report, the
```

Page 73

1   General Council will make the directive that a
2   distribution will be made to the members on such
3   a date and time, and then from there this account
4   has to make available those distributions ready
5   to be made on that day and time to the members.
6       Q.   Okay.  Correct me, then, if I'm wrong,
7   I want to see if I can explain what I understand.
8   So then the treasurer stands up and says, okay,
9   today we have $20 million in the NTDR account and
10  the plan is to make a distribution in a week?
11      A.   No.
12      Q.   I'm sorry.
13      A.   It is just reported that there is money
14  in the account.
15      Q.   Okay.
16      A.   The treasurer does not say, we want to
17  distribute it.  The treasurer does not say, this
18  is how much you are going to get.  He just
19  reports that there is this amount of money in
20  this particular account.
21      Q.   Okay.  He just says what the balance is
22  as of that time?
23      A.   He just gives a report for that moment.
24      Q.   In our example he may say as of right
25  now there is $20 million in the account and we

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 74

1   are going to give each member his or her
2   distribution in the future?
3       A.   No.
4       Q.   But not of the specific amount?
5       A.   No.
6       Q.   No?
7       A.   No.
8       Q.   I'm still not getting it.
9       A.   Exactly.
10      Q.   How does it work?
11      A.   The amount that is in the -- you have
12  to understand we have several accounts.
13      Q.   Right.
14      A.   So that when it comes to that account,
15  the amount will be relayed to the General
16  Council.  The General Council is not going to
17  ask, well, how much am I going to get?  How much
18  is that guy going to get?  They don't sit there
19  and say, oh, you are going to have that much
20  money next week.  Uh-uh.
21          The General Council will direct the
22  Business Council that there will be a
23  distribution made 30 days from now on this day at
24  this time.  That's telling us we'll expect a
25  distribution at this time and day.  Please have

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 75

1   it ready.
2       Q.   Oh, okay.  I sort of had the cart
3   before the horse then.
4           What happens is at the quarterly
5   meeting the Tribe itself takes a vote and tells
6   the Business Council, the treasurer, et cetera,
7   to make a distribution 30 days from now of what's
8   in the NTDR account at that time, 30 days hence,
9   correct?
10      A.   Right.  But it's not necessarily
11  30 days.
12      Q.   Well, whatever the time is.
13      A.   That's what I'm saying.  That's why I
14  told you they'll give us --
15      Q.   Right.
16      A.   -- a day and a time for a distribution.
17      Q.   Okay.  How long in advance do they
18  usually set it?
19      A.   Somewhere close to 30 days, I would
20  say.
21      Q.   And then whatever is in the account as
22  of that time --
23      A.   Exactly.
24      Q.   -- a check is written to each tribal
25  member?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 76

1       A.   Right.
2       Q.   For his or her amount?
3       A.   Yes.
4       Q.   And that amount is equal as to each
5   tribal member?
6       A.   Right.
7       Q.   Everybody gets exactly the same amount
8   of money, every enrolled member?
9       A.   Mm-hmm.
10      Q.   Okay.  At the quarterly meeting before
11  the distribution is made, does the treasurer give
12  an estimate, a rough estimate?
13      A.   No.
14      Q.   Does he say how much is in the account
15  as of the quarterly meeting?
16      A.   The only thing the treasurer will give
17  is the amount of money that is in the account at
18  the time of the reporting.
19      Q.   Okay.  So in our example he'll say,
20  okay, as of tonight we have $20 million --
21      A.   Mm-hmm.
22      Q.   -- but obviously people know that it
23  may not be exactly $20 million in the account at
24  the time 30 days hence when we may direct that
25  the distribution be made?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 77

1    A.   Mm-hmm.
2    Q.   What else has to be paid out of this
3  NTDR account other than this distribution?
4    A.   The monies -- we have to make sure that
5  the monies are there.  Sometimes even though the
6  numbers are showing a specific number, you have
7  to make sure that the dollars are there too
8  because sometimes some of our other facilities --
9  I mean some of our outlets, also for gaming,
10  they'll have other costs that they have to cover.
11  If that happens, they're going to get behind on
12  their payments into that account.
13    Q.   I'm sorry.  I'm getting confused.
14    A.   Cash flow.
15    Q.   No.  I know.  I'm not that much of a
16  businessman.
17         No.  What I'm getting confusing about
18  is I thought you told me that what goes into the
19  NTDR account from the gaming facility is eight
20  point whatever percent?
21    A.   Mm-hmm.
22    Q.   Of gross --
23    A.   Right.
24    Q.   -- revenue?
25    A.   Right.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 78

1    Q.   So what expenses, then, affect that?
2  If that's a tax on the gross revenue, what else
3  affects --
4    A.   Sometimes the facility will have
5  expenses that they may have to cover and
6  sometimes it falls short in making that payment
7  to the taxes, and sometimes we'll have to get on
8  their back to make sure that they have funds to
9  cover those portions that has to be contributed
10  to that account.
11    Q.   Oh, the gaming facility itself may be
12  delinquent in remitting its -- what was it,
13  8.7 percent; is that it?
14    A.   Yes.
15    Q.   So sometimes the gaming facility itself
16  may be delinquent in remitting its 8.7 percent of
17  gross?
18    A.   Yes.  Or sometimes other facilities
19  that we gather money from --
20    Q.   Like what is it, the antenna array?
21    A.   Yes.
22    Q.   Who do you lease the antennas to?
23    A.   Different vendors.  I know we rent to
24  AT&T and Verizon, and I think we also rent to --
25  what is it?  What is that other phone company

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 79

1  that just went out of business?  I can't remember
2  them.  I'm sorry.
3    Q.   Sprint?
4    A.   Motorola.
5    Q.   Motorola, right.
6         You tax Sprint and Motorola and AT&T,
7  the Seminoles, you tax them also at 8.7 percent?
8    A.   Whoever purchases -- makes a purchase
9  on the Reservation has to pay those taxes.  Even
10  our guests that stay at the hotel there, they get
11  charged our tax.
12    Q.   And they pay a separate line item tax
13  at 8.7 percent?
14    A.   I believe so.
15    Q.   Sprint and Motorola has to pay an extra
16  line item tax on top of their remittance -- of
17  their lease payment?
18    A.   Yes.
19    Q.   Okay.  So what do you do then when the
20  gaming facility is behind on its remittance, on
21  its 8.7 percent tax remittance which goes into
22  the NTDR account?
23    A.   Well, you have to work with them.
24    Q.   If they're delinquent, do you charge
25  them a fee for being delinquent?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 80

1    A.   No.
2    Q.   Do you charge them interest?
3    A.   No.
4    Q.   How long in your experience is the
5  longest that they have been delinquent in making
6  their remittance?
7    A.   It is usually within 30 days.
8    Q.   So if it's 8.7 percent of gross, these
9  must be fairly large remittances, and they don't
10  charge any kind of interest?
11    A.   No.
12    Q.   What if a vendor is delinquent in terms
13  of their remittance of the 8.7 percent?
14    A.   No.  We don't charge interest or fees
15  or penalties or anything like that.
16    Q.   To any other vendor?
17    A.   No.  To nobody.
18    Q.   Are the Seminoles timely on their
19  payments on grazing leases?
20    A.   Yes.
21    Q.   How is this tax set, that is, the
22  8.7 percent, how is that number arrived at?
23    A.   I'm not sure because this was something
24  that was created back in '95.
25    Q.   And the percentage rate hasn't changed

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 81

1   since `95?
2       A.   I believe it was changed not too long
3   ago.  Maybe like in 2010 I think it was, but I'm
4   not sure.
5       Q.   Okay.  Do you know what that rate is
6   tied to?  Is there a reason for that percentage
7   rate?
8       A.   No.
9       Q.   Do you know or are you saying it is not
10  tied to anything?
11      A.   I don't know.
12      Q.   Do you know who might know?
13      A.   Yes.
14      Q.   Who might that be?
15      A.   The individual that worked on it was
16  Mr. Dexter Lehtinen.
17      Q.   Dexter Lehtinen?
18      A.   Yes.  I believe he is the witness for
19  the Service, so you might want to ask him.
20      Q.   I don't think he's a witness for the
21  Service.
22      A.   That's what I understand.
23      Q.   Anybody else?
24      A.   No.
25      Q.   Any other tribal members who might have

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 82

1   knowledge in that regard?
2       A.   No.  Absolutely not.
3       Q.   Would the former Chairman, Mr. Cypress,
4   know anything about that?
5       A.   I would think so.
6       Q.   Who was the Chairman in 1995?
7       A.   That would be Chairman Cypress.
8       Q.   And his tenure was from what year to
9   what year?
10      A.   Probably about `87 to 2009.  So he is
11  the man that you will need to ask.
12      Q.   I can see that.
13          MR. ROMAN:  By the way, the deposition
14  is scheduled for Tuesday.
15          MR. WELSH:  Let's go off the record.
16          (Discussion off the record.)
17  (Recess in Proceedings for up lunch at 1:20
18          and resumed back at 2:25 p.m.)
19      Q.   {By Mr. Welsh}  You realize we're back
20  on the record now and you're still under oath?
21      A.   Yes, sir.
22      Q.   Good.  I just had a couple of questions
23  about what you were telling me in terms of the
24  different benefits that the Tribe provides, and
25  we can wrap them up pretty fast.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 83

1           Just one question about your position
2   as Chairman first.  Are you paid for that
3   position?
4       A.   Yes, I am.
5       Q.   And like a salary from the Tribe for
6   being Chairman?
7       A.   Yes.  I do get a salary.
8       Q.   How much is that, if you don't mind me
9   asking?
10      A.   My salary is $360,000 a year.
11      Q.   And that's just a lump sum salary or
12  monthly?
13      A.   They pay me a lump sum, annual.
14      Q.   And has that been the same salary for
15  all the years that you have been Chairman?
16      A.   Yes, sir.  We did get a cost of living
17  adjustment last year.  I think that was the first
18  increase I have seen.
19      Q.   So last year you made more than
20  $360,000?
21      A.   I'm not sure.  Maybe 3 percent or
22  2 percent.  I'm not sure what the --
23      Q.   And that's voted on by the General
24  Council?
25      A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 84

1       Q.   Is it recommended by the Business
2   Council first?
3       A.   Yes.
4       Q.   Okay.
5       A.   That was for all employees, so...
6       Q.   Oh, the 3 percent increase --
7       A.   Yes.
8       Q.   -- was for all the employees?
9       A.   Yes.  It's called a cost of living
10  adjustment.
11      Q.   And that is set by the General Council?
12      A.   Yes.
13      Q.   After a recommendation by the Business
14  Council?
15      A.   Right.
16      Q.   I understand.
17      A.   I just want to make sure that you're
18  not thinking it is just for the Chairman.
19      Q.   No.  I wouldn't want to ask about
20  everybody else because I don't think that that
21  would be fair.
22          And you also said that the Tribe
23  provides certain health benefits to the tribal
24  members?
25      A.   They provide health benefits to the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 85

1    tribal members.
2        Q.    What kind of health benefits?
3        A.    They pay for medical services that
4    normally wouldn't be covered by some of our
5    existing programs or sometimes our existing
6    programs do not have enough resources, that the
7    Tribe will cover the remaining balance.
8        Q.    When you say existing programs, do you
9    mean like federal health benefits?
10       A.    Yes.  Indian Health Service
11   specifically.
12       Q.    I didn't understand how it worked.  The
13   Indian Health Service provides benefits to the
14   Tribe, health insurance?
15       A.    Indian Health Service is the agency
16   that was supposed to provide for the health
17   service for Indian Tribes across the country.  As
18   I mentioned earlier, funding has been cut back
19   over the years and our service -- our needs
20   sometimes exceed the service that IHS can
21   provide.  IHS is Indian Health Service.  In that
22   case the Tribe has to pick up the difference.
23       Q.    I see.  And procedurally, then, what
24   happens?  Indian Health Service provides -- do
25   they provide doctors?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 86

1        A.    Yes.  They provide doctors.  They'll
2    provide appointments to outside services if need
3    be like hospitalization, medications.
4        Q.    Off the Reservation?
5        A.    Yes.  Off the Reservation -- I'm not
6    saying off the Reservation for off Reservation
7    Indians.  What I'm saying --
8        Q.    No.  No.  The Indian Health Service, is
9    that a service provided on the Reservation?
10       A.    Yes.
11       Q.    I see.  But they can only do so much
12   there, I take it?
13       A.    Yes.  With the limited resources.
14       Q.    Other than that, if you need to go to a
15   doctor or a hospital off the Reservation, Indian
16   Health Service will still pay for some part of
17   it?
18       A.    If they have the funds, they will pay
19   what they are supposed to pay.  If you stay at
20   the hospital or let's say you have to go see a
21   doctor, IHS has only so much money.  They can
22   only cover three days of the hospital stay for a
23   week.  We'll pick up the rest, meaning the Tribe
24   will pick up the rest.  If you need to see a
25   specialist and IHS doesn't have enough funds to

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 87

1    cover it, the Tribe will pick up the rest.
2        Q.    Is that a set program?  I mean, how is
3    that determined?
4        A.    It is like anything else.  If the need
5    is there, the Tribe will pay for it.
6        Q.    Does the tribal member who needs a
7    service have to make application to somebody?
8        A.    No.
9        Q.    How does it work?
10       A.    No.  The Health -- the Health Service
11   Director will inform the Business Council and the
12   Business Council will give that authorization.
13       Q.    So the tribal member talks to a person
14   in the Tribe who is the Health Service --
15       A.    The Health Director.
16       Q.    The Health Director.  And then the
17   Health Director --
18       A.    Informs us.
19       Q.    -- informs the General Council?
20       A.    The Business Council.
21       Q.    Then what does the Business Council do?
22       A.    They will let the General Council know
23   that that service has been provided or will be
24   provided.
25       Q.    And then the General Council votes on

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 88

1    approving that or authorizing it?
2        A.    And then they'll authorize it or
3    they'll affirm an action that has already been
4    taken.
5        Q.    Do they have the power to reject?
6        A.    Oh, yes.
7        Q.    Okay.  I take it that never happens?
8        A.    No.
9        Q.    I think there was a Housing Committee
10   and now there is a Health Service Director or
11   whatever he is called?
12       A.    Yes.
13       Q.    Are there other entities like that for
14   other benefits?
15       A.    I'm sure there are, but I'm not sure
16   which area to point to.  I know health is one of
17   our main services.  Housing is one of our main
18   services.  But each department that we have does
19   have a department head that keeps abreast on
20   those programs.
21       Q.    Okay.  If we could, we have a few
22   exhibits we need you to look through and discuss
23   for just a minute.
24           MR. WELSH:  I think we will mark this
25   as --

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 89

1     MR. ROMAN:  Do you need this back?
2     MR. WELSH:  Yes.  Off the record.
3        (Discussion off the record.)
4     (Thereupon, Ordinance Number Three was
5     marked as Plaintiff's Exhibit 14 for
6     Identification.)
7     Q.   Mr. Cypress -- I'm sorry.  Mr. Billie,
8  if you would look through for one second.  I
9  didn't mean that.
10    A.   Is that on the record?
11       (Discussion off the record.)
12    Q.   {By Mr. Welsh}  Mr. Billie, I have
13  handed you what is marked as Exhibit No. 14 and
14  it's Miccosukee Tribe of General Council
15  Ordinance Number Three.  Do you recognize this
16  document?
17    A.   Yes.
18    Q.   I take it you have seen it before?
19    A.   Yes.
20    Q.   Were you involved in the drafting of
21  this document?
22    A.   No.  No, I wasn't.
23    Q.   But your father was?
24    A.   Let me see.  He served as Assistant
25  Chairman -- I can't say yes or no.  I really

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 90

1  don't know.
2     Q.   Okay.  But you're quite familiar with
3  this document, correct?
4     A.   Yes.
5     Q.   And it is, I take it, a business record
6  of the Tribe, that is, a General Council
7  ordinance?  It's a business record of the Tribe?
8  It's something that the Tribe creates and keeps?
9     A.   Yes, it is.
10    Q.   And it's in the ordinary course of
11 business for the Tribe to keep such documents,
12 that is, General Council ordinances?
13    A.   Yes.
14    Q.   And this particular ordinance was, in
15 fact, made and kept in the course of business of
16 the Tribe?
17    A.   Yes.
18    Q.   Okay.  Can you tell me, just generally,
19 what General Council Ordinance Number Three is?
20    A.   It seems to be the ordinance of giving
21 the Tribe the ability to collect our taxes within
22 the Tribe.
23    Q.   Okay.  On all taxes?
24    A.   Here it says on gross sales.
25    Q.   Okay.  Okay.  And in the first

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 91

1  paragraph, the first whereas on the first page of
2  Exhibit 14, it says, "the Miccosukee General
3  Council", which you said before is all the Tribe
4  members over the age of 18, "is authorized and
5  empowered by Article 4, Section 3 of the
6  Constitution and Bylaws of the Miccosukee Tribe
7  of Indians of Florida to levy and collect
8  assessments subject to review by the Secretary of
9  the Interior".
10       What does that mean?  What is the
11 review by the Secretary of the Interior?
12    A.   I know that in years past whenever an
13 ordinance like this would be approved, it would
14 be approved by the General Council.  It would
15 then have to be forwarded to the Secretary of
16 Interior for their review.  If they would have
17 any problems, they would let the Tribe know of
18 the problems and give them an opportunity to make
19 any corrections or adjustments.
20    Q.   Okay.  Now, the third whereas on the
21 first page of Exhibit 14 says, "whereas the
22 financial burdens of the Tribal government should
23 fairly fall upon all those who use and benefit
24 from the public facilities and services furnished
25 by the Tribe within the Miccosukee Reservation".

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 92

1        How do you interpret, as Chairman of
2  the Tribe, the phrase "should fairly fall upon
3  those who use and benefit from the public
4  facilities"?  Is that an equal -- that is, is it
5  a communal sort of thing or is each tribal member
6  who benefits -- who uses and benefits from a
7  particular function should pay for that function?
8     A.   It has always been communal.  So for me
9  I would have to interpret it that way.
10    Q.   That's how you interpret it?
11    A.   Yes.
12    Q.   Okay.  Now, the next one it says, "now,
13 therefore, it is ordained" -- again, this is on
14 the first page of Exhibit 14 -- "that a tax on
15 gross sales by any tribal enterprise is hereby
16 imposed in accordance with the following
17 provision", correct?
18    A.   Mm-hmm.
19    Q.   So is that what the taxes that you have
20 described previously in your testimony, they're
21 pursuant to this theory that a tax will be
22 imposed on gross sales?
23    A.   Well, the tax that was created in '95,
24 as I mentioned, I really don't know.
25    Q.   Oh, you don't know?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 93

1    A.   Because, like I said, I was not the
2    architect.  The architect on that was Mr. Dexter
3    Lehtinen; and as I said, I understand that he is
4    serving as a witness for the Service and you need
5    to ask him that question.  He is the architect.
6    Q.   I understand, but we will get to that
7    document in a minute.  But this phrase, "a tax on
8    gross sales of any tribal enterprise", do you
9    know what that is referring to?
10   A.   Which question?
11   Q.   The "now, therefore" on the first page
12   of Exhibit 14.
13   A.   That would be taxation, as it says, on
14   the gross sales by any of our enterprises.  That
15   was something that I talked about earlier.
16   Q.   That's what I was trying to get at.
17   Any of your enterprises includes leasing of land
18   for grazing or what else, airboat rides?  Does
19   the Tribe run those?
20   A.   Yes.  The Tribe does run those.
21   Q.   Okay.  And the tourist facilities where
22   you have your tourist facilities in the village?
23   A.   Yes.  The tourist village.
24   Q.   And they pay a tax on gross sales?
25   A.   They're supposed to be assessed a tax.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 94

1    Q.   Okay.  Now, turn over to what is marked
2    down at the bottom right at page L000227.  It
3    talks about a tax on the sale of tangible
4    personal property of what appears to be one half
5    of one percent or .5 percent.
6    A.   Okay.
7    Q.   It talks about retail sales.  Do you
8    know what that is referring to or --
9    A.   No.
10   Q.   -- is that still a tax that exists?
11   A.   No, I don't.
12   Q.   Okay.  Over on page L000229 it talks
13   about there in paragraph number three, it says
14   enforcement, disposition of tax proceeds.  It
15   says, "the Miccosukee Business Council shall
16   enforce the payment of taxes provided for by this
17   ordinance and shall deposit such collections in a
18   separate account".
19   Is there such a separate account, as
20   far as you know?
21   A.   No.  I don't know.
22   Q.   That's not talking about the NTDR
23   account?
24   A.   Again, I really don't know how that
25   NTDR account was established.  I don't know if it

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 95

1    was an offshoot of this or if this was meant to
2    replace that.
3    Q.   Okay.  In that paragraph it also talks
4    about expending such monies for tribal purposes
5    in accordance with the annual budget approved as
6    provided in Section 10 of Article 5 of the
7    Constitution of the Tribe.
8    Do you know what that's talking about?
9    A.   I'm not 100 percent sure, but it seems
10   that what we were doing before when I was talking
11   about how we used to get distributions back in
12   the early days and I was telling you how we used
13   to get $20, $25 or $100 during a distribution.
14   Q.   Okay.  This is signed by the general
15   secretary, Bobby Billie?
16   A.   Yes.
17   Q.   Is that any relation?
18   A.   Yes.
19   Q.   And the Chairman was Buffalo Tiger,
20   correct?
21   A.   Yes.
22   Q.   This is actually approved by the
23   Secretary of the Interior?
24   A.   Yes.
25   Q.   Okay.  I see.  Thank you.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 96

1    (Thereupon, the Gross Receipts Tax
2    Ordinance was marked as Plaintiff's
3    Exhibit 15 for Identification.)
4    Q.   Mr. Billie, I have handed you what has
5    been marked as Exhibit No. 15.  It is captioned
6    Gross Receipts Tax Ordinance.  Do you recognize
7    this document?
8    A.   It appears to be a newer account.
9    Q.   Section number four at the very bottom
10   says, "this tax shall be imposed retroactively
11   to, and considered effective as of January 1,
12   1995, regardless of the actual date of approval
13   by the General Council".
14   You have seen this document before?
15   A.   Yes.  I have seen it.
16   Q.   Like I said, it's captioned Gross
17   Receipts Tax Ordinance.  So, first of all, is it
18   an ordinance in the same sense as what we just
19   saw in Exhibit No. 14?
20   A.   I don't see the tax document to it.  So
21   without it, I can't say it is.  The other one,
22   Exhibit 14 you showed me, it had the signatory
23   sheet with the appropriate signatures.  That I
24   said, yes, it is; but for this one, since I don't
25   see the second page, I can't say it is.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 97

1      Q.   So you don't know for sure if it is an
2  approved ordinance?
3      A.   Right.
4      Q.   Signed off on by the tribal secretary
5  and General Council?
6      A.   Right.
7      Q.   Is that what it would take to make it
8  an official ordinance and business record of the
9  Tribe?
10     A.   Yes.
11     Q.   Okay.  So assuming that it did have
12  that, it would be an official business record in
13  the same sense as Exhibit 14?
14     A.   Yes.
15     Q.   All right.  But you have seen this
16  document, nonetheless?
17     A.   Yes, I have.
18     Q.   And the copy that you saw did have a
19  signature page?
20     A.   I believe it did.
21     Q.   Okay.  We are just missing the
22  signature page.  Is there anything else, based on
23  your recollection of the one that you saw,
24  whether there is anything else to this beyond the
25  signature page?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 98

1      A.   No.
2      Q.   So it's just these four sections, plus
3  the signature page?
4      A.   Right.  But I don't remember how many
5  sections there were.  That's why I'm saying you
6  only have one page, so I'm not sure if this is a
7  page from the set or not.
8      Q.   You think it might have additional
9  sections beyond these four?
10     A.   Right.
11     Q.
12     A.   We need to look at the complete set.
13            MR. FARRIOR:  I will double-check.
14     Q.   We would love to have that if we don't
15  have it.
16            MR. WELSH:  Off the record.
17            (Discussion off the record.)
18            MR. WELSH:  Back on the record.
19     Q.   {By Mr. Welsh}  Mr. Billie, we just
20  talked about where the other part of this exhibit
21  may be or come from, and I think, and you tell me
22  if I have got it wrong, but what I understand now
23  is that the document which we have as Exhibit
24  No. 15 as the Gross Receipts Tax Ordinance, was
25  faxed to the Tribe, and that's what the fax

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 99

1  number at the top shows, to the Tribe from
2  Mr. Dexter Lehtinen; is that correct?
3      A.   Yes.  My understanding.
4      Q.   So this was a record created for the
5  Tribe but was retained by the Tribe's then
6  attorney, Mr. Lehtinen?
7      A.   Your guess is as good as mine.
8      Q.   But where have you seen this document
9  before?
10     A.   During the process of looking to piece
11  together exactly what had happened as to why we
12  have this ongoing dispute with the Service.
13     Q.   Okay.  So you -- by you I'm not
14  speaking -- well, someone in the Tribe, whether
15  you or someone else, found what we have marked as
16  Exhibit 15 in the records of the Tribe but only
17  this one page?
18     A.   Yes.
19     Q.   Is that correct?
20     A.   Right.
21     Q.   Okay.  So this one page, what we have
22  as the Gross Receipts Tax Ordinance, was actually
23  a record of the Tribe which had been kept by the
24  Tribe?
25     A.   The original one is.  I'm saying this

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 100

1  to be the original one, Exhibit 14.
2      Q.   Yes, sir.
3      A.   That one I am familiar with.  I had
4  seen that before.  But this one, when I saw it,
5  it was something that I was not familiar with.
6      Q.   Exhibit No. 15?
7      A.   Right.
8      Q.   But you saw it when it was obtained
9  from the records of the Tribe, correct?
10     A.   I'm not sure exactly where it was
11  obtained because, like I said, we had -- when we
12  started having the issue with the IRS in March
13  of 2010, that's when we started putting all the
14  pieces together.  2010 is -- March, 2010 is the
15  month that the IRS came down to tell us that we
16  owe them X amount of dollars for taxes that we
17  never paid.  That was the first time that I had
18  ever come to the knowledge that we had owed back
19  taxes.
20     Q.   Okay.  I understand.
21     A.   Prior to that, we were never told that
22  we were on audits or that the IRS was assessing
23  liability for the Tribe.
24     Q.   Your lawyer, Mr. Lehtinen, never told
25  you about that?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

25 (Pages 97 to 100)

Page 101

```
 1      A.   Nope.
 2      Q.   Okay.
 3      A.   We were led to believe that everything
 4   was fine.  That there were negotiations and
 5   discussions and papers being shuffled back and
 6   forth, and we were never told about any audits or
 7   liabilities being assessed.
 8      Q.   Okay.  I understand.
 9           So how did you first come into
10   possession of what we now have marked as Exhibit
11   No. 15?
12      A.   When I had our Legal Department start
13   looking into this and they started obtaining
14   documents and information and when we started
15   piecing things -- this information together.
16      Q.   So then you came into possession of
17   Exhibit No. 15 first back in --
18      A.   I wouldn't say first.  I mean, I guess
19   you are using it as part of your explanation,
20   right?
21      Q.   No.  When you first saw it, you
22   obtained it from somebody in the Tribe's Legal
23   Department in and around 2010?
24      A.   It would have to be, yes.  2010 is
25   correct, yes.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 102

```
 1      Q.   And so you just got it from your Legal
 2   Department?
 3      A.   Mm-hmm.
 4      Q.   And all you got was the same copy that
 5   we have here, which is only one page without a
 6   signature page?
 7      A.   Right.
 8      Q.   Okay.  It was kept by your Legal
 9   Department somewhere?
10      A.   Mm-hmm.
11      Q.   And they would have, I take it, kept it
12   in the same fashion basically as Exhibit 14 among
13   the business records of the Tribe?
14      A.   Right.  Prior to that, I wasn't
15   familiar with it.  I was only familiar with the
16   original ordinance, which is Exhibit 14.  And,
17   again, that was based on when the distribution
18   was made, the -- Exhibit 14 seemed to capture the
19   spirit of what the Tribe had been providing back
20   in the earlier days of my life.
21      Q.   Right.  I understand.
22      A.   And then when I saw that, I didn't
23   understand or couldn't figure out where that came
24   into play.  It just seemed like that was only
25   trying to reshuffle our papers within the Tribe.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 103

```
 1      Q.   I understand.
 2           Sir, this talks about the gross
 3   receipts tax which you talked about before in the
 4   first paragraph, Establishment.  We have talked,
 5   again, about the setting up of the Miccosukee
 6   Indian Bingo and Gaming at Krome Avenue, which is
 7   that piece of land that you described earlier,
 8   which was set aside for purposes of creating a
 9   place for the gaming?
10      A.   Mm-hmm.
11      Q.   And here it talks about a 6 and a half
12   percent tax?
13      A.   Mm-hmm.
14      Q.   I think that you said that has now gone
15   up to 8.7?
16      A.   Yes.
17      Q.   Do you know when it went up?
18      A.   I believe it was around 2010.
19      Q.   Okay.  And it defines gross receipts as
20   everything, I guess, wagered and received at
21   MIBG, Miccosukee Indian Bingo and Gaming, and all
22   the other operations there, including food,
23   beverage services, gift shop, et cetera.  Then it
24   describes how it is to be dealt with, the
25   Assessment and Collection.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 104

```
 1           If you would, read through that and see
 2   if there is anything that you see that you
 3   believe is incorrect?
 4      A.   Okay.
 5      Q.   Are there any corrections, sir?  Does
 6   that seem correct to you, sir?
 7      A.   What do you mean correct?
 8      Q.   Is there anything in there -- in terms
 9   of your knowledge of how the gross receipts tax
10   works, is there anything in there that you see
11   that is not correct in the way that it's actually
12   applied?
13      A.   No.  I don't think so.
14      Q.   Okay.  So, as best you know, what is
15   stated there in terms of everything that's on
16   Exhibit No. 15 is correct?
17      A.   Yes, sir.
18      Q.   So I will hand you what is marked as
19   Exhibit 3.
20           MR. WELSH:  Do you have it, Daniel?
21           MR. DAVIS:  Yes.
22      Q.   I hand you what is marked as Exhibit
23   No. 3.  This is a redacted copy of a much bigger
24   ledger with attached checks.
25      A.   Mm-hmm.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 105

```
 1      Q.   I don't know if you have ever even seen
 2 the redacted copy through your current attorney
 3 who can address that.
 4      Do you recognize the document generally
 5 in form?  This copy only shows points relative to
 6 tribal member Sally Jim and her family.
 7      A.   Yes.  Okay.  This was -- I take it this
 8 was a spreadsheet, right?
 9      Q.   Well, I have to -- your attorney can
10 address that.  I don't want --
11      A.   Okay.
12      Q.   Do you know what Exhibit No. 3 is,
13 which is really a compound exhibit of what you
14 just referred to as a spreadsheet which shows a
15 number of things and then attached checks from
16 the Miccosukee Tribe to a tribal member?
17      A.   Yes.
18      Q.   Do you recognize all the documents in
19 what is marked as Exhibit No. 3?
20      A.   Yes.
21      Q.   And for purposes of the record, could
22 you explain to me what you call, first, the
23 spreadsheet and what the different categories at
24 the top of the spreadsheet refer to?
25      MR. ROMAN:  I'm sorry.  Whether he
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 106

```
 1 recognizes the check or the spreadsheet?
 2      MR. WELSH:  First the spreadsheet.
 3      MR. ROMAN:  He wouldn't know that.
 4      MR. WELSH:  Well, if he doesn't, he
 5 doesn't.  I'm just trying to get the facts.
 6      A.   I was saying it is a spreadsheet
 7 because that's what it appears to be, but I'm not
 8 really sure, so.  That part I don't normally see,
 9 so that part I can't verify exactly what it is;
10 but the copies of the checks, those I'm familiar
11 with, so those are what they are.
12      Q.   We'll go to the --
13      A.   Those are the distribution checks.
14      Q.   We can come back to it and then maybe
15 working together we can relate the check to the
16 spreadsheet.
17      The checks start on page Bates number
18 00084.
19      A.   Mm-hmm.
20      Q.   And if you could explain what that
21 check on that page represents and what it is for?
22      A.   That would have been -- no.  I can't
23 say that that would have been for a distribution,
24 but on the -- from what is identified on the
25 check itself, it seems to have come from that
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 107

```
 1 account, the account that we used to make that
 2 distribution from.
 3      Q.   Okay.  Could that have been a loan to
 4 Ms. Jim?
 5      A.   It could have been, yes.
 6      Q.   And how would that have worked?
 7      A.   A loan is usually -- the way it works
 8 is they can take a loan against their future
 9 distribution.  So if this was a loan, it would
10 have been monies taken against her distribution
11 that may have been coming up.  This was issued
12 back in 2002.
13      Q.   Yes.  2001?
14      A.   Yes.  2001, I'm sorry.  It was more
15 likely a loan against her future distribution.
16      Q.   Okay.  Let's go to the next one.  If
17 you turn back to the very last or second to the
18 last, apparently, page of the exhibit that is
19 00087.
20      A.   Okay.
21      Q.   There is a check made out to Alex
22 Osceola and Sally Jim, do you see that, for
23 $44,600?  Is that a quarterly distribution check
24 from the NTDR account?
25      A.   I would say it is.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 108

```
 1      Q.   Okay.  And if you look over on the
 2 first page of the exhibit that is 00080 that ties
 3 into the check amount, correct?
 4      A.   I'm looking -- oh, the check amount?
 5 Yes.
 6      Q.   Okay.  So then if you look on what you
 7 call, I think, the spreadsheet or schedule, it
 8 has got a name with the tribal member, in this
 9 case on the first page, 00080, Sally Jim.  It
10 says number of members covered, is that what CRVD
11 is?  Is that what that means?
12      A.   That, I'm not sure.  It seems to say
13 percentage of mem or member.
14      Q.   But it has a four.  Would that have
15 been the number of people in the family?
16      A.   I couldn't say with 100 percent
17 certainty.
18      Q.   And the way that the dividend works is
19 that the gross dividend is, what, the next
20 column?  That's the amount that you described as
21 voted on by the Council and then it's paid out by
22 the tribal secretary?
23      A.   Okay.  Well, as I mentioned --
24      Q.   Is that how it works?
25      A.   As I mentioned, the amount is not
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 109

1    really voted on.
2        Q.   No.  You explained that it's
3    authorized?
4        A.   Right.
5        Q.   Whatever it comes out to?
6        A.   Right.
7        Q.   Divided by the number of tribal
8    members?
9        A.   Right.
10       Q.   And then are these other columns
11   showing -- I guess tribal members can take loans;
12   is that correct?
13       A.   That's correct.
14       Q.   And then the check amount, then, would
15   be the amount less what they have already taken
16   out as a loan?
17       A.   Yes.
18       Q.   Okay.  Is that basically what this
19   schedule -- how it works and what it shows?
20       A.   That's what it looks like, yes.
21       Q.   Did the Tribe also -- could a tribal
22   member also request that some amount be put into
23   an account at SmithBarney or somewhere else for
24   future benefit of the family?
25       A.   Yes.  Sometimes some families would put

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 110

1    some of their monies -- some of their kid's
2    monies into a trust account.
3        Q.   And, as far as you know, looking at
4    this spreadsheet, Exhibit No. 13, is that what
5    the different columns would be, one for loan
6    versus one --
7        A.   It is possible.
8        Q.   And the Tribe accounted for that?
9        A.   Mm-hmm.
10       Q.   Who did that?  The secretary?
11       A.   That would have been with the treasurer
12   and the people in finance.
13       Q.   So in this case the check, which is on
14   page 00087, which is in the net amount of the
15   distribution to Ms. Jim for that quarter of
16   $44,600, some of that amount would have been for
17   her other family members, correct?
18       A.   Yes.
19       Q.   And what control does Ms. Jim have over
20   that since the check is made out to her and
21   Mr. Osceola?
22       A.   Yes.
23       Q.   I believe he is also a tribal member?
24       A.   Yes.
25       Q.   Okay.  So he would have gotten a

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 111

1    distribution then also?
2        A.   Yes.
3        Q.   And it would have been part of this
4    $44,600?
5        A.   Yes.
6        Q.   And then there are two children who
7    would have been tribal members but also their
8    money would have been included also in that
9    $44,600?
10       A.   Yes.
11       Q.   And then how would either Mr. Osceola
12   or the children obtain their money out of the
13   check that was made out to Ms. Jim and
14   Mr. Osceola?
15       A.   As you pointed out, his money would
16   have been placed in a trust account.  The kids
17   wouldn't have access to it.  The idea is to have
18   that money sitting in their trust account until
19   the child reaches of age and is able to think for
20   him or herself and be able to have access to his
21   or her money.
22       Q.   Okay.  Did the Tribe have a program in
23   that regard?  Was it required that for -- were
24   these minor children, children under the age of
25   18 or something?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 112

1        A.   Yes.
2        Q.   And that was the Tribe program?
3        A.   Yes.  And at some point I believe the
4    General Council had instructed the Business
5    Council to start putting away money for some of
6    the kids, and so you have some families whose
7    kids' money goes directly into those trust
8    accounts.
9        Q.   But in the case of the example that we
10   have here on Exhibit 3, was there a program in
11   place then, in 2001, to require that some of this
12   money that is a tribal program --
13       A.   It's possible because I can't remember
14   when that action was taken.  So, yes, it is
15   possible.
16       Q.   You just don't know whether in 2001
17   whether there was a program to require Ms. Jim
18   and Mr. Osceola to put aside --
19       A.   Right.
20       Q.   -- some of the money into a trust
21   account for the benefit of the minor children?
22       A.   Right.
23       Q.   But at some point the Tribe did create
24   such a program?
25       A.   Right.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 113

```
 1    Q.   Does it still exist today?
 2    A.   Yes.
 3    Q.   Is it written?  Is it a written program
 4  that obligates them legally to do it?
 5    A.   No.
 6    Q.   So how does it work?
 7    A.   It is a decision that is made, again,
 8  either by the General Council or the Business
 9  Council.  But if it is made by the Business
10  Council, it has to be also relayed back to the
11  General Council.
12    Q.   So it isn't -- I'll explain and you can
13  tell me if I have it right.  So in the case of
14  certain families the Business Council then, with
15  the agreement of the General Council, required
16  that certain tribal members put aside -- some
17  part of the distribution which goes to the family
18  and to the minor children of the family be put
19  aside into a trust --
20    A.   Mm-hmm.
21    Q.   -- account so that the adults can't
22  access the money of the children until the
23  children reach their majority or over 18?
24    A.   Right.
25    Q.   And the Tribe then just instructs those
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 114

```
 1  people to put the money into the account or does
 2  the Tribe do it for them?
 3    A.   We go ahead and instruct our Finance
 4  Department to go ahead and have those monies
 5  deposited into the trust account.
 6    Q.   I see.  That isn't true for every
 7  member of the Tribe?
 8    A.   No.
 9    Q.   But it's just when the Tribe believes
10  for some reason or other those particular adults
11  aren't equipped to take care of the money which
12  is being distributed for the children?
13    A.   Right.
14    Q.   I see.  And that's a decision made
15  first by the Business Council and then approved
16  by the --
17    A.   It goes either way.
18    Q.   I see.  I don't want to be cruel to
19  anybody, but if the Tribe finds that certain
20  people aren't responsible enough to take care of
21  the money for their children?
22    A.   No.  It is just that -- I mean, in some
23  cases that would apply, but in most cases it's --
24  sometimes families fall apart.
25    Q.   Oh, okay.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 115

```
 1    A.   When the family falls apart --
 2    Q.   Right.
 3    A.   -- sometimes the kids become a victim.
 4    Q.   Right.  So the Tribe steps in?
 5    A.   Exactly.
 6    Q.   The Tribe has the power to do that, to
 7  take --
 8    A.   Yes.
 9    Q.   But ordinarily the entire distribution
10  check goes to one member of the family or two
11  members of the family?
12    A.   Exactly.
13    Q.   Is the distribution check, in the case
14  of Mr. Osceola and Ms. Jim, it's made out to
15  both?
16    A.   Mm-hmm.
17    Q.   Is it always made out to a husband and
18  wife or is it made out only to the wife in some
19  cases or how does it work?
20         MR. DAVIS:  Object to the form.
21         MR. ROMAN:  Go ahead.
22    A.   I'm not sure how it was done before I
23  came in, but I have seen where even in the
24  family, a family will pick up one check or
25  sometimes they'll pick up more than one check,
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 116

```
 1  meaning that sometimes it is broken up.
 2    Q.   Okay.  Sometimes a check is made out to
 3  each family member if they're all --
 4    A.   Sometimes the check is made out to the
 5  wife, plus the kids, and a separate check for the
 6  husband or vice versa.
 7    Q.   Okay.
 8    A.   Or a check will contain both the wife
 9  and the husband, and the amount will be totaled
10  or the aggregate total will be given to the
11  husband and wife.
12    Q.   Okay.  But in the example of
13  Exhibit 13, you don't have any idea whether there
14  was a Tribe requirement that some amount of this
15  money be put into a trust fund for the benefit of
16  the children?
17    A.   I know there was, but I'm not sure if
18  it applied to them.
19    Q.   To Mr. Osceola and Ms. Jim?
20    A.   Right.
21    Q.   Okay.  But you don't know if that
22  happened in this case at all?
23    A.   Right.
24    Q.   Okay.  If you look at page 00087, it
25  shows the $44,000, it shows both the front and
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 117

```
 1    back of the check?
 2      A.  Mm-hmm.
 3      Q.  And the check is endorsed by Ms. Jim
 4    and Mr. Osceola?
 5      A.  Mm-hmm.
 6      Q.  And it appears that it was then cashed,
 7    and then this check was deposited into an
 8    account, which appears to be the Miccosukee NTDR
 9    account.  Do you recognize that?
10      A.  Mm-hmm.
11      Q.  Procedurally, then, what happened to
12    this $44,600?
13      A.  I guess they spent it.
14      Q.  Probably.  Now, I meant -- so they
15    endorsed this check, and tell me if I'm wrong,
16    Mr. Osceola and Ms. Jim endorsed the check and
17    then received money, I take it, from the Tribe,
18    and then the Tribe deposited the check into a
19    Tribe account, correct?
20      A.  The endorsed check?
21      Q.  Yes.
22      A.  Yes.  It would have to be deposited
23    back into the Tribe because the Tribe itself is
24    cashing it for them.
25      Q.  The Tribe itself gave --
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 118

```
 1      A.  Cash.
 2      Q.  -- cash to Mr. Osceola and Ms. Jim?
 3      A.  Yes.  They have that option.
 4      Q.  Is that what the Tribe members
 5    generally do?
 6      A.  Yes.  The majority of them.
 7      Q.  Do any of the members that you know of
 8    not do that?
 9      A.  Yes.
10      Q.  What do they with their check?
11      A.  Like me, we deposit it in a regular
12    bank.
13      Q.  You don't get the cash?
14      A.  No.
15      Q.  Sir, if you would, turn back to the
16    first page of the exhibit on page 00080.  Do you
17    have any idea what those -- and I understand now
18    what most of it means in terms of last name and
19    first name and number and the gross dividends and
20    check amounts.
21         Do you know what those numbers mean at
22    the top of the two columns or three columns, I
23    guess?
24      A.  Okay.  I'm not sure what it is.
25      Q.  Are they account numbers within the
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 119

```
 1    Tribe?
 2      A.  That's what -- I mean, I really don't
 3    know.
 4      Q.  Okay.
 5         MR. ROMAN:  Yes.  Remember this was a
 6    spreadsheet that was done by Mr. Farrior.
 7    This is a spreadsheet --
 8         MR. WELSH:  He used.
 9         MR. ROMAN:  He is the person that did
10    this.
11         MR. WELSH:  He is the treasurer?
12         MR. ROMAN:  No.  No.
13         MR. ROMAN:  This is a document that he
14    created.
15         MR. WELSH:  Okay.
16         MR. ROMAN:  He brought it to the
17    deposition last week on Monday.
18         THE WITNESS:  Can we take a short
19    break?
20         MR. WELSH:  Sure.
21         (Recess in Proceedings.)
22    (Thereupon, Mr. Cypress, Jr. and Ms. Willie
23    are no longer present for the deposition.)
24      Q.  {By Mr. Welsh}  Mr. Billie, you
25    understand you're still under oath?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 120

```
 1      A.  Yes.
 2         MR. WELSH:  And we'll mark now
 3    Exhibit -- this is going to be 16.
 4         (Thereupon, a Memorandum was marked as
 5    Plaintiff's Exhibit 16 for Identification.)
 6      Q.  Sir, I have handed you what has been
 7    marked as Exhibit 16.  It appears to be on
 8    Miccosukee Tribe of Indians Finance Office
 9    letterhead.  It is a memo from Billy Cypress,
10    initialled apparently by Billie Cypress, to Mike
11    Hernandez from 1995 concerning taxation and trust
12    fund distribution.  The second page is another
13    similar memo from Mr. Cypress to Mr. Hernandez
14    concerning the NTDR account.
15         Do you recognize these as documents of
16    the Tribe at least?
17      A.  Yes.  From the previous administration.
18      Q.  Yes.  I understand.
19         Okay.  And at the time of this memo was
20    Mr. Cypress the Chairman of the Tribe?
21      A.  Yes.
22      Q.  And who was Mike Hernandez?
23      A.  He was the Finance Director.
24      Q.  Okay.  And is this a record of the
25    Tribe?  These memorandums, did the Tribe keep
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 121

1    such documents?
2        A.   Yes.
3        Q.   Okay.  Were these two particular
4    documents made and kept as records of the
5    Tribe -- of the Miccosukee Tribe?
6            MR. DAVIS:  Before we get into this, I
7        just want to make sure that this is not the
8        deposition of the Tribe's 30(B)(6) witness.
9            MR. WELSH:  No.
10           MR. DAVIS:  This should go --
11           MR. WELSH:  I mean, for some of this, I
12       just want to understand some of this and
13       that may facilitate --
14           MR. DAVIS:  Going into the general
15       welfare program, can I assume that's where
16       you are going?
17           MR. WELSH:  No.  I just want to know
18       some things about this.
19           MR. DAVIS:  Okay.
20           MR. WELSH:  In terms of his dealings
21       with the Tribe and that sort of thing; but,
22       hopefully, if it limits things, that would
23       be helpful.
24       Q.   {By Mr. Welsh}  Do you recognize these
25    as business records of the Tribe?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 122

1        A.   Yes.
2        Q.   Okay.  If you look at the first page,
3    it is captioned RE:  Taxation of Trust Fund
4    Distributions?
5        A.   Yes.
6        Q.   And it just says, "in response to your
7    concerns regarding the necessity to record the
8    distributions to tribal members on their 1994 tax
9    returns, I have consulted with our tribal
10   attorney".
11           Who was the tribal attorney at that
12   time; do you know?
13       A.   This was `95.  That would have been
14   Dexter.
15       Q.   Dexter Lehtinen?
16       A.   Yes.
17       Q.   "And have been assured that this income
18   does not need to be reported on the individual's
19   tax return".
20           So is it correct to say, then, that the
21   tribal attorney at that time, Mr. Lehtinen, at
22   least Mr. Cypress is telling Mr. Hernandez that
23   Mr. Lehtinen said that the income does not need
24   to be reported on the individual member's tax
25   return; is that correct?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 123

1        A.   Yes.
2        Q.   Okay.  And then it says, "as Finance
3    Director", that is Mr. Cypress is telling
4    Mr. Hernandez as Finance Director?
5        A.   Yes.
6        Q.   "I expect you and your staff to prepare
7    tax returns for the members of the Tribe in
8    accordance with and relying on our attorney's
9    opinion".
10           So as you understand this document, is
11   Mr. Cypress then telling Mr. Hernandez to prepare
12   tax returns for the members not reporting the
13   trust fund distribution?
14       A.   Yes.
15       Q.   And that's Mr. Cypress directing that?
16       A.   Yes.
17       Q.   And the second page of Exhibit No. 16
18   is, again, a record of the Tribe.  A memo from,
19   again, Mr. Cypress to Mr. Hernandez again talking
20   about the trust fund, the NTDR account, correct?
21       A.   Yes.
22       Q.   And in this one Mr. Cypress says, "at
23   the direction of our legal counsel", and, again,
24   that's Mr. Lehtinen?
25       A.   I would assume so.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 124

1        Q.   "I want you to open a checking account
2    at Republic National Bank.  In this account I
3    want you to deposit the, quote, tribal tax,
4    unquote, collected at the Miccosukee Bingo".
5            Is the tribal tax what we talked about
6    earlier today as the tax -- the gross receipts
7    tax?
8        A.   Yes.
9        Q.   So that's what started out at 6 and a
10   half percent and now I think it is 8.7 percent?
11       A.   Yes.
12       Q.   "The funds in this account will be
13   evenly distributed to our members periodically".
14           And, again, is that what you talked
15   about in your prior testimony where quarterly it
16   is decided by the Tribe that a distribution will
17   be made of the funds in the NTDR account?
18       A.   Yes.
19       Q.   And then it is given out equally to
20   each member of the Tribe?
21       A.   Yes.
22       Q.   Okay.  In the next paragraph on the
23   second page of Exhibit 16 it says, "regarding
24   your specific concerns regarding the IRS' recent
25   ruling concerning withholding requirements on

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 125

1    gaming profit, our attorney has advised that this
2    money should not be considered gaming profits,
3    and, therefore, not taxable".
4           So, again, is this Mr. Cypress
5    explaining what Mr. Lehtinen said concerning the
6    taxability of the NTDR quarterly distributions to
7    the tribal members?
8       A.   It looks like it.  I would have to say
9    yes.
10      Q.   Thank you, sir.
11           Mr. Billie, I hand you what has been
12   marked as Exhibit No. 5.
13      A.   Yes, sir.
14      Q.   I want you to glance through that and
15   tell me if you can identify and tell me what this
16   document is?
17      A.   This seems to be minutes for a General
18   Council meeting which was held on Thursday,
19   February 2, 1995.
20      Q.   Have you seen this document or a
21   document such as this before?
22      A.   This particular one, no.
23      Q.   You don't recognize this particular
24   one?
25      A.   No.  I've seen another one like this

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 126

1    particular one.
2       Q.   Do you believe that you were at the
3    General Council meeting on February 2, 1995?
4       A.   Mm-hmm.
5       Q.   Do you believe you were there?
6       A.   Yes.  Yes.  I'm sorry.
7       Q.   Is there anything in here in particular
8    that tells you that you believe that you were
9    there?
10      A.   Oh, yes.  I see my name in here.
11      Q.   Oh, okay.
12           Do you remember basically the substance
13   of what is discussed in Exhibit No. 5?
14      A.   Not specifically.  It's been a long
15   time ago.  Almost 20 years ago.
16      Q.   Right.
17      A.   I guess it is 20 years ago.
18      Q.   Right.  Based on your knowledge of the
19   Tribe, does this look like a document of the
20   Miccosukee Tribe?
21      A.   Yes.
22      Q.   Do you have any reason to believe this
23   isn't a -- are these minutes business records of
24   the Tribe?
25      A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 127

1       Q.   And are they made and kept in the
2    ordinary course of the business of the Tribe?
3       A.   Yes.
4       Q.   So you believe this one was, in fact,
5    made and kept --
6       A.   Yes.
7       Q.   -- in the ordinary course of the
8    business of the Tribe?
9       A.   Yes, it is.
10      Q.   Thank you.  I just have a couple of
11   questions about things in here.
12           MR. WELSH:  Do you want to use the page
13   numbers or -- let's go off the record one
14   second.
15           (Discussion off the record.)
16           MR. WELSH:  Back on the record.  We'll
17   use both numbers, page number and Bates
18   number.
19           MR. ROMAN:  Okay.
20           MR. WELSH:  All right, Daniel?
21           MR. DAVIS:  Yes.
22      Q.   {By Mr. Welsh}  Turning in Exhibit 5 to
23   the document on page four, Bates number L000337,
24   there is an item five; do you see that?
25      A.   Mm-hmm.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 128

1       Q.   It says, "Chairman Cypress", that's the
2    same person we have discussed previously, Billy
3    Cypress as Chairman, "stated Dexter Lehtinen,
4    Tribal Attorney, would be giving an update
5    regarding these two issues, but he would like to
6    make a brief report about the Business Council
7    trip to Connecticut to visit the Foxwoods Casino
8    owned and operated by the Mashantucket Pequot
9    Tribe.  He stated their enrollment applications
10   are not screened and blood quantum is not taken
11   into consideration.  Therefore, the enrollment is
12   quite high.  They make a lot of money from their
13   casino and are saying they would be willing to
14   pay the taxes being imposed".
15           What is he talking about there, if you
16   know, on the taxes being imposed?  What taxes are
17   those?
18      A.   He is probably talking about the taxes
19   that we're being asked to pay on the
20   distributions that we make.
21      Q.   On the NTDR distributions?
22      A.   That the Service is trying to make us
23   pay on those distributions.
24      Q.   On the distributions we have been
25   talking about, the quarterly distributions?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 129

```
 1    A.   Mm-hmm.  Yes.  I'm sorry.
 2    Q.   And here he is saying that the Pequot
 3  Tribe would be willing to pay those taxes?
 4    A.   Yes, sir.
 5    Q.   Okay.  Then it goes on to say, "the
 6  other Indian Tribes say they admire the way the
 7  Miccosukee Tribe still holds on to their cultural
 8  beliefs, maintains their traditional ways and
 9  ensures the blood quantum of enrolled
10  applicants".
11         Does that mean that -- the blood
12  quantum means that a certain -- what you have
13  described before, 50 percent blood has to be
14  Miccosukee blood?
15    A.   Right.
16    Q.   Before you can enroll?
17    A.   Yes.
18    Q.   Some other Tribes don't require that?
19    A.   No.
20    Q.   They require a smaller percentage?
21    A.   Yes.
22    Q.   Okay.  If you turn over to page five,
23  which is also Bates stamped L00038, there are
24  more discussions of this law.  It says "Mr.
25  Lehtinen reviewed the new law".
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 130

```
 1         Is that the taxing law that you were
 2  talking about, which is where the IRS wants to
 3  tax the quarterly distributions?
 4    A.   Yes.
 5    Q.   "On payments made to tribal members
 6  from Indian Gaming profits.  The Government had
 7  said they would never tax income derived from
 8  tribal lands but it has never been clearly
 9  defined legally.  The Indian Tribes look at the
10  wording in a different view than the government".
11         What is the different view between the
12  government and the Indians, just very briefly, if
13  you can?
14    A.   Well, as I had mentioned, our
15  distribution had been made long before this came
16  up.  When we were getting $20, the IRS wasn't on
17  our door knocking saying that they wanted to tax
18  our $20 distribution.
19         It seems like in the `90's,
20  particularly `95 when it was noticed that our
21  distribution had gotten bigger, it seemed to take
22  an interest in getting our taxes from our
23  distribution.
24         But our distribution -- the spirit of
25  the distribution has never changed with the
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 131

```
 1  Tribe.  As I mentioned earlier, the distribution
 2  was meant to assist tribal members.
 3         I'm not sure if you're aware, but the
 4  other issue that I am taking up when I go to
 5  Washington is the cleanup of our homeland, which
 6  is the Everglades.
 7    Q.   I read a lot about that.
 8    A.   Most of us have lived in the Everglades
 9  and grew up in the Everglades, and I remember
10  when I was younger we used to eat from the canals
11  of the Everglades.  We would eat fish, turtle.
12  We would eat Wading bird.  We would eat deer from
13  the Everglades.
14         But, I believe, it was in the late
15  `80's and early `90's we were informed not to eat
16  more than eight ounces of fish from the Glades
17  per month because the fish were contaminated with
18  mercury.  Today the Everglades is heavily
19  polluted from phosphorus runoff from farmlands up
20  along the Kissimmee River which washes into Lake
21  Okeechobee, and Lake Okeechobee then releases its
22  waters down to the Everglades.
23         Now our phosphorus level exceeds the
24  standards set by the EPA which is ten parts per
25  billion.  In some areas we're getting dirty water
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 132

```
 1  as much as ten times that amount.
 2         No longer can our people continue to
 3  sustain themselves in the Everglades.  They have
 4  to have a means of surviving.  They cannot
 5  survive no longer by eating the fish, turtle,
 6  deer that they once did.
 7         A lot of our members have never held a
 8  job.  They have never had to file a 1040 because
 9  they have never had to hold a job because they
10  have lived off the Everglades, but things started
11  changing.  And that's where the biggest
12  distribution came from, and that's how they
13  continue to sustain themselves even today.
14         The spirit of the assistance, as I
15  pointed out earlier, has never changed with us;
16  but when the law changed in `95, that was never
17  taken into consideration of how they're looking
18  to change our culture, our tradition, our way of
19  life.
20    Q.   That's what he is talking about in the
21  first sentence of page 338, the new law is the
22  law taxing --
23    A.   Mm-hmm.
24    Q.   -- the gross profits tax?
25    A.   Now the IRS wants to re-define what we
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 133

```
 1    term assistance to taxable income, and we have
 2    never seen it and received it as taxable income.
 3    We have never received it as income.
 4          And even when I was little, I was never
 5    told that this is your source of income.  Survive
 6    on it.  No.  We were always told that this is to
 7    help you survive.  This is what the Tribe is
 8    doing for you.
 9       Q.   Okay.  I understand.  Then in the
10    second paragraph on page 338 it says,
11    "Mr. Lehtinen reported the tribal members will be
12    receiving two separate checks at this Trust Fund
13    distribution.  One will be with the gross
14    receipts and one will be the tax amount due which
15    he urged tribal members to deposit so they may
16    use to pay taxes when due".
17          What is being talked about there, if
18    you know?
19       A.   Hold on a second.  Let me read this.
20    Again, you are going to have to ask Mr. Dexter
21    Lehtinen exactly what he meant on that.
22       Q.   Do you recall ever getting two checks?
23       A.   No.
24       Q.   As a trust fund distribution?
25       A.   No.  I can only make my own conclusion;
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 134

```
 1    but as a tribal member, no, we have never
 2    received two checks in one distribution.
 3       Q.   You only got the one trust fund
 4    quarterly distribution we have discussed earlier?
 5       A.   Right.
 6       Q.   Never two checks in that regard?
 7       A.   No.  Like I said, it was never from the
 8    trust fund.  That was a trust fund or the NTDR
 9    account was created in `95.
10       Q.   That's what he's talking about.  Is
11    that the 6 and a half percent that he talks about
12    in the last sentence of the second paragraph?
13       A.   Right.
14       Q.   Okay.  On page 338?
15       A.   Yes.  Before everything came into an
16    account.  So he is restructuring for the Tribe.
17    Now, what was his reasoning, I do not know.
18       Q.   Okay.  The third paragraph on page 338
19    says, "Chairman Cypress reiterated Mr. Lehtinen's
20    report.  He added tribal members are reporting
21    the Trust Fund payments when they apply for
22    credit.  He urged tribal members to refrain from
23    this.  Administration Office receives calls from
24    businesses to verify these payments and they are
25    informed they are not aware of it in order to
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 135

```
 1    protect the tribal members.  If this keeps
 2    happening, then it could lead to where it affects
 3    the other assistance monies the tribal members
 4    receive from federal agencies".
 5       Q.   Do you know what is being discussed in
 6    that paragraph?
 7       A.   Yes.
 8       Q.   Can you tell me?
 9       A.   Tribal members sometimes identify their
10    assistance as income when they need outside
11    financial assistance such as like when they're
12    purchasing a large ticket item.
13       Q.   Like a car or something?
14       A.   Exactly like a car.
15          They're trying to use the assistance as
16    a source of income.  Even today I used to tell
17    them, it's not income.  It can't be identified as
18    income because it is not income.  It is
19    assistance.  Assistance is not something that you
20    can say you will be getting this for the rest of
21    the year.  It is only given to you because there
22    is money in that account, and the General Council
23    has determined that it will be distributed among
24    the membership.  If there is no money or if the
25    General Council decides there will not be a
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 136

```
 1    distribution, then there will not be a
 2    distribution.
 3       Q.   Okay.  So, therefore, and correct me if
 4    I'm wrong, Chairman Cypress is telling the Tribe
 5    at the General Council meeting not to report or
 6    not to use as or not to report as income on
 7    credit applications and saying the money which
 8    they're given as quarterly distribution from the
 9    NTDR account?
10       A.   Right.  It's like people when they live
11    in apartments, they get assistance from the
12    federal government, what they call HUD
13    assistance, they don't identify that as income on
14    their application.
15          We are doing the same thing here.  They
16    use it as the same but it is not income.  They
17    cannot identify it as such.
18       Q.   Okay.  I understand.  So that was right
19    then, how I described it, that is, that Chairman
20    Cypress was telling the Tribe here not to report
21    the quarterly payment from the NTDR account on
22    things like credit applications as income?
23       A.   Right.
24       Q.   And just not list it at all?
25       A.   Right.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 137

1    Q.   Okay.  Because, as you said, it could
2  affect -- that last sentence in the third
3  paragraph on page 338, "if this keeps happening,
4  then it could lead to where it affects the other
5  assistance monies the tribal members receive from
6  federal agencies"?
7    A.   Yes.
8    Q.   Because if they showed it as income,
9  then it might reduce other federal benefits that
10  are provided to tribal members?
11    A.   Right.  Or the amount of money that we
12  receive from other federal agencies based on our
13  financial burden.
14    Q.   The tribe as a whole or individual
15  members?
16    A.   Yes.  The Tribe as a whole.
17    Q.   How would that work?
18    A.   Some programs we have to pass up
19  because there is a requirement that is set by the
20  federal government for us to meet certain
21  criteria.  Even though we don't consider our
22  assistance as income like the IRS, the federal
23  government could consider it as income.  So
24  that's why we stay away from those programs.
25    Q.   Income to the Tribe or income to the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 138

1  individuals?
2    A.   I'm talking about grants or federal
3  monies that the Tribe receives for some of these
4  programs that it would provide to the membership.
5    Q.   If they believe that the NTDR account
6  money, the gross receipts check money went to the
7  Tribe and then for distribution to members, they
8  might cut back on some programs?
9    A.   No.  What I'm saying is that sometimes
10  there would be programs where you are only
11  required to make $12,000 a year and the
12  distribution you saw where they're getting like
13  $44,000, they would attempt to use that as income
14  rather than assistance, and, thereby, telling the
15  Tribe that the tribal member is not eligible for
16  that program.
17    Q.   Okay.  Because he makes too much money?
18    A.   Right.  He or she would make too much
19  money.
20    Q.   I see.  But if it's not reported as
21  income, the federal government would still give
22  the other assistance?
23    A.   Mm-hmm.
24    Q.   In the last sentence on page 338 it
25  says, "Mr. Lehtinen read and summarized the Gross

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 139

1  Receipts Tax Ordinance.  He explained approval
2  for this to be enacted would have to come from
3  the General Council".
4         Is that the Gross Receipts Tax
5  Ordinance that was Exhibit No. 15 that we
6  discussed earlier?
7    A.   I would assume.  That one page, yes.
8  That's what I was saying, you're missing some
9  pages.
10    Q.   Because it says here it has to be
11  approved by the General Council?
12    A.   Right.  And I don't see where it says
13  it was approved.
14    Q.   Would that have to be in these
15  records -- in the business records of the General
16  Council meeting?
17    A.   Yes.  It would be attached to this if
18  it was done properly.
19    Q.   Is that what is meant on page 339?
20    A.   That's what we are looking at.
21         MR. ROMAN:  Above item six.
22    Q.   Right.  "Motion carried with a vote of
23  22 for, zero opposed with three abstentions"?
24    A.   Right.  Yes.  He would have to have the
25  remaining pages on this.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 140

1    Q.   But the vote that was taken, which is
2  reflected on page 339, is relating to what we
3  have marked as Exhibit 15, correct?
4    A.   Mm-hmm.
5    Q.   So it was then properly approved by the
6  Tribe, correct?
7    A.   Yes.  On these minutes that's what it
8  says, but on your copy it only has the cover
9  sheet.
10    Q.   I see.  Because it was approved by the
11  Tribe --
12    A.   So we have to assume somewhere it is
13  out there.
14    Q.   Right.  We are just missing the second
15  page because this -- in your opinion, does this
16  then show that Exhibit 15, the Gross Receipts Tax
17  Ordinance, was approved by the Tribe?
18    A.   Yes.
19    Q.   You are mentioned.  You're right.  I'm
20  sorry.  You were at this meeting?  It says
21  "Colley Billie", is that you?
22    A.   Yes.
23    Q.   "Asked if Miccosukee Indian Bingo was
24  paying tribal taxes as other tribal enterprises
25  were".

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 141

1    Do you remember asking that?
2    A.  Mm-hmm.
3    Q.  Okay.  It says, Mr. Cypress said that
4  they're imposing a 6.5 tribal tax levy on the
5  bingo operation, correct?
6    A.  Mm-hmm.
7    Q.  And you ask, "what will happen to the
8  tax money being set aside in a separate account
9  for the taxes".
10    What did Mr. Cypress mean -- below your
11  name it says, "Chairman Cypress stated Business
12  Council will keep General Council apprised if
13  there is any other information forthcoming.  He
14  added after all is straightened out, then monies
15  could come back to the Tribe".
16    What is he talking about there?
17    A.  Okay.  Now I think I understand what
18  you meant or what this earlier paragraph meant.
19  I think it might be a typo.  I miss -- how do you
20  say that?  I was misquoted.  What he had talked
21  about was that --
22    Q.  He is Billy Cypress?
23    A.  No.  Dexter Lehtinen.
24    Q.  Okay.
25    A.  What he had talked about was they were

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 142

1  going to be setting aside monies to pay for taxes
2  if it was ever determined that those monies were
3  subject to taxation.
4    Q.  Okay.  If the quarterly distributions
5  were determined to be taxable to the individual
6  tribal members, they were going to set aside
7  monies --
8    A.  Right.
9    Q.  -- to pay those -- the Tribe would set
10  aside the monies for the individual tribal
11  members?
12    A.  Right.  So he had explained that there
13  would be some monies set aside each time there
14  was a distribution made, and that those monies
15  will accumulate; and if there ever was a time
16  when the IRS would challenge the assistance and
17  deem it to be subject to taxation, the Tribe
18  would have available funds to take and pay for
19  the liability, and the individual tribal member
20  would not be held liable for it in the future.
21    Q.  Because the money would be reserved for
22  them by the Tribe?
23    A.  Right.  But I remember we were
24  asking -- we meaning the General Council were
25  asking among ourselves, why is this money not

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 143

1  subject to taxation?  If we are being told it is
2  not taxable, then why are we setting aside
3  monies?  We are being told we don't have to pay
4  taxes but we are going to put this aside and hope
5  that you don't have to use it.
6    But that didn't last too long because
7  when I came in we did an assessment.  Some of
8  those monies were actually spent by the previous
9  Chairman before he left office and not in
10  relation to taxation.
11    Q.  So for some period of time money was
12  actually set aside --
13    A.  Yes.
14    Q.  -- by the Tribe to pay taxes for the
15  individual member's income tax?
16    A.  If it was ever determined.
17    Q.  If it was ever determined?
18    A.  Right.
19    Q.  And that was money segregated and put
20  in a separate account?
21    A.  Yes.
22    Q.  And that money was taken out of each
23  member's individual quarterly distribution?
24    A.  I think at the time they had enough
25  funds to set aside and not take it from the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 144

1  quarterly distribution.
2    Q.  So they set it aside in addition to --
3    A.  Right.
4    Q.  -- the quarterly distribution amount?
5    A.  Right.
6    Q.  But then that money which was set aside
7  for income tax for the individuals disappeared?
8    A.  When the economic recession hit us, the
9  gaming facility wasn't generating as much revenue
10  as it was previously.  So instead of cutting back
11  on expenses, the previous administration
12  continued at the same level.
13    Q.  To make quarterly distributions?
14    A.  No.  To spend the same amount of money
15  that it had been spending.
16    Q.  Spending on what?
17    A.  Providing services, and that's also
18  where our other litigation comes in.  You know we
19  are trying to sue Dexter for wrongful
20  misrepresentation and for charging us excessively
21  for these services, as well as Sarah Woods and
22  Michael Keenan, and there are other people that
23  have also come in and taken money out of those
24  accounts.
25    So you have to understand that there

KRESSE & ASSOCIATES, LLC
(305) 371-7692

36 (Pages 141 to 144)

Page 145

1    were other expenses that the Tribe was paying and
2    also trying to maintain the level of service that
3    was being provided to the general membership like
4    the housing assistance, health assistance, tribal
5    assistance.
6            You guide your revenue as tiny because
7    of the economic recession, but none of those were
8    reduced to reflect the recession.  So since
9    you're not bringing in enough revenue but your
10   services are up here and your revenues are down
11   here, what do you do to fill in the gap?  You
12   take it from what you have been saving.
13       Q.   And you don't cut the quarterly
14   distribution?
15       A.   Right.  And you don't cut anybody out,
16   except the money that you are supposed to use.
17       Q.   Your savings account?
18       A.   Mm-hmm.
19       Q.   I understand.  Okay.
20       A.   So those monies are no longer there.
21   When I came in some part of the money had already
22   been exhausted.
23       Q.   That's what you were talking about
24   going back to page 339 of the exhibit?
25       A.   That's what I was asking about, what

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 146

1    would happen to those monies?
2        Q.   Right.  On page 339 of Exhibit 5 it
3    says, you -- again, I'm looking below Chairman
4    Cypress, "Colley Billie stated after this is
5    straightened out and if funds are returned, will
6    Business Council be the ones to oversee the use
7    of the funds?  He asked this as the Business
8    Council -- he asked this as the Business Council
9    could use the funds for other projects instead of
10   what it was designated for".
11           What are you talking about there?
12       A.   Truthfully?
13       Q.   Sure.
14       A.   I never trusted Billy.
15       Q.   Okay.  So you're --
16       A.   What passed is what I was afraid of.
17       Q.   What are you asking Mr. Cypress there?
18       A.   Who is going to be watching the money.
19       Q.   The set aside money that you just
20   talked about?
21       A.   Right.  In other words, I don't want
22   the fox getting in the henhouse, and that's what
23   happened.  The foxes are in the henhouses.
24       Q.   So what you're asking is what can this
25   set aside money be used for other than

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 147

1    potentially for income taxes?
2        A.   Mm-hmm.
3        Q.   And --
4        A.   And the Business Council will be
5    watching it.  That was telling him, me.
6        Q.   And that's what he is talking about in
7    the next paragraph on page 339 where it says,
8    "Chairman Cypress stated this would not be done
9    as the monies would be placed in a separate
10   designated account".
11       A.   Yes.
12       Q.   "He added the monies could be used to
13   pay the taxes due for each tribal member", and
14   that's the income taxes on quarterly
15   distributions that you were telling me about?
16       A.   Mm-hmm.
17       Q.   "If any of the tribal members have any
18   problems arising from the tax situation, then the
19   Tribe will help with the legal expenses and the
20   tribal attorney will be available to help".
21           So is Mr. Cypress telling you that the
22   set aside money to pay in the event that the
23   quarterly distributions are ultimately determined
24   to be taxed, that the money will be there and the
25   Tribe will provide legal representation to those

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 148

1    members?
2        A.   Mm-hmm.  Yes.
3            MR. WELSH:  You can get the mm-hmm's as
4    yes, right?
5            THE COURT REPORTER:  Yes.
6            (Discussion off the record.)
7        Q.   And then it goes on to say, "he added",
8    that's Mr. Cypress, "added that in the future if
9    the General Council wishes, then they can abolish
10   the ordinance being discussed, if it is passed".
11   Then it passes, correct?
12       A.   Yes.  It passed.  I believe I was one
13   of the ones that had abstained because I didn't
14   feel comfortable.
15       Q.   And as you have said, you think the
16   money in the separate account that was set aside
17   to pay potential future income taxes disappeared?
18       A.   Yes.  It did disappear.  Then when I
19   came into office, I asked Dexter to defend the
20   Tribe as he had promised, and he told me, no.  He
21   said that he cannot defend the Tribe because he
22   had said that he never said that we never had to
23   pay taxes on it, but that wasn't true.
24           He stood up with Billy Cypress at the
25   General Council telling us we do not have to pay

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 149

1    taxes on these monies, but yet at the same time
2    in the next breath they would tell us, oh, we are
3    going to save some monies just in case we have to
4    pay for it.
5        Q.   So he stood there way back in 1995 and
6    told the whole Tribe that, first of all, it's
7    really not taxable but it may be taxable, so we
8    are going to set aside all this money in a
9    separate account and reserve it for you if it
10   does come to pass that you have to pay taxes?
11       A.   Right.  He said that I'll be there to
12   represent you.
13       Q.   And the money will be there to pay the
14   taxes?
15       A.   Mm-hmm.
16       Q.   Turning over to page 342 of Exhibit 15,
17   I just don't -- this is on pages 342 and 343.  I
18   didn't understand what some of these accounting
19   numbers mean.
20            When it says income for sales for the
21   Miccosukee Service Plaza, is that gross income or
22   what is that?
23       A.   Income from sales would be -- yes, that
24   would be the gross income.  The cost of sale is
25   what would it cost, say, like to buy supplies.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 150

1        Q.   Okay.
2        A.   The needed costs that you have to buy
3    to run a business.
4        Q.   Okay.
5        A.   The operating expenses would be like
6    your employees and other related expenses.
7        Q.   Okay.  Now, is the gross receipts tax
8    applied to the service plaza or not?
9        A.   Yes, it is.
10       Q.   So where is that here?  Where is it
11   there?
12       A.   That's not in there.  I believe that is
13   already removed.
14       Q.   It's removed from the year-to-date
15   figure which is $3,351,000?
16       A.   Yes.
17       Q.   That would be net of the gross receipts
18   tax?
19       A.   Right.
20       Q.   Then if you turn to the next page, 343,
21   there is something I don't understand about some
22   of these.  It says enterprise checkbook balances.
23   When they have the little carrot like thing by
24   them like the restaurant, there is $131,199, is
25   that a negative figure?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 151

1        A.   Yes, it is.
2        Q.   Okay.  And that's true, then, if you
3    look at the enterprise -- going down the page on
4    343, it says enterprise income and expense, and
5    it shows restaurant, and then there is a negative
6    figure of $61,000?
7        A.   Yes.
8        Q.   But then it has a figure of $44,073 as
9    tribal assistance.  What does that mean?
10       A.   That means that the Tribe itself had to
11   invest its own money to cover needed expenses.
12       Q.   Okay.  So --
13       A.   Probably the assistance or whatever you
14   want to call.
15       Q.   The Tribe gave the restaurant $44,000?
16       A.   Yes.
17       Q.   But it still had a loss of $17,000?
18       A.   Yes.
19       Q.   It just reduced the loss?
20       A.   Yes.  Because your loss total is
21   $61,000.
22       Q.   Then what happens in the case of the
23   restaurant, it has a loss still of $17,000?
24   That's just --
25       A.   That's just a running number.  So that

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 152

1    means that either the following week or the
2    following couple of weeks we would have given
3    that restaurant additional monies.
4        Q.   Oh, so you would make up the $17,000?
5        A.   Yes.
6        Q.   So it would just net out?
7        A.   Yes.
8        Q.   It would come out to zero then?
9        A.   Yes.
10       Q.   Eventually?
11       A.   It would come out to zero, but it would
12   be a loss.
13       Q.   Right.  It would be a real economic
14   loss, but the paper loss then would just zero
15   out; is that correct?
16       A.   Yes.
17       Q.   Okay.  So these are, I guess, just to
18   keep the restaurant going and -- who else runs at
19   a loss?  The village?
20       A.   Yes.  Most of our enterprises run at a
21   loss.
22       Q.   I see.  If we go down to the village on
23   page 343, it has a $60,000 real economic loss?
24       A.   Yes.
25       Q.   But then you give tribal assistance of

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 153

1   $45,000?
2       A.   Yes.  You have to understand that we
3   have tribal members that are employed at those
4   places.  If you shut it down, where are these
5   tribal members going to get a job at?  So that is
6   taken into consideration.
7       Q.   Okay.  I didn't understand that.
8            Then if you turn to page 344 of
9   Exhibit 15 -- I'm sorry, Exhibit 5, this is the
10  general account and expense statement?
11      A.   Mm-hmm.
12      Q.   So we have got there -- what does it
13  mean when it says we have gone to -- it shows a
14  date of 2-2-1995.  We have income of $2,802,000?
15      A.   Mm-hmm.
16      Q.   But year-to-date actual is $2,853,000?
17      A.   Yes.
18      Q.   It's not a big difference, but what is
19  the difference?
20      A.   The year-to-date?
21      Q.   Yes.
22      A.   Current and year-to-date?
23      Q.   Yes.
24      A.   The current is whatever period we are
25  reporting on.  If it's for the six months, that

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 154

1   would be current actual, and then the year would
2   be the running total.
3       Q.   Okay.  Then down here where you have
4   income, Headstart support, it's only $16,000, but
5   what is that?  Is that a federal government
6   program or was that a tribe program?
7       A.   No.  I think that's covering a tribal
8   employee.  That's the Headstart Program.
9       Q.   Okay.  You mean it's federal government
10  money coming into the Tribe to cover an employee?
11      A.   Not all the employees.  Remember I was
12  telling you that sometimes federal funds is not
13  enough to cover some of our programs --
14      Q.   Right.
15      A.   -- and I was telling you that sometimes
16  the Tribe has to provide those additional dollars
17  that it needs.
18      Q.   Right.
19      A.   This is a perfect example.  There is
20  an -- obviously there is a tribal employee over
21  at the Headstart, but that tribal employee is not
22  covered by the program itself probably for lack
23  of funds.  So the additional funds to pay for
24  that tribal employee would have to come from the
25  Tribe's own resources.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 155

1       Q.   Is that $16,000 being provided by the
2   Tribe or by the federal government?
3       A.   The Tribe.  All this is provided by the
4   Tribe.  Nothing to do with the federal
5   government.
6       Q.   I see.  Okay.  I think now I
7   understand.  If you go down on that same page,
8   344, you have a paragraph that begins, "Chairman
9   Cypress stated this issue is always addressed in
10  every General Council meeting".
11           Going on down he said, "he added some
12  of the enterprises are losing money but the
13  General Council helps by providing assistance"?
14      A.   Yes.
15      Q.   That's what you were telling me?
16      A.   Yes.
17      Q.   So out of the general account the Tribe
18  puts money into businesses which aren't
19  economically profitable?
20      A.   Mm-hmm.
21      Q.   Like --
22      A.   Yes.  I'm sorry.
23      Q.   Like the village, the restaurant, that
24  sort of thing?
25      A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 156

1       Q.   You have in front of you what has
2   previously been marked as Exhibit 6.  Again, is
3   this a business record of the Miccosukee Tribe
4   being a record of the special General Council
5   meeting of November 2, 1995?
6       A.   Yes.
7       Q.   And just to go through the
8   familiarities, is it, again, a record which was
9   made and kept in the ordinary course of business
10  of the Tribe?
11      A.   Yes, sir.
12      Q.   And was it so made and kept?
13      A.   Yes.
14      Q.   Now, over on the second page of Exhibit
15  No. 6 at page two, and also page L000355, down
16  near the very bottom of the page there is more
17  discussion apparently with Mr. Lehtinen and
18  Mr. Cypress of the NTDR payments.
19           Down at the very bottom there is a
20  sentence that says, "Chairman Cypress stated that
21  the cost of the expansion", this is apparently
22  referring to a parking lot and some other things,
23  "would not affect the NTDR payment but the tribal
24  programs which are assisted by gaming revenue
25  will experience cutbacks for at least four

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 157

1   months".
2        Do you know what Mr. Cypress is talking
3   about there?
4        A.   The parking -- I believe he is talking
5   about the parking lot improvements that were made
6   over at the gaming facility.
7        Q.   Why does he have to point out that the
8   cost of expansion would not affect the NTDR
9   payments but that other programs assisted by the
10  gaming revenue would be cut back?
11       A.   I'm not sure why because that was --
12  those monies were selected at a fixed rate.  I
13  think we started at 6.5 percent, so that should
14  have come off from the top, unless he is changing
15  that and collecting it from the bottom by taking
16  out all the expenses.
17       Q.   Did he ever do that or did that ever
18  happen?
19       A.   I don't know.
20       Q.   Okay.  What tribal program is he
21  talking about cutting back for at least four
22  months?
23       A.   This would probably be housing and
24  health assistance and apparently the education.
25  The third one I'm not sure.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 158

1        Q.   Welfare programs?
2        A.   Yes.
3        Q.   If you turn over to page three, also
4   L000356, Exhibit 6, last -- second to last full
5   paragraph, it's a very short paragraph about
6   Mr. Cypress and Mr. Lehtinen again.  But that
7   paragraph beginning with, "Chairman Cypress
8   updated General Council on the taxation on gaming
9   and revenue issue.  He reported Congress and
10  Senators have said states are not taxed.
11  Therefore, the Indian Tribes should be given the
12  same consideration.  They have stated federal
13  government was to have given federal aid but
14  assistance funds are being cut.  They have
15  advised that anyone presenting this bill will
16  face opposition.  He added gaming revenue
17  taxation issue seems to be losing momentum.  In
18  the event it does come into effect, then the
19  tribal attorney has two financial plans which can
20  be implemented which would aid the Tribe in
21  avoiding the paying of taxes".
22       Do you know what he was talking about
23  there?
24       A.   The only one that I'm aware of was when
25  he created that ordinance and started assessing

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 159

1   our taxes at the gaming facility at 6.5.
2        Q.   So the one that we have seen before,
3   the gross receipts --
4        A.   Yes.
5        Q.   -- tax?
6        A.   That's the only one I am familiar with.
7        Q.   Okay.  That was what Mr. Lehtinen and
8   Mr. Cypress apparently were talking about in
9   terms of a way to avoid the taxation of the
10  distribution?
11       A.   It seems to be.
12       Q.   Over on the next page, page four, also
13  page L000357, there is a short paragraph.
14  "Chairman Cypress stated funds generated by
15  MIBG", which, again, is Miccosukee Indian -- is
16  that Bingo Gaming?
17       A.   Yes.  Miccosukee Indian Bingo and
18  Gaming.
19       Q.   Oh, Bingo and Gaming.
20       "Are used to build tribal housing but
21  some tribal members are putting this in jeopardy
22  by listing NTDR payments on loan applications".
23       What is being put in jeopardy?  What is
24  the problem being discussed there?
25       A.   Again, I think that he is referring to

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 160

1   some of our tribal members are identifying those
2   assistance as income.
3        Q.   So they're showing the quarterly
4   distribution --
5        A.   Yes.
6        Q.   -- payments as income?
7        A.   As income, right.
8        Q.   How is that going to put tribal housing
9   in jeopardy?
10       A.   That part I don't know.
11       Q.   Okay.  I didn't understand that from
12  what you said before.
13       And that's what he is talking about in
14  the next paragraph where, "he added that homes
15  are released -- when homes are released, a copy
16  of the homeowner's agreement is given.  A tribal
17  member has apparently given this copy to a car
18  salesman when applying for car financing".
19       What is a release of a homeowner's
20  agreement and how would that affect financing for
21  a car?
22       A.   Well, there were times when he would
23  give out these announcements and sometimes some
24  of us really didn't understand the correlation,
25  so...

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 161

1    Q.   What is the homeowner's agreement that
2  he's talking about there?
3    A.   The agreement that a homeowner receives
4  as an understanding that his responsibility to
5  maintain the house has been reviewed with him or
6  her.  That's what the homeowner (sic) generally
7  consists of.
8    Q.   And that's what you described before
9  where the Tribe provides housing to a member?
10   A.   Mm-hmm.
11   Q.   And how is that going to affect an
12 application for car financing?
13   A.   I have no idea.  I really don't.
14        MR. WELSH:  Can we take a break for one
15   second?
16        (Recess in Proceedings)
17   (Thereupon, Mr. Farrior is no longer present
18   in the deposition.)
19        MR. WELSH:  We are back on the record
20   and we'll try to make it as fast as
21   possible.  Sorry.
22        THE WITNESS:  No problem.
23   Q.   Where did we leave off?
24   A.   Page three.
25   Q.   No.  On page four we talked about, on

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 162

1  357, the homeowner's agreement and you couldn't
2  figure out what Mr. Cypress was talking about
3  there?
4    A.   No.  I mean, unless they're showing it
5  as proof that they're homeowners.
6    Q.   That must be it, because the last
7  sentence, again, we are on page four, the
8  paragraph which starts "when homes are released"
9  the last sentence says, "he stressed to General
10 Council that they, paren, tribal members, end
11 paren, are charged just a fraction of the cost to
12 build this house and ownership should not be
13 jeopardized".
14        Now, does that help you in terms of
15 what he is talking about?
16   A.   No.  The tribe charges the homeowner
17 $10,000 for the house.
18   Q.   And the house cost a lot more than
19 that?
20   A.   Yes.
21   Q.   So if the homeowner then listed the
22 house on a financing application as an asset,
23 could that in some way imperil the Tribe?
24   A.   I don't think so.
25   Q.   Who owns the house?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 163

1    A.   That's what I mean.  It's communal.
2  The Tribe -- the Reservation is held in trust.
3  The title is held by the government, so the
4  homeowner never really gets title.
5    Q.   Never gets fee simple title?
6    A.   No.
7    Q.   So what does the homeowner get?
8    A.   Basically nothing.
9    Q.   What right does the homeowner have to
10 live in the house?
11   A.   He has the right to live there.
12   Q.   The Tribe gives him the right to live
13 there?
14   A.   Yes.
15   Q.   And he can't be evicted from the house
16 by the Tribe?
17   A.   Well, he can be if he does something
18 horrendous, the Tribe can have them evicted.  Not
19 that we have done it before; but as long as he
20 lives peacefully, he can stay there for the rest
21 of his life.
22   Q.   But the homeowner isn't really a
23 homeowner, then?  He can't sell the house?
24   A.   Right.  That's what I'm saying.  He
25 never gets title.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 164

1    Q.   So the homeowner doesn't really own the
2  house?  He can't sell it to another Tribal
3  member, for instance?
4    A.   Not the house, not the property.
5    Q.   So if he were to list that on his
6  application for financing as an asset, that
7  really wouldn't be true because he doesn't really
8  own it?
9    A.   Right.
10   Q.   I understand.  But as opposed to that,
11 the last paragraph on page four where it says,
12 "Chairman Cypress stated Administration Office is
13 still receiving calls regarding tribal members
14 listing NTDR payments on their credit
15 applications.  He stated Business Council has
16 repeatedly asked tribal members not to do this as
17 it could cause consequences".
18        That's what you were talking about
19 before where the tribal members are showing their
20 NTDR payments -- quarterly distributions as
21 income on credit applications?
22   A.   Mm-hmm.
23   Q.   And again --
24   A.   Yes, sir.  Sorry.
25   Q.   I'm try to get through this fast.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 165

```
 1    Again, Mr. Cypress is telling the members not to
 2    do that because that could cause -- as he said,
 3    could cause consequences, as in the last
 4    paragraph on page four, correct?
 5        A.  Yes.
 6        Q.  If you run over -- that one runs over.
 7    The last paragraph on page four runs over to
 8    page five.  It says, "members from facing
 9    problems with the IRS, but if they (tribal
10    members) continue to list this as income, then
11    all Business Council effort will be for naught".
12            What is he talking about there?
13        A.  For naught means nothing, but the
14    general concern was that our
15    distribution could be declared as income, and
16    once they're declared as income, it will become
17    subject to taxation.
18        Q.  I see.  So Mr. Cypress, and correct me
19    if I'm wrong, is saying that, again, the members
20    of the Tribe should not list their NTDR
21    distributions quarterly as income because -- on
22    credit applications because if they do that, then
23    that would help the IRS show that the
24    distributions are, in fact, income and so
25    taxable?
```

                    KRESSE & ASSOCIATES, LLC
                        (305) 371-7692

Page 166

```
 1        A.  Yes.
 2        Q.  Okay.  It keeps on talking about that.
 3    So that's what he's telling people at the General
 4    Council meeting?
 5        A.  Yes.
 6        Q.  The tribal members?
 7        A.  Yes.
 8        Q.  The next paragraph down there, he -- I
 9    guess, is that Mr. Cypress again?  The next
10    paragraph on page five, he again requested of the
11    General Council?
12        A.  Where?
13        Q.  Right below.  Is that he, Mr. Cypress
14    again?  He again requested of the General
15    Council?
16        A.  Yes.
17        Q.  And then he, I guess, again is
18    Mr. Cypress.  "He added some of the other Indian
19    Tribes" -- is that Mr. Cypress saying that?
20        A.  Yes.
21        Q.  "He added some of the other Indian
22    Tribes have followed suit and are not paying
23    taxes on gaming revenues.  He stated Business
24    Council is working very hard to keep other Indian
25    Tribes' problems from affecting the Miccosukee
```

                    KRESSE & ASSOCIATES, LLC
                        (305) 371-7692

Page 167

```
 1    Tribe; but if tribal members continue to list
 2    NTDR payments, they will hurt themselves in the
 3    long term".
 4            So, again, without belaboring this
 5    again, Mr. Cypress is just saying that the
 6    Miccosukee Tribe and some other Tribes are trying
 7    to be consistent in not reporting these kinds of
 8    distributions as income, these quarterly net
 9    gaming revenue income -- not income,
10    distributions as income, and they're
11    communicating with other Tribes?  Did he contact
12    other Tribes; do you know?
13        A.  I don't know.
14        Q.  Is that what he is talking about?
15        A.  That's what it seems to be saying.
16        Q.  Okay.
17        A.  But he never really explained who he is
18    talking to or contacting.
19        Q.  He didn't?
20        A.  No.
21        Q.  But down at the bottom of page five,
22    the very last sentence says, "the Seminole Tribe
23    has four gaming halls but their tribal members
24    receive only $1,000 per month and the Miccosukee
25    has only one but tribal members receive
```

                    KRESSE & ASSOCIATES, LLC
                        (305) 371-7692

Page 168

```
 1    substantially more".
 2            The Seminole Tribe is a much bigger
 3    Tribe?
 4        A.  Yes.
 5        Q.  So the money has to be spread out among
 6    a lot more people?
 7        A.  Yes.
 8        Q.  And turning over to page six of that
 9    document, which is Exhibit 6, "Chairman Cypress
10    stated Business Council had informed the tribal
11    members that NTDR payments would be in accordance
12    with the revenue generated at Miccosukee Indian
13    Bingo and Gaming"?
14        A.  Right.
15        Q.  What does he mean by that?
16        A.  I think what he is saying is that
17    whatever amounts of money that is accumulated in
18    the account is a reflection of the business
19    activity over at the Miccosukee Indian Bingo and
20    Gaming.  Meaning that those monies are derived by
21    charging a percentage.  If the revenue goes up,
22    hopefully, the taxes collected and placed into
23    that account would go up.
24        Q.  That's the 6 and a half percent and
25    then what later became 8.7; is that right?
```

                    KRESSE & ASSOCIATES, LLC
                        (305) 371-7692

Page 169

```
 1      A.   Yes.
 2      Q.   It goes into the NTDR account and
 3  that's what's used to pay the quarterly
 4  distribution?
 5      A.   Yes.
 6      Q.   So all he is saying is the quarterly
 7  distribution is tied to the --
 8      A.   Business activity.
 9      Q.   The business activity and the gross
10  receipts tax which the money is from which is
11  then placed into the NTDR account?
12      A.   Mm-hmm.
13      Q.   And then is used for the quarterly
14  payment?
15      A.   Yes.
16      Q.   Down here, is this you and Mr. Cypress
17  talking, half way down the page on page six?
18  "Chairman Cypress stated Chairman Billie has said
19  they are now balking at paying --
20      A.   No.  That's Chairman Billie from
21  Seminole.
22      Q.   Okay.  I see.
23          So he is saying that the Seminoles are
24  balking at paying the gaming taxes?
25      A.   Yes.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 170

```
 1      Q.   And which gaming taxes are those?
 2      A.   I believe they're paying taxes on
 3  their -- on their programs, as well as the
 4  distribution -- the per capita distribution that
 5  they make.
 6      Q.   So the Seminoles are paying income
 7  taxes on their per capita distribution?
 8      A.   That is my understanding.  That they
 9  were paying taxes on the services that they
10  provide.
11      Q.   Oh, like quarterly distribution type
12  services or some other services?
13      A.   Other services.
14      Q.   Like what?
15      A.   Like we were informed that when a
16  tribal member gets a repair done on their leaky
17  roof, they get a 1099 for the cost of the repair.
18      Q.   Oh, I see.  So if the Tribe pays to fix
19  somebody's roof, they give them a 1099 for the
20  value of the repair of the roof?
21      A.   Yes.
22      Q.   Is that a roof on the Reservation?
23      A.   Yes.
24      Q.   So then that would force the tribal
25  member to pay tax on the amount of the value of
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 171

```
 1  the repair to the roof?
 2      A.   Which is basically a service that is
 3  being provided by the Tribe.
 4      Q.   Right.
 5      A.   As I understand, it's a service the
 6  Tribe provides.
 7      Q.   But as far as you understand that's
 8  what he's talking about that the Seminoles are
 9  doing?
10      A.   Yes.  When it refers to the Seminoles,
11  he's talking about both the Seminole members and
12  the Tribe as a whole.
13      Q.   Okay.  Down at the bottom of page six
14  it refers to Mr. Lehtinen.  Mr. Lehtinen reported
15  the second page, apparently it's net income and
16  figures, and he's talking about $750,000 and
17  $1,200,000 and this year $2,400,000.
18          Is he talking about net income from
19  what?
20      A.   See the previous paragraph.
21      Q.   I guess that runs over to page seven?
22      A.   See, I'm not sure if he is reporting as
23  the legal counsel for the Tribe or if he is
24  reporting as the manager for the Miccosukee
25  Indian Bingo and Gaming.  It seems like he is
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 172

```
 1  reporting as a manager.
 2      Q.   Of the gaming facility?
 3      A.   Yes.
 4      Q.   Well, on page seven, "Mr. Lehtinen
 5  reported that if the government were to levy
 6  34 percent on Indian Gaming profits, the Tribe
 7  would be paying more in tax this month than
 8  revenue made two years ago".
 9          Is the 34 percent the tax that would
10  have to be withheld on the gaming profits if
11  taxes were to be withheld on them?
12      A.   I think he is talking about the payout
13  where --
14      Q.   The quarterly distribution payout?
15      A.   No.  No.  The gaming -- winning payout.
16  When players hit a jackpot they have to pay taxes
17  on those winnings, and I believe they were
18  assessed at 32 or 34 percent, unless it was
19  34 percent back at that time.
20      Q.   Why does he then say, "the Tribe would
21  be paying more in tax this month than revenue
22  made two years ago"?  Would the Tribe have to pay
23  that tax?
24      A.   I don't think so, but I'm not
25  100 percent sure on that one.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 173

```
 1      Q.   Okay.  That's not the withholding tax
 2   that would be required on the quarterly
 3   distributions?
 4      A.   It doesn't seem to be.
 5      Q.   Okay.  If you turn to page nine,
 6   please, read the bottom of that page, Ms. Osceola
 7   explained she just wanted to figure the payments
 8   to the Tribe in December.  Then apparently Mr.
 9   Cypress explains it, and I don't quite understand
10   his explanation here.  It all comes together on
11   page nine running over into page ten, there is
12   another quote from Mr. Lehtinen.  Read the bottom
13   sentence on -- there are two sentences on
14   page nine and then it continues over on to that
15   complete paragraph on page ten.  See if that's --
16   what is stated there is your understanding as
17   well as what Mr. Lehtinen said back then?  Is
18   that your understanding of how the system works?
19      A.   Yes, it is; but I'm noticing that the
20   34 percent --
21      Q.   Yes.
22      A.   -- that you were asking about, they are
23   talking about the amount that can be levied, I
24   believe, on the distribution.  I think that
25   34 percent is the number that they're using to
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 174

```
 1   say that that's what would be levied on the
 2   distribution if we were to pay taxes.
 3      Q.   So that would be -- the 34 percent
 4   would have been 34 percent of the amount of the
 5   quarterly distribution?
 6      A.   Yes.
 7      Q.   Okay.  That's what we talked about a
 8   minute ago when you weren't quite sure.
 9           If you know, when Mr. Lehtinen says on
10   page nine running over to page ten, "he stated
11   the distributions, paren, NTDR payments, end
12   paren, are paid for legal purposes", what does he
13   mean for legal purposes?  That "the legal
14   ordinance was constructed which is from the gross
15   receipts".
16      A.   My understanding is that he devised
17   this setup --
18      Q.   Who?  Mr. Lehtinen?
19      A.   Yes.  This setup of collecting -- not
20   collecting but levying a tax rate of 6.5 on the
21   revenue collected by the Miccosukee Indian Bingo.
22   That was his way of preserving what the Tribe had
23   been doing before and attempting to maintain it
24   in the same fashion that he had -- it had been
25   used to.  Meaning that he believed by doing this,
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 175

```
 1   he believed that the IRS will not question, and
 2   it says so here on the -- what is that?  The
 3   fourth paragraph?
 4      Q.   Yes, sir.  Where "Mr. Lehtinen reported
 5   Congress and the IRS are aware of the system"?
 6      A.   Mm-hmm.
 7      Q.   Yes, sir.
 8      A.   I think that he believed that this will
 9   satisfy the concerns of the IRS and allow the
10   Tribe to continue making distributions to the
11   members the way it had before without it being
12   subject to taxation.
13      Q.   I see.  Okay.
14           Let's move on to what is marked
15   previously as Exhibit No. 7.  Do you have Exhibit
16   No. 7?
17      A.   Um?
18           (Discussion off the record.)
19      Q.   {By Mr. Welsh}  We are back on the
20   record, Mr. Cypress (sic).  I'm sorry.  I see
21   that so often on there.  I see it right there
22   right in front of me again.
23           Mr. Billie, do you see Exhibit No. 7?
24   Again, is this, like we discussed before from the
25   other exhibits, a business record of the
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 176

```
 1   Miccosukee Tribe of Indians of Florida made and
 2   kept in the ordinary course of business, and is
 3   it the course and business of the Tribe to keep
 4   such records?
 5      A.   Yes.
 6      Q.   And over on page three of that
 7   document, which is also page L000243 there, the
 8   first full paragraph says, "Chairman Cypress
 9   reported the threat of gaming taxes is still
10   there and he urged the General Council not to
11   report this income when filing their income tax
12   report.  He stressed the importance of not
13   listing the NTDR payments when applying for
14   credit".
15           Is that the same problem that we have
16   discussed several times today in terms of listing
17   the NTDR or quarterly payments on credit
18   applications?
19      A.   Yes.
20      Q.   And thereby potentially impairing those
21   payments in the sense that they might then be
22   taxed?
23      A.   Yes, sir.
24      Q.   Okay.  On page four there's a paragraph
25   that begins -- I don't quite understand this.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 177

1   Page four there is a paragraph that begins about
2   half way down.  He reported -- I think that again
3   is Mr. Cypress, correct?
4       A.   I would agree with you.
5       Q.   "One Indian Tribe had requested the
6   Tribe's help".  Is that your Tribe or another
7   Tribe?
8       A.   I think he is referring to another
9   Tribe; but as I mentioned, he never got specific
10  before.
11      Q.   "In implementing the kind of plan we
12  had which enabled us to legally avoid paying the
13  taxes".  Is that "we" the Miccosukee Tribe?
14      A.   Yes, sir.
15      Q.   Okay.  "This request was presented to
16  the tribal attorney for review".  Is that
17  Mr. Lehtinen again?
18      A.   Yes, sir.
19      Q.   "He strongly recommended that the
20  request be denied.  The tribal attorney's
21  reasoning was that this Indian Tribe's enrollment
22  -- was that this Indian Tribe's enrolled tribal
23  members", that is, the Indian Tribe's enrolled
24  tribal members, "do not work together for the
25  betterment of their Tribe such as the Miccosukee

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 178

1   Tribal members do.  This Indian Tribe has already
2   spent their per capita line item".
3           What is he referring to there?  What is
4   their per capita line item, if you know?
5       A.   No.  I really don't know what he's
6   referring to.  He seems to be talking about
7   another Tribe; and as I mentioned, he never ever
8   got specific as to who contacted us or contacted
9   the Tribe and never did he present any kind of
10  document to show that the request was actually
11  made.
12      Q.   If you turn over to page five,
13  Mr. Billie, I think the third from the bottom
14  paragraph helps explain something that you
15  explained to me earlier where it says, "Chairman
16  Cypress stated tribal members have been
17  questioning the administration of staff and
18  Business Council members on the expected amount
19  of the NTDR payments.  He stated that the amount
20  is not known until towards the end of the month,
21  even though the amount depends on if there are
22  any substantial prize payouts.  If this occurs,
23  this affects the amount coming to the tribal
24  members".
25          What are prize payouts?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 179

1       A.   It could be a car or sometimes we have
2   to pay out like $200,000 in a bonus jackpot that
3   gets hit on one of our machines.  Any of those
4   areas are prize payouts.
5       Q.   So how would that -- why would that
6   reduce the NTDR payment if it's a percent of
7   gross?
8       A.   Again, it's the cash flow.  Even though
9   on paper you are showing all your categorized
10  items, you only have one pile of cash and you
11  have to divvy up those monies and put it into
12  those categories, but sometimes when you have a
13  big payout, that will eat up into the funds that
14  were supposed to go in other areas.  So sometimes
15  that category will not receive as much cash as it
16  should have until like the following day or the
17  following week when cash is generated to cover
18  that area that has been short.
19      Q.   Okay.  So tell me if I'm right in
20  trying to understand this again.  So if they had
21  to make a really big payout because they hit a
22  giant $200,000 jackpot or whatever at the gaming
23  operation, then the gaming operation wouldn't
24  have enough money right at that moment to pay the
25  6 and a half or 8.7 percent over to the NTDR

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 180

1   account at that moment and you would have to wait
2   a little while until they got some more money so
3   they could make that up?
4       A.   Yes.  The customer itself would be paid
5   at that moment.
6       Q.   The customer would?
7       A.   The customer would take home the money;
8   but if your intake for the whole day was $200,000
9   and the payout was $260,000, you're still short by
10  $60,000.
11      Q.   So the facility couldn't pay to the
12  NTDR account the 6 and a half percent or 8.7
13  percent?
14      A.   Right.  Until the next day.
15      Q.   That's all he's talking about here?
16      A.   Yes.
17      Q.   Okay.
18      A.   So what he's saying is that if that
19  happens, we could be missing that money and it
20  may not be that exact amount that you are seeing
21  on paper.
22      Q.   And that would affect then --
23      A.   Then that would affect what you said.
24  If people see $20 million, all they have to do is
25  divide it by 600 and they'll say, oh, this is

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 181

1    what we'll get.  No, not necessarily.  It's how
2    much is actually in the pot.
3        Q.   In the NTDR account the day that the
4    distribution is made?
5        A.   Right.
6        Q.   You take that and divide it by the 600?
7        A.   Right.
8        Q.   Okay.  I'm getting a better
9    understanding.
10            Let's move on to, I hope, Exhibit
11   No. 8.
12       A.   I have it.
13       Q.   Mr. Billie, again, we can go through it
14   really fast.  I have placed in front of you
15   Exhibit No. 8, which, again, is what appears to
16   be the minutes of the Miccosukee Tribe of Indians
17   of Florida General Council meeting, Thursday,
18   May 4, 2000.  Is this an excerpt from -- it's
19   only the first page of that meeting and page six.
20   Is it an excerpt from what are the business
21   records of the Miccosukee Tribe of Indians made
22   and kept in the ordinary course of business, and
23   is it the business of the Tribe to make and keep
24   such records?
25       A.   Yes, sir.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 182

1        Q.   Okay.  Turn to what is marked as
2    page six, also L000397.  In the first
3    paragraph -- full paragraph it's discussing
4    Mr. Cypress again, "reported that the gaming laws
5    are becoming more stringent and they're always
6    working to ensure that the gaming employees are
7    aware of these and are following these.  He
8    informed General Council that the NIGC also
9    ensures that all gaming laws are being followed
10   and as a result, if a tribal member should cash
11   their NTDR check at the gaming facility, this
12   will be reported to the IRS as required by
13   banking laws.  He stated the only way the tribal
14   member's money will not be reported to the IRS is
15   if they cash the checks -- their checks at the
16   Administration Office.  This is the only way --
17   the only way they can be assured they will not be
18   reported".
19            What is the NIGC?
20       A.   National Indian Gaming Commission.
21       Q.   Is that a federal governmental agency
22   or --
23       A.   That's the agency that oversees all
24   tribal casinos across the country.
25       Q.   Why is it that if the tribal members

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 183

1    cash their checks at the Administration Office,
2    that won't be reported to the IRS?
3        A.   Because -- I guess because it's just a
4    different location.  That part I'm not really
5    sure.
6        Q.   Okay.  Well, when they cash -- you said
7    most members cash their checks at the
8    Administration Office?
9        A.   Yes.
10       Q.   So they just get cash for the check
11   right there?
12       A.   Right.
13       Q.   I get that part.
14            Again, discussing the same.  Chairman
15   Cypress again reported -- talks about the same
16   thing, about not putting the NTDR money on credit
17   card applications?
18       A.   Yes.  He's reiterating the same thing.
19       Q.   Okay.  Let's move on to Exhibit No. 9.
20   Exhibit 9 is placed in front of you.  Again, it's
21   what appears to be a cover page, and one page of
22   the record of the special General Council
23   meeting, Thursday, August 3, 2000.
24            Again, is this a record of the
25   Miccosukee Tribe of Indians made and kept in the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 184

1    ordinary course of business, and is it the
2    business of the Tribe to keep such records?
3        A.   Yes, sir.
4            MR. ROMAN:  By the way, just for the
5        record, every General Council meeting that
6        you have already marked as an exhibit, we
7        will stipulate that it is a business record
8        so you don't have to authenticate all of
9        them one by one.
10           MR. WELSH:  Okay.  Good.
11           MR. ROMAN:  Yes.
12           MR. WELSH:  Can we have a stipulation
13       on the record that I'll just ask him, is
14       this a business record of the Tribe; if he
15       says yes, then we'll be done with it?
16           MR. ROMAN:  Yes.
17           MR. WELSH:  It will save a lot of time.
18       Q.   {By Mr. Welsh}  Sir, you have
19   Exhibit 9.  Okay.  The third paragraph down says,
20   "Chairman Cypress stated at every General Council
21   meeting the tribal members are being asked not to
22   claim the NTDR monies as income when applying for
23   credit", which we have already discussed,
24   correct?
25       A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 185

1    Q.   Again, he says -- Chairman Cypress
2  says, "distribution monies are nontaxable NTDR.
3  He stated if the IRS were to find out about these
4  monies, then we could end up being taxed and it
5  would mean the tribal members have 33 percent --
6  would have 33 percent of the NTDR money deducted
7  to cover this tax".
8        Why is it 33 percent and why would they
9  be deducted by the Tribe or who would deduct the
10  33 percent?
11    A.   Well, I would assume from the
12  individuals; but as far as why 33 percent, I
13  guess you will have to ask him next week.
14    Q.   Okay.  So this would have been
15  withholding tax that the Tribe would carry out on
16  the NTDR distribution -- the quarterly
17  distribution made to the tribal members?
18    A.   If they were deemed subject to be --
19  subject to taxation.
20    Q.   Okay.  Sir, I will place in front of
21  you Exhibit No. 10.
22    A.   Okay.
23    Q.   Is Exhibit 10 a business record of the
24  Miccosukee Tribe of Indians?
25    A.   Yes, sir.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 186

1    Q.   Okay.  I won't bother you with that
2  one.  It's duplicative of the other stuff.
3        This is Exhibit No. 11.  Sir, do you
4  have Exhibit No. 11 in front of you?
5    A.   Yes.
6    Q.   Is it a business record of the
7  Miccosukee Tribe of Indians?
8    A.   Yes, sir.
9    Q.   This is the first one, I believe, if
10  you turn to the second page of this exhibit, this
11  is a meeting of February 3, 2011, and it shows
12  you, I believe, Colley Billie as Chairman; is
13  that correct?
14    A.   Yes, sir.
15    Q.   So you were the officer of the Tribe
16  who oversaw this particular General Council
17  meeting, correct?
18    A.   Yes, sir.
19    Q.   Over on page five of this document,
20  which is also L000465, it appears that there is a
21  new lawyer, Mr. Jordan.  Are you acquainted with
22  him?
23    A.   Yes, sir.
24    Q.   Mr. Jordan, beginning on page five, is
25  giving what appears to be a legal counsel report,

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 187

1  and on page six there is a paragraph at the very
2  top which runs over from the previous page, but
3  part way down there is a sentence that begins "he
4  stated he attended", and I believe that is
5  Mr. Jordan, correct?
6    A.   Yes.
7    Q.   "A meeting in New Mexico where he asked
8  if the audits could be stopped or if this could
9  be handled as a class action.  We received a
10  commitment from IRS they would not attempt to
11  levy tribal property".
12        What is Mr. Jordan talking about there,
13  if you know?
14    A.   I think he is talking about the audits
15  that were being conducted on the tribal members.
16  As far as the years, I'm not really sure.  I
17  think he's talking about the audits that were
18  conducted for the years 2000 to 2005.
19    Q.   Okay.  "He says we received a
20  commitment".  "We", is that he on behalf of the
21  Tribe?
22    A.   Yes.
23    Q.   So the Tribe "received a commitment
24  from the IRS that they would not attempt to levy
25  any tribal property"?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 188

1    A.   Yes.  That's what he said.
2    Q.   So he had communicated to you that the
3  Internal Revenue Service is not going to attempt
4  to actually levy and take tribal properties for
5  what might be determined to be back taxes?
6    A.   Yes.
7    Q.   Over on page seven of this document,
8  sir, the second sentence where Chairman Billie,
9  that's you, correct?
10    A.   Yes, sir.
11    Q.   "Said, yes, this is true, but that was
12  because of his criminal case, not his tax
13  filings".
14        What is that sentence talking about, if
15  you know?
16    A.   That was in reference to his ongoing
17  investigation being conducted by the Internal
18  Revenue Service.  I had been informed --
19    Q.   The investigation of Mr. Cypress?
20    A.   Right.
21        (Continuing) That the Service was
22  conducting an audit on his personal matters, and
23  it was of a criminal nature.  And since he was
24  sitting in on discussions that we were having, we
25  meaning the Council was having with the General

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 189

1    Council on the legal situation with the Tribe, I
2    had asked him to excuse himself from
3    participating in our meetings.
4        Q.   Oh, I see.  So you and the General
5    Council were asking Mr. Cypress to leave because
6    of Mr. Cypress' criminal -- potential criminal
7    issue?
8        A.   Right.
9        Q.   Right.
10        A.   During the discussion of this
11    particular issue.
12        Q.   Okay.
13        A.   On any other portion of the meeting he
14    was welcome to stay.
15        Q.   Right, but on the tax issue you asked
16    him to leave?
17        A.   Right.
18        Q.   Over on page eight you have a new
19    lawyer now, Mr. Roman is mentioned.  Is that your
20    counsel who is sitting here today?
21        A.   Yes, sir.
22        Q.   It says, Mr. Roman makes a report on
23    legal situations.  At the very bottom of
24    page eight, which is also L000468, it says, "the
25    Tribe sent a protest letter to the IRS explaining

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 190

1    the benefits".
2        By benefits we're talking about --
3    again, the benefits meaning the NTDR quarterly
4    distributions, correct, sir?
5        A.   Yes.
6        Q.   It says, "Mr. Roman recommended tribal
7    members do not open any paperwork from IRS.  Just
8    bring it to the fourth floor".
9        What does that mean?  What is bringing
10    documents from the IRS to the fourth floor?
11        A.   All the mailings, correspondences that
12    the IRS is flooding the tribal members with,
13    we're asking them to bring it up to the Legal
14    Department on the fourth floor of the office
15    building.
16        Q.   Oh, that's the fourth floor of the
17    tribal office building?
18        A.   Yes.
19        Q.   On the Reservation?
20        A.   Yes.
21        Q.   Okay.  On the very last page of this
22    document is a signature page.  Is that your
23    signature as Chairman?
24        A.   Yes, sir.  That's my scribble.
25        Q.   It's on page L000471.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 191

1        MR. WELSH:  Do we have this one dated
2    February 3, 2011?  Is that in there?  It is
3    Exhibit 11.  Did we already do that one?
4        MR. ROMAN:  Yes, we did.  You just
5    finished that one.
6        MR. WELSH:  I'm sorry.
7        Q.   {By Mr. Welsh}  Sir, you have been
8    handed what has been marked as Exhibit 12.  Do
9    you recognize this document?
10        A.   I can't say that I do.
11        Q.   Do you know if that document was ever
12    provided to General Council?
13        A.   No.
14        Q.   You don't know one way or the other?
15        A.   No, it wasn't.
16        Q.   Okay.
17        A.   I don't even remember this.  Not that
18    I'm aware of.
19        Q.   Well, maybe this will help.
20        (Thereupon, a Memo dated June 26, 2006
21        was marked as Plaintiff's Exhibit 17 for
22        Identification.)
23        Q.   Sir, you have been handed what is
24    marked as Exhibit No. 17.  Do you recognize this
25    document?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 192

1        A.   No, I don't.
2        Q.   You haven't seen this document before?
3        A.   No.
4        (Thereupon, a Memo dated August 26, 2003 was
5        marked as Plaintiff's Exhibit 18 for
6        Identification.)
7        Q.   Sir, I have handed you what has been
8    marked as Exhibit 18.  It is a memorandum dated
9    August 26, 2003 to Billy Cypress, Chairman, and
10    Dione Carroll, General Counsel, from -- or on the
11    letterhead of the law firm of White & Case.
12        Do you recognize this document?
13        A.   Yes, sir.
14        Q.   Can you tell me what it is?
15        A.   I believe this is the letter that
16    basically tells the Tribe that the distribution
17    will be subject to taxation.
18        Q.   By distribution, sir, you mean the
19    quarterly distributions from the NTDR account
20    that we have been discussing today?
21        A.   Right.
22        Q.   When is the first time that you saw
23    this document?
24        A.   I think late 2010.  I believe it was
25    late 2010.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 193

1    Q.   Do you know, was this document ever
2  revealed to the Tribe itself, the General Council
3  of the Tribe?
4    A.   No.
5    Q.   As far as you know, when is the first
6  time that the General Council of the Tribe was
7  made aware of this document?
8    A.   When we started addressing the issue.
9    Q.   That would have been in the year 2010?
10   A.   Yes, sir.
11   Q.   And prior to that time, as far as you
12 know, Mr. Cypress -- Chairman Cypress never
13 revealed this document to the Tribe or any other
14 member thereof?
15   A.   Right.
16   Q.   Do you know if he ever -- now, do you
17 know if he ever, that is, Mr. Cypress, ever
18 revealed it to anyone else in the Tribe prior --
19   A.   I don't think so.
20   Q.   Okay.
21   (Thereupon, a Memo dated February 14,
22   2003 was marked as Plaintiff's Exhibit 19
23   for Identification.)
24   Q.   Sir, you have been handed what has been
25 marked as Exhibit No. 19.  Do you know what this

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 194

1  document is?
2    A.   Yes.
3    Q.   Can you tell me what this document is?
4    A.   I believe this is the document, again,
5  where White & Case talks about the distributions
6  that we make.  Since it is from gaming revenues,
7  that it would be subject to taxation.  And I
8  think that was a request that was made by our
9  in-house counsel, Dione Carroll, from what I
10 remember.
11   Q.   And --
12   A.   I think this one came in first and then
13 the second one came about after the other one
14 that we looked at.  Yes.  Yes.
15   Q.   Do you know when the first time was
16 that you saw this document?
17   A.   Again, it was in late 2010.
18   Q.   Again, do you know if any one of the
19 Tribe saw this document prior to late 2010?
20   A.   No.
21   Q.   Well, I guess in that case anyone in
22 the Tribe, including Mr. Cypress?
23   A.   Well, I assume Mr. Cypress saw it and
24 I'm sure he was aware of it.  For the rest of us,
25 we were never privy to this information.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 195

1    Q.   Until 2010?
2    A.   Right.
3    Q.   Okay.  Now I think we have gone through
4  all the documents.  If we can return to your
5  expert witness summary, which I think you had
6  before you as Exhibit 13.  Yes.  It's part of the
7  first packet.
8    A.   Okay.
9    Q.   If you turn over to the part of 13
10 which is your expert witness summary.
11   A.   Okay.
12   Q.   I think, Mr. Billie, you have already
13 explained quite a bit on the history and the
14 purpose and the theory of welfare within the
15 Miccosukee Tribe.  I think I understand that
16 based on what you already explained to me, but I
17 have a few questions about this.
18       You say, as the Chairman -- this is on
19 the first page.  It is only two pages which runs
20 over to the second page.  On the first page you
21 say, as Chairman you are a member of the
22 Miccosukee Business Council.  In this role you
23 have knowledge about, number one, the
24 governmental purpose for the quarterly assistance
25 to tribal members.  I think you have already told

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 196

1  me some of that.
2        What do you consider to be the
3  components of the tribal assistance which the
4  quarterly distributions go to fund?
5    A.   Can you rephrase that question?
6    Q.   Well, we have -- you are talking about
7  the quarterly distributions here, correct, sir?
8    A.   Right.
9    Q.   And you say that in your position with
10 the Tribe you have knowledge about, number one,
11 the governmental purpose for the quarterly tribal
12 assistance to tribal members; number two, the
13 egalitarian nature of the Miccosukee society;
14 and, number three, the different and important
15 constitutional functions that both the Miccosukee
16 Business Council and the Miccosukee General
17 Council perform within the tribal government.
18       I think you have told me about -- we
19 have talked earlier, I think, correct, about the
20 Business Council and General Council?
21   A.   Mm-hmm.
22   Q.   How they're different.  I think I
23 understand that.  And you explained the
24 egalitarian nature of the Miccosukee society to
25 me already.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 197

```
 1     A.   Yes.
 2     Q.   But what I wondered is number one, the
 3  governmental purpose for the quarterly tribal
 4  assistance to the tribal members.  I wanted you
 5  to tell me what you mean by the governmental
 6  purpose for the quarterly tribal assistance?
 7  What is the governmental purpose of the quarterly
 8  tribal assistance?
 9     A.   Well, the main function of the Tribe is
10  to look out for the membership of the general
11  membership.  As such, the government is
12  responsible for providing the basic needs of its
13  members, and part of that need includes general
14  welfare.
15        As I mentioned, we do provide services
16  in other areas; but in this particular area of
17  general welfare, we do provide assistance to the
18  members of the Tribe so that they can obtain the
19  basic needs.  And as a government, I believe that
20  the tribal council is the only place that can
21  determine what the needs of the tribal membership
22  are.
23        I don't think the needs of the tribal
24  membership can be dictated by a person that is
25  not within the Tribe.  Nobody from -- at the
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 198

```
 1  Washington, D.C. level should determine what
 2  welfare program the Miccosukee tribal government
 3  should be providing to its people.  I don't think
 4  any office at the Tallahassee office should be
 5  deciding what is the best needs for the members
 6  of the Miccosukee Tribe.
 7        The Tribe itself elects the members of
 8  the Business Council, and I think as a result,
 9  the Business Council is the one that is in the
10  best position to provide those needs and to make
11  available those needs to its membership.
12     Q.   I understand.
13        MR. ROMAN:  Can we stipulate to that?
14        MR. WELSH:  No.  I understand what he
15  said.
16        MR. ROMAN:  Oh.
17     Q.   The last sentence on the last paragraph
18  on page one of your expert witness summary says,
19  this includes -- talking about the obligation of
20  the tribal government's duty to promote and
21  provide for the general welfare of the people, it
22  says, "this includes Miccosukee oral history and
23  the role that such history plays in the daily
24  operations of the tribal government".
25        What role does the oral history play in
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 199

```
 1  the daily operations of the government?
 2     A.   It plays a major role because
 3  Miccosukee's do not have any qualified set of
 4  guidelines when it comes to its services that it
 5  provides, and that includes the general welfare.
 6  And then tying it back into the new Tribal
 7  General Welfare Exclusion Act, I know that some
 8  Tribes do have written guidelines set for
 9  themselves, but there were some of us that had
10  expressed as not having a set of written
11  guidelines that were still in the oral state.
12        And to ask us to put these in writing
13  would be to alter, change or interfere with our
14  culture, traditions and our beliefs.  We didn't
15  think that that was the appropriate nature of the
16  IRS, and so we had asked that we be inclusive as
17  part of the new legislation and to accept us for
18  who we are and to let us live out the rest of our
19  lives in accordance with our culture and
20  tradition that we have followed for eons.
21     Q.   Okay.  And the last full sentence on
22  the first page of your expert witness summary
23  says, "in his testimony he will explain the
24  requirements and benefits of the Miccosukee
25  General Welfare programs".
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 200

```
 1        Are those the same requirements and
 2  benefits which you talked about earlier today in
 3  your testimony, that is, once you are an enrolled
 4  member of the Tribe --
 5     A.   Yes.
 6     Q.   -- you're qualified to receive the
 7  benefits of the tribal welfare programs?
 8     A.   Yes.  You have to be an enrolled
 9  member.  To be an enrolled member, you have to be
10  50 percent Miccosukee.  And once you have been
11  accepted, you are entitled to all the benefits
12  and services that the Tribe provides to all its
13  members within the Tribe.
14     Q.   I know earlier today, and correct me if
15  I'm wrong, you went through with me what the
16  different welfare programs are of the Tribe which
17  include housing?
18     A.   Housing, school.
19     Q.   Health?
20     A.   The school, the police.
21     Q.   The school, the police.
22     A.   Police, water service.
23     Q.   Education?
24     A.   Yes.
25     Q.   Assistance to individuals who want to
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 201

1    go on in their education.  Was there anything
2    else?  Were there any other programs that were
3    missed before?
4        A.   I'm sure there is, but those are the
5    ones that come to mind immediately.
6            MR. WELSH:  Thank you very much, sir.
7    I have no further questions.  Mr. Roman.
8            MR. ROMAN:  Yes.  I just have a couple
9    of questions.
10           CROSS EXAMINATION
11   BY MR. ROMAN:
12       Q.   When you looked at Exhibit 6, which is
13   the special General Council meeting of Thursday,
14   November 2, 1995, and I direct your attention to
15   page ten, L000363, there's a paragraph that says,
16   "Mr. Lehtinen reported Congress and the IRS are
17   aware of the system devised and implemented by
18   the Tribe.  He added they have reviewed it and
19   have accepted that it is legally correct, but
20   they may try to do something about it".
21           Did Mr. Lehtinen represent to tribal
22   members that the system that he was recommending
23   to the Tribe in 1995 regarding the nontaxability
24   of the distributions had been reviewed by both
25   Congress and the Internal Revenue Service?  Is

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 202

1    that what he is saying there?
2        A.   Yes.  That's what he's saying there.
3    Whether he actually did it or not is something I
4    question today, but, yes, that's what he
5    represented.
6        Q.   Did he also tell tribal members and the
7    Tribe that both Congress and the IRS had accepted
8    it as a system as legally, correct?
9        A.   Yes.
10       Q.   Did he ever show any documentation to
11   anyone that you're aware of which backed this
12   statement that he made about the system that he
13   had designed for the Miccosukee Tribe and its
14   members that we have discussed here today as
15   having been accepted by both the IRS and
16   Congress?
17       A.   No.  There was no such document
18   presented at the meeting.
19       Q.   Now, after you were elected Chairman of
20   the Miccosukee Tribe in 2009 did Dexter Lehtinen
21   continue as the general counsel, and I mean
22   C-O-U-N-S-E-L, for the Miccosukee Tribe?
23       A.   Yes, he did.
24       Q.   Until the time of his termination did
25   you have communications with him in his role as

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 203

1    general counsel for the Miccosukee Tribe?
2        A.   Yes, I did.
3        Q.   Did you ask him, as part of those
4    communications, to give you reports about any and
5    all issues that -- legal issues that he had been
6    working on on behalf of the Tribe?
7        A.   Yes, I did.
8        Q.   Did Mr. Lehtinen produce to you
9    Exhibit 12, this letter dated June 27, 2006 to
10   Christie Jacobs, Director, Indian Tribal
11   Governments?
12       A.   Not to my knowledge.
13       Q.   Did he ever produce to you the
14   memorandum dated -- behind that letter dated
15   June 28, 2006 from him, Guy A. Lewis and Anthony
16   J. O'Donnell, Jr., to Christie Jacobs, Director
17   of Indian Government Services?
18       A.   No.
19       Q.   I'm sorry, to Indian Tribal
20   Governments?
21       A.   No.
22       Q.   Did Mr. Lehtinen produce at any time,
23   either on June 27, 2006 or any time thereafter
24   this Exhibit 12 at any of the General Council
25   meetings that he attended as tribal attorney?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 204

1        A.   No.  He never did.
2        Q.   Exhibit 17, which is a letter -- which
3    is a memorandum to Billie Cypress, Chairman, from
4    Dexter Lehtinen as tribal attorney dated June 26,
5    2006, did Mr. Lehtinen ever disclose to you after
6    you were elected Chairman of the Tribe this
7    memorandum?
8        A.   No, he didn't.
9        Q.   Did he ever discuss with you the
10   existence of this memorandum?
11       A.   No, he didn't.
12       Q.   Did he ever tell you that this
13   memorandum existed?
14       A.   No, he didn't.
15       Q.   Did he ever present this memorandum
16   during any of the General Council meetings that
17   took place in which he reported as attorney for
18   the Tribe from June 26, 2006 until his
19   termination in May of 2010?
20       A.   No, he did not.
21       Q.   Exhibit 19, which is the memorandum --
22   the memorandum from White & Case, February 14
23   2003 to the account of Michael Hernandez
24   regarding distribution of the gaming tax to
25   tribal members.  Did Mr. Lehtinen ever discuss

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 205

1    this memorandum with you after you were elected
2    Chairman?
3        A.   No.  No, he didn't.
4        Q.   Did he ever show you this memorandum?
5        A.   No, he did not.
6        Q.   Did he ever tell you about the
7    existence of this memorandum?
8        A.   No, he did not.
9        Q.   Did he ever present this memorandum
10   during any of the General Council meetings that
11   he attended as attorney for the Tribe from
12   February 14, 2003 until May 1, 2010?
13       A.   No, he did not.
14       Q.   Exhibit 18 is the second memorandum
15   from White & Case dated February 26, 2003 to
16   Billy Cypress, Chairman, and Dione Carroll,
17   General Counsel, from Jane A. Houk, Analysis of
18   Alternative Structure:  Instituting Per Capita
19   Payment and Related Tax Withholding and Filing
20   Issues.
21           After you were elected Chairman did
22   Mr. Lehtinen ever discuss this memorandum with
23   you?
24       A.   No, he did not.
25       Q.   Did he ever tell you about the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 206

1    existence of this memorandum?
2        A.   No, he did not.
3        Q.   Did he ever give you this memorandum?
4        A.   No, he did not.
5        Q.   From August 26, 2003 until May 1, 2010
6    did Mr. Lehtinen ever present this memorandum
7    during any of the General Council meetings that
8    he attended?
9        A.   No, he did not.
10       Q.   Did he ever discuss either of the two
11   White & Case memos before the General Council
12   meetings?
13       A.   No, he did not.
14       Q.   Did he ever discuss the letter to the
15   IRS to Christie Jacobs and this memorandum of
16   June 27, 2006 before the General Council meeting
17   and that would be Exhibit 12?
18       A.   No, he did not.
19       Q.   After your election as Tribal Chairman
20   did you appoint Mr. Lehtinen as the lead attorney
21   in tax matters involving tribal issues between
22   the Tribe and the Internal Revenue Service?
23       A.   Yes, I did.
24       Q.   And did he continue to be in charge of
25   the issues regarding the taxability or

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 207

1    nontaxability of the NTDR?
2        A.   Yes, he was.
3        Q.   During this time being in charge of the
4    issue until May 1, 2010, did he ever inform you
5    of any of the contents of any of the memorandums
6    that you have seen here today as reflected on
7    Exhibits 17, 18, 19 and 12?
8        A.   No.  No, he did not.
9        Q.   Based on your experience in attending
10   General Council meetings for the years that you
11   have testified about in here, do you have any
12   doubt that Dexter Lehtinen was representing
13   tribal members like yourself on this particular
14   issue?
15       A.   Yes.  I do have some doubt.
16       Q.   What do you mean by that?
17       A.   I'm not sure if he actually was
18   representing us or if he was only looking out for
19   himself.
20       Q.   Based on your experience did he hold
21   himself out like he was, in fact, representing
22   tribal members like yourself in this issue?
23       A.   Yes, he did.
24       Q.   When you said that you have doubt, is
25   that based on the evidence that you have seen

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 208

1    since you were elected the Chairman?
2        A.   No.
3        Q.   What do you base that on?
4        A.   I base it on the consistent message
5    that I explained earlier that I had received at
6    the past meetings where we're being told we don't
7    have to pay taxes on our distributions that we
8    receive, but at the same time we are bing told
9    that we are setting aside monies just in case the
10   IRS should ever deem these monies to be subject
11   to taxation.
12       Q.   Did you have any doubt as an individual
13   tribal member that Dexter Lehtinen was acting as
14   lawyer for tribal members also on this issue?
15       A.   Yes.
16       Q.   Did you believe he was basically
17   representing tribal members like yourself on this
18   issue?
19       A.   Yes, I did.
20       Q.   And do you base that on the
21   representations that he was making at a General
22   Council meeting?
23       A.   Yes.
24       Q.   You have talked about the General
25   Welfare Exclusion Act.  I just have one question

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 209

1   about that.  Are you aware of whether the types
2   and amount of welfare programs vary according to
3   family, according to states?
4       A.   Yes.
5       Q.   Are you aware of whether they vary
6   according to regions of the country?
7       A.   Yes.
8       Q.   According sometimes even to countries?
9       A.   Yes.
10      Q.   Are you aware of whether they also vary
11  according to different Tribes?
12      A.   Yes.
13          MR. ROMAN:  I have nothing else.
14          MR. WELSH:  Thank you.  I have nothing.
15          THE COURT REPORTER:  Read or waive?
16          MR. RAMON:  We'll read.
17
18          (Thereupon, the deposition
19           was concluded at 6:02 p.m.)
20
21
22
23
24
25

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 210

1       C E R T I F I C A T E   O F   O A T H
2
3   THE STATE OF FLORIDA)
4   COUNTY OF MIAMI-DADE)
5
6       I, SHEILA A. WILSON, a Notary Public
7   for the State of Florida, certify that COLLEY
8   BILLIE personally appeared before me and was duly
9   sworn.
10      WITNESS my Hand and Official Seal this
11  29th day of March, 2015.
12
13
14          _____
            Sheila A. Wilson
            Notary Public-State of Florida
15          My Commission No. DD695787
            Expires:  October 26, 2015
16
17
18
19
20
21
22
23
24
25

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 211

1       C E R T I F I C A T E
2
3   THE STATE OF FLORIDA)
4   COUNTY OF MIAMI-DADE)
5
6       I, SHEILA A. WILSON, a Registered
7   Professional Reporter, do hereby certify that I
8   was authorized to and did stenographically report
9   the deposition of COLLEY BILLIE, a witness called
10  in the above-styled cause; that the witness was
11  first duly sworn by me; that a review of the
12  transcript was requested; and that the transcript
13  is a true and complete record of my stenographic
14  notes.
15      I further certify that I am not an
16  attorney or counsel of any of the parties, nor
17  related to any of the parties, nor financially
18  interested in the action.
19      Dated this 29th day of March, 2015.
20
21          _____
            Sheila A. Wilson, RPR
22          Court Reporter
23
24
25

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 212

1       E R R A T A   S H E E T
2   RECORD CHANGES HERE - DO NOT WRITE ON THE TRANSCRIPT
3   IN RE: U.S. of AMERICA v. SALLY JIM
4   PAGE/LINE        CHANGE         REASON
5   _____   _____   _____
6   _____   _____   _____
7   _____   _____   _____
8   _____   _____   _____
9   _____   _____   _____
10  _____   _____   _____
11  _____   _____   _____
12  _____   _____   _____
13  _____   _____   _____
14  _____   _____   _____
15  _____   _____   _____
16  _____   _____   _____
17  _____   _____   _____
18  _____   _____   _____
19  _____   _____   _____
20  _____   _____   _____
21  _____   _____   _____
22  Under penalties of perjury, I declare that I have read
    my deposition and that it is true and correct subject
23  to any changes in form or substance entered here.
24  _____    _____
    (Date)           COLLEY BILLIE
25

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Kresse & Associates, LLC
44 W. Flagler Street
6th Floor
Miami, Florida  33130

March 30, 2015

Mr. Colley Billie
c/o Bernardo Roman, Esq.
Law Office of Bernardo Roman, III, PA
1250 S.W. 27th Avenue
Suite 506
Miami, FL  33135

Dear Mr. Billie:

This letter is to inform you that the transcript of your deposition taken on March 26, 2015 is available for your reading and signature. Please make arrangements to read a copy of your deposition and note any corrections on the errata sheet. Please return the errata sheet to Mr. Roman with a copy to Mr. Welsh.

If the reading and signing have not been completed prior to April 30, 2015, the original transcript will be filed as is without corrections.

Thank you for your prompt attention to this matter.

Sincerely,

Sheila A. Wilson, RPR
Court Reporter

cc:  Clerk of the Court

KRESSE & ASSOCIATES, LLC
(305) 371-7692

# Exhibit 13



Page 1

```
 1    .
 2         IN THE UNITED STATES DISTRICT COURT FOR THE
           SOUTHERN DISTRICT OF FLORIDA
 3
            CIVIL NO. 1:14-cv-22441-CMA
 4
 5
 6    UNITED STATES OF AMERICA,
 7         Plaintiff,
 8    vs.
 9    SALLY JIM,
10         Defendant.
11    _____/
12
13
            DEPOSITION
14
               OF
15
          GABRIEL K. OSCEOLA
16
17
18       44 West Flagler Street
            Suite 600
19        Miami, Florida
20
21
22       Thursday, April 2, 2015
         10:10 a.m. - 5:50 p.m.
23
24
25
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 2

```
 1         APPEARANCES
 2
 3    For the Plaintiff:
 4         ROBERT L. WELSH, ESQ.
           WILLIAM E. FARRIOR, ESQ.
 5         U.S. Department of Justice
           Tax Division
 6         P.O. Box 14198
           Ben Franklin Station
 7         Washington, D.C. 20044
 8
      For the Defendant:
 9
           BERNARDO ROMAN, III, ESQ.
10         YINET PINO, ESQ.
           DANIEL DAVIS, ESQ.
11         Of the Law Offices of
           Bernardo Roman, III, P.A.
12         1250 S.W. 27th Avenue
           Miami, Florida 33135
13
14    Also Present:
15         Pete Osceola
16
17         ------
18
19
          I N D E X
20
      Witness          Direct     Cross
21
      GABRIEL K. OSCEOLA     4, 206     196
22
23
24
25
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 3

E X H I B I T   I N D E X

| Plaintiff's | Description | Page |
|---|---|---|
| 20 | Subpoena | 13 |
| OBJ 99-1 | Financial Statement | 36 |
| | 9-30-2001 | |
| 21 | Minutes 2-2-1995 | 110 |
| 22 | Minutes 5-4-1995 | 123 |
| 23 | Minutes 11-2-1995 | 127 |
| 24 | Minutes 2-8-1996 | 134 |
| 25 | Minutes 11-4-1999 | 146 |
| 26 | Minutes 2-8-2001 | 151 |
| 27 | Minutes 5-3-2001 | 164 |
| 28 | Minutes 6-19-2001 | 165 |
| 29 | Minutes 2-7-2002 | 167 |
| 30 | Minutes 5-2-2002 | 170 |
| 31 | Memo 1-11-2005 | 178 |
| 32 | Various General | 180 |
| | Reports | |
| 33 | Complaint | 185 |
| 34 | Accounting Reports | 191 |

(All Exhibits Retained By Mr. Roman)

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 4

```
 1    THEREUPON:
 2         GABRIEL K. OSCEOLA,
 3    a witness named in the notice heretofore filed,
 4    having been first duly sworn, deposes and says as
 5    follows:
 6         DIRECT EXAMINATION
 7    BY MR. FARRIOR:
 8      Q.   We are on the record. You understand
 9    that you are under oath?
10      A.   Yes.
11         MR. FARRIOR:  And let's go around the
12    room and have the attorneys and the other
13    people in the room identify themselves,
14    please.
15         MS. PINO:  Yinet Pino on behalf of the
16    Miccosukee Tribe.
17         MR. DAVIS:  Daniel Davis on behalf of
18    Sally Jim.
19         MR. OSCEOLA:  Pete Osceola, a
20    Miccosukee member.
21         MR. WELSH:  Robert Welsh, United
22    States.
23      Q.   {By Mr. Farrior}  Good morning. My
24    name is Will Farrior.  I'm an attorney for the
25    United States.  I represent the United States in
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 5

1  the case of U.S. versus Sally Jim.  We are here
2  today to take your deposition in this case.  This
3  deposition is being taken in accordance with the
4  Federal Rules of Civil Procedure.
5      Could you please state your full name
6  for the record?
7      A.  Gabriel Osceola.
8      Q.  Do you have a middle name?
9      A.  Kelly.
10     Q.  Have you ever gone by any other names
11  or nicknames?
12     A.  No.
13     Q.  What is your current address?
14     A.  H, as in Henry, C, as in Charles, 61
15  Box West 9988, Ochopee, O-C-H-O-P-E-E, Florida
16  34141.
17     Q.  Have you ever had your deposition taken
18  before?
19     A.  No.
20     Q.  Have you ever testified in court
21  before?
22     A.  Yes.
23     Q.  What type of matter was that?
24     A.  Just small -- what is it?  County.
25  County court.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 6

1      Q.  Did it involve like a workers' comp
2  issue?
3      A.  No.
4      Q.  Or a car crash or something like that
5  or what was it?
6      A.  It was traffic.  Traffic, yes.
7      Q.  I will go through some of the standard
8  instructions.  You have been here seeing how this
9  process goes and so you understand it already.
10  If you do not hear a question, say so and I will
11  repeat it.  If you do not understand the
12  question, you can just say so and I will do my
13  best to rephrase it.  If you do not know or do
14  not remember the information necessary to answer
15  the question, just say so.  If you answer a
16  question, I will assume that you have heard it
17  and understood it and have given me your best
18  recollection.  Do you understand?
19     A.  Yes.
20     Q.  If at any point in time you realize an
21  earlier answer that you gave was inaccurate or
22  incomplete, you can state that you would like an
23  opportunity to correct or supplement your answer
24  and you will be allowed to do so.
25     A.  Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 7

1      Q.  If you need to take a break, just let
2  us know.  You will have to finish the question we
3  are on and then you can take a break.
4      A.  Okay.
5      Q.  Please provide verbal answers so that
6  the court reporter can record your response.  We
7  will both do our best to speak slowly and
8  clearly, and we'll do our best to wait until the
9  other person is finished talking before beginning
10  your answer and before I begin my next question.
11  Do you understand?
12     A.  Yes.  I will try the same.
13     Q.  I'm sorry?
14     A.  I will try the same for you.  I'll try
15  not to cut you off.
16     Q.  Thank you.
17      Are you currently under the influence
18  of any medication or alcohol or can you think of
19  any other reason why you might not be completely
20  truthful today with your answers?
21     A.  I had a Red Bull and coffee.  That
22  might be a bad mix.
23     Q.  That doesn't affect your ability to
24  answer truthfully, though?
25     A.  No.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 8

1      Q.  Could you describe what you did to
2  prepare for today's deposition?
3      A.  Just I have been skimming over all your
4  previous documents in the previous depos that I
5  have attended.
6      Q.  Could you describe sort of your life
7  history, including your education, where you live
8  and what sorts of jobs you have held?
9      A.  Life history?  How far back?
10     Q.  Back as far as when you were born.
11     A.  I was born in a small town, in
12  Clewiston, Florida.  I don't know.  I was born
13  there.  Most of my life I lived out on the
14  Everglades over in Collier County.  I grew up in
15  what is called a camp or village.  That's what
16  the tourists might call it.  I was raised by my
17  grandparents mainly.  My mom was around, but she
18  was doing her thing.
19      And right around fourth grade I went
20  to -- my granddaddy decided that I should go to
21  public school, and in order to -- what he states
22  was I was -- I should learn both the cultural
23  aspect of our people and what, I guess you would
24  call, society has to offer, I guess, so I can
25  understand both.  And I had problems in high

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 9

```
 1    school, even in high school, Everglades City.
 2    Then in high school I went back to Clewiston High
 3    School.  I went back to Everglades City, and then
 4    I ended up at Braddock High School in Miami.  And
 5    then right around 11th grade is when my father --
 6    my natural father passed away.  Right after that
 7    I just left high school and got my GED.  That was
 8    right around when I was 18.
 9         So I traveled to -- I decided to go to
10    trade school, auto diesel, one that's in Arizona.
11    It was called Arizona Automobile Institute.  I
12    was there for about two years.  I came back when
13    I was around 20.
14         Not too long after that I had my
15    children, which are both what you call
16    full-blooded tribal members.  In the meantime
17    this whole time in these -- the first part of my
18    life I was what you would call an independent or
19    a traditional.  I was not enrolled in the Tribe.
20    I didn't enroll until 2005 to the Miccosukee
21    Tribe.  Bad choice.  I was asked when I was 18 if
22    I was going to enroll, but I told my granddaddy,
23    I said, for now I'm okay.  I was doing fine.
24         I worked odd jobs.  For the majority of
25    the time I worked for the Miccosukee Tribe.  I
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 10

```
 1    think my main job was working for the Miccosukee
 2    Health Clinic.  I was there for about four years,
 3    I believe.  After that I worked for the
 4    Recreation Department.  I was on the Health
 5    Board, Gaming Board.  And finally I became
 6    assistant for a couple of the councilmen.  I
 7    worked in the Elderly Department.
 8         And then in 2010 was my first official
 9    ballot of running for councilman, which I lost by
10    one vote.  And this is my second attempt.  I won
11    this election and I was elected secretary of the
12    Council, Business Council.  That's where I'm at
13    now.  And I have been in my position for -- since
14    December, 2013, I believe.
15    Q.   Okay.  Are you currently married?
16    A.   No.
17    Q.   Have you ever been married?
18    A.   Not officially.
19    Q.   What do you mean by that?
20    A.   My longest relationship was with the --
21    my kids' mom, which was about four years.  I have
22    two sons out of it.
23    Q.   What are the ages of your sons?
24    A.   14 and 12.
25    Q.   Are they enrolled members of the
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 11

```
 1    Miccosukee Tribe?
 2    A.   Yes.
 3    Q.   When did they get enrolled?
 4    A.   When they were born, and I'm sure you
 5    have heard a few times already about the Tribe
 6    being a matriarchal society, so the mom gets to
 7    decide if they're enrolled or not.
 8    Q.   Can you tell me the name of the child's
 9    mother?
10         MS. PINO:  Objection.  Relevancy, and
11         it's beyond the scope of the notice.
12    Q.   Go ahead and answer.
13    A.   Angie.
14    Q.   What is her last name?
15    A.   Cypress.  She is remarried.  She has a
16    husband.  They're fine.
17    Q.   You mentioned you're on the Gaming
18    Board?
19    A.   Yes.
20    Q.   What does that entail?
21    A.   Whenever there are conferences
22    regarding -- mostly gaming conferences, they will
23    send us.  There was about a half dozen of us, I
24    believe, when I was in there, but the majority of
25    them were seniors kind of, and I was always the
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 12

```
 1    young one no matter what board I joined.  Like
 2    right now I'm on the Council.  I was always
 3    single and so I was willing to go wherever they
 4    sent me.  So those conferences, let's say, are in
 5    Biloxi or Alabama.  Nothing too far.  Mostly
 6    visit Indian gaming facilities of other Tribes.
 7    After the first couple of them it gets boring.
 8    They're always trying to sell you stuff like slot
 9    machines and stuff.
10    Q.   What made you want to become an
11    enrolled member of the Tribe in 2005?
12         MS. PINO:  Objection.  Irrelevant and
13         beyond the scope.
14    A.   Nothing.  Just choice.  I have always
15    lived in the community.
16    Q.   And then what made you want to be a
17    councilman for the Tribe?
18    A.   It's not really what I wanted.  Like I
19    said, I was raised by my grandparents and
20    seniority is very important in my life to the
21    older people around me.  So a couple of the, I
22    guess you would call them, senior women in the
23    community approached me or confronted me almost
24    and asked me if I was running for Council.  I
25    told them no.  They said, no, you are going to
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 13

1   run.  We are going to vote for you.  I said,
2   okay.  I put my name on the ballot.  It's up to
3   you.  That's why I'm here.  I'm not here for a
4   so-called paycheck.  I'm doing it for myself.
5       Q.   Being secretary of the Tribe is your
6   full-time job currently?
7       A.   Yes.
8       Q.   What is your salary?
9       A.   $150,000.
10          MR. FARRIOR:  I'm going to mark this
11   as -- I think we are on Exhibit 20.
12      (Thereupon, the Subpoena for the Taking
13       of Deposition was marked as Plaintiff's
14       Exhibit 20 for Identification.)
15      Q.   I hand you what is marked as
16   Exhibit 20.
17      A.   Mm-hmm.  Yes.
18      Q.   This is a subpoena to testify to the
19   Miccosukee Tribe of Indians in this case, United
20   States versus Sally Jim.
21          Have you seen this document before?
22      A.   Yes.
23      Q.   Where did you see this document before?
24      A.   At the tribal administration office, in
25   my office.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 14

1       Q.   And are you here today to testify in
2   response to this subpoena?
3       A.   Yes.
4       Q.   And are you here today to testify as a
5   representative of the Miccosukee Tribe of
6   Indians?
7       A.   Yes.
8       Q.   Looking at the attachment to this
9   subpoena, do you understand that part one of the
10   attachment lists the topics that you are to
11   testify about today?
12      A.   Yes.
13      Q.   Are any of these topics of which you
14   are unprepared to testify about?
15      A.   Regarding the revenues and salaries, I
16   might need to have the numbers in front of me.
17   I'm not an accountant, so...
18      Q.   Anything else?
19      A.   Also, it's 2001, so I'll need those
20   documents.
21      Q.   When you saw you will need those
22   documents, what documents are you referring to?
23      A.   Like I stated, I just got in office in
24   2013.  So I have seen these documents before, but
25   if you want details, I need to have them in front

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 15

1   of me.
2       Q.   Just --
3       A.   I have seen them before.
4       Q.   Sure.  In a very general level, could
5   you describe what documents you're talking about?
6       A.   I guess it falls back into the numbers
7   area I was reading regarding the salaries,
8   gambling winnings, transfer of anything of value
9   to Sally Jim.
10          Yes.  This falls back into numbers.  I
11   was wrong.
12      Q.   Okay.  So are you telling me that you
13   would need to look at documents to refresh your
14   recollection to answer some of the questions
15   about the revenues and amounts transferred to
16   Sally Jim in the year 2001?
17      A.   Yes.  It says "any payment,
18   remuneration, gift, distribution, salary,
19   gambling winnings, or transfer of anything of
20   value from the Tribe to Sally Jim for the year
21   2001".  I'm sure it involves numbers.
22      Q.   Could you describe what documents you
23   would look at in order to answer that question?
24      A.   Gambling winnings, I'm sure it has to
25   do with the MIG, Miccosukee Indian Gaming.  It

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 16

1   will have to come from their department.
2       Q.   Let's look specifically at number three
3   which says gross revenues, net revenues.  Do you
4   see where it says that?
5       A.   Mm-hmm.
6       Q.   I understood that you said you would
7   need to look at documents in order to talk about
8   specifically what the gross and net revenues,
9   expenses and taxes of the Tribe were for the
10   years in question?  Did I understand you
11   correctly?
12      A.   I would need to what?
13      Q.   Looks at documents?
14      A.   Regarding that?
15      Q.   Yes.
16      A.   If you are going to ask about numbers,
17   yes.
18      Q.   Could you describe what documents you
19   would need to look at to answer questions about
20   numbers?
21      A.   Outside of the gross revenues and net
22   revenues, regarding expenses and taxes of the
23   Tribe's operations, numbers regarding taxes of
24   our enterprises, if you are going to ask numbers,
25   I need papers.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 17

1    Q.   Could you just describe what papers you
2  are talking about that you would need to see?
3    A.   The financial statements.
4    Q.   What do the financial statements look
5  like?
6    A.   It is the standard updates that we
7  receive during the Business Council.
8    Q.   Have you seen financial statements
9  before?
10   A.   Yes.  Just from the MIG, Miccosukee
11  Indian Gaming, keeps us updated every week.
12   Q.   And does the Tribe keep these financial
13  statements?
14   A.   I'm sure they do, but the majority of
15  them are probably at the gaming hall.
16   Q.   Does the Tribe keep a --
17   A.   What I see are mostly reports keeping
18  us updated.
19   Q.   So you also see reports of financial
20  statements; is that correct?
21   A.   Yes.
22   Q.   Does the Tribe keep reports of
23  financial statements for the years 1995 to 2001?
24   A.   I'm not sure.  That is a while back.
25   Q.   If the Tribe kept financial statements

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 18

1  from those years, where would they be?
2    A.   Maybe the Treasury, I believe.
3    Q.   Has anyone at the Tribe gone to look
4  for those financial statements?
5    A.   To my understanding the Finance
6  Director and the Director for the MIG did
7  investigate that matter.
8    Q.   Are those two different people?
9    A.   Yes.
10   Q.   Who is the Finance Director?
11   A.   Byron Heslop.
12   Q.   How do you spell that?
13   A.   B-Y-R-O-N, Heslop, H-E-S-L-O-P.
14   Q.   And who is the Director for MIG?
15   A.   Marshall -- I don't recall.  I only
16  call him by Marshall.  I forgot his last name.
17   Q.   Are both those individuals tribal
18  members?
19   A.   No.
20   Q.   Neither are tribal members?
21   A.   No.
22   Q.   Did you talk to Byron Heslop and ask
23  him if he looked for financial statements for the
24  1995 through 2001 tax years?
25   A.   Did I speak with him?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 19

1    Q.   Yes.
2    A.   No.
3    Q.   Do you know if anybody spoke with him?
4    A.   Not me personally.
5    Q.   How did you find out that Byron Heslop
6  and this person named Marshall were looking for
7  documents?
8    A.   From our legal department.
9    Q.   You found that out from your legal
10  department?
11   A.   Yes.
12   Q.   When you say your legal department, who
13  are you talking about?
14   A.   Bernie is who I speak to.
15   Q.   Do you know whether or not Byron Heslop
16  or Marshall found documents about the gross and
17  net revenues of the Tribe's operations from 1995
18  to 2001?
19   A.   No.  I don't know.
20   Q.   You don't know?
21   A.   I can't recall that.
22   Q.   Do you know if they're still looking
23  for documents?
24   A.   I'm not sure.
25   Q.   Okay.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 20

1    A.   This is over 14 years ago, so...
2        MR. FARRIOR:  I need to take a break
3  real quick.
4        (Recess in Proceedings)
5    Q.   {By Mr. Farrior}  We're back on the
6  record, and you understand that you are still
7  under oath?
8    A.   Yes.
9    Q.   Okay.  When we were off the record we
10  were discussing the topics in part one.
11   A.   Okay.
12   Q.   And you mentioned, as I understood it,
13  that to answer questions regarding three and four
14  you would need documents, including financial
15  statements and reports?
16   A.   Mm-hmm.
17   Q.   Is that correct?
18   A.   Yes.
19   Q.   Are there any other topics that you
20  would need to consult documents in order to
21  respond to questions?
22   A.   Because as it states there, we are to
23  bring them here, so we have a few statements, I
24  believe.
25   Q.   Okay.  You have a few financial

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 21

1   statements; is that what you are saying?
2      A.   Yes.  This is the subpoena, right?
3      Q.   Yes.
4      A.   Yes.
5      Q.   Did you bring financial statements with
6   you today?
7      A.   Yes.
8      Q.   Which financial statements did you
9   bring with you today?
10     A.   We have the -- these year-end audits,
11  which is 1995, `96, `97, `98, `99 and 2001.
12     Q.   Okay.
13        MR. FARRIOR:  Do you mind if I see
14     those?
15        MS. PINO:  He will be able to testify
16     about those, but we filed an objection as to
17     producing these documents.  We brought them
18     so he could testify about them if he is
19     asked questions, but the Tribe is -- so we
20     are objecting at this point to producing
21     this, but he can testify about them.  He can
22     look at them to refresh his recollection
23     about specific numbers.
24        MR. FARRIOR:  Okay.  Let's make sure
25     the record is clear.  You have financial

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 22

1   statements with you that you are not
2   producing, but Mr. Osceola may consult those
3   as he attempts to answer questions?
4      MS. PINO:  You cannot take them with
5   you, but you can take a look at them now.
6      MR. WELSH:  Can we get a copy of them?
7      Q.   {By Mr. Farrior}  So are these
8   financial statements the type of thing that would
9   be handed out to tribal members at General
10  Council meetings?
11     A.   Yes.  They would be our year-end
12  audits.  Those are audited by an outside source.
13     Q.   Okay.  So when it came to General
14  Council meeting minutes --
15     A.   Those are the ones that have to be
16  turned in to NIGC.
17        MR. WELSH:  Do you have extra copies?
18     Maybe we could make an extra copy so he
19     could look at them and we can look at them.
20     What do you want to do, hand them across the
21     table?
22        MR. FARRIOR:  They're saying we can't
23     have them.
24        MR. WELSH:  I understand that but to
25     talk to him about them.  We'll give them

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 23

1   back to you.  Is this the objection that you
2   filed yesterday?
3      MS. PINO:  Yes, it is.
4      MR. WELSH:  Can we take a break and
5   make copies so we won't have to be handing
6   them back and forth when we ask him a
7   question about something on a line or
8   whatever?  We'll give them back to you for
9   now until they rule on your objection.
10     MS. PINO:  Yes.  That's fine.
11        (Recess in Proceedings)
12     Q.   {By Mr. Farrior}  We're back on the
13  record.  Did you bring any other documents with
14  you to refer to in order to answer questions?
15     A.   I believe we brought what we needed to
16  bring.  Yes.  Yes.
17     Q.   What other documents did you bring?
18     A.   (Indicating).
19     Q.   So it looks like you brought General
20  Council minutes redacted for 1995 through 2002;
21  is that correct?  Did you bring anything else?
22     A.   I believe that's it.
23     Q.   Okay.  So is it true that the
24  Miccosukee Tribe has gaming operations?
25     A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 24

1      Q.   When did that start?
2      A.   When was it?  `80's.  It started with
3   the bingo operation in the 80's.
4      Q.   Was it around 1990?
5      A.   Yes.  Yes.  That's when it first got
6   legalized.
7      Q.   Then at that point the Tribe added
8   pull-tabs and poker?
9      A.   Yes.  Pull-tabs weren't started.
10     Q.   When were pull-tabs added?
11     A.   Late `80's.  Like `88 or `89.
12     Q.   So it started with both bingo or
13  pull-tabs or pull-tabs --
14     A.   Pull-tabs, yes.
15     Q.   Pull-tabs before bingo?
16     A.   Yes.
17     Q.   When did the Tribe add poker?
18     A.   Back then it was -- nothing was defined
19  yet.  Indian gaming was young and bingo was
20  legalized after the Seminole legal dispute with
21  the State, so...
22     Q.   When did the Tribe add pull-tab
23  machines?
24     A.   I believe `90, `91.
25     Q.   When did the Tribe add poker?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 25

1    A.   Right around the same time.  It was
2  just very small stakes.  A quarter maybe.  The
3  pots were like two bucks maybe.
4    Q.   When did the Tribe open the hotel?
5    A.   That was in `93.
6    Q.   So are you aware of any taxes that the
7  Tribe applies to its operations?
8    A.   Just our standard gross license
9  receipts that we collect from the enterprises.
10   Q.   Can you describe what that is?
11   A.   That's the taxes collected.  It's like
12 GA for every enterprise.
13   Q.   I'm sorry?  A GA?
14   A.   General administrative expenses, the
15 cost of doing business for every enterprise.
16   Q.   And when did the Tribe institute its
17 gross receipts license fee?
18   A.   I can't recall exact dates.
19   Q.   Was it before 1990?
20   A.   Yes.  I believe so.
21   Q.   Are you aware of the Tribe passing a
22 resolution in 1995 applying its gross receipts
23 license fee to its gaming operation?
24   A.   I have seen documents pertaining to
25 that, you know.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 26

1    Q.   Do you deny that the Tribe passed a
2  resolution in 1995 applying its gross receipts
3  license fee to its gaming operation?
4    A.   Do I deny it?
5    Q.   Yes.
6    A.   No.
7    Q.   Why did the Tribe pass a resolution in
8  1995 applying a gross receipts license fee to its
9  gaming operation?
10   A.   I believe it was a governmental
11 choice -- a governmental decision.
12   Q.   When you say a governmental decision,
13 you mean a governmental decision by the Tribe?
14   A.   I believe so.
15   Q.   And why did the Tribe make that
16 decision?
17   A.   I specifically -- specifically I don't
18 know.  It was just a decision.
19   Q.   Was it related to the taxes?
20   A.   Taxes?
21   Q.   Yes.
22   A.   The only thing I can think of is maybe
23 the rate.  It is a different rate for MIG.  I
24 believe it is 8.7 percent.
25   Q.   Now it's 8.7 percent?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 27

1    A.   I believe so.  Something like that.
2    Q.   And that's a different rate than is
3  applied to other operations; is that right?
4    A.   Yes.
5    Q.   Why is there a different rate for MIG
6  as opposed to other operations?
7    A.   It helps fund the governmental complex,
8  so if we need to employ more people, the
9  government needs more funds.
10   Q.   But why not apply the same rate to all
11 of the operations?
12   A.   Because all the other operations are
13 not substantial.
14   Q.   What do you mean by "all the other
15 operations are not substantial"?
16   A.   The enterprises, they don't make any
17 money.
18   Q.   Was that true in 2001?
19   A.   I can't recall.  That's a while back,
20 so...
21   Q.   To the best of your knowledge was that
22 true in 2001?
23   A.   2001?  I have seen a few enterprise
24 numbers, and, yes, they were behind, most of the
25 enterprises.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 28

1    Q.   If an enterprise is behind, would the
2  Tribe provide assistance to that enterprise?
3    A.   Of course, yes.
4    Q.   Where did that money come from?
5    A.   From the tribal taxing account.  I
6  believe it is called now the general account.  It
7  is funded through each department.
8    Q.   It's funded -- I'm sorry.  I just
9  didn't understand you.
10   A.   Through each department.  Through each
11 enterprise.
12   Q.   What do you mean by that?
13   A.   Let's say the golf course is short for
14 a year, the Tribe has to carry the tab.  Let's
15 say it loses $1 million, you have to cover the
16 $1 million.
17   Q.   And where does the $1 million come
18 from?
19   A.   From the general account.
20   Q.   Where does the money in the general
21 account come from?
22   A.   From -- that comes from the gaming.
23   Q.   Does it come through the gross receipts
24 license fee or just directly from the gaming
25 profits?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 29

```
 1      A.   Gross receipts license fee?  Those come
 2  from -- we have many different accounts.  The
 3  golf course is not a trust property, so you can't
 4  tax it.  Let's say the airboats, yes, it comes
 5  from the gross receipts tax funding.  It is self
 6  -- it is supposed to self-sustain itself, but it
 7  can't because the whole world is not looking to
 8  get on airboats.  It's not a 24-hour or so...
 9      Q.   So you mentioned that the Tribe has
10  different accounts?
11      A.   Mm-hmm.
12      Q.   So the Tribe has a general account; is
13  that right?
14      A.   Mm-hmm.
15      Q.   And the Tribe has an NTDR account; is
16  that right?
17      A.   Yes.
18      Q.   What does NTDR stand for?
19      A.   Nontaxable Distribution Reserve, I
20  believe.
21      Q.   And does the Tribe have any other
22  accounts?
23      A.   Outside of the general account, just
24  standard accounts for each enterprise.  The
25  majority of them are under, so the Tribe has to
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 30

```
 1  cover them.
 2      Q.   Does the Tribe have an account called a
 3  reserve account?
 4      A.   A reserve account?
 5           MS. PINO:  Objection.  Outside of the
 6      scope of the subpoena.
 7      Q.   You can answer.
 8      A.   Yes.
 9      Q.   What is that used for?
10      A.   Nothing mainly.  Just like a savings
11  account.
12      Q.   And that's separate from the general
13  account?
14      A.   Yes.
15      Q.   Did the Tribe have that account in --
16  the reserve account in 2001?
17      A.   I'm not aware of that.  I would have to
18  look at the financial statement probably to
19  answer.
20      Q.   Can you do that?  I guess we don't have
21  them in the room right now.
22           What is the purpose of the NTDR
23  account?
24      A.   The NTDR account?
25      Q.   Yes.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 31

```
 1      A.   That's where the taxes are collected.
 2      Q.   So the gross receipts license fee gets
 3  placed in the NTDR account; is that correct?
 4      A.   Yes.
 5      Q.   Does any of the gross receipts license
 6  fee get also placed in the general account?
 7      A.   I don't think so.
 8      Q.   And then where does the money go from
 9  the NTDR account?
10      A.   Where does the money go?
11      Q.   Right.
12      A.   It just accumulates, whatever is in
13  there, unless something is spent or something is
14  short.
15      Q.   Is the NTDR account used to make
16  distributions to tribal members?
17      A.   When it is approved, yes, if there is
18  anything in there.
19      Q.   How long has the Tribe had the NTDR
20  account?
21      A.   `94, `95.
22      Q.   Why did the Tribe open the NTDR
23  account?
24      A.   I can't recall why.
25      Q.   Do you know if it related to avoiding
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 32

```
 1  federal income tax?
 2      A.   Avoiding?
 3      Q.   Right.
 4           MS. PINO:  Objection.  Out of the scope
 5      of the subpoena.
 6      Q.   You can answer.
 7      A.   I'm not sure.
 8      Q.   Who was involved in opening the NTDR
 9  account?
10      A.   That had to be the previous
11  administration.
12      Q.   Who are you referring to when you say
13  the previous administration?
14      A.   The elected officials from `95.
15      Q.   When did the Tribe start making
16  distributions to tribal members?
17      A.   I don't know exact dates.  It has been
18  -- the distributions have always been there if
19  there is anything in there.  It can be -- might
20  have started out as 20 bucks, 25 bucks back in
21  the `70's and `80's.
22      Q.   How much were the distributions in `94,
23  `95?
24      A.   `94 and `95?  I don't know the exact
25  number.  It fluctuates.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 33

1    Q.   Do you know about how much?
2    A.   No. I can't tell you off the top of my
3 head. It's more like a Treasury question.
4    Q.   Have you talked to any people in the
5 Treasury Department of the Tribe in order to
6 prepare for today's deposition?
7    A.   No.
8    Q.   Why not?
9    A.   In my office I handle the minutes of
10 the Tribe. Whatever meeting is coming up, the
11 elections, my office handles the elections.
12    Q.   Could you explain to me how the
13 distributions to tribal members works? Like what
14 is the process?
15    A.   What is the process?
16    Q.   Right.
17    A.   Regarding how it is disbursed?
18    Q.   Sure.
19    A.   Whatever amount is in there is divided
20 up by how many members there are.
21    Q.   And when you say whatever amount is in
22 there, you mean the amount in the NTDR account?
23    A.   Yes.
24    Q.   How often is the tax collected from the
25 Tribe operations and put into the NTDR account?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 34

1    A.   I believe every 30 days, whenever a
2 payment is made by whatever enterprise we have
3 and collected.
4    Q.   And then NTDR distributions are made
5 quarterly; is that correct?
6    A.   That's not the norm or that's not the
7 policy. It's voted upon at General Council
8 because General Council meetings are quarterly.
9    Q.   So what is the General Council of the
10 Tribe?
11    A.   That's the overall authority of the
12 Tribe.
13    Q.   The overall authority; is that what you
14 said?
15    A.   Mm-hmm.
16    Q.   Who makes up the General Council?
17    A.   Everybody who are tribal members.
18    Q.   And the Tribe has General Council
19 meetings quarterly; is that correct?
20    A.   Yes.
21    Q.   At the General Council meetings the
22 treasurer announces how much money is in the NTDR
23 account; is that correct?
24    A.   He states that there are funds
25 available for distribution.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 35

1    Q.   And then --
2    A.   There is no exact number.
3    Q.   He doesn't say an exact number?
4    A.   No, because he can't, because we have
5 the meetings at the beginning of the month.
6    Q.   And then at the General Council meeting
7 a member moves to have a distribution; is that
8 correct?
9    A.   Yes, if they want to.
10    Q.   And then the Tribe sets a distribution
11 date approximately 30 days after the General
12 Council meeting; is that correct?
13    A.   Yes. They make a motion to distribute
14 and then they make a motion to set a date.
15    Q.   In your experience has there always
16 been funds in the NTDR account to make a
17 distribution?
18    A.   Yes.
19    Q.   And in your experience has the Tribe
20 always voted and approved making a distribution?
21    A.   Of recent times, yes.
22    Q.   What do you mean "of recent times"?
23    A.   Now funds are available because we have
24 gaming. We have the leases. We have oil leases.
25 Without those funds, I believe the government

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 36

1 would -- the tribal government would always be in
2 the red.
3    Q.   Did the Tribe have oil leases in 2001?
4    A.   I believe so. I believe the oil leases
5 started in the early `80's.
6    Q.   What was the total amount of gross
7 receipts license fees that the Tribe obtained
8 from oil leases in 2001?
9    A.   I'm not sure. I can't say.
10    Q.   How would you find that out?
11    A.   Talk to the Finance Department.
12    Q.   Is there any document you could look at
13 that would --
14    A.   Exactly? I'm not sure.
15    Q.   Would the financial statements of the
16 Tribe show that?
17    A.   Maybe.
18    Q.   Would you take a look?
19    A.   We would have to.
20    Q.   I believe it is this one.
21       MR. WELSH: Can we go off the record?
22       (Discussion off the record.)
23    (Thereupon, the Financial Statement dated
24    September 30, 2001 was marked as
25    Plaintiff's Exhibit OBJ 99-1 for

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 37

1    Identification.)
2    Q.   (By Mr. Farrior)  We're back on the
3    record.  We are looking at what we have marked as
4    OBJ 99-1.  This is a Miccosukee Tribe financial
5    statement, September 30, 2001, and we are looking
6    at page 30.
7         Sir, you were explaining that there is
8    a list of revenues on page three and one of them
9    is leases and rentals?
10   A.   Yes.
11   Q.   And you believe that is the oil leases
12   for the Tribe?
13   A.   A part of it.  A part of it.
14   Q.   What do you mean by that?
15   A.   That's not the only leases we have.
16   Q.   Are any other leases reflected in this
17   financial statement?
18   A.   That I can't tell you.  That's a
19   Finance question.
20   Q.   So when it says -- go ahead.  I'm
21   sorry.
22   A.   Accountants made this financial
23   statement, and you can see it is attached what
24   company made it.
25   Q.   Right.  Do you know what it means when

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 38

1    it says owners' compensation fees?
2    A.   Owners' compensation fees, no.
3    Q.   So across the top it says General Fund.
4    Do you see that?
5    A.   Yes.
6    Q.   Do you know what that means?
7    A.   General Fund?  Yes.  That's where it
8    goes and then the Enterprise Funds is where a
9    part of it is distributed.  This is the end, I
10   believe.
11   Q.   What do you mean by Enterprise Funds is
12   part --
13   A.   Remember I told you that there is a
14   shortage in enterprises?
15   Q.   Okay.
16   A.   Funds get taken out of particular
17   payments for wherever the lease is coming from
18   and gets distributed to the enterprises.
19   Q.   So where it says admissions, there is
20   nothing under General Fund and then there is
21   $827,000 under Enterprise Funds?
22   A.   Mm-hmm.
23   Q.   What does that mean?
24   A.   Because the Tribe put $827,633 in
25   there.  The admissions --

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 39

1    Q.   Go ahead.  I'm sorry.
2    A.   The admissions are like for our
3    festivals.  We keep count of how many people come
4    in.  Once you disburse that on the same date, it
5    doesn't count for anything because we have to
6    hire employees for festivals.  I don't know how
7    many people came in.
8    Q.   And then the last entry is Totals
9    (Memorandum Only) Reporting Entity, is the last
10   column, what does that mean?
11   A.   Totals -- which one again?
12   Q.   What is the significance of the third
13   column after Enterprise Funds?
14   A.   Yes.  That should be the end of the
15   year.
16   Q.   What is -- looking at the first column
17   on the revenue under admissions it says fund
18   raising.  What does that refer to?
19   A.   Fund raising?  The only fund raising
20   that I'm aware of is regarding the local school,
21   the Miccosukee Indian School, MIS, they do the
22   majority of the fund raising.
23   Q.   Under that it says interest, do you
24   know what that refers to?
25   A.   No.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 40

1    Q.   Under that it says leases and rentals.
2    You discussed that includes some of the oil
3    leases?
4    A.   That's just a part of it.
5    Q.   How do you know that that is just a
6    part of it?
7    A.   It is under one item.
8    Q.   What do you mean by that?
9    A.   We have various leases.  It doesn't go
10   into detail which lease.  We have cell phone
11   towers.  We have hunting leases we give out.  We
12   have -- what is it?  The hunting camp we lease
13   out, which are on the Reservation.
14   Q.   How much money did the Tribe make from
15   leases like that during the 2001 year?
16   A.   From here it says $660,581.
17   Q.   And that would include $12,099 of
18   Enterprise Funds?
19   A.   Yes.
20   Q.   So that would be assistance from the
21   Tribe?
22   A.   Yes.
23   Q.   The next one is license and permits.
24   Do you know what that refers to?
25   A.   Yes.  That should be the hunting

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 41

1 licenses because they have fees in order to get a
2 license, and the background checks are pretty
3 substantial with the police department, and they
4 have to pay a fee.
5     Q.   The other one is "other", do you know
6 what would be included in that?
7     A.   I'm not aware of what that is.
8     Q.   And we already talked about the owners'
9 compensation fees?
10    A.   Mm-hmm.
11    Q.   You're not sure what that is?
12    A.   No.
13    Q.   $69,804,000?
14    A.   Mm-hmm.
15    Q.   Does that help give you an idea of what
16 that is?
17    A.   No.
18    Q.   Sales, do you know what that is?
19    A.   Sales?  From this it's only coming from
20 the enterprises, so it has to be from the
21 enterprises.  Only a fraction of the enterprises
22 actually bring in sales.  Each individual
23 enterprise is its own entity, so...
24    Q.   It says tribal assistance, do you know
25 what that means?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 42

1     A.   Tribal assistance?
2     Q.   Underneath sales.
3     A.   The only tribal assistance that I am
4 aware of is what the Tribe assists to each
5 enterprise.  That's the only thing that I'm aware
6 of.
7     Q.   And then the last one is tribal tax,
8 $92,000?
9     A.   Mm-hmm.
10    Q.   What does that mean?
11    Q.   What does the number mean?
12    Q.   What does that line signify?
13    A.   The tax collected.
14    Q.   From what?
15    A.   Whatever is sold.
16    Q.   Okay.  Sales tax probably?
17    A.   Mm-hmm.  Because there is a sales tax
18 and a tribal tax.  The sales tax might be 7
19 percent, but the tribal tax might be 1 percent.
20 It might be one cent.  I forget what the exact
21 number is.
22    Q.   Okay.  And then the next section lists
23 Expenditures?
24    A.   Mm-hmm.
25    Q.   What sorts of expenditures were

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 43

1 reported to the NIGC?
2     A.   To the NIGC?
3     Q.   This was a financial statement prepared
4 for the NIGC, correct?
5     A.   Yes.  I believe so.
6     Q.   So these are expenditures that the
7 Tribe is reporting to the NIGC; is that correct?
8 Well, let me ask you this, is the financial
9 statement that is handed out at the General
10 Council meeting different from the financial
11 statement that is given to the NIGC?
12    A.   I was wrong.  This is a tribal
13 financial statement because it says "does not
14 include".  See the memo attached?
15    Q.   Which page are you on?
16    A.   Four, I believe.  My apologies.  I was
17 wrong.
18    Q.   I don't think I have a memo attached.
19 Maybe it does.  Okay.  Yes.
20    A.   Third paragraph.
21    Q.   Okay.  So it says "the general purpose
22 of financial statements referred to above do not
23 include the accounts of Miccosukee Indian Bingo,
24 the Miccosukee Resort and Convention Center and
25 the Miccosukee Service Plaza".

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 44

1         So from this memo can you tell what
2 this financial statement was prepared for?
3     A.   Because under the constitution of the
4 Tribe we have to have an end-of-the-year audit by
5 an auditor, mandatory, in order to present it to
6 the tribal members.  And every member of the
7 General Council is allowed to come to look at it
8 after it is done, and they're always welcome to.
9     Q.   Looking at Expenditures, one of the
10 lines says trust fund distribution?
11    A.   Yes.
12    Q.   What is that?
13    A.   I believe you guys have discussed it
14 before, I believe.  That some minors are taken
15 care of by setting aside their funds, and then
16 the trust fund is under the umbrella of the
17 Tribe.
18    Q.   So we have discussed how certain minors
19 receive an NTDR distribution which gets put into
20 a trust fund for that minor as opposed to being
21 given to the head of the household that that
22 minor lives in?
23    A.   Mm-hmm.
24    Q.   Is that correct?
25    A.   Yes.  Because they're all case by case.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 45

1  Each individual household has a different
2  situation.
3      Q.   And so you're saying that the line that
4  refers to a trust fund distribution could be
5  referring to solely those funds that are put
6  directly into a trust fund for the benefit of a
7  minor?
8      A.   Yes.  But like I said, it's under an
9  umbrella.  It might be a trust fund under and
10  there might be individual accounts for each
11  minor.  It's not just for one individual.
12     Q.   Under Expenditures, Total Expenditures
13  it says, excess of revenues over expenditures
14  before loss on litigation.
15     A.   Mm-hmm.
16     Q.   What litigation is that referring to?
17     A.   I am not sure.  In 2001?  I'm not sure.
18     Q.   Then the next line says loss on
19  litigation.  Do you know what that means?
20     A.   Maybe -- the only thing I can think of
21  is our insurance policy.  From time to time we
22  have a slip and fall that we have to pay out.
23  Maybe there is someone -- a valet guy hits a car
24  in the valet area.  I have seen a couple of those
25  since I have been in office.  It is a pain, but

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 46

1  it is just a part of doing business.  You have to
2  cover your employees.
3      Q.   And earlier when we were looking at
4  where it says owners' compensation fees, does
5  that amount suggest that the revenue generated
6  from owners' compensation fees is coming from
7  gaming?
8      A.   I'm not sure.
9      Q.   Does the Tribe have any other
10  operations that would generate $69 million a
11  year?
12     A.   No.  I don't believe so, no.  The Tribe
13  is the actual owner of the Miccosukee Indian
14  Gaming, so...
15     Q.   Right.
16     A.   Back then I'm not sure how it was set
17  up.  Like I said, the Treasury should know the
18  majority of these line items.
19     Q.   By Treasury, who do you mean?
20     A.   The Treasury Department.
21     Q.   Who is the treasurer?
22     A.   Jerry Cypress.  That is a job I don't
23  want.  A numbers guy, you know.
24     Q.   How many members were in the Tribe in
25  2001?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 47

1      A.   Under 400, I believe.
2      Q.   Is there any document you could look at
3  that would pin down the exact number?
4      A.   I'm sure there is.
5      Q.   Where would that document be?
6      A.   It should be mentioned in the minutes.
7  Every General Council, when there is an
8  enrollment, after there is an exact enrollment,
9  when it is voted on and somebody gets accepted
10  into the Tribe, afterwards it's announced how
11  many members there are now at that moment.
12     Q.   How much money did the Tribe distribute
13  in 2001 through the NTDR account?
14     A.   Like I said before, I'm not sure.
15  That's a while back.
16     Q.   What sorts of documents could you look
17  at to determine how much money the Tribe
18  distributed in 2001?
19     A.   In 2001?  What sorts of documents?
20     Q.   Yes.
21     A.   Like I stated, you would have to ask
22  the Treasury about that.
23     Q.   Have you seen any documents that the
24  Treasury has that would reflect how much the
25  Tribe distributed in 2001?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 48

1      A.   How much the Tribe distributed, no.  To
2  me they're all crazy numbers because they're not
3  exact.  Even if you look at it the following
4  week, it might be a different number because
5  payments are coming in and revenues are going
6  out.  You are paying everybody else you need to
7  pay off, employees, so it is always fluctuating.
8  Whatever the numbers that I look at might be
9  totally different from what the treasurer looks
10  at.
11     Q.   So when the Tribe makes a distribution,
12  generally it pays the head of the household an
13  amount; is that correct?
14     A.   The head of household?
15     Q.   Yes.
16     A.   Pays the head of household?
17     Q.   Yes.
18     A.   Each individual member is distributed
19  assistance, but the head of household, for
20  whatever reason, the majority of the time they're
21  picking up for the minors.  They pick up the
22  total amount.  Maybe it might be a guardian or
23  something, you know, so...
24     Q.   So when the head of household picks up
25  the total amount, it's some amount multiplied by

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 49

```
 1    how many numbers of -- enrolled members are in
 2    the household; is that correct?
 3         A.   Yes.
 4         Q.   And are you aware that the Tribe had a
 5    loan program in 2001?
 6         A.   I believe it did, yes.
 7         Q.   Can you describe how the loan program
 8    worked?
 9         A.   How the loan program worked?  Well,
10    it's -- it's something that is kind of frowned
11    upon.  Loans can be -- what do you call it?
12         Q.   Payments?
13         A.   Yes.
14              But as a government if somebody needs a
15    loan, we need to help them.  That's how it was
16    established.  When somebody comes in for a loan,
17    they go to the loan officer, fills out the
18    paperwork, signs whatever they need to sign, then
19    she takes it to the treasurer.  Then the
20    treasurer announces it to the Business Council
21    and there is a decision made and we have to
22    authorize it with two signatures.  It doesn't
23    just happen.  It's not a -- you don't go to a
24    window and just pick it up.  Sometimes they're
25    turned down.  Sometimes they're not.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 50

```
 1         Q.   Why are they turned down?
 2         A.   Remember I told you it was a case by
 3    case basis?  Someone might have their own
 4    personal problems that the Tribe is aware of that
 5    they might not want to be a part of.
 6         Q.   How much per individual did the Tribe
 7    distribute in 2001?
 8         A.   I'm not sure of the exact number.
 9         Q.   I'm going to hand you what has already
10    been marked as Exhibit 3.  This is a redacted
11    copy of a spreadsheet.
12         A.   Okay.
13         Q.   Have you seen this document before?
14         A.   What is this?  A spreadsheet?  Yes.  I
15    have seen it.
16         Q.   You have seen the nonredacted version
17    of this?
18         A.   No.
19         Q.   Just the redacted version?
20         A.   Yes.
21         Q.   It shows that Sally Jim received a
22    gross distribution --
23         A.   It says dividend on here.
24         Q.   Gross dividend?
25         A.   Yes.  This is the evidence, so it must
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 51

```
 1    be from Morrero, right?  This is how we lined up
 2    things like this, so I'm not sure what the
 3    language is on here.  It says gross dividend,
 4    F0005, F0007.  I don't know what that is.  I'm
 5    not exactly sure what he is trying to accomplish
 6    with this.  I can't confirm what this is.
 7         Q.   Do you have any reason to believe that
 8    Mr. Morrero provided inaccurate information to
 9    the IRS when he provided them with this
10    spreadsheet?
11         A.   Do I have reason to believe?
12         Q.   Right.  Any reason to believe.
13         A.   I wasn't familiar with the guy.  I've
14    only seen him one time during a deposition.
15    Outside of that I'm not sure what he was trying
16    to accomplish because he worked with the previous
17    administration.  In detail you have to ask him
18    what -- whoever was in office back them.
19         Q.   Sitting here today as a representative
20    of the Tribe in response to our subpoena, do you
21    have any evidence or any reason to believe that
22    the information that Mr. Morrero provided to the
23    IRS was inaccurate?
24         A.   Do I have any evidence?
25         Q.   Right.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 52

```
 1         A.   No.  No.  Like I said, I'm not sure
 2    what he was trying to accomplish with this.  I
 3    don't know his accounting system.  I don't know
 4    anything.
 5         Q.   The best that we can tell -- so looking
 6    at this column which says 15,400, we surmise that
 7    that is an amount that was directed into a
 8    SmithBarney account for --
 9         A.   Do you have that document for me to
10    look at?
11         Q.   No, we don't.  We were hoping that the
12    Tribe could provide it.
13         A.   Oh.
14         Q.   And then we thought that the 10,000 was
15    a loan amount.
16         A.   Mm-hmm.
17         Q.   Do you have any reason to believe that
18    that is wrong or right?
19         A.   I couldn't confirm either way, right or
20    wrong.
21         Q.   Okay.  Can you describe the physical
22    process that tribal members go through to pick up
23    their distributions?
24         A.   Depending on what date is set, the
25    process is -- there is a time.  Usually it starts
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 53

1   in the morning around 8:00 and ends at 1:00
2   maybe. It's not the whole day. They come to the
3   main government building and the Finance Director
4   is available that day to help distribute the
5   checks. They come pick up their checks, but they
6   also have the -- what do you call it? Being able
7   to cash their check is available. Being able to
8   put the kid's money in the trust is available
9   that day. They have to notify the Finance
10  Director of what they want their funds to be used
11  for or set aside. It is very -- not lax, but we
12  have police around. But it is available to
13  everybody in the Tribe, every tribal member.
14      Q.   So are tribal members given a check
15  with the amount of their distribution on it?
16      A.   Yes.
17      Q.   And has that always been the case?
18      A.   Yes.
19      Q.   And then most tribal members cash their
20  check right there with the Tribe; is that
21  correct?
22      A.   I would say a pretty good amount. Not
23  all of them. Like I said, some of them, like
24  their kid's distribution, they have it put in the
25  trust. Some parents don't want to touch their

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 54

1   kid's money. Like I said, it is a case by case.
2           That's just the end of that quarter,
3   whatever funds are available to distribute. Like
4   I said, it's not a policy to distribute. It's
5   just when it is approved, it is distributed.
6       Q.   Does the tribal member notify the
7   administration office ahead of time if they plan
8   on cashing their check with the administration
9   office?
10      A.   No. No.
11      Q.   But the administration office has
12  envelopes prepared for each tribal member; is
13  that correct?
14      A.   Yes. The government has printed
15  envelopes available.
16      Q.   But do they prepare the envelopes ahead
17  of time?
18      A.   Ahead of time?
19      Q.   With the distribution for each tribal
20  member?
21      A.   Occasionally, yes. Occasionally.
22      Q.   How do they know to do that if they're
23  not sure whether the tribal member is going to
24  cash the check with the administration office?
25      A.   Because, like I said, a majority of the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 55

1   time they cash their checks, and they're not
2   different amounts. They're all pretty much the
3   same. If not, we would have to open up the holy
4   kingdom to count money, I believe, to cash the
5   checks.
6       Q.   Where does the administration office
7   get the cash that it uses to cash the
8   distribution check?
9       A.   Where do they get it? I'm not sure.
10  Maybe the bank. You would have to ask the
11  Treasury about that. I'm not a part of that.
12      Q.   Okay. Do you know if they get it from
13  the gaming facility?
14      A.   The gaming facility? I'm not sure.
15      Q.   Do you know, how does the cash arrive
16  on to the --
17      A.   I'm not sure. We don't have armored
18  trucks. We don't have any whatever -- any
19  other -- like everybody else, we use banks.
20      Q.   How much did the Tribe distribute to
21  Sally Jim in 2001?
22      A.   I'm not sure.
23      Q.   How would we find that out?
24      A.   Like I said, the Treasury would know
25  more about that, the exact numbers that you are

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 56

1   looking for maybe.
2       Q.   Are you aware of whether Sally Jim was
3   employed by the Tribe in 2001?
4       A.   Employed, was I aware? I know she used
5   to work for the Miccosukee Health Clinic. She
6   was like the director or something over there.
7       Q.   How much in wages did Sally Jim receive
8   in 2001 from the Tribe?
9       A.   I don't know the exact number.
10      Q.   Where would we go to figure out the
11  exact number?
12      A.   The Finance Director might tell you.
13  The Finance Director works under the Treasury.
14      Q.   Does the Tribe have any records from
15  2001 regarding gaming winnings?
16      A.   Who has it?
17      Q.   Does the Tribe?
18      A.   Does the Tribe? MIG might, Miccosukee
19  Indian Gaming might. That's 2001. I don't know
20  the exact years we keep other records.
21      Q.   Do you know if anyone has gone and
22  asked MIG if they have records of Sally Jim's
23  gambling winnings from 2001?
24      A.   Yes. When we opened up, that's what I
25  was mentioning, our Finance Department

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 57

1    investigated the matter.  They couldn't find
2    anything.  His name was Marshall.  I forgot his
3    last name.  He was the Director over at gaming.
4    He is the one that investigated the matter also.
5        Q.   He couldn't find anything?
6        A.   Yes.  That's what I am aware of.  Me
7    personally I don't know how they store their
8    information.  I would be lost if I knew how they
9    stored their information.
10       Q.   Can you testify today whether the Tribe
11   provided anything else apart from salary,
12   distributions, potential gaming winnings to Sally
13   Jim for the 2001 tax year?
14       A.   If they distributed anything?
15       Q.   Or provided anything else?
16       A.   Other than the standard, you know,
17   benefits of welfare, housing, water.
18       Q.   So the Tribe has a housing program; is
19   that correct?
20       A.   Yes.
21       Q.   Can you describe how that works?
22       A.   Well, we have a long list, let's just
23   start, and when you are on that waiting list,
24   when you finally get called by the Housing
25   Committee -- the Housing Department -- they have

Page 58

1    meetings maybe every month, the last Thursday of
2    every month, I believe.  Even then on that date
3    there are a bunch of people waiting.  And you
4    come in.  They ask if you have applied.  You have
5    to present yourself that you can take care of a
6    house.  It's not just given.
7        And the overall committee has to vote
8    on the matter.  Once they approve it, they
9    forward the information to the Housing Director.
10   Then the Director forwards it to the Business
11   Council, and then the Business Council is
12   notified.  And if everything is fine, it's
13   approved.  No problem.
14       But occasionally if there is anything
15   that is of a concern to the Housing Committee,
16   they let us know; and they're able to present
17   themselves -- the individual applying can present
18   themselves to the General Council as to why he
19   believes he should have a house available for
20   him.
21       Q.   So when the Tribe builds a house for
22   somebody, do they pay anything?
23       A.   I believe it is $10,000 back to the --
24   I think they call it the housing fund.  Housing
25   is its own department, so it needs to be funded.

Page 59

1        Q.   And how much does it cost the Tribe
2    generally to build these houses?
3        A.   Whatever they are charging now,
4    contractors, general contractors.  Nowadays it's
5    between $300,000 and $400,000 maybe.  These days
6    we have a shortage of space, so it is very
7    limited on what we can build because the tribal
8    members have expanded the number.
9        Q.   Is the Tribe currently in the process
10   of building more houses?
11       A.   It is very difficult.  We live next to
12   a national park and it's preserved.  The County
13   isn't going to give up any room.  We have to --
14   they're federal.  We have to go federal if we
15   have anything to say.  That is very difficult.
16   The majority of our land is on the water, on the
17   swamp.
18       Q.   Right.
19            How many houses does the Tribe have on
20   its land?
21       A.   I don't know the exact number.
22       Q.   Is it less than 100?
23       A.   More, I believe.
24       Q.   And your house is on tribal lands?
25       A.   Yes.

Page 60

1        Q.   How many different neighborhoods are
2    there?
3        A.   Neighborhoods?  It's not really
4    neighborhoods.  It is a Reservation.  You can't
5    really call it a neighborhood.  I say we have two
6    Reservations that we have houses on, which is the
7    MRA, Miccosukee Reserve Area, which is on Highway
8    41 and Tamiami Trail, and then a few houses on
9    the I-75 Reservation.  I would say about half a
10   dozen over there.  But the majority of our people
11   enjoy living in the Everglades, so they prefer
12   not to stay on I-75.  We have empty houses over
13   there, but nobody wants to live over there.  We
14   have homes -- we like to be in our homeland.
15       Q.   Does the Tribe provide chickees?
16       A.   Yes.
17       Q.   Can you describe that process?
18       A.   Process?
19       Q.   Yes.
20       A.   When it is requested -- it's requested.
21   Put in a request to -- what is it?  I would call
22   it the Administration Department upstairs on the
23   fourth floor, and they put it in a memo form and
24   then it is presented to the Business Council.
25   And if there are no major issues, it is usually

Page 61

1  approved because to us it is considered a
2  necessity where they do the cooking chickee. We
3  enjoy cooking and eating outside. To us it is a
4  necessity.
5      Q.  So a chickee is used for cooking and
6  eating?
7      A.  The majority of the time, yes.
8      Q.  Does the Tribe employ chickee builders?
9      A.  Employ chickee builders? Our employees
10 have built chickees, yes. Even I have built a
11 chickee. It's not something you go to school
12 for. We did it to survive. What you see now out
13 on the highway is a truck with a sign Tiki Hut,
14 that's brand new. Where do you think they got
15 that idea? If we had patented it and copyrighted
16 it, it would have been ours.
17      They take it and then they make
18 regulations with the State of Florida, and now
19 they try to tell us we need permits in order to
20 build what we have always built. To them it is a
21 luxury. To us it was a necessity. To them they
22 want it to look good next to their pool the
23 majority of the time. To us it was a necessity.
24 We live there. We live under it. It provided
25 housing. That is our original housing.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 62

1      Q.  Can you describe how health care is
2  provided to the tribal members?
3      A.  How health care is provided? We have a
4  clinic. We have a Miccosukee Health Clinic that
5  provides for the majority of the tribal members,
6  95 percent. Some individuals have very -- I
7  don't want to say advanced, but very difficult
8  issues they deal with.
9      Like my little cousin, she has very
10 thin bones. They break easily. She is in a
11 wheelchair the majority of the time. She has had
12 over 20 surgeries. The last one she was in for
13 like 12 hours for her spine. The Tribe covers
14 everything for that without question.
15      Q.  And so in certain instances tribal
16 members may go to get care outside of the clinic
17 outside of the Reservation; is that correct?
18      A.  Yes.
19      Q.  And then that --
20      A.  The majority of the time it is like
21 emergency situations. Something they can't
22 provide at the Miccosukee Health Clinic.
23      Q.  And the Tribe will cover that
24 generally; is that correct?
25      A.  Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 63

1      Q.  The cost of that?
2      A.  Yes.
3      We have a dental office, and we have
4  standard medical -- somebody has a cold, they
5  come in. Vaccinations and stuff like that, we
6  provide that.
7      Q.  Where does the funding come from for
8  the health clinic on the Reservation?
9      A.  The majority for the tribal members it
10 is from the Tribe, regardless of salaries for
11 employees, the majority of that comes from the
12 Indian Health Service.
13      Q.  And the Indian Health Service is a
14 program of the federal government?
15      A.  Yes. Like BIA almost. There are a lot
16 of Indians, I guess, and a shortage of money.
17      Q.  Does the Tribe have any program where
18 it provides transportation to their members?
19      A.  Transportation to their members?
20      Q.  Right. For their members.
21      A.  A program? It's not really a program.
22 We have an Elderly Service Department that
23 provides rides from time to time to -- because
24 you have to understand that some of our seniors
25 and elders, they don't drive. They still don't

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 64

1  drive. They would rather not.
2      We provide rides to get to Publix or
3  they want to go to the movies. You drop them off
4  and pick them up and keep them company if they
5  need it. It's not -- it's just under the same
6  umbrella that we talked about. We have always
7  cared for ourselves. We always will.
8      Q.  What other services does the Tribe
9  provide for its members?
10      A.  What other services? Well, a
11 gymnasium. We have a wellness center. Like our
12 elderly program, like I said, they cut the lawns
13 of every senior's house because they need it
14 without question. If they need firewood for
15 their cooking chickee in the back, we provide
16 that.
17      We have a Miccosukee Family Treatment
18 Center for individuals that have issues that they
19 need to take care of regarding using of --
20      Q.  Mental health?
21      A.  No, it's not really mental.
22      Q.  Drugs and alcohol?
23      A.  It is more like drugs and alcohol, yes.
24 They usually have a 90-day program that is
25 provided and paid for. They have counselors that

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 65

1  come in and we pay them.  That's all on the
2  government complex.
3         We have a police department.  We have a
4  fire department.  We have -- we had a water
5  tower, but we are replacing that with a whole new
6  water plant that we have in another area, and we
7  are laying pipe through the whole Reservation now
8  for cleaner water because the other one was the
9  original system that was put in back in the
10 `60's, I believe.
11   Q.   The Tribe provides water for its
12 members living on the Reservation?
13   A.   Mm-hmm.
14   Q.   Do individual members pay property tax
15 to the Tribe?
16   A.   Other than -- like I said, whatever
17 goes back to the housing fund, and that's it.
18 The $10,000 that they need to put back into the
19 housing fund.
20   Q.   Do individual members pay any taxes to
21 the Tribe?
22   A.   I don't believe so.  I haven't anyway.
23   Q.   Individual members living on the
24 Reservation don't pay state tax, do they?
25   A.   I don't think so.  All that stuff has

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 66

1  been the norm.  It's nothing we just started.
2  It's always been the norm.
3    Q.   Are you knowledgeable about the Tribe's
4  federal tax liabilities?
5    A.   Federal tax liabilities?
6  Knowledgeable?  I understand, from what I have
7  read since I have gotten in office, I am aware of
8  what is going on.
9    Q.   So you are aware that the Tribe does
10 not pay federal income tax; is that correct?
11   A.   Yes.
12   Q.   Are you aware that the Tribe has some
13 withholding tax obligations?
14   A.   Obligations?
15   Q.   Right.
16   A.   I understand there is an area that
17 needs to be addressed that we haven't addressed
18 it.
19   Q.   Are you aware, for example, if the
20 Tribe employs somebody, it has to withhold
21 employment taxes from their checks, federal
22 employment taxes?
23   A.   Mm-hmm.
24   Q.   Are you aware that the Tribe has that
25 obligation?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 67

1    A.   Mm-hmm, and I believe they do.
2    Q.   Are you aware if the Tribe employs a
3  service provider, in certain circumstances the
4  Tribe has to withhold -- pay withholding tax and
5  report what it has paid to as a service provider?
6    A.   I understand there is that and also --
7  what is it?  A 1099, is that what they call it?
8    Q.   Right.
9    A.   They have to provide that.
10   Q.   So for certain --
11   A.   Make the provider aware of it, the ones
12 that have to pay taxes on it.  I understand that.
13   Q.   Are you aware of a provision requiring
14 Tribes -- requiring all persons, including
15 Tribes, to withhold from distributions of net
16 gaming revenue?
17   A.   Net gaming revenue?
18   Q.   Correct.
19   A.   I believe I have read into that.
20   Q.   Have you heard discussions about that
21 provision --
22   A.   Discussions, no.  We don't have
23 discussions on that.
24   Q.   How did you become aware of that
25 provision?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 68

1    A.   Like I said, since I got in office I
2  have read into the situation about the net
3  revenue issue.  I understand that there is a
4  gaming issue, and I understand it relates to the
5  Revenue Allocation Plan.
6    Q.   What do you mean, Revenue Allocation
7  Plan?
8    A.   I believe this is a -- you guys or the
9  IRS, the Service has a policy or -- what do you
10 call it?
11   Q.   A requirement?
12   A.   Is that what you call it?  Tribes, if
13 they wish, they can apply or turn in a Revenue
14 Allocation Plan for approval.  Once it gets
15 approved, you abide by it.  I don't remember it
16 being mandatory or anything, a policy or...
17   Q.   Okay.
18   A.   To me that's a gaming issue, so...
19   Q.   So the Miccosukee Tribe does not have a
20 Revenue Allocation Plan; is that correct?
21   A.   No.
22   Q.   Do you know why the Miccosukee Tribe
23 does not have a Revenue Allocation Plan?
24   A.   No.  I couldn't tell you that.  I don't
25 know.  The General Council would have to vote on

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 69

1    it if they wish to have one.
2    Q.   Does the Miccosukee Tribe currently
3    withhold federal income tax from NTDR
4    distribution payments?
5    A.   Currently?
6    Q.   Yes.
7    A.   Yes.
8    Q.   When did it start doing that?
9    A.   Last June, I believe.
10   Q.   Why did it start doing that?
11   A.   We started negotiating with the IRS
12   regarding settlement.  We even had the Director,
13   Ms. Shelley Van Doran, come out and speak with us
14   at the government complex, but it was very, very
15   minimal on what was discussed.  As far as I know,
16   we're in negotiations.  If not, I guess we need
17   notification.
18   Q.   Did you personally participate in the
19   negotiations?
20   A.   It was two days.  I was in on the
21   second day.
22   Q.   Who did the IRS meet with?
23   A.   The Business Council and a few tribal
24   members, maybe ten members.  It was more like a
25   question and answer situation kind of thing.

          KRESSE & ASSOCIATES, LLC
              (305) 371-7692

Page 70

1    Nothing was ever resolved on the matter, I don't
2    believe.
3          Even during that meeting I brought it
4    up to Ms. Van Doran about the situation, and she
5    reiterated to me that this is not a gaming issue.
6    So to me that's where I stand because that's what
7    she stated to me.
8    Q.   What do you mean by that?  I just don't
9    understand.  What is the significance of that --
10   A.   I brought up this situation that has
11   been going on, in actuality, for almost 20 years.
12   This is the first time you have come out to the
13   tribal government complex.  After discussing with
14   us that, okay, you withhold and we'll come out
15   and see you.  That was put in place.  They came
16   out and saw us, and I brought that up.  I said,
17   we have always had gambling the past 20 years.
18   This is the first time you have come out.  Then
19   she told me, this is not a gaming issue to me,
20   and I said, okay, so this must be about our
21   tribal government.
22         So to me that's where I stand.  This is
23   not a gaming issue.  This is not about our
24   gaming, to my understanding, because that's what
25   she said to me in our government building.  There

          KRESSE & ASSOCIATES, LLC
              (305) 371-7692

Page 71

1    are witnesses.
2    Q.   So prior to June of last year the Tribe
3    was not withholding from -- withholding federal
4    income tax from distributions from the NTDR
5    account, correct?
6    A.   No.
7    Q.   Why was the Tribe not withholding from
8    distributions from the NTDR account?
9    A.   Because under welfare you don't claim a
10   welfare check.
11   Q.   Why do you say that?
12   A.   That's how -- isn't that how
13   municipalities are run, social and general
14   welfare?
15         The tribal government runs in the same
16   way.  We collect taxes and care for the general
17   welfare of the community of the tribal members.
18   The only difference is the number of the
19   population.
20         The U.S. Constitution has general
21   welfare in its wording.  The government gives the
22   authority to disburse in any way it pleases.
23   Maybe I'm wrong.
24   Q.   Did the Tribe ever receive any advice
25   not to withhold federal income tax from

          KRESSE & ASSOCIATES, LLC
              (305) 371-7692

Page 72

1    distributions from the NTDR account?
2    A.   Not to withhold?
3    Q.   Right.
4    A.   Outside of the fact that administration
5    or the Business Council has warned that they need
6    to understand, this is assistance.  This isn't a
7    salary.  This isn't a payment.
8          When you live out in the Everglades,
9    it's very rough and we are providing assistance
10   to our community.  We don't have a Publix.  We
11   don't have a mall out there, department stores.
12   We have to travel for that stuff.  It is a rural
13   area.  They will never have it out there.  We are
14   on the border of a national park.  They barely
15   accept us out there.
16   Q.   My question was more towards whether
17   the Tribe -- whether you're aware of the Tribe
18   receiving any advice, including legal advice?
19   A.   Legal advice?  Me personally, I'm not
20   aware of it, the conversations, if they had it.
21   It has to be asked to the former administration
22   whatever conversations they had regarding legal
23   advice.
24         Regarding memos, I haven't received any
25   advice to withhold or not withhold until

          KRESSE & ASSOCIATES, LLC
              (305) 371-7692

Page 73

1    recently.  Like I said, last year they started
2    withholding that.  That was a choice that the
3    General Council made regarding the topic of
4    negotiation.
5        Q.   Are you aware of the tribal members
6    ever being told not to report distributions on
7    their personal federal income tax returns?
8        A.   Outside of the memos that I have seen
9    regarding this situation, no.  Just on the memos
10   that I received to read.
11       Q.   When you say the memos that you
12   received, what are you referring to?
13       A.   I believe there is one from Dexter and
14   there is a memo from the Chairman, I believe.  My
15   understanding of the situation.
16           MR. DAVIS:  Just to clarify for the
17       record, which Chairman are you talking
18       about?
19           THE WITNESS:  The former, Mr. Billy
20       Cypress.
21       Q.   So what do these memos look like?  Did
22   you provide these memos to us?
23       A.   I'm not sure.
24           THE WITNESS:  Did we bring them, the
25       memos?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 74

1           MR. DAVIS:  Will, can you clarify, by
2       withholding, you mean the taxability of the
3       tribal distributions?
4           MR. FARRIOR:  No.  We are talking about
5       what memos that Mr. Osceola is referring to
6       right now.
7        A.   Just regarding Billy Cypress telling or
8    Dexter and Billy going back and forth regarding
9    the withholding, and Mike Hernandez also.  He was
10   the former Finance Director.  The in-house memos.
11       Q.   I'm going to hand you what has been
12   previously marked as Exhibit 16.  Does this look
13   like the memo you're referring to?
14       A.   Yes.  Yes.
15       Q.   I am also going to hand you what has
16   been previously marked as Exhibit 17.
17       A.   I have seen this before.
18       Q.   Okay.  Is that the other memo you're
19   referring to?
20       A.   Lehtinen?
21       Q.   Right.
22       A.   I have seen this before.  Yes, I have
23   seen this before.
24       Q.   And I'm going to also hand you what has
25   been marked as Exhibit 18 and Exhibit 19.  Have

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 75

1    you seen these memos before?
2        A.   Yes.  I saw this late last year, I
3    think.
4        Q.   That was the first time that you saw
5    it?
6        A.   Yes.  After I got in office.
7        Q.   Who showed it to you late last year?
8        A.   Well, legal dropped off a pile of
9    papers for me to catch up on, and I have read
10   everything.
11       Q.   What was in the pile of paperwork that
12   legal dropped off for you to catch up?
13       A.   Most of it was minutes.
14       Q.   Was there anything else in the pile of
15   paperwork?
16       A.   Minutes and something about our loan
17   program, but outside of that I guess issues with
18   checks or something.  Yes, but I have read these
19   before.  I have seen these before.
20       Q.   So when you say for you to catch up,
21   what do you mean?
22       A.   Regarding legal matters.  I like to be
23   aware of what is going on.
24       Q.   And were these minutes of the Business
25   Council meetings or General Council meetings?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 76

1        A.   The majority of them were General
2    Council.
3        Q.   You mentioned that you have seen memos
4    from Dexter Lehtinen.  Who is Dexter Lehtinen?
5        A.   I believe the former -- what do you
6    call it -- legal general counsel for the Tribe, I
7    believe.
8        Q.   When was he in that position?
9        A.   I'm not sure of the exact date he
10   started, but he was there until 2010 until the
11   now acting chairman let him go.
12       Q.   And are you aware of whether Dexter
13   Lehtinen ever provided advice regarding the
14   taxability of distributions to tribal members?
15       A.   I'm not aware.  I couldn't tell you
16   that.
17       Q.   Are you aware of anybody else providing
18   advice regarding the distribution -- the
19   taxability of distributions to tribal members?
20       A.   Outside of the memos, like I said, I
21   looked at and read, no.
22       Q.   Are you aware of Billy Cypress ever
23   telling tribal members not to report
24   distributions from gaming -- from the NTDR
25   account on their personal income tax?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 77

1     A.   I believe there were a couple of
2 situations during the General Council meetings
3 where he was warning tribal members not to do
4 that because, I believe, they attempted to use it
5 for credit or a line of credit or something and
6 that's not what it is for.
7     But when those situations happen, it is
8 not the vast majority of them.  It is only a
9 couple of people that do it, and then the
10 Business Council is made aware of it from my
11 understanding.
12     Q.   Do you currently tell people not to
13 report distributions when they apply for lines of
14 credit?
15     A.   No.
16     Q.   Why not?
17     A.   Because we withhold.
18     Q.   Is Billy Cypress an expert in federal
19 tax law?
20     A.   I don't think so.  I'm not aware of his
21 background education-wise.
22     Q.   Is there any reason for the tribal
23 members to think that Billy Cypress is an expert
24 in federal tax law?
25     A.   Any reason to believe?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 78

1     Q.   Right.
2     A.   No.
3     Q.   Are you aware of Billy Cypress ever
4 conveying the rationale -- the Tribe's rationale
5 for withholding from distributions from the NTDR
6 account?
7     A.   The rationale?
8     Q.   Yes.  Conveying that rationale to
9 tribal members.
10     A.   Outside of the way the government
11 receives its funding for the NTDR account, no.
12     Q.   And when --
13     A.   Because it is received through the
14 gross receipts tax.  It's not under the
15 government allocation plan.
16     Q.   So part of the rationale is the fact
17 that the Tribe places gross receipts tax on its
18 gaming operation, is that correct, as opposed to
19 directly --
20     A.   It taxes every enterprise.
21     Q.   Right.  But it also taxes the gaming
22 operation; is that correct?
23     A.   Yes, also.
24     Q.   So one of the rationales for not
25 withholding from distributions from the NTDR

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 79

1 account is because the Tribe uses its tribal tax
2 rather than directly distributing gaming revenue;
3 is that correct?
4     A.   Mm-hmm.
5     Q.   Yes?
6     A.   Yes.  Sorry.  It's my first mm-hmm that
7 you had to correct.
8     MR. FARRIOR:  Do you mind if we take a
9 short break?  We can go off the record.
10     (Discussion off the record.)
11     (Recess in Proceedings)
12     (Thereupon, Mr. Roman is now present in the
13 deposition.)
14     Q.   (By Mr. Farrior)  We are back on the
15 record.  I need to have you pull back what we
16 marked as Exhibit 20, which is your subpoena.
17 I'm going to go through each of those and just
18 ask you -- do you see on part one, number five it
19 says, "Advice the Tribe and its members received
20 regarding the taxability of the distributions to
21 tribal members from 1990 to the present"?  Do you
22 see where it says that?
23     A.   Yes.
24     Q.   Can you describe what you prepared
25 today to testify about that topic?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 80

1     A.   Like I said, my office is in charge of
2 the minutes, and I have read through sections of
3 the area that we are being deposed for.
4     Q.   So you read through the minutes; is
5 that correct?
6     A.   Yes.
7     Q.   Looking at part two, you understand
8 that part two lists document requests that the
9 United States has for the Tribe to produce
10 documents?
11     A.   Mm-hmm.
12     Q.   Looking at number one it says, "all
13 documents evidencing any payment, remuneration,
14 gift, distribution, salary, gambling winnings, or
15 transfer of anything of value from the Tribe to
16 Sally Jim for the year 2001".
17     Are you aware of whether the Tribe
18 provided the United States with any documents
19 responsive to that request?
20     A.   Outside of the audits -- year-end
21 audits, I don't believe we did.
22     Q.   Why not?
23     A.   I was notified of this deposition a
24 couple of days ago, so I had a short time to
25 receive these.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 81

1    Q.   When you say you were notified a couple
2 of days ago, what day specifically were you
3 notified?
4    A.   Tuesday.
5    Q.   Tuesday, that would have been the --
6 you're saying the 31st?
7    A.   Yes.  Is that the date?  Yes.
8    Q.   Does the Tribe have any documents
9 evidencing their payments or transfers of
10 anything to Sally Jim for the year 2001?
11    A.   If they did distribute anything or a
12 gift or gambling winnings -- see, it is two
13 things.
14    Q.   Right.
15    A.   You're talking about distributions or
16 you're talking about gambling winnings.  So the
17 transfer of value, we don't have anything other
18 than the housing that we provide.  I don't know
19 what remuneration means.  Regarding the payment,
20 that would be it under her salary.
21    Q.   Does the Tribe have an unredacted copy
22 of what we have marked as Exhibit 3, which is the
23 Morrero spreadsheet?
24    A.   If they do, I haven't seen it.  What
25 you have in front of me is what I have seen.

KRESSE  &  ASSOCIATES,  LLC
(305)  371-7692

Page 82

1    Q.   In the back of Exhibit 3 are checks.
2    A.   Mm-hmm.
3    Q.   Does the Tribe have copies of these
4 checks?
5    A.   We would have to investigate that
6 because, like I said, it is 2001.  I'm not sure
7 how far back we keep the copies of checks.
8    Q.   Is the Tribe currently investigating
9 whether it has copies of these checks?
10    A.   They are investigating the matter.  I'm
11 not sure if they still are.
12    Q.   Who specifically has investigated?
13    A.   If it's in-house, it has to be Byron
14 Heslop, the Finance Director.  I was just made
15 aware that we weren't able to find them.
16    Q.   Who told you that?
17    A.   Our legal.
18    Q.   When you say legal, who are you
19 referring to?
20    A.   Mr. Bernie Roman.
21    Q.   Looking at number two it says, "all
22 documents evidencing periodic payments from the
23 Tribe to tribal members".
24       Do you see where it says that?
25    A.   Periodic payments to the Tribe?  Yes.

KRESSE  &  ASSOCIATES,  LLC
(305)  371-7692

Page 83

1 It seems like it is the opposite of one, but I
2 guess they're only asking for the distribution
3 documents.
4    Q.   Right.  It's referring to asking for
5 distribution documents.
6       Did you provide any documents
7 responsive to this request?
8    A.   I don't have them with me, because, as
9 I stated before, this is the Treasury Department.
10    Q.   Specifically what documents does the
11 Treasury Department have?
12    A.   You're asking for payments to third
13 parties on behalf of tribal members.  You're
14 asking for payments paid to third parties, so you
15 would have to ask the Treasury Department.
16 That's what I'm stating, the exact thing that you
17 are requesting.
18    Q.   Do you know what records the Treasury
19 Department keeps?
20    A.   No, I don't.
21    Q.   I believe you were here when Sally Jim
22 gave her deposition; is that correct?
23    A.   No.
24    Q.   Okay.  She described how when she gets
25 her distribution, she gets a check and she signs

KRESSE  &  ASSOCIATES,  LLC
(305)  371-7692

Page 84

1 the back of it and also when she picks up her
2 envelope, there is a sheet that she signs?
3    A.   Mm-hmm.
4    Q.   Do you know about that sheet that she
5 was talking about?
6    A.   Yes.  It is just the paperwork that is
7 approved, and it's the signature that makes sure
8 the individual that requested the envelope picked
9 it up.  It's just proof that she picked it up.
10    Q.   Does the Tribe keep those?
11    A.   I believe so.  They should.
12    Q.   Does the Tribe have them for 2001?
13    A.   I'm not sure.
14    Q.   Where would they be?
15    A.   In the Treasury Department.
16    Q.   Has the Treasury Department looked for
17 whether they have those sheets for 2001?
18    A.   No.  Not -- not this particular one.
19    Q.   Has the Treasury Department looked for
20 whether they have cancelled checks for the
21 distributions from 2001?
22    A.   Cancelled checks?
23    Q.   Right.
24    A.   I'm not sure.
25    Q.   Are there any other resolutions that

KRESSE  &  ASSOCIATES,  LLC
(305)  371-7692

Page 85

1   the Tribe has like -- so in the General Council
2   meeting when the Tribe authorizes the
3   distribution, votes on it, and that's marked in
4   the minutes, is there any other document that
5   sort of marks down that the Tribe has made that
6   decision to make a distribution?
7       A.   Any other document?  No.
8       Q.   And at each General Council meeting the
9   treasurer reports what is available for
10  distribution in the NTDR account?
11      A.   At our General Council meeting?
12      Q.   I think that's what you said earlier.
13      A.   He reports that -- you have to make the
14  General Council understand that from now until
15  the date of distribution the numbers will be
16  different.
17      Q.   Right.
18      A.   So they're not exact is what he tells
19  them.  Which it's a report to the General
20  Council.  They're more like summaries, I guess,
21  almost.
22      Q.   But the General Council will be made
23  aware of what is in that account available for
24  distribution as of that time?
25      A.   It's usually after distribution because

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 86

1   they just receive a check.  We don't know the
2   exact number.
3       Q.   Right.  But at the General Council
4   meeting the treasurer or Finance Director or
5   whoever tells the General Council as of right now
6   there is this much available for distribution; is
7   that correct?
8       A.   Yes.
9       Q.   Is it the treasurer or the Finance
10  Director?
11      A.   Both.
12      Q.   And --
13      A.   Because the treasurer presents that
14  particular part of the agenda, and then the
15  Finance Director assists him to present the
16  number.
17      Q.   Is there any document showing where the
18  treasurer or Finance Director gets their numbers
19  that they report to the General Council?
20      A.   I'm sure there is.
21      Q.   What sort of document would that be?
22      A.   Standard -- you know, what do you call
23  the -- whatever each department has in its
24  account.
25      Q.   An account statement or something like

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 87

1   that?
2       A.   Yes.  Something like that.  I'm not an
3   accountant.  Like I said, I don't know the exact
4   wording.
5       Q.   So when the Tribe makes a distribution,
6   someone has to figure out how much is in the
7   account and then divide it by the number of
8   members in the Tribe to figure out how much each
9   member gets; is that correct?
10      A.   Mm-hmm.
11      Q.   When is that done?
12      A.   The final week leading up to the
13  distribution date.
14      Q.   Who does it?
15      A.   The Finance Director does it.
16      Q.   And does he keep records of that
17  calculation?
18      A.   The calculation?  I'm not sure.  You
19  can do it on a calculator.  What it is, you
20  divide it by around 600.  Once the tribal
21  membership gets up to 1,000, I'm sure it will be
22  way less.  We don't discriminate between member
23  to member.  Everybody gets the same.
24      Q.   Looking at number three it says, all
25  documents regarding the establishment and

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 88

1   operation of the -- I'm paraphrasing -- the
2   Tribe's quarterly distribution program.
3       A.   Mm-hmm.
4       Q.   Did you provide any documents
5   responsive to this request?
6       A.   No.
7       Q.   Why not?
8       A.   Because the operation of the
9   distributions -- you have to understand, we are a
10  cultural tribal government, so our culture comes
11  first.  Of utmost importance is the welfare of
12  our people.  So it's -- what do you call it?
13      Q.   Oral?
14      A.   Yes.
15      Q.   So there are no documents regarding the
16  establishment of the program; is that correct?
17      A.   Outside of -- what is it?  The articles
18  themselves regarding the gross license fees.
19      Q.   The resolution?
20      A.   The taxes go into the NTDR account.
21  Outside of the distribution, no.  Even if it was
22  $10,000, if we are handing out five bucks, we're
23  handing out five bucks.  If there's 100 million
24  in there, we give out 100 million.  It's not --
25  the program wasn't to get rich.  It is to provide

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 89

1    for the Tribe.  The guideline is regarding being
2    a member, as long as you are a member of the
3    Tribe.
4        Q.    The guideline is you have to be a
5    member of the Tribe; is that correct?
6        A.    Yes.  Then the benefits and welfare are
7    available.
8        Q.    I'm going to show you what has been
9    previously marked as Exhibit 14 and Exhibit 15.
10       A.    Okay.
11       Q.    Exhibit 14 is the earlier ordinance on,
12   I guess, the sales tax.
13       A.    Mm-hmm.
14       Q.    And then Exhibit 15 is the Gross
15   Receipts Tax Ordinance.  Were these the
16   resolutions that you were referring to just a
17   second ago?
18       A.    Yes.  It looks like it.  Is this all of
19   it?
20       Q.    We think that that one is missing a
21   signature page, but we are not sure.  Do you know
22   if that is true or not?
23       A.    I have read this before during the
24   other depositions.  This is incomplete almost.
25       Q.    Have you ever seen a copy of that --

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 90

1        A.    A copy of this, not the original.  I
2    have seen a copy of this.
3        Q.    When you are saying this, which exhibit
4    number is this?
5        A.    15 it says.
6        Q.    Have you ever seen a copy of that with
7    a signature page attached to it?
8        A.    No, not yet.
9        Q.    Looking at number four, this refers to
10   general welfare programs other than the NTDR
11   distribution program?
12       A.    Mm-hmm.
13       Q.    Did you provide any documents
14   responsive to this request?
15       A.    No.
16       Q.    And the Tribe has a housing program?
17       A.    Yes.
18       Q.    And there presumably are documents?
19   For example, there is an application --
20       A.    Mm-hmm.
21       Q.    -- that the tribal members fill out.
22   Why didn't you provide that to us?
23       A.    I would need a couple of semi-trucks
24   for all of this.  It isn't just regarding
25   housing.  It is regarding --

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 91

1        Q.    Right.
2        A.    -- various miniscule stuff that needs
3    to be fixed that they have documents on also.  A
4    sink breaks or you need a new toilet seat or
5    whatever.
6        Q.    So what sorts of documents does the
7    Tribe have that would be responsive to this
8    request?
9        A.    Purchase orders.  Whatever medical care
10   we provide regarding nurses and hospitals.
11       Q.    Does the Tribe have any written
12   guidelines for any of the programs listed in
13   request number four?
14       A.    They have policies and procedures, each
15   department.
16       Q.    So the policies and procedures for each
17   department; is that what you said?
18       A.    Mm-hmm.
19       Q.    So, for example, you were on the Health
20   Board; is that correct?
21       A.    Yes.
22       Q.    And it would have policies and
23   procedures?
24       A.    Regarding the minutes, yes.
25       Q.    Were there minutes of the Health Board

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 92

1    meetings?
2        A.    I'm not sure.  It has been so long.
3        Q.    What about education?
4        A.    Education?
5        Q.    The Tribe has a program where it
6    assists with education expenses; is that correct?
7        A.    Yes.  I believe whatever the funding --
8    BIE, Bureau of Indian Education, can provide, we
9    provide.
10       Q.    So is that for the school on the
11   Reservation?
12       A.    Mm-hmm.  We also have a cultural
13   activity that we provide.  We call it Cultural
14   Day, and we do it once a month for all the
15   children.
16       Q.    What happens at that?
17       A.    Teach them our culture and customs.
18   One hour out of a day.  We have one of the elders
19   come in and speak to them.
20              You have to understand it is very
21   difficult for them to sit still, they are kids.
22   Yes.  That's one of the programs that we provide.
23   We also have like an Indian village language
24   class, which is called MIL.
25              Like I said, our culture comes first.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 93

1 We don't want any shortage of that. We are not
2 going to cut the budget for that. We are going
3 to provide that.
4    Q.   So just to make sure that the record is
5 clear, the Tribe has -- there is a school on the
6 Reservation; is that correct?
7    A.   Yes.
8    Q.   And the Tribe gets funding for that
9 school from the Bureau of Indian Education?
10    A.   Mm-hmm.
11    Q.   And then if there is a shortfall, the
12 Tribe will make that up and contribute to the
13 school?
14    A.   Of course. Of course.
15    Q.   And then are you aware that the Tribe
16 also has a program where they'll pay for
17 postsecondary education?
18    A.   Yes. We have something set aside for
19 that. I'm a big supporter of that.
20    Q.   Are there any written guidelines for
21 that program?
22    A.   Written guidelines, no. That one it's
23 requested through our Adult Education Department.
24 Even that, there is funding for that also. I
25 believe it is our Learning Center they call it.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 94

1 And the Director there receives the request,
2 they're going to attend secondary, as you said,
3 and then it comes in front of the Business
4 Council and then we vote on it and approve or
5 disapprove. Things don't just happen.
6    Q.   Does the Tribe have any programs where
7 they provide food for their members?
8    A.   Food? I know we do a lot of -- not a
9 lot, but our standard holiday parties in the
10 community where the whole community gets
11 together, like Easter, Thanksgiving, and we also
12 have Indian Day. It's just like, I guess, buffet
13 style almost. Just a long -- we cater. And the
14 holidays we usually hand out hams or turkeys to
15 the community members, each house.
16    Q.   And are you aware of a program where
17 they provide meals for elderly members?
18    A.   Yes. We have a senior program. They
19 get breakfast and lunch, I believe; and those are
20 delivered, if necessary, but some of them do come
21 in. We make them feel welcome, hopefully.
22    Q.   Looking at number five it says, "all
23 documentation regarding loans or advances from
24 the Tribe to tribal members".
25         Did you provide any documents

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 95

1 responsive to this request?
2    A.   I don't believe so.
3    Q.   So the Tribe has a loan program? We
4 discussed it earlier; is that correct?
5    A.   Yes. We use the same documents. Like
6 I said, we discuss it and go through the same
7 parameters. They put in a request to the loan
8 officer and it's forwarded to the Business
9 Council, and the Business Council votes on it.
10    Q.   Does the Tribe have any documentation
11 of loans that Sally Jim took out during the 2001
12 year?
13    A.   Regarding this -- what do you call
14 it -- case, I have seen documentation that
15 been provided like the ones you showed me. I
16 believe one was like a title loan. One was like
17 an employee loan or something.
18    Q.   And that was part of the documents that
19 Mr. Morrero provided, is that correct, that
20 you're referring to?
21    A.   I believe so. Yes. I didn't go
22 through every document that was provided by
23 Mr. Morrero.
24    Q.   Are you aware of any other documents
25 that the Tribe has regarding its loan program?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 96

1    A.   Those documents are all we use. It's
2 all in-house. It's not given to you.
3    Q.   Do you know if the Tribe keeps the
4 documents like the ones that Mr. Morrero had
5 anywhere?
6    A.   They should. In the tribal government
7 complex maybe.
8    Q.   Has the Tribe done a search for those
9 documents in response to the subpoena request?
10    A.   On this particular one, I'm not sure.
11 I'm not sure how far it got investigated.
12         I don't mean to keep repeating myself,
13 but most of this stuff is outside of my position.
14 It's the Treasury Department. So in order --
15 like I said, I was notified 48 hours ago that I
16 was going to a depo, which I have no problem
17 doing; but in order for me to receive these, I
18 would have to go in front of the Business Council
19 and notify them and receive a memo that approved
20 for me to go searching around in another office
21 area. And that is just policy. I can't overstep
22 my boundaries.
23    Q.   The next request says, "all documents
24 evidencing advice the Tribe received or tribal
25 members received regarding the taxability of

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 97

1    distributions"?
2    A.   Yes.
3    Q.   Did you provide any documents
4    responsive to this request?
5    A.   Did I provide any?  I'm not sure.
6         THE WITNESS:  Did we provide the memo
7    outside of the ones -- Mr. Daniel?
8    A.   I don't think we did.
9    Q.   So --
10   A.   But those would be the same memos I
11   have seen that you showed me earlier.
12   Q.   So we looked at two memos from the law
13   firm of White & Case.
14   A.   Mm-hmm.
15   Q.   And we looked at a memo from Dexter
16   Lehtinen, which were Exhibit Nos. 19 and 18, the
17   White & Case ones, and the memo from Dexter
18   Lehtinen was Exhibit 17.
19        Does the Tribe have other memos showing
20   advice that it got on the taxability of
21   distributions?
22   A.   Other memos?
23   Q.   Right.
24   A.   Outside of the one approving last
25   year's withholdings, that's it.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 98

1    Q.   So the Tribe got a memo approving the
2    withholding that the Tribe started in June
3    of 2004 (sic)?
4    A.   It was voted on and it was approved.
5    It was a resolution.
6    Q.   So from --
7         MS. PINO:  2014.
8         MR. FARRIOR:  Right, 2014.  Sorry.
9    Q.   So the Tribe passed a resolution in
10   2014 and you provided us with a copy of that?
11   A.   Yes.  I believe you guys have it.
12   Q.   When did we get a copy of that?
13   A.   Last year, I believe.
14   Q.   Last year.  When you say "we", do you
15   mean the IRS?
16   A.   Yes.  The Service.
17   Q.   So apart from that, are there any other
18   memos evidencing advice that the Tribe received
19   about the taxability of distributions?
20   A.   Advice, no.
21   Q.   Are there any other documents showing
22   advice that the Tribe received?
23   A.   I don't think so.  Outside of what I
24   have been presented here, that's the majority.
25   Maybe I have forgotten one maybe.  I'm not sure.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 99

1    though.  That's the majority of them.
2    Q.   So you joined the Tribe in 2005,
3    correct?
4    A.   Yes.
5    Q.   How did you personally know not to
6    report distributions on your personal income tax
7    return?
8    A.   Initially I wasn't told anything.  I
9    was told just this is the distribution.  Back
10   then I didn't go to every meeting, so what was
11   approved or not approved, I wasn't aware of.
12   Q.   If you didn't go to the meeting, how
13   did you find out that there would be a
14   distribution?
15   A.   It's a small community.  Word of mouth
16   or you could go to the office and read the
17   minutes.  The minutes are made public to the
18   community.
19   Q.   Did you do that?
20   A.   In 2005, I'm not sure.  I was a lot
21   younger.
22   Q.   Did you file a tax return for the year
23   2005?
24        MS. PINO:  Objection.  Outside of the
25        scope of the subpoena.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 100

1         MR. ROMAN:  Attorney/client privilege
2         and instruct you not to answer that
3         question.
4         MR. WELSH:  Fifth Amendment?
5         MS. PINO:  Fifth Amendment.
6    Q.   Are you following that instruction and
7    you're not going to answer my question?
8    A.   Yes.
9    Q.   And just to make sure we get it on the
10   record, did you report distributions you received
11   from the Tribe on your personal tax return for
12   the years 2005 through 2013?
13        MS. PINO:  Objection.  I'm instructing
14        the witness not to answer, and he is
15        asserting his Fifth Amendment privilege.
16   Q.   And you are going to follow your
17   counsel's instructions?
18   A.   Yes.
19        MR. FARRIOR:  We'll go off the record.
20   (Recess in Proceedings for lunch at 1:00
21   p.m. and resumed back at 1:45 p.m.)
22   Q.   {By Mr. Farrior}  Back on the record.
23   You understand that you are still under oath?
24   A.   Yes.
25   Q.   Is there anything after we have had

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 101

1 lunch that you answered before that you need to
2 correct or supplement from this morning?
3     A.   Not that I can think of at the moment.
4     Q.   We were looking through the subpoena at
5 the various document requests.  The next one is
6 "all minutes and recordings of Tribal General
7 Council meetings from 1995 to the present".
8         You have provided redacted minutes for
9 Tribal General Council meetings from 1995 to
10 2002; is that correct?
11    A.   Yes.
12    Q.   Why did you not provide General Council
13 meeting minutes from 2002 onward?
14    A.   Was it requested?  I don't think it was
15 requested.
16    Q.   So this is the request, the subpoena.
17 It says from 1995 to the present.
18    A.   Okay.  That must have been my mistake.
19 I thought we were leading up to 2001.
20    Q.   So do you have the minutes available
21 from 2002 to the present?
22    A.   No.
23    Q.   You don't have them available like in
24 your office?
25    A.   I believe we do.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 102

1     Q.   Were you the one who went through and
2 redacted the General Council minutes?
3     A.   Not me personally.
4     Q.   Who was it?
5     A.   It has to be legal.
6     Q.   Did you review what was redacted?
7     A.   The majority of it is requests like the
8 housing issue and stuff that I brought up
9 earlier.  Stuff that came up like that earlier.
10 That's all it is.  Nothing out of the ordinary.
11    Q.   You did not provide recordings of
12 General Council meetings; is that correct?
13    A.   No.
14    Q.   Why not?
15    A.   I just didn't bring them.
16    Q.   You have those; is that correct?
17    A.   I believe we have the majority.  I
18 believe we might be missing a couple here and
19 there, but we have the majority.
20    Q.   We'll come back to that.
21        Number eight is "all communications
22 between the Tribe and Sally Jim".
23        Do you see where it says that?
24    A.   Mm-hmm.
25    Q.   Did you provide any documents

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 103

1 responsive to that request?
2     A.   2001?
3     Q.   Right.
4     A.   The only communications would be the
5 loan.
6     Q.   Okay.
7     A.   Either a phone call or they walk in.
8     Q.   And the General Council minutes would
9 reflect communications if Sally Jim was at the
10 General Council meeting?
11    A.   If she had asked a question.  We don't
12 have a log of who shows up at General Council.
13    Q.   And apart from that, you're aware of no
14 other documents reflecting communications between
15 the Tribe and Sally Jim regarding the Tribe's
16 distribution program?
17    A.   No.  No.
18    Q.   Number nine is "all documents regarding
19 the establishment and operation of the Tribe's
20 gross receipts tax"?
21    A.   Yes.
22    Q.   Do you see where it says that?
23        Earlier we looked at two ordinances --
24 tribal ordinances.  Are there any other documents
25 reflecting the establishment and operation of the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 104

1 Tribe's gross receipts license fee or gross
2 receipts tax?
3     Q.   Are there any other documents?
4     Q.   Yes.
5     A.   It says gross revenue.  That should be
6 the financial statement that we showed earlier.
7 Regarding expenses, yes, it should be on the
8 financial statement.
9     Q.   So the Tribe's financial statements
10 should show that; is that what you are saying?
11    A.   Yes.  It's the end of the year final
12 numbers.
13    Q.   So the final numbers show specifically
14 how much gross receipts tax was received from
15 each of the tribal enterprises?
16    A.   I don't think it did.
17    Q.   Do you know if that information is
18 available anywhere on any document?
19    A.   It should, yes.  This is another area
20 where the Treasury Department would come into
21 play.  Because this entails exact numbers on what
22 was available, so it would -- he would be able to
23 provide that for you.
24    Q.   I think you are looking at request
25 number ten which is "all documents showing the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 105

1    net and gross revenue, expenses and taxes of the
2    Tribe's operations"?
3        A.   Mm-hmm.
4        Q.   Including the gaming facility?
5        A.   Mm-hmm.
6        Q.   So did you provide any documents to us
7    showing those?
8        A.   Exactly this one, I don't think so.
9        Q.   And why not?
10       A.   Because the gaming facility has its own
11   statements, and I'm sure they have their own
12   individual audits also when they do the audits.
13       Q.   Does the Tribe have access to the
14   gaming facility's statements and audits?
15       A.   The Tribe, yes.
16       Q.   And those were not provided to us; is
17   that correct?
18       A.   Yes.  Because this is 2001, right, I
19   believe?
20       Q.   Right.
21       A.   This is one of the areas where we
22   investigated and we couldn't find anything that
23   year.
24       Q.   So are you saying definitively that
25   there -- either the Tribe or the gaming facility

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 106

1    do not have financial statements for the 2001
2    year reflecting the net and gross revenues,
3    expenses and taxes?
4        A.   Each and of itself should have an end
5    of the year audit, that's what I'm saying.
6        Q.   Thus far the Tribe has been unable to
7    locate that for the gaming facility for 2001?
8        A.   I haven't received the gaming
9    facility's audit.  I made the mistake earlier
10   that I believe it was included, and I stated it
11   was not in the memo attached.
12       Q.   Looking at the next request, it's for
13   "all documents regarding the Tribe's NTDR account
14   for 2001".
15           Does the Tribe have any documents
16   regarding its NTDR account for 2001?
17       A.   Source of funds?
18       Q.   Right.
19       A.   I don't believe I brought it.
20       Q.   When you say "I don't believe I brought
21   it" --
22       A.   I don't have it.
23       Q.   What is "it"?
24       A.   Well, like I said, again, I would have
25   to go down to the Treasury Department and receive

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 107

1    these.
2        Q.   Does the Treasury Department keep bank
3    statements for the NTDR account?
4        A.   Yes, they should.
5        Q.   And has anyone tried to look for the
6    bank statements for the NTDR account for 2001?
7        A.   They investigated the matter, our
8    Director, but I'm not sure if they looked for
9    exactly this document.
10           Me, personally, I don't crunch the
11   numbers, so to speak.  If I need something found,
12   I ask the Director to direct his employees.  And
13   upon investigation, I'm not sure if they found
14   this.
15       Q.   So the next two requests, the court did
16   not enforce the subpoena as to these requests,
17   but I'm just going to ask you, as to number 12,
18   it refers to documents used as exhibits in the
19   Tribe's other lawsuits.
20           Do you see where it says that?
21       A.   12, right?
22       Q.   Yes.
23       A.   Yes.
24       Q.   Are you aware that the Tribe had other
25   lawsuits?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 108

1        A.   Yes.
2        Q.   Do you know if anybody went through
3    exhibits used in those lawsuits to see if there
4    were documents responsive to our other requests?
5        A.   I have gone through them; but if you
6    are asking for a particular one, I might not be
7    able to recall.  I might --
8        Q.   So you --
9        A.   -- have gone through them.
10       Q.   You personally went through exhibits
11   used in the other lawsuits?
12       A.   Yes.
13       Q.   When was that?
14       A.   All through my first year in office.
15       Q.   And that was --
16       A.   Even previous litigations, I have gone
17   through them.  Even as far as the TTF (phonetic)
18   case.
19       Q.   But you didn't go through those
20   exhibits for purposes of finding documents
21   responsive to the subpoena; is that correct?
22       A.   No.
23       Q.   And do you know if anybody has?
24       A.   Regarding the subpoena, no.  I don't
25   know if anybody has.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 109

1    Q.   And the same question with regard to
2    13, which is "all documents exchanged in
3    discovery", and there is a list of cases there.
4         Are you aware that there were documents
5    exchanged in discovery in those cases?
6    A.   I believe so, yes, because I read these
7    before.  Maybe I read too much, I don't know, but
8    I read these before.
9    Q.   Do you know if anybody went through the
10   documents exchanged in discovery to see if there
11   were documents responsive to our other requests?
12   A.   I can't recall off the top of my head.
13       MR. FARRIOR:  Can we go off the record
14   for just a second?
15       (Discussion off the record.)
16       MR. FARRIOR:  We'll go back on the
17   record.
18       I'm going to ask that you be handed a
19   copy of what is Bates stamped at the
20   beginning SJ723, which is the Miccosukee
21   General Council meeting minutes from
22   February 2, 1995.
23       And I'm going to note for purposes of
24   the record this is the same as what has been
25   previously marked as Exhibit 5 except for

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 110

1    varying redactions, and I'm going to ask
2    that this be marked as Exhibit 21.
3        (Thereupon, the General Council Meeting
4        Minutes were marked as Plaintiff's
5        Exhibit 21 for Identification.)
6    Q.   Have you seen this document before?
7    A.   Yes.
8    Q.   And this document is minutes of a
9    General Council meeting; is that correct?
10   A.   Yes.
11   Q.   And this is a business record of the
12   Tribe; is that correct?
13   A.   Yes.
14   Q.   Did you review these minutes in
15   preparation for your deposition today?
16   A.   Yes.
17   Q.   Looking at SJ728 --
18       MS. PINO:  Can we go off the record?
19       MR. FARRIOR:  Yes.
20       (Discussion off the record.)
21   Q.   {By Mr. Farrior}  We are back on the
22   record.  Looking at page five, which on my copy
23   is marked SJ728, at the top it says, "Mr.
24   Lehtinen reviewed the new law placing taxation on
25   payments made to tribal members from Indian

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 111

1    Gaming profits".
2        Do you see where it says that?
3    A.   Yes.
4    Q.   Do you know what new law that's
5    referring to?
6    A.   What year is this?  `95?
7    Q.   Yes.  It's all right if you don't.
8    A.   No.
9    Q.   The second paragraph says,
10   "Mr. Lehtinen reported tribal members will be
11   receiving two separate checks --
12   A.   Mm-hmm.
13   Q.   -- at this trust fund distribution".
14   A.   Yes.
15   Q.   Do you recall reading that when you
16   reviewed these memos?
17   A.   Yes.
18   Q.   Do you know if at any point in time the
19   tribal members were given two separate checks?
20   A.   I looked into that.  I couldn't find
21   anything that states that we did in the minutes
22   that were discussed here, but I don't know --
23   Q.   Do you know what happened with that
24   idea or it just got scrapped?
25   A.   I don't know.  I can't recall why.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 112

1    Because even the minutes after this, it doesn't
2    even state why that never came about.  Maybe it
3    was just an idea.  I'm not sure.
4    Q.   Looking where it says, "Alice J.
5    Osceola asked if these trust fund payments are
6    not reported, the individual does not have to
7    report it on their tax returns".
8        Do you see where it says that?
9    A.   Yes.
10   Q.   And is that accurate, that's what
11   happened, a tribal member -- first of all, do you
12   know who Alice Osceola is?
13   A.   Yes.  I believe she --
14       MR. ROMAN:  You mean Alice J?
15       MR. FARRIOR:  Alice J.
16       MR. ROMAN:  Okay.
17   A.   Yes.  I'm aware of who that is.
18   Q.   Is everybody named Osceola in the same
19   Clan?
20   A.   No.  That's just a common name.
21   Q.   What Clan are you in?
22   A.   Panther.
23   Q.   And is everybody named Cypress in the
24   same Clan?
25   A.   No.  A common name.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 113

1    When she asked this, I believe she was
2 looking for clarification on what was discussed.
3    Q.   And then Chairman Cypress stated that
4 it, meaning the tax, does not have to be included
5 on the tax return?
6    A.   Yes.
7    Q.   Are you aware of whether before 1995
8 tribal members were told not to include
9 distributions on their tax returns?
10    A.   I believe that was the common knowledge
11 of the way things were distributed.
12    Q.   At the bottom it says that "Mr.
13 Lehtinen read and summarized the Gross Receipts
14 Tax ordinance"?
15    A.   Mm-hmm.
16    Q.   Is that the same Gross Receipts Tax
17 Ordinance that we reviewed and that was marked as
18 Exhibit No. 15?
19    A.   For the `95 one?
20    Q.   Right.
21    A.   I understand it's in the same year, but
22 I can't confirm that he is talking about the same
23 one.
24    Q.   But the Tribe did pass a Gross Receipts
25 Tax Ordinance in 1995; is that correct?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 114

1    A.   If there was a vote attached to it,
2 they would have.  If there was a motion and then
3 there was a vote, it would have.
4    Q.   And then these tribal members reflect
5 that there was a motion and a vote; is that
6 correct?
7    A.   Yes.  That's what it states here on the
8 minutes.  I'm trying to see what the actual
9 motion was.  It says motion carried, but it
10 doesn't say who made the motion.  It just says
11 "Chairman Cypress requested action on motion
12 previously made".  It doesn't say who made the
13 motion because it usually states it.  It looks
14 like it has been passed.  It just doesn't state
15 who made the motion because it has to be seconded
16 also.
17    Q.   And then are you aware of the Tribe
18 setting up a reserve account for the purposes of
19 paying tax on the distributions should they
20 become due?
21    A.   Yes.  I know that a separate reserve
22 was established, but at the end of 2009 and `10
23 it was depleted.
24    Q.   Where did the money go?
25    A.   I couldn't tell you that.  That's a

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 115

1 Treasury question.  Exactly where it went, that's
2 a Treasury question.
3    Q.   Were tribal members told that there was
4 a reserve established?
5    A.   According to this, that's what they
6 were working on.  This is 1995.
7    Q.   Right.  Looking at page nine, which is
8 also marked as SJ732, this is a finance report by
9 Mike Hernandez.
10    A.   Mm-hmm.
11    Q.   Did you ever hear Mike Hernandez give a
12 finance report at a General Council meeting?
13    A.   A few times, but that's what every
14 Finance Director did.
15    Q.   Who was the Finance Director before
16 Mike Hernandez?
17    A.   I can't recall that.
18    Q.   Who is the Finance Director after Mike
19 Hernandez?
20    A.   I believe it is who is there now.
21 There was another gentleman.  I forgot his name.
22 There was a young gentleman that was there for
23 about a year, year and a half, and then Byron
24 Heslop came in.
25    Q.   Do you know when Mike Hernandez stopped

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 116

1 being the Finance Director?
2    A.   Should be around when the new
3 administration came in and the new Chairman.
4    Q.   Is there a reason why the Finance
5 Director would change when there is a new
6 administration?
7    A.   Well, to my understanding when a new
8 administration comes in, they hire who they want
9 to.
10    Q.   This says under item number seven, Mike
11 Hernandez presented enterprise financial
12 statements to General Council.
13    What is an enterprise financial
14 statement?
15    A.   Like we were discussing, every
16 enterprise is taxed, the enterprises.  Airboat,
17 village, service plaza, gas station, school,
18 restaurant.
19    Q.   Is an enterprise financial statement
20 the same thing that we looked at earlier and
21 marked as --
22    A.   Roughly, yes.
23    Q.   -- OBJ 99-1?
24    A.   Yes, definitely.
25    Q.   What do you mean "roughly"?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 117

1    A.   That's the end of the year audit.
2    Q.   Okay.  Just so I'm clear, what is the
3  difference between the end of the year audit and
4  the enterprise financial statement?
5    A.   Because, like I said, in the
6  constitution it states that we audit ourselves
7  every year.  In the constitution we have to
8  provide that to -- we have to open our books to
9  the tribal members every year to keep the
10 integrity.
11   Q.   Does the Tribe keep its enterprise
12 financial statements that are distributed to the
13 General Council?
14   A.   They should.  I believe they do.
15   Q.   Where are those kept?
16   A.   In the Treasury.
17 (Thereupon, Mr. Roman and Mr. Pete Osceola are
18 no longer present in the deposition.)
19   Q.   So also included in this is a summary
20 of the enterprise financial statements; is that
21 correct?
22   A.   Yes.
23   Q.   Where does the information come from
24 that is presented in the General Council minutes?
25   A.   Where does the information come from?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 118

1    Q.   Right.
2    A.   From the Finance Department, which is
3  the treasurer.
4    Q.   Do the enterprise financial statements
5  have additional information than what is
6  presented in the General Council minutes summary?
7    A.   Outside of what I said earlier, no.
8  There is no extra information.  What might be
9  presented at the General Council a week later
10 might be a different number.  Outside of that,
11 there is nothing substantial.
12   Q.   Right.  I'm saying not that the
13 information is different, but is there additional
14 detail or is it easier to understand?
15   A.   Additional detail?  Not really.  Just
16 the layout might be different regarding how it is
17 presented.  That's about it.
18   Q.   Okay.  So have you reviewed financial
19 statements that look like this on pages nine and
20 ten of the General Council minutes?
21   A.   Yes.  But this is back in `95, so there
22 are less pages.  Now there are more pages.  As
23 the Tribe grew, finance had to grow.  We had more
24 employees.
25       MR. FARRIOR: Let's go off the record

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 119

1    for a second.
2       (Discussion off the record.)
3    Q.   (By Mr. Farrior)  We're back on the
4  record.  Okay.  We are looking at the summary of
5  the financial statements in the Council minutes.
6       So looking at the Miccosukee Service
7  Plaza, that's the Tribe's service plaza; is that
8  correct?
9    A.   Yes.
10   Q.   Where is that located?
11   A.   Off of I-75 in Broward County.
12   Q.   This is showing that the service plaza
13 had a loss for the year-to-date?
14   A.   Yes.
15   Q.   Is that correct?
16   A.   Yes.
17   Q.   And then there is the arts festival?
18   A.   Yes.
19   Q.   So it has current actual and
20 year-to-date actual.  What is the difference
21 between those two?
22   A.   I think the year-to-date actual is what
23 is spent up until February.
24   Q.   Okay.  And so it is showing a profit of
25 current actual of $12,000?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 120

1    A.   Yes.
2    Q.   Would that be --
3    A.   But that doesn't -- it's not really
4  profit.  It is just sort of like a budget because
5  there are only two festivals a year.  It gets
6  spent and replenished.  So that actual account is
7  only like used twice a year back then.
8    Q.   So that's just the balance of the
9  account?
10   A.   Yes, mainly, for that particular one.
11   Q.   So enterprises checkbook balances,
12 those are just what is in each individual
13 account?
14   A.   Yes.  That's what is used to pay the
15 vendors like food deliveries and stuff if it is
16 for the restaurant.
17   Q.   So there is a statement of enterprises
18 income and expenses.  Where did this information
19 come from?
20   A.   It has to be the Finance Department.
21   Q.   And so for each enterprise it has a
22 profit or a loss for the year?
23   A.   Yes.
24   Q.   And that's the first line?
25   A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 121

1    Q.   Is that the same thing for the
2  restaurant, it has lost $61,000 approximately?
3    A.   Yes.
4    Q.   And then there is a line for tribal
5  assistance?
6    A.   Yes.  The Tribe assistance, $44,000.
7  So it only shows a loss at a minimal of $17,000.
8    Q.   And the tribal assistance comes from
9  the Tribe's general account?
10   A.   Yes.
11   Q.   So the restaurant, the airboats, the
12 village, the general store all lost money; is
13 that correct?
14   A.   Yes.
15   Q.   And the gift shop and service station
16 made money?
17   A.   Yes.
18   Q.   But --
19   A.   In 1995 it did.
20   Q.   And the losses from the other
21 enterprises exceeded the income from the service
22 station and the gift shop; is that correct?
23   A.   Yes.
24   Q.   And looking at the next page it says
25 general account income and expenses statement.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 122

1  Can you describe to me what this means?
2    A.   Regarding which particular --
3    Q.   Just what is shown.  What is shown here
4  generally.  First of all, what does it mean by
5  general account income and expenses statement?
6    A.   Whatever comes in.  Whatever goes out.
7    Q.   Is that from the general account
8  specifically?
9    A.   Yes.  Whatever is in there.
10   Q.   And then it says income?
11   A.   Mm-hmm.
12   Q.   Where is the income coming from?
13   A.   From the Tribe, I believe.
14   Q.   And what is the difference between
15 current actual versus year-to-date actual?
16   A.   This is -- this particular General
17 Council is showing these numbers.  Year-to-date
18 is -- I believe our fiscal year starts in
19 October.  So this is after -- what is it?  Six
20 months.
21       MR. FARRIOR:  I'm going to ask that you
22     be handed the General Council minutes from
23     May 4, 1995.  We will mark that as
24     Exhibit 22.
25

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 123

1    (Thereupon, the General Council Meeting
2    Minutes dated May 4, 1995 were marked as
3    Plaintiff's Exhibit 22 for Identification.)
4    Q.   And this is a copy of the General
5  Council minutes that you provided to us; is that
6  correct?
7    A.   Yes.
8    Q.   I'm going to ask you to look at
9  page nine, which is also marked SJ752, under
10 finance report, second paragraph says, "he,
11 meaning Billy Cypress, reported IRS is trying to
12 tax the trust fund payments, but Business Council
13 has the tribal attorneys working on this"?
14   A.   Yes.
15   Q.   Do you know what that means?
16   A.   In 1996?  I can't recall which
17 particular trust fund he is talking about.  Maybe
18 he's talking about the reserve that they were
19 trying to set up the previous year.
20   Q.   So assuming he's talking about the
21 trust fund payment, is it possible he is
22 referring to the NTDR distributions?
23   A.   Yes.
24   Q.   And the tribal attorneys were working
25 on making sure that the IRS couldn't tax the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 124

1  trust fund distribution; is that correct?
2    A.   Yes.
3    Q.   Which attorneys were they at the time?
4    A.   In `96 I believe it was Dexter because
5  he had broad responsibilities.
6    Q.   And do you know what happened with
7  that?
8    A.   No, not exactly.  I can't recall right
9  now.
10   Q.   Looking at the next page.
11   A.   Page ten?
12   Q.   That's correct.  So, again, this is
13 referring to Mike Hernandez reviewing a report?
14   A.   Okay.
15   Q.   Do you see where it says that?
16   A.   Which paragraph?
17   Q.   Back to item seven, "Mike Hernandez,
18 Finance Director, reviewed page one of the
19 report".
20   A.   Which paragraph?  I'm sorry.
21   Q.   So the first paragraph on page ten.
22   A.   Yes, I see it.
23   Q.   So Mike Hernandez was reviewing a
24 report of the Tribe's enterprises; is that what
25 it looks like to you?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 125

1    A.   Yes.
2    Q.   And you didn't provide us with a copy
3  of that report; is that correct?
4    A.   No.
5    Q.   On page five of the report that
6  Mr. Hernandez is reviewing it says, "Mr.
7  Hernandez reported for the six months ending
8  March, `95, 7.1 million had been received with
9  the majority of the funds coming from MIBG.  He
10  added 6.7 was used in the operation of the Tribe
11  but the majority distributed for trust fund
12  payments".
13    A.   Mm-hmm.
14    Q.   Does MIBG refer to Miccosukee Indian
15  Bingo and Gaming?
16    A.   Yes.
17    Q.   And is the trust fund the NTDR
18  payments?
19    A.   I believe that's what he is talking
20  about.
21    Q.   Looking at the next page, page 11 --
22  so, again, first of all, it says, "Colley Billie
23  stated tribal assistance is included, so it was
24  not an actual profit".
25    He is referring to the financial

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 126

1  statements for the Tribe's enterprises presented
2  at the meeting; is that correct?  Is that how you
3  read that?
4    A.   Yes.
5    Q.   And the Tribe subsequent to 1995
6  continued to provide assistance to its
7  enterprises?
8    A.   Yes.  The majority of them.
9    Q.   And then the next sentence says,
10  "Mr. Hernandez stated without the assistance,
11  enterprises would not have made any profit".
12    Do you see where it says that?
13    A.   Yes.
14    Q.   And was that true in 1995?
15    A.   Yes.
16    Q.   Was that true in 2001?
17    A.   Yes.
18    Q.   And that means the enterprises overall;
19  is that correct?
20    A.   A majority of them.  Back then they
21  were, a majority of them.
22    Q.   In 2001 would the enterprises overall
23  have made any profit?
24    A.   Would they have made any profit?  No.
25  No.  They were always in the red.  These

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 127

1  enterprises, the majority of them are out in the
2  Everglades, so it is very difficult to make a
3  substantial profit.
4    MR. DAVIS:  Can we go off the record?
5    MR. FARRIOR:  Sure.
6    (Discussion off the record.)
7    MR. FARRIOR:  I'm going to ask that you
8  be handed the November 2, 1995 General
9  Council meeting minutes.  We'll go ahead and
10  mark this as Exhibit 23.
11    (Thereupon, the General Council Meeting
12  Minutes dated November 2, 1995 were
13  marked as Plaintiff's Exhibit 23 for
14  Identification.)
15    Q.   And this exhibit is the same as has
16  been previously marked as Exhibit 6 except for
17  redactions that you made to this exhibit and also
18  the addition of this cover page.  The cover page
19  says corrections needed on the following page.
20    Do you see where it says that on the
21  front?
22    A.   Yes.
23    Q.   Do you know where that came from?
24    A.   When -- the part of the agenda where
25  approval of minutes comes up, on this one where

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 128

1  it is stated number three, when minutes are
2  presented, the General Council points out changes
3  that need to be corrected because they were
4  present at the previous meeting; and when that
5  happens it doesn't get approved and they have to
6  go back to the main administration building to be
7  corrected.
8    Q.   So the minutes for the following
9  General Council meeting would show you what these
10  specific corrections --
11    A.   Not exactly, because this is a
12  corrected version.
13    Q.   This is the correct version?
14    A.   Yes.  That's what it is stating.
15    Q.   Okay.  Looking at page two of the
16  minutes, which is SJ825, the second to the bottom
17  paragraph.
18    A.   Yes.
19    Q.   It says, "Chairman Cypress stated the
20  cost of the expansion would not affect the NTDR
21  payments but the tribal programs which are
22  assisted by gaming revenue will experience
23  cutbacks for at least four months".
24    Do you know what he is talking about
25  there?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 129

1    A.   The programs would be related to the --
2  what do you call it -- the social welfare that is
3  provided in the community, the school, police
4  department, fire department.
5    Q.   Generally does the Tribe if it's
6  running short on money still make the NTDR
7  payments but cuts funding to other programs?
8    A.   It's not really cut.  It's just not
9  paid.  It is not paid to that program.
10   Q.   So it pays less to other programs?
11   A.   Yes.
12   Q.   Is that generally how --
13   A.   Because the tribal programs, the budget
14 is set.  They're paid regardless, their
15 employees.
16   Q.   Let me ask you this, on page three
17 below the redaction it says, "Chairman Cypress
18 updated General Council on the taxation".
19   A.   Mm-hmm.
20   Q.   In the middle of the paragraph it says,
21 "in the event it does come into effect, then the
22 tribal attorney has two financial plans which can
23 be implemented which would aid the Tribe in
24 avoiding the paying of taxes"?
25   A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 130

1    Q.   Do you see where it says that?
2    A.   Yes.
3    Q.   Do you know what the two plans were?
4    A.   No.  That would be the attorney.  I
5  guess you will have to ask Dexter about that one.
6    Q.   If you look at page six, there is a
7  discussion about --
8    A.   Which paragraph?
9    Q.   Well, just generally the top half of
10 the page is a discussion about Chairman Billie
11 and Chairman Cypress meeting with representatives
12 of the Seminole Tribe; and on the fourth
13 paragraph down it says, "Chairman Cypress stated
14 Chairman Billie has said they, meaning the
15 Seminoles, are now balking at paying the gaming
16 taxes"?
17   A.   Yes.
18   Q.   "They have questioned how the
19 Miccosukee Tribe with little or no formal
20 education has managed to avoid paying these taxes
21 and the Seminole Tribe with a highly educated
22 staff are being made to pay the taxes".
23        Do you see where it says that?
24   A.   Yes.
25   Q.   So do you agree that tribal members

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 131

1  were generally made aware that other Tribes were
2  paying tax on distribution of gaming revenues?
3    A.   Yes.
4    Q.   And did this raise any concerns that
5  you are aware of within the Miccosukee Tribe that
6  other Tribes were paying tax whereas the
7  Miccosukee Tribe was not?
8    A.   Repeat that.
9    Q.   So are you aware of any concerns that
10 anybody had in the Miccosukee Tribe based on the
11 fact that other Tribes were paying taxes --
12   A.   Concerns?
13   Q.   Right.
14   A.   No.
15   Q.   Why not?
16   A.   In this particular statement in '95 I
17 believe the IRS was questioning the Seminole
18 Tribe regarding how their funds were being --
19 what do you call it -- spent, not being issued.
20 It was in regards to being spent.
21        And I remember they had a big issue
22 about that, because there was a big investigation
23 regarding the Seminole Tribe.  The details I
24 don't know about, but I know there was a big
25 issue.  And, yes, we communicate as Tribes, but

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 132

1  outside of that we each have our own tribal
2  responsibilities to maintain itself.
3    Q.   You were on the Gaming Board for the
4  Tribe; is that correct?
5    A.   Yes.
6    Q.   And you said you would go and visit
7  with other tribal casinos; is that correct?
8    A.   Yes.
9    Q.   Do you discuss taxation with other
10 Tribes?
11   A.   No.  The one I went to was mainly more
12 like -- outside of the gaming issues, it's just
13 like a sales conference kind of.  Trying to sell
14 the Tribe new tables.  Depends on what class you
15 are in, if you're Class Two or Class Three.  We
16 are Class Two so we are limited in what we can
17 purchase.  And we can't use everything from
18 everybody because we already have our vendors
19 that we are using.  That's all it was.  It wasn't
20 anything major.
21   Q.   What is the AAR Plaza?  What does AAR
22 stand for?
23   A.   Alligator Alley.
24   Q.   What does the R stand for?
25   A.   Reserve -- Reservation, I guess.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 133

1    Q.   Looking at the back of this exhibit
2 there are some handwritten notes.  Do you know
3 what these are from?
4    A.   These are the notes that you see on
5 page one, 000824, where it says recording
6 secretaries and it states some names with some
7 positions, that's their notes, because they are
8 official notes of the meeting of the General
9 Council.  These are different notes that each
10 individual made; and when they're listening to
11 the recordings and typing their minutes, they use
12 that to assist them to remember what was stated.
13    Q.   Looking at what is marked as SJ891.
14    A.   What page is that?  Sorry.
15    Q.   In the notes.  In the margin -- so
16 there is a redaction on this page?
17    A.   Yes.
18    Q.   And the first redaction and then in the
19 margin it says something about "TTGI gaming
20 taxes, question mark".  Do you see where it says
21 that?
22    A.   Mm-hmm.
23    Q.   And then can you read what it says
24 below that?
25    A.   Something text.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 134

1    Q.   But do you see anything in the -- not
2 in the margin that would refer to tax?
3    A.   In the second paragraph it says consult
4 at General Council meeting to discuss taxes next
5 week.  That's what it says.
6    Q.   My question is, what was redacted here,
7 was it related to taxes because it appears to be
8 a note in the margin about taxes directly next to
9 it?
10    A.   I couldn't tell you that.  I can barely
11 read it, so.  Maybe it's just this person's side
12 note to remember what it was.
13       MR. FARRIOR: I'm going to ask that you
14       be given the February 8, 1996 General
15       Council minutes.  We will mark that for
16       identification as Exhibit 24.
17       (Thereupon, the General Council Meeting
18       Minutes dated February 8, 1996 were
19       marked as Plaintiff's Exhibit 24 for
20       Identification.)
21    Q.   Looking at this, do you recognize this
22 as the General Council meeting minutes from
23 February 8, 1996?
24    A.   Yes.
25    Q.   Did you review those in preparation for

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 135

1 your deposition?
2    A.   Yes, I did.  I looked through them.
3    Q.   Looking at page four it says, "one
4 Indian Tribe had requested the Tribe's help in
5 implementing the kind of plan which has enabled
6 us to legally avoid paying the taxes".
7       Do you see where it says that?
8    A.   Which paragraph?
9    Q.   I'm sorry.  The fourth paragraph there.
10    A.   Okay.
11    Q.   First sentence.
12    A.   First sentence?
13    Q.   First sentence of the first paragraph
14 on page four.
15    A.   Okay.  Yes, I see it.
16    Q.   Do you know what other Tribe that is?
17    A.   No.
18    Q.   Is there any way of finding out?
19    A.   You would have to ask the former
20 chairman.
21    Q.   Are you aware of any discussions that
22 the Miccosukee Tribe has had with other Tribes
23 about sharing its plan that it has for avoiding
24 paying taxes?
25    A.   I understand it has come up at meetings

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 136

1 where legal brought up that it was asked or
2 requested by other Tribes, but no Tribe in
3 particular was ever named.
4    Q.   Looking at page five, the third
5 paragraph on the bottom, it says, "Chairman
6 Cypress stated tribal members have been
7 questioning the administration staff and Business
8 Council members on the expected amount of the
9 NTDR payments"?
10    A.   Mm-hmm.
11    Q.   And then it says, "he stated the amount
12 is not known until towards the end of the month"?
13    A.   Mm-hmm.
14    Q.   "Even then the amount depends on if
15 there were any substantial prize payouts"?
16    A.   Mm-hmm.
17    Q.   Is this going to what you were saying
18 about the NTDR payments being calculated
19 approximately a week before the actual
20 distribution is made?
21    A.   Repeat that.  I'm sorry.
22    Q.   Earlier you were explaining to me, I
23 thought, that the General Council would be told
24 how much was available in the NTDR account for
25 distribution, but that wasn't the set amount --

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 137

1    A.   Mm-hmm.
2    Q.   -- because the amount could increase --
3    A.   Mm-hmm.
4    Q.   -- as additional gross receipts license
5  fees were collected?
6    A.   Yes.
7    Q.   So that appears to say what you were
8  saying; is that correct?
9    A.   Yes.  It fluctuates depending on how
10 much we give out regarding jackpots and stuff.
11 Sometimes you might get two, three, four jackpots
12 at time.  When you add that up, it's close to
13 $1 million in one day, so it shows a loss for
14 that day for gaming.  It is very difficult to
15 determine what is set.
16   Q.   Is money ever taken out of the NTDR
17 account to pay jackpots?
18   A.   To pay jackpots?  Not out of the
19 account.  The cash flow that is already there is
20 paid out at the gaming establishment.
21   Q.   Is money ever taken out of the NTDR
22 account to pay anything other than the NTDR
23 distribution?
24   A.   I'm sure that there have been loans in
25 the past to cover the enterprises because you

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 138

1  have to understand in `96 we just established
2  ourselves as a gaming facility.  All this was
3  still fresh back then.
4    Q.   So it's possible if there were a large
5  payout that the gaming facility had to make, it
6  could take a loan from the NTDR account to cover
7  that and then make it up later?
8    A.   From gaming?
9    Q.   Right.
10   A.   No, not from gaming.  To the
11 enterprises mainly because those are the ones
12 that show losses.  The gaming wouldn't need it.
13 Gaming is the only thing that has been actually
14 self-sustaining itself over the years.
15   Q.   So looking at the financial report
16 which begins on page 19.
17   A.   Okay.
18   Q.   So on page 20, the second paragraph
19 says, "Mr. Hernandez reported the finance staff
20 would not be preparing tax returns for tribal
21 members but they have scheduled for persons to be
22 available to do this tomorrow".
23        Do you see where it says that?
24   A.   Yes.
25   Q.   Are you aware of the Tribe providing

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 139

1  services for tax preparation for the tribal
2  members?
3    A.   Yes.
4    Q.   And he says, "he added this service
5  will be done at no charge to the tribal members
6  and apologized for any inconvenience this may
7  cause"?
8    A.   Yes.
9    Q.   Was that done the same way after 1996,
10 that the finance staff would not, themselves, be
11 preparing tax returns, but they would bring in
12 people to do them?
13   A.   Yes.
14   Q.   Who did they bring in?
15   A.   I believe it used to be Jackson Hewitt
16 back then.
17   Q.   Who is it now?
18   A.   What is the other one?
19   Q.   H&R Block?
20   A.   Yes.
21   Q.   So Mr. Hernandez was reviewing the
22 first quarter for the general account?
23   A.   Mm-hmm.
24   Q.   And it says, "he reported the amount of
25 money received in this period was approximately

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 140

1  $5.5 million"?
2    A.   Mm-hmm.
3    Q.   "The majority of these monies was
4  received from MIG"?
5    A.   Yes.
6    Q.   So it says, salaries and benefits,
7  general operating expenses, tribal and community
8  acts?
9    A.   Yes.
10   Q.   What does that mean?
11   A.   All three of them?
12   Q.   Yes.
13   A.   Salaries and benefits are the
14 employees.
15   Q.   So are those expenditures of the --
16   A.   Yes.
17   Q.   Okay.  What is included in tribal and
18 community acts?
19   A.   Like the functions that I stated that
20 we put on for the community.  The Tribe has
21 tribal functions in the community like on the
22 holidays and maybe one day out of the month there
23 will be cultural functions for the children.
24   Q.   Then it says, "Mr. Hernandez stated the
25 largest expenditure was for the NTDR payments

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 141

1  which amounted to approximately $2.6 million".
2      Q.  Do you see where it says that?
3      A.  Yes.
4      Q.  Is that included in any of the other
5  numbers on that page?
6      A.  Included?
7      Q.  Yes.  Would that be, for example,
8  included in tribal and community acts?
9      A.  Would they be included?  No.  It is a
10  different line item for MIG.
11      Q.  So looking at page 24, this is the
12  statement for Miccosukee Indian Bingo and Gaming;
13  is that correct?
14      A.  Yes.  That's what it says.
15      Q.  So it has total revenue and total cost
16  of revenue and, in parentheses, prizes paid out?
17      A.  Yes.
18      Q.  I understand that the total revenue is
19  the amount coming in and then the total cost of
20  revenue is the prizes paid out; is that correct?
21      A.  Cost of revenue?
22      Q.  Right.
23      A.  Yes.
24      Q.  And then under operating expenses it
25  has $13,639,000 approximately; do you see that?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 142

1      A.  Yes.
2      Q.  Then it says, "Mr. Hernandez explained
3  that the biggest expense was the gaming license
4  fees, parentheses, NTDR".
5      Do you see where it says that?
6      A.  Yes.
7      (Thereupon, Mr. Roman is now present in the
8  deposition.)
9      Q.  Is the gaming license fee included in
10  operating expenses in this financial statement?
11      A.  Yes.
12      MR. RAMON:  This is not on the record.
13      (Discussion off the record.)
14      Q.  {By Mr. Farrior}  And so at this point
15  in time the gross profit, which is the revenue
16  minus the cost of revenue, is approximately 22,
17  and then the operating expenses which includes
18  the NTDR is approximately 13.6 million, and then
19  that equals the income from operations?
20      A.  Mm-hmm.
21      Q.  Which is approximately $8 million; is
22  that right?
23      A.  Yes.  That's what it states.
24      Q.  So the gaming operation for this
25  quarter showed a net revenue -- net income of

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 143

1  approximately $8.6 million, excluding the NTDR;
2  is that correct?
3      A.  Yes.
4      Q.  Do you know if there was any quarter
5  where the revenue from Miccosukee Bingo and
6  Gaming was negative after subtracting the gross
7  receipts license fee?
8      A.  Not that I am aware of.
9      Q.  Specifically in 2001?
10      A.  In 2001 if there was a negative?
11      Q.  Yes.
12      A.  No.
13      Q.  There was not?
14      A.  If there was a negative, no.
15      Q.  You're not aware or you know that there
16  was not a negative?
17      A.  I was not aware.
18      Q.  Looking at page 27 under item nine it
19  says, "Billy Cypress added check cashing will be
20  available and urged tribal members to cash their
21  checks there"?
22      A.  Mm-hmm.
23      Q.  What is that referring to?
24      A.  On distribution days the Finance
25  Department offers members to cash their checks,

KRESSE & ASSOCIATES, LLC
(305) 371-7692

## Page 144

1  and it goes back to that same issue.  Since it's
2  an assistance check, we have some tribal members
3  that might try to get a line of credit for it to
4  an outside entity or a bank or, let's say, a car
5  or something, and that's not what it is to be
6  used for.
7      Q.  Let me make sure I understand.  What
8  does cashing checks with the Tribe have to do
9  with that?
10      A.  It is convenience.
11      Q.  So your testimony is that Chairman
12  Cypress was urging tribal members to cash their
13  checks for the tribal members' convenience?
14      MR. ROMAN:  Objection.
15      Mischaracterizing the testimony.
16      A.  Like I said, it's just a convenience
17  for the Tribe members to do it on the property.
18      Q.  Looking at page 39, under item 16 there
19  is a general discussion?
20      A.  Yes.
21      Q.  And this refers to an MPD officer?
22      A.  Yes.
23      Q.  Are MPD officers members of the Tribe?
24      A.  Yes.  Miccosukee Police Department.
25      Q.  So this refers to a situation where a

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 145

1    judge was questioning a tribal member.  Is that a
2    County judge?
3        A.   It says Homestead.  It must be down
4    south.  It had to be.
5        Q.   It says, "the presiding judge
6    questioned this person if he was employed, and if
7    so, he would be able to pay the fine if one
8    should be imposed".
9            Do you see where it says that?
10       A.   Yes.
11       Q.   And so --
12       A.   It must be a court case.
13       Q.   "The Miccosukee police officer was
14   present and informed the judge the tribal members
15   receive well over $5,000 every three months and
16   this person did have the money".
17           Do you see where it says that?
18       A.   Yes.
19       Q.   And then on the paragraph in the middle
20   of the page it says, "Treasurer Billie stated the
21   officer was wrong in reporting the NTDR payments
22   as this is directly forbidden".
23           Do you see where it says that?
24       A.   Yes.  I see it.
25       Q.   And is it true that the Tribe forbids

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 146

1    revealing the NTDR payments to judges in cases in
2    court outside of the Tribe?
3        A.   You have to understand, Miccosukee
4    Police Department officers are under the tribal
5    government, biggest in the Tribe, and they're not
6    in a position of discussing financial
7    information, which is not his department.  He is
8    not from the Finance Department.  That's the
9    issue.
10           MR. FARRIOR:  I'm going to ask that you
11   be handed the November 4, 1999 General
12   Council meeting minutes.  I'm going to mark
13   this for identification as Exhibit 25.
14   (Thereupon, the General Council Meeting
15   Minutes dated November 4, 1999 were
16   marked as Plaintiff's Exhibit 25 for
17   Identification.)
18       Q.   Have you seen this document before?
19       A.   Yes.
20       Q.   And you reviewed this document in
21   preparation for your deposition?
22       A.   Yes.
23       Q.   Looking at page nine, the first
24   paragraph says, "Chairman Cypress reported that
25   the hotel was completed and was opened in June.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 147

1    The required resolution was passed in October and
2    is now legally classified as a commercial
3    business".
4            Do you see where it says that?
5        A.   Yes.
6        Q.   And then, "he stated tribal members may
7    question why this is being done, but they need to
8    understand that with the fight over placing a tax
9    levy against our revenue, if this was not done,
10   then we would lose more money".
11           Do you see where it says that?
12       A.   Yes.
13       Q.   Do you understand that what that means?
14       A.   Do I understand what it means?
15       Q.   Right.  What is being talked about?
16   (Thereupon, Mr. Pete Osceola is now present
17    in the deposition.)
18       A.   No.
19       Q.   Looking at the middle of the next
20   paragraph it says, "he stated the Seminole
21   Tribe's gaming profit distribution process has
22   been compared with the Miccosukee Tribe's"?
23       A.   Mm-hmm.
24       Q.   "They question why Seminole tribal
25   member's profit share is taxed and ours is not".

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 148

1            Do you see where it says that?
2        A.   Yes.
3        Q.   And are you aware around this time of
4    there being questions about why Seminole Tribe's
5    gaming profit and distribution process was taxed
6    and the Miccosukee Tribe's was not?
7        A.   In `99?
8        Q.   Right.
9        A.   It has to do with the Tribe's structure
10   of how the Tribe is set up.
11       Q.   So when it refers to the Miccosukee
12   Tribe's gaming distribution process, it's
13   referring to the NTDR payment?
14       A.   Yes.  Not how the structure is set up,
15   but, yes, that's what it is pertaining to.
16       Q.   Looking at the next paragraph --
17       A.   Mm-hmm.
18       Q.   -- "Chairman Cypress stated he had
19   repeatedly informed General Council if they want
20   to make a major purchase, they can come to the
21   tribal purchasing agent and he will locate what
22   they are looking for.  They can then give him the
23   money and he will make the purchase for them
24   through the Tribe, and they will not have any tax
25   problems".

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 149

1      Do you see where it says that?
2      A.   Yes.
3      Q.   "He stated that if tribal members
4  should make this major, slash, expensive purchase
5  on their own, then they would face tax problems
6  which he wants them to avoid"?
7      A.   Mm-hmm.
8      Q.   Can you describe -- first of all, are
9  you aware of tribal members being told to make
10 major purchases through the Tribe?
11     A.   No.  I'm not aware.
12     Q.   Do you have any reason to believe that
13 he is incorrect, what is reflected in these
14 minutes, that Chairman Cypress had repeatedly
15 informed at that time General Council members not
16 to make major purchases unless they do so through
17 the Tribe?
18     A.   I'm not sure what major purchases he is
19 discussing here.
20     Q.   Do you know what tax problems are
21 discussed here in these minutes?
22     A.   No.
23     Q.   So currently are tribal members told
24 not to make major purchases unless they do so
25 through the Tribe's purchasing agent?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 150

1      A.   Currently?
2      Q.   Right.
3      A.   Not that I'm aware of, no.
4      Q.   Since the time you have joined the
5  Tribe are you aware of people directing that the
6  Tribe pay a third party a portion of their NTDR
7  distribution for large purchases such as a car?
8      A.   A car?  Not since I have been in
9  office.
10     Q.   What about since you joined the Tribe
11 in 2005?
12     A.   I'm sure there were different loan
13 programs, but I don't remember any.
14     Q.   Looking at page 14 there are some
15 redactions on this page that I wanted to ask you
16 about.
17     A.   Yes.
18     Q.   On the last paragraph it says,
19 "Mr. Tiger stated that the tribal members are
20 receiving", and then it appears to be a
21 redaction, and then in parentheses, "the NTDR
22 distribution"?
23     A.   Yes.
24     Q.   Do you see where it says that?
25     A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 151

1      Q.   And then there appears to be another
2  redaction and it says, "there are some who are
3  not saving their money".
4      Do you know why that was redacted?
5      A.   No.
6      Q.   Would it appear, from reading this
7  paragraph, that whatever was redacted related to
8  the NTDR distributions?
9      A.   That's what's in parentheses, so it
10 must be a subject.
11     MR. FARRIOR:  I'm going to ask that you
12 be handed the February 8, 2001 General
13 Council meeting minutes.  We have marked
14 this for identification as Exhibit No. 26.
15 (Thereupon, the General Council Meeting
16 Minutes dated February 8, 2001 were
17 marked as Plaintiff's Exhibit 26 for
18 Identification.)
19     Q.   Do you recognize these as the General
20 Council meeting minutes from February 8, 2001?
21     A.   Yes.
22     Q.   These are from the Tribe's records; is
23 that correct?
24     A.   Yes.
25     Q.   On page 20 this refers to a question by

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 152

1  Sally Jim on the third paragraph?
2      A.   Yes.
3      Q.   Is that the Sally Jim that is a
4  defendant in this lawsuit?
5      A.   Yes.
6      Q.   So looking at page 33 which is the
7  finance report.
8      A.   Yes.
9      Q.   So Julio Martinez presented the
10 financial report it says on page 35?
11     A.   35?
12     Q.   Yes.  Where did that information come
13 from that is in these summary of the revenues and
14 costs of the enterprises?
15     A.   The Finance Department.
16     Q.   So at this point there was a gross
17 receipts license fee on the tribal enterprises;
18 is that correct?
19     A.   Yes.
20     Q.   And do these financial statements
21 reflect the enterprises paying a gross receipts
22 license fee?
23     A.   These particular ones?
24     Q.   Yes.
25     A.   No.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 153

1    Q.   Now, why not?
2    A.   Because these are the revenue numbers.
3   Gross receipts license fee expenses.
4    Q.   Right.  So, for example, the Miccosukee
5   restaurant, it shows total revenue, total cost of
6   purchases, gross profit, total operating
7   expenses?
8    A.   Yes.
9    Q.   Would the total operating expenses
10   include the gross receipts license fee?
11   A.   Yes.
12   Q.   So it would be reflected in this --
13   A.   In the operating expenses.
14   Q.   Right.
15       Would the financial reports that
16   accompanied this explain the operating expenses
17   in greater detail?
18   A.   It should.
19   Q.   Does the gross profit line include
20   assistance from the Tribe?
21   A.   Gross profit?
22   Q.   Right.
23   A.   Not yet.
24   Q.   How do you know?
25   A.   Because it is a negative at the bottom.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 154

1    Q.   Okay.  And then some of them, for
2   example, if you look at Miccosukee Village and
3   Cultural Center, on page 37 it includes a line
4   for tribal assistance?
5    A.   Yes.  Yes.  The restaurant hasn't been
6   given an assistance here, according to these
7   numbers.
8    Q.   Looking at the Miccosukee Service Plaza
9   which is on 37 and 38 --
10   A.   Okay.
11   Q.   -- there is a distribution to the
12   Tribe, which is the next to last line.
13   A.   Yes.
14   Q.   Is that a distribution into the Tribe's
15   general account?
16   A.   Yes.
17   Q.   What is that for?
18   A.   I think when it says distribution to
19   the Tribe, I don't remember the exact date, but
20   the distribution from this particular enterprise,
21   the Miccosukee Service Plaza, that $127,000,
22   would have been put into a CD -- a CD account.
23   It's in its own account.
24   Q.   So at that time the Service Plaza was
25   at a net loss from operations?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 155

1    A.   Yes.
2    Q.   Why did the Tribe put distributions
3   from the Service Plaza into a CD account?
4    A.   So it can self-sustain itself.  Let's
5   say something needs to be fixed or a bathroom
6   needs to be overhauled, the money is saved for
7   that particular enterprise.  That's how it
8   self-sustains itself.  Maybe it needs an addition
9   or something.
10   Q.   Looking at MIG on page 38.
11   A.   Yes.
12   Q.   There is total revenue, total cost of
13   revenue, prize payouts, gross profit and then
14   total operating expenses?
15   A.   Yes.
16   Q.   Do you see that line?
17   A.   Yes.
18   Q.   Does that include the money transferred
19   for the NTDR distributions?
20   A.   Total operating expenses?
21   Q.   Right.
22   A.   It should.
23   Q.   And so how much of those operating
24   expenses are for NTDR distributions and how much
25   are regular operating expenses?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 156

1    A.   Repeat that.  I'm sorry.
2    Q.   Is there any way to find out what
3   percentage of these total operating expenses that
4   are listed here were used for the gross receipts
5   license fee and what were used for other
6   operating expenses?
7    A.   Yes.  I'm sure there is.
8    Q.   What would you do to find that out?
9    A.   Look at the -- request it from the
10   Treasury Department, the Finance Department.
11   Q.   So this report is for February 8, 2001.
12   Does this include the previous quarter or --
13   A.   The previous quarter?
14   Q.   Right.  What time period does this
15   cover?
16   A.   It seems to be just --
17   Q.   Okay.  I'm sorry.  It says it covers
18   seven months ending January 31, 2001?
19   A.   Yes.
20   Q.   Why would it have just covered that
21   time period?
22   A.   I'm not sure.  You would have to ask
23   the Finance Department.  From what I read, I
24   usually read actual and year-to-date.  So this is
25   mentioning year-to-date.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 157

1    Q.   So then it states net income at the
2    bottom and it is a positive number.  So the
3    Miccosukee Indian Bingo and Gaming made a profit
4    even after the gross -- the Miccosukee Indian
5    Bingo and Gaming paid the gross receipts license
6    fee; is that correct?
7    A.   Yes.
8    Q.   And then there is an entry for
9    distribution of net revenue from MIBG?
10   A.   Yes.
11   Q.   And some went into a reserve account
12   and some went into the general account?
13   A.   Yes.  This particular one states it
14   went to the reserve account, which I stated is
15   like a savings account.  It doesn't get touched.
16   Q.   How is it determined what amount would
17   be put in the reserve account versus the general
18   account versus other projects?
19   A.   I'm not sure.  That's a Finance
20   question.  What percentage, I'm not sure.
21   Q.   Look at page 39.
22   A.   39, yes.
23   Q.   So it's referring to amounts allocated
24   to different categories, including tribal health
25   assistance, and then below that it says,

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 158

1    "Chairman Cypress stated General Council will
2    start to notice an increase in this line item.
3    Tribal members who receive NTDR monies are
4    depositing it into their banking institutions in
5    town, and this is creating problems if they have
6    Medicaid or Medicare.  He stated when an
7    application is processed, the applicant submits
8    their social security number; and when this is
9    entered into the computer, their bank account
10   shows up".
11       So are you aware of conversations like
12   that going on in the Tribe?
13   A.   Yes.  There's always conversations like
14   this regarding the tribal members.  They're not
15   sure the -- I don't know if you call them
16   penalties, but the proper procedures regarding
17   lines of credit or services such as this,
18   Medicaid or Medicare.
19   Q.   So the way I read this is the tribal
20   members are being discouraged from putting the
21   NTDR distributions in their bank accounts?
22   A.   Yes, if they have it.  Not all Tribe
23   members have bank accounts.
24   Q.   And that's because they may be denied
25   Medicare or Medicaid if they have too much money

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 159

1    in their bank account; is that correct?
2    A.   If that's the procedure they use, it
3    must be.  I'm not sure what the procedure is for
4    Medicaid or Medicare.
5        But it's stating here that they
6    recently notified the Health Department to stop
7    all submissions or applications for the services.
8    Q.   So what does that mean?
9    A.   He is saying the Tribe will cover their
10   costs.  They don't need to apply for anything.
11   He is saying that the tribal members could be
12   penalized; therefore, these individuals who were
13   and could have been -- health costs will be
14   covered by the General Council.  The Tribe will
15   take care of them.  They didn't need to do that
16   is what they are saying.
17   Q.   And then on the next page it says, "he
18   stated the same situation is happening with the
19   food stamp program"?
20   A.   Yes.
21   Q.   That's not a tribal food stamp program,
22   correct?
23   A.   Yes.
24   Q.   It is or is not?
25   A.   Is not.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 160

1    Q.   It says, "he stated that the tribal
2    members have stopped going into Miami to apply
3    for food stamps, instead they go to Collier
4    County"?
5    A.   Yes.
6    Q.   I don't know what the difference is?
7    A.   I guess they have the same offices, one
8    in Miami and one in Naples probably, Collier
9    County.
10   Q.   So why would tribal members stop going
11   into Miami and instead go into Collier County to
12   apply for food stamps?
13   A.   Not every tribal member likes Miami.
14   They go to Naples.  It is just a choice, I guess.
15   That's what he's stating, he's encouraging the
16   tribal members to utilize their NTDR monies to
17   become more self-sufficient.  That's what it is
18   for.  Previous to gaming, that's what we were on,
19   food stamps and Medicaid.
20   Q.   Looking at page 41, on the second
21   paragraph, last sentence it says, "he stated that
22   it is better for the tribal members to invest
23   their money here rather than the public banking
24   institutions"?
25   A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 161

```
 1    Q.   What is that referring to?
 2    A.   I believe that's pertaining to -- back
 3 then they used -- what was it -- SmithBarney back
 4 then, I believe.  And SmithBarney worked with the
 5 Tribe in order to open maybe a money market
 6 account to save their money.  We didn't know
 7 anything about it.  Tribal members weren't aware
 8 of what investing is, so they would try to teach
 9 us.  Maybe once a year we would have them come
10 out and try to teach us what investments were.
11 It wasn't popular.  Maybe a couple of people did
12 it.  Maybe that's what he is talking about, I
13 believe.
14    Q.   Looking at the last paragraph on 41, it
15 says, "Chairman Cypress stated that the tribal
16 members would not have to pay as much on their
17 income tax returns or they may be entitled to a
18 larger return".
19         Do you see where it says that?
20    A.   Yes.
21    Q.   What is that talking about?
22    A.   I'm not sure.
23    Q.   Okay.
24    A.   Is it redacted?  It seems like the
25 letters are cut in half.  I'm not sure.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 162

```
 1    Q.   Looking at page 42 there is a list.  So
 2 at the bottom there is a statement for the
 3 Miccosukee general account.  Do you see where
 4 that is?
 5    A.   Yes.
 6    Q.   And one of the lines is tribal
 7 community activities includes NTDR distributions?
 8    A.   Yes.
 9    Q.   Were monies from the NTDR distributions
10 ever put into the general account?
11    A.   Into the -- what was that again?  I'm
12 sorry.
13    Q.   I'm just wondering why this statement
14 for the general account said that tribal and
15 community activities includes NTDR distributions?
16    A.   I'm not sure.  I'm not sure.
17    Q.   The next section says, NTDR, and
18 apparently Mr. Martinez is referring to a
19 financial report that he is showing the Tribe,
20 and it says, "the column on the left explains
21 sources of revenue received from and the amounts.
22 The right column is the amount distributed to
23 tribal members".
24         Do you see where it says that?
25    A.   Yes.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 163

```
 1    Q.   Do you know what financial report or
 2 what he is referring to there?
 3    A.   I believe the numbers we were just
 4 discussing.
 5    Q.   But it says the right column is the
 6 amount distributed to the tribal members.
 7 Looking at these two columns, do they look like
 8 amounts distributed to the tribal members?
 9    A.   Yes.  I don't see a right column, so I
10 don't know what he is talking about.  There is
11 only one column.
12    Q.   In looking at page 44 it says, middle
13 of the page, "Chairman Cypress informed General
14 Council the deadline for NTDR loan requests and
15 personal loan deduction submissions will be
16 February 13, 2001"?
17    A.   Yes.
18    Q.   So it's true that generally the Tribe
19 would set a deadline approximately two weeks
20 before the distribution date for tribal members
21 to get loans on that distribution?
22    A.   Yes.  That's the deadline for loans
23 available.
24    Q.   And where did the two weeks come from?
25    A.   Because the last two weeks they're
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 164

```
 1 finalizing the final numbers of what's going to
 2 be distributed.  When it comes to the Finance
 3 Department, they're overwhelmed with all these
 4 other enterprises that have to make payments.  So
 5 this is just another directive that they're being
 6 given by us, from General Council, in order to
 7 ease off and give them a deadline.
 8         MR. FARRIOR:  I'm going to ask that you
 9    be handed General Council meeting minutes
10    from May 3, 2001.
11    Q.   Looking at page 14 --
12         MR. FARRIOR:  I'm going to mark it as
13    Exhibit 27.  I'm sorry.
14    (Thereupon, the General Council Meeting
15    Minutes dated May 3, 2001 were marked as
16    Plaintiff's Exhibit 27 for Identification.)
17    Q.   Do you recognize Exhibit 27 as the
18 General Council meeting minutes for May 3, 2001?
19    A.   Yes.
20    Q.   And on page 14 someone has redacted out
21 the numbers?
22    A.   They must have.
23    Q.   Do you know why that was redacted out?
24    A.   No.
25    Q.   Do you know when it was redacted?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 165

1    A.   I don't know if it is redacted, because
2    sometimes the recorder doesn't work.  Back then
3    it was cassette.  The cassettes were kind of
4    crappy back then for a long meeting, but I can't
5    confirm either way.  So it was redacted, I guess.
6    I don't know why it is redacted to your question.
7    I'm sorry.
8         MR. FARRIOR:  I'm going to ask that you
9    be handed the minutes for June 19, 2001.
10   We'll mark that for identification as
11   Exhibit 28.
12        (Thereupon, the General Council Meeting
13   Minutes dated June 19, 2001 were marked as
14   Plaintiff's Exhibit 28 for Identification.)
15   Q.   It appears that these minutes have been
16   heavily redacted.
17   A.   Mm-hmm.
18   Q.   So --
19   A.   See what I was talking about on page
20   SJ001649, page 13?  "Before action was taken,
21   tape was changed.  Both sides of tape were blank;
22   therefore, a lot of questions and comments were
23   not recorded.  As a result, these could not be
24   noted".  That's what it's talking about.
25   Q.   So --

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 166

1    A.   So I can't confirm either way whether
2    they're redacted or there was just a glitch with
3    the recorder.  I'm not sure.
4    Q.   Okay.  So we are not sure whether the
5    redactions were purposely made or there was a
6    glitch in the recording for this particular
7    meeting?
8    A.   Yes.  I'm not sure.
9    Q.   Do you know whether or not the meeting
10   minutes for June 19, 2001 reflect any discussions
11   of distributions or benefits from the Tribe to
12   its members?
13   A.   There is always discussions regarding
14   NTDR because it is part of the report.
15   Q.   Do you see any discussions reflected in
16   this copy of the minutes from June 19, 2001?
17   A.   Not in this particular set that I have
18   in front of me.
19        MR. FARRIOR:  I'm going off the record
20   for a second and take a break.
21        (Recess in Proceedings)
22        MR. FARRIOR:  We're back on the record.
23   I'm going to ask that you be handed General
24   Council meeting minutes for February 7,
25   2002, and we'll mark these as Exhibit 29.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 167

1         (Thereupon, the General Council Meeting
2    Minutes dated February 7, 2002 were
3    marked as Plaintiff's Exhibit 29 for
4    Identification.)
5    Q.   I ask that you refresh your
6    recollection by turning to the finance report,
7    which is on --
8    A.   25?
9    Q.   Thank you.  Which is on 25, and the
10   report covers -- supposedly on the bottom of page
11   25 it says the report would cover seven months
12   ending January 31st.
13        Would that be January 31, 2001?
14   A.   Yes.
15   Q.   And was this report that Julio Martinez
16   gave accompanied by a report of financial
17   statements that is not included in these minutes?
18   A.   I'm sorry?
19   Q.   Did Julio Martinez give out a written
20   report of financial statements for the tribal
21   enterprises?
22   A.   These numbers were distributed.
23   Q.   On a separate sheet; is that correct?
24   A.   No.  These numbers were given exactly
25   like this.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 168

1    Q.   Okay.  But they were given as part of
2    handouts to tribal members?
3    A.   Yes.  To the General Council.
4    Q.   For example, look on page 38, it says,
5    "Mr. Martinez explained tab four"?
6    A.   Yes.
7    Q.   So is tab four referring to a report
8    that Mr. Martinez handed out?
9    A.   When these are handed out, on some of
10   these or on some of the copies of these you can
11   tell -- like this, they have a binder thing, so
12   each one comes as a tab.  That's what he means by
13   tab four.
14   Q.   So he would have handed out a bound
15   report with tabs in it?
16   A.   Yes.  Explaining the month's gaming and
17   how these are distributed to different
18   categories.  So tab four is under here MIBG,
19   MIRC, golf course report.  Each one of these
20   would be a tab.
21   Q.   Okay.  At the General Council meeting
22   there would be a report handed out with tabs; is
23   that correct?
24   A.   Yes.
25   Q.   And would that be from the previous

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 169

1  meeting or that would be for the present meeting?
2      A.   It would be for the present meeting.
3      Q.   This finance report includes numbers
4  for Indigenous Images.  Do you know what that is?
5      A.   Yes.  One of the programs.
6      Q.   What program is that?
7      A.   It is like a cultural sewing program
8  where a majority of the -- in that program we
9  employ whoever wants to sew traditional clothing
10  like jackets that the gentleman is wearing down
11  there.  That's what they sew.  And that
12  particular program in turn sells them to the
13  outside.
14          It's not anything special.  That's why
15  the numbers are so low.  There are usually only
16  two or three employees that work there.  It is
17  offered to the community.  Like I said, it is
18  just cultural, you know, and we provide something
19  to the communities.
20      Q.   Looking at pages 27 and 28, it list
21  total operating expenses for the Miccosukee
22  Indian Gaming as $6.6 million?
23      A.   Yes.
24      Q.   Does that seem low for the seven-month
25  period ending January 31, 2001?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 170

1      A.   Does that seem low?
2      Q.   Right.  Well, let me ask you this
3  first:  Does that total operating expense include
4  the gross receipts license fees?
5      A.   Yes.
6      Q.   So did the Tribe's total NTDR
7  distribution for the seven-month period ending
8  January 31, 2001 exceed $6.6 million?
9      A.   What was that again?  Did the what?
10      Q.   So these numbers ostensibly or
11  presumably cover January 31st -- the seven-month
12  period ending January 31, 2001.  Do you agree
13  with me on that?
14      A.   To me it's for that month.  Operating
15  expenses for that month, 30 days.  Because like I
16  stated before, the other minutes there is another
17  column here that states year-to-date.
18      Q.   Right.
19      A.   That would be for seven months.  Once
20  again, I don't know why it is presented this way.
21          MR. FARRIOR:  Let me ask that you be
22      handed General Council meeting minutes from
23      May 2, 2002, and this will be marked for
24      identification as Exhibit 30.
25

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 171

1          (Thereupon, the General Council Meeting
2      Minutes dated May 2, 2002 were marked as
3      Plaintiff's Exhibit 30 for Identification.)
4      Q.   Look at page 19.
5      A.   Yes.
6      Q.   The second paragraph says, "he,
7  presumably meaning Billy Cypress, stated Business
8  Council has repeatedly asked tribal members to
9  set aside their children's money in trust
10  accounts.  The parents should be supporting their
11  children but this is not happening.  They are
12  using their children's money".
13          Do you see where it says that?
14      A.   Yes.
15      Q.   So parents had access to distributions
16  that were made for the benefit of their children;
17  is that correct?
18      A.   Yes.
19      Q.   Looking at the next page, page 20, it
20  says, "he, meaning Chairman Cypress, stated there
21  might come a day when tribal members elect to pay
22  taxes on their NTDR in order to be able to report
23  it as income".
24          Do you see where it says that?
25      A.   Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 172

1      Q.   What does that mean?
2      A.   As I stated before, the way we are set
3  up we collect taxes on our enterprises.  We don't
4  have a regular allocation plan.  If the General
5  Council ever decided they wanted to go in that
6  direction, it's up to the General Council.  It
7  doesn't mean anything.
8      Q.   Okay.
9      A.   In gaming this is -- you know, the law
10  is always changing, so there is never a definite.
11  Gaming can be cut off tomorrow and we have
12  nothing, so...
13      Q.   The sentence after the next sentence
14  says, "he stated that the best thing that the
15  tribal members can do in order to stay out of
16  trouble with the IRS is to not think of this as
17  real money or income".
18          Do you see where it says that?
19      A.   Mm-hmm.
20      Q.   Is that still the Business Council's
21  advice for tribal members?
22      A.   At the time it was because, as I
23  stated, previous to gaming we didn't have
24  anything.  So the majority could receive funds at
25  that time and weren't able to budget their money.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 173

1  So when you spend more than what you have, what
2  happens? You run out.
3      Q.  But the NTDR distributions were real
4  money, though; is that correct?
5      A.  Real money?  Yes.  I believe so.
6      Q.  And, then, it says, "they should think
7  of this as money they can spend without
8  accounting for it".
9          Do you see where it says that?
10     A.  Mm-hmm.
11     Q.  What does that mean?
12     A.  See, that's where the -- he seems to be
13 reiterating that this is assistance.  This isn't
14 income.  So in order for it to remain assistance,
15 you can't apply it as income.  That's where the
16 real money comes in.
17     Q.  The next paragraph says, "he, meaning
18 Chairman Cypress, stated if tribal members put
19 their money into the trust account, then if they
20 need to make a purchase, then a tribal check can
21 be issued"?
22     A.  Mm-hmm.
23     Q.  "If the IRS should have any questions,
24 the check will be from the Tribe, and it will be
25 the Business Council's responsibility to answer

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 174

1  the questions"?
2      A.  Mm-hmm.
3      Q.  "If a tribal member should give them a
4  check of their own and there are questions, then
5  the Tribe will not be able to help them.  They
6  would have to settle with the IRS on their own.
7  This is not an issue to be taken slightly.  It is
8  important that all tribal members understand the
9  extent of the problems we would face if this
10 continues".
11         Generally is that paragraph referring
12 to tribal members making large purchases from
13 their own funds as opposed to routing their funds
14 through the Tribe like we discussed earlier?
15     A.  It's in relation to how some tribal
16 members -- remember I discussed SmithBarney,
17 opening up a money market account?
18     Q.  Right.
19     A.  It's like a savings account but it's
20 under the umbrella of the Tribe.  And so they
21 open up that account, and they're able to use it.
22 The money has already been distributed.  It's
23 after the fact, so it's like in a savings
24 account.  So in order to purchase something, in
25 order to receive it back, it's put back out as a

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 175

1  tribal check because it's under the tribal
2  umbrella.  It's not in relation to a loan program
3  to buy things.  No, it is not.
4      Q.  So why would the check being from the
5  Tribe as opposed to an individual tribal member
6  reduce the chance of the IRS -- creating problems
7  with the IRS?
8      A.  Because if --
9          MS. PINO:  Objection.  Speculation as
10  to what the IRS would say.
11     Q.  You can answer.
12     A.  To my understanding if I went to
13 SmithBarney myself outside of the Tribe and
14 opened an account, I move money back and forth,
15 am going to get taxed for it.  That's my
16 understanding.
17     Q.  But if the Tribe does it for you, you
18 won't get taxed; is that what the Tribe is
19 telling its members?
20     A.  It won't get taxed?  I don't know, but
21 it is under the umbrella of the Tribe.  That's
22 why they use SmithBarney to open up trust
23 accounts.  They offer many different things, so
24 that was just an example that I used.
25     Q.  Let me ask you to turn to the finance

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 176

1  report on page 22.
2      A.  Okay.
3      Q.  So, first of all, looking at page 21,
4  it says, "Treasurer Billie stated that the
5  following report will cover all tribal
6  enterprises, including the AAR Service Station.
7  After the report is completed, the FY 2003
8  proposed general account budget will be handed
9  out".
10         Have you ever been at General Council
11 meetings where proposed budgets have been handed
12 out?
13     A.  Yes.
14     Q.  Did they hand out a proposed budget for
15 the year 2001?
16     A.  Yes.  We would have.
17     Q.  Does the Tribe still maintain those
18 proposed budgets in their records?
19     A.  They should, but we would have to have
20 that investigated by the Finance Director.
21     Q.  Do you know if anybody has done that or
22 has looked for that proposed one for the 2001
23 year?
24     A.  No, not to my knowledge.  Every year a
25 budget has to be approved.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 177

1      Q.    The General Council approves a
2    budget --
3      A.    Yes.
4      Q.    -- for the following year; is that
5    correct?
6      A.    Yes.
7      Q.    And does the Tribe stick to that budget
8    generally?
9      A.    Yes.  Generally, yes.
10     Q.    So this report covers the nine-month
11   period ending March 31, 2002, according to this
12   document?
13     A.    Mm-hmm.
14     Q.    Is that accurate?
15     A.    Yes.  According to the numbers, yes,
16   because these show a loss.
17     Q.    Now, what do you mean by "these show a
18   loss"?
19     A.    The ones in parentheses are a loss.
20   Those are the year-to-date numbers.
21     Q.    Looking at Miccosukee Indian Gaming on
22   page 24, it has total operating expenses at
23   approximately $59 million?
24     A.    Yes.
25     Q.    Does that include NTDR distributions?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 178

1      A.    The license fee?
2      Q.    Yes.
3      A.    Yes, it should.
4      Q.    And then on page 25 it says,
5    "Mr. Martinez reported there is $7,275,000
6    available for distribution in the NTDR account as
7    of today?
8      A.    Yes.
9      Q.    Is that reflected anywhere else in the
10   financial report, how he arrived at that number?
11     A.    On this particular financial report?
12     Q.    Yes.
13     A.    No.
14     Q.    At this time, in 2002 approximately how
15   many tribal members were there?
16     A.    It had to be less than 400.  I don't
17   know what the exact number was.
18          MR. FARRIOR:  I'm going to ask that
19       this be marked as Exhibit 31.
20          (Thereupon, a Memo dated January 11, 2005
21       was marked as Plaintiff's Exhibit 31 for
22       Identification.)
23     Q.    This is a memo dated January 11, 2005,
24   from Dione, D-I-O-N-E, Carroll, C-A-R-R-O-L-L,
25   dated -- I think I said dated January 11, 2005?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 179

1      A.    Mm-hmm.
2      Q.    Have you seen this document before?
3      A.    Yes.
4      Q.    What is this document?
5      A.    When the issue of the -- the taxation
6    issue was brought up initially, she was inquired
7    upon about her -- how she was representing the
8    Tribe and its enterprises or gaming enterprise
9    actually.
10     Q.    And Dione Carroll was counsel for the
11   Tribe?
12     A.    A part of the counsel.
13     Q.    And that's S-E-L?
14     A.    C-O-U-N-S-E-L, yes.
15     Q.    So she was an attorney for the Tribe?
16     A.    Yes.
17     Q.    Why did she write this memo?
18     A.    I believe she might be trying to defend
19   herself.
20     Q.    When you said she was inquired upon,
21   who was inquiring about her representation of the
22   Tribe?
23     A.    The Tribe.
24     Q.    The Tribe was?
25     A.    Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 180

1      Q.    How do you know that?
2      A.    Because this is a memo.
3      Q.    Do you know if Dione Carroll was
4    concerned that she was violating her ethical
5    obligations in relation to the Tribe's failure to
6    pay tax on its distributions?
7      A.    Yes.  She was the -- she might have
8    been investigated.
9      Q.    Investigated by the Tribe?
10     A.    Yes.
11     Q.    And that's why she wrote this memo?
12     A.    I believe her being employed was in
13   question, and she was trying to defend herself
14   for all her services.
15          MR. FARRIOR:  I'm going to ask that the
16       following be marked as Exhibit 32.
17          (Thereupon, Various General Reports were
18       marked as Plaintiff's Composite Exhibit
19       32 for Identification.)
20     Q.    This is a compilation of general
21   reports apparently prepared by Dexter Lehtinen.
22     A.    Mm-hmm.
23     Q.    Have you seen these documents before?
24     A.    Not these particular ones.
25     Q.    Have you seen similar looking general

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 181

1   reports?
2     A.  Yes.  From his office, yes.
3     Q.  What were these general reports used
4   for?  Were they given to the Business Council or
5   General Council?
6     A.  Yes.  I believe they were distributed
7   to the Business Council.  They should have been.
8   But I believe initially they go to the Chairman,
9   I believe, and then it's presented to the
10  Business Council.
11    Q.  Is it ever presented to the General
12  Council?
13    A.  This is in-house, it looks like.  It
14  seems like a house memo.
15    Q.  Looking at the first one in this
16  compilation of February 9, 2006, under C on
17  page six what is marked L253.
18    A.  This one?
19    Q.  That's correct.  Yes.  The last
20  sentence it says -- on the page it says, "the IRS
21  disagrees about the law and maintains that the
22  members do owe federal taxes on money they may
23  receive from their Tribe".
24      Do you see where it says that?
25    A.  Yes.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 182

1     Q.  Were you aware that Dexter Lehtinen was
2  giving that advice to the Business Council as
3  early as February 9, 2006?
4    A.  2006?  I don't believe so.  Not in
5  2006.
6    Q.  And was that information passed along
7  to the tribal members in 2006, that the IRS
8  disagrees and maintains that members owe federal
9  taxes on money that they received from the Tribe?
10    A.  If they were notified, it would have to
11  have been dispersed at the General Council, and
12  these were not dispersed at the General Council.
13    Q.  These excerpts from general reports,
14  are these from the records of the Tribe, if you
15  know?
16      MR. ROMAN:  If you know.
17    A.  No.  I don't know.
18      MR. DAVIS:  Will, can you clarify if
19   this is redacted?
20    A.  Whoever they were reporting to, that's
21  where it went to.
22      MR. FARRIOR:  You can set that aside
23   for the time being.
24      MR. DAVIS:  So the record is clear, it
25   looks like it is redacted.  I want to make

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 183

1   sure that the record is clear about that.
2      MR. FARRIOR:  That's fine.
3      MR. ROMAN:  Off the record.
4      (Discussion off the record.)
5    Q.  So, Mr. Osceola, in preparing for your
6  testimony today as a representative on behalf of
7  the Tribe, do know if these -- did you figure out
8  if these general reports that we have marked as
9  Exhibit --
10    A.  32.
11    Q.  (Continuing) 32, thank you, were
12  actually distributed to the Business Council?
13    A.  I'm not aware of them being distributed
14  to the General Council.
15    Q.  But you don't know that they weren't?
16    A.  No.  I can't confirm that either.  They
17  would have been attached to minutes I have read
18  before, and I have never seen those.
19      MR. FARRIOR:  Can we go off the record
20   for a second?
21      (Discussion off the record.)
22    Q.  We are back on the record.  Does the
23  Tribe make end-of-year or Christmas bonus
24  distributions?
25    A.  Christmas bonus?  Yes.  We have like a

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 184

1  holiday kind of assistance kind of thing.
2    Q.  Did the Tribe make that end-of-year
3  distribution in the year 2001?
4    A.  2001?  I'm not sure if it went that far
5  back.
6    Q.  How would you figure out if the Tribe
7  made end-of-year distributions in the year 2001?
8    A.  It should be on record somewhere in the
9  Finance Department.
10    Q.  So the Finance Department would have
11  records of that; is that correct?
12    A.  Yes.
13    Q.  Has anyone made an attempt to find the
14  records showing whether or not the Tribe made
15  end-of-year distributions in 2001?
16    A.  No, not that I'm aware of.
17    Q.  Generally how much are the end-of-year
18  distributions?
19    A.  In 2001?  I don't know.
20    Q.  What about now?
21    A.  Now?  I believe it was $7,000.
22    Q.  $7,000 per person?
23    A.  Yes.
24    Q.  How was that amount generally
25  determined?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 185

1      A.   Just what is in the NTDR.  It's nothing
2  out of the ordinary.  Whatever is in there.
3           MR. FARRIOR:  I'm going to ask that
4      this be marked as Exhibit 33.
5      (Thereupon, the Complaint was marked as
6      Plaintiff's Exhibit 33 for Identification.)
7      Q.   This is a complaint filed in the State
8  Court of Florida.
9      A.   Yes.
10     Q.   Miccosukee Tribe of Indians v. Dexter
11  Lehtinen.
12     A.   Yes.
13     Q.   Have you seen this document before?
14     A.   Yes.  I have gone through it before.
15     Q.   Have you gone through this in
16  preparation for your testimony today?
17     A.   Not this particular one, but I have
18  seen it before.
19     Q.   Look at page nine.  It says, "that on
20  or about January of 1993 Dexter Lehtinen became
21  the general counsel for the Miccosukee Tribe"; is
22  that true?
23     A.   Yes.  That sounds about right.
24     Q.   On page 11, paragraph 49 says, "that
25  from on or about February of 1992 until on or

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 186

1  about May 10, 2010 Lehtinen charged the
2  Miccosukee Tribe in excess of $50 million for his
3  work as general counsel for the Miccosukee
4  Tribe"?
5      A.   Yes.
6      Q.   Do you see where it says that?
7      A.   Yes.
8      Q.   Is that accurate?
9      A.   This is what that states; but according
10  to the accuracy, I can't confirm that.
11     Q.   Is there any documents that would
12  confirm or deny that number that you're aware of?
13     A.   I can't confirm that either, but I'm
14  sure there is.
15     Q.   Where would you look if you were trying
16  to confirm that?
17     A.   I would look in the Finance Department
18  to investigate whatever has been paid out to
19  Dexter from February, `92 to May, 2010.  It's not
20  paid in cash, so...
21     Q.   Looking at page 13 it says,
22  paragraph 51 says, "on or about December 8, 1994,
23  Lehtinen unequivocally, assertively and
24  confidently assured the Miccosukee Tribe and
25  members of the class that the provisions of 26

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 187

1  U.S.C., Section 34029(r) did not apply to them"?
2      A.   Yes.
3      Q.   Do you see where it says that?
4      A.   Yes.
5      Q.   When it says "members of the class", is
6  that referring to tribal members?
7      A.   It surely looks that way.
8      Q.   So does the Tribe have any evidence,
9  documentary evidence of the advice Lehtinen gave
10  on December 8, 1994?
11     A.   Evidence?
12     Q.   Right.
13     A.   The Tribe?  I can't confirm that, but
14  I'm not sure what Ms. Theresa Willie would have
15  to say about that.  She was a part of this.
16     Q.   What about on January 24, 1995, are you
17  aware of any documents showing advice Lehtinen
18  provided on that date?
19     A.   No.  I can't confirm that either.
20     Q.   And the same question for February 27,
21  1995?
22     A.   I can't confirm that either.
23     Q.   Look at page 19, paragraph 83, it says,
24  "on or about May 6, 2010 Lehtinen, for the first
25  time ever, informed the Miccosukee Tribe and the

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 188

1  members of the class that they had misunderstood
2  his tax advice that what he meant was that the
3  Tribe did not have to pay federal income tax, and
4  that he had never expressed a legal opinion as to
5  whether the members of the Miccosukee Tribe had
6  to pay federal income tax".
7           Do you see where it says that?
8      A.   Yes.
9      Q.   Is that accurate?
10     A.   Yes.
11     Q.   What happened on May 6, 2010?
12     A.   That's when there was a -- he was
13  called in, the Business Council questioning the
14  Tribe's system.  And like in the previous
15  document that was shown to me that I had never
16  seen before, the rest of the Tribe was never
17  privy to this information that he had before this
18  date.  So he tried to defend himself and say he
19  was misunderstood.
20     Q.   So your understanding of Lehtinen's
21  advice was up until May 6, 2010 his advice was
22  that the NTDR distributions were not taxable in
23  the hands of the individual members?
24     A.   Yes.
25     Q.   And on May 6, 2010 there was a meeting

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 189

1   of the Business Council?
2       A.   Yes.
3       Q.   And were you present for that meeting?
4       A.   No.
5       Q.   Were you a member of the Business
6   Council at that time?
7       A.   No.
8       Q.   Right.  It was after?  I'm sorry.  2013
9   is when you joined the Business Council; is that
10  right?
11      A.   Yes, 2013.  December, 2013.
12      Q.   Was the substance of this meeting, the
13  2010 meeting conveyed to the General Council and
14  tribal members?
15      A.   Yes.
16      Q.   Was that at a General Council meeting?
17      A.   Yes.
18      Q.   Did the Tribe take any action in
19  response to learning that Lehtinen had changed
20  his advice with regard to the federal taxes?
21      A.   Initially he was relieved of his
22  services, and then there was an internal
23  investigation as to what he was -- if he had any
24  information within his office.
25      Q.   Did the Tribe start paying or start

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 190

1   withholding from distributions at that time?
2       A.   No.
3       Q.   Why not?
4       A.   It wasn't about the taxes.  It was the
5   way the taxes are collected to the government of
6   the Tribe.  A municipality has a right to collect
7   taxes.
8       Q.   But did Lehtinen change his advice, as
9   you understood it, about whether individual
10  members had to pay taxes on NTDR distributions?
11      A.   In 2010 he did.
12      Q.   After 2010 are you aware of any
13  individual members that started paying taxes on
14  the NTDR distributions?
15      A.   No.  Because they weren't told to pay
16  taxes.
17      Q.   And are you aware that the Tribe
18  brought this complaint against Lehtinen arguing
19  that the advice he gave that tribal members did
20  not have to pay tax on NTDR distributions was
21  wrong?
22      A.   Repeat that.  I'm sorry.
23      Q.   Are you aware whether or not this
24  complaint alleges that Lehtinen's advice that
25  tribal members did not have to pay tax on NTDR

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 191

1   distributions was incorrect, Lehtinen's advice
2   was incorrect?
3       A.   Incorrect?
4       Q.   Right.
5       A.   The reason this was brought is because
6   the system that is utilized by the Tribe, he was
7   a major figure in implementing the system because
8   he was allowed to.  He had a lot of
9   responsibilities he was given.  And in
10  implementing this system, in the end, instead of
11  defending it, he turned his back on it.  That's
12  why the suit was brought.  The very system he
13  implemented, he never stood up for it.  It's like
14  we were hung out to dry.  That's where we are at
15  now.
16      Q.   I'm going to hand you another document
17  which we are going to mark as Exhibit 34, and
18  specifically I'm going to ask that you turn to --
19  so, I guess, first of all, this is a compilation
20  of accounting reports and responses by the
21  Business Council?
22       (Thereupon, Various Accounting Reports
23       and Responses were marked as Plaintiff's
24       Exhibit 34 for Identification.)
25      A.   Yes.  This is end-of-year audits.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 192

1       Q.   Have you seen documents like these
2   before?
3       A.   Yes.
4       Q.   Have you seen these particular audits
5   and responses by the Business Council?
6       A.   Yes.  They seem familiar.
7       Q.   I'm going to ask that you look at
8   page two -- actually, first look at Bates number
9   L576 at the bottom right-hand corner.
10      A.   576?
11      Q.   Right.  It's approximately at the back
12  of the third page of the document.
13      A.   Okay.
14      Q.   So there is a letter from the
15  accounting firm, the Menendez accounting firm?
16      A.   Mm-hmm.
17      Q.   And this is a letter conveying the
18  accounting firm's results of their audit; is that
19  correct?
20      A.   Yes.
21      Q.   Have you seen this document before?
22      A.   It seems familiar, yes.
23      Q.   And so this is dated September 15,
24  2006, and then on the front cover of this there
25  is a letter provided in connection with the audit

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 193

```
 1    also dated September 15, 2006 from the Business
 2    Council?
 3        A.   Yes.
 4        Q.   And then looking at the fifth page,
 5    L575, there are signatures on it.  This appears
 6    to be signed by the Business Council?
 7        A.   575?  Yes.
 8        Q.   Is this letter, beginning on the front
 9    page of this exhibit, the Business Council's
10    response to the audit?
11        A.   It seems like it, yes.
12        Q.   Let's turn to what has been marked
13    L577, which is the second page of the letter
14    prepared by the Menendez accounting firm.
15        A.   Mm-hmm.
16        Q.   Under trust fund distributions --
17        A.   Yes.
18        Q.   -- does that refer to the NTDR
19    distributions?
20        A.   Yes.
21        Q.   It says, "we noted that the Tribe is
22    not withholding a portion of the gross receipts
23    license fees received from the Miccosukee Indian
24    Bingo Hall that is distributed to the Tribe
25    members to assist with living expenses"
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 194

```
 1        Do you see where it says that?
 2        A.   Yes.
 3        Q.   And then the next paragraph begins, "in
 4    accordance with IRS Publication 15, if you make
 5    certain payments to members of Indian Tribes from
 6    gaming profits, you must withhold federal income
 7    tax".
 8        Do you see where it says that?
 9        A.   Yes.
10        Q.   And it states, "among other things,
11    failure to withhold can result in penalties and
12    fines for the Tribe".
13        Do you see that?
14        A.   Yes.
15        Q.   "During the audit it was noted that the
16    Tribe is still not withholding".
17        Do you see where it says that?
18        A.   Yes.
19        Q.   And the last paragraph says, "we have
20    been made aware by management that the Tribe has
21    received a notification letter from the Internal
22    Revenue Service Center in reference to
23    distribution withholdings.  We recommend the
24    Business Council discuss this issue with a tax
25    attorney to review the Tribe's defense and to
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 195

```
 1    obtain guidance on the related issues".
 2        Do you see where it says that?
 3        A.   Yes.
 4        Q.   Were you aware that the Tribe's
 5    accounting firm was notifying the Tribe of the
 6    matters set forth in this document at this time?
 7        A.   Previous to reading this last year, no.
 8        Q.   Last year, is that what you said?
 9        A.   Yes.
10        Q.   Was the substance of what we just
11    looked at ever conveyed to the members of the
12    Tribe?
13        A.   No.
14        MR. FARRIOR:  We pass the witness.
15        MR. DAVIS:  Let's take a break and go
16    off the record.
17        MR. FARRIOR:  Sure.
18        (Recess in Proceedings)
19    (Thereupon, Pete Osceola is no longer present
20    for the deposition.)
21        MS. PINO:  On behalf of the Tribe, the
22    Tribe would like to designate another
23    corporate representative for the areas of
24    any financial accounting questions and
25    documents related to those areas.
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 196

```
 1        Additionally, the Tribe would like to
 2    designate another corporate rep for the area
 3    of the advice of counsel relating to the
 4    flexibility of the distributions, and a
 5    possible third designee for any other
 6    questions that this corporate rep has not
 7    been able to respond appropriately.
 8        And the name of the designee for the
 9    financing and accounting questions and
10    topics of discussion is Jerry Cypress, the
11    treasurer of the Tribe.
12        MR. WELSH:  That's for financial?
13        MS. PINO:  Yes.  Financial and
14    accounting questions.
15        For the other areas, we will provide
16    the names in writing either in e-mail format
17    or a letter to counsel for the IRS.
18            CROSS EXAMINATION
19    BY MR. DAVIS:
20        Q.   Good evening.  Daniel Davis and I want
21    to ask you some questions on behalf of Sally Jim.
22    Early in the morning when Mr. Farrior from the
23    Department of Justice was asking you some
24    questions you were looking at Exhibit No. 3.
25        Who created the document that is
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 197

1    Exhibit No. 3?
2        A.   To my understanding an accountant named
3    Mr. Morrero.
4        Q.   Could Mr. Morrero confirm the numbers
5    that are on that spreadsheet?
6        A.   This was his accounting system, so I
7    believe he can.
8            MR. FARRIOR:  Object to the form.
9    Foundation.
10       Q.   To the best of your knowledge, could
11   Mr. Morrero confirm those numbers?
12       A.   Yes.
13       Q.   Thank you.  Put that aside.
14           To the best of your knowledge, did the
15   Tribe provide Ms. Jim with her W-2?
16       A.   From an employment status?
17       Q.   Yes.
18       A.   Yes.  If she was an employee, the Tribe
19   would have issued a W-2.
20       Q.   In response to questions from the
21   Department of Justice you indicated that a
22   chickee is a luxury to nontribal members and a
23   necessity to tribal members.
24           Are there other examples of things that
25   the Tribe provides to its members that are

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 198

1    necessities to tribal members but might be
2    considered a luxury to nontribal members?
3        A.   Necessities would be what the tribal
4    government offers, so health benefits; security,
5    which is administered through the police
6    department; education which is administered
7    through the Indian school.  We have a Recreation
8    Department for the community.  Water, we have a
9    water plant for the whole community.  And aside
10   from that, we have our cultural community
11   functions that we hold for the community.
12       Q.   Does the Tribe consider its quarterly
13   distributions to be a necessity?
14       A.   Yes.
15       Q.   You were asked some questions about the
16   White & Case memo.
17           Was the memo distributed to the tribal
18   members when it was created in 2003?
19       A.   No.
20       Q.   What about in 2004?
21       A.   No.
22       Q.   What about in 2005?
23       A.   No.
24       Q.   Was it ever distributed to tribal
25   members?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 199

1        A.   No.
2        Q.   I am handing you what has been marked
3    as Exhibits 18 and 19, the White & Case memo --
4    the two White & Case memorandums.
5            On Exhibit No. 18 it says it is from
6    one individual Ms. Houk, H-O-U-K, to Billy
7    Cypress and Dione Carroll.
8            Did any of those three individuals ever
9    distribute this memorandum to the tribal members,
10   to the best of your knowledge?
11       A.   No.
12       Q.   Now, Exhibit No. 19 is from the same
13   individual, Ms. Houk, H-O-U-K, and from
14   Mr. Gragg, G-R-A-G-G, and it says the memorandum
15   is to Dione Carroll and Mike Hernandez.
16           Did any of those individuals, to the
17   best of your knowledge, distribute this
18   memorandum to tribal members?
19       A.   No.
20       Q.   Did the Tribe believe that Dexter
21   Lehtinen was an expert in federal tax law?
22       A.   The Tribe?
23       Q.   Yes.  The Tribe.
24       A.   Yes.
25       Q.   Did Dexter Lehtinen speak Miccosukee or

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 200

1    does he speak Miccosukee?
2        A.   No.
3        Q.   Do all tribal members speak English?
4        A.   No.
5        Q.   When Dexter Lehtinen gave his report to
6    the General Council in English, did all tribal
7    members understand what he was saying in English?
8            MR. FARRIOR:  Objection to the form.
9    Foundation.
10       Q.   I will rephrase the question.
11           When Dexter Lehtinen gave his legal
12   advice, was that ever translated to Miccosukee?
13       A.   Was it translated?
14       Q.   Yes.
15       A.   Yes.
16       Q.   Was it necessary to translate his legal
17   advice to Miccosukee so other tribal members
18   would understand it?
19       A.   Yes.
20       Q.   When Billy Cypress conveyed legal
21   opinions, whose advice was he restating at
22   General Council meetings?
23       A.   Legal opinions?
24       Q.   Yes.  Whose legal opinions was he
25   reciting?

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 201

```
1       A.   Dexter Lehtinen.
2       Q.   Was it reasonable for tribal members to
3   rely on Billy Cypress' translation or his
4   statements?
5           MR. FARRIOR:  Objection to form.
6       Foundation.  Lack of personal knowledge.
7       Q.   You can answer.
8       A.   I'm sorry.  What was that?
9       Q.   When Billy Cypress was conveying the
10  legal opinions of Dexter Lehtinen who you just
11  said was an expert, was it reasonable for tribal
12  members to rely on Billy Cypress' translation?
13      A.   Yes.
14           MR. FARRIOR:  Object to the form.
15      Foundation.
16      Q.   According to the minutes of the General
17  Council meetings that you have been asked about,
18  was Lehtinen present during all of those
19  meetings?
20      A.   General Council?
21      Q.   Yes.
22      A.   Yes.
23      Q.   Was Lehtinen present when Billy Cypress
24  made statements regarding legal opinions?
25      A.   Translations?
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 202

```
1       Q.   Translations or in English?
2           MR. FARRIOR:  Object to the form.
3       Foundation.
4       A.   Yes.
5       Q.   Is that yes to translation and yes to
6   restatements in English?
7       A.   Yes.
8       Q.   Did Dexter Lehtinen ever say that the
9   English restatement was incorrect?
10      A.   No.
11      Q.   Did Dexter Lehtinen ever correct Billy
12  Cypress' restatement?
13      A.   No.
14      Q.   What language are the General Council
15  minutes in, the written ones that you were
16  talking about earlier today?
17      A.   English.
18      Q.   Why aren't they in Miccosukee?
19      A.   Our language is oral.
20      Q.   Do minutes show you what someone said
21  or what someone meant to say?
22           MR. FARRIOR:  Objection.  Foundation.
23      A.   Both.
24      Q.   You were questioned about the two check
25  statements that the minutes --
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 203

```
1       A.   Yes.
2       Q.   -- the statements by Dexter Lehtinen in
3   regard to the two checks.
4           Is Dexter Lehtinen still alive?
5       A.   Yes.
6       Q.   If the United States wants to know what
7   Dexter Lehtinen meant when he said the statement
8   who is the best person to ask?
9       A.   Dexter Lehtinen.
10      Q.   Is Billy Cypress still alive?
11      A.   Yes.
12      Q.   If the United States wants to know what
13  Billy Cypress meant at General Council meetings,
14  who should they ask?
15      A.   Billy Cypress, former Chairman.
16      Q.   I want to draw your attention to
17  Exhibit No. 26.  On page 38 of this exhibit you
18  see MIBG, Miccosukee Indian -- what is MIBG?
19      A.   Miccosukee Indian Bingo and Gaming.
20      Q.   The numbers under MIBG, does that
21  include numbers for the hotel?
22      A.   For the hotel?
23      Q.   Yes.
24      A.   No.
25      Q.   Does it include anything except for
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 204

```
1   numbers from gaming, slot machines and like
2   pull-tabs machines?
3       A.   MIBG is only under gaming.
4       Q.   When a parent receives a check or a
5   distribution for his child, does the Tribe keep
6   records on how that parent uses the monies that
7   belong to the child?
8       A.   How they use it, no.
9       Q.   So if the United States wants to know
10  how a parent -- what a parent did with the money
11  for their child, would the Tribe have records of
12  that?
13      A.   How they used it?
14      Q.   Yes.
15      A.   There are no records.
16      Q.   Until May, 2010 did you ever see any
17  attorney other than Dexter Lehtinen at General
18  Council meetings?
19      A.   Occasionally, but I can't remember who
20  their names -- what their names were.
21      Q.   The General Council meetings, the
22  minutes from them, do they show Dexter Lehtinen's
23  advice to tribal members?
24      A.   General Council advice?
25      Q.   The General Council minutes, do they
```

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 205

1  show Mr. Lehtinen's advice, his legal advice?
2      A.   Yes.
3      Q.   Would they show his advice that, for
4  instance, U.S.C. 3402, which is reported on from
5  Mr. Farrior from the Day case, would the minutes
6  show his advice regarding this statute?
7      A.   He gave advice, but he didn't give
8  100 percent of advice to the General Council.  It
9  was limited.  He should have been giving
10  100 percent of his information so sound decisions
11  could be made by the General Council.
12     Q.   Why is it the Tribe's opinion that
13  Mr. Lehtinen did not give 100 percent of his
14  advice to the Tribe?  Why do you hold that
15  belief?
16     A.   The Tribe's opinion?
17     Q.   Yes.  How do you know that he did not
18  give 100 percent of his advice?
19     A.   After he was relieved of his services,
20  after further internal investigation, we found
21  documents pertaining to advice that he didn't
22  give to the General Council.  He withheld
23  information which he should have distributed to
24  the Tribe.  What do they call it?  Ethics.
25     Q.   There were a number of questions from

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 206

1  the Department of Justice regarding if you were
2  present at meetings or if you recalled certain
3  things or if you were aware of certain items.
4      Do you understand those questions to be
5  in your personal capacity?  That you, Mr. Gabriel
6  Osceola, were present at certain meetings?
7      A.   Yes.  I believe they were pertaining to
8  me.
9      MR. DAVIS:  Thank you for your time,
10     and I have no further questions at this
11     time.
12     MR. FARRIOR:  Just a couple of quick
13     questions.
14     REDIRECT EXAMINATION
15  BY MR. FARRIOR:
16     Q.   You just referenced documents that you
17  found pertaining to advice that Dexter Lehtinen
18  gave?
19     A.   Yes.
20     Q.   Can you describe those documents?
21     A.   That's in relation to the White & Case
22  memos and the audits that were presented to me
23  from --
24     Q.   From the Menendez firm?
25     A.   Yes.  Menendez, CPA.

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 207

1      Q.   Were there any other documents?
2      A.   I'm sure there were, but I can't recall
3  what they were at the moment.
4      MR. FARRIOR:  No further questions.
5  Thank you for being here today.
6      THE COURT REPORTER:  Read or waive?
7      MR. DAVIS:  Read.
8
9      (Thereupon, the deposition
10     was concluded at 5:50 p.m.)

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 208

1      C E R T I F I C A T E   O F   O A T H
2
3  THE STATE OF FLORIDA)
4  COUNTY OF MIAMI-DADE)
5
6      I, SHEILA A. WILSON, a Notary Public
7  for the State of Florida, certify that GABRIEL K.
8  OSCEOLA personally appeared before me and was
9  duly sworn.
10     WITNESS my Hand and Official Seal this
11  6th day of April, 2015.
12
13
14     _____
       Sheila A. Wilson
       Notary Public-State of Florida
15     My Commission No. DD695787
       Expires:  October 26, 2015
16
17
18
19
20
21
22
23
24
25

KRESSE & ASSOCIATES, LLC
(305) 371-7692

Page 209

```
 1            C E R T I F I C A T E
 2
 3     THE STATE OF FLORIDA)
 4     COUNTY OF MIAMI-DADE)
 5
 6          I, SHEILA A. WILSON, a Registered
 7     Professional Reporter, do hereby certify that I
 8     was authorized to and did stenographically report
 9     the deposition of GABRIEL O. OSCEOLA, a witness
10     called in the above-styled cause; that the
11     witness was first duly sworn by me; that a review
12     of the transcript was requested; and that the
13     transcript is a true and complete record of my
14     stenographic notes.
15          I further certify that I am not an
16     attorney or counsel of any of the parties, nor
17     related to any of the parties, nor financially
18     interested in the action.
19          Dated this 6th day of April, 2015.
20
21          _____
22          Sheila A. Wilson, RPR
           Court Reporter
23
24
25
```

        KRESSE & ASSOCIATES, LLC
           (305) 371-7692

Kresse & Associates, LLC
44 W. Flagler Street
6th Floor
Miami, Florida 33130

April 6, 2015

Mr. Gabriel o. Osceola
c/o Bernardo Roman, Esq.
Law Offices of Bernardo Roman, P.A.
1250 S.W. 27th Avenue
Suite 506
Miami, FL 33135
Dear Mr. Osceola:
     This letter is to inform you that the
transcript of your deposition taken on April 2,
2015 is available for your reading and signature.
Please make arrangements with Mr. Roman to read a
copy of your deposition and note any corrections
on the errata sheet. Please return the errata
sheet to Mr. Roman with a copy to Mr. Farrior.
     If the reading and signing have not been
completed prior to May 8, 2015, the original
transcript will be filed as is without
corrections.

     Thank you for your prompt attention to this
matter.
                    Sincerely,


                    Sheila A. Wilson, RPR
                    Court Reporter

cc: Clerk of the Court

        KRESSE & ASSOCIATES, LLC
           (305) 371-7692

---

Page 210

```
 1            E R R A T A  S H E E T
 2     RECORD CHANGES HERE - DO NOT WRITE ON THE TRANSCRIPT
 3     IN RE: U.S. of AMERICA v. SALLY JIM
 4     PAGE/LINE      CHANGE        REASON
 5     _____  _____  _____
 6     _____  _____  _____
 7     _____  _____  _____
 8     _____  _____  _____
 9     _____  _____  _____
10     _____  _____  _____
11     _____  _____  _____
12     _____  _____  _____
13     _____  _____  _____
14     _____  _____  _____
15     _____  _____  _____
16     _____  _____  _____
17     _____  _____  _____
18     _____  _____  _____
19     _____  _____  _____
20     _____  _____  _____
21     _____
22     Under penalties of perjury, I declare that I have read
       my deposition and that it is true and correct subject
23     to any changes in form or substance entered here.
24     _____
         (Date)      GABRIEL K. OSCEOLA
25
```

        KRESSE & ASSOCIATES, LLC
           (305) 371-7692

# Exhibit 14

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| United States | ) | |
|---|---|---|
| *Plaintiff* | ) | Civil Action No.  1:14-cv-22441-CMA |
| v. | ) | |
| Sally Jim | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Miccosukee Tribe of Indians of Florida

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
See Attachment part 1

| Place: | U.S. Attorney's Office<br>99 N.E. 4th Street<br>Miami, Fl. 33132 | Date and Time:<br>03/03/2015 10:00 am |
|---|---|---|

The deposition will be recorded by this method:  stenographic means

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Attachment part 2

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  2-24-15

*CLERK OF COURT*

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   United States
_____ , who issues or requests this subpoena, are:
William E. Farrior, 555 4th Street NW, Washington, DC 20001, william.e.farrior@usdoj.gov, 202-616-1908

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 1:14-cv-22441-CMA

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

    ☐ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

    $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
      (i) is a party or a party's officer; or
      (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
   (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
   (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
   (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      (i) fails to allow a reasonable time to comply;
      (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
      (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      (iv) subjects a person to undue burden.
   (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
      (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
   (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      (i) expressly make the claim; and
      (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Attachment to Subpoena to Miccosukee Tribe of Indians of Florida

Part 1

1.      Any program operated by the Miccosukee Tribe of Indians of Florida during the year
        2001 that provided benefits, services, or any other form of assistance to Tribal members.

2.      Any program providing periodic distributions to members of the Miccosukee Tribe of
        Indians of Florida ("Tribal members") from 1990 to 12/31/2001.

3.      The gross revenues, net revenues, expenses, and taxes of the Tribe's operations from
        1/1/1995 to 12/31/2001, including the Tribe's gaming facility.

4.      Any payment, remuneration, gift, distribution, salary, gambling winnings, or transfer of
        anything of value from the Tribe to Sally Jim for the year 2001.

5.      Advice the Tribe and its members received regarding the taxability of distributions to
        Tribal members from 1990 to the present.

6.      The documents described in Part 2.

Part 2

1.      All documents evidencing any payment, remuneration, gift, distribution, salary, gambling
        winnings, or transfer of anything of value from the Tribe to Sally Jim for the year 2001.

2.      All documents evidencing periodic payments from the Tribe to Tribal members or
        payments to third parties on behalf of Tribal members from 1/1/2001 to 12/31/2001,
        except salary, wages, gambling winnings, and any payments which were reported to the
        IRS on a Form 1099, Form W2G, or Form W4.

3.      All documents regarding the establishment and operation of the Tribe's program to
        provide quarterly and end of year distributions to Tribal members, including guidelines
        for eligibility and procedures for approval of distributions.

4.      All documents regarding the establishment and operation of any general welfare program
        operated by the Tribe prior to 12/31/2001 on behalf of Tribal members, including
        programs providing housing, medical care, food, education, child care, and
        transportation.

5.      All documentation regarding loans or advances from the Tribe to Tribal members from
        1/1/2001 to 12/31/2001, including documentation setting forth the parameters of the
        Tribe's loan program or its initiation.

6.      All documents evidencing advice the Tribe or Tribal members received regarding the
        taxability of payments and/or distributions to Tribal members from 1992 to the present.
        This request excludes documents evidencing advice between the Tribe and Bernardo

1

12177690.2

Roman or his associates, unless the Tribe is waiving attorney-client privilege for any such documents. This request excludes documents evidencing advice between the Tribe and the law firm Jorden Burt, unless the Tribe is waiving attorney-client privilege for any such documents.

7.   All minutes and recordings of Tribal General Council meetings from 1995 to the present.

8.   All communications between the Tribe and Sally Jim, including communications made available to tribal members generally, regarding the distribution program in place in 2001.

9.   All documents regarding the establishment and operation of the Tribe's gross receipts tax or gross receipts license fee that the Tribe had in place in 2001. This request excludes documents showing the net and gross revenue, expenses, and taxes of the Tribe's operations for years other than 2001.

10.  All documents showing the net and gross revenue, expenses, and taxes of the Tribe's operations, including the Tribe's gaming facility, for the 2001 tax year.

11.  All documents regarding the Tribe's NTDR account for the year 2001, including cleared checks, bank statements, and any documents showing the source of funds in the Tribe's NTDR account.

12.  All documents used as exhibits in a deposition or hearing in any law suit that the Tribe brought regarding distributions to tribal members.

13.  All documents exchanged in discovery in the following cases: Miccosukee Tribe v. Bermudez, No. 00-25711 (Fla. Cir. Ct.), Miccosukee Tribe v. Lewis, No. 12-12816, 14-277 (Fla. Cir. Ct.), Miccosukee Tribe v. Lehtinen, No. 11-39362 (Fla. Cir. Ct.), Miccosukee Tribe v. Cypress, No. 12-22439 (S.D. Fla.).

12177690.2

# Exhibit 15

JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
110–113

Page 110

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
             CASE NO:  14-cv-22441-ALTONAGA/MCALILEY
 3
 4   UNITED STATES OF AMERICA,
 5                   Plaintiff,
 6            vs.
 7
 8   SALLY JIM,
 9                   Defendant.
10   _____/
11
12
13
14                    DEPOSITION OF
15                    JOSE I. MARRERO
16         TAKEN ON BEHALF OF THE DEFENDANT
17           VOLUME II, PAGES 110 to 205
18
19
20            Monday, March 16, 2015
21           10:25 a.m. - 4:10 p.m.
22
23             515 East Las Olas Boulevard
                    Suite 1300
             Fort Lauderdale, Florida  33301
24
25            Theresa Tomaselli, RMR
```

Page 111

```
 1              APPEARANCES OF COUNSEL
 2
     On behalf of the Plaintiff:
 3
          UNITED STATES DEPARTMENT OF JUSTICE
 4        BY:  WILLIAM E. FARRIOR, JR., ESQUIRE
          1100 L Street, Northwest
 5        Room 11000
          Washington, D.C.  20005
 6        Tel:   202.616.1908
          Fax:   202.514.4963
 7        E-mail:  william.e.farrior@usdoj.gov
 8
 9   On behalf of the Defendant:
10        LAW OFFICES OF BERNARDO ROMAN, III
          BY:  BERNARDO ROMAN, III, ESQUIRE
11        AND:  DANIEL E. DAVIS, ESQUIRE
          1250 Southwest 27th Avenue
12        Suite 506
          Miami, Florida  33135
13        Tel:   305.643.7993
          Fax:   305.643.7995
14        E-mail:  bromanlaw@bellsouth.net
15
16   On behalf of the Witness:
17        SHENDELL & POLLOCK, PL
          BY:  KENNETH S. POLLOCK, ESQUIRE
18        2700 North Military Trail
          Suite 150
19        Boca Raton, Florida  33431
          Tel:   561.241.2323
20        Fax:   561.241.2330
          E-mail:  ken@shendellpollock.com
21
22
     Also Present:
23
          GABRIEL OSCEOLA
24
25
```

Page 112

```
 1                INDEX OF EXAMINATION
 2   WITNESS                                         PAGE
 3   JOSE I. MARRERO
 4
     CONTINUED FURTHER DIRECT EXAMINATION             113
 5   BY MR. ROMAN
 6
     CROSS EXAMINATION                                150
 7   BY MR. FARRIOR
 8
     REDIRECT EXAMINATION                             193
 9   BY MR. DAVIS
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 113

```
 1        CONTINUED DEPOSITION OF JOSE I. MARRERO
 2        (The deposition continues from Volume I.)
 3           CONTINUED FURTHER DIRECT EXAMINATION
 4   BY MR. ROMAN:
 5      Q.  Mr. Marrero, when you spoke of going to the
 6   Tribe and talking to people in order to make the
 7   classifications and the reclassifications that you did,
 8   who did you speak to?
 9      A.  Mostly Mr. Hernandez.
10      Q.  Would that be Miguel Hernandez, their former
11   Director of Finance?
12      A.  Yes.  Mostly Mr. Hernandez or Dionne Carroll.
13   Those were two of the people I mostly spoke with.  I may
14   have, on occasion, spoke with one of the bookkeepers
15   there or something, if there was something particular
16   that they couldn't answer, but everything went through
17   Mr. Hernandez or Mr. -- who was the other one there?
18      Q.  Julio Martinez.
19      A.  -- Julio Martinez.  And actually, I spoke
20   with Julio probably more than Mr. Hernandez.  I spoke
21   with Julio almost on a daily basis when I was there to
22   work there.  If not, that was the people I dealt with
23   asking for information.
24      Q.  Did you ever have any discussions with anyone
25   at the Tribe regarding the Tribe's Welfare Program?
```



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
114–117

Page 114
1    A.  Discussions about the Tribal Welfare Program?
2    Q.  Yes, the Tribe's Welfare Program.
3    A.  The only thing I can recall about that was, I
4  believe Miss Carroll gave me a document regarding that.
5    Q.  And what document was that?
6    A.  I don't recall, but I remember getting a
7  document.  I don't know if it was an order or a business
8  motion, or I don't recall what it was, and I don't even
9  know if I have it in the file anymore, but I do recall
10  getting some sort of either a document, but I don't
11  recall exactly where it was from.
12    Didn't have any extensive conversations, but
13  I do recall getting a document.
14    Q.  Did you ever have a discussion with anyone at
15  the Tribe regarding the Tribe's Assistance Program?
16    MR. FARRIOR:  Object to the form.
17    MR. POLLOCK:  I'm sorry.  What program?
18    MR. ROMAN:  Assistance.
19    THE WITNESS:  I don't recall having a
20    conversation other than -- other than how a check
21    or something may have been classified that I was
22    asking about, but about the program, if that's
23    the -- no.
24    MR. POLLOCK:  That's the question.
25    THE WITNESS:  No.

Page 115
1  BY MR. ROMAN:
2    Q.  And what were you told about the
3  classification that you just mentioned?
4    A.  Nothing other than how it may have been
5  classified, because I wasn't -- I wasn't talking about
6  the program.  I'm only interested in how it was recorded
7  in the books and, you know, what documents related to
8  that transaction.
9    Q.  What did they tell you about the
10  classification, how they classified things?  When you
11  said, they told me about the classification, what are
12  you referring to?
13    MR. POLLOCK:  Hold on.
14  BY MR. ROMAN:
15    Q.  When you were told about how they classified
16  things, what did they tell you?
17    MR. POLLOCK:  Are you asking Mr. Marrero to
18    reveal communications specifically?
19    MR. ROMAN:  No, no, no.  This is -- I'm not
20    asking you anything about having to do, except
21    with the people you talked to at the Tribe, the
22    Finance Department.
23    THE WITNESS:  Yeah, again, strictly an
24    accounting issue of how they would have posted
25    it.  You know, why did they post it here, and

Page 116
1    where is the documentation for it.  That's the
2    only types of questions that I would have asked
3    them regarding that, so that I would know where
4    it was classified.
5  BY MR. ROMAN:
6    Q.  Who at the Tribe tell you -- what did they
7  tell you about the NTDR?
8    A.  The NTDR Program?
9    Q.  Yes, or in general about NTDR.
10    MR. POLLOCK:  Are you asking the question --
11    MR. ROMAN:  Without a lawyer -- I'm sorry.
12  BY MR. ROMAN:
13    Q.  When you contacted the Miccosukee Finance
14  Department, whoever you talked to over there --
15    MR. POLLOCK:  Just so I'm clear, are you
16    asking Mr. Marrero to reveal specific
17    communications he had with representatives of the
18    Tribe?
19    MR. ROMAN:  Yes, regarding the NTDR Program.
20    MR. POLLOCK:  And you don't believe those
21    communications would be privileged?
22    MR. ROMAN:  No, because he did not have them
23    with the attorneys.  For example, let me break it
24    down.
25

Page 117
1  BY MR. ROMAN:
2    Q.  Did you ask Miguel Hernandez about NTDRs,
3  like, for example, the NTDR to Miss Jim; the NTDR to
4  Tribal member; did you ask Mr. Hernandez, what does NTDR
5  mean?
6    MR. FARRIOR:  Object to the form.
7    MR. POLLOCK:  Join.
8    THE WITNESS:  I asked him what the NTDR
9    account was, yes.
10  BY MR. ROMAN:
11    Q.  And what did he tell you?
12    A.  It was the net taxable distributions --
13    Q.  Okay.
14    A.  -- from gaming revenue.
15    Q.  And did he tell you -- what else did he tell
16  you about the NTDR?
17    A.  That that was the account that was basically
18  used to make the distributions to Tribal members.
19    Q.  And did he tell you anything about the NTDR
20  Program?
21    A.  Yes.
22    Q.  What did he tell you?
23    A.  That the way that that was devised was based
24  on some document that had been prepared back in the
25  early 2000s of how that was going to be distributed and



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
118–121

Page 118

1 how it was determined.  But why they did it or didn't
2 get only -- that's what it was.  They followed whatever
3 instructions they got back then in the year 2000 or
4 2000-whatever it was, and that's how they did it.  Okay.
5 Fine.  So now I know how they come up with their
6 distribution amounts.
7    Q.   Did Mr. Hernandez tell you who gave him those
8 instructions?
9    A.   No.
10    Q.   Did Mr. Hernandez ever have a conversation
11 with you about the role, if any, that Dexter Lehtinen
12 played in the NTDR Program?
13    A.   I don't recall Mr. Hernandez having that
14 conversation with me.
15    Q.   Did you have that conversation with anyone?
16    A.   Yes.
17    Q.   Who?
18    A.   The attorneys.
19    Q.   Which attorneys?
20    A.   Guy Lewis, I believe.
21    Q.   Did you have that conversation with Dexter
22 Lehtinen?
23    A.   I don't believe I ever had that conversation
24 with Dexter.
25    Q.   And what did Guy Lewis tell you?  He's going

Page 119

1 to object, that's fine, don't answer it, but what did
2 Mr. Lewis tell you?
3       MR. POLLOCK:  I'm going to instruct you not
4    to answer the question to the extent that it's
5    going to cause you to reveal attorney/client
6    privileged communications.
7 BY MR. ROMAN:
8    Q.   Would it be fair to say that whatever
9 communications you had regarding the NTDR with
10 Mr. Lewis, were separate and apart of any communications
11 that you may have had with Mr. Lehtinen?
12       MR. POLLOCK:  Objection to the form.
13 BY MR. ROMAN:
14    Q.   In other words, let me rephrase that.
15       MR. POLLOCK:  He already --
16 BY MR. ROMAN:
17    Q.   You never had a conversation with
18 Mr. Lehtinen about the NTDR, correct?
19    A.   I don't recall ever having a conversation
20 with him about NTDR.
21    Q.   Okay.  Would it be fair to say, without
22 telling me what you talked about, that you had
23 conversation with Mr. Lewis where you were doing this
24 work for the Tribe, separate and apart from
25 Mr. Lehtinen?

Page 120

1    A.   Yes.
2    Q.   Okay.  Would it be fair to say that -- let me
3 ask you this way:  Who did you interact with during the
4 time that you were doing this work:  Mr. Lehtinen or
5 Mr. Lewis?
6       MR. POLLOCK:  Object to the form.
7       THE WITNESS:  Both.
8 BY MR. ROMAN:
9    Q.   Did you interact more with one than with the
10 other or the same amount?
11       MR. POLLOCK:  Object to the form.
12       THE WITNESS:  More with Mr. Lewis.
13 BY MR. ROMAN:
14    Q.   Would it be fair to say that you had
15 interactions, without telling me what they were about,
16 and communications with Mr. Lewis, separate and apart
17 from Mr. Lehtinen?
18    A.   Yes.
19    Q.   Okay.  And would it be fair to say that you
20 had more interaction with Mr. Lewis including
21 conversations, discussions, meetings, about the work
22 that you were doing, than with Mr. Lehtinen?
23       MR. POLLOCK:  Object to the form.
24       THE WITNESS:  Yes.
25

Page 121

1 BY MR. ROMAN:
2    Q.   Now, did anybody at the Miccosukee Finance
3 Department, either Mr. Hernandez, Julio Martinez, or
4 anyone that was not an attorney, did they ever tell you
5 anything about whether the NTDR were taxable or not?
6       MR. FARRIOR:  Object to form.
7       THE WITNESS:  In the Finance Department?
8 BY MR. ROMAN:
9    Q.   Yes.
10    A.   Not that I recall.
11    Q.   Okay.  Now, without telling me what was said,
12 was the issue of -- was the question of whether the
13 NTDRs were taxable or not, an issue that you discussed
14 with the attorneys?
15       MR. POLLOCK:  Can you repeat that question?
16       MR. ROMAN:  Yes.
17 BY MR. ROMAN:
18    Q.   Was that issue ever discussed with the
19 attorneys?
20       MR. POLLOCK:  Whether or not the NTDR was
21    taxable?
22       MR. ROMAN:  Yes.
23       THE WITNESS:  Yes.
24 BY MR. ROMAN:
25    Q.   And would it be fair to say the attorneys



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
122–125

Page 122

1 that you're referring to will be Guy Lewis and Dexter
2 Lehtinen?
3      MR. POLLOCK:  Object to the form.
4      THE WITNESS:  Yes.
5 BY MR. ROMAN:
6    Q.   Did you ever have any discussions about the
7 work that you were doing with any members of the
8 Miccosukee Business Council?
9    A.   No.
10    Q.   Did you ever have any discussions of any of
11 the work that you were doing with Billy Cypress?
12    A.   Yes.
13    Q.   And what did you talk about?
14    A.   My recollection was simply giving him an
15 update on where we were; a status report, if you will.
16    Q.   And how was that status report?  Was that
17 verbally; was that in writing, a phone call?
18      MR. POLLOCK:  Object to the form.
19      THE WITNESS:  Verbally.
20 BY MR. ROMAN:
21    Q.   And how many times did that happen?
22    A.   Best of my recollection, once.
23    Q.   And was there a reason why you communicated
24 only with Billy Cypress and not the other members of the
25 Business Council?

Page 123

1    A.   Did I know of?
2    Q.   Yes.
3    A.   I normally just deal with the attorneys
4 unless they ask me to talk to someone else.
5    Q.   And was your communication with Billy Cypress
6 based on a call that came from Billy Cypress or were you
7 instructed to call Billy Cypress?
8    A.   Neither.  I happened to be in the office and
9 Guy Lewis was there, and he brought me into his office
10 and I gave him an update.
11    Q.   Okay.  Guy Lewis -- you were at the Tribe.
12 Guy Lewis brought you into Billy Cypress's office and
13 said, give him an update?
14    A.   Essentially, yes.
15    Q.   And what was the update that you gave Billy
16 Cypress?
17    A.   I do not recall.
18    Q.   Now, you have never represented Billy
19 Cypress, correct?
20    A.   Correct.
21      MR. POLLOCK:  I'm sorry.  Just to get back,
22      Mr. Marrero shot the answer before I could say
23      anything.  I think to the extent there was
24      communications between Mr. Marrero, Mr. Lewis,
25      and Mr. Cypress, I also believe that would be

Page 124

1      protected attorney/client privilege.  However, he
2      already answered.  He gave his answer already,
3      but I just wanted to put my objection on the
4      record.
5 BY MR. ROMAN:
6    Q.   Okay.  Let me ask you this:  At the time of
7 that communication that you gave the answer to, was Guy
8 Lewis the attorney for Billy Cypress?
9    A.   I don't know.  I don't know that he was.  All
10 I know is, he was representing the Tribe, who I was
11 retained to represent, was the Tribe.
12    Q.   Were you ever aware of whether Guy Lewis was
13 representing Billy Cypress in tax matters?
14    A.   Yes -- no -- let me rephrase that.  Repeat
15 that question, if you please.
16    Q.   Were you ever aware that Guy Lewis was
17 representing Billy Cypress?
18    A.   Yes.
19    Q.   When did you become aware?
20    A.   In the News.
21    Q.   When was that?
22    A.   I have no recollection exactly when that was.
23    Q.   During the time that you were doing the work
24 that you have described here and testified about for the
25 Miccosukee Tribe, were you ever aware that Guy Lewis was

Page 125

1 representing Billy Cypress in tax matters?
2      MR. POLLOCK:  Object to the form.
3      THE WITNESS:  I have no knowledge of that.
4 BY MR. ROMAN:
5    Q.   Do you have any knowledge of that, as you sit
6 here today?
7    A.   Only if you tell me so.
8    Q.   So would it be fair to say then, that you
9 were never aware during your representation of the
10 Miccosukee Tribe, that Guy Lewis was also representing
11 Billy Cypress in tax matters?
12    A.   As an individual?
13    Q.   As an individual, yes.
14      MR. POLLOCK:  Not as a representative of the
15      Tribe?
16      MR. ROMAN:  No, no, no, as an individual.
17      THE WITNESS:  I don't recall that ever being
18      a part of any conversations.
19 BY MR. ROMAN:
20    Q.   Were you aware whether Guy Lewis was
21 representing Billy Cypress in his capacity as the
22 Chairman of the Miccosukee Tribe?
23    A.   Again --
24      MR. POLLOCK:  Object to the form.
25      THE WITNESS:  -- I learned it through the



Case 1:14-cv-22441-CMA  Document 125-7  Entered on FLSD Docket 06/17/2015  Page 158 of 207

JOSE I. MARRERO Volume II                                    March 16, 2015
UNITED STATES OF AMERICA vs. JIM                            126–129

Page 126

1     News.  That was never a part of any
2   conversations.
3   BY MR. ROMAN:
4     Q.  So the answer will be that you were not aware
5   of that?
6     A.  I was not aware of that.
7       MR. POLLOCK:  Object to the form.
8   BY MR. ROMAN:
9     Q.  Okay.  Now, did you ever discuss with Sally
10  Jim at any point -- and I know you said you never met
11  her -- but did you ever --
12      MR. POLLOCK:  Spoke to her.
13  BY MR. ROMAN:
14    Q.  You never spoke with her; you never sent her
15  a letter?
16      MR. POLLOCK:  Nothing.
17  BY MR. ROMAN:
18    Q.  Nothing.  You have had no communication in
19  any form whatsoever regarding her tax matters or her tax
20  records, correct?
21    A.  Any issue, period.
22    Q.  Okay.  All right.
23      Now, did you also -- without giving me the
24  names, did you also represent some individual Tribal
25  members in tax matters?

Page 127

1     A.  None.  Zero.
2     Q.  Okay.  Did you assist Guy Lewis when he was
3   representing Tribal members in tax matters?
4     A.  No.
5       MR. POLLOCK:  Object to the form.
6   BY MR. ROMAN:
7     Q.  Would it be fair to say that the person that
8   was doing that work was Mr. Robinson?
9       MR. POLLOCK:  Object to the form.
10  BY MR. ROMAN:
11    Q.  Did you ever meet Mr. Robinson?
12    A.  Are you referring to from Gerson Preston?
13    Q.  Yes.
14    A.  I've never met him.  I spoke to him on the
15  phone once.
16    Q.  Would it be fair to say that you had no
17  interaction with him regarding the work that you were
18  doing for the Miccosukee Tribe?
19    A.  Correct.
20    Q.  Okay.  Now, this meeting of December 29, 2005
21  that you testified about, was this in response to the
22  summons, the subpoena that the Service had issued in
23  December of 2005, to the members of the Business
24  Council?
25      MR. FARRIOR:  Object to form.

Page 128

1       MR. POLLOCK:  Join.
2       THE WITNESS:  My recollection was that there
3   was numerous summonses that were being issued and
4   the question was:  One, it was the holidays, and
5   what do we do with responding to those; and two,
6   is there another way to be able to comply without
7   having to go through the summons process.
8       And so that's the impetus of my conversation
9   and call, was to see, can we make some sort of
10  arrangement to do that.
11  BY MR. ROMAN:
12    Q.  But would it be fair to say that that was in
13  response to summons that the Service issued against
14  members of the Business Council?
15      MR. POLLOCK:  Object to the form.
16      MR. FARRIOR:  Object to the form.
17      THE WITNESS:  I have no way of knowing that.
18  I never saw the summons.
19  BY MR. ROMAN:
20    Q.  What were you told about the reason for this
21  meeting?  Did anyone tell you why -- if you never saw
22  the summons, okay, why was this meeting being arranged
23  during the holidays that you described?
24      MR. POLLOCK:  Object to the form.
25      THE WITNESS:  Again, because if summonses

Page 129

1   were issued and a discussion became about whether
2   or not -- what we could do to try and quash those
3   summonses and because -- is there some way else
4   to resolve the issue.
5       Knowing that I worked with IRS, they asked me
6   to reach out so we could have a meeting; can we
7   figure out a way to resolve the issue of the
8   summonses.  That was all.  I have not seen the
9   summonses.  Didn't know what the summonses -- it
10  was simply to have that discussion in that
11  meeting.
12  BY MR. ROMAN:
13    Q.  Were you told against whom the summons had
14  been issued?
15    A.  I don't recall that at all.
16    Q.  When you were paid for your services for the
17  work that you described here doing, did the payment come
18  from the Miccosukee Tribe or did it come from Lewis's
19  office, Guy Lewis's office?
20    A.  It would have come from -- it was billed out
21  to the Miccosukee Tribe.
22    Q.  And your check, where did it come from?
23    A.  I don't know.  I didn't receive them.
24    Q.  When you were paid, who paid you?
25    A.  They would send the check, whoever sent the



JOSE I. MARRERO Volume II                                    March 16, 2015
UNITED STATES OF AMERICA vs. JIM                                    130–133

Page 130

1    check, to our Billing Department, and they would receive
2    it. Who specifically sent it, what account it came
3    from, I have no way of knowing.
4        Q.   Okay. The check that your firm received --
5        A.   Correct.
6        Q.   -- the payor on that check, who was the
7    payor?
8            MR. POLLOCK: Object to the form.
9            THE WITNESS: The only thing I can tell you
10       for a fact is that in our billing system, it was
11       billed out to the Miccosukee Tribe of Indians,
12       and a check was received, because I would get the
13       report saying, a payment was received. I cannot
14       tell you who the payor was because I never saw
15       the check.
16   BY MR. ROMAN:
17       Q.   Who did you bill?
18       A.   Miccosukee Tribe of Indians.
19       Q.   Okay. So if you billed the Miccosukee Tribe
20   of Indians, who was your client?
21       A.   Lewis & Tein hired me to represent the Tribe
22   in the employment tax issues.
23       Q.   Did you bill Lewis & Tein or did you bill --
24           MR. POLLOCK: Bernie, he just testified
25       twice. He told you.

Page 131

1            MR. ROMAN: I want to make sure that we are
2        clear on this because you're not clear.
3            MR. POLLOCK: He said --
4    BY MR. ROMAN:
5        Q.   When your firm prepared -- let me ask you
6    this: How regularly did you prepare billing records on
7    your work?
8        A.   Monthly.
9        Q.   Okay. When you prepared -- when your firm
10   prepared your billing records to get paid every month,
11   who did your firm bill? Did your firm bill Lewis & Tein
12   or did it bill the Miccosukee Tribe?
13       A.   Again, to the best of my knowledge, it was
14   billed out to the Miccosukee Tribe of Indians, but I
15   cannot tell you because I don't do the billings.
16           MR. POLLOCK: Bernie, hold on a second. Hold
17       on a second. I have to tell you, my position is,
18       that at this point, you are harassing the
19       witness. You've asked him four different times
20       who he billed out the invoice to. He told you
21       four times it's the Tribe. I'm going to ask you
22       respectfully --
23           MR. ROMAN: Yes.
24           MR. POLLOCK: -- listen, Mr. Marrero is here
25       in good faith. He's answered all of your

Page 132

1    questions. I have allowed both of you to ask
2    questions, which is improper in and of itself.
3    I'm asking you to please stop asking repetitive
4    questions so we can get out of here as soon as we
5    can. And respect Mr. Marrero's health, please.
6        MR. ROMAN: Mr. Marrero has raised an issue
7    of who the client is, which is important, not
8    only because of the privilege that he has raised,
9    but also the privilege that he has raised
10   regarding the Miccosukee Tribe.
11       I am only trying to ascertain, since he has
12   claimed that he was hired by Lewis & Tein.
13   However, we had just learned that he billed every
14   month to the Tribe and that the Tribe paid him
15   directly, not the person that hired him, which he
16   claims to be Lewis & Tein, for purposes of who
17   the client is, and who he can claim the privilege
18   with, not only here today, but on future issues.
19   I'm trying to narrow down --
20       MR. POLLOCK: I understand that.
21       MR. ROMAN: -- basically, who paid it. If
22   he's telling me, look -- let's do it one at a
23   time.
24       If he's telling me, look, my firm billed the
25   Tribe and I have no idea where the check came

Page 133

1    from, that's fine. We will move on. I only have
2    a couple more questions.
3            MR. POLLOCK: That's what he said.
4            MR. ROMAN: But I want to make sure we are
5        clear on that. That's --
6    BY MR. ROMAN:
7        Q.   Basically, you guys billed the Tribe and then
8    the check came from somewhere; you just don't know where
9    it came from?
10       A.   Correct.
11       Q.   Okay. One last question on that. When you
12   were paid, you, every week or every two weeks, whenever
13   your firm paid you, would it be fair to say that your
14   check came from your firm?
15       A.   Correct.
16       Q.   Not from the Tribe or anybody else?
17       A.   Correct.
18       Q.   Okay. That's it. We are done on that issue.
19       Now, when information was released in
20   September 2006, September 29, 2006, to the Agent Furnas,
21   information that you released, okay, you are the only
22   one that released those CDs to Furnas, correct?
23       A.   As far as I know, yes.
24       Q.   Okay. Now, any other information that may
25   have been released, separate and apart from that, you



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
134–137

Page 134

1 took no part on the release to the Service, correct?
2 　　　MR. POLLOCK:  Object to the form.
3 　　　THE WITNESS:  Again, my only recollection of
4 　the only information that I released and gave and
5 　sent to them would have been those CDs.
6 BY MR. ROMAN:
7 　Q.  Okay.  Out of all the attorneys that you were
8 working with that you have mentioned here today, is
9 there one particular attorney that you considered the
10 lead attorney, the main attorney in this case?
11 　A.  For which issue; for the one we are talking
12 about, the employment tax?
13 　Q.  For any issue.
14 　　　MR. POLLOCK:  Object to the form.
15 BY MR. ROMAN:
16 　Q.  Let's break it down.
17 　　　For the employment tax, who was the lead
18 attorney, according to you?
19 　A.  I mostly dealt with two attorneys, Michael
20 Tein and Claudio Reidi.
21 　Q.  Okay.  Now, on the other issue that you
22 worked on like NTDRs, separate from the tax, from the
23 employment tax, who did you consider the lead attorney?
24 　　　MR. FARRIOR:  Object to the form.
25 　　　MR. POLLOCK:  I thought the first issue was

Page 135

1 　employment tax.
2 　　　MR. ROMAN:  Yes.  The second one is NTDR.
3 　　　MR. POLLOCK:  Okay.
4 BY MR. ROMAN:
5 　Q.  On the NTDR issue, who was the lead attorney;
6 who was the attorney, that if you had a problem or a
7 question, who would you call?
8 　　　MR. FARRIOR:  Object to the form.
9 　　　MR. POLLOCK:  Join.  And I'm sorry.  Can I
10 　ask for a clarification?
11 　　　MR. ROMAN:  Sure.
12 　　　MR. POLLOCK:  When you say, who was the lead
13 　attorney, to me, that definition can mean many
14 　things.  Are you asking him --
15 BY MR. ROMAN:
16 　Q.  Good point.  Let's suppose you're working on
17 the NTDR, like you were working on, and you had a
18 problem or a question, and you had to call one of the
19 lawyers; who would you call?
20 　A.  Guy Lewis.
21 　Q.  Okay.  Would that apply also if you had a
22 question regarding the tax liability of Sally Jim that
23 we have discussed here?
24 　　　MR. POLLOCK:  Object to the form.
25 　　　Mischaracterizing any prior testimony.

Page 136

1 　　　THE WITNESS:  Again, I don't have any issues
2 　with any individuals.  I would never have called
3 　anyone on an individual.
4 BY MR. ROMAN:
5 　Q.  Okay.  But if you had a question about the
6 NTDRs, you would call Guy Lewis?
7 　A.  No.  Let me -- again, if I had an issue about
8 getting information about the NTDR account because
9 remember, I'm only authorized to release what they tell
10 me I can.  So if I went to Julio or to Mike and I asked
11 for information, and they said, cannot be released, I
12 would then have to say, Guy, they are telling me they
13 can't give me the information.  That's it.
14 　　　That was the only thing I would ever ask him
15 about, if -- and I don't even recall that ever coming
16 up, as a matter of fact.
17 　Q.  When you say "Guy," by the way, you're
18 referring to Guy Lewis?
19 　A.  Yes.
20 　Q.  Okay.  Were you ever asked by anyone,
21 including the attorneys that you were working with, to
22 give a briefing to the Miccosukee General Council like
23 the one you gave to Billy Cypress?
24 　A.  Okay.  A briefing was probably a 30-second
25 summary.  So are you talking about a detail stuff, are

Page 137

1 you talking about a 30-second, here's where we at?
2 I'm not sure.
3 　Q.  Yes.
4 　A.  And the answer to both of those would be, no.
5 　Q.  Now, on the question of the work that you
6 were doing, did you ever believe, based on the work that
7 you were doing, that that work was related to Tribal
8 members?
9 　　　MR. POLLOCK:  Object to the form.  Asked and
10 　answered.
11 　　　THE WITNESS:  My work -- I was hired to do
12 　the employment tax issues for the Miccosukee
13 　Tribe of Indians, which included everything that
14 　came out of there and included Tribal members as
15 　well as non-Tribal members.  It included
16 　employment tax issues which applied to both
17 　categories.
18 BY MR. ROMAN:
19 　Q.  The disclosure of the two CDs on September
20 29, 2006 to Agent Furnas, your disclosure to
21 Agent Furnas, what percentage of those Tribal members
22 included in that CD were employees of the Miccosukee
23 Tribe?
24 　　　MR. POLLOCK:  Object to the form.
25 　　　THE WITNESS:  I have no idea.



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
138–141

Page 138
1  BY MR. ROMAN:
2     Q.  How would the -- how did the disclosure of
3  that information relate to employment taxes?
4     A.  Because Mr. Furnas had asked for a complete
5  listing of all GL and NTDR.
6     Q.  You need to tell us what that is because the
7  record needs to know what the GL and the other thing is.
8     A.  General ledger, and the NTDR accounts was
9  requested officially by the IRS in their documentation,
10  and that's what was provided after the attorneys had
11  approved their release.
12     Q.  But my question is:  We understand that that
13  information was provided because it was requested by the
14  IRS.
15        What was the specific relationship between
16  the information that you provided in those two CDs on
17  September 2006 to Agent Furnas and the issue of
18  employment taxes?
19     A.  The matrix shows that because some of those
20  payments that were coming out and reflected in the
21  general ledger and NTDR, based on my review, were not
22  subject to withholdings.  And those amounts were coming
23  out of the account and recorded in the books.  And the
24  only way to let Mr. Furnas know what employment taxes
25  were not going to be done, here's the listing of all the

Page 139
1  information that you have; here's what I extracted; he
2  had to have what he requested, was the entire amount.
3     Q.  Are you saying that the NTDR distributions
4  were related to employment taxes?
5     A.  No.  They are related to withholding
6  requirements.  There was two issues:  Withholding
7  requirements on the gaming revenues for all the Indian
8  Tribes, including the Miccosukee Tribe, is subject to
9  1099 withholdings.
10        In addition to that, there was 1099s for
11  other than NTDR distributions, to vendors, to all the
12  other categories which showed up in the general ledger,
13  as well as the NTDR account.  Therefore, everything that
14  was in there could be subject to withholdings, of which
15  would have included the distributions as well as the
16  reimbursements, everything that we categorized in there.
17  So everything was potentially subject to some kind of
18  withholding.
19     Q.  Who told you that the NTDR, the
20  distributions, the NTDR payments to Tribal members came
21  from gaming revenues?
22     MR. POLLOCK:  Object to the form.
23     THE WITNESS:  Who told me it came from gaming
24     revenue?  I believe that was multiple people
25     would have told me that.

Page 140
1  BY MR. ROMAN:
2     Q.  Who?
3     A.  Julio, Mike, Dionne Carroll, Guy Lewis,
4  Dexter Lehtinen.
5     MR. POLLOCK:  I don't want you to reveal
6     attorney/client privileged communications, Jose.
7  BY MR. ROMAN:
8     Q.  But I will follow up, because what you just
9  said, even though Mr. Pollock is understandably
10  concerned, there is no issue there.
11        Let me just ask you this:  Were you ever
12  provided with the opinion letter that Dexter Lehtinen
13  and Guy Lewis provided to the IRS in June or July of
14  2006 -- I believe it was June of 2006 -- which explained
15  the legal -- the Tribe's legal position regarding the
16  NTDR payments?
17     MR. FARRIOR:  Objection to form.
18     MR. POLLOCK:  Join.
19     THE WITNESS:  I got a copy of a memo
20     prepared, yes.
21  BY MR. ROMAN:
22     Q.  That's the memo I'm referring to.  Did you
23  receive a copy of that?
24     A.  I received a copy of a memo in 2006.
25     Q.  And who gave it to you?

Page 141
1     A.  I don't recall who specifically gave it to
2  me.
3     Q.  Did that memo state that the procedure of
4  NTDR payments come from gaming revenue?
5     MR. FARRIOR:  Objection to form.
6     MR. POLLOCK:  Join.
7     THE WITNESS:  Without -- I believe -- I don't
8     recall exactly without looking at it.  What -- it
9     was a multi-page document, so I don't recall all
10     the issues that were on it that I received.  I
11     remember getting a copy of it.
12  BY MR. ROMAN:
13     Q.  Would it be fair to say that when you were
14  doing the work that you described doing here, you were
15  told by either Tribal employees or by people that work
16  at the Miccosukee Finance Department --
17     MR. POLLOCK:  Not the lawyers.
18  BY MR. ROMAN:
19     Q.  -- that the NTDR distributions came from
20  gaming revenues?
21     A.  Yes.
22     Q.  Were you also told by those people that are
23  not lawyers, that that was the position of the Tribe?
24     MR. FARRIOR:  Objection to form.
25     MR. POLLOCK:  Join.



JOSE I. MARRERO Volume II                                   March 16, 2015
UNITED STATES OF AMERICA vs. JIM                                  142–145

Page 142

1      THE WITNESS:  I don't believe I had that kind
2    of discussion with anyone in the Finance
3    Department.
4  BY MR. ROMAN:
5      Q.  Okay.  When you did the work that you did,
6  did your findings corroborate that the NTDRs came from
7  gaming revenues?
8      A.  Yes.
9      MR. POLLOCK:  Hold on.  You can answer the
10    question, but I don't want you to reveal any
11    attorney/client privileged communications.
12  BY MR. ROMAN:
13      Q.  And was that work done -- was that conclusion
14  that you reached, based on the matrix and the
15  information that was provided to you by the Miccosukee
16  Finance Department?
17      A.  In part.
18      Q.  And without telling me what you talked about,
19  was that conclusion also based on communications,
20  without telling me what they were, that you had with the
21  attorneys?
22      A.  That information was actually based on IRS's
23  information they had provided, as well as the finance
24  company.
25      Q.  And then would it be fair to say that you

Page 143

1  then agreed with the IRS findings?
2      MR. FARRIOR:  Objection to form.
3      THE WITNESS:  Are you asking for my expert
4    opinion or are you asking for my analysis?
5  BY MR. ROMAN:
6      Q.  I'm asking you what your conclusion was
7  based -- what you concluded after your analysis.
8      MR. FARRIOR:  Object to the form.
9  BY MR. ROMAN:
10      Q.  Did you agree with the Service's position?
11      MR. FARRIOR:  Objection to form.
12      MR. POLLOCK:  Join.
13      THE WITNESS:  I don't think that's what
14    you're asking me.
15  BY MR. ROMAN:
16      Q.  Okay.  That's what I'm asking you.
17      A.  There's a difference between my analysis of
18  what the numbers were and what my opinion is as to what
19  they are.  It's two different issues.
20      Q.  Okay.  When you were doing the analysis, did
21  your analysis confirm that the NTDRs came from the
22  gaming revenues?
23      MR. FARRIOR:  Objection to form.
24      MR. POLLOCK:  Join.
25      THE WITNESS:  It did show that the revenues

Page 144

1    came from game -- net gaming revenues.
2  BY MR. ROMAN:
3      Q.  Okay.  And did your analysis and
4  conclusions -- were the same as that reached by
5  Agent Furnas?
6      MR. FARRIOR:  Objection to form.
7      MR. POLLOCK:  Join.
8      THE WITNESS:  Again, I say:  Are you asking
9    for my analysis or my expert opinion?
10  BY MR. ROMAN:
11      Q.  Did the result of the analysis -- you did an
12  analysis, and at the end, you had a conclusion.  Okay?
13  When you reached that conclusion, and you then saw what
14  Agent Furnas's conclusion was, did your conclusion agree
15  with Agent Furnas's conclusion?
16      MR. FARRIOR:  Objection to the form.
17      MR. POLLOCK:  Object to the form.
18  BY MR. ROMAN:
19      Q.  What you did, it's what you do; did the end
20  result of what you did agree with what Agent Furnas was
21  saying?
22      A.  And, again, I will repeat myself:  You're
23  asking me for what my opinion was, not what my analysis
24  is.  They are two separate issues.
25      Q.  Okay.  You did an analysis, correct?  At the

Page 145

1  end, there was a conclusion, correct?  And you wrote a
2  conclusion, correct, for all the work that you did,
3  right?  Are we there?
4      A.  Correct.
5      Q.  Okay.  Then you took your conclusion, and you
6  looked at Agent Furnas's conclusion, what he was saying.
7  Did you reach the same conclusion or a different one?
8      MR. POLLOCK:  Object to the form.
9      THE WITNESS:  Again, my conclusion is based
10    on my opinion and my -- as an expert as to
11    whether or not I agree, but that's -- you're
12    asking me a different question.  You're not
13    asking me -- you're asking me once I did that
14    analysis, whether or not, in my opinion, based on
15    my expertise, do I agree with him?
16    That's an expert opinion question.
17  BY MR. ROMAN:
18      Q.  Okay.
19      A.  Not an analysis question.
20      Q.  Let me ask --
21      A.  You can ask it again, but I'm going to give
22  you the same answer.
23      Q.  Okay.  As an expert, can we agree that you
24  are an expert in the matter you were working on?
25      A.  Yes.



Case 1:14-cv-22441-CMA   Document 125-7   Entered on FLSD Docket 06/17/2015   Page 163 of 207

JOSE I. MARRERO Volume II                                    March 16, 2015
UNITED STATES OF AMERICA vs. JIM                            146–149

Page 146
1    MR. FARRIOR:  Object to the form.
2 BY MR. ROMAN:
3    Q.  And that you were hired as an expert?
4    A.  Correct.
5    Q.  And that you rendered an opinion as an
6 expert?
7    A.  Correct.
8    Q.  Okay.  Was your expert opinion in agreement
9 or disagreement with Agent Furnas's conclusion?
10   MR. POLLOCK:  Object to form.
11   THE WITNESS:  I agreed with the IRS that they
12   are subject to withholdings, net gaming revenues
13   are subject to withholdings.
14 BY MR. ROMAN:
15   Q.  And when did you make that -- when was the
16 month and year in which you made that determination?
17   A.  I can't tell you exactly when that was, but I
18 know I had reached that conclusion based on completing
19 all of my research.
20   Q.  When did you first reach that conclusion?
21   MR. POLLOCK:  Object to the form.  Asked and
22   answered.
23 BY MR. ROMAN:
24   Q.  What year?
25   A.  Without looking at all the research again and

Page 147
1 what dates it was, I can't recall specifically the month
2 and year of when that conclusion was reached.
3    Q.  When you did communicate that conclusion, who
4 did you give that conclusion to?
5    A.  Two questions:  Which one do you want me to
6 answer first?
7    Q.  Who did you tell of your conclusion?
8    A.  I would have told all of the attorneys.
9    Q.  Who else?
10   A.  No one else.
11   Q.  How much more work did you do for the
12 Miccosukee Tribe in tax matters after you reached that
13 conclusion?
14   MR. POLLOCK:  Object to the form.
15   THE WITNESS:  The only thing I did was to
16   complete that matrix which shows what
17   withholdings should be adjusted, because I
18   believed that there was certain amounts in there
19   that IRS was taking the position were subject to
20   withholdings, whether it was the 1099
21   distributions, whether it was W-2 stuff that was
22   in there, because they have listed everybody on
23   that list.
24   So my analysis and my conclusion was that,
25   while you may be correct, these are the amounts

Page 148
1    that need to be adjusted out, because they are
2    not subject to withholdings.
3 BY MR. ROMAN:
4    Q.  Do you have copies of the billing records
5 that you prepare every month for the Miccosukee and send
6 to the Miccosukee Tribe?
7    A.  Rachlin would still have those.  I do not
8 believe I have those.
9    Q.  Are you aware that Rachlin, as a firm, no
10 longer exists?
11   A.  I am.
12   Q.  And are you aware of what happened to their
13 billing records for clients like the Miccosukee Tribe?
14   A.  I have no idea.
15   Q.  Are you aware whether those billing records
16 were transferred over to the new accounting firm?
17   A.  I have no idea.
18   Q.  Do you know whether the current firm that you
19 work with or consult with will have those records?
20   A.  I have only records of billings of any, if I
21 have any billings, from the time that I took over at MRW
22 in 2009 forward, that at that time, I would say almost
23 everything had been concluded by that time.
24   Q.  Do you have copies of your billing records
25 for the work that you did for the Miccosukee Tribe that

Page 149
1 you have described here today?
2    MR. POLLOCK:  Object to the form.
3    THE WITNESS:  You mean prior to 2009?
4 BY MR. ROMAN:
5    Q.  You worked for the Miccosukee Tribe for 2005,
6 correct?  That's when you were hired, to 2006?
7    A.  From 2005 forward, correct.
8    Q.  Okay.  Do you have billing records for the
9 work that you did and billed the Miccosukee Tribe for
10 the year 2005?
11   A.  There may be copies of select billings that
12 happened to be attached to something else that I
13 provided, and I believe you might have a copy, but I do
14 not have the monthly billings.  I never kept the monthly
15 billings, because when I left Rachlin, that was not one
16 of the things that I kept, was their billing records.
17   Q.  Would it be fair to say that you do not
18 have -- for the most part, you don't have copies of any
19 of the billings for the work that you did for the
20 Miccosukee Tribe?
21   A.  I wouldn't say that categorically because I
22 know there's some in there that -- there's a summary, but
23 the day-to-day -- and there's something attached, but
24 that's the only one that I know of that I may have, but
25 again, it's just by chance that I have it because it



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
150–153

Page 150

1  happened to be attached maybe to something else, but I
2  do not -- I did not keep the monthly or daily billings
3  of it, because when I left, I left.
4      Q.  Yes.  Now, you never received a 1099 from the
5  Miccosukee Tribe during the years that you did this
6  work, correct?
7      A.  Me personally?
8      Q.  Yes.
9      A.  No.
10         MR. ROMAN:  Okay.  I have nothing else,
11     Mr. Marrero.  Thank you.
12         THE WITNESS:  Okay.
13         MR. FARRIOR:  Let's go off the record for
14     just a second.
15         (Thereupon, a luncheon recess was taken.)
16            CROSS EXAMINATION
17  BY MR. FARRIOR:
18      Q.  All right.  We are on the record.  Do you
19  understand you're still under oath, Mr. Marrero?
20      A.  I sure do.
21      Q.  I introduced myself earlier, but I will do it
22  again.  My name is Will Farrior.  I represent the United
23  States in this case; it's the United States versus Sally
24  Jim.
25         So you served as the accountant for the

Page 151

1  Miccosukee Tribe of Indians; is that correct?
2      A.  I served as a consultant with them on an
3  employment tax issue for the Tribe.
4      Q.  Okay.  And the work you did was restricted to
5  employment taxes; is that correct?
6      A.  That is correct.
7      Q.  And so you communicated with the IRS about
8  tax issues for the Tribe; is that correct?
9      A.  As it relates to employment taxes.
10      Q.  And in communicating with the IRS, you
11  distinguished employment tax withholding from other
12  types of withholding; is that correct?
13         MR. POLLOCK:  Object to the form.
14         THE WITNESS:  Employment tax withholdings for
15     me includes both income tax and Social Security.
16     Any kind of withholdings that are required is the
17     general parameters of what's required under
18     employment taxes.
19  BY MR. FARRIOR:
20      Q.  Okay.  Are you familiar with 26 U.S.C.
21  Section 3402-R which relates to withholding on
22  distribution of gaming revenue?
23      A.  Yes.
24      Q.  Do you consider withholdings under that
25  provision to be part of employment tax withholdings?

Page 152

1      A.  It's part of what IRS considers under
2  employment taxes, yes.
3      Q.  Okay.  So that was part of what you were
4  looking at when you were acting as a consultant in
5  matters related to the Miccosukee Tribe?
6      A.  Yes.  I was asked to look at all withholding
7  issues, again, which is why they gave me all the
8  information, so whatever they were subject to
9  withholdings, whether it be income tax, Social Security
10  tax, but it was the whole plan of employment tax.
11      Q.  And so all withholding, just to be clear,
12  includes the potential applicability of withholding
13  under Section 3402-R?
14      A.  Correct.
15      Q.  Were you ever aware that the Tribe had a
16  Bingo Hall?
17      A.  Yes.
18      Q.  And do you know when the Tribe started its
19  Bingo Hall?
20      A.  I don't know specifically when it started.
21      Q.  And are you aware when the Section 3402-R was
22  added to the Internal Revenue Code, approximately?
23         MR. POLLOCK:  Object to the form.
24         THE WITNESS:  Off the top of my head, I don't
25     know when it was added, but it was added long

Page 153

1     before I started this consulting job.
2  BY MR. FARRIOR:
3      Q.  Did you ever come across that provision when
4  you were working for the IRS?
5      A.  Yes.
6      Q.  Can you tell me generally about how you came
7  across it, or no?
8      A.  Well, generally, as well, it goes way back
9  when I was the Head of the Office for Criminal
10  Investigation in Mississippi.  We assisted them in
11  establishing casinos and stuff, riverboat gaming, and of
12  course, later on, they did Indian gaming in Mississippi.
13  Of course, they have it also in Minnesota, which I was
14  Head of the office up there.  And, of course, when I
15  came down to Florida and was the Head of the Criminal
16  Investigation here, there's Indian gaming, again, down
17  here.
18         So during that process of being a Head of
19  those offices, I interacted with our civil side in the
20  examination, and the issues of Indian gaming, and what
21  the requirements were for Indian gaming would have been
22  issues that we would have discussed in general on many
23  occasions during that process.
24      Q.  Earlier, we were discussing the NTDR account
25  or you were discussing the NTDR account with Mr. Roman.



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
154–157

Page 154

1  So I believe you said that the NTDR account was the
2  nontaxable distributable revenues account?
3      A.  No.  It's the net taxable -- net taxable
4  revenue that was being distributed from Indian gaming.
5      Q.  Were there any other sources of funds that
6  went into the NTDR account that you were aware of?
7          MR. POLLOCK:  Object to the form.  Are you
8      talking about sources other than gaming?
9          THE WITNESS:  Other than gaming?
10  BY MR. FARRIOR:
11      Q.  Yes.
12      A.  Best of my recollection, there was other
13  sources of funds that came revenues, because there was a
14  tax they assessed on other businesses, whether it was
15  their little shops that they had or their fishing.
16  Everything that generated revenues went into that
17  account.
18          Best of my recollection, there was seven,
19  eight different kinds of classifications of types of
20  businesses.  If they were subject to a tax, then best of
21  my recollection, it also went into that account.
22      Q.  Was that tax referred to as a "gross receipts
23  license fee"?
24      A.  Correct.
25      Q.  And the Tribe levied its own gross receipts

Page 155

1  license fee on its revenue-generating operations; is
2  that correct?
3      A.  That's correct.
4      Q.  Were you aware, in around -- were you aware
5  what the gross receipts license fee was, what percentage
6  it was around the year 2001?
7      A.  I don't recall what specific year it was, but
8  I recall a 7 percent fee, and I don't know what years --
9  I don't recall off the top of my head what years it
10  referred to, but it applied to the years I was looking
11  at.  I believe it was 7 percent.
12      Q.  And did you ever get a sense of how much
13  revenue was coming from the tax on gaming, as opposed to
14  the tax on the other operations of the Tribe?
15      A.  My only recollection was, it was
16  significantly great -- the revenue from gaming was
17  significantly greater than the revenue from any other
18  source.
19      Q.  Would you say that the revenue from any other
20  source was less than 5 percent of the revenue that was
21  going into the NTDR account?
22      A.  Off the top of my head, I don't know the
23  number.  I can just tell you that, for me, it was
24  significantly higher from the gaming than it was from
25  any of the other sources.

Page 156

1      Q.  Did you ever perform an analysis of the other
2  sources of revenue, other than gaming, as to see whether
3  those operations were subsidized by gaming revenue?
4      A.  I performed no other analysis of the other --
5  the other revenue stream as to what funding would have
6  gone to them, if that's the question, if I understood
7  you correctly.  There was no breakdown analysis that I
8  created, sources of revenues or fundings or... I did no
9  other analysis.
10      Q.  Did you ever perform any analysis of the
11  Tribe's operations to see which ones were profitable and
12  generating positive revenue?
13      A.  Again, my only charge was to do the
14  employment tax-related issues, so I wasn't asked to do
15  any other analysis or reviews.  It was strictly
16  employment tax and withholdings.
17      Q.  Can you describe what your knowledge is of
18  the process that the Tribe used in making the NTDR
19  distributions?
20      A.  From what I was explained, they would take
21  gross revenues or subtract out all of the applicable
22  expenses that they had at Bingo that applied to those
23  revenues, and they would come up with a net.
24          And they would then determine that that is
25  the net distributable revenues.  My recollection is that

Page 157

1  they also deducted -- I'm trying to remember --
2  something else in there that was not -- I don't recall.
3          They deducted everything they thought was
4  deductible to get to the net gaming revenue figure at
5  the bottom line.  And they gave me what that was, and I
6  can't recall off the top of my head what all of those
7  were, but that's how they got to it.
8          Whatever the expenses were that they
9  categorized, they deducted and they got a net number
10  from the gross.
11      Q.  When you say "they," who are you referring
12  to?
13      A.  The Finance Department.  That's how they were
14  told to categorize net revenue.  It's minus expenses,
15  whatever those were, the listing, and they had their net
16  revenues from gaming, and that's what became the net
17  gaming revenues that were subject to withholdings.
18      Q.  Do you know anything about how -- the process
19  of how the Tribe physically distributed the money to its
20  individual members?
21      A.  No.
22      Q.  I'm going to hand you what was previously
23  marked Exhibit 1.
24          MR. FARRIOR:  I've got a copy for your
25      counsel.



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
158–161

1        MR. POLLOCK:  Thank you.
2        MR. DAVIS:  Thank you.
3   BY MR. FARRIOR:
4        Q.   So this was a document that you produced
5   today; is that correct?
6        A.   Correct.
7        Q.   So you collected these documents in the
8   course of preparing the matrices, the matrix that we
9   talked about earlier; is that correct?
10       A.   Correct.
11       Q.   And this is related to the 2003 tax year for
12   Sally Jim; is that right?
13       A.   That's correct.
14       Q.   Can you just describe what we are looking at
15   here on the first page?
16       A.   This is a copy of a check that would have
17   been written to Sally Jim in the amount of $2,000 on
18   January 24th of 2003 from the general account, is what
19   it says on the copy.
20       Q.   So let me make sure I understand.  In 2003,
21   there was a -- the IRS made assessments for 2003, or
22   proposed assessments against the Tribe; is that correct?
23       A.   That's correct.
24       Q.   And then the Tribe protested and brought a
25   tax court case?

1        A.   That's my understanding, yes.
2        Q.   Okay.  And you received information from the
3   IRS that said, we would like an explanation of certain
4   payments?
5        A.   Correct.
6        Q.   And that led to the project of creating the
7   matrix?
8        A.   Correct.
9        Q.   And so can you tell me how this would fit
10   into that project?
11       A.   Well, because while this check looks like it
12   came from the general account, based on here, the
13   notation that's on here says:  "General account - NTDR
14   deduction."
15            So because I was asked to look at
16   withholdings and the subject of how much as it related
17   to the NDTR (sic) account, I had to request permission
18   to get anything outside of there, but since it was on
19   the schedule that I was provided, I asked them, the
20   Finance Department, to provide me with the backup or
21   what is this check, and they would have provided them to
22   me.
23       Q.   And just to be clear, I think you said
24   "NDTR," when you meant NTDR.
25       A.   Oh, I'm sorry.  NTDR -- NT, the T and the D

1   sound the same.  N, T as in Thomas, D as in David, R as
2   in Robert.
3        Q.   So the Tribe had a loan program for its
4   members; is that correct?
5        A.   Best I recall, yes.
6        Q.   And could you describe how this check, the
7   first page of Exhibit 1, relates to that loan program?
8        A.   If you look at page -- the next page, you
9   will see a purchase order based on what I had asked, the
10   supporting documentations for the check.
11            It's written out.  It says:  "To Sally Jim,
12   from general account loan, title loan," and then, of
13   course, it shows that it's an NTDR deduction, submitted
14   by the Chairman and certified by the Tribal Chairman --
15   Treasurer, I'm sorry, Tribal Treasurer, and then, in the
16   order of the amount of the check is for $2,000 with the
17   notation of $200 in interest.
18            So the payback was actually $2,200, so
19   essentially, it's a loan to be made to this individual,
20   Miss Sally Jim, for $2,000 with a pay back of $2,200.
21       Q.   And what's the significance of "title loan"?
22       A.   Nothing other than they classified it as --
23   or somebody wrote in there that, what kind of loan it
24   was.  Sometimes it would be a car loan.  There was, as I
25   noted in my analysis, several different kinds of

1   notations on there.  Why they put that, I can't tell
2   you.  But they would have different little notations on
3   there as to what kind of loan it was.
4            But it would say "general loan," and then it
5   may or may not have a comment next to it.
6        Q.   And the fact that it says "NTDR deductions,"
7   does that mean that the payback will be deducted from
8   Sally Jim's subsequent NTDR distribution?
9        A.   That was my understanding.  And in the third
10   page that goes with that, was internal -- a memo that I
11   would have been given from the Administrative Office,
12   where essentially, as I understood it, she would have
13   come in and asked for a loan.  They wrote it out, and
14   you know, she acknowledges that she's aware the loan
15   request has to be approved, the total trust -- you know,
16   whatever the document says, and it shows what her
17   outstanding loan balance is, if she has one.
18            Then it's approved and signed.  And all
19   becomes part of the source documentation to support the
20   $2,000 title loan that she was requesting.
21       Q.   Do you know if these memorandum were created
22   as part of your investigation, or the Tribe already had
23   them?
24       A.   As far as I know, I was told this was all
25   part of the process of preparing the initial -- this is



Case 1:14-cv-22441-CMA  Document 125-7  Entered on FLSD Docket 06/17/2015  Page 167 of 207

JOSE I. MARRERO Volume II                                    March 16, 2015
UNITED STATES OF AMERICA vs. JIM                                  162–165

Page 162

1  the process of, if you will, the first thing that came
2  in was the request, then the purchase order was cut,
3  then the check was cut.  That was the order they were
4  supposed to be done in.
5      Q.  And the Tribe also made loans to employees
6  that they would deduct out of payroll; is that correct?
7      A.  From what I had on the documentation, yes, at
8  least to Miss Sally Jim in this particular instance, it
9  looked like an employee loan, and it would then be a
10  payroll deduction, not offset from trust fund -- from
11  the NTDR account -- hold on.  Let me see.
12      Because this one, if you notice, on the check
13  itself, it doesn't say "NTDR," it says "payroll
14  deduction," so they may -- again, the specific note of
15  what it belonged to.  This happened to be an employee
16  loan, same kind of notation, same kind of interest rate,
17  same kind of approval process, same kind of, you come
18  into the office, you ask for the loan, you say what it's
19  for, how it's going to be paid back, and then they cut
20  the check.
21      Q.  Looking at this page, it says:  "Title loan
22  from GIA," or something like that?
23      MR. POLLOCK:  What's the date on that, Will?
24      MR. FARRIOR:  It's dated October 8th, 2003.
25      THE WITNESS:  The next one.  Okay.  On the

Page 163

1      next one it says "title loan."
2  BY MR. FARRIOR:
3      Q.  Then I think the following page --
4      A.  The following page says "NTDR deduction."  It
5  doesn't say it on the check on this one.  It just says
6  "loan," but the document, the purchase order says
7  "NTDR," and I believe -- and then the original source
8  document where she made the request says "title loan"
9  from G/A -- I have no idea -- oh, general account, I
10  believe is what the G/A stood for.
11      Q.  Okay.
12      A.  And then "NTDR" because that's where the
13  check would have come from, because remember, I was
14  looking at the general account and I have a
15  cross-reference to the NTDR account, so I was asking for
16  information to corroborate that amount.
17      Q.  I'm going to hand you what was previously
18  marked Exhibit 5.  Thank you.
19      MR. FARRIOR:  Do you all have your copies of
20  Exhibit 5?
21      MR. POLLOCK:  Yes.  Hold on one second.
22      MR. FARRIOR:  Sure.
23  BY MR. FARRIOR:
24      Q.  Exhibit 5 are minutes of a meeting from
25  around July 31st, 2006.  Didn't we decide that earlier?

Page 164

1  Is that correct?
2      A.  Correct.
3      Q.  These minutes refer to Mr. Lehtinen saying
4  that the Tribe did make equal payments of money from the
5  NTDR account; do you see where it says that?
6      MR. POLLOCK:  Where did he say that, Will?
7      MR. FARRIOR:  In the fourth paragraph.
8      THE WITNESS:  "He also said that the Tribe
9      did make equal payments of money from the NTDR
10      account."  Yes, I see that, right here.
11  BY MR. FARRIOR:
12      Q.  And is it accurate that then it says:  "He
13  said payments may not appear to be equal, but the Tribe
14  says that payments were to be equal or other payments
15  may represent other types of payments."
16      Do you see where it says that?
17      A.  Correct.  I see that.
18      Q.  So is it true that the Tribe had a program in
19  place where it made payments to heads of household,
20  members who were head of their household in equal amount
21  for each member of the household?
22      MR. POLLOCK:  Object to the form.
23  BY MR. FARRIOR:
24      Q.  Let me try it again.
25      A.  Yeah.  Try that one again.

Page 165

1      Q.  Let me try it again.  So the Tribe made
2  distributions to its members; is that correct?
3      A.  Are you talking about from net gaming
4  revenue; are we talking about now?
5      Q.  Just generally.  The Tribe made distributions
6  to its members; is that correct?
7      A.  Yes.
8      Q.  And the amount was calculated, each member --
9  it was paid to the head of household; is that correct?
10      A.  My understanding was that every member was to
11  receive an equal distribution of the household -- the
12  household, which meant, as I was explained, if there was
13  three members in the household, then the three members
14  in the household each got, so if there was a mother,
15  father, and child, all three received the same payment.
16      That was my understanding.
17      Q.  And that payment would be made to the head of
18  the household; is that correct?
19      A.  That, I don't recall specifically.
20      Q.  Okay.  And so the records of the payments did
21  not appear to be equal because of things like the loan
22  program; is that correct?
23      A.  That's correct.
24      Q.  Were you aware of the Tribe making payments
25  to third parties on behalf of members and then deducting



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
166–169

Page 166

1  those amounts from their NTDR distribution?
2     A.  Yes.
3     Q.  How regular was that?
4     A.  I can't tell you how regular.  All I know is,
5  when I went through the analysis, again, when I asked
6  for the checks and saw the -- I could see that they were
7  cutting a check to a third party, which is how I
8  accounted for and found, so I could do my matrix.
9        So I was aware.  Percentage-wise, I cannot
10 tell you.  All I know is that I found those instances
11 trying to reconcile where those checks were going to or
12 from, and then in the source documents they provided
13 would then tell me it was going to a third party.
14    Q.  Were you aware of any guidelines that the
15 Tribe had about how payments to third parties on behalf
16 of members would be made?
17    A.  I don't recall what guidelines for third
18 parties, other than they had to request it, it had to be
19 approved, which was the copy -- so someone had to
20 approve that was within the authorization, because once
21 they requested it, both the Chairman and the Treasurer
22 signed it.  So whatever the process was, I got the
23 document that showed it was authorized payment, which is
24 all I needed to do my reconciliation.
25    Q.  What sorts of third parties was the Tribe

Page 167

1  paying on behalf of members?
2     A.  My recollection, it could be an auto dealer.
3  It could be an attorney.  It could be a contractor to do
4  construction work.  It varied.  It could be a credit
5  card company.  There was various that I can recall.  But
6  how many different ones, I don't remember offhand, but
7  those are the ones that I recall may have shown up on
8  the ones that I looked at.
9     Q.  What sort of range of amounts did you see?
10       MR. POLLOCK:  Object to the form.
11       THE WITNESS:  It varied from a few hundred
12    dollars to thousands of dollars.
13 BY MR. FARRIOR:
14    Q.  Were there any that were more than $10,000?
15    A.  I recall maybe a couple.  They were over
16 $10,000, but how much over, I just remember there was
17 several over that amount, but I can't recall how many.
18    Q.  Looking at the sixth paragraph down under:
19 "In attendance" on Exhibit 5 --
20    A.  Yes.
21    Q.  -- it says: "Mr. Marrero discussed the loans
22 extended to members by the Tribe, and he said that the
23 maximum amount that could be loaned was $11,000."
24       Is it possible that the payments made to
25 third parties on behalf of Tribal members were outside

Page 168

1  of the Tribe's loan program?
2     A.  Again, at the time of this meeting in July of
3  2006, that is the information I had.  If it would have
4  changed, which I -- you know, my analysis again, if I
5  saw one over 11- or 10-, which I recall -- I think my
6  recollection is there were others greater -- would have
7  come after I did my analysis, but this is the
8  information I had at that point in time.
9     Q.  So it could be part of the loan program; is
10 that what you're saying, the payments to third party?
11    A.  It's possible that it was, but again, I don't
12 know.  All I know is at that time, the loan program,
13 best of my knowledge, the maximum amount at the time
14 that they were having this meeting, my recollection was
15 $11,000.
16       And those matrixes were done after, so if
17 there was amounts greater, it would not have been known
18 to me at this point in time.
19    Q.  Did you, at any point in time, see any
20 written guidelines for the loan program?
21    A.  I don't recall ever seeing the written
22 document for that.
23    Q.  Is it true that the Business Council was
24 responsible for management of the loan program?
25    A.  According to Mr. Lehtinen, it was.  That's

Page 169

1  not something that I would have known or said.
2     Q.  Okay.
3        MR. POLLOCK:  I'm sorry.  What was the
4     question?
5        MR. FARRIOR:  Was the Business Council in
6     charge of the loan program.
7        MR. POLLOCK:  Thank you.
8  BY MR. FARRIOR:
9     Q.  And the answer was:  Not to your personal
10 knowledge?
11    A.  Not my personal knowledge.  According to
12 this, it is what Mr. Lehtinen said.  I'm just reading
13 from the memo.
14    Q.  And then on the second page, the fourth
15 paragraph -- well, first of all, you discussed financial
16 statements with Agent Furnas; is that correct?
17    A.  All I stated to them is that I believe
18 there's one for the Bingo, and I'm not sure that any
19 existed for the NTDR account.
20       (Discussion held off the record.)
21 BY MR. FARRIOR:
22    Q.  So looking at the fifth paragraph on the
23 second page, it says:
24       "Mr. Marrero stated that his account analysis
25     for the NTDR account covers the first quarter for



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
170–173

Page 170

1    the 2005 year.  He said he sampled transactions
2      during the first quarter of 2005."
3        Do you see where it says that?
4    A.  Yes.
5    Q.  Earlier today, you were testifying about
6  performing a sample analyses in order to potentially
7  dissuade Agent Furnas from asking for a full accounting
8  of the deductions; is that what that refers to?
9    A.  That's exactly what that referred to, because
10  I knew there was so many transactions that I did a
11  random sampling and said, here's what I've done.
12  There's 544 Tribal members, and here's the
13  distributions.  You're talking about 14, almost
14  $15 million.  Can we essentially shortcut this by giving
15  you a sample and answer your questions, which is typical
16  of what we do.
17        And so I gave him a sample of what the type
18  of documentation information there could be to satisfy
19  him, hopefully, and not have to do an item-by-item,
20  member-by-member analysis as he was requesting.
21    Q.  At that time, were you and the other
22  representatives for the Tribe proceeding under the
23  assumption that the NTDR distributions were not going to
24  be taxed by the IRS?
25    A.  Not going to be taxed?

Page 171

1        MR. POLLOCK:  Object to form.
2        THE WITNESS:  My only -- my only --
3  BY MR. FARRIOR:
4    Q.  Right.  I'll withdraw the question.
5    A.  Okay.
6    Q.  Was there any agreement between you, as
7  representatives of the Miccosukee Tribe, and the
8  representatives of the IRS, whether the NTDR
9  distributions would be subject to withholding?
10    A.  Yes.
11    Q.  And what was that agreement?
12    A.  The agreement only was that he was contesting
13  that all payments and everything that was coming out of
14  what he gave me was subject to withholdings.  And ours,
15  or mine, was that there are things in there that are not
16  subject to withholding, which is what, again,
17  ultimately, ended up in the matrix.
18        So we did not discuss anything, other than
19  what was subject to withholdings.
20    Q.  And one of the things that was potentially
21  subject to withholdings was the NTDR distributions; is
22  that correct?
23    A.  Correct.
24    Q.  In the fourth paragraph up from the bottom,
25  it refers to Smith Barney accounts.  Do you see where it

Page 172

1  says that?
2    A.  Correct.
3    Q.  Is it true that members could direct the
4  Tribe to make distributions into Smith Barney accounts
5  for, I guess, for their savings?
6        MR. POLLOCK:  Object to form.
7        THE WITNESS:  My understanding, again, was
8      the Smith Barney account was like any other bank
9      account.  Some people had a brokerage account;
10      some people had a bank account; some people had a
11      savings account, so that they could direct their
12      distributions to be deposited to the Smith Barney
13      account like they could to any other account.
14  BY MR. FARRIOR:
15    Q.  So you're not aware of the Tribe running any
16  program or agreement with Smith Barney to hold accounts
17  for Tribal members?
18    A.  Not that I know of.
19    Q.  Looking at the next page, it says:
20  "Question:  How were the distributions determined?"
21        Do you see where it says that?
22    A.  Yes.
23    Q.  And it says:  "Mr. Lehtinen:  Every time a
24  distribution is to be made, the Business Council votes
25  to approve the distribution.

Page 173

1        "Mr. Furnas asked -- it says "it," but I
2  think it means -- "if there were any written
3  resolutions, and Mr. Lehtinen responded there probably
4  were not."
5        Do you see where it says that?
6    A.  Yes.
7    Q.  Did you have any personal knowledge about
8  written resolutions?
9    A.  I don't have any personal knowledge about any
10  of those resolutions at all.
11    Q.  So you never came across any Tribal
12  resolutions regarding NTDR distributions?
13    A.  No.
14    Q.  Were you ever aware of any guidelines that
15  the Tribe had in making its NTDR distributions?
16    A.  I'm not aware of any guidelines that they
17  used.
18    Q.  And you never saw any writing setting forth
19  guidelines for the NTDR distribution program?
20    A.  No.  I only worked with the end product,
21  which was the result and then dealing with those.
22    Q.  The next question it says:
23        "Question:  Were any of the payment from the
24      NTDR account based on individually-demonstrated
25      financial, educational, medical, or other needs."



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
174–177

Page 174

1        Do you see where it says that?

2    A.   Yes.

3    Q.   And the answer is:  Do you have an answer to

4  that question sitting here today?

5    A.   "Were any of the payment from the NTDR

6  account based on individually-demonstrated financial,

7  medical, or other needs?"

8        To this day, I have no idea as to how they

9  came up with their number.

10    Q.   And "their number," you mean the amount of

11  the NTDR distribution?

12    A.   Well, the only thing I know, again, is

13  there's a net gaming revenue and there was a

14  distribution made.  And since I don't know how many

15  Tribal members there were at the time, I don't know if

16  it matched -- just a simple math -- I don't know how

17  they came up with that number, that specific number.

18    Q.   As far as you know, the only input they

19  needed to come up with that number was what their net

20  gaming revenue was for the applicable time period; is

21  that correct?

22        MR. DAVIS:  Objection.

23        THE WITNESS:  My understanding, again, is

24     that distributions were based on net, and however

25     they came up with that number, that was the

Page 175

1     number that they distributed.  How they came up

2     with it, I don't know.

3  BY MR. FARRIOR:

4    Q.   Looking at I guess the paragraph right below

5  the middle of the page, it says:

6        "Mr. Marrero also added that each family gets

7     an amount for each distribution payment.  A

8     one-member household would get one distribution

9     payment; a two-member household would get two

10     distribution payments," and so forth.

11        Does that paragraph reflect what you were

12  saying earlier about how the distributions were made?

13    A.   Correct.  The number of members in the

14  household times that, whatever the number was, that's

15  what they got.

16    Q.   Looking at the last answer on the page, it

17  says, according to you, it says that:  "Amounts going

18  into the NTDR account come from various businesses of

19  the Tribe."

20    A.   Correct.

21    Q.   And you see a list of businesses there?

22    A.   Correct.

23    Q.   But you never -- just to be clear, you never

24  performed an analysis of whether and to what extent any

25  of these businesses were subsidized by gaming revenue;

Page 176

1  is that correct?

2    A.   I did not.

3    Q.   Looking at this page, I guess it's the

4  next-to-the-last page --

5    A.   Yes.

6    Q.   -- right above the middle it says:

7  "Mr. Marrero will also furnish a breakdown of tax

8  revenues deposited into the NTDR account by category

9  (source)."

10    A.   Correct.

11    Q.   Do you see where it says that?

12    A.   Correct.

13    Q.   Did you ever furnish the breakdown mentioned

14  here?

15    A.   Not that I recall, not -- to Mr. Furnas or

16  IRS?

17    Q.   That's correct.

18    A.   No.

19    Q.   Do you know of any reason why you wouldn't

20  have done that?

21    A.   I never got to that, as far as I recall,

22  because I only did the 2003 matrix, so I never got to

23  that.

24    Q.   Why did you quit working for the Miccosukee

25  Tribe of Indians?

Page 177

1        MR. POLLOCK:  Object to the form.

2        MR. ROMAN:  Assumes facts not in evidence.

3        THE WITNESS:  The 2003 tax court case was the

4     one that they needed the matrix for.  After that,

5     they did not request any additional work to be

6     done.

7  BY MR. FARRIOR:

8    Q.   So that's when you stopped working for the

9  Miccosukee Tribe of Indians after you prepared that

10  matrix?

11    A.   That's the last thing that I was asked to

12  prepare.

13    Q.   I'm going to hand you what was marked earlier

14  as Exhibit 4.  I'm going to ask you to turn to -- thank

15  you -- turn to the page marked 26 at the bottom.

16        MR. POLLOCK:  What page?

17        THE WITNESS:  26.  Okay.  I'm there.

18  BY MR. FARRIOR:

19    Q.   Bates numbers.  This is notes from a meeting

20  and interview apparently prepared by James Furnas.  You

21  looked at this document earlier?

22    A.   Correct.

23    Q.   Do you recall this meeting that's

24  memorialized in these notes?

25    A.   Yes.



JOSE I. MARRERO Volume II                                                  March 16, 2015
UNITED STATES OF AMERICA vs. JIM                                               178–181

Page 178

1     Q.   And the subject of this meeting was the
2   Miccosukee NTDR accounts distributions; is that correct?
3     A.   That was -- that was the only thing that
4   Mr. Furnas and us, or myself, discussed, so it had to be
5   a NTDR-related meeting.
6     Q.   Looking at page 27 --
7     A.   Yes.
8     Q.   -- number 3 says:
9        "Were any payments from the NTDR account
10       based on individually-demonstrated financial,
11       educational, medical, or other needs?  How did
12       individual members apply for these payments and
13       how were the needs documented?"
14       Do you see where it says that?
15    A.   Yes.
16    Q.   And then it says:  "Per Marrero and Lehtinen,
17   none of the payments were need-based."
18       Do you see where it says that?
19    A.   Yes.
20    Q.   Is that your recollection of what was
21   conveyed during this meeting?
22    A.   Best of my recollection, yes.
23    Q.   And sitting here today, do you believe that's
24   an accurate statement?
25    A.   They weren't based on need?

Page 179

1     Q.   Yes.
2     A.   The best of my recollection, yes, it wasn't
3   based on need.
4     Q.   The next question addresses when the Tribe
5   began its gross receipts tax.  Do you see that question?
6     A.   Yes.
7     Q.   Were you aware of the Tribe passing a gross
8   receipts tax in 1995?
9     A.   Pardon?  Run that by me again.
10    Q.   So the answer reflected in this interview
11   note addresses a gross receipts tax, apparently, that
12   began in 1984?
13    A.   Correct.
14    Q.   And were you aware of the Tribe passing an
15   additional tax at any later period of time?
16    A.   Yes.
17    Q.   When was that?
18    A.   I don't recall when it was passed, but best I
19   recall, it had to do with the percentage of tax that we
20   talked about earlier regarding any kind of business
21   entities and what the gross tax or fees would be charged
22   by the Tribe.
23    Q.   Was that tax, the later tax, passed in
24   response to the passage of Section 3402-R?
25       MR. DAVIS:  Object to form.

Page 180

1       THE WITNESS:  I don't recall that discussion
2   at all, so I don't know.  I don't know.
3   BY MR. FARRIOR:
4     Q.   Mr. Roman was asking you questions earlier
5   about providing a power of attorney to Furnas,
6   Agent Furnas.  Do you recall him asking you questions
7   about that?
8     A.   Correct.
9     Q.   What is the purpose of providing Agent Furnas
10   with a power of attorney?
11    A.   Well, under Code Section 6103, they can't
12   divulge any information that's related to the tax
13   matters of any entity, be it employment tax, income tax,
14   or anything, or just tax-related information without
15   proper authorization, which is the power of attorney
16   which authorizes an authorized representative to give
17   that information.
18    Q.   So is it fair to say that the power of
19   attorney was needed so that Agent Furnas could disclose
20   information to you, rather than so that you could
21   disclose information to Agent Furnas?
22    A.   Correct.
23    Q.   As a result of your consultant work that you
24   perform, did you advise the Tribe to start filing 1099s
25   for any of its categories of payments?

Page 181

1       MR. ROMAN:  Objection.  Are you going to
2   claim privilege, attorney/client privilege?  He
3   said for the work that he did for the Tribe.
4       MR. POLLOCK:  Can you repeat the question, or
5   read it back, please.
6       (Thereupon, a portion of the record was read
7   by the reporter.)
8       MR. POLLOCK:  Can I take a minute and talk to
9   my client about that?
10      MR. FARRIOR:  Sure.
11      MR. ROMAN:  We just want to be clear, if he
12   gave advice based on the accounting work that he
13   did, there will be no privilege.  But this is --
14   if this was legal advice that he gave through the
15   attorneys --
16      MR. POLLOCK:  Well --
17      MR. FARRIOR:  -- I don't want to have long
18   discussions on the record in my part.
19   We will go off the record, please.
20      (Discussion held off the record.)
21      MR. POLLOCK:  Can you please read back the
22   question one more time?
23      (Thereupon, a portion of the record was read
24   by the reporter.)
25      THE WITNESS:  No.



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
182–185

Page 182

1  BY MR. FARRIOR:
2      Q.  Why not?
3      A.  I did not provide any advice to any Tribal
4  members at all, so I would not have said anything to
5  them, period.
6      Q.  What about the Tribe?
7      A.  All of my analysis and consulting would have
8  been done with the attorneys for them to do what they
9  thought, so it would have been privileged because it was
10  with the attorneys to divulge.
11      Q.  Earlier, Mr. Roman was asking you questions
12  about General Council authorizations being needed to
13  release certain documents.  Do you recall those
14  questions?
15      A.  I do.
16      Q.  How did you find out about requirements about
17  authorization needed to release information within the
18  Tribe?
19      A.  Usually, I would have heard it in a meeting.
20      Q.  And are you aware of any of these
21  requirements being written down?
22      A.  Not -- I've never seen them, so I don't know
23  if they are written.
24      Q.  Are you aware of any information ever being
25  disclosed without a written authorization from the

Page 183

1  Miccosukee Business Council?
2          MR. POLLOCK:  Object to the form.
3          THE WITNESS:  I have no knowledge of any
4      disclosure of information without their approval.
5      I have no way of knowing that.
6  BY MR. FARRIOR:
7      Q.  I'm going to hand you what was previously
8  marked Exhibit 7, and Exhibit 7 is an excerpt from the
9  matrix you created for the 2003 tax year; is that
10  correct?
11      A.  Correct.
12      Q.  And, specifically, it's an excerpt related to
13  Sally Jim; is that right?
14      A.  Correct.
15      Q.  What is the significance of the last column
16  on the first page?
17      A.  The very last column?
18      Q.  Yes.
19      A.  The very last column says:
20          "IRS proposed assessment balance less 1099
21      amount per Miccosukee records or IRS amount,
22      whichever is less.  Footnote:  We do not have all
23      1099 info yet, so it is not incorporated into the
24      spread."
25          And so that amount was a reconciliation

Page 184

1  showing that we had accounted for at least these -- this
2  amount up to that point, of what we are saying is the
3  lesser of the IRS adjustment of the Miccosukee 1099
4  information that we have.  And that's just kind of a
5  check column over here, to make sure that we are in
6  balance and that I'm not either writing a number wrong,
7  you know, so these two numbers are going to match.  And
8  that's essentially a reconciliation to make sure that
9  I'm not out of balance.
10      Q.  Can I ask you about this column right here
11  (indicating)?  What's the significance of this column?
12      A.  Per the IRS, they gave us what they
13  considered the total additional wages per their Form
14  4668.  And so if I deducted an amount from that, I would
15  have a remaining balance of taxable wages.
16          And then I would have the lesser of the IRS
17  adjustment or what -- if I had a 1099, and so I'm taking
18  out in this example the $9,000.  When I took out the 9-,
19  I'm reducing it now, or whatever their total was, down
20  to 189-.  And this is my check to make sure that I'm in
21  balance and these numbers are reconciling to what I have
22  so that I didn't do a typo or something didn't go wrong
23  here.  So all I'm really doing here is continue to
24  reduce the number and showing how I got to that amount.
25      Q.  So does this number 180,960.04 represent the

Page 185

1  taxable wages for Sally Jim for 2003?
2      A.  No.  The 189- is the total of all of the
3  individuals on the matrix.  The $9,000 figure is her
4  figure individually.
5      Q.  Okay.
6      A.  The 189- is, I subtracted what must have been
7  $189,960.04 just prior to that, subtracted her 9,000, so
8  now I'm down to 180- of what the total 4668 adjustments
9  were.  I have now come to getting it down by -- so,
10  again, you know, I'm just trying to reconcile what I'm
11  reducing.  She made up $9,000 of this amount to-date.
12      Q.  Are you aware of the Tribe having any
13  programs that provided benefits and services to its
14  members outside of its NTDR distribution program?
15      A.  I know they provide benefits.  What they are,
16  I have no idea.  I don't recall what they are.
17      Q.  Do you know if the Tribe had a program where
18  they provided medical services to their members?
19      A.  I recall that issue came up only because
20  there was various payments to nurses and things, so that
21  issue came up about providing medical services, so I do
22  recall they do that.
23      Q.  And were payments to nurses -- were you aware
24  of those ever being deducted from NTDR distributions?
25      A.  I recall we made an adjustment based on a



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
186–189

Page 186

1   conversation about nurses and some other categories
2   based on information. That's why I'm aware of the
3   nurses in particular and the health issue.
4       Q.   But when the Tribe mates its NTDR
5   distribution to a member, so the Tribe pays a nurse on
6   behalf of a member; is that the sort of payment to a
7   nurse that you came across?
8       A.   Yes. If you looked at one of the columns, it
9   specifically outlines nurses and so on, and I know,
10  based on a conversation we had, that we made an
11  adjustment for that. Without the spreadsheet, I can't
12  tell you, but I know we had that conversation because we
13  did come across that.
14      Q.   You made an adjustment to the withholding tax
15  calculation that you were making; is that correct?
16      A.   I believe we did based on that conversation.
17      Q.   But you don't know whether or not the Tribe
18  would go in and specifically reduce somebody's NTDR
19  distribution based on a payment they made -- the Tribe
20  made to a nurse?
21      A.   Without looking at the source documents that
22  we pulled, I couldn't tell you.
23      Q.   Did the Tribe employ nurses?
24      A.   Pardon?
25      Q.   Did the Tribe employ nurses?

Page 187

1       A.   I believe they did, but I don't have
2   direct -- but that's why I think they came up, because
3   they did employ nurses as employees, which is why that
4   issue came up. So I believe, yes, my recollection is
5   simply because the issue came up.
6       Q.   Do you know if the Tribe provided educational
7   benefits to their -- to its members?
8       A.   I don't recall.
9       Q.   Do you know if the Tribe provided childcare
10  benefits to their members?
11      A.   I don't recall.
12      Q.   You mentioned attending a meeting in
13  Albuquerque with the IRS; is that correct?
14      A.   Correct.
15      Q.   How did you get to that meeting?
16      A.   On a plane, chartered.
17      Q.   Who chartered the plane?
18      A.   I'm not sure who chartered the plane. I
19  don't know for a fact who did.
20      Q.   Do you know if the Tribe was paying for the
21  plane?
22      A.   I don't know.
23      Q.   Did you ever ride on a chartered plane
24  related to your work with the Miccosukee, besides that
25  time?

Page 188

1       A.   I rode on -- the only time I rode on a plane
2   that had anything to do with the Miccosukees was on that
3   flight.
4       Q.   Okay. Mr. Roman asked you about giving
5   briefings at General Council meetings, and you said you
6   did not do that; is that correct?
7       A.   Correct.
8       Q.   Did you ever attend a General Council
9   meeting?
10      A.   No.
11      Q.   Did you ever attend a Business Council
12  meeting?
13      A.   No.
14      Q.   Did you ever attend any meeting of Tribal
15  members where taxes were discussed?
16      A.   No.
17      Q.   Any of your work, as far as you are aware,
18  were you doing it in preparation for a presentation to
19  be made at a General Council meeting?
20      A.   I have no knowledge of that.
21      Q.   Were you aware of the Tribe having a theory
22  for NTDR distributions not being subject to withholding
23  tax?
24      A.   Yes.
25      Q.   What was that theory?

Page 189

1       A.   Based on the analysis or report that I was
2   provided back in mid 2006, I believe, of what they
3   believe -- "they" being the -- whoever made -- I don't
4   recall who made the presentation -- I mean the
5   document -- but whoever prepared it believed why they
6   didn't have to pay tax on those distributions.
7       Q.   And what was the theory?
8       A.   Best of my recollection is, it fell on some
9   of the same theories as the other businesses that were
10  run on Indian properties and owned, since they were not
11  subject to tax interest specifically carved out that
12  that was also being carved out, "that" being the NTDR.
13      Q.   You didn't agree with the theory that the
14  NTDR distributions were not subject to withholding tax;
15  is that correct?
16      A.   Now, we are getting back to that one question
17  that you had before. Are you asking for my opinion or
18  are you asking for my analysis of what I did?
19      Q.   I'm asking for your analysis based on the
20  facts.
21      A.   I'm back in the same place I was before.
22          MR. ROMAN: You need to treat him like you
23      treat me.
24          THE WITNESS: I know. I'm back to the same
25      place I was.



Case 1:14-cv-22441-CMA   Document 125-7   Entered on FLSD Docket 06/17/2015   Page 174 of 207

JOSE I. MARRERO Volume II                                    March 16, 2015
UNITED STATES OF AMERICA vs. JIM                               190–193

Page 190

1  BY MR. FARRIOR:
2    Q.  I'll ask you this:  Did you, based on your
3  analysis, conclude as a factual matter that the NTDR
4  distributions were sourced from gaming revenue?
5    A.  The NTDR distributions were sourced from
6  gaming revenue, and other sources.
7    Q.  How much from other sources?
8    A.  Percentage-wise, I can't tell you.
9    Q.  So you worked on the issues for the Tribe
10 from the 2000 to 2005 tax years; is that correct?
11   A.  Correct.
12   Q.  Were you aware -- did you ever come across
13 any distinctions between how the NTDR distributions were
14 made for any one specific year during that time frame?
15   A.  Differences?  My recollection -- my
16 recollection is, that since I was doing 2003, that's the
17 year I counted, so I don't recall any differences.
18   Q.  You don't -- you're not aware of any
19 distributions and how -- I'm sorry.
20       You're not aware of any distinctions in how
21 the distribution scheme worked from year to year; is
22 that correct?
23   A.  I'm not aware of how it went from year to
24 year.
25   Q.  Did you ever get a sense for whether Miguel

Page 191

1  Hernandez believed that the NTDR distributions were
2  subject to withholding tax?
3    A.  That's a question you need to ask him.  I
4  didn't have any of those discussions with him.
5    Q.  Did you have any of those discussions with
6  Julio Martinez?
7    A.  No.
8    Q.  Same question for Dionne Carroll?
9    A.  As counsel for the Tribe at the time, I would
10 have discussed with her my results.
11   Q.  And your results were that the NTDR
12 distributions were subject to withholding tax; is that
13 correct?
14   A.  I believe the matrix shows that.
15   Q.  And just to confirm, your matrix has a column
16 related to the NTDR distributions; is that correct?
17   A.  That's correct.
18   Q.  Can you identify which column that is?
19   A.  That would have been -- let's see.  "Total
20 Amount from Checks to Payees Pulled from Miccosukee
21 Records."  That's the last column before the break.  It
22 would have been -- that's the sum total of the checks
23 that were drawn out from the accounts.
24       So each one of these, actually, were checks,
25 each category.  Each category were checks drawn from --

Page 192

1  they were just put into categories and this is the
2  total.  So all of them are actually from that account.
3    Q.  When you say "that account" --
4    A.  NTDR account.
5    Q.  And so just to make sure I'm clear:  The
6  categories leading up to that final amount are ones that
7  you would consider not subject to withholding tax; is
8  that correct?
9    A.  Correct.
10   Q.  And then what would be left in that column
11 would be what would be subject to withholding tax, as
12 far as you knew; is that correct?
13   A.  Correct.  My recollection -- again, I want to
14 be clear there's not a misunderstanding.  The figure
15 that that reflects is only those amounts that I
16 determined were not subject to withholdings.
17       That's not the sum total of the adjustment.
18   Q.  So looking back at Exhibit 1, for example,
19 this -- the first page is a $2,000 loan to Sally Jim
20 from the general account which was reimbursed from
21 deducting it from her NTDR distribution in the 2003 tax
22 year; is that correct?
23   A.  Correct.
24   Q.  And that would not be subject -- I'm sorry.
25       That would be subject to withholding; is that

Page 193

1  correct?
2    A.  Again, some of these were, yes.  Again, if it
3  was listed on here as a deductible amount, then it
4  wouldn't.  If it's not listed on there, then it would
5  not.  There was a question because whether it was a loan
6  or not as to whether or not it was -- at the time that
7  it was taken, whether it was subject to withholding.
8        MR. FARRIOR:  Thank you for taking the time
9    to answer my questions.  That's all I have for
10   right now, subject to, if I have anything else
11   after they get a chance to redirect.  I pass the
12   witness.
13       MR. DAVIS:  I have some questions to follow
14   up from Mr. Farrior.
15       REDIRECT EXAMINATION
16 BY MR. DAVIS:
17   Q.  Do you know why the Tribe gives distributions
18 to its members?
19   A.  Why?  No.
20   Q.  And do you know if the distributions come
21 from net revenue or the gross receipts tax?
22       MR. FARRIOR:  Objection to form.
23       MR. POLLOCK:  Join.
24       THE WITNESS:  All I was told was that
25   distributions were made on the NTDR account and



JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
194–197

Page 194

1    they came up with a way to distribute it, and
2    they distributed it.
3  BY MR. DAVIS:
4    Q.   So then you don't know if they come -- you do
5  not know if they come from the net revenue or the gross
6  receipts tax?
7        MR. POLLOCK:  Objection to form.
8        MR. FARRIOR:  Objection to form.
9        THE WITNESS:  Again, they came from the NTDR,
10      and the NTDR account has gaming revenue taxes and
11      it was then distributed.
12  BY MR. DAVIS:
13    Q.   Do you know where the theory of nontaxable
14  distributions come from, or the Tribe's theory?
15        MR. FARRIOR:  Objection to form.
16        MR. POLLOCK:  Object to form.
17        THE WITNESS:  Are you asking the original or
18      when I found out?  I'm not sure what the question
19      is.
20  BY MR. DAVIS:
21    Q.   When you found out about the theory of the
22  nontaxable distributions that the Tribe had that
23  Mr. Farrior referenced when he was asking you questions,
24  do you know where that theory came from?
25    A.   The original theory?

Page 195

1    Q.   That was used at the Tribe.
2    A.   Yes.
3    Q.   Where?
4    A.   That information came -- was provided by the
5  attorneys so...
6    Q.   Which attorneys?
7        MR. POLLOCK:  Hold on.  You can answer the
8      question, but if the question -- if you have to
9      answer that question by revealing privileged
10      communications you had with the lawyers, then
11      that would be confidential, and I'm instructing
12      you not to answer that.  If you learned it from
13      somewhere else, feel free to answer the question.
14        THE WITNESS:  I believe I got a copy of that,
15      my recollection is, from Dexter Lehtinen's
16      office.
17  BY MR. DAVIS:
18    Q.   When you say "I got a copy of that," what
19  does "that" refer to?
20    A.   A document which showed where the original
21  theory came from.
22    Q.   I would like to direct your attention to the
23  minutes from the meeting of July 31, 2006 that was just
24  referred to marked as Exhibit 5.
25        If you look at the second page where it lists

Page 196

1  numbers 1 through 8 at the bottom --
2    A.   Correct.
3    Q.   -- do you see that?
4    A.   Correct.
5    Q.   Do you know the percentage breakdown of what
6  amount went into each NTDR?
7        MR. POLLOCK:  I'm sorry.  Just for
8      clarification, 1 through 9.
9        MR. DAVIS:  Yes, 1 through 9.  9 goes on to
10      the next page.
11        THE WITNESS:  Again, I don't know the
12      percentages of what went into that, only that the
13      gaming was the large majority.
14  BY MR. DAVIS:
15    Q.   Do you know how much?
16    A.   I don't know how much the percentages of each
17  were.
18    Q.   The checks that you provided in Exhibit
19  Number 1 for the 2003 tax year, do you know if
20  distributions for Sally Jim are the same for 2001?
21        MR. POLLOCK:  Object to form.
22        MR. FARRIOR:  Form.
23        THE WITNESS:  I don't recall.
24  BY MR. DAVIS:
25    Q.   And do you know if the process in 2003 for

Page 197

1  distributions was the same that it was in 2001?
2    A.   I have no way of knowing that.
3    Q.   On Exhibit Number 1, there's a document dated
4  10/8/03.  Can you hand that document over?
5    A.   Yes.
6        MR. POLLOCK:  What page are you on?
7        MR. DAVIS:  It's page 9.
8        THE WITNESS:  Okay.  I have that one now.
9  BY MR. DAVIS:
10    Q.   Page 9.  It says: "To be used for title
11  loans from GIA or G/A"?
12    A.   G/A, general account, because if you look at
13  the program name, it says general account on the
14  purchase order.
15    Q.   Okay.  Earlier you said that you were
16  referencing the meeting notes and you had said that the
17  distributions were made equally to each member.
18        To the best of your knowledge, do you know
19  how the Miccosukee Tribe counts enrollments as its
20  members, how it counts its member body?
21    A.   No.
22    Q.   And to be clear, you don't know the process
23  of approving loans?
24    A.   The process?
25    Q.   The process that a loan gets approved.



Case 1:14-cv-22441-CMA   Document 125-7   Entered on FLSD Docket 06/17/2015   Page 176 of 207

JOSE I. MARRERO Volume II
UNITED STATES OF AMERICA vs. JIM

March 16, 2015
198–201

Page 198

1    A.  The process that it gets approved?  None
2 other than it has to go and be approved, I believe, by
3 the Council -- I believe that was in a memo that was in
4 there -- and then it's signed off, and that's their
5 authorization to process it.
6    Q.  Do you know what factors are taken into
7 account?
8    A.  No.
9    Q.  If distributions went into a savings account
10 as opposed to a checking account, would the taxability
11 be any different for the member?
12    A.  Are you asking me for --
13    MR. POLLOCK:  Objection to the form.
14    THE WITNESS:  -- a tax issue question?
15    MR. POLLOCK:  Mr. Davis, with all due
16    respect, I think you're going a little bit
17    outside of redirect at this point.
18    MR. DAVIS:  Well, he was asked earlier if
19    Tribe --
20    MR. POLLOCK:  I'm not instructing him not to
21    answer.  I'm just letting you know.
22    MR. DAVIS:  I will clarify.
23 BY MR. DAVIS:
24    Q.  You were asked earlier about if Tribe members
25 could place their distributions into a savings account

Page 199

1 or into different types of account with the Smith Barney
2 reference that Mr. Farrior made.
3    If it was placed into a different account,
4 would that be handled any differently on your end?
5    A.  For withholding purposes?
6    Q.  Yes.
7    A.  No.
8    Q.  You were asked about written guidelines, and
9 to be clear, you don't know for 100 percent certainty if
10 there actually were any written guidelines?
11    A.  For what?
12    MR. POLLOCK:  Object to the form.  Asked and
13    answered.
14 BY MR. DAVIS:
15    Q.  For distributions.
16    A.  I never saw any written guidelines for
17 distributions.
18    Q.  If the IRS didn't have a power of attorney
19 for Sally Jim, could they have disclosed to you her tax
20 liability?
21    MR. FARRIOR:  Object to the form.
22    MR. POLLOCK:  Object to the form.
23    THE WITNESS:  I never received any
24    information on tax liabilities of any members.
25    MR. DAVIS:  Okay.  Thank you.  That's it.

Page 200

1 That's so much for answering the questions.
2    MR. FARRIOR:  I'm good.
3    MR. POLLOCK:  You're good.  He will read if
4 it is ordered.
5    MR. DAVIS:  We have it ordered expedite.
6    THE COURT REPORTER:  Do you want a copy?
7    MR. FARRIOR:  Yes, I will buy a copy.  The
8 Government will buy a copy.
9    (Witness excused.)
10    (Deposition was concluded.)

Page 201

1            DEPOSITION ERRATA SHEET
2
3 Assignment no:  280346
4       UNITED STATES OF AMERICA vs. SALLY JIM
5
6      DECLARATION UNDER PENALTY OF PERJURY
7
8      I declare under penalty of perjury that I have
9 read the entire transcript of my deposition/examination
10 under oath taken in the captioned matter or the same
11 has been read to me, and the same is true and accurate,
12 save and except for the changes and/or corrections, if any,
13 as indicated by me on the DEPOSITION ERRATA SHEET
14 hereof, with the understanding that I offer these
15 changes as if still under oath.
16
17      Signed on the _____ day of _____,
18 2015.
19
20            _____.
21               JOSE I. MARRERO
22
23
24
25



Case 1:14-cv-22441-CMA   Document 125-7   Entered on FLSD Docket 06/17/2015   Page 177 of 207

JOSE I. MARRERO Volume II                                                    March 16, 2015
UNITED STATES OF AMERICA vs. JIM                                             202–205

## Page 202

```
1                  DEPOSITION ERRATA SHEET
2
3    Page No.____Line No._____Change to: _____
4    _____
5    Reason for change: _____
6    Page No.____Line No._____Change to: _____
7    _____
8    Reason for change: _____
9    Page No.____Line No._____Change to: _____
10   _____
11   Reason for change: _____
12   Page No.____Line No._____Change to: _____
13   _____
14   Reason for change: _____
15   Page No.____Line No._____Change to: _____
16   _____
17   Reason for change: _____
18   Page No.____Line No._____Change to: _____
19   _____
20   Reason for change: _____
21   Page No.____Line No._____Change to: _____
22   _____
23   Reason for change: _____
24   SIGNATURE:_____DATE:_____, 2015
25            JOSE I. MARRERO
```

## Page 203

```
1                  DEPOSITION ERRATA SHEET
2
3    Page No.____Line No._____Change to: _____
4    _____
5    Reason for change: _____
6    Page No.____Line No._____Change to: _____
7    _____
8    Reason for change: _____
9    Page No.____Line No._____Change to: _____
10   _____
11   Reason for change: _____
12   Page No.____Line No._____Change to: _____
13   _____
14   Reason for change: _____
15   Page No.____Line No._____Change to: _____
16   _____
17   Reason for change: _____
18   Page No.____Line No._____Change to: _____
19   _____
20   Reason for change: _____
21   Page No.____Line No._____Change to: _____
22   _____
23   Reason for change: _____
24   SIGNATURE:_____DATE:_____, 2015
25            JOSE I. MARRERO
```

## Page 204

```
1           C E R T I F I C A T E   O F   O A T H
2
3    STATE OF FLORIDA     )
4    COUNTY OF BROWARD     )
5
6         I, the undersigned authority and Notary
7    Public certify that JOSE I. MARRERO personally
8    appeared before me and was duly sworn on Monday, March
9    16, 2015.
10
11        Sworn to before me this 18th day of March,
12   2015.
13
14
15
16
17
18        Theresa Tomaselli, RMR
          Notary Public - State of Florida
19        My Commission No. EE91591
          My Commission Expires 8/27/2015
20        280346
21
22
23
24
25
```

## Page 205

```
1                  REPORTER'S CERTIFICATE
2
3
4         I, THERESA TOMASELLI, Registered Merit
     Reporter and Notary Public in and for the State of
5    Florida at Large, do hereby certify that I was
     authorized to and did report said deposition in
     stenotype; and that the foregoing pages are a true and
     correct transcription of my shorthand notes of said
6    deposition.
7         I further certify that said deposition was
     taken at the time and place hereinabove set forth and
8    that the taking of said deposition was commenced and
     completed as hereinabove set out.
9
10
          I further certify that I am not an attorney
11   or counsel of any of the parties, nor am I a relative or
     employee of any attorney or counsel of party connected
12   with the action, nor am I financially interested in the
     action.
13
          The foregoing certification of this
14   transcript does not apply to any reproduction of the
     same by any means unless under the direct control and/or
15   direction of the certifying reporter.
16        DATED this 18th day of March, 2015.
17
18
19
20        THERESA TOMASELLI
          280346
21
22
23
24
25
```



# Exhibit 16



| Last | First | # of men c'rr'd | Gross Dividend | P0065 | P0007 | P0003 | Check Amount |
|---|---|---|---|---|---|---|---|
| ATK | SAL&CY | # | $ 79,800.00 | 15490.00 | 10800.00 | | $ 44,200.00 |



EXHIBIT

govt 3 sun
by

3.25.15



00081

00081





00083

00083

**MICCOSUKEE TRIBE**
MICCOSUKEE NTDR ACCOUNT
P. O. Box 440021, Tamiami Station
Miami, Florida  33144

First Union National Bank
Miami, Florida
R/T 067006432
63-643 / 670

**5O7978**

| DATE | 6/15/01 |
|---|---|
| AMOUNT | ***4,460.00 |

PAY     Four Thousand Four Hundred Sixty  and 00/100******

TO THE
ORDER
OF          SALLY JIM

*Billy Cy_____*
*may Billi*

⑈5O7978⑈  ⑆O67OO643 2⑆ 2O9OOO3 1644 27⑈        ⑈OOOO446OOO⑈

SUBSEQUENT COLLECTING BANK USE ONLY

JUN 20 01

M631◦75134
FIRST UNION NATL BANK
ORLANDO  06202001
4032732296

7098
2522 4

PAY TO THE ORDER OF
FIRST UNION NATIONAL BANK
067006432
FOR DEPOSIT ONLY
GENERAL ACCOUNT
2090003164469

REQUEST 000001 571887    4460.00
ROLL REDE   20010620  000004032732296
JOB REDE  C  ACCT 0032090003164427
REQUESTOR Alicia Harris
000106750

Alicia Harris
PA4292

**00084**

00084



REQUEST 00001571887000005 40623.19
ROLL 1160   20010308  000000040561308+
JOB BCIA  V  ACCT 0032090003164427
REQUESTOR Alicia Harris



REQUEST 00001571887000005 3200.00
ROLL 3550   20010326 0000000324955967+
JOB BCIA  V  ACCT 0032090003164427
REQUESTOR Alicia Harris

| MICCOSUKEE TRIBE OF INDIANS OF FLORIDA | FIRST UNION NATIONAL BANK | 203222 |
|---|---|---|
| N.T.D.R. ACCOUNT<br>P.O. BOX 440021<br>TAMIAMI STATION<br>MIAMI, FL 33144 | MIAMI, FLORIDA 33131   63-643<br>670 | Jun 2, 2001 |

PAY TO THE ORDER OF   ALEX OSCEOLA & SALLY JIM                    $ 44,600.00

FORTY FOUR THOUSAND SIX HUNDRED AND 00/100 DOLLARS*****                         DOLLARS

*Billy Cypress*

MEMO _____

⑈203222⑈ ⑆067006432⑆209000316442 7⑈        ⑈0004460000⑈

REQUEST 000001571887    44600.00
ROLL REDE   20010606  000004039743448
JOB REDE  C  ACCT 0032090003164427
REQUESTOR Alicia Harris
000106750

Alicia Harris
PA4292

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA
N.T.D.R. ACCOUNT
P.O. BOX 440021
TAMIAMI STATION
MIAMI, FL 33144

FIRST UNION NATIONAL BANK
MIAMI, FLORIDA 33131

63-643
670

203222

Jun 2, 2001

PAY TO THE
ORDER OF   ALEX OSCEOLA & SALLY JIM                           $ 44,600.00

FORTY FOUR THOUSAND SIX HUNDRED AND 00/100 DOLLARS*****                    DOLLARS

Billy Cypress

M. of Bear

MEMO

⑈203222⑈ ⑆067006432⑆ 209000316 44 27⑈          ⑈0004460000⑈

SUBSEQUENT COLLECTING BANK USE ONLY

M631075134
FIRST UNION NATL BANK
ORLANDO 06062001
4039743448

7890 0 · / · ·

YOU MICCOSUKEE NTDR ACCOUNT
DO NOT CREDIT 209000316 4427
067006432
FOR DEPOSIT ONLY
FOR DEPOSITORY BANK USE ONLY

Sally Jim
Alex Osceola
PAY TO THE ORDER OF
FIRST UNION NATIONAL BANK

REQUEST 000001571887     44600.00
ROLL REDE   20010606  000004039743448
JOB REDE  C  ACCT 0032090003164427
REQUESTOR Alicia Harris
000106750

Alicia Harris
PA4292

# Exhibit 17

# MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

## FINANCIAL STATEMENTS

### September 30, 2001

SJ002609

# CONTENTS

|  | Page Numbers |
|---|---|
| REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS | 1 |
| FINANCIAL STATEMENTS | |
| Combined Balance Sheet - All Funds | 2 |
| Combined Statement of Revenues and Expenditures - All Funds | 3 |
| Combined Statement of Changes in Fund Equity - All Funds | 4 |
| Combined Statement of Revenues and Expenditures - Budget and Actual - General Fund | 5 |
| Combined Statement of Revenues, Expenditures and Changes in Retained Earnings - Enterprise Funds | 6 |
| Combined Statement of Cash Flows - Enterprise Funds | 7 |
| Notes to the Financial Statements | 8 |

SJ002610

# C O N T E N T S

|  | Page Numbers |
|---|---|
| REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS | 1 |
| FINANCIAL STATEMENTS | |
| Combined Balance Sheet - All Funds | 2 |
| Combined Statement of Revenues and Expenditures - All Funds | 3 |
| Combined Statement of Changes in Fund Equity - All Funds | 4 |
| Combined Statement of Revenues and Expenditures - Budget and Actual - General Fund | 5 |
| Combined Statement of Revenues, Expenditures and Changes in Retained Earnings - Enterprise Funds | 6 |
| Combined Statement of Cash Flows - Enterprise Funds | 7 |
| Notes to the Financial Statements | 8 |

SJ002611



MENENDEZ, CPA, P.A.
Certified Public Accountants

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

To the Business Council of the
Miccosukee Tribe of Indians of Florida

We have audited the general purpose financial statements of the Miccosukee Tribe of Indians of Florida (the Tribe) as of and for the year ended September 30, 2001, as listed in the accompanying table of contents. These general purpose financial statements are the responsibility of the Tribe's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the general purpose financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the general purpose financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall general purpose financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

The general purpose financial statements referred to above do not include the accounts of the Miccosukee Indian Bingo, the Miccosukee Resort and Convention Center and the Miccosukee Service Plaza, which should be included in order to conform with accounting principles generally accepted in the United States of America. If the omitted fund accounts had been included, based on audited information as of and for the year ended June 30, 2001, the Enterprise funds assets, liabilities, fund equity, revenues and expenditures would have increased approximately $83,804,000, $81,653,000, $2,151,000, $143,248,000 and $104,241,000 respectively.

In our opinion, except for the effects on the financial statements of the omission of the accounts of the Tribe's bingo, resort and convention center and service plaza operations as described in the preceding paragraph, the general purpose financial statements referred to above present fairly, in all material respects, the financial position of the Miccosukee Tribe of Indians of Florida, as of September 30, 2001, and the results of its operations and its cash flows of its enterprise fund for the year then ended in conformity with accounting principles generally accepted in the United States of America..

*Menendez CPA. P.A.*
Certified Public Accountants

Pembroke Pines, Florida
August 29, 2003

- 1 -

Telephone: (954) 290-9525
18459 Pines Blvd, #236
Pembroke Pines, FL 33029
E-mail: mmcpaz@aol.com

SJ002612

# MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

## COMBINED BALANCE SHEET - ALL FUNDS

### September 30, 2001

| | General Fund | Enterprise Funds | Totals (Memorandum only) Reporting Entity |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and cash equivalents | $ 29,637,621 | $ 224,990 | $ 29,862,611 |
| Accounts receivable, net | 292,573 | - | 292,573 |
| Investment securities | 5,646,670 | 43,508 | 5,690,178 |
| Due from other funds | 212,984 | 238,571 | 451,555 |
| Due from related parties | 712,923 | - | 712,923 |
| Investment in Miccosukee Resort and Convention Center | 63,941,972 | - | 63,941,972 |
| Loans receivable from tribal members | 5,308,306 | - | 5,308,306 |
| Supplies | - | 91,847 | 91,847 |
| Prepaid expenses | - | 55,832 | 55,832 |
| Fixed assets, net | 34,702,771 | 767,014 | 35,469,785 |
| Other assets | 1,054,500 | 530 | 1,055,030 |
| TOTAL ASSETS | $ 141,510,320 | $ 1,422,292 | $ 142,932,612 |
| **LIABILITIES AND FUND EQUITY** | | | |
| LIABILITIES | | | |
| Accounts payable | $ 1,405,591 | $ 88,812 | $ 1,494,403 |
| Payroll related liabilities | 733,092 | 445,301 | 1,178,393 |
| Due to other funds | 123,410 | 115,031 | 238,441 |
| Due to related parties | 421,686 | - | 421,686 |
| Estimated liability on litigation | 17,546,071 | - | 17,546,071 |
| TOTAL LIABILITIES | 20,229,850 | 649,144 | 20,878,994 |
| COMMITMENTS AND CONTINGENCIES | | | |
| FUND EQUITY | | | |
| CONTRIBUTED CAPITAL | - | 646,370 | 646,370 |
| RETAINED EARNINGS | - | 126,778 | 126,778 |
| FUND BALANCE - UNRESTRICTED | 121,280,470 | - | 121,280,470 |
| TOTAL FUND EQUITY | 121,280,470 | 773,148 | 122,053,618 |
| TOTAL LIABILITIES AND FUND EQUITY | $ 141,510,320 | $ 1,422,292 | $ 142,932,612 |

The accompanying notes are an integral part of the financial statements.

- 2 -

SJ002613

# MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

## COMBINED STATEMENT OF REVENUES AND EXPENDITURES - ALL FUNDS

### For the Year Ended September 30, 2001

| | General Fund | Enterprise Funds | Totals (Memorandum only) Reporting Entity |
|---|---|---|---|
| **REVENUES** | | | |
| Admissions | $          - | $     827,633 | $        827,633 |
| Fund raising | 41,576 | - | 41,576 |
| Interest | 2,375,643 | - | 2,375,643 |
| Leases and rentals | 648,482 | 12,099 | 660,581 |
| Licenses and permits | 148,063 | | 148,063 |
| Other | 1,564,537 | 41,462 | 1,605,999 |
| Owners' compensation fees | 69,804,561 | - | 69,804,561 |
| Sales | - | 1,343,339 | 1,343,339 |
| Tribal assistance | - | 720,307 | 720,307 |
| Tribal tax | 92,414 | - | 92,414 |
| TOTAL REVENUES | 74,675,276 | 2,944,840 | 77,620,116 |
| | | | |
| **EXPENDITURES** | | | |
| Community programs | 1,093,252 | - | 1,093,252 |
| Contributions | 199,456 | - | 199,456 |
| Depreciation | 1,005,038 | 97,367 | 1,102,405 |
| Equipment rental | - | 45,078 | 45,078 |
| Entertainers' fees | - | 90,649 | 90,649 |
| Housing expenses | 1,948,926 | - | 1,948,926 |
| Insurance | 134,463 | 24,390 | 158,853 |
| Interest | 29,022 | - | 29,022 |
| Other | 315,086 | 148,788 | 463,874 |
| Professional fees | 2,246,889 | - | 2,246,889 |
| Promotional activitites | 26,833 | 123,953 | 150,786 |
| Repairs and maintenance | 457,819 | 133,006 | 590,825 |
| Salaries and benefits | 5,346,900 | 1,253,044 | 6,599,944 |
| Supplies | 457,673 | 832,658 | 1,290,331 |
| Telephone | 212,195 | - | 212,195 |
| Travel and entertainment | 954,608 | - | 954,608 |
| Tribal direct support | 3,156,248 | - | 3,156,248 |
| Tribal tax | - | 55,919 | 55,919 |
| Trust fund distributions | 32,268,000 | - | 32,268,000 |
| Utilities | 265,141 | 44,157 | 309,298 |
| TOTAL EXPENDITURES | 50,117,549 | 2,849,009 | 52,966,558 |
| | | | |
| EXCESS  OF REVENUES OVER EXPENDITURES BEFORE LOSS ON LITIGATION | 24,557,727 | 95,831 | 24,653,558 |
| | | | |
| LOSS ON LITIGATION | (1,589,672) | - | (1,589,672) |
| | | | |
| EXCESS OF REVENUE OVER EXPENDITURES AND LOSSES | $    22,968,055 | $     95,831 | $     23,063,886 |

The accompanying notes  are an integral part of the financial statements.

SJ002614

# MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

## COMBINED STATEMENT OF CHANGES IN FUND EQUITY - ALL FUNDS

### For the Year Ended September 30, 2001

|  | General Fund | Enterprise Fund | Totals (Memorandum) Reporting Entity |
|---|---|---|---|
| FUND BALANCE - BEGINNING OF YEAR | $ 97,333,958 | $ - | $ 97,333,958 |
| RETAINED EARNINGS - BEGINNING OF YEAR | - | (33,815) | (33,815) |
| CONTRIBUTED CAPITAL | - | 646,370 | 646,370 |
| PRIOR PERIOD ADJUSTMENTS | 978,457 | 64,762 | 1,043,219 |
| FUND BALANCE AND RETAINED EARNINGS, RESTATED | 98,312,415 | 677,317 | 98,989,732 |
| EXCESS OF REVENUE OVER EXPENDITURES | 22,968,055 | 95,831 | 23,063,886 |
| FUND EQUITY - END OF YEAR | $ 121,280,470 | $ 773,148 | $ 122,053,618 |

The accompanying notes are an integral part of the financial statements.

- 4 -

SJ002615

# MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

## COMBINED STATEMENT OF REVENUES AND EXPENDITURES - BUDGET AND ACTUAL - GENERAL FUND

### For the Year Ended September 30, 2001

| | Budget | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **REVENUES** | | | |
| Fund raising | $ - | $ 41,576 | $ 41,576 |
| Interest | - | 2,375,643 | 2,375,643 |
| Leases and rentals | 1,209,700 | 648,482 | (561,218) |
| Licenses and permits | 272,000 | 148,063 | (123,937) |
| Other | 645,400 | 1,564,537 | 919,137 |
| Owners' compensation fees | 68,126,054 | 69,804,561 | 1,678,507 |
| Tribal tax | 65,000 | 92,414 | 27,414 |
| TOTAL REVENUES | 70,318,154 | 74,675,276 | 4,357,122 |
| **EXPENDITURES** | | | |
| Community programs | 930,400 | 1,093,252 | (162,852) |
| Contributions | 50,000 | 199,456 | (149,456) |
| Depreciation | - | 1,005,038 | (1,005,038) |
| Housing expenses | 2,513,000 | 1,948,926 | 564,074 |
| Insurance | 78,000 | 134,463 | (56,463) |
| Interest | - | 29,022 | (29,022) |
| Other | 194,600 | 315,086 | (120,486) |
| Professional fees | 1,613,200 | 2,246,889 | (633,689) |
| Promotional activitites | 210,000 | 26,833 | 183,167 |
| Repairs and maintenance | 808,441 | 457,819 | 350,622 |
| Salaries and benefits | 6,333,357 | 5,346,900 | 986,457 |
| Supplies | 576,959 | 457,673 | 119,286 |
| Telephone | 88,796 | 212,195 | (123,399) |
| Travel and entertainment | 440,800 | 954,608 | (513,808) |
| Tribal direct support | 6,521,849 | 3,156,248 | 3,365,601 |
| Trust fund distributions | 32,303,000 | 32,268,000 | 35,000 |
| Utilities | 109,200 | 265,141 | (155,941) |
| TOTAL EXPENDITURES | 52,771,602 | 50,117,549 | 2,654,053 |
| EXCESS OF REVENUES OVER EXPENDITURES BEFORE LOSS ON LITIGATION | 17,546,552 | 24,557,727 | 7,011,175 |
| LOSS ON LITIGATION | - | (1,589,672) | (1,589,672) |
| EXCESS OF EXPENDITURES AND LOSSES OVER REVENUE | $ 17,546,552 | $ 22,968,055 | $ 5,421,503 |

The accompanying notes are an integral part of the financial statements.

- 5 -

SJ002616

## MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

### COMBINED STATEMENT OF REVENUES, EXPENDITURES AND CHANGES IN RETAINED EARNINGS - ENTERPRISE FUNDS

#### For the Year Ended September 30, 2001

| | Airboats | Arts Festival | Cultural Center | General Store | Giftshop | Indigenous Images | Restaurant Account | Service Station | Tours | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | | | | |
| Admissions | $ 480,244 | $ 67,260 | $ 279,331 | $ - | $ 798 | $ - | $ - | $ - | $ - | $ 827,633 |
| Leases and rentals | - | - | - | 12,099 | - | - | - | - | - | 12,099 |
| Other | 19,086 | 2,759 | - | - | 2,884 | - | 16,733 | - | - | 41,462 |
| Sales | - | 19,857 | - | - | 275,062 | 25,330 | 473,212 | 549,878 | - | 1,343,339 |
| Tribal assistance | - | 233,518 | 391,789 | - | - | 85,000 | 10,000 | - | - | 720,307 |
| TOTAL REVENUES | 499,330 | 323,394 | 671,120 | 12,099 | 278,744 | 110,330 | 499,945 | 549,878 | - | 2,944,840 |
| **EXPENDITURES** | | | | | | | | | | |
| Depreciation | 24,078 | 9,423 | 19,101 | 3,095 | 9,561 | 3,021 | 27,930 | 1,158 | | 97,367 |
| Equipment rental | - | 39,799 | - | - | - | - | 5,279 | - | | 45,078 |
| Entertainers' fees | - | 90,649 | - | - | - | - | - | - | | 90,649 |
| Insurance | 8,127 | - | 6,075 | 134 | 2,565 | 3,618 | 4,005 | - | | 24,390 |
| Other | 102,175 | 7,659 | 9,557 | - | 4,088 | 1,533 | 14,033 | 9,609 | | 148,788 |
| Promotional activities | 15,534 | 92,597 | 5,722 | - | 6,386 | - | 3,714 | - | | 123,953 |
| Repairs and maintenance | 82,958 | 481 | 13,893 | 3,461 | 8,787 | - | 22,008 | 1,418 | | 133,006 |
| Salaries and benefits | 328,988 | 8,559 | 324,584 | - | 146,029 | 62,071 | 310,450 | 72,363 | | 1,253,044 |
| Supplies | 2,783 | 49,204 | 10,482 | - | 128,269 | 6,068 | 211,434 | 424,418 | | 832,658 |
| Tribal tax | 15,042 | - | 6,104 | - | 8,877 | 699 | 15,118 | 10,079 | | 55,919 |
| Utilities | 2,877 | - | 8,561 | - | 7,017 | 3,235 | 21,307 | 1,160 | | 44,157 |
| TOTAL EXPENDITURES | 582,562 | 298,371 | 404,079 | 6,690 | 321,579 | 80,245 | 635,278 | 520,205 | | 2,849,009 |
| EXCESS(DEFICIENCY) OF REVENUES OVER EXPENDITURES | (83,232) | 25,023 | 267,041 | 5,409 | (42,835) | 30,085 | (135,333) | 29,673 | (4,929) | 95,831 |
| RETAINED EARNINGS (DEFICIT) BEGINNING, RESTATED | 136,523 | 25,814 | (93,428) | 33,406 | 167,353 | (9,233) | (156,736) | (67,823) | - | 30,947 |
| CONTRIBUTED CAPITAL | - | - | 128,950 | 15,191 | 238,352 | - | 246,139 | 17,738 | - | 646,370 |
| RETAINED EARNINGS (DEFICIT) ENDING | $ 53,291 | $ 50,837 | $ 302,563 | $ 54,006 | $ 362,870 | $ 20,852 | $ (45,930) | $ (20,412) | $ (4,929) | $ 773,148 |

The accompanying notes are an integral part of the financial statements.

SJ002617

# MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

## COMBINED STATEMENT OF CASH FLOWS - ENTERPRISE FUNDS

### For the Year Ended September 30, 2001

CASH FLOWS FROM OPERATING ACTIVITIES

| | |
|---|---:|
| Excess of revenues over expenditures | 95,831 |
| Adjustments to reconcile excess of revenue over | |
| expenditures to net cash provided by operating activities | |
| Depreciation | 97,367 |
| Prior period adjustments | 64,762 |
| Change in operating assets and liabilities: | |
| Accounts receivable | 207 |
| Due from other funds | (119,785) |
| Prepaids | (23,306) |
| Accounts payable | (41,778) |
| Payroll related liabilities | 283,955 |
| Due to other funds | 115,031 |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 472,284 |

CASH FLOWS FROM INVESTING ACTIVITIES

| | |
|---|---:|
| Purchase of equipment | (309,174) |
| Decrease in investments, net | 788 |
| NET CASH USED IN INVESTING ACTIVITIES | (308,386) |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 163,898 |
| CASH AND CASH EQUIVALENTS, beginning of year | 61,092 |
| CASH AND CASH EQUIVALENTS, end of year | 224,990 |

The accompanying notes are an integral part of the financial statements.

SJ002618

# MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

## NOTES TO FINANCIAL STATEMENTS

### Year Ended September 30, 2001

**Note 1**   **NATURE OF THE ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

### Organization

The Miccosukee Tribe of Indians of Florida (the Tribe) is a tribe defined by the Indian Reorganization Act of June 18, 1934. The Constitution and Bylaws of the Miccosukee Tribe of Indians of Florida was ratified and duly adopted by the members of the Miccosukee Tribe on December 17, 1961 and approved by the Department of the Interior (DOI) of the United States of America on January 11, 1962.

Pursuant to the Constitution of the Miccosukee Tribe of Indians of Florida, the Miccosukee General Council is authorized to approve the annual budget for the General Fund. The Miccosukee Business Council is authorized to approve modification of the annual budget, administer funds (within the control of the Tribe) and engage in any business that will further the economic well-being of its members.

A summary of the significant accounting policies, as applicable to governmental units, which have been applied in the preparation of the financial statements of the various funds follows.

### Basis of Presentation - Fund Accounting

The accounts of the Tribe are organized on the basis of funds which are considered separate accounting entities. The operations of each fund are accounted for with a separate set of self-balancing accounts that comprise its assets, liabilities, fund balance/retained earnings, revenues, and expenditures/expenses as appropriate. The various funds are summarized by type in the financial statements.

The following fund types are used by the Tribe:

<u>General Fund</u>

The general fund is the operating fund of the Tribe and accounts for all revenues and expenditures of the Tribe not encompassed within other funds. All leases and rental revenues and other receipts that are not allocated by the Business Council to some other fund are accounted for in this fund. General operating expenditures and the capital improvement costs that are not paid through other funds are paid from the general fund.

- 8 -

SJ002619

Note 1     NATURE OF THE ORGANIZATION AND SUMMARY OF SIGNIFICANT
           ACCOUNTING POLICIES (Continued)

Enterprise Funds

These funds are established to account for operations that are financed and operated in a manner similar to private business enterprises, where the intent is that costs of providing goods or services to the general public in a continuing basis be financed or recovered primarily through user charges.

**Basis of Accounting**

The general fund is accounted for using the modified accrual basis of accounting. Under the modified accrual basis of accounting, revenues are recognized when they become measurable and available. Expenditures are recognized in the accounting period in which the fund liability is incurred, if measurable.

The Enterprise funds are accounted for using the accrual basis of accounting. Their revenues are recognized when they are earned, and their expenses are recognized when they are incurred.

**Budgets and Budgetary Accounting**

As set forth in the Tribe's Constitution and Bylaws, the Tribe's General Council adopts an annual budget for the general fund. The annual budget for this fund is prepared in accordance with the basis of accounting utilized by that fund. The budget for these funds is presented in the Statement of Revenues and Expenditures - Budget and Actual. All annual appropriations lapse at fiscal year end.

**Cash Management**

The Tribe pools cash resources of its various funds to facilitate the management of cash. Cash applicable to a particular fund is readily identifiable. The balance in the pooled cash accounts is available to meet current operating requirements. Cash in excess of current requirements is invested in various interest-bearing securities and disclosed as part of the Tribe's investments (see Note 8).

**Cash Equivalents**

For purposes of the statement of cash flows, the Tribe considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

**Receivables**

All receivables are reported at their gross value and, where appropriate, are reduced by the estimated portion that is expected to be uncollectible.

- 9 -

SJ002620

**Note 1     NATURE OF THE ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

**Supplies**

Supplies consist of food and other supplies and are valued at the lower of cost (determined on the first-in, first-out method) or market.

**Fixed Assets**

Fixed assets used in tribal operations are accounted for in the general fund.

Fixed assets acquired for Enterprise activities are capitalized in the enterprise fund.

Fixed assets are valued at historical cost, or estimated at historical cost if actual historical cost is not available.  Donated fixed assets are valued at their estimated fair value on the date of donation.  Depreciation is computed over the estimated useful lives of the respective assets on a straight-line basis.

**Tribal Assistance**

Assistance is offered to support the local enterprises of the Tribe.  These funds are then used for improvements to the structures and/or equipment leading to improved profitability.

**Use of Estimates and Assumptions**

The preparation of the financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

**Note 2     MEMORANDUM TOTAL COLUMNS ON COMBINED STATEMENTS**

Total Columns on the Combined Statements are captioned "memorandum only" to indicate that they are presented only to facilitate financial analysis.  Data in these columns do not present financial position, results of operations, or changes in financial position in conformity with generally accepted accounting principles.  Neither is such data comparable to a consolidation.  Interfund eliminations have not been made in the aggregation of this data.

- 10 -

SJ002621

**Note 3    CREDIT RISK**

Financial instruments which potentially subject the Tribe to concentrations of credit risk consist principally of cash and cash equivalents, investments, due from other funds and accounts receivable. The Tribe maintains its cash in bank deposit accounts which, at times, may exceed federally insured limits. The Tribe has not experienced any losses in such accounts.

**Note 4    FIXED ASSETS**

As of September 30, 2001, fixed assets consist of the following:

|  | General Fund | Enterprise Fund |
|---|---|---|
| Land | $  16,158,913 | $    154,823 |
| Building and improvement | 17,736,807 | 1,286,721 |
| Furniture and fixtures | 33,335 | 60,617 |
| Equipment | 2,997,649 | 506,657 |
| Transportation vehicles | 2,250,167 | - |
|  | 39,176,871 | 2,008,818 |
| Less accumulated depreciation and amortization | (4,474,100) | (1,241,804) |
| Fixed assets, net | $  34,702,771 | $    767,014 |

**Note 5    DUE FROM (TO) RELATED PARTIES**

As of September 30, 2001, due from (to) related parties for the general fund consists of the following:

Due from Miccosukee Corporation, Inc. (the Corporation) for certain expenses in excess of the Corporation's grant revenue on an individual grant basis paid by the Tribe. This receivable is non-interest bearing and has no specific repayment date.                                              $    198,610

Due from Miccosukee Indian Bingo (the Bingo), for license fees and net revenue distributions owed to the Tribe. This receivable is non-interest bearing and has no specific repayment date.                                              73,412

Due from Miccosukee Service Plaza (the Plaza), for certificate of deposit in the name of the Plaza paid by Miccosukee Tribe. This receivable is non-interest bearing and has no specific repayment date                                              440,901

Total due from related parties                                              $    712,923

- 11 -

SJ002622

**Note 5     DUE FROM (TO) RELATED PARTIES (Continued)**

Due to Miccosukee Corporation, Inc. (the Corporation) for certain expenses in excess of the Corporation's grant revenue on an individual grant basis paid by the Corporation. This payable is non-interest bearing and has no specific repayment date.                                                        $    417,143

Due to Miccosukee Service Plaza (the Plaza), for various expenses.   This payable is non-interest bearing and has no specific repayment date                                                                                           4,543

Total due to related parties                                              $    421,686

**Note 6     INVESTMENT IN MICCOSUKEE RESORT AND CONVENTION CENTER**

Investment in Miccosukee Resort and Convention Center represents expenditures related to the construction of the Miccosukee Resort and Convention Center paid by Miccosukee Tribe.

**Note 7     LOANS RECEIVABLE FROM TRIBAL MEMBERS**

Loans receivable from tribal members represents loans made to individual tribal members. These loans are limited to $10,000 but the general council can increase the limit at their discretion. Loans are charged at a 10% interest and are discounted prior to the issuance of the check.  These loans are collected from the quarterly tribal distribution.

**Note 8     INVESTMENT SECURITIES**

Investments made by the Tribe are summarized below.  The investments that are represented by specific identifiable investment securities are classified as to credit risk by the three categories described below:

| | |
|---|---|
| Category 1 | Insured or registered, or securities held by the Tribe or its agent in the Tribe's name |
| Category 2 | Uninsured and unregistered, with securities held by the financial institution or agent in the Tribe's name |
| Category 3 | Uninsured and unregistered, with securities held by the financial institution or agent but not in the Tribe's name |

- 12 -

SJ002623

**Note 8     INVESTMENT SECURITIES (Continued)**

The investments for the Tribe are considered a Category 1 credit risk and consist of the following securities:

| Description | Cost | Market Value |
|---|---|---|
| U. S. Government Bonds | $    4,529,529 | $  4,574,431 |
| Stocks | 1,050,031 | 1,072,239 |
| Total Investment Securities | $    5,579,560 | $  5,646,670 |

**Note 9     COMPENSATED ABSENCES**

It is the Tribe's policy to permit employees to accumulate a total of not more than forty (40 days of earned but unused compensated absences. Upon separation from the Tribe's service any accumulated compensated absences will be paid to the employee. A liability of $282,537 of accrued compensated absences at September 30, 2001 has been recorded.

**Note 10     LEASES AND RENTALS**

The Tribe is the lessor on several operating leases expiring in various years through 2007.

The following is a schedule, by years, of minimum future rentals on noncancelable operating leases:

| Year ending September 30, | |
|---|---|
| 2002 | $   460,788 |
| 2003 | 297,060 |
| 2004 | 194,000 |
| 2005 | 31,500 |
| 2006 | 24,000 |
| Thereafter | 16,000 |
| Total minimum future rentals | $1,023,348 |

Minimum future rentals do not include contingent rentals that may be received under cost of living escalators.

The Tribe's major sources of lease and rental income for fiscal 2001 are summarized as follows:

| | |
|---|---|
| Farm lease | $   196,084 |
| Oil and pipeline leases | 165,637 |
| Surface ground leases | 286,761 |
| Total | $   648,482 |

-13-

SJ002624

**Note 11    LICENSES AND PERMITS**

Licenses and permits represent revenues generated from annual dues for camp permits and decals that are issued by the Tribe.  These licenses and decals grant the permittee temporary occupancy and access to the Miccosukee Indian Alligator Alley Reservation and camp for recreation, fishing and frogging.  Dues are determined annually by the Business Council and are recognized as revenues when assessed because they are measurable and are collectible within the current periods.  Licenses and permits for the year ended September 30, 2001 totaled approximately $148,000.

**Note 12    OWNERS' COMPENSATION FEES**

The Miccosukee Tribe of Indians of Florida own and operates several economic development enterprises within the boundaries of the reservation. The Miccosukee Indian Bingo  provides pulltab, bingo, poker and other entertainment services to patrons. The Miccosukee Resort and Convention Center features 46 suites and 256 guest rooms with 46,000 square feet of meeting and banquet facilities. The Miccosukee Service Plaza is a full service plaza which provides gasoline and store goods to retail customers.

The Tribe assesses a gross receipts license fee to the Miccosukee Indian Bingo and the Miccosukee Resort and Convention center equal to 7.75% of total gross revenues. Total gross revenues are defined as gross revenues for all revenue-generating activities plus other income, net and interest income. Such gross receipts license fee amounted to $32,103,681 and $546,810 for the year ended September 30, 2001.

The Tribe receives net revenues generated by the Miccosukee Indian Bingo. The funds are disbursed at the direction of the Business Council as the governing board. The funds are to be used for tribal government operations or programs; provide for the general welfare of the Miccosukee Indian Tribe and its members; promote tribal economic development; or help fund operations of local government. Total net revenues disbursed by the Miccosukee Indian Bingo to the Tribe amounted to $36,513,438 for the year ended September 30, 2001.

The Tribe assesses a tax fee to the Miccosukee Service Plaza of two cents per gallon for every gallon sold. The Tribe also receives net revenues generated by the Miccosukee Service Plaza. The funds are disbursed at the direction of the Business Council as the governing board. Total funds disbursed to the Tribe mounted to $373,942 for the year ended September 30, 2001.

The Tribe executed a separate contractual agreement with a third party to manage the Miccosukee Smoke Shop that is located on the Miccosukee Reservation and owned by the Tribe.  Net revenues generated from the operations under this management agreement is allocated between the management companies and the Tribe based on a contractual amount that is stipulated in the contracts.

-14-

SJ002625

**Note 12    OWNERS' COMPENSATION FEES (Continued)**

The following is a summary of the Tribe's net owner's compensation fees for the year ended September 30, 2001:

| | |
|---|---:|
| Miccosukee Indian Bingo | $ 68,617,120 |
| Miccosukee Resort and Convention Center | 546,810 |
| Miccosukee Service Plaza | 373,942 |
| Miccosukee Smoke Shop | 266,689 |
| | $ 69,804,561 |

**Note 13    COMMITMENTS AND CONTINGENCIES**

(a)  Litigation with Former Management Company

In February, 1992 the former management contractor (Tamiami Partners Ltd, or "TPL") sued the Miccosukee Indians of Florida in Federal District Court.  In this complaint and various motions, TPL sought to block the Tribe's contractual remedies against TPL through injunctive and other equitable relief after the Miccosukee Tribal Gaming Agency denied gaming licenses to various employees and to TPL.

After several appeals, in March 2001 the Tribe received a summary final judgment from the United States District Court, Southern District of Florida, to pay TPL the sum of $9.5 million dollars plus pre-judgement interest from December 6, 1993 and interest from the date of the order to the date of payment.

On December 6, 2002, the Tribe paid $17,546,071 to TPL consistent with the summary final judgment.  These financial statements reflect a liability representing the settlement plus interest through September 30, 2001 as a loss on litigation. The Tribe recorded a loss of approximately $16 million in 2000 and $1.6 million in 2001 which is reflected in the combined statement of revenues and expenditures.

(b)  Litigation with Contractor

The Tribe is currently under a pending lawsuit in the Tribal Court with the contractor that built a number of buildings for the Tribe. The contractor is making a claim for monies that it asserts is owed to it by the Tribe as a result of these construction projects. The Tribe is actively contesting the claim and considers the likelihood of being required to pay such amounts remote.

-15-

SJ002626

**Note 13    COMMITMENTS AND CONTINGENCIES (Continued)**

(c) Self-Insurance

The Tribe retains the risk of workers compensation under a self-insurance program (the Program). The Tribe liability under the Program includes unpaid claims and an estimate of claims that have been incurred but not reported. Incurred but not reported claims include known loss events that are expected to later be presented as claims, unknown loss events that are expected to become claims and expected future development on claims already reported. The liability was estimated to be approximately $325,000 as of September 30, 2001. The ultimate cost of this retained risk is estimated by management. Management believes the ultimate actual cost of this retained risk will not have a material impact on the Tribe's financial position.

(d) Other Matters

From time to time, the Tribe may be involved in routine litigation and claims incidental to its business. The Tribe does not believe that the ultimate resolution of any of these matters will have a material adverse effect on the accompanying financial statements.

**Note 14    EMPLOYEE BENEFIT PROGRAMS**

Eligible employees, as defined, of the Tribe participate in a deferred retirement plan sponsored by the Tribe whereby the Tribe will match employee contributions up to 5% of gross compensation. Total Tribe contribution for September 30, 2001 was approximately $108,000.

**Note 15    PRIOR PERIOD ADJUSTMENTS**

Fund Equity at the beginning of the year has been adjusted for the following:

|  | General Fund | Enterprise Fund |
|---|---|---|
| Net Equity (Deficit) at beginning of year, as previously stated | $97,333,958 | ($33,815) |
| Contributed Capital |  | 646,370 |
| Adjustments: |  |  |
| To write-off prior years payables and receivables collected and paid in prior years. |  | 64,762 |
| To adjust accumulated depreciation for overstatement of depreciation in prior year. | 978,457 |  |
| Fund Equity (Deficit) at beginning of year, as restated | $98,312,415 | $677,317 |

-16-

SJ002627