Exhibit 20

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 14-22441-CIV-ALTONAGA/O'Sullivan**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

SALLY JIM,

      Defendant.

_____/

**SALLY JIM'S RESPONSE TO THE UNITED STATES' FIRST SET OF INTERROGATORIES**

    Sally Jim, by and through undersigned counsel serves the United States' a Response to the United States' First Set of Interrogatories.

**INTERROGATORIES**

INTERROGATORY NO. 1

    Detail each payment, remuneration, gift, distribution, salary, gambling winnings or transfer of anything of value received by Sally Jim during the year 2001, including amount, source, date of transfer, and whether you contend that such amount is includable in Sally Jim's taxable income for the 2001 tax year. Identify any and all documents evidencing such transfers and persons that have knowledge or information concerning such transfers.

ANSWER:

| Item | Amount | Source | Issued To | Date | Taxable? |
|------|--------|--------|-----------|------|----------|
| W-2 | Wages, tips, other comp.: 25990.01 | Miccosukee Corporation | Sally Jim | 2001 | Yes |
| General Welfare Benefit | Check Amount: 40623.19 | Miccosukee Tribe | Sally Jim & Alexander Osceola | 2001 1st Quarter | No |
| General | Check Amount: 44600.00 | Miccosukee | Sally Jim & | 2001 | No |

1

| Item | Amount | Source | Issued To | Date | Taxable? |
|------|--------|--------|-----------|------|----------|
| Welfare Benefit | | Tribe | Alexander Osceola | 2nd Quarter | |
| General Welfare Benefit | Check Amount: 44600.00 | Miccosukee Tribe | Sally Jim & Alexander Osceola | 2001 3rd Quarter | No |
| General Welfare Benefit | Check Amount: 46965.00 | Miccosukee Tribe | Sally Jim & Alexander Osceola | 2001 4th Quarter | No |

The W-2 is attached, the General Welfare checks were provided by the United States.

INTERROGATORY NO. 2

     To the extent that you contend that any of the items included in your answer to interrogatory 1 are not includable in Sally Jim's taxable income for federal income tax purposes for the year 2001, please explain why, and state each and every factual and legal basis for your contention as to each item. Identify any and all documents and persons that have knowledge or information concerning your contentions.

ANSWER:

Distributions are not taxable because they are for tribal assistance for General Welfare Purposes. The documents attached provide the explanation for this answer. The persons that have knowledge or information about these matters, in addition to those named in the attached documents, are Dexter Wayne Lehtinen, Esq., ex-Chairman Billy Cypress, Miguel Hernandez, and Julio Martinez.

INTERROGATORY NO. 3

> In paragraph 6 of your First Amended Answer to Complaint, Doc. 15 (Amended Answer), you state that you "reasonably relied on legal advice provided to [you] and to the Miccosukee Tribe" to justify your failure to file a tax return for the 2001 tax year. Please list and describe every instance in which you received legal advice regarding your tax liabilities including the date of every instance, in what form advice was received (*e.g.*, oral or in writing), from whom such advice was received, where you received such advice, and the substance of such advice. Identify any and all documents evidencing such advice and persons that have knowledge or information concerning such advice.

ANSWER:

Ms. Jim objects to this question as it assumes that the distributions are taxable. The distributions are not taxable. However, if the distributions are taxable only then does the following apply: Ms. Jim has heard this legal advice, that distributions are not taxable, multiple times. She heard this legal advice at General Council meetings held on the Miccosukee Reservation. Ms. Jim does not recall the specific dates as more than a decade has passed. Ms. Jim believes that the Tribe's former lawyer, Dexter Lehtinen, was present at all these meetings when the legal advice was given. Ms. Jim believes that the legal advice came from him or from other members of the finance department who were also present at the General Council Meetings. The other individuals who spoke at the meetings were Julio Martinez and Mike Hernandez. The members of the Business Council were also present at these meetings. Ms. Jim has also heard this legal advice repeated outside of General Council meetings from fellow tribal members but does not recall the specific time and location. All legal advice given to Ms. Jim was verbal. Individuals with knowledge or information concerning such advice are all tribal members present during the meetings mentioned in this paragraph and the specific individuals named above.

INTERROGATORY NO. 4

> Please state each and every factual contention on which you base your defense (B)(1) on page 3 of your Amended Answer. Identify any and all documents and persons that have knowledge or information concerning your contentions.

ANSWER:

This information is in the Bates documents provided by the United States. The IRS listed the

distributions as "Income from Miccosukee Indian Tribe." IRS Agents James M. Furnas and

Mark Holborn have knowledge or information concerning this answer.

INTERROGATORY NO. 5

Please state each and every factual contention on which you base your defense (B)(2) on page 3 of your Amended Answer. Identify any and all documents and persons that have knowledge or information concerning your contentions.

ANSWER:

See the attached documents explaining the factual reasons for this defense. Dexter Lehtinen has

knowledge or information concerning this contention.

INTERROGATORY NO. 6

> Please state whether you contend that distributions from the Tribe to Sally Jim are or are not in substance distributions of gaming proceeds from the gaming facility owned by the Tribe, and describe the factual basis for such contentions. Identify any and all documents and persons that have knowledge or information concerning your contention. If you contend that distributions of Tribal gaming proceeds do not constitute taxable income in the hands of the recipient, please describe your basis for such contention.

ANSWER:

Ms. Jim does not have personal knowledge as to whether or not the distributions are in substance distributions of gaming proceeds from the gaming facility owned by the Tribe because this information was based on legal and accounting advice that she was not privy to. The document that supports the information about the tax is the Resolution that imposes the tax. The legal basis supporting the conclusion that the proceeds do not constitute taxable income is that the payments constitute general welfare. The factual basis for payments to Ms. Jim constituting general welfare payments are: 1) they were provided to her according to the following specific guidelines; a) she needed to meet the blood quantum requirement of be 50% Miccosukee blood, she had to be an enrolled member which requires applying for enrollment, being sponsored by an enrolled tribal member, and approved by the Miccosukee General Council; b) to the extent Ms. Jim knows, there is no special treatment for any members of the business council or their relatives; 2) the payments (not wages) to Ms. Jim were not related to or were compensation for any services performed by her; 3) Ms. Jim, as part of a small egalitarian society, does not consider the amount of payments to be lavish and extravagant because these payments helped provide for her basic needs and what her culture considers appropriate and necessary.

The persons that have knowledge or information about these matters, in addition to those named in the attached documents, are the members of the Miccosukee Tribe, Dexter Wayne Lehtinen, Esq., ex-Chairman Billy Cypress, Miguel Hernandez, and Julio Martinez.

<u>INTERROGATORY NO. 7</u>

      Please state each and every factual contention underlying your claim in your Amended Answer at paragraph (B)(3) that distributions from the Tribe to you were "for general welfare purposes, and thus are not subject to federal income taxation and reporting requirements." Identify any and all documents and persons that have knowledge or information concerning your contention.

<u>ANSWER:</u>

Please see answer to Interrogatory Number 6. Additionally, see the hearing transcript on December 18, 2014 in *United States v. Colley Billie*, Case No. 14-20938. Individuals who have knowledge or information concerning the above interrogatories include every tribal member who was eighteen years of age or older in 2001.

INTERROGATORY NO. 8

> Please describe the factual bases for your contention in your Amended Answer at paragraph (C)(1) that imposition of penalties is unwarranted because your failure to timely file and timely pay is due to reasonable cause and not due to willful neglect. Identify any and all documents and persons that have knowledge or information concerning your contention.

ANSWER:

Ms. Jim objects to this question as it assumes that the distributions are taxable. The distributions are not taxable. However, if the distributions are taxable only then does the following apply:

Ms. Jim, as a tribal member, relied on the legal advice of Dexter Lehtinen, Esq. that the distribution was not taxable. Ms. Jim heard from Dexter Lehtinen, the Tribe's former attorney, regarding his advice concerning the taxability of distributions. Dexter Lehtinen informed the Tribe and tribal members that, in his opinion, distributions were exempt from taxation and that Tribal Members had no reporting obligations. Dexter Lehtinen held himself out as competent and an expert on tax issues, and was fully conversant with the Tribe's General Welfare Program and Tribal Distributions, and with the nature, source, and amount of distributions. Ms. Jim remembers that Dexter Lehtinen was aware that she, a tribal member, received distributions and thus all relevant facts were known by Dexter Lehtinen. The Tribe did not await passively for Dexter Lehtinen's volunteered advice. Dexter Lehtinen made specific findings as to the taxability of the Tribe's general welfare program and the distributions. Ms. Jim sought and received this advice in good faith. Ms. Jim is unfamiliar with tax law.

Assuming distributions are taxable, Ms. Jim was not aware of her obligation to file a return and pay taxes on the distributions. The alleged failure to file the return and pay the tax was through no fault of her own. Given Ms. Jim's age, education, and prior experience, Ms. Jim exercised ordinary business care and prudence in the acceptance of Dexter Lehtinen as her attorney. Ms.

Jim's experience, having no knowledge of the taxability of General Welfare programs and Tribal Distributions, was such that she relied upon her attorney, Dexter Lehtinen, to inform her of the taxability of distributions. Ms. Jim's alleged omission was not due to inattention but to the advice of Dexter Lehtinen that no such returns were necessary. The advice of competent counsel constitutes 'reasonable cause' for alleged failure to file, and Ms. Jim, as a taxpayer who in good faith acted upon such advice, after counsel had full disclosure, is not guilty of willful neglect. Ms. Jim, following competent counsel's instruction, acted in good faith and was reasonably prudent.

Moreover, Ms. Jim had no knowledge that she was required to file a tax return as to distributions until the IRS brought this lawsuit. Ms. Jim relied on the expert advice of Dexter Lehtinen, which evidences her care and attention to her duties under the tax law. The reliance shows Ms. Jim's exercise of ordinary business care and prudence. Dexter Lehtinen had a reputation for competency and ability. He had the necessary data, Ms. Jim relied on him. Finally, the Tribe and Ms. Jim as a tribal member have continually asserted through letters to the IRS that the distribution monies fall within the general welfare exclusion.

Ms. Jim has no knowledge of a specific amount of gambling winnings for the 2001 tax year as more than a decade has passed and as a result demands strict proof.

As to Ms. Jim's wages, upon learning that her tax return was not filed as to her wages, Ms. Jim is filing a tax return for tax year 2001.

Please see attached memoranda. Individuals who have knowledge include Dexter Lehtinen, Billy Cypress, and all tribe members who were present at any General Council meeting where Dexter Lehtinen represented that distributions were nontaxable.

