**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No.: 1:14-cv-22441-CMA |
| | ) | |
| SALLY JIM | ) | |
| Defendant. | ) | |

**UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's Amended Scheduling Order (ECF No. 155), the United States submits the following proposed findings of fact and conclusions of law.

FINDINGS OF FACT

1.      On the dates and in the amounts set forth below, a delegate of the Secretary of Treasury made assessments against Sally Jim for federal income tax liabilities, penalties, and interest for tax year 2001.

| Tax Year | Date Assessed | Tax Assessed | Penalties Assessed | Interest Assessed |
|---|---|---|---|---|
| **2001** | 09/13/2004 | $15,498.00 | $2,551.95*<br>$1,644.59**<br>$430.55*** | $1,783.72 |
| | 06/26/2006 | | $1,190.91** | |
| | 12/31/2012 | $95,823.00 | $21,560.18*<br>$3,833.70*** | |

*late filing penalty – 26 U.S.C. § 6651(a)(1)
**failure to pay penalty – 26 U.S.C. § 6651(a)(2)
***estimated tax penalty – 26 U.S.C. § 6654

2.      Despite notices and demands for payment, Ms. Jim failed to pay her federal income tax liabilities in full.  Ms. Jim continues to accrue interest, penalties, and statutory

additions.  As of April 9, 2015, Ms. Jim is indebted to the United States for her federal income tax liabilities for tax year 2001, in the amount of $278,758.83.

3.      In 2001, Sally Jim was a member of the Miccosukee Tribe of Indians ("the Tribe").  As a member of the Tribe, Sally Jim received quarterly distributions in per capita amounts based on the number of members in her household.

4.      In 2001, Sally Jim received quarterly distributions from the Tribe totaling $272,000.

5.      Sally Jim had complete dominion over distributions that she received, and she had absolute discretion how to spend her distributions.

6.      In January of 2015, Sally Jim attempted to submit a belated 2001 tax return to the IRS; in that return, she stated that she received $272,000 in benefits from the Miccosukee Tribe of Indians which she listed as "other income" but "excluded from gross income" as Indian general welfare benefits.

7.      Sally Jim also received wages of $25,990 in 2001 from her employment in the Tribe's healthcare facility.

8.      Sally Jim admits to having gambled in 2001.  She has no documentary evidence or specific recollection substantiating any losses that may offset gambling winnings.

9.      Sally Jim did not file a tax return when due for the 2001 tax year.  Apart from a small amount of tax withheld from her wages, Sally Jim failed to make estimated payments of tax or pay her tax liability when due.

10.     For decades prior to 1990, the Tribe made per capita distributions to its members, in generally *de minimis* amounts.  These distributions were funded by a tribal tax levied on gross sales.

13939388.1

11.     Around 1990, the Tribe started operating its gaming facility referred to as the Bingo Hall or MIBG.  The Tribe's gaming facility offers so-called class II gaming, including high-stakes bingo, poker, and video pull-tab machines.

12.     When its gaming facilities began generating large amounts of income, the Tribe's ability to distribute large sums of money to its members increased.

13.     In response to the passage of 26 U.S.C. § 3402(r), which required tribes to withhold federal income tax from distributions of net gaming revenue, the Tribe devised a scheme to argue that its distributions did not constitute "net revenue" from gaming for purposes of the statute.  Specifically, the Tribe enacted a so-called "gross receipts tax" or "gross receipts license fee" which it applied to its gaming facility.  The Tribe's license fee is a percentage of the gross revenue of the Bingo Hall.  The Tribe places the license fee into what it terms a NTDR ("non-taxable distributable revenue") account.

14.     The Tribe initially set the license fee at 6.5% of gross revenue in 1995.  The Tribe later increased the fee to more than 8% of gross revenue.  Since its establishment, the Tribe has made per capita distributions to tribal members from its NTDR account.

15.     Virtually all, if not all, of the Tribe's distributions constitute in substance distributions of net gaming revenue.

16.     The Tribe makes decisions through its Business Council and its General Council. The General Council of the Tribe consists of every member of the Tribe over 18.  The General Council meets quarterly.

17.     Sally Jim attended numerous General Council meetings.  For those she did not attend, she sometimes learned of the substance of the meetings from her sisters.

3

18.     At each meeting, the finance director or treasurer reports to the General Council that funds are available in the NTDR account for distribution.  The General Council then approves making a distribution and sets a distribution date, usually about 30 days from the date of the meeting.  Whether the Tribe made a distribution depended only on whether funds were available for distribution and whether the General Council of the Tribe approved distribution. The General Council approved distributions whenever funds were available.  The amount of distributions depended only on the amount of funds available, which in turn depended on the performance of the Tribe's gaming facility.

19.     On the date of distributions, the head of household generally picks up a check equal to the per capita amount of the distribution multiplied by the number of members in that person's household.  The amount of the distribution is equal to all members but the specific amount of the check may vary depending on whether a tribal member took a loan in advance of the distribution, whether a tribal member directed the Tribe to deposit a certain amount in a brokerage account for the member's benefit, and whether the tribal member directed the Tribe to make a large purchase for the member's benefit.

