UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-22441-CIV-ALTONAGA/O'Sullivan

**UNITED STATES OF AMERICA**,

        Plaintiff,

v.

**SALLY JIM**,

        Defendant, and

**MICCOSUKEE TRIBE OF INDIANS
OF FLORIDA**,

        Intervenor-Defendant.
_____/

**ORDER SETTING FORTH COURT'S FINDINGS OF
FACT AND CONCLUSIONS OF LAW**

**THIS CAUSE** came before the Court for a non-jury trial from August 11 to 16, 2016. The Court has carefully considered the witnesses' testimony, the exhibits admitted into evidence, the parties' written submissions, and the applicable law. Based on a review of the record and pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law.

**I. INTRODUCTION**[1]

This case involves the tax liability of Defendant, Sally Jim ("Jim"), a member of Intervenor-Defendant, the Miccosukee Tribe of Indians (the "Tribe"), for the 2001 tax year. Jim did not timely file a tax return in 2001. In January 2015, she attempted to submit a belated 2001 tax return to the Internal Revenue Service ("IRS"), in which she stated she received $272,000.00

---

[1] These facts are summarized from the "Background" section of the June 3, 2016 Order ("MSJ Order") [ECF No. 173], granting in part Plaintiff, United States of America's Third Renewed Motion for Summary Judgment . . . [ECF No. 156].

in benefits from the Tribe as "other income," excluded from gross income as Indian general welfare benefits.

Since the 1960s, the Tribe has distributed quarterly payments in the form of checks or cash, issued in equal amounts to each tribal member. While these payment amounts were originally very small — about $20–25 several times a year — around 1990, the Tribe started operating a gaming facility known as the Bingo Hall or Miccosukee Indian Bingo Gaming (hereinafter, the "Bingo Hall"), offering class II gaming, including bingo, poker, and video pull-tab machines. The Bingo Hall began generating larger amounts of income, allowing the Tribe to distribute increased quarterly assistance payments to its members. Today, the Tribe's quarterly distributions reach into the tens of thousands of dollars per tribal member.

On December 8, 1994, Congress added a provision to the Internal Revenue Code, requiring American Indian tribes to withhold federal income tax from any payment of net revenue from class II gaming. *See* 26 U.S.C. § 3402(r). In response, the Tribe enacted a "gross receipts tax" or "gross receipts license fee," which it applied to its gaming facility. This license fee is a percentage of the gross revenue of the Bingo Hall, and the Tribe places the fee into a non-taxable distributable revenue ("NTDR") account. The Tribe distributes its quarterly assistance payments to its members from this NTDR account. The Tribe argues these payments do not constitute net revenue derived from gaming so as to render the payments taxable under 26 U.S.C. section 3402(r) or under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. section 2701 *et seq*. Rather, it asserts these payments are excludable from federal taxation as general welfare benefits or "income from the land."

Jim raised these same arguments when the IRS issued its tax assessment finding her indebted to the United States in the amount of $278,758.83 — including taxes on the

$272,000.00 in tribal distributions she received in 2001, as well as interest, penalties, and statutory additions. (*See generally* Response in Opposition . . . [ECF No. 159]). At the summary judgment stage, the Court concluded the Tribe's distributions, derived from gaming proceeds, are not excludable from federal taxation as general welfare payments or income from the land. (*See* MSJ Order 7–17). However, the undersigned found there were genuine issues of material dispute regarding: (1) what, if any, percentage of the distributions were derived from non-gaming sources; (2) whether the IRS's assessment was inflated because it included distributions made to Jim's husband and daughters; and (3) whether Jim was liable for penalties for her failure to file a tax return and pay taxes when due. (*See id.* 14–20). The case proceeded to a bench trial, and the Court limits its present Order to these three outstanding issues.

## II.  FINDINGS OF FACT

The Miccosukee Tribe distributes payments in the form of checks or cash issued in equal amounts to each tribal member on a quarterly basis. (*See* Joint Pre-Trial Stipulation ("Stipulation") [ECF No. 168] ¶¶ 15–18). While these payment amounts were historically very small — about $20–25 several times a year — in 1990, the Tribe started operating the Bingo Hall gaming facility, offering class II gaming, including high-stakes bingo, poker, and video pull-tab machines. (*See id.* ¶ 12). When its gaming facilities began generating large amounts of income, the Tribe's ability to distribute large sums of money to its members increased. (*See* Tr. Ex. 7, at 6 (noting that NTDR payments were "in accordance" with revenue at the Bingo Hall)).