INTERROGATORY NO. 9

Please describe your efforts to exercise ordinary business care and prudence as asserted in your Amended Answer at paragraph (C)(2). Identify any and all documents and persons that have knowledge or information concerning your contention.

ANSWER:

Please see the answer to Interrogatory Number 8 for a comprehensive answer to Interrogatory Number 8, Number 9, and Number 10.

INTERROGATORY NO. 10

      Please list relevant facts you disclosed to your attorney for the 2001 tax year and state when and how you disclosed such facts to your attorney, as claimed in paragraph (C)(3) of the Amended Answer. Identify any and all documents and persons that have knowledge or information concerning your contention.

ANSWER:

Please see the answer to Interrogatory Number 8 for a comprehensive answer to Interrogatory Number 8, Number 9, and Number 10.

INTERROGATORY NO. 11

In paragraph (C)(5) of the Amended Answer, you contend that the Tribe hired Dexter Lehtinen to provide legal advice regarding distributions. Please detail all payments made in any way or by any method to Dexter Lehtinen, his firm or any of his associates by amount and date made by the Tribe or any member or agent or employee thereof during the years in which he was so employed. Identify any and all documents and persons that have knowledge or information concerning your contention.

ANSWER:

Ms. Jim objects as overly broad, vague and Ms. Jim does not have knowledge. It is broad because it covers taxable years that are not at issue. It is vague because it does not define "any method." Moreover, it is not within Ms. Jim's knowledge because Ms. Jim does not have knowledge of payments to Dexter Lehtinen that "any [Tribe] member," and payments made by the Tribe to Dexter Lehtinen. The persons with knowledge regarding payments made to Lehtinen are: Julio Martinez, Mike Hernandez, and Jodi Rae Goldenberg, Jeanine Bennett, and Dione Carroll.

INTERROGATORY NO. 12

> To the extent that you did not admit any item in the First Request for Admissions, state in detail the basis for your denial, including the legal basis and any and all facts concerning your contentions. Identify any and all documents and persons that have knowledge or information concerning your contention.

ANSWER:

*Request for Admissions No. 3:*

No, because Exhibit A includes monies for two individuals, who are the two individuals listed on the distribution check.

*Request for Admissions No. 4:*

Ms. Jim is without knowledge.

*Request for Admissions No. 5:*

Ms. Jim objects. This question is overbroad as it does not include a temporal scope.

*Request for Admissions No. 6:*

Ms. Jim objects. This question is overbroad as it does not include a temporal scope.

*Request for Admissions No. 7:*

Ms. Jim objects. The terms "original," and "exclusive source," are not defined and as a result the question is vague. Assuming Sally Jim defines original as first, she is without knowledge as to the original exclusive source of the Tribe's distributions.

*Request for Admissions No. 8:*

Ms. Jim objects. The terms "original," and "primary source," are not defined and as a result the question is vague. Assuming Sally Jim defines original as first, she is without knowledge as to the original primary source of the Tribe's distributions.

*Request for Admissions No. 9:*

Ms. Jim is without knowledge.

The question is overbroad as it requests information regarding all tribal members.

*Request for Admissions No. 10:*

Ms. Jim is without knowledge.

The question is overbroad as it requests information regarding all tribal members.

*Request for Admissions No. 11:*

Ms. Jim is without knowledge.

*Request for Admission No. 12:*

Ms. Jim is without knowledge.

*Request for Admission No. 13:*

Ms. Jim objects. The question is vague as it does not explain whether it refers to all distributions or some distributions. As to checks provided by the IRS for the month of March and June 2001, Ms. Jim admits the checks provided by the IRS in discovery contain the text "NTDR Account".

*Request for Admission No. 14:*

Ms. Jim objects. The question is overly broad as the question does not contain a temporal scope.

Ms. Jim lacks knowledge as to each and every quarterly distribution from the inception of the General Welfare Program.

*Request for Admission No. 15:*

Ms. Jim objects. The question is overly broad. The question does not provide a temporal scope, and concerns other tribal members. The question is overbroad as it requests information regarding all tribal members.

Ms. Jim is without specific knowledge.

*Request for Admission No. 16:*

Ms. Jim is without knowledge.

*Request for Admission No. 18:*

Ms. Jim is without knowledge as to the exact dates, and is without knowledge as to whether Dexter Lehtinen controlled all legal representation of the Tribe.

*Request for Admission No. 19:*

Ms. Jim is without knowledge as to the exact dates, and is without knowledge as to the amount Lehtinen charged the Tribe for his work as main attorney for the Miccosukee Tribe.

*Request for Admissions No. 20:*

Ms. Jim objects. The question is overly broad as it calls for information outside the temporal scope. The question calls for a legal conclusion for which Ms. Jim lacks knowledge.

Ms. Jim is without knowledge of the specific date and specific statute.

*Request for Admissions No. 21:*

Ms. Jim objects. The question calls for information outside the temporal scope. The question calls for a legal conclusion of which Ms. Jim lacks knowledge.

Ms. Jim is without knowledge of the specific statute.

*Request for Admissions No. 22:*

Ms. Jim is without knowledge as to the specific date and specific conversation Dexter Lehtinen had with other tribal members. Ms. Jim admits only that Dexter Lehtinen was General

Counsel to the Miccosukee Tribe from the early 1990s until about May 1, 2010. *See* ECF No. 15 at paragraph 6; Amended Answer, ECF No. 15, Affirmative Defenses, paragraph C 7.

The question is overbroad as it requests information regarding all tribal members.

*Request for Admissions No. 23:*

Ms. Jim objects as the question calls for a legal conclusion. The question is also overbroad as it requests information regarding all tribal members.

Ms. Jim is without knowledge.

*Request for Admissions No. 24:*

Ms. Jim objects. The question is compound. The question seeks a legal conclusion and Ms. Jim lacks knowledge.

Ms. Jim is without knowledge as to date and statute.

Ms. Jim admits only that Dexter Lehtinen was General Counsel to the Miccosukee Tribe from the early 1990s until about May 1, 2010. *See* ECF No. 15 at paragraph 6; Amended Answer, ECF No. 15, Affirmative Defenses, paragraph C 7.

*Request for Admissions No. 25:*

Ms. Jim objects. The question calls for a legal conclusion for which Ms. Jim lacks knowledge.

Ms. Jim is without knowledge as to date and statute.

Ms. Jim admits only that Dexter Lehtinen was General Counsel to the Miccosukee Tribe from the early 1990s until about May 1, 2010. *See* ECF No. 15 at paragraph 6; Affirmative Defenses paragraph C 7.

*Request for Admissions No. 26:*

Ms. Jim is without knowledge as to date and statute. Ms. Jim admits only that Dexter Lehtinen was General Counsel to the Miccosukee Tribe from the early 1990s until May 1, 2010. *See* ECF No. 15 at paragraph 6; Affirmative Defenses paragraph C 7.

*Request for Admissions No. 27:*

Ms. Jim objects. The question is vague. Ms. Jim does not know who "members of the class" are. The question calls for a legal conclusion for which Ms. Jim lacks knowledge.

*Request for Admissions No. 28:*

Ms. Jim is without knowledge as to date. Ms. Jim admits Dexter Lehtinen advised the Miccosukee Tribe and tribal members such as herself that the distributions disbursed to tribal members were not taxable income and thus no tax returns were required as to that income. *See* Answer, ECF No. 15, Affirmative Defenses paragraph C 7.

*Request for Admissions No. 29:*

Ms. Jim objects. The question calls for a legal conclusion for which Ms. Jim lacks knowledge.

Ms. Jim admits Dexter Lehtinen advised the Miccosukee Tribe and tribal members such as herself that the distributions disbursed to tribal members were not taxable income and thus no tax returns were required as to that income. *See* ECF No. 15, Affirmative Defenses paragraph C 7.

*Request for Admissions No. 30:*

Ms. Jim is without knowledge as to the specific date. Ms. Jim is without knowledge as to specific conversations Dexter Lehtinen may have had with various individual tribal members. The question is overbroad as it requests information regarding all tribal members.

*Request for Admissions No. 31:*

Ms. Jim is without knowledge as to the specific date and the specific quote. Ms. Jim is without knowledge as to specific conversations Dexter Lehtinen may have had with various individual tribal members. The question is overbroad as it requests information regarding all tribal members.

*Request for Admissions No. 32:*

Ms. Jim is without knowledge as to the specific date and the specific quote. Ms. Jim is without knowledge as to specific conversations Lehtinen may have had with various individual tribal members. The question is overbroad as it requests information regarding all tribal members.

*Request for Admissions No. 33:*

Ms. Jim is without knowledge.

*Request for Admissions No. 34:*

Membership of the Miccosukee Tribe of Indians of Florida is contingent on a proper application to the Miccosukee Tribe, approval by the Miccosukee General Council, sponsorship by a current member of the Miccosukee Tribe of Indians of Florida, and a minimum of 50 % Miccosukee blood. Ms. Jim was not born a member of the Miccosukee Tribe; she had to satisfy the above requirements.

*Request for Admissions No. 35:*

Ms. Jim objects. The question is vague as it does not specify the recipient. The question is overbroad as it may be referring to every recipient. In that situation, Ms. Jim is without knowledge as to every recipient.

*Request for Admissions No. 36:*

Ms. Jim objects. The question is argumentative because it assumes that the Tribe provided Christmas bonuses, which she does not remember.

Ms. Jim is without knowledge as to what the Tribe provided to its members.

*Requested for Admission No. 37:*

Ms. Jim objects. The question is argumentative because it assumes that the Tribe provided Christmas bonuses, which she does not remember.

Ms. Jim denies the Tribe provided medical care as the Tribe is not a doctor who can provide medical care.

*Requested for Admission No. 38:*

Ms. Jim objects. The question is argumentative because it assumes that the Tribe provided Christmas bonuses, which she does not remember. The question is vague, and the question does not define "education benefits."

Ms. Jim is without knowledge regarding what the Tribe provided to all members.

The question is overbroad as it requests information regarding all tribal members.

*Requested for Admission No. 40:*

Ms. Jim is without knowledge as to tax year and amount. Bates documents provided by the IRS do not show gambling winnings for the 2001 tax year.

Individuals who have knowledge of the Answer to Interrogatory No. 12 include the Miami-Dade County Clerk of Court, Dexter Lehtinen, Theresa Willie, Chairman Colley Billie, Assistant Chairman Roy Cypress, Jr., Secretary Gabriel Osceola, Lawmaker William Osceola, Treasurer Jerry Cypress, Jasper Nelson, IRS Agent James M. Furnas, and Joseph P. Klock, Esq.