20.     The Tribe's distributions are not based on the needs of the recipient, and the only guideline to be eligible for distribution is that the recipient must be a member of the Tribe. The Tribe "cashes" most tribal members' checks immediately, essentially handing out prepared envelopes full of cash.

21.     During 2001, Sally Jim had four eligible members of her household for whom she received per capita distributions.  The per capita distributions were solely within her control. She directed a portion of her distribution to be placed in an account ostensibly for the benefit of

4

one of her daughters, though she retained access to the money and eventually spent it on household expenses.

22.     From before 1995 to 2009, Billy Cypress was chairman of the Tribe. Although Chairman Cypress told tribal members that distributions from the Tribe were not subject to federal income tax and instructed members not to report distributions on their federal income tax returns, Cypress often instructed members at General Council meetings not to disclose that they were receiving distributions to persons outside the Tribe.  Chairman Cypress's primary message was that tribal members did not have to pay tax on distributions only as long as the IRS did not know about them.  Sally Jim recalls Billy Cypress stating that "if the IRS were to find out about these monies, then we could end up being taxed."  As part of Cypress's scheme to hide the distributions from the IRS, Cypress repeatedly instructed members not to report distributions on credit applications.

23.     Sally Jim was aware of these instructions and following these instructions did not report distributions as income when applying for financing to purchase a truck.

24.     Cypress additionally instructed members not to cash their distribution checks in places where they would be reported to the IRS.  He stated that the only way the tribal member's money will not be reported to the IRS is if they cash their checks at the Administration office. He stated that if a tribal member also had a banking account (with a substantial amount of money) then this would be reported and IRS would investigate how the money was obtained. Sally Jim was aware of these instructions.

25.     Tribal members were told to allow the Tribe to make large purchases for them so that the IRS could not trace purchases to individual tribal members.

13939388.1

26.     Cypress also notified members that the Tribe would keep a reserve should the members ultimately have to pay taxes on their distributions.  Cypress's statement that distributions were not taxable but that the Tribe would nonetheless establish a reserve raised concerns among tribal members.

27.     Cypress discussed on several occasions that other tribes' members were paying tax on distributions.

28.     Sally Jim lives in a house provided by the Tribe.  She additionally has several programs available to her and the members of her household, including programs providing education, medical care, and elder care. If tribal members are unable to pay bills such as their electric bill or pay for necessary repairs to their homes, the Tribe will step in and cover those costs.

29.     Lands generating tribal income are held in trust for the Tribe, and not for Sally Jim personally.

30.     At her deposition, Sally Jim first refused to state why she failed to file tax returns when due, citing her Fifth Amendment privilege.  She later conceded that she had the paperwork ready to file her tax return for 2001, but "just completely forgot to file that year."

31.     Sally Jim claims to have relied on Billy Cypress, not legal advice from the Tribe's attorney Dexter Lehtinen, in choosing not to report or pay tax on distributions.  Billy Cypress is not a tax expert.

32.     Sally Jim claims to have spent the entire amount of her distributions for 2001 on household expenses.  The amount of Sally Jim's distributions vastly exceeds the amount of necessary household expenses for a household of four in Miami during 2001.

13939388.1

33.     The Tribe's only specified guideline for the Tribe's distribution scheme is that the recipient must be a member of the Tribe.

34.     The Tribe's distribution scheme was not based on need and not designed to meet any specific need of the recipient.  The distributions made under the distribution scheme were lavish and extravagant.

35.     Once a Tribal member received a distribution, the Tribe placed no limitations on the recipient's use of the distribution.

36.     The Tribe did not attempt to designate the distributions at issue as "general welfare" until after the commencement of this suit.

## CONCLUSIONS OF LAW

1.     Sally Jim is subject to federal income tax on all her income from whatever source derived.   26 U.S.C. § 61.

2.     Indian tribes are not subject to federal income taxation; however, individual American Indians are subject to the same requirement to pay income taxes as non-Indians, unless specifically exempted by a treaty or agreement with the tribe or an act of Congress.  *Squire v. Capoeman*, 351 U.S. 1, 6 (1956); *Doxtator v. Comm'r*, T.C. Memo. 2005-113 (2005) (collecting cases).

3.     In 2001, Sally Jim received taxable income, including salary, gambling winnings, and per capita distributions of net gaming revenue, from the Tribe.

4.     There is no specific exemption from taxation that applies to the income at issue in this case.

5.     Congress explicitly intended for tribal members to be taxed on per capita distributions of gaming revenue.

13939388.1

6.      Congress indicated its intent to tax per capita distributions of net gaming revenue in the Indian Gaming Regulatory Act.  25 U.S.C. § 2710(b)(3) and (d)(1)(ii).