Thereafter, the Tribe devised a mechanism to argue its distributions did not constitute "net revenue" from gaming for purposes of 26 U.S.C. section 3402(r), which required tribes to withhold federal income tax from distributions of net gaming revenue. (*See* Tr. Ex. 3, at 5 (noting the "new law placing taxation on payments made to tribal members from Indian Gaming

3

profits")). Specifically, the Tribe enacted a "gross receipts tax" or gross receipts license fee that it applied to its gaming facility. (Tr. Ex. 1; *see also* Tr. Ex. 3, at 5). The Tribe's license fee is a percentage of the gross revenue of the Bingo Hall. (*See* Stip. ¶ 13). The Tribe places the license fee into what it terms an NTDR account. (*See id.* ¶ 14). The Tribe makes per capita distributions to tribal members from this NTDR account. (*See* Tr. Ex. 5).

The vast majority, if not all, of the Tribe's distributions come from the Tribe's net gaming revenue. (*See* Tr. Ex. 46, at 3 (stating the total trust fund distributions for the year ending September 30, 2001 were $32,268,000.00), at 14 (stating the gross receipts license fee for the Bingo Hall was $32,103,681.00 and for Miccosukee Resort and Convention Center was $546,810.00 for the year ending September 30, 2001); Tr. Ex. 52, at 3, 11 (showing the Bingo Hall subsidized the Miccosukee Resort and Convention Center); Tr. Ex. 53, at 3 (showing total trust fund distributions for the year ending September 30, 2002 were $36,335,300.00), at 13 (showing the Bingo Hall paid $37,462,023.00 in gross receipts license fee for year ending September 30, 2002)). The Tribe produced no documentary evidence substantiating its claim that sources other than the Bingo Hall contributed to the NTDR account. (*See* Tr. Ex. 46, at 13–14 (not showing tribal leases and rentals paying any gross receipts license fee)). Tribal representative, Billy Cypress ("Cypress"), testified he could not suggest a percentage of the NTDR account deposits derived from non-gaming sources.

The day-to-day operations of the Tribe are managed by the Business Council, at the direction and approval of the General Council. The General Council of the Tribe consists of every member of the Tribe over 18. (*See* Stip. ¶ 16). The General Council meets quarterly. (*See id.*).

At each meeting, the finance director or treasurer reported to the General Council the available funds for distribution in the NTDR account. (*See id.* ¶ 18). The General Council then approved making a distribution and set a distribution date, usually about 30 days from the date of

the meeting. (*See id.*). Whether the Tribe made a distribution depended on whether funds were available for distribution and whether the Tribe's General Council approved distribution. (*See, e.g.*, Tr. Ex. 30, at 24). The amount of distributions depended on the funds available, which in turn depended on the performance of the Tribe's gaming facility. (*See* Tr. Ex. 7, at 6 (explaining NTDR distributions were in accordance with the revenue generated at the Bingo Hall)).

From before 1995 to 2009, Cypress was chairman of the Tribe. (*See* Stip. ¶ 20). Cypress testified that although he told tribal members distributions from the Tribe were not subject to federal income tax and instructed members not to report distributions on their federal income tax returns, he also instructed members at General Council meetings not to disclose they were receiving distributions to persons outside the Tribe. Cypress also instructed members not to report distributions to credit card agencies, and not to cash their distribution checks in places where they would be reported to the IRS. (*See also* Tr. Ex. 30, at 6). Cypress notified members the Tribe would keep a reserve should the members ultimately have to pay taxes on their distributions. (*See* Tr. Ex. 3, at 6). As a member of the Tribe, Jim attended many of these General Council meetings. (*See* Stip. ¶ 17).

During 2001, four members of Jim's household were entitled to receive distributions from the Tribe — Jim; her husband, Alex Osceola ("Alex"); her daughter, Alexis Osceola ("Alexis"); and her adopted daughter, Tamara Jim ("Tamara"). (*See id.* ¶ 19). The Tribe's distributions were not based on the needs of the recipient, and the only guideline to be eligible for distribution was that the recipient must be a member of the Tribe. (*See id.* ¶ 15). Jim testified the Tribe is a matriarchal society; thus, tribal custom establishes the mother is the head of the household. When the Tribe made quarterly distribution payments, Jim, as the head of

5

household, generally picked up a check equal to the per capita amount of the distribution multiplied by the number of members in her household.