INTERROGATORY NO. 13

> During the year 2001, list the benefits that the Tribe made available to its members including but not limited to housing, health care, food, child care, education, transportation, or other living expenses. Identify each such benefit you received.

ANSWER:

First, Ms. Jim lacks knowledge as to any request for information relating to what benefits the Tribe may have made available to its members in 2001. Ms. Jim objects to the undefined term "benefit." A benefit is a term that is open to different interpretations. Ms. Jim does not recall any benefit provided to her by the Tribe in the year 2001 besides the general welfare payments that are the subject of this collection suit.

INTERROGATORY NO. 14

> Identify all documents in your possession, custody, or control that you believe are relevant to the claims of any party in this action, including but not limited to, all documents that you may use as exhibits at trial.

ANSWER:

At this time Ms. Jim does not have possession and control of any documents other than the ones already exchanged in this litigation (including documents attached to the United States' First Request for Interrogatories), or in possession of the IRS.

The documents that are relevant to the claims of any party in this action include:

Legal Memoranda from Dexter Lehtinen, Esq.; transcripts of deposition of Dexter Lehtinen, IRS Agent James M. Furnas, and Theresa Willie; and the Miccosukee Tribe's Gross Tax Receipts Ordinance.

INTERROGATORY NO. 15

If any document described in Sally Jim's First Request for Production of Documents was, but no longer is, in your possession or subject to your custody or control, in existence, state whether: (a) it is missing or lost; (b) it has been destroyed; (c) it has been transferred, voluntarily or involuntarily to others; and/or (d) it has been disposed of otherwise. In each instance, explain the circumstances surrounding such disposition and identify the person(s) directing or authorizing the same, and the date(s) thereof. Indentify each document by listing its author, and the author's address, type (e.g., letter, memorandum, telegram, chart, photograph, etc.), dates, subject matter, present location(s) and custodian(s), and state whether the document (or copies thereof) are still in existence.

ANSWER:

Not to the best of Ms. Jim's knowledge.

CERTIFICATION

I declare under penalty of perjury that the foregoing answers to the United States' First

Set of Interrogatories to Defendant Sally Jim are true and correct.


Executed on the _20_ day of _JANUARY_, 2015

Sally Jim

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been sent via email on January 20, 2015, to Robert

L. Welsh (Robert.L.Welsh@usdoj.gov; William.E.Farrior@usdoj.gov), attorney for Plaintiff.

Respectfully Submitted,

/s/ Bernardo Roman III
BERNARDO ROMAN III, ESQ.
(Fla. Bar No.: 0002739)
Attorney for Sally Jim
P.O. Box 440021, Tamiami Station
Miami, Florida 33144
Telephone: (305) 894-5214
Facsimile: (305) 894-5212
E-mail: bromanlaw@bellsouth.net

# LEHTINEN VARGAS & RIEDI
### ATTORNEYS AT LAW
#### A PROFESSIONAL ASSOCIATION



EXHIBIT

1

June 27, 2006

To: Ms. Christie Jacobs, Director
Indian Tribal Governments
Internal Revenue Service
Albuquerque, NM

Re: Non-taxability of Miccosukee tribal tax distributions

Dear Ms. Jacobs:

We understand from the ongoing examination process of the Miccosukee Tribe in Miami-Dade County, Florida, that the Service believes that provision of funds to individual Miccosukee Tribal members, from tribal funds generated by the Tribe through the levy of a tribal tax on businesses conducted on its Reservation, are taxable to the individual members and subject to mandatory withholding by the Tribe under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §2710(b)(3)(D). This position reflects both a misapplication of IGRA and the pertinent principles of Indian sovereignty and taxation, an argument we attempt to outline in this communication. The Tribe hopes to reach a reasonable accommodation on the subject of this memorandum, without litigation. The Tribe also hopes and requests that the separate audit of Miccosukee Indian Gaming will be closed, as the Tribe believes all relevant aspects of that audit are complete.

We are submitting herewith memorandum of law setting forth the Tribe's legal position. The Tribe is prepared to explain to IRS all financial aspects of its tribal tax and its provision of such tax revenue to tribal members, including a schedule of the tribal tax on gaming operations for years 2002 to present, together with a schedule of the individual distributions of the tax. This tax has been imposed by the Tribal government on gross gaming revenue, as well as on other businesses doing business on the Miccosukee reservation. Imposition of such a tax, of course, is well within the sovereign discretion of the Tribe. *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130 (1982).

The provision of any portion of this Tribal tax to its members, like its use for any Tribal or welfare purpose, are not taxable and generate no withholding

7700 N. KENDALL DRIVE, SUITE 303   MIAMI, FLORIDA 33156   TELEPHONE (305) 279-1166   FAX (305) 279-1365

obligations. For analytical purposes, the provision of tribal tax revenues to tribal members may be referred to as a "distribution" of tax revenues. The Tribe does not make the distributions under IGRA, nor as part of an IGRA distribution plan. IGRA by its clear terms only applies to distributions which are made from "net revenues" and only to those which are made "directly." A tribal tax on gross revenues is unambiguously an "above the line" item tied to gross revenues rather than to net revenues, and represents an exclusion from net revenues rather than a component thereof. The tribal tax is an expense under Generally Accepted Accounting Principles (not a component of net revenue). While Congress may have the power to impose tax obligations on the Tribe and its individual members, it must do so explicitly. Congress has not done so in IGRA or any other statute. In fact, as relates to the Miccosukee Tribe, Congress has specifically evidenced its intent to protect this small tribal community and its way of life.

The Service has consistently acknowledged that Indian tribes, in the absence of the clearest statement to the contrary from Congress, are not taxable entities for income tax or other tax purposes. The Service has further acknowledged that expenses for the general welfare of Tribal members generate no income tax consequences for either the Tribe or its members who benefit from the general welfare expenses. The Service, finally, has acknowledged that income to individual Indians from mineral extraction, farming and timber activities on Tribal land are not taxable. The Service, however, appears not to have gone far enough in applying and recognizing the fundamental principle which underlies these specific circumstances. The principle to be applied, which is clearly found in the still vital Supreme Court precedent of *Squire v. Capoeman,* 351 U.S. 1 (1956), is that income derived from Indian trust lands is non-taxable, so long as the Tribe has maintained its historic organic unity and has not subdivided its holdings into alienable fee simple holdings for its individual members. Under *Squire's* trust principles, the federal government, which is the "guardian" of Indian interests, does not tax its beneficiary for its own interests. The Miccosukee Tribe is comprised of wholly "dependent" tribal members. There is no question that the land generating the gaming gross revenue which is the source of the tribal tax we address here is "trust land" and not land owned in fee simple by either the Tribe or its individual Indian members. Thus, the principles of *Capoeman* apply with full force.

Not only does the General Allotment Act of 1887 at issue in *Squire* apply here, there are specific laws which further underline the intent that Tribal income be free from all taxation. The Miccosukee Reserve Act, 16 U.S.C. 410, gave the Miccosukee land the status of "Indian country" and Trust lands, and treated as a "reservation," to be governed by the Tribe. The Miccosukee Settlement Act, 25

2

U.S.C. 1750, added the lands on which Miccosukee Indian Gaming is held,
providing expressly that none of the lands would be taxable under "Federal or State
law." Looking at the potential federal taxation the obvious intent of this exemption
was to underline the application of the *Squire* logic to income derived from the
land in question.

What Congress has expressly declared non-taxable, however, is not subject
to tax. Far from the clear statement of taxability which would be necessary to
overcome principles of Indian sovereignty, Congress has made plain its intent to
exempt the Miccosukee from the taxes apparently sought by the Service now.

Further, even in the event that the income tax statute applies, there is ample
reason to believe that the payments from the Tribe to its members represent gifts
under the principles of *Commissioner v. Duberstein,* 363 U.S. 278 (1960), and thus
exempt from any taxation.

For these reasons, the Miccosukee Tribal members are not required to pay
income tax, nor does the Tribe have any related withholding obligations.
Furthermore, the audit of MIG should be closed, as all aspects of that audit are
complete.

Sincerely,

Dexter W. Lehtinen
Counsel for the
Miccosukee Tribe of Indians
of Florida

DWL/bvd

3

# LEHTINEN VARGAS & RIEDI
### ATTORNEYS AT LAW
#### A PROFESSIONAL ASSOCIATION

**FROM:** **DEXTER W. LEHTINEN**
             **GUY A. LEWIS**
             **ANTHONY J. O'DONNELL, JR.**

**TO:** **CHRISTIE JACOBS, DIRECTOR**
        **INDIAN TRIBAL GOVERNMENT (IRS)**

**RE: EXCLUSION FROM GROSS INCOME OF MICCOSUKEE DEPENDENT TRIBAL MEMBERS TRIBAL TRUST PAYMENTS MADE FROM TRUST ACCOUNT FUNDS DERIVED FROM THE TRIBE'S DEVELOPMENT, USE AND TAXATION OF COMMON TRIBAL LANDS HELD IN TRUST BY THE UNITED STATES**

**DATE: JUNE 28, 2006**

---

      This memorandum summarizes the position of the Miccosukee Tribe of Indians of Florida with respect to imposition of federal income taxation on the funds provided (trust payments made) by the Tribe to its dependent tribal members from the revenues generated by the imposition of a tribal tax on business conducted on the Reservation..

**I.** **IGRA's REFERENCE TO "FEDERAL TAXATION" DOES NOT APPLY TO PAYMENTS FROM THE TRIBE'S LONG STANDING TAX ASSESSMENTS ON GROSS REVENUES OF RESERVATION ENTERPRISES AND ITS TRADITIONAL NON-GAMING INCOME FROM TRIBAL TRUST LANDS**

      *A. The Tribe's Historic Identity And Everglades Homeland.*

      The Miccosukee Tribe and its tribal members collectively form a "dependent nation" and are trustee beneficiaries of lands held in trust by the United States. Their subsistence and livelihood are dependent upon these trust lands. The Miccosukee reside in the Florida Everglades, their traditional tribal homeland, where they still retain aboriginal rights in the Everglades waters, flora and fauna, including the rights to access and use the natural resources of Everglades National Park and Big Cypress National Preserve. Unlike many other tribes, the Miccosukee have never left, and are currently inhabiting, reservation lands set aside within the Everglades for their exclusive use with all the attributes of independent tribal self government. Unlike many

7700 N. KENDALL DRIVE, SUITE 303   MIAMI, FLORIDA 33156   TELEPHONE (305) 279-1166   FAX (305) 279-1365

other tribes, none of the Miccosukee trust lands have ever been distributed to tribal members by allotment or otherwise, so that none of the tribal members has acquired independent, fee ownership of tribal trust lands; accordingly, all of the Miccosukee are unalloted, wholly dependent tribal members. Finally, unlike many other tribes, membership in the Tribe is narrowly restricted to individuals of at least one-half blood Miccosukee so that the traditional tribal identity and interdependence of the Tribe and its tribal members has been preserved.