7.      Per capita distributions of net gaming revenue are subject to income tax withholding under 26 U.S.C. § 3402(r).

8.      The per capita distributions to Sally Jim are not excludable from income as general welfare payments.

9.      Longstanding IRS practice excludes general welfare payments, including those from tribes to tribal members, from taxable income.  *E.g.*, *Maines v. Comm'r*, No. 14699-12, 2015 WL 1062997, at *9 (T.C. Mar. 11, 2015); *Bailey v Comm'r*, 88 T.C. 1293, 1299-1301 (1987); *Graff v. Comm'r*, 74 T.C. 743, 753-754 (1980), *aff'd per curiam*, 673 F.2d 784 (5th Cir. 1982); *Bannon v. Comm'r*, 99 T.C. 59, 63 (1992).

10.     The Tribal General Welfare Exclusion Act, 26 U.S.C. § 139E, codified the existing administrative practices exempting general welfare payments from taxable income.

11.     The Tribe's per capita distributions do not constitute general welfare payments because they are not based upon the needs of the recipients, but are made on a per capita basis based upon the availability of net gaming revenues to the Tribe.  26 U.S.C. § 139E(b)(2)(B).

12.     The Tribe's distributions are not excluded from taxable income under the Tribal General Welfare Exclusion Act because the Tribe's distribution scheme is not administered under sufficient specified guidelines as required under 26 U.S.C. § 139E(b)(1).

13.      The Tribe's distributions are not excluded from taxable income under the Tribal General Welfare Exclusion Act because the Tribe's distributions are lavish and extravagant.  26 U.S.C. § 139E(b)(2)(C).

13939388.1

14.     Per capita distributions of net gaming revenue do not constitute general welfare. *Compare* 26 U.S.C. § 139E *with* 26 U.S.C. § 3402(r) *and* 25 U.S.C. § 2710(b)(3).

15.     The per capita distributions to Sally Jim are not exempt from individual income taxation as income from the land.  *Squire v. Capoeman*.  351 U.S. 1 (1956).

16.     The exemption for income from the land generally does not apply to personal income from lands held in trust communally for the benefit of the Tribe.  *United States v. Anderson*, 625 F.2d 910, 913-14 (9th Cir. 1980) (collecting cases).

17.     The Tribe's distributions are not income from the land because they were derived from net gaming revenue, and not from such activities as farming, ranching, oil and gas leases, or other activities which have been held to constitute income directly derived from the land.  *In re Cabazon Indian Casino*, 57 B.R. 398, 402 (9th Cir. 1985) ("The income derived from operating a casino stems in a far more important fashion from card playing, liquor sales and food preparation, than it does from the land alone."); *Doxtator v. Comm'r*, T.C. Memo. 2005-113 at * 9; *Campbell v. Commissioner*, T.C. Memo.1997–502.

18.     The Tribe's imposition of the gross receipts license fee and deposit of the proceeds of that fee into the NTDR account do not alter the fundamental nature of those proceeds as gaming revenues.  *Ocmulgee Fields, Inc. v. Comm'r*, 613 F.3d 1360, 1368 (11th Cir. 2010) ("[T]he substance of a transaction rather than the form which it is cast, ordinarily determines tax consequences.").

19.     Section 1750e, Title 25, United States Code is inapplicable to the questions of Sally Jim's individual income tax liability and to the taxability of the Tribe's distributions of net gaming revenue.

13939388.1

20.     Section 2210, Title 25, United States Code is inapplicable to distributions to individual tribal members and it does not exempt income that is not directly derived from the land.

21.     Section 459e, Title 25, United States Code, does not apply to this case.  This section refers to lands described in 25 U.S.C. § 459a, which does not include any land belonging to the Miccosukee Tribe.

22.     The IRS validly assessed Sally Jim unpaid income taxes, interest, and penalties for tax year 2001 on the basis of $25,990 in wages and $272,000 in per capita distributions of net gaming revenue.

23.     Sally Jim's failure to file a tax return for Tax Year 2001 was not the result of reasonable cause, nor can she show that it was not the result of willful neglect.

24.     Sally Jim's failure to timely pay the tax owed for Tax Year 2001 was not the result of reasonable cause, nor can she show that it was not the result of willful neglect.

25.     Sally Jim is liable for penalties under 26 U.S.C. §§ 6651(a)(1), (a)(2), and 6654.

26.     Sally Jim is liable to the United States in the amount of $278,758.83 as of April 9, 2015 for unpaid federal income taxes, penalties, and interest assessed against her for the 2001 Tax Year, plus interest and statutory additions accruing after April 9, 2015, until this amount is paid in full.

May 24, 2016

Respectfully submitted,

CAROLINE D. CIRAOLO

Acting Assistant Attorney General
Tax Division

10

By: s/ William E. Farrior
WILLIAM E. FARRIOR
S.D. Fla. Bar No. A5501479
U.S. Department of Justice
Trial Attorney, Tax Division
Post Office Box 14198
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-1908
Facsimile: (202) 514-9868
William.E.Farrior@usdoj.gov

Of Counsel:
WIFREDO A. FERRER
United States Attorney

Attorneys for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF and that it will be served accordingly on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

s/ William E. Farrior
WILLIAM E. FARRIOR
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 14198
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-1908
Facsimile: (202) 514-9868
William.E.Farrior@usdoj.gov

13939388.1