Pursuant to Tribal law, custom, and tradition, Jim frequently received the distributions on behalf of all four members of her household, in cash. Jim testified she gave one-fourth of the distributions to Alex; however, Alex testified he never filed a tax return reporting receipt of distributions from the Tribe, including for the 2001 tax year. Jim also testified she saved portions of her daughters' distributions in tribal trusts for their future benefit, and used the remaining funds to provide for herself, her daughters, and their general welfare needs. She did not provide any documentary evidence of the existence of these trusts. Furthermore, her daughter, Alexis, testified she did not file a tax return reporting distributions from the Tribe for the 2001 tax year.

Jim testified she spent the entire amount of her distributions for 2001 on household expenses. Yet, the amount of Jim's distributions vastly exceeds a reasonable amount of necessary expenses for a household of four in Miami during 2001, especially considering the Tribe provided housing for Jim's family, and education and subsidized healthcare for her children. (*See id.* ¶ 21). If tribal members are unable to pay bills, such as their electric bill, or pay for necessary repairs to their homes, the Tribe may step in and cover those costs. (*See id.*).

Jim did not file a tax return for the 2001 tax year. Jim testified she was aware of the need to file a tax return; had the ability to file tax returns; and had previously filed tax returns using H&R Block. At her deposition, Jim conceded she had the paperwork ready to file her tax return for 2001, but "just completely forgot to file that year." (Deposition of Sally Jim ("Jim Deposition") [ECF No. 156-7] 58:1–4 ("Q: Could you describe what efforts you took if any to determine whether you needed to file a tax return for 2001? A: I think I had everything ready,

but I just completely forgot to file that year.")). In contrast, at trial Jim testified she both forgot and thought she did not have to file a tax return based on instructions from the Tribe's former attorney, Dexter Lehtinen ("Lehtinen"), as well as advice from Cypress and the Business Council. The Court finds this testimony conflicts with her deposition testimony, and so her reasons for not filing a tax return are not credible.[2]

In January 2015, Jim attempted to submit a belated 2001 tax return to the IRS. (*See* Stip. ¶ 11). In that return, she stated she received $272,000.00 in benefits from the Tribe, which she listed as "other income" but "excluded from gross income" as Indian general welfare benefits. (*See id.*). Jim also reported receiving $25,990.00 in wages in 2001 from her employment in the Tribe's healthcare facility. (*See id.* ¶ 9). Apart from a small amount of tax withheld from her wages, Jim failed to make any estimated payments of tax or pay her tax liability when due. (*See id.* ¶ 10).

On the dates and in the amounts set forth below, a delegate of the Secretary of the Treasury made assessments against Jim for federal income tax liabilities, penalties, and interest for the 2001 tax year:

| Tax Year | Date Assessed | Tax Assessed | Penalties Assessed | Interest Assessed |
|---|---|---|---|---|
| 2001 | 09/13/2004 | $15,498.00 | $2,551.95* $1,644.59** $430.55*** | $1,783.72 |
| | 06/26/2006 | | $1,190.91** | |
| | 12/31/2012 | $95,823.00 | $21,560.18* $3,833.70*** | |

*late filing penalty – 26 U.S.C. § 6651(a)(1)
**failure to pay penalty – 26 U.S.C. § 6651(a)(2)
***estimated tax penalty – 26 U.S.C. § 6654

---

[2] Lehtinen testified he never represented Jim or any other individual member of the Tribe. He stated he never instructed Jim not to file her federal income tax returns, nor did he instruct her not to pay tax on the distributions she received from the NTDR account.

(*See id.* ¶ 1). Despite notices and demands for payment, Jim failed to pay these federal income tax liabilities in full. (*See id.* ¶ 2). Thus, as of April 9, 2015, the IRS found Jim indebted to the United States for 2001 federal income tax liabilities in the amount of $278,758.83. (*See* Tr. Ex. 71).