Under the Indian Reorganization Act of 1934, the Tribe– through its tribal leaders, the Chairman, the Business Council, the Tribal Council and the Tribal Elders – serves as co-trustee with the United States and joint guardian of the tribal rights and resources for the benefit of its tribal members. In discharging the Tribe's duties as trustee, the tribal leaders have resolutely sought to preserve the natural environment of the Everglades, including utilizing the Tribe's financial resources to undertake significant state and federal environmental litigation to protect the lands and waters of their Everglades homeland against threatened degradation and destruction.

Despite the expanse of the Miccosukee's traditional Everglades homeland and aboriginal rights, the Tribe, its tribal leaders and its tribal members have come to reside almost exclusively within a remote, 695-acre tract of tribal reservation lands, which are part of the Everglades National Park fronting the south side of the Tamiami Trail. These reservation lands were designated by Congress as the "Miccosukee Reserved Area" (the "MRA") and recognized as a permanent home for the tribal members and as "Indian country" pursuant to the "Miccosukee Reserved Area Act," 16 U.S.C. Section 410. Under this congressional enactment, the MRA is treated as an Indian reservation for purposes of determining the authority of the Tribe to govern its own affairs. 16 U.S.C. 410, Sec, 5(c)(1), (2)(A). Congress has further demonstrated its support for the Tribe's independent self-government of its tribal trust lands and tribal members by completely excluding the Miccosukee from the omnibus provisions of Public Law 280.

The vast majority of the members and leaders of the Tribe reside within the MRA's reservation housing, which has been provided to them by the Tribe. In addition to being used for individual housing, the MRA land is also used by the Tribe to provide tribal governmental and administrative offices, judicial chambers, police and fire

2

COMPOSITE EXHIBIT 1

stations, school buildings, a health clinic, a library, a water tower an various cultural and recreational facilities for the benefit of the tribal members. The MRA also has tribal cultural exhibits, attractions, services and enterprises for both tribal members and visitors to this reservation enclave.

### B. *The Tribe's Acquisitions And Development Of Additional Tax Exempt Trust Lands To Achieve Economic Self-Sufficiency*

Neither the Tribe's tribal rights to the vast aboriginal homelands of the Everglades nor their limited landholdings within the MRA have ever been suitable for allotment or for improvement necessary to provide the Tribe and its tribal members with economic self-sufficiency as contemplated by the Indian Reorganization Act. In an effort to attain tribal self-sufficiency, the Tribe undertook an extended effort to acquire undeveloped acreage fronting Tamiami Trail and Krome Avenue at the edge of the Tribe's historic Everglades homeland. The sole purpose of the Tribe's acquisition of the Krome trust land parcels was to establish various resort enterprises on these lands in order to promote economic development for the Tribe and to provide for the care and welfare of its dependent tribal members.

The keystone, six-acre corner parcel of the Krome trust land – right at the intersection of Tamiami Trail and Krome Avenue – was placed in trust for the Tribe pursuant to the "Miccosukee Settlement Act," which ratified a settlement agreement between the Tribe and the State of Florida and authorized transfers to the Tribe of "new reservation lands to be held in trust by the United States." 25 U.S.C. Section 1750(5). Congress expressly provided that this trust land would be "for the use and benefit of the Miccosukee Tribe as Miccosukee Indian Reservation lands;" and further provided that: *"None of the lands conveyed to the Miccosukee Tribe under this part or the Settlement Agreement shall be taxable under Federal or State law."* 24 U.S.C. Sections 1750(7) and 1750e(c)(1)(B)(emphasis added). The Act's provision that none of the trust lands would be taxable under federal or state law constituted a clear expression of congressional intent not to subject the Tribe's trust lands, or income derived there from by the Tribe and its tribal members, to federal income taxation.

Congress also expressly authorized, pursuant to the Indian Gaming Regulatory Act (IGRA) itself, that other parcels of the Krome trust land be acquired and taken into

3

trust by the United States for the "exclusive use" of the Tribe's members "entitled . . . to residence at such reservation." 25 U.S.C. Section 2719(b)(3). To ensure that gaming would be one of the resort enterprises allowed on the Krome trust land, Congress included an express exception for this Miccosukee trust property when it enacted IGRA whereby Congress specifically allowed the Tribe's newly acquired Krome trust land to be used for gaming activity. 25 U.S.C. Section 2719(b)(2)(B) and (C).

## C. *The Tribe's Trust Revenues Are Not Subject To the "Federal Taxation" Provisions of IGRA*

Even if the Krome trust lands were not exempt from taxation as specifically provided in the Miccosukee Settlement Act, the Tribe's gross revenue tax proceeds from these trust lands would not be taxable. Under IGRA, the "net revenues" from a tribe's gaming activities "may be used to make per capita payments to the members;" and only those payments made directly from net revenues "are subject to Federal taxation." 25 U.S.C. Section 2710(b)(3)(D). The Internal Revenue Service's "Internal Revenue Manual" guidelines narrowly "define 'per capita payments' as those payments made or distributed to all members of the tribe or to identified groups of members which are paid directly from the net revenues of any gaming activity." *IRS Internal Revenue Manual*, 4.88.1.6.1-2. Likewise, the Department of Interior Bureau of Indian Affairs regulations define "per capita payment" as "the distribution of money . . . which is paid directly from the net revenues of any tribal gaming activity." 25 C.F.R. Section 290.2.

The Tribe's trust payments to its tribal members are not per capita payments made from the net revenues of its gaming operations as defined by IGRA. To the contrary, the trust payments are made from a separate tribal trust account of distributable tribal revenues, which are comprised of: (1) its revenues from the Tribe's fixed tax assessments on the gross revenues of the Tribe's gaming enterprises; (2) its fuel tax on the Tribe's fueling station; and (3) its income from tribal leases, licenses and enterprises on other tribal trust lands. All of these tribal revenues – the assessments on gross revenues, the fuel tax revenues and the income revenues – are

4

derived by the Tribe from enterprises and activities located on and using the resources of tribal lands held in trust by the United States.

### *(1) Tribal Assessments on Reservation Gross Revenues.*

The Constitution adopted by the Miccosukee and approved by the Secretary of Interior in 1962, authorized its General Council "To levy and collect assessments and to impose fees . . . upon members and non-members doing business within the reservation." Pursuant to this authority, the Tribe's current reservation tax assessment is a 7.75% levy on the gross revenues generated by all enterprises located on tribal trust land, including a 7.75% assessment on gaming and other resort revenues from the Krome trust land. The original tribal tax assessment was established by the Tribe and approved by the Secretary of Interior in 1984, and was set at 5% of gross revenues from tribal trust land enterprises and activities. Over the subsequent two decades, this gross revenue tax assessment was periodically increased by the Tribe to its presently assessed 7.75% figure. Throughout this entire time, from 1985 to the present, the Tribe has consistently used portions of both its reservation tax assessment revenues and its other trust land income to fund periodic trust payments to its tribal members.

Neither IGRA, the Internal Revenue Code nor any other federal law requires the Tribe to provide notice of potential federal income tax liability to its tribal members for any of its tribal trust account distributions. The distributed funds are derived from tribal trust lands held in trust by the United States, either as tribal tax assessments on gross revenues of trust land enterprises or as tribal income from trust land leases and enterprises. The ultimate determination as to how and in what amounts the Tribe's trust account funds are applied is in the sole discretion of the Tribe's independent tribal government. The distributions are limited by the tribal government's determination of existing and projected trust account revenues of the Tribe; they are not based on any right or property interest of the tribal members or upon the performance of any work or service by the tribal members. They are in the nature of gifts of trust income, founded solely upon the Tribe's historic, familial relationship with its members, whose identity with the Tribe and continued participation in tribal affairs is deemed vital to the perpetuation of the Tribe's traditional life and culture.

### *(2) Retention of Exemption for Tribal Trust Revenues.*

5

IGRA's narrow and specific authorization for federal taxation on per capita payments from net gaming revenues is explicable only by the fact that Congress recognized that the imposition of such taxation on the distribution of tribal trust land income would otherwise be precluded. As a statutory exception, moreover, IGRA's "federal taxation" provision must be strictly and narrowly construed under established federal precedents; and its limited applicability to per capita payments made directly from gaming "net revenues" could not be broadened, even under "ordinary" rules of taxation, to include other types of tribal revenues derived from tribal trust lands.

The clear negative implication of IGRA's "federal taxation" proviso is that distributions of the Tribe's tax assessments on gross revenues of gaming would not be subject to federal taxation where the gaming net revenue itself is not distributed to tribal members. This same negative implication would apply to the Internal Revenue Code's provision requiring tax withholdings by every "Indian Tribe making a payment to a member of an Indian Tribe from the net revenues of any Class II or Class III gaming activity conducted or licensed by such tribe." 16 U.S.C. Section 3402(r)(1). Where the Tribe makes payments only out of tax revenues and non-gaming trust income, the withholding on payments "from the net revenues" of gaming simply would not apply.

Moreover, there is a presumption that a federal statute is not intended to make a radical change in established tribal affairs; and federal courts have required that such a purpose be made clear by Congress. Under the "federal taxation" provisions of IGRA, Congress intended only to tax a newly federally regulated use of tribal trust lands – gaming; it did not intend to tax other tribal trust enterprises. Furthermore, under IGRA, Congress intended to tax only one aspect of the gaming enterprise – federal taxation on per capita payments from net revenues; it did not intend to tax other revenues or payments from gaming. Finally, Congress did not intend to abolish the Tribe's established tax assessments and its other trust income already in existence and long used by the Miccosukee tribal government for making tax exempt distributions of tribal trust funds to tribal members.

Absent express legislation to the contrary, the Miccosukee tribal government possessed inherent sovereign power to continue internal tribal taxation of gross revenues from enterprises operating on tribal trust land and to obtain income from the

6

development and use of its tribal trust lands. The Tribe likewise retained its authority
to distribute those tribal trust revenues by making periodic, tax exempt payments to its
dependent tribal members, none of whom had any individual ownership of tribal lands
and almost all of whom themselves resided within the MRA and other common tribal
trust lands. In sum, Congress gave no indication in IGRA that it intended to abolish
any existing exemptions for distributions of tribal trust taxation and trust income to
dependent tribal members except with respect to per capita payments that might be
made from the net revenue of tribal gaming.