### III. CONCLUSIONS OF LAW

#### A. Percentage of Tribal Distributions Derived from Non-Gaming Sources

Jim is subject to federal income tax on all her income from whatever source derived. *See* 26 U.S.C. §§ 1, 61. While Indian tribes are not subject to federal income taxation, individual American Indians are subject to the same requirement to pay income taxes as non-Indians, unless specifically exempted by a treaty or agreement with the tribe or an act of Congress. *See Squire v. Capoeman*, 351 U.S. 1, 6 (1956); *Doxtator v. Comm'r*, T.C. Memo. 2005-113, 2005 WL 1163978, at *4 (T.C. May 18, 2005) (collecting cases). In 2001, Jim received taxable income, including salary and per capita distributions of net gaming revenue, from the Tribe. Once a tax assessment is proven, "the taxpayer must then prove that the assessment is erroneous in order to prevail." *United States v. White*, 466 F.3d 1241, 1248 (11th Cir. 2006) (citation omitted).

The Court concluded at summary judgment the Tribe's distributions, derived from gaming proceeds, are not exempted from federal taxation as general welfare payments or income from the land. (*See* MSJ Order 7–17). But there was a genuine issue of material fact regarding what, if any, percentage of the distributions was derived from non-gaming sources. (*See id.* 20). At trial, Defendant and Intervenor-Defendant did not present any evidence identifying a specific percentage of the distributions derived from non-gaming sources. Accordingly, the Court finds there is no exemption from taxation that applies to the income at issue in this case.

### B. Distributions Made to Jim's Husband and Daughters

At summary judgment, the Court also found a genuine issue of material fact regarding whether the IRS's assessment of Jim's tax liability was inflated because it included distributions made to Jim's husband and daughters. (*See id.* 14–15). "Gain, lawful or unlawful, constitutes taxable income 'when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it.'" *United States v. Mueller*, 74 F.3d 1152, 1155 (11th Cir. 1996) (quoting *Rutkin v. United States*, 343 U.S. 130, 137 (1952)). Upon considering the testimony and evidence presented at trial, the Court concludes Jim exercised sufficient control over the full amount of tribal distributions she received; thus, the IRS properly calculated its assessment.

First, in 2015, when Jim attempted to submit a belated 2001 tax return to the IRS, she reported $272,000.00 in benefits from the Tribe on her personal *individual* tax return. (*See* Stip. ¶ 11; Tr. Ex. 67). The figure $272,000.00 is the full amount of tribal distributions Jim received on behalf of herself, Alex, and their daughters. (*See* Stip. ¶¶ 7–8). Significantly, Alex and Alexis both testified they did not file tax returns for 2001 claiming any amount of tribal benefits.

Second, while Jim testified she saved portions of her daughters' distributions in tribal trusts for their future benefit, she did not provide any documentary evidence of the existence of these trusts. Furthermore, at her deposition, Jim admitted her family ended up spending all the money in her daughter, Tamara's trust account on household expenses. (*See* Jim Dep. 48:19–49:5).

Finally, the Tribe is a matriarchal society; thus, tribal custom establishes Jim as the head of the household. (*See* Stip. ¶ 4). Payments the Tribe makes to a male member of the Tribe who is married to a female member of the Tribe are generally made available to the female member.

(*See id.* ¶ 5). Similarly, payments the Tribe makes to minor children who are members of the Tribe are generally made available to the individual who is the head of household for those minor children — in this case, Jim. (*See id.* ¶ 6). Jim testified if she and Alex were to divorce, any marital property would go to her, and Alex would vacate the home.

Considering the evidence submitted at trial in its totality, the Court concludes Jim sufficiently controlled the total amount of distributions her family received from the Tribe. Again, Jim even admitted the full amount as her personal income by including that figure on the tax return she submitted in 2015. Thus, the Court finds the IRS did not improperly inflate Jim's tax liability by including the full amount of the tribal distributions she received on behalf of her family.