## II. TRIBAL REVENUES FROM COMMON TRUST LANDS ARE "OTHERWISE EXEMPT" WHEN DISTRIBUTED TO DEPENDENT TRIBAL MEMBERS HAVING NO INDIVIDUAL OWNERSHIP OF TRIBAL LANDS

The general position of the Internal Revenue Service as applied to distributions
of tribal income to tribal members is set forth in IRS Revenue Ruling 67-284 as
follows:

> Income tax statutes do not tax Indian tribes. The tribe is not
> a taxable entity. Tribal income *not otherwise exempt from*
> *Federal income tax* is includible in the gross income of the
> Indian tribal member when distributed or constructively
> received by him. See Choteau v. Commissioner, 283 U.S. 691
> (1931) (emphasis added).

However, the Supreme Court decision relied upon by this IRS ruling, *Choteau*
*v. Burnet*, 283 U.S. 691 (1931), did not establish the general taxability of every
individual tribal member's income. To the contrary, the *Choteau v. Burnet* decision
involved a fully independent tribal member who had obtained fee simple ownership of
his allotment of tribal lands and who was no longer dependent upon tribal trust lands
for his care and livelihood. The decision in no way addressed the income tax issues
posed by the Miccosukee situation: the imposition of federal income tax on tribal
payments received by dependent tribal members having no independent fee ownership
of tribal lands, where the distributed revenues are comprised of the tribal tax
assessments on and tribal income from land uses, enterprises and activities on common
tribal lands held in trust by the United States.

7

Case 1:14-cv-22441-CMA Document 46-5-9 Entered on FLSD Docket 01/21/2015 Page 13 of 74

It is the Tribe's position that all tribal income and tribal tax revenues generated by the Tribe from its lands held in trust by the United States are "otherwise exempt from Federal income tax" as trust income when distributed as trust payments to its dependent tribal members.  Accordingly, under the terms of Revenue Ruling 67-284, these exempt trust funds would not be taxable absent an express imposition of federal income taxation by Congress.  The wholly dependent tribal members such as the Miccosukee – having no independent ownership of tribal lands as in the *Choteau v. Burnet* case, and still living or eligible to live on the common tribal trust lands of the tribal reservation –  would not be liable for federal income tax on the Tribe's distributions of tribal revenues that are derived from the Tribe's development, use and taxation of tribal lands held in trust by the United States.  Exemption of tribal trust payments is based upon interrelated considerations of the continued ward status of the dependent tribal members, none of whom having independent ownership of tribal land and almost all of whom reside within the Miccosukee reservation, the implied trust obligations of the United States as trustee of tribal lands and tribal members and the inherent right of self-government exercised by the Tribe as co-trustee in its disposition of tribal revenues derived from tribal trust land.

A. *The Long Established Exemption Of Income To Dependent Tribal Members Derived From Common Tribal And Allotted Individual Lands Still Held In Trust By The United States*

From the outset, the United States government's interpretations of the Internal Revenue Act determined that income derived by dependent tribal members from either common tribal trust lands or individual allotted trust lands was exempt from federal income tax.   In a series of opinions, the Attorney General rejected the imposition of federal income tax, concluding that with respect to income of tribal members derived from trust lands it could "not lightly be assumed that Congress intended to tax the ward for the benefit of the guardian." 34 Op. Atty. Gen. 439, 445 (1925).  See also, 34 Op. Atty. Gen. 275, 281 (1924); 35 Op. Atty. Gen. 1 (1925); and 35 Op. Atty. Gen. 107 (1926).   Two of these Attorney General opinions were published as Treasury Decisions, which constituted official decisions of the federal agency charged with

8

SJ 11

implementing the tax code. T.D. 3570, III-1 Cum.Bull. 85 (1924); and T.D. 3754, IV-2 CumBull. 37 (1925).

The Department of Interior agreed with both the Attorney General and the Treasury Department in a "Solicitor General Opinion" issued on January 26, 1926, which determined that the income of dependent tribal members derived by the tribe from its common reservation trust lands was not subject to federal income tax. 1926 WL 4020 (Sol.Gen.). The Interior Department's opinion reported that the tribal members were, like the Miccosukee, "unallotted tribal Indians in the fullest sense of that term," and summarized their dependent, non-taxable status as follows:

> We are here dealing with unallotted tribal Indians residing on a large "reservation" set apart for their use, the legal title to which rests not in the Indians, either individually or as a tribe, but in the United States. . . .
>
> The income here in question . . . was derived from sources almost entirely, if not exclusively, within the reservation set apart for the use of the tribe of which he is a member, and for the reasons herein given I am of the opinion that such income is not taxable under existing Internal Revenue law.

*Id.* at p. 3. Consistent with these administrative determinations by all three of the federal agencies responsible for determining the legal status of individual tribal members, the Interior Department's then acknowledged expert in Indian law concluded that: "It is clear that the exemption accorded tribal and restricted Indian lands extends to the income derived directly therefrom." Cohen, *Handbook of Federal Indian Law* (1941), p. 265, citing *Blackbird v. Commissioner of Internal Revenue,* 38 F.2d 976 (10th Cir. 1930); *United States v. Homeratha,* 42 F. 2d 305 (WD Okla. 1930); *Pitman v. Commissioner*, 64 F.2d 740 (10th Cir. 1933). See also *Squire v. Capoeman,* 351 U. S. 1, 8-9 (1956), citing Cohen, supra.

During the following decade, while the administrative interpretations of the Attorney General, Treasury Department and Department of Interior continued in force, Congress enacted several revenue acts related to income taxation without including any reference to tribes or dependent tribal members (Revenue Acts of 1926, 1928, 1932 and 1934). Congress also enacted the comprehensive Indian Reorganization Act of 1934, which terminated the individual allotment of tribal trust lands to individual members,

9

ended the prevailing assimilationist policy and instituted a new national policy of strengthening independent tribal self-government and promoting tribal economic self-sufficiency. Again, in this Act, Congress made no specific reference to changing the income tax status of tribes or of their dependent tribal members.

One example where Congress did enact an express exception to the trust land tax exemption was an Act in 1928, which allowed a state gross production tax on oil and gas produced on restricted allotted trust lands in Oklahoma. The Supreme Court, however, rejected the state's effort to make a broad interpretation and extension of this congressional exception for taxing oil and gas production to include an income tax on tribal members' royalty interests derived from those lands. *Carpenter v. Shaw*, 280 U.S. 363, 368 (1930). Likewise, the Tenth Circuit has narrowly construed the same Act of 1928 as only authorizing a direct gross oil and gas production tax on tribal trust lands, and determined that the expressly authorized tax could not be broadly interpreted or extended to overcome the trust land's exemption so as to impose an individual income tax on lease bonus or advance royalty payments. The court explained that even though the act authorized "all State and Federal taxes of every kind and character," the narrow intent of the congressional exception was to tax only mineral production and would not divest the overall tax exempt status for income of dependent tribal members derived from their trust lands:

> We are not dealing with an ordinary citizen. We are dealing with a non-competent, restricted Choctaw Indian living on his allotted, restricted land. *This Indian's lease bonus is taxable if and only if the Act 1928 says it is. It is true that section three did and does subject to all State and Federal taxes any true production royalty which an Indian received from production on his restricted land. But it goes no further than that. It does not say that, under the "ordinary" rules of taxation, a lease bonus is to be treated as an advance royalty.* . . . . The language of the statute purports to put Indians and other citizens of Oklahoma on the same footing only as regards minerals *produced. The Indians still enjoy the special tax advantage as to other income from the allotted restricted lands* (emphasis added).

*United States v. Daney,* 370 F.2d 791, 795 (10th Cir. 1966). Accord, *Clark v. United States*, 587 F.2d 465 (10th Cir. 1978)(notwithstanding congressional authorization for

10

tax on oil and gas production, trust land exemption from income tax was retained for payments of cash bonus and delay rentals which would also be considered taxable under "ordinary" rules of taxation).

Thus, even where Congress has authorized a legislative exception to the tax exemption of income from tribal trust land, the Supreme Court and other federal courts have strictly construed that exception and narrowly applied it only to the specific type of taxable revenue referenced in the legislation – not to be expanded by "ordinary" rules of taxation followed by the Treasury Department. The trust land income to tribes and dependent tribal members remained exempt from both state and federal income taxation. That same approach would be applicable to the express statutory authorization of "federal taxation" on direct distributions of net revenues from gaming on trust lands under IGRA. This statutory exception to the trust doctrine exemption would likewise be strictly construed and narrowly applied to the income of dependent tribal members derived from tribal lands held in trust by the United States, so that the taxable payments would only include direct distributions from the "net revenues" of gaming operations on tribal trust lands and would not be expanded to impose federal taxation on tribal trust payments made from internal tribal taxation of gaming as well as other tribal trust income.

### A. Squire v. Capoeman – Transitional Status Of Dependent Tribal Member With Allotment Of Tribal Land Still Held In Trust By the United States

The *Squire v. Capoeman* decision addressed the transitional situation of a dependent tribal member governed by the General Allotment Act of 1887. The tribal member had obtained an allotment parcel of tribal trust land, as authorized by Congress under the Act, but had not yet received full, fee simple ownership of his allotment so as to become a fully independent Indian. *Id.* at 3. The tribal member's land allotment, therefore, retained the same status as the common lands of his tribe's reservation – held in trust by the United States.

The Supreme Court concluded that, consistent with the United States "Government's role as respondent's trustee and guardian," this transitional tribal member would retain the tax exemption afforded the tribe on income derived from

11

tribal trust land and would not be liable for federal income tax on income he received from timber sales off his allotted trust land. *Id.* at 2, 9-10. As long as the tribal member remained the holder of allotted trust land, the Court concluded, "it is necessary to preserve the trust and income derived directly therefrom . . . from tax burdens." *Id.* at 9. It was only when the tribal member obtained a fee simple patent in the allotted land – and the land was no longer held in trust by the United States – that the income he derived from the use of the land would be taxable as any other citizen without regard to his being an Indian. *Id.* at 10.

Recognizing the tax code as a law of general applicability, the Supreme Court did acknowledge in *Squire v. Capoeman* that individual Indians who were or became independent of tribal affairs would be subject to the same income taxes as other citizens: "We agree with the Government that Indians are citizens and that in ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the payment of income taxes as are other citizens." *Id.* at 6. At the same time, the Supreme Court recognized an exception to the tax law's applicability with respect to dependent tribal members deriving their income from lands held in trust by the United States.