### C. Liability for Penalties for Jim's Failure to File a Tax Return and Pay Taxes When Due

Under 26 U.S.C. section 6651(a)(1), if a taxpayer fails to timely file her tax return, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect," the IRS shall impose a penalty in the form of "5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate . . . ." *Id.* (alteration added). Similarly, 26 U.S.C. section 6651(a)(2) provides that "unless it is shown that such failure is due to reasonable cause and not due to willful neglect," if a taxpayer fails to timely pay her required taxes, the IRS shall impose a penalty in the form of "0.5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate." *Id.*

The term "willful neglect" may be read as meaning "a conscious, intentional failure or

reckless indifference," while "reasonable cause" calls on the taxpayer to demonstrate she exercised "ordinary business care and prudence" but nevertheless was "unable to file the return within the prescribed time." *United States v. Boyle*, 469 U.S. 241, 245–46 (1985) (internal quotation marks and citation omitted); *see also In re Sanford*, 979 F.2d 1511, 1514 n.8 (11th Cir. 1992) (noting Treasury Regulation § 301.6651-1(c)(1) "considers a delay in filing a required return to be due to reasonable cause if the taxpayer 'exercised ordinary business care and prudence in providing for payment of his tax and was nevertheless either unable to pay the tax or would suffer an undue hardship' if he paid the tax on time" (internal quotation marks omitted)). While under some circumstances reliance on a tax expert may constitute reasonable cause for failing to meet a deadline "where [the] taxpayer made full disclosure to [the] expert, [and] relied on his advice," *James v. United States*, No. 8:11-CV-271-T-30AEP, 2012 WL 3522610, at *3 (M.D. Fla. Aug. 14, 2012) (alterations added), simply forgetting to file a return does not constitute reasonable cause, *see Halbin v. C.I.R.*, 97 T.C.M. (CCH) 1066, *4 (T.C. 2009).

During her deposition, Jim admitted she forgot to file her 2001 tax return. (*See* Jim Dep. 58:1–4 ("Q: Could you describe what efforts you took if any to determine whether you needed to file a tax return for 2001? A: I think I had everything ready, but I just completely forgot to file that year.")). At trial Jim testified she was aware of the need to file a tax return; had the ability to file tax returns; and had previously filed tax returns using H&R Block. While she also testified at trial that instructions from Cypress, Lehtinen, and the Business Council lead her to believe she did not have to file her 2001 tax return, the Court finds this testimony not credible.

Specifically, even if Cypress and the Business Council advised Jim she did not need to file a tax return, these individuals are not tax experts upon whom Jim could rely to establish reasonable cause. *Cf. James*, 2012 WL 3522610, at *3. Neither could Jim rely upon Lehtinen's

advice to establish reasonable cause. Lehtinen testified: (1) he never represented Jim or any other individual member of the Tribe; and (2) he never instructed Jim not to file her federal income tax returns, nor did he instruct her not to pay tax on the distributions she received from the NTDR account. Additionally, this is not a situation where Jim asserted a "sincere, albeit erroneous, belief" that her tribal distributions were not subject to federal income tax. *Jourdain v. Comm'r of Internal Revenue*, 71 T.C. 980, 991 (1979), *aff'd sub nom. Jourdain v. C. I. R.*, 617 F.2d 507 (8th Cir. 1980). To the contrary, Cypress's testimony revealed the Tribe instructed its members, including Jim, to take active measures to conceal from the IRS their distributions from the NTDR account.

Accordingly, the Court finds Jim has not established her failure to timely file her 2001 tax return is excused by reasonable cause; thus, sanctions are appropriate pursuant to 26 U.S.C. sections 6651(a)(1) and (2). Sally Jim is liable to the United States in the amount of $278,758.83, as of April 9, 2015, for unpaid federal income taxes, penalties, and interest assessed against her for the 2001 Tax Year, until this amount is paid in full.

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that final judgment will be entered by separate order in favor of the United States of America and against Sally Jim. Plaintiff is instructed to submit a proposed order[3] of final judgment by **August 25, 2016**.

---

[3] Pursuant to the CM/ECF Administrative Procedures, proposed orders shall be filed as an attachment to a motion, notice, or other filing. The proposed document must also be e-mailed to altonaga@flsd.uscourts.gov. The proposed document shall be submitted by e-mail in Word format. The e-mail line and the name of the attachment should include the case number, followed by a short description of the attachment (e.g., 00-cv-00000 Order).

CASE NO. 14-22441-CIV-ALTONAGA/O'Sullivan

**DONE AND ORDERED** in Miami, Florida, this 19th day of August, 2016.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:	counsel of record