The Supreme Court's decision in *Squire v. Capoeman* certainly did not hold that dependent tribal members, such as the Miccosukee – owning no tribal lands themselves, living within reservation lands held in trust by the United States and governed by omnibus federal remedial legislation – would be considered subject to federal income tax on benefits they would receive from the tribe's utilization of its trust lands. To the contrary, the Supreme Court expressly extended the tribe's tax exemption on income from tribal trust land to include income of the dependent, "non-competent" tribal member as long as its own allotted tribal landholdings remained in the same status as the common tribal landholdings – in trust of the United States. This extension of the tribe's trust exemption to the individual tribal member was based upon "a congressional intent to subject an Indian allotment to all taxes only after a patent in fee is issued to the allottee." *Id.* at 8. The Supreme Court further concluded that "This [congressional intent] implies that, until such time as the patent is issued, the allotment

12

SJ 15

shall be free from all taxes, both those in being and those which might in the future be enacted." *Id.* at 8.

Although the Supreme Court's holding in *Squire v. Capoeman* focused on the potential encumbrances arising from assessing income tax on income derived from the allotted landholdings held in trust for a dependent tribal member, it "is not a technical or narrow decision." *Stevens v. Commissioner*, 452 F.2d 741, 744 (9th Cir. 1971). Its rationale rested more upon the Court's interpretation of the overall trust purpose of Congress than on implementing the specific terms of the General Allotment Act. Indeed, the Supreme Court's rationale expressly referenced as being "entitled to consideration" the broad, fundamental trust principles originally articulated by the Attorney General concerning established government policy that precluded the imposition of federal income tax upon dependent tribal members, as follows:

> [U]nable, by implication to impute to Congress under the broad language of our Internal Revenue Acts an intent to impose a tax for the benefit of the Federal Government on income derived from the restricted property of these wards of the nation, property the management and control of which rests largely in the hands of officers of the Government charged by law with the responsibility and duty of protecting the interests and welfare of these dependent people. In other words, it is not lightly to be assumed that Congress intended to tax the ward for the benefit of the guardian.

*Squire v. Capoeman,* supra at 8, citing 34 Op. Atty. Gen. 439, 445 (1925).

Based upon the implied trust obligations of the United States, the Supreme Court concluded that the federal income tax burdens sought to be imposed upon dependent tribal members in the use of tribal trust land allotted to them was simply contrary to the clear duty and congressional undertaking to protect these dependents:    "It is unreasonable to infer that, in enacting the income tax law, Congress intended to limit or undermine the Government's undertaking.    To tax respondent [a dependent tribal member] under these circumstances would in the words of the court below, be 'at least, a sorry breach of faith with these Indians.'" *Id.* at 9.

The Supreme Court's reference to this early Attorney General opinion as an essential part of its *Squire v. Capoeman* rationale, gives added significance to the United States government's initially established position with respect to imposing

13

federal income taxes on tribes and their dependent tribal members. As summarized previously, the federal government's position was set forth in a series of Attorney General opinions, which concluded "that the income derived by restricted Indian wards from tribal or allotted Indian Lands was exempt from tax." *Strom v. Commissioner*, 6 T.C. 621, 625 (1946). As was stated by an acknowledged expert in Indian law, and also quoted as authority by the Supreme Court in its *Squire v. Capoeman* decision: "It is clear that the exemption accorded [both] tribal and restricted Indian lands extends to the income directly therefrom." *Squire v. Capoeman*, supra at 8-9, citing Cohen Handbook of Federal Indian Law 265 (1941).

The Supreme Court's decision in *Squire v. Capoeman*, therefore, was totally consistent with and expressly relied upon the United States government's well-established interpretation of the tax code with respect to dependent tribal members – that the income received by dependent tribal members from the use of either tribal or allotted trust land would be exempt.

In fact, the Supreme Court's *Squire v. Capoeman* decision pointedly limited the applicability of a subsequent Attorney General Opinion in 1937 (39 Op. Atty. Gen. 107), which had applied the Court's holding in *Five Civilized Tribes v. Commissioner*, 295 U.S. 418 (1935), to narrow its original opinions on the tax exempt status of tribes and dependent tribal members so as to make taxable "reinvestment income" which is derived from investing exempt trust income outside the tribal trust lands themselves. *Squire v. Capoeman*, supra at 9. Moreover, subsequent decisions of the Ninth Circuit and the Court of Claims have applied *Squire v. Capoeman's* trust lands exemption to include income derived from all tribal lands acquired and held in trust under the Indian Reorganization Act as well. *Stevens v. Commissioner*, 452 F.2d 741 (9th Cir. 1971); and *Big Eagle v. United States*, 300 F.2d 765 (Ct. Cl. 1962).

Accordingly, it is evident that the above-referenced IRS Revenue Ruling 67-284, cannot be used to assert a sweeping income tax liability on income derived from tribal trust lands for the benefit of dependent tribal members without regard for either the source of their income from tribal lands held in trust by the United States or the nature of their status as dependents of the United States. To the contrary, under the *Squire v. Capoeman* decision, tribal trust land income would be considered "otherwise

14

exempt" when distributed to dependent tribal members and therefore nontaxable under the terms of Revenue Ruling 67-284 itself. In fact, the Ninth Circuit decision in *Stephens v. Commissioner,* supra, did prompt a modification to this revenue ruling and a recognition that the implied trust principles of *Squire y. Capoeman* would extend the income tax exemption to all tribal lands acquired and held in trust under the Indian Reorganization Act of 1934, not just to individual allotments held under the earlier General Allotment Act of 1887. See IRS Revenue Ruling 74-13; and IRS General Counsel Memorandum, District Director, March 1, 1978, GMC 37432, 1978 WL 43436.

### C. *Choteau v. Burnet – Taxable Status of Independent "Fully Emancipated" Tribal Member*

. The protective "trustee and guardian" doctrine of *Squire v. Capoeman* was fully consistent with the Supreme Court's earlier decision in *Choteau v. Burnet*, 283 U.S. 691 (1931), which is the single Supreme Court decision purportedly relied upon by the above-referenced IRS revenue ruling. The IRS cites *Choteau v. Burnet* for its pronouncement that tax exempt tribal revenues derived from the use of tribal trust land become taxable to all individual tribal members when "distributed" to them. Again, this IRS ruling totally misapplies the actual holding of the Supreme Court's decision. In *Choteau v. Burnet,* the Supreme Court merely approved the imposition of federal income tax on the share of royalties from tribal mineral leases received by a "fully emancipated" tribal member holding shares in the tribal mineral estate and proceeds. Unlike the tribal member in *Squire v. Capoeman*, this individual was not a dependent tribal member, designated as "incompetent" and living on tribal trust lands, but had become a non-dependent tribal member, holding "a certificate of competency." He had obtained fee simple title to his original allotment of tribal trust lands so those lands were no longer held in trust by the United States; and he owned outright his "original share in the tribal revenues" from oil and gas leases reserved by the tribe from the tribe's original trust lands. *Id.* at 692-3.

The Supreme Court rejected the argument that this fully independent individual was "exempt" simply "because of his status as an Indian," *Id.* at 694, and explained that the real status of such a non-dependent tribal member was that of a citizen:

15

> It is evident that, as respects his property, . . .[Choteau's]
> status is not different from that of any citizen of the
> United States.  In the process of gradually changing the
> relation between the Indian and the government he has
> been, with respect to the income in question, fully
> emancipated. . . . The claim that with respect to this
> income the petitioner was restricted, and therefore exempt
> from the tax laid by sections 210 and 211(a) must fail.

*Id.* at 695-96.  At the same time, the Supreme Court carefully differentiated the non-
dependent tribal member such as Choteau from other tribal "members who do not have
certificates of competency" and remained "restricted" but who were also receiving
shares of royalties from the same tribal oil and gas leases.  With respect to these
dependent tribal members – whose identical income from tribal royalties was
simultaneously being exempted from federal taxation by a separate ruling of the Tenth
Circuit in the same appellate case below – the Supreme Court stated "we are not
concerned." *Id.* at 695.  The Supreme Court thereby disclaimed its intent to pass upon
the exemption from federal income tax being granted to the incompetent tribal member
for her share of tribal trust land revenues. See *Blackbird v. Commissioner of Internal
Revenue*, 38 F.2d 976 (10th Cir. 1930)(tribal trust income to dependent tribal member
without fee ownership of tribal land is exempt).

Of utmost significance for interpreting federal tax law, the Supreme Court stated
that the non-dependent tribal member's claim of exemption "requires a reference to the
policy of the government with respect to the Indians" to determine whether there was
any provision that "has any bearing upon the question of the liability of an individual
Indian to pay tax upon income derived by him from his own property." *Id.* at 694.
The Court concluded that the legislative policy then in effect under the federal allotment
program would ultimately make an individual Indian become a fully independent,
"competent" tribal member, subject to federal income taxation:

> The course of legislation discloses that the plan of the government
> has been gradually to emancipate the Indian from his former status as
> a ward, to prepare him for complete independence by education and the
> gradual release of his property to his own individual management.
> This plan has included imposing upon him both the responsibilities
> and the privileges of the owner of property, including the duty to pay
> taxes. . . .

16

. . . It is evident that, as respects his property other than his homestead, his status is not different from that of any citizen of the United States. In the process of gradually changing the relation between the Indian and the government he has been, with respect to the income in question, fully emancipated.

*Id.* at 695. Thus, the taxable tribal member addressed by the Supreme Court in *Choteau v. Burnet* was a non-dependent, "competent" tribal member owning his allotted land in fee simple, not a dependent tribal member owning no land and residing on the trust lands of a reservation.

As discussed above, the Supreme Court would subsequently contrast this "fully emancipated" tribal member with the still dependent, non-taxable tribal member deriving his income from tribal or allotted trust land in *Squire v. Capoeman*. Neither case, however, would support the imposition of federal income taxes on wholly dependent tribal members such as the Miccosukee who receive distributions of tribal trust revenue from the tribe's development, use and taxation of common tribal lands located within the reservation, all of which are held in trust by the United States. See, e.g., *Stevens v. Commissioner*, supra; and *Big Eagle v. United States*, supra.

**D.     *Blackbird v. Commissioner – Exempt Status Of Dependent Tribal Member For Distributions Of Income Derived By Tribe From Tribal Trust Lands***

The *Choteau v. Burnet* decision is singularly relevant to the Miccosukee income tax issue not only because it was narrowly focused solely on the non-dependent, competent tribal member, Henry Choteau, but also because it was a companion case to the case of Mary Blackbird, who was a dependent, incompetent tribal member receiving the same distribution of tribal lease royalties. The two contrasting cases were decided by the Tenth Circuit simultaneously in a single opinion, *Blackbird v. Commissioner of Internal Revenue,* 38 F.2d 976 (10th Cir. 1930). The Tenth Circuit ruled in favor of the Commissioner's position on taxability with respect to the non-dependent tribal member Choteau. That ruling was subsequently upheld by the Supreme Court in *Choteau v. Burnet*, which was "clearly bottomed upon the fact that this Indian had achieved emancipation." *Big Eagle v. United States,* 300 F. 2d 765, 768 (Ct. Cl. 1962).

17

COMPOSITE EXHIBIT 1

The Tenth Circuit simultaneously ruled against the Commissioner's position on taxability with respect to the dependent tribal member Blackbird. Because Blackbird was a "restricted" tribal member without "a certificate of competency," the Tenth Circuit concluded that she was a "ward" of the United States and not subject to the federal income tax statute:

> She is a restricted full-blood Osage. Her property is under the supervising control of the United States. **She is its ward, and we cannot agree that because the income statute, Act of 1918 . . . subjects "the net income of every individual" to the tax, this is alone sufficient to make the Acts applicable to her.** Such holding would be contrary to the almost unbroken policy of Congress in dealing with its Indian wards and their affairs. Whenever they and their interests have been the subject affected by legislation they have been named and their interests specifically dealt with. Elk v. Wilkins, 112 U.S. 94, 100, 5 S.Ct. 41, 44, 28 L.Ed. 643: "General acts of Congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them" (emphasis added).

*Id.* at 977. Although the *Blackbird v. Commissioner* opinion used the general term "Indian" when explaining that general federal tax law should not be applied to Blackbird, the Tenth Circuit clearly limited this principle of exception only to tribal members in a dependent status whose property was still held in trust by the United States. Indeed, the same opinion rejected an exemption for the same type of tribal income received by the non-dependent and "emancipated" tribal member, Choteau. This distinction between dependent and non-dependent tribal members and the limitation of the trust doctrine to include only dependent tribal members deriving income from lands held in trust by the United States governed the entirety of the Tenth Circuit's discussion of special treatment for "Indians" under federal law:

> In Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941, the court, after noting the general rule that exemptions from taxation are to be strictly construed, said . . . : "But in the government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal; **doubtful expressions, instead of being resolved in favor of the United States, are resolved in favor of a weak and defenseless people, who are made wards of the nation, and dependent wholly upon its protection and good faith.** This rule of construction has been recognized, without exception, for more

18

than a hundred years, and has been applied in tax cases"
(emphasis added).

*Id.* at 977-78.    In the Tenth Circuit's analysis of Blackbird's situation, the individual
tribal members who were to be afforded this special treatment under laws of general
applicability, including tax laws, were clearly not "Indians" in general. There simply
was no "Indian Canon" being advanced by the decision to cover all Indians regardless
of status.    Rather, the Tenth Circuit was articulating a trust canon, where the special
rule of statutory applicability in favor of Indians was to be applied only with respect to
the dependent tribal members whose land and livelihood are still held in trust by the
United States. These were the protected class of tribal members "who are made wards
of the nation, and dependent wholly upon its protection and good faith." *Id.* at 978.

From the court's perspective, moreover, the exception for dependent tribal
members, deriving income from lands held in trust by the United States, was mandated
by an even broader principle – the rule of reason governing the applicability of all law,
which had been expressed earlier by the Supreme Court as follows:

> "All laws should receive a sensible construction. General
> terms should be so limited in their application as not to lead
> to injustice, oppression, or an absurd consequence. It will
> always, therefore, be presumed that the legislature intended exceptions to its
> language, which would avoid results of this
> characater. The reason of the law in such cases should
> prevail over its letter."

*Id.* at 978. Applying this "reason of the law" to the companion case of the non-
dependent tribal member Choteau, the Tenth Circuit concluded that he was no longer
entitled to an exception from the income tax law:

> His certificate of competency bestowed upon him unrestricted
> management of his affairs and gave him full power to use and
> dispose of his property according to his own judgment.
> **Thereafter, his pro-rata share in the mineral production was
> paid to him not as a ward of the Government.** . . .
> **[T]hereupon, he assumed the same burdens that the law
> imposes on every other individual property owner. We think
> his civil status thus fixed brought him within the terms of
> the income tax statutes** (emphasis added).

19

*Id.* at 979-80. Thus, a clear, reasoned distinction in "civil status" between the non-dependent and the dependent tribal member was drawn for purposes of interpreting the applicability of federal income tax law. In the process, the basic trust doctrine that had always protected dependent Indians under federal law was clarified and preserved.

As pointed out earlier, the Supreme Court in *Choteau v. Burnet* expressly declined to pass on the exemption afforded to Blackbird, which was based both upon her status as a dependent tribal member and upon the trust status of tribal lands generating her income. Accordingly, as the Court of Claims recognized in *Big Eagle v. United States,* "Blackbird was neither overruled nor modified by Choteau." *Id.* at 768. The United States government likewise "acquiesced in the ruling on the Blackbird Case" and thereby allowed the Blackbird portion of the Tenth Circuit's decision to stand as precedent. *Superintendent Five Civilized Tribes v. Commissioner,* 75 F.2d 183, 184 (10th Cir. 1935). In fact, the Tenth Circuit continued to follow "the policy considerations announced in Blackbird" and has "continued to find tax exemptions by implication when restricted Indians were involved." *Daney v. United States*, 247 F.Supp. 533 (D.Kansas 1965), *affd., United States v. Daney,* 370 F.2d 791 (10th Cir. 1966). See also, *United States v. Hallam,* 304 F.2d 620 (10th Cir. 1962).

More importantly, the Supreme Court would later approve the trust principles of the *Blackbird v. Commissioner* exception in its *Squire v. Capoeman* decision, where the Court specifically overruled the Tenth Circuit's retreat from *Blackbird* in *Jones v. Taunah*, 186 F.2d 445 (10th Cir. 1951). *Squire v. Capoeman*, supra, at 5. The Supreme Court emphasized that its previous decision in *Five Civilized Tribes*, which the majority in the Tenth Circuit's *Jones v. Taunah* decision had misconstrued, had not overturned the tax exemption for income of dependent tribal members derived from land held in trust by the United States, but had only addressed "reinvestment income" – derived from the investment of surplus exempt trust land income into other, outside sources of income. *Id.* at 9. The Supreme Court then cited with approval the dissent in *Jones v. Taunah*, which in turn had referenced the authority of the Tenth Circuit's earlier *Blackbird v. Commisioner* decision in support of its finding of a "congressional intent" to exempt the income of dependent tribal members derived from lands still held in trust by the United States. *Id.* at 8, footnote 11, citing dissenting opinion, *Jones v.*

20

*Taunah*, 186 F.2d 445. *Accord, United States v. Daney*, 370 F.2d 791 (10th Cir. 1966); and *Nicodemus v. United States*, 132 F. Supp. 608 (N.D. Idaho, 1955).

The significance of the *Blackbird v. Commissioner* precedent for the Miccosukee situation is that, with respect to Blackbird, the decision held that a dependent tribal member would not be subject to federal income tax on her receipt of pro-rata distributions of royalties obtained by the tribe from leases of minerals that had been reserved by the tribe from the tribe's allotted trust lands and held for the common benefit of all tribal members. *Id.* at 977. The circuit court made this holding in the same decision where it approved imposition of income taxation on the same pro-rata share of mineral lease royalties owned by the independent and "fully emancipated" tribal member, Choteau, whom subsequently the Supreme Court also found to be "independent" and subject to federal income taxation. *Id.* at 979-80.

Making a consistent application of this implied trust doctrine, the pro-rata distribution of tribal revenues from tribal lands held in trust by the United States for the benefit of dependent tribal members would remain exempt from federal income taxation as long as the individuals remained dependent members of the tribe and restricted "wards" of the United States.    The basic trust principle of exempting the trust income of dependent tribal members would apply whether the implied trust obligations of the United States in its role as trustee and guardian arose with respect to allotted trust land or to common tribal trust land, both of which were held in trust for the benefit of the dependent tribal member. *Blackbird v. Commissioner*, supra. See also *Stevens v. Commissioner*, 452 F.2d 741 (9th Cir. 1971)(dependent tribal member's income from allotted as well as tribal and government-approved acquisition lands held in trust by the United States was exempt from federal income taxation); *United States v. Hallam,* 304 F.2d 620 (10th Cir. 1962)(income from allotted trust land to dependent "wards of the United States" not taxable); *United States v. Daney*, 370 F.2d 791 (10th Cir. 1966)(dependent tribal member's cash bonus for oil and gas lease of trust land was exempt); and *Big Eagle v. United States,* 300 F.2d 765 (Ct. Cl. 1962)(dependent tribal member's income from common tribal mineral deposit royalties from trust lands was exempt from federal income taxes).

21

SJ 24

The Miccosukee tribal members, living without fee ownership of tribal lands and almost exclusively within the Miccosukee Reserve Area, are wholly dependent members, having their housing, medical care, education, police and fire protection and general welfare provided by the Tribe. The land upon which the gaming, resort and other tribal revenues are generated and taxed are tribal lands specifically acquired and held in trust by the United States for their benefit. The Tribe has thus assumed the role of trustee under the Indian Reorganization Act in the exercise of its inherent self-government taxing powers through the generation and distribution of trust income and tax revenues as trust payments for its dependent tribal members. Accordingly, it would be unreasonable to infer that Congress would intend to impose federal income taxation as a burden upon both the dependent tribe and its dependent members.

These trust principles, moreover, apply with equal force when the income is attributable to tribal lands established under the Indian Reorganization Act of 1934, which carries over the provisions of the General Allotment Act for tribal lands acquired in trust for the benefit of tribes and their tribal members. See 25 U.S.C. 335, cited in *Stevens v. Commissioner*, supra; and IRS Revenue Ruling 74-13 (1974). In fact, an internal IRS General Counsel Memorandum summarizes the broadening tax exemption for income derived from trust lands under both the Indian Reorganization Act and the General Allotment Act as follows:

> [T]he language of the Indian Reorganization Act of 1934, 25 U.S.C. Sec. 465 (1963), broadly authorizes the Secretary of Interior, in his discretion, "to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to land, within or without existing reservations, including trust or otherwise restricted allotments, . . . for the purpose of providing land for Indians." That section provides further that "title to any land rights thus acquired shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation."
>
> Furthermore, the General Allotment Act of 1887, as amended, 25 U.S.C. Sec. 335 (1963), provides that unless otherwise specifically provided, the provisions of the General Allotment Act are extended to all lands hereto-fore purchased or which may be purchased by the authority of Congress

22

>for the use or benefit of any individual Indian or band or
>tribe of Indians. Accordingly, land acquired by the United States
>in trust under the Indian Reorganization Act of 1934 are generally
>covered by the provisions of the General Allotment Act. See
>*Stevens v. Commissioner*, 452 F.2d 741 (9th Cir. 1971); and Rev. Rul. 74-13.

IRS General Counsel Memorandum, District Director, March 1, 1978, GMC
37432, 1978 WL 43436. The Ninth Circuit decision cited by this IRS memorandum,
*Stevens v. Commissioner*, had determined that the trust principles underlying the
exception to federal income tax in the Supreme Court's *Squire v Capoeman* decision
would apply to all tribal trust lands however established "in the absence of special
legislation indicating a different intent." *Stevens v. Commissioner*, supra at 745. See
also, *United States v. Hallam*, 304 F.2d 620 (10th Cir. 1962)(continued status as wards
of the United States exempted rentals, royalties and proceeds from sales on trust lands
from federal income taxation); and *Big Eagle v. United States*, 156 Ct.Cl. 665, 300
F.2d 765 (1962) (dependent tribal member's income from tribal mineral lease royalties
was exempt).

Given the implied trust obligations of the United States as trustee of tribal lands
for the benefit of tribes and their dependent tribal members – a trust relationship
recognized in each of the above Supreme Court decisions – it would be patently
"unreasonable to infer" that Congress would impose an income tax on dependent tribal
members for income derived from development and use of tribal lands held in trust by
the United States for their benefit – regardless of whether that land is tribal trust land,
allotted trust land or acquired trust land such as the Miccosukee's. *Stevens v.
Commissioner*, supra at 746-749. Thus, the Supreme Court and other federal courts
have recognized that exceptions to the income tax law can be based upon reasonable
inferences from acts of Congress related to implementation of the United States' trust
obligations to dependent tribal members. See, e.g. *Squire v. Capoeman*, supra at 9
(dependent deriving capital gains income from land allotment); *Blackbird v.
Commissioner*, supra at 977-78 (dependent tribal member's shares in tribal mineral
leases exempt from income taxation); *United States v. Daney*, 370 F.2d 791 (10th Cir.
1966)(bonus for execution of mineral lease exempt even where lease royalties are
expressly taxable under Act of Congress).

23

Case 1:14-cv-22441-CMA Document 525-9 Entered on FLSD Docket 06/20/2015 Page 53 of 54

### E. *Merrion v. Jicarilla Apache Tribe - The Exercise of Inherent Taxing Powers of Tribal Self Government Constitutes An Exception To Laws of General Applicability.*

The fact that federal tax laws are statutes of general applicability has also been cited by the Internal Revenue Service as grounds for denying an income tax exception for individual tribal members. See, e.g., Revenue Ruling 54-456 (1954); Revenue Ruling 67-284 (1967); and I.R.S. General Counsel Memorandum 33600, 1967 WL (August 24, 1967). *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 115-119 (1962). See, e.g., *I.R.S. General Counsel Memorandum* 33600, 1967 WL (August 24, 1967). However, the Supreme Court's decision in *Merrrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982), held that a tribe had the inherent power of self-government to tax businesses operating on its reservation lands as "an essential attribute of Indian sovereignty," which could not be divested or "implicitly [taken] away by various pieces of legislation" that do not expressly work a clear "divestiture of Indian taxing power." *Id.* at 137, 149. The Court recognized that this "fundamental attribute of sovereignty" had a "significant territorial component" and was limited to tribal lands within its reservation (ie. lands held in trust by the United States). This limitation to "transactions occurring on *trust* lands" was later re-emphasized by the Court in *Atkinson Trading Company v. Shirley*, 532 U.S. 645 (2001). Moreover, the *Merrion* decision concluded that "the taxing power of Indian tribes as an essential instrument of self-government and territorial management has been a shared assumption of all three branches of the Federal Government." *Merrion v. Jicarilla Apache Tribe, supra* at 139, 142.

It is clear, therefore, that the Miccosukee Tribe's tax assessments on gross revenues of its commercial gaming and other reservation enterprises, whose gross revenues are derived from tribal trust lands, which were acquired to enhance tribal economic independence and were placed in trust by the United States for the purpose of achieving economic self-sufficiency and enhancing tribal independence, constitute an exercise of power essential to tribal self-government as recognized in *Merrion v. Jicarilla Apache Tribe.*. Accord, *Kerr-McGee Corporation v. Navajo Tribe of Indians*, 471 U.S. 195 (1985)(distinction between tribe acting as a commercial entity entering

24

into mineral leases of tribal trust lands and as a sovereign taxing authority imposing tribal assessments on leasehold values and gross lease revenues). Under these circumstances, an exception from individual federal income taxation for distributions of tribal tax revenues assessed on the proceeds from tribal gaming and of tribal revenues from other enterprises operated on tribal lands held in trust by the United States is not only mandated by the trust doctrine but also would be necessary to protect the Tribe's essential powers of tribal "self-government and territorial management." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982). The Tribe relies upon its taxing power to accomplish "the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987). Just as the Tribe's income from trust lands remains exempt when distributed to dependent tribal members, so too would the Tribe's tax revenues from those trust lands be excluded from the tribal members' gross income for federal tax purposes.

### F. Trust Payments Are "Otherwise Exempt" And Excludable As Gifts Of Tribal Funds To Dependent Tribal Members.

The Tribe's trust payments to its dependent tribal members are also "otherwise exempt" and excludable as non-taxable gifts. See *Kirschling v. United States*, 746 F.2d 512 (9th Cir. 1984). The payments are gratuitously made for the benefit of members who have no legal right or interest in the funds distributed – they are all wholly dependent members without any ownership interest in tribal lands or tribal income. The donative intent of the Tribe arises from its organic, familial relationship with its dependent tribal members, not from any legal duty or obligation to make the payments. The payments are respectfully and generously made to sustain the integrity of traditional tribal life and culture within the Miccosukee reservation, not in return for any work or expectation of service by the members themselves. Accordingly, the payments would be considered non-taxable gifts by the Tribe and excludable from the gross income of its dependent tribal members. See *Commissioner v. Duberstein*, 363 U.S. 278 (1960).

### CONCLUSION

25

Both the implied trust obligations of the United States and the sovereign powers of independent tribal self-government would extend to exempt the trust payments made by the Tribe from tribal revenues to dependent tribal members where the revenues are comprised of tribal tax assessments and income derived from the development and use of tribal lands held in trust by the United States. The nexus of the income sought to be taxed is at the heart of the trust obligations of the United States and the essential attributes of tribal sovereignty. The tribal tax revenues and income is being derived from tribal trust lands; and the economic resources of the Tribe are being distributed for the benefit of dependent tribal members who themselves have no individual ownership of tribal lands. The Tribe is governed by a host of remedial legislation clearly demonstrating a congressional purpose of strengthening independent tribal self government and economic self-sufficiency that would be thwarted by the federal government's intruding into internal tribal affairs, disrupting the established familial identity of tribal members with the Tribe and imposing the burden of individual federal income taxation on these dependent tribal members. Moreover, the trust payments gratuitously made by the Tribe's governing authorities for the benefit of dependent tribal members would be excludable as non-taxable gifts of trust property, not subject either to the federal income tax or to the federal gift tax.

26

# Exhibit 21

LEHTINEN VARGAS & RIEDI
ATTORNEYS AT LAW
A PROFESSIONAL ASSOCIATION

MEMORANDUM

To:    Billy Cypress, Chairman
From:  Dexter Lehtinen, Tribal Attorney
Re:    Tribal Income Tax Position
Date:  June 26, 2006

<u>Summary</u>

As directed, attorneys representing the Miccosukee Tribe (Lehtinen, Lewis, and O'Donnell) have prepared a memorandum to be given to the Internal Revenue Service, with my cover letter, presenting the best possible case for non-taxation of certain revenues distributed to tribal members (which the IRS claims are subject to individual income taxes). This legal position (with the memorandum and cover letter), which is contrary to the stated legal position of the IRS, will be presented to the IRS Office of Indian Tribal Governments.

<u>Discussion</u>

<u>Taxation of the Tribe and Individual Tribal Members</u> – As discussed in the past, the Miccosukee Tribe is not subject to income taxation, but individual tribal members are subject to income taxation, according to United States law. Although many American Indian Tribes and individual tribal members have asserted that the Tribes and their members are not subject to the laws of the United States, the United States and the Internal Revenue Service assert that tribal members are subject to federal income taxes. As you know, the IRS asserts that tribal members owe federal taxes on money received from the Tribe, whatever the source, including from tribal tax revenues (with the statutory exception of certain natural resources).

The position of the Miccosukee Tribe (described in the memorandum) is contrary to the IRS position. While the Tribe has chosen to adopt a different position with respect to individual federal income taxation, the IRS is unlikely to accept this position (as the General Council and the Business Council have been advised in previous meetings). IRS may (but need not) compromise the amount of individual member taxes due, if the Tribe eventually agrees to pay some amount on their behalf (as has sometimes occurred elsewhere in the country). Accordingly, placing funds in reserve to cover the potential taxes due from individual tribal members (if the IRS rejects the Tribe's position), as you have indicated the Tribe is doing, is a prudent step.

(continued)

7700 N. KENDALL DRIVE,  SUITE 303   MIAMI, FLORIDA 33156   TELEPHONE (305) 279-1166   FAX (305)

EXHIBIT
3

EXHIBIT "G"

EXHIBIT
3

<u>Tribal Income Tax Position</u>                                  <u>Page Two</u>

    <u>Tribal Withholding from Funds Given to Tribal Members</u> – The
issue of whether the Tribe should "withhold" any amounts from
funds given to tribal members is quite distinct from the issue of
whether individual tribal members owe income taxes on the funds
received (as we have discussed).  Individuals often owe income
taxes on funds received, for which there has been no withholding
by the entity which paid the funds to the individual.  Thus, the
issue of tribal members obligation to pay income taxes is not
related to, or controlled by, the issue of whether the Tribe has
an obligation to withhold any funds.


                       *** end ***



EXHIBIT

14-2

L000195
L